**20-cv-05083 (RA)**
**20-cv-05823 (RA)**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

*In re LEHMAN BROTHERS HOLDINGS INC.*, *et al.*,

*Debtors.*

JOSEPH WASKE,

*Appellant,*

—against—

LEHMAN BROTHERS HOLDINGS INC.,

*Appellee.*

REX WU,

*Appellant,*

—against—

LEHMAN BROTHERS HOLDINGS INC.,

*Appellee.*

ON APPEAL FROM THE UNITED STATES BANKRUPTCY COURT FOR
THE SOUTHERN DISTRICT OF NEW YORK (CHAPMAN, J.)

*IN RE: LEHMAN BROTHERS HOLDINGS INC., ET AL*
CASE NO. 08-13555

**APPENDIX TO BRIEF FOR APPELLEE, PART I**

WEIL, GOTSHAL & MANGES LLP
Garrett A. Fail
Jason Hufendick
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Email: Garrett.Fail@weil.com
Email: Jason.Hufendick@weil.com

*Attorneys for Appellee Lehman Brothers Holdings Inc.*

## TABLE OF CONTENTS

| Item No. | DESCRIPTION | DATE | DOCKET ENTRY | APPENDIX PAGE |
|---|---|---|---|---|
| 1. | Order Establishing the Deadline for Filing Proofs of Claim, Approving the Form and Manner of Notice Thereof and Approving the Proof of Claim Form | 7/02/2009 | 4271 | A001 |
| 2. | Debtors Disclosure Statement for Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and its Affiliated Debtors Pursuant to Section 1125 of the Bankruptcy Code | 9/01/2011 | 19629 | A033 |
| 3. | Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and its Affiliated Debtors filed by Lori R. Fife on behalf of Lehman Brothers Holdings Inc. | 11/29/2011 | 22737 | A197 |
| 4. | Order Confirming Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and Its Affiliated Debtors | 12/06/2011 | 23023 | A423 |
| 5. | Motion for an Order Enforcing the Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and Its Affiliated Debtors for Purposes of Distributions | 4/08/2019 | 59614 | A484 |
| 6. | Joinder of M. Gregory Rex Wu's Motion | 4/25/2019 | 59659 | A492 |
| 7. | Joinder of Dan Ianello to Motion of Rex Wu to Approve Motion for an Order Enforcing the Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and its Affiliated Debtors for Purposes of Distributions | 5/23/2019 | 59735 | A494 |

WEIL:\97670049\1\58399.0011

| Item No. | DESCRIPTION | DATE | DOCKET ENTRY | APPENDIX PAGE |
|---|---|---|---|---|
| 8. | Joinder of Julie Ianello to Motion of Rex Wu to Approve Motion for an Order Enforcing the Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and its Affiliated Debtors for Purposes of Distributions | 5/23/2019 | 59736 | A496 |
| 9. | Plan Administrator's Objection to Motion to Allow Late Claim | 5/29/2019 | 59738 | A498 |
| 10. | Joinder of Alex Olivo to Rex Wu's Motion | 5/31/2019 | 59741 | A509 |
| 11. | Joinder of Glen A. Blaze to Rex Wu's Motion | 6/03/2019 | 59753 | A511 |
| 12. | Joinder of Elizabeth Harrison to Rex Wu's Motion | 6/04/2019 | 59755 | A513 |
| 13. | Motion to Reclassify by Joseph J. Waske | 1/02/2020 | 60337 | A515 |
| 14. | Joinder of Rex Ru to Motion to Reclassify | 1/07/2020 | 60348 | A524 |
| 15. | Plan Administrator's Objection to Motion to Reclassify | 1/21/2020 | 60378 | A527 |
| 16. | Letter to Judge Chapman, by Rex Wu | 1/30/2020 | 60400 | A538 |
| 17. | Response to Plan Administrators Objection to Motion to Reclassify | 1/31/2020 | 60403 | A540 |

WEIL:\97670049\1\58399.0011

| Item No. | DESCRIPTION | DATE | DOCKET ENTRY | APPENDIX PAGE |
|---|---|---|---|---|
| 18. | Waske's Motion to Reserve for Motion to Reclassify | 2/25/2020 | 60448 | A557 |
| 19. | Waske's Motion for Summary Judgment | 3/20/2020 | 60484 | A568 |
| 20. | Plan Administrator's Objection to Motion to Reserve | 3/24/2020 | 60482 | A573 |
| 21. | Order of U.S. District Court Judge Paul A. Engelmayer Dismissing Ianello/Wu Appeal | 4/01/2020 | 60495 | A579 |
| 22. | Notice of Telephonic Hearing | 4/06/2020 | 60498 | A582 |
| 23. | Letter to Judge Chapman, by Joseph J. Waske | 4/09/2020 | 60507 | A584 |
| 24. | Memorandum Endorsed Order Denying Request | 4/14/2020 | 60508 | A585 |
| 25. | Notice of Memorandum Endorsed Order Denying Request | 4/14/2020 | 60509 | A586 |
| 26. | Response to Plan Administrator's Objection to Motion to Reserve | 4/20/2020 | 60542 | A588 |
| 27. | Plan Administrator's Objection to Motion for Summary Judgement | 5/18/2020 | 60641 | A604 |
| 28. | Response to Plan Administrator's Objection to Motion for Summary Judgement | 5/19/2020 | 60642 | A608 |
| 29. | Notice of Agenda of Matters Scheduled for Hearing on June 3, 2020 on June 3, 2020 at 10:00 a.m. | 5/28/2020 | 60653 | A616 |

WEIL\97670049\1\58399.0011

| Item No. | DESCRIPTION | DATE | DOCKET ENTRY | APPENDIX PAGE |
|---|---|---|---|---|
| 30. | Letter to Honorable Shelley C. Chapman, by Rex Wu | 6/03/2020 | 60655 | A619 |
| 31. | Order Denying (I) Motion to Reclassify; (II) Motion to Reserve for Motion to Reclassify; and (III) Motion for Summary Judgment | 6/11/2020 | 60678 | A621 |
| 32. | Transcript from Hearing Held on June 3, 2020 | 6/23/2020 | 60697 | A623 |
| 33. | Transcript from Hearing Held on June 19, 2019 | 6/19/2019 | 60753 | A647 |
| 34. | Capital Trust III Allowed Claim No. 21805 against LBHI | 9/21/2009 | 59911 | A738 |
| 35. | Capital Trust IV Allowed Claim No. 22122 against LBHI | 9/21/2009 | 59911 | A745 |
| 36. | Capital Trust V Allowed Claim No. 22123 against LBHI | 9/21/2009 | 60753 | A752 |
| 37. | Capital Trust VI Allowed Claim No. 67753 against LBHI | 11/30/2011 | 60753 | A759 |

5

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------x
                                                      :
In re                                                 :        **Chapter 11 Case No.**
                                                      :
**LEHMAN BROTHERS HOLDINGS INC.,** *et al.*,          :        **08-13555 (JMP)**
                                                      :
                              **Debtors.**            :        **(Jointly Administered)**
                                                      :
                                                      :
-------------------------------------------------------------------x

### ORDER PURSUANT TO SECTION 502(b)(9) OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3003(c)(3) ESTABLISHING THE DEADLINE FOR FILING PROOFS OF CLAIM, APPROVING THE FORM AND MANNER OF NOTICE THEREOF AND APPROVING THE PROOF OF CLAIM FORM

Upon the motion, dated May 26, 2009 (the "<u>Motion</u>"),[1] of Lehman Brothers

Holdings Inc. and its affiliates, as debtors and debtors in possession in the above referenced

chapter 11 cases (collectively, the "<u>Debtors</u>"),[2] pursuant to sections 502(b)(9) of the Bankruptcy

Code and Bankruptcy Rule 3003(c)(3) seeking an order (i) establishing the deadline for filing

proofs of claim, (ii) approving the form and manner of notice thereof and (iii) approving the

proof of claim form, all as more fully set forth in the Motion; and the Court having jurisdiction to

consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334 and

---

[1] Unless otherwise defined herein, capitalized terms used herein shall have the meanings ascribed thereto in the Motion.

[2] Lehman Brothers Holdings Inc. (08-13555); LB 745 LLC (08-13600); PAMI Statler Arms LLC (08-13664); Lehman Brothers Commodity Services Inc. (08-13885); Lehman Brothers Special Financing Inc. (08-13888); Lehman Brothers OTC Derivatives Inc, (08-13893); Lehman Brothers Derivatives Products Inc. (08-13899); Lehman Commercial Paper Inc. (08-13900); Lehman Brothers Commercial Corporation (08-13901); Lehman Brothers Financial Products Inc. (08-13902); Lehman Scottish Finance L.P. (08-13904); CES Aviation LLC (08-13905); CES Aviation V LLC (08-13906); CES Aviation IX LLC (08-13907); East Dover Limited (08-13908); Luxembourg Residential Properties Loan Finance S.a.r.l. (09-10108); BNC Mortgage LLC (09-10137); Structured Asset Securities Corporation (09-10558); LB Rose Ranch LLC (09-10560); and LB Kalakaua Owners LLC (09-12516).

the Standing Order of Referral of Cases to Bankruptcy Court Judges of the District Court for the

Southern District of New York, dated July 19, 1984 (Ward, Acting C.J.); and consideration of

the Motion and the relief requested therein being a core proceeding pursuant to 28 U.S.C.

§ 157(b); and venue being proper before this Court pursuant to 28 U.S.C. § § 1408 and 1409; and

due and proper notice of the Motion having been provided to the Notice Parties; and it appearing

that no other or further notice need be provided; and the Court having determined that the relief

sought in the Motion is in the best interests of the Debtors, its creditors and all parties in interest;

and upon the record of the hearings held on June 24, 2009 and June 29, 2009; and the Court

having determined that the legal and factual bases set forth in the Motion establish just cause for

the relief granted herein; and after due deliberation and sufficient cause appearing therefore, it is

ORDERED that the Motion is granted; and it is further

ORDERED that, pursuant to Rule 3003(c)(3) of the Bankruptcy Rules, and except

as otherwise provided herein, **September 22, 2009, at 5:00 p.m. (prevailing Eastern Time)** is

established as the deadline (the "Bar Date") for each person or entity (including, without

limitation, each individual, partnership, joint venture, corporation, estate, trust and governmental

unit) to file proofs of claim (each a "Proof of Claim") based on prepetition claims (as defined in

section 101(5) of the Bankruptcy Code) against the Debtors; and it is further

ORDERED that all Proofs of Claim filed against the Debtors must substantially

conform to the form attached as Exhibit B hereto ("Proof of Claim Form") and must be received

on or before the Bar Date by the official noticing and claims agent in the Debtors' chapter 11

cases, Epiq Bankruptcy Solutions, LLC ("Epiq") or the Court.  The original Proof of Claim Form

should be sent to the following address:

If by overnight mail, to:

Epiq Bankruptcy Solutions, LLC
Attn: Lehman Brothers Holdings Claims
Processing
757 Third Avenue, 3rd Floor
New York, New York 10017

If by hand delivery, to:

Epiq Bankruptcy Solutions, LLC
Attn: Lehman Brothers Holdings Claims
Processing
757 Third Avenue, 3rd Floor
New York, New York 10017

                or

Clerk of the United States Bankruptcy Court
Attn: Lehman Brothers Holdings Claims
Processing
One Bowling Green
New York, New York 10004

; and it is further

If by first-class mail, to:

Lehman Brothers Holdings Claims Processing
c/o Epiq Bankruptcy Solutions, LLC
FDR Station, P.O. Box 5286
New York, New York  10150-5076

ORDERED that Proofs of Claim will be deemed timely filed only if **actually**

**received** by Epiq or the Court on or before the Bar Date; and it is further

ORDERED that neither the Court nor Epiq shall be required to accept Proofs of

Claim sent by facsimile, telecopy, or electronic mail transmission; and it is further

ORDERED that the following persons or entities are **not** required to file a Proof

of Claim on or before the Bar Date:

(a)     any person or entity whose claim is listed on the Schedules and (i) whose claim is **not** described as "disputed," "contingent," or "unliquidated," and (ii) who does not dispute the amount, priority or nature of the claim set forth in the Schedules;

(b)     any person or entity whose claim has been paid in full by the Debtors;

(c)     any person or entity that holds an interest in the Debtors, which interest is based exclusively upon the ownership of common or preferred stock, membership interests, partnership interests, or warrants or rights to purchase, sell or subscribe to such a security or interest; **provided**, **however**, that interest holders who wish to assert claims (as opposed to ownership interests) against the Debtors that arise out of or relate to the ownership or purchase of an interest, including claims arising out of or relating to the sale, issuance, or distribution of the interest, must file Proofs of Claim on or before the Bar Date, unless another exception identified herein applies;

(d)     any person or entity that holds a claim that has been allowed by an order of this Court entered on or before the Bar Date;

(e)     any holder of a claim for which a separate deadline is fixed by this Court;

(f)     any holder of a claim who has already properly filed a Proof of Claim with the Clerk of the Court or Debtors' court-approved claims agent, Epiq, against the Debtors utilizing a claim form which substantially conforms to the Proof of Claim Form; **provided**, **however**, any holder that has filed a Proof of Claim based on a Derivative Contract or a Guarantee on or prior to the Bar Date, is required to amend such Proof of Claim to conform to the procedures set forth in this Motion for the filing of Proofs of Claims based on Derivative Contracts and Guarantees;

(g)     any holder of any claim solely against (i) Lehman Brothers Inc. or (ii) any other entity affiliated with the Debtors that is involved in a bankruptcy, insolvency proceeding or similar proceeding, in a foreign jurisdiction; **provided**, **however**, if such claim is based on an obligation guaranteed by a Debtor, the holder of such claim must file a Proof of Claim on or before the Bar Date;

(h)     any holder of a security listed on the Master List of Securities available on the Debtors' website http://www.lehman-docket.com (the "Master List of Securities") due to the fact that the indenture trustee for such securities will file a global proof of claim on behalf of all holders of securities issued thereunder; (Wilmington Trust Company, US Bank National Association, and the indenture trustee for each of the other securities included on the Master List of Securities, each will file a global proof(s) of claim on behalf of all holders of securities for which it is identified as Indenture Trustee on the Master List of Securities); **provided**, **however**, that security holders who wish to assert claims against the Debtors arising out of or relating to the sale, issuance, or distribution of a security, must file Proofs of Claim on or before the Bar Date, unless another exception identified herein applies; and

(i)　　any entity included on the Exempt Entities List available on the Debtors' website http://www.lehman-docket.com (the "Exempt Entities List") and any subsidiary for which the entity on the Exempt Entities List owns at least a fifty percent equity interest in such subsidiary, specifically excluding any subsidiary that is in a bankruptcy, insolvency or similar proceeding in a foreign jurisdiction and Lehman Brothers Inc.;

and it is further

ORDERED that, any holder of a security that is not listed on the Master List of Securities may request that a security be added to the Master List of Securities by completing the form entitled "Inquiry Regarding Security Not on Master List of Securities" available on the Debtors' website http://www.lehman-docket.com and submitting it to the Debtors as directed on such form on or prior to August 5, 2009.  The Debtors will investigate the inquiry and within 15 days of the receipt of such inquiry, the Debtors will (x) add the security to the Master List of Securities (if appropriate) or (y) provide an explanation solely to the party submitting such inquiry as to why the security will not be added to the Master List of Securities.  The Master List of Securities listed on the website shall be **final** as of August 20, 2009; and it is further

ORDERED that any security that is listed on the Master List of Securities is not a Derivative Contract and the holders of such security are not required to complete the Derivative Questionnaire on account of such security; and it is further

ORDERED that a holder (or any other party authorized under the Bankruptcy Code and the Bankruptcy Rules to submit a Proof of Claim on behalf of such holder) of a security that is guaranteed by a Debtor shall be required to file a Proof of Claim against such Debtor based on the Guarantee and complete the Guarantee Questionnaire; and it is further

ORDERED that any person or entity that holds a claim arising from the rejection of an executory contract or unexpired lease must file a Proof of Claim based on such rejection by

the later of (i) the Bar Date and (ii) the date which is forty-five (45) days following the effective date of such rejection or be forever barred from doing so; and it is further

ORDERED that each Proof of Claim must: (i) be written in the English language; (ii) be denominated in lawful currency of the United States; (iii) conform substantially with the Proof of Claim Form; (iv) state the name and case number of the specific Debtor against which it is filed; (v) set forth with specificity the legal and factual basis for the alleged claim; (vi) include supporting documentation or an explanation as to why documentation is not available; and (vii) be signed by the claimant or by an authorized agent of the claimant; and it is further

ORDERED that for the purposes of this Order, the term "Derivative Contract" shall mean any contract that is any of (i) a "swap agreement" as such term is defined in section 101(53B) of the Bankruptcy Code or (ii) a "forward contract" as such term is defined in section 101(25) of the Bankruptcy Code; provided that a cash-market purchase or sale of a security or loan (i.e. any purchase or sale of a security or loan for settlement within the standard settlement cycle for the relevant market), exchange-traded future or option, securities loan transaction, repurchase agreement in respect of securities or loans, and any guarantee or reimbursement obligations which would otherwise be included in the definition of "swap agreement" or "forward contract" pursuant to the definition of such terms in the Bankruptcy Code shall not be considered a Derivative Contract for the purposes of this definition; provided further that, any notes, bonds, or other securities issued by the Debtors or their affiliates (including, but not limited to, Lehman Brothers Holdings Inc., Lehman Brothers Treasury Co. B.V., Lehman Brothers Bankhaus AG, Lehman Brothers Holdings plc, Lehman Brothers Securities N.V., and Lehman Brothers (Luxembourg) Equity Finance S.A.) shall not be considered "Derivatives Contracts" within the meaning of this Order; and it is further

ORDERED that each holder of a claim against a Debtor based on amounts owed

pursuant to any Derivative Contract must:

(a)     on or before the Bar Date, fill-out and return a Proof of Claim in the same manner as all other claimants;

(b)     check the appropriate box on the Proof of Claim;

(c)     on or before **October 22, 2009, at 5:00 pm (prevailing Eastern Time)** (the "Questionnaire Deadline"), log on to http://www.lehman-claims.com, enter the unique identification number included (the "Unique ID Number") on the Proof of Claim mailed to such holder by the Debtors and complete the electronic Derivative Questionnaire, substantially in the form attached as Exhibit C hereto (the "Derivative Questionnaire"); and

(d)     on or before the Questionnaire Deadline, electronically upload supporting documentation on the website (as required in the Derivative Questionnaire), rather than attaching such documents to the Proof of Claim;

and it is further

ORDERED that each holder of a claim against a Debtor based on amounts owed

pursuant to a promise, representation or agreement to answer for the payment of some debt or the

performance of some duty in case of the failure of another person or entity who is liable in the

first instance (a "Guarantee") must:

(a)     on or before the Bar Date fill-out and return a Proof of Claim in the same manner as all other claimants;

(b)     on or before the Bar Date check the appropriate box on the Proof of Claim;

(c)     on or before the Questionnaire Deadline (**October 22, 2009, at 5:00 pm (prevailing Eastern Time)**), log on to http://www.lehman-claims.com, enter the Unique ID Number included on the Proof of Claim mailed to such holder by the Debtors and complete the electronic Guarantee Questionnaire, substantially in the form attached as Exhibit D hereto (the "Guarantee Questionnaire"); and

(d)     on or before the Questionnaire Deadline, electronically upload supporting documentation and evidence of the underlying claim amount on the

7

website, as required in the Guarantee Questionnaire, rather than attaching such documents to the Proof of Claim;

and it is further

ORDERED that, each holder of a claim against a Debtor based on a Guarantee by a Debtor of the obligations of a non-Debtor entity under a Derivative Contract must:

(a)     on or before the Bar Date, fill-out and return a Proof of Claim in the same manner as all other claimants;

(b)     check both boxes on the Proof of Claim that such claim is based on a Derivative Contract and based on a Guarantee;

(c)     on or before the Questionnaire Deadline (**October 22, 2009, at 5:00 pm (prevailing Eastern Time)**), log on to http://www.lehman-claims.com, enter the Unique ID Number of the Proof of Claim and complete the electronic Guarantee Questionnaire and electronically upload supporting documentation on the website (as required in the Guarantee Questionnaire), rather than attaching such documents to the Proof of Claim; and

(d)     on or before the Questionnaire Deadline, log on to http://www.lehman-claims.com, enter the Unique ID Number of the Proof of Claim and complete the electronic Derivative Questionnaire and electronically upload supporting documentation on the website (as required in the Derivative Questionnaire), rather than attaching such documents to the Proof of Claim;

and it is further

ORDERED that if a holder is required to complete the Derivative Questionnaire or Guarantee Questionnaire, such holder need only submit the documentation required by the applicable Questionnaire by the Questionnaire Deadline and need not submit the documentation required by the applicable Questionnaire with such holder's Proof of Claim by the Bar Date; and it is further

ORDERED that if a holder files a Proof of Claim based on a Derivative Contract or a Guarantee that does not have a Unique ID Number, such holder shall comply with the

8

procedures set forth in the prior three paragraphs, except that instead of entering a Unique ID Number on the website, such holder shall instead indicate on the website that they filed a Proof of Claim that did not have a Unique ID Number; and it is further

ORDERED that entities affiliated with the Debtors that are the subject of a bankruptcy, insolvency proceeding or similar proceeding in a foreign jurisdiction that file a claim against a Debtor shall not be required to complete the Derivative Questionnaire; and it is further

ORDERED that the information submitted on the website http://www.lehman-claims.com in respect of Derivative Contracts and Guarantees will not be accessible on the website other than by the party that submitted such information, the Debtors, the Creditors' Committee and their respective advisors and counsel; and it is further

ORDERED that the website http://www.lehman-claims.com and the information submitted thereon will remain accessible by the party that submitted such information following the Bar Date and the information submitted on the website will be subject to the same rules and standards as amendments and supplements to proofs of claim; and it is further

ORDERED that if a holder asserts a claim against more than one Debtor or has claims against different Debtors, a separate Proof of Claim must be filed with respect to each Debtor; and it is further

ORDERED that pursuant to Bankruptcy Rule 3003(c)(2), any holder of a claim against the Debtors who is required, but fails to file a proof of such claim in accordance with the Bar Date Order on or before the Bar Date, specifically, including filling out the Derivative Questionnaire or the Guarantee Questionnaire and uploading required information to the website http://www.lehman-claims.com (which Derivative Questionnaire or Guarantee Questionnaire shall not be required to be completed until the Questionnaire Deadline), specifying the applicable

9

Debtor and other requirements set forth herein, shall be forever barred, estopped and enjoined

from asserting such claim against the Debtors (or filing a Proof of Claim with respect thereto),

and the Debtors and their property shall be forever discharged from any and all indebtedness or

liability with respect to such claim, and such holder shall not be permitted to vote to accept or

reject any chapter 11 plan filed in these chapter 11 cases, or participate in any distribution in the

Debtors' chapter 11 cases on account of such claim or to receive further notices regarding such

claim; and it is further

ORDERED that notice of the entry of this Order and of the Bar Date in

substantially the form attached as Exhibit A hereto (the "Bar Date Notice"), which Bar Date

Notice are approved in all respects, shall be deemed good, adequate, and sufficient notice if it is

served by deposit in the United States mail, first class postage prepaid, on or before July 8, 2009

upon:

| | | |
|---|---|---|
| (a) | the U.S. Trustee; | |
| (b) | attorneys for the Creditors' Committee; | |
| (c) | all known holders of claims listed on the Schedules at the addresses stated therein; | |
| (d) | all (i) current employees of the Debtors, (ii) all former employees of the Debtors terminated after September 1, 2006 and (iii) all of the Debtors' retirees; | |
| (e) | all parties known to the Debtors as having potential claims against the Debtors' estates; | |
| (f) | all counterparties to the Debtors' executory contracts and unexpired leases listed on the Schedules at the addresses stated therein; | |
| (g) | all parties to litigation with the Debtors (as of the date of the entry of the Bar Date Order); | |
| (h) | the Internal Revenue Service for the district in which the case is pending and, if required by Bankruptcy Rule 2002(j), the Securities and Exchange | |

10

Commission and any other required governmental units (a list of such agencies is available from the Office of the Clerk of the Court); and

(i)       all parties who have requested notice pursuant to Bankruptcy Rule 2002;

and it is further

ORDERED that the Debtors shall mail one or more Proof of Claim Forms (as appropriate) to all parties listed in the preceding paragraph, each with a Unique ID Number printed on the form, together with instructions for filing a Proof of Claim, except that the Proof of Claim Form shall be omitted from any mailing to holders of LBHI securities that are on the Master List of Securities; and it is further

ORDERED that, pursuant to Bankruptcy Rules 2002(f) and (*l*), the Debtors shall publish the notice substantially in the form of the Bar Date Notice once in The New York Times (International Edition), The Wall Street Journal (International Edition) and The Financial Times, each at least forty-five (45) days prior to the Bar Date, which publication is hereby approved in all respects and shall be deemed good, adequate, and sufficient publication notice of the Bar Date and the procedures for filing Proofs of Claim in these cases; and it is further

ORDERED that, if the Debtors amend or supplement their Schedules subsequent to the date hereof, the Debtors shall give notice of any amendment or supplement to the holders of claims affected thereby, and such holders shall be required to file Proofs of Claim in respect of their claims prior to the later of (i) the Bar Date and (ii) thirty (30) days from the date on which such notice is given, or be forever barred from doing so; and it is further

ORDERED that Proofs of Claims may only be filed by parties that are authorized to file such claims in accordance with Bankruptcy Code and the Bankruptcy Rules; and it is further

ORDERED that any current or former affiliate of the Debtors, other than affiliates listed on the Exempt Entities List, that has a claim (as defined in section 101(5) of the Bankruptcy Code) against any of the Debtors that arose prior to the applicable Commencement Date must file a Proof of Claim in accordance with this Order or be forever barred from doing so; and it is further

ORDERED that (other than stipulations, agreements and orders entered into by the Debtors with JPMorgan Chase Bank, N.A, Pacific Investment Management Company LLC and the Internal Revenue Service) the Debtors shall not enter into any stipulations or agreements that modify the procedures set forth in this Order for the filing of Proofs of Claim based on Derivative Contracts (including the completion of the Derivative Questionnaire) without either the consent of the Creditors' Committee or the approval of the Court; and it is further

ORDERED that notwithstanding anything to the contrary contained in this Order, the following procedures apply to the filing of any and all claims (including any claims under a related Guarantee) against the Debtors arising from securities issued by the Debtors or any of the Debtors' affiliates outside of the United States, solely to the extent identified on http://www.lehman-docket.com under the heading "Lehman Programs Securities" (any such security, a "Lehman Program Security") as of July 17, 2009 at 5:00 pm (prevailing Eastern Time):

(a)    **November 2, 2009, at 5:00 p.m. (prevailing Eastern Time)** is established as the deadline (the "Securities Programs Bar Date") for each person or entity (including, without limitation, each individual, partnership, joint venture, corporation, estate, trust and governmental unit) (the "Filing Entities" and each a "Filing Entity") to file proofs of claim based on any Lehman Program Security;

(b)    the Debtors, in coordination with the Creditors' Committee, are authorized to, and will, create a notice of the Securities Programs Bar Date (the "Securities Programs Bar Date Notice") and a proof of claim form (the "Securities Programs Proof of Claim Form") as necessary to provide notice of the Securities Programs Bar Date;

(c)     the Debtors are authorized to, and will, translate the Securities Programs Bar Date Notice into relevant foreign languages; it being understood that claims submitted in respect of any Lehman Program Security must: (i) be written in the English language; (ii) to the extent a claim amount is reflected thereon, be denominated in lawful currency of the United States using the exchange rate as applicable as of September 15, 2008; (iii) conform substantially with the Securities Programs Proof of Claim Form; (iv) state the name and case number of the specific Debtor against which it is filed; (v) identify the International Securities Identification Number ("ISIN") and/or Committee on Uniform Securities Identification Procedures ("CUSIP") number, as applicable, for each Lehman Program Security; (vi) include either a Euroclear electronic instruction reference number or a Clearstream blocking reference number; (vii) be signed by the Filing Entity or by an authorized agent of the Filing Entity; and (viii) be submitted in hard copy form with an original signature;

(d)     the Debtors shall publish on http://www.lehman-docket.com a proposed list of "Lehman Programs Securities," to include at a minimum issuances under (i) that certain U.S.$100,000,000,000 Euro Medium Term-Note Program, (ii) that certain U.S.$4,000,000,000 German Note Issuance Programme, as described in a certain Base Prospectus, dated August 28, 2007, (iii) the Swiss Certificates Programme, as described in a certain Programme Prospectus, dated November 29, 2007 and (iv) the Italian Inflation Linked Notes, dated December 2005 – December 2017, which list will include the ISIN and/or CUSIP, as applicable, for each Lehman Program Security, no later than July 6, 2009 at 5:00 pm (prevailing Eastern Time), and the Debtors, the Creditors' Committee, the account holders or holders of any Lehman Program Security that identify themselves in writing to the Debtors, and the trustees for Lehman Brothers Treasury Co. B.V. and other applicable foreign proceedings will work in good faith to agree on a list of "Lehman Programs Securities" by no later than July 13, 2009;

(e)     in the event there are any disputes concerning the contents of the list of "Lehman Program Securities," the Court may consider such disputes on an expedited basis with notice to the disputing parties;

(f)     notice of the entry of this Order, of the Bar Date and of the Securities Programs Bar Date in the form of the Securities Programs Bar Date Notice shall be deemed good, adequate, and sufficient notice if (i) it is  served by deposit in the United States mail, first postage prepaid, and/or delivered by electronic mail on or before July 27, 2009 upon (1) the U.S. Trustee, (2) Euroclear, Clearstream and the Depository Trust Company and other similar clearing systems, as applicable (collectively, the "Clearing Systems") and (3) each of the issuers (and their representative or administrator) of the Lehman Program Securities (the "Issuers"), and (ii) the Debtors request that the Clearing Systems and the Issuers promptly distribute the Securities Program

13

Bar Date Notice to the account holders and/or holders of any Lehman Program Security;

(g)     pursuant to Bankruptcy Rules 2002(f) and (l), the Debtors shall publish notice (translated into the appropriate language, if necessary) substantially in the form of the Securities Programs Bar Date Notice at least once in one leading national newspaper in each of Italy, Spain, France, Germany, The Netherlands (in English), Switzerland, Luxembourg, United Kingdom, Hong Kong, Mexico, Belgium, Austria, Greece, Brazil, Argentina, Australia and Japan, each at least sixty (60) days prior to the Securities Programs Bar Date, which publication notice hereby is approved in all respects and shall be deemed good, adequate, and sufficient notice of the Bar Date and the Securities Programs Bar Date and the procedures for filing Proofs of Claim and Securities Programs Proofs of Claim in these cases;

(h)     any person or entity that files a claim based on both (i) a Lehman Program Security and (ii) any other claim, is not required to complete the Guarantee Questionnaire or Derivative Questionnaire in respect of the portion of the claim that relates to such Lehman Program Security, but is required to complete the Guarantee Questionnaire and Derivative Questionnaire, as applicable, prior to the Questionnaire Deadline with respect to all other claims that are not based on a Lehman Program Security;

(i)     persons or entities that file claims based on any Lehman Program Security are not required to attach or submit any documentation supporting any claim based on such Lehman Program Security; provided however that, the Debtors reserve the right to seek production of all documentation required by Bankruptcy Rule 3001(c) as part of the claims reconciliation process;

(j)     claims based on any Lehman Program Security shall not be disallowed on the ground that such claims were not filed by the proper party or an authorized agent, as contemplated by Bankruptcy Rule 3001(b);

(k)     a Filing Entity that files a claim based on any Lehman Program Security, by filing such claim, for the purposes of U.S. Bankruptcy proceedings, consents to and hereby is deemed to be the claimant for the purpose of receiving notices and distributions, if any, except as otherwise provided in a confirmation order related to a plan, and responding to any objection interposed as to such claim.  For the avoidance of doubt, a Filing Entity that files a claim on behalf of multiple account holders or holders of any Lehman Program Security shall not be required to provide identifying information for such account holders or holders of any Lehman Program Security;

(l)     nothing in this Order shall impose a duty or obligation on any party to any agreement related to any Lehman Program Security to file a claim beyond whatever duty or obligation currently exists in the applicable agreements for the Lehman Program Security or applicable law;

14

(m)     nothing in this Order shall prevent a holder of a Lehman Program Security that has filed a proof of claim from buying or selling claims based on a Lehman Program Security in a manner consistent with the applicable clearing system practice; and

(n)     other than as specifically provided in clauses (a) through (m) above, all provisions of this Order apply to holders of claims under any Lehman Program Security and holders of claims based on such Lehman Program Security are required to comply with all provisions of this Order;

and it is further

ORDERED that nothing in this Order shall prejudice the right of the Debtors or any other party in interest to dispute or assert offsets or defenses to any claim reflected in the Schedules; and it is further

ORDERED that the Debtors and Epiq are authorized and empowered to take such steps and perform such acts as may be necessary to implement and effectuate the terms of this Order; and it is further

ORDERED that notification of the relief granted by this Order as provided herein and in the Motion is fair and reasonable and will provide good, sufficient, and proper notice to all creditors of their obligations in connection with claims they may have against the Debtors in these chapter 11 cases; and it is further

ORDERED that any person or entity who desires to rely on the Schedules will have the responsibility for determining that the claim is accurately listed in the Schedules; and it is further

ORDERED that entry of this Order is without prejudice to the right of the Debtors to seek a further order of this Court fixing the date by which holders of claims **not** subject to the Bar Date established herein must file such claims against the Debtors or be forever barred from voting upon any chapter 11 plan of the Debtors, from receiving any payment or distribution of property from the Debtors, Debtors' estates, or their successors or assigns with respect to such claims, and from asserting such claims against the Debtors.

Dated: New York, New York
        July 2, 2009

        _s/ James M. Peck_____
        UNITED STATES BANKRUPTCY JUDGE

A016

## **Exhibit A**

**Notice of Bar Date**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------x
                                                        :
In re                                                   :        **Chapter 11 Case No.**
                                                        :
**LEHMAN BROTHERS HOLDINGS INC.,** *et al.*,            :        **08-13555 (JMP)**
                                                        :
                            **Debtors.**                :        **(Jointly Administered)**
                                                        :
                                                        :
-------------------------------------------------------------------x

<u>**NOTICE OF DEADLINES FOR FILING PROOFS OF CLAIM**</u>

TO ALL PERSONS AND ENTITIES WITH
CLAIMS AGAINST THE DEBTOR LISTED BELOW:

     PLEASE TAKE NOTICE THAT, on July 2, 2009, the United States Bankruptcy Court for the Southern District of New York (the "<u>Court</u>"), having jurisdiction over the chapter 11 cases of Lehman Brothers Holdings Inc. and certain of its affiliates, as debtors and debtors in possession in the above referenced chapter 11 cases (collectively, the "<u>Debtors</u>"), entered an order (the "<u>Bar Date Order</u>") establishing **September 22, 2009, at 5:00 p.m. (prevailing Eastern Time)** as the last date and time for each person or entity (including, without limitation, individuals, partnerships, corporations, joint ventures, and trusts) to file a proof of claim ("<u>Proof of Claim</u>") based on prepetition claims against the Debtors (the "<u>Bar Date</u>").  The Bar Date Order, the Bar Date and the procedures set forth below for the filing of Proofs of Claim apply to all claims against the Debtors (other than those set forth below as being specifically excluded) that arose prior to the applicable Commencement Date (the "<u>Commencement Date</u>"), the date on which the Debtors commenced their case under chapter 11 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>"), as set forth in Schedule A hereto.

     **If you have any questions with respect to this Notice, please feel free to contact the Debtors' court-approved claims agent Epiq Bankruptcy Solutions, LLC ("Epiq") at (866)-879-0688**.

     **A CLAIMANT SHOULD CONSULT AN ATTORNEY IF THE CLAIMANT HAS ANY QUESTIONS, INCLUDING WHETHER SUCH CLAIMANT SHOULD FILE A PROOF OF CLAIM. PLEASE NOTE THAT EPIQ IS NOT PERMITTED TO GIVE LEGAL ADVICE.**

     **Some parties are required to file a Proof of Claim in order to preserve their claim against the Debtors.  Other parties are not required to file a Proof of Claim in order to preserve their claim against the Debtors.  The following is a summary explanation of each.**

1.      **WHO MUST FILE A PROOF OF CLAIM**

     You **MUST** file a **Proof of Claim** to share in the Debtors' estates if you have a claim that arose prior to the applicable Commencement Date, and it is not one of the other types of claims described in Section 2 below.  Acts or omissions of the Debtors that arose before the applicable Commencement Date, may give rise to claims against the Debtors that must be filed by the Bar Date, notwithstanding that such claims may not have matured or become fixed or liquidated prior to the applicable Commencement Date.  Pursuant to section 101(5) of the Bankruptcy Code and as used herein, the word "claim" means:  (a) a right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or (b) a right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

2.      **WHO NEED <u>NOT</u> FILE A PROOF OF CLAIM**

You need not file a Proof of Claim if:

(1)     Your claim is listed on the Schedules and (i) is **<u>not</u>** described as "disputed," "contingent," or "unliquidated," and (ii) you do **<u>not</u>** dispute the amount, priority or nature of the claim set forth in the Schedules;

(2)     Your claim has been paid in full by the Debtors;

(3)     You hold an interest in the Debtors, which interest is based exclusively upon the ownership of common or preferred stock, membership interests, partnership interests, or warrants or rights to purchase, sell or subscribe to such a security or interest; **<u>provided</u>**, **<u>however</u>**, that interest holders who wish to assert claims (as opposed to ownership interests) against the Debtors that arise out of or relate to the ownership or purchase of an interest, including claims arising out of or relating to the sale, issuance, or distribution of the interest, must file Proofs of Claim on or before the Bar Date, unless another exception identified herein applies;

(4)     You hold a claim that has been allowed by an order of this Court entered on or before the Bar Date;

(5)     You hold a claim for which a separate deadline is fixed by this Court;

(6)     You hold a claim for which you have already properly filed a Proof of Claim with the Clerk of the Court or Debtors' court-approved claims agent, Epiq, against the Debtors utilizing a claim form which substantially conforms to the Proof of Claim Form; **<u>provided</u>**, **<u>however</u>**, any holder that has filed a Proof of Claim based on a Derivative Contract (as defined below) or a Guarantee (as defined below) on or prior to the Bar Date, is required to amend such Proof of Claim to conform to the procedures set forth in this Motion for the filing of Proofs of Claims based on Derivative Contracts and Guarantee;

(7)     You hold a claim solely against (i) Lehman Brothers Inc. or (ii) any other entity affiliated with the Debtors that is involved in a bankruptcy or insolvency proceeding or similar proceeding, in foreign jurisdiction; **<u>provided</u>**, **<u>however</u>**, if such claim is based on an obligation guaranteed by a Debtor, the holder of such claim must file a Proof of Claim on or before the Bar Date;

(8)     You hold a security listed on the Master List of Securities available on the Debtors' website http://www.lehman-docket.com (the "<u>Master List of Securities</u>") due to the fact that the indenture trustee for such securities will file a global proof of claim on behalf of all holders of securities issued thereunder; (Wilmington Trust Company, US Bank National Association, and the indenture trustee for each of the other securities included on the Master List of Securities, each will file a global proof(s) of claim on behalf of all holders of securities for which it is identified as Indenture Trustee on the Master List of Securities); **<u>provided</u>**, **<u>however</u>**, that security holders who wish to assert claims against the Debtors arising out of or relating to the sale, issuance, or distribution of a security, must file Proofs of Claim on or before the Bar Date, unless another exception identified herein applies; and

(9)     You are an entity included on the Exempt Entities List available on the Debtors' website http://www.lehman-docket.com (the "<u>Exempt Entities List</u>") and any subsidiary for which the entity on the Exempt Entities List owns at least a fifty percent equity interest in such subsidiary, <u>specifically</u> <u>excluding</u> any subsidiary that is in a bankruptcy, insolvency or similar proceeding in a foreign jurisdiction and Lehman Brothers Inc.

If your claim falls within any of the above categories, your rights as the holder of such claim will be preserved without you filing of a Proof of Claim.  Any other person or entity (including, without limitation, each individual, partnership, joint venture, corporation, estate, trust or governmental entity) that has a claim against a Debtor must file a Proof of Claim, as described herein, before the Bar Date.

**YOU SHOULD NOT FILE A PROOF OF CLAIM IF YOU DO NOT HAVE A CLAIM AGAINST THE DEBTORS.**

**THE FACT THAT YOU HAVE RECEIVED THIS NOTICE DOES NOT MEAN THAT YOU HAVE A CLAIM OR THAT THE DEBTORS OR THE COURT BELIEVE THAT YOU HAVE A CLAIM. MANY PARTIES ARE REQUIRED TO BE SERVED WITH THIS NOTICE AND IT IS REQUIRED TO REACH A BROAD AUDIENCE OF POTENTIAL CLAIMANTS.**

---

**SPECIAL NOTE TO HOLDERS OF LEHMAN SECURITIES**

Holders of securities are **NOT** required to file a proof of claim on account of their ownership if, and only if, such security is listed on the Debtors' Master List of Securities because such security was issued under an indenture pursuant to which an indenture trustee will file a global proof of claim on behalf of all holders of securities issued thereunder; (Wilmington Trust Company, US Bank National Association, and the indenture trustee for each of the other securities included on the Master List of Securities, each will each file a global proof(s) of claim on behalf of all holders of securities for which it is identified as Indenture Trustee on the Master List of Securities). The Master List of Securities is available for review at http://www.lehman-docket.com. The list is fully searchable by code (CUSIP or ISIN) or by security description.

If you do not see your security listed on the Master List of Securities and you have a question about the Master List of Securities, please download the form entitled "Inquiry Regarding Security Not on Master List of Securities," and complete and return it as directed on the form prior to August 5, 2009.

Inquiries will be investigated, and within 15 days of the Debtors receipt of such inquiry, either the security will either be added to the Master List of Securities (if appropriate), or, if you have provided contact information, you will be notified that the security is not being added to the Master List of Securities and given further information.

The Master List of Securities shall be finalized on August 20, 2009 and not subject to further change.

A Proof of Claim form is being included with the Bar Date Notices being served on holders of LBHI securities other than to holders of securities that are on the Master List of Securities.

IF YOU BELIEVE YOU HAVE A CLAIM AGAINST **LBHI** OTHER THAN ON ACCOUNT OF YOUR LEHMAN SECURITIES OWNERSHIP, YOU MUST FILE A PROOF OF CLAIM FORM, AS DIRECTED IN THIS BAR DATE NOTICE. A COPY OF THE PROOF OF CLAIM FORM IS AVAILABLE AT HTTP://WWW.LEHMAN-DOCKET.COM.

---

**3.      EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

Any person or entity that holds a claim arising from the rejection of an executory contract or unexpired lease must file a Proof of Claim based on such rejection by the later of (i) the Bar Date, and (ii) the date which is forty-five (45) days following the effective date of such rejection or be forever barred from doing so.

**4.      WHEN AND WHERE TO FILE**

All Proofs of Claim must be filed so as to be **actually received** on or before the Bar Date at the following address:

If by overnight mail, to:                      If by first-class mail, to:

Epiq Bankruptcy Solutions, LLC                 Lehman Brothers Holdings Claims Processing
Attn: Lehman Brothers Holdings Claims Processing   c/o Epiq Bankruptcy Solutions, LLC
757 Third Avenue, 3rd Floor                    FDR Station, P.O. Box 5286
New York, New York 10017                       New York, New York  10150-5076

A020

If by hand delivery, to:

Epiq Bankruptcy Solutions, LLC
Attn: Lehman Brothers Holdings Claims Processing
757 Third Avenue, 3rd Floor
New York, New York 10017

       or

Clerk of the United States Bankruptcy Court
Attn: Lehman Brothers Holdings Claims Processing
One Bowling Green
New York, New York 10004

Proofs of Claim will be deemed timely filed only if **actually received** by Epiq or the Court on or before the Bar Date.  Proofs of Claim may **not** be delivered by facsimile, telecopy, or electronic mail transmission.

In the event the Debtors amend their Schedules to (a) designate a claim as disputed, contingent, unliquidated or undetermined, (b) change the amount of a claim reflected therein, or (c) add a claim that was not listed on the Schedules or remove a claim that was listed on the Schedules, then, and in such event, the Debtors will notify the affected claimant be notified of such amendment and be granted thirty (30) days from the date of such notification within which to file a claim or be forever barred from doing so.

**5.      WHAT TO FILE**

      If you file a Proof of Claim, your filed Proof of Claim must: (i) be written the English language; (ii) be denominated in the lawful currency of the United States; (iii) conform substantially with the form attached to this notice (the "Proof of Claim Form"); (iv) state the name and case number of the specific Debtor against which it is filed; (v) set forth with specificity the legal and factual basis for the alleged claim; (vi) include supporting documentation or an explanation as to why documentation is not available; and (vii) be signed by the claimant or by an authorized agent of the claimant.

If you are asserting a claim against more than one Debtor or have claims against different Debtors, a separate Proof of Claim must be filed with respect to each such Debtor.

**EXCEPT AS SET FORTH IN THE FOLLOWING THREE PARAGRAPHS, YOU SHOULD ATTACH TO YOUR COMPLETED PROOF OF CLAIM FORM COPIES OF ANY WRITINGS UPON WHICH YOUR CLAIM IS BASED. IF THE DOCUMENTS ARE VOLUMINOUS, ATTACH A SUMMARY.**

**CLAIMS BASED ON DERIVATIVE CONTRACTS**

**IF YOU FILE A PROOF OF CLAIM BASED ON AMOUNTS OWED PURSUANT TO A DERIVATIVE CONTRACT, YOU MUST: (A) ON OR BEFORE THE BAR DATE, FILL-OUT AND RETURN A PROOF OF CLAIM FORM IN THE SAME MANNER AS ALL OTHER CLAIMANTS INCLUDING CHECKING THE APPROPRIATE BOX ON THE PROOF OF CLAIM FORM AND (B) ON OR BEFORE THE QUESTIONNAIRE DEADLINE, LOG ON TO http://www.lehman-claims.com, ENTER THE UNIQUE IDENTIFICATION NUMBER INCLUDED ON THE PROOF OF CLAIM FORM MAILED TO SUCH HOLDER BY THE DEBTORS AND COMPLETE THE ELECTRONIC DERIVATIVE QUESTIONNAIRE SUBSTANTIALLY IN THE FORM ATTACHED AS EXHIBIT C TO THE BAR DATE ORDER (THE "DERIVATIVE QUESTIONNAIRE") AND ELECTRONICALLY UPLOAD SUPPORTING DOCUMENTATION ON THE WEBSITE (AS REQUIRED IN THE DERIVATIVE QUESTIONNAIRE), RATHER THAN ATTACHING SUCH DOCUMENTS TO THE PROOF OF CLAIM FORM.**

**A "DERIVATIVE CONTRACT" IS A CONTRACT THAT IS ANY OF (I) A "SWAP AGREEMENT" AS SUCH TERM IS DEFINED IN SECTION 101(53B) OF THE BANKRUPTCY CODE OR (II) A "FORWARD CONTRACT" AS SUCH TERM IS DEFINED IN SECTION 101(25) OF THE BANKRUPTCY CODE.  A CASH-MARKET PURCHASE OR SALE OF A SECURITY OR LOAN (I.E. ANY PURCHASE OR SALE OF A SECURITY OR LOAN FOR SETTLEMENT WITHIN THE STANDARD SETTLEMENT CYCLE FOR THE RELEVANT MARKET), EXCHANGE-TRADED FUTURE OR OPTION, SECURITIES LOAN TRANSACTION, REPURCHASE AGREEMENT IN RESPECT OF SECURITIES OR LOANS, AND ANY GUARANTEE OR REIMBURSEMENT OBLIGATIONS WHICH WOULD OTHERWISE BE INCLUDED IN THE DEFINITION OF "SWAP AGREEMENT"**

OR "FORWARD CONTRACT" PURSUANT TO THE DEFINITION OF SUCH TERMS IN THE BANKRUPTCY CODE <u>SHALL NOT BE CONSIDERED</u> A DERIVATIVE CONTRACT FOR THE PURPOSES OF THIS DEFINITION NOR SHALL ANY NOTES, BONDS, OR OTHER SECURITIES ISSUED BY THE DEBTORS OR THEIR AFFILIATES (INCLUDING, BUT NOT LIMITED TO, LEHMAN BROTHERS HOLDINGS INC., LEHMAN BROTHERS TREASURY CO. B.V., LEHMAN BROTHERS BANKHAUS AG, LEHMAN BROTHERS HOLDINGS PLC, LEHMAN BROTHERS SECURITIES N.V., AND LEHMAN BROTHERS (LUXEMBOURG) EQUITY FINANCE S.A.).

THE "QUESTIONNAIRE DEADLINE" IS OCTOBER 22, 2009, AT 5:00 PM (PREVAILING EASTERN TIME).

<u>CLAIMS BASED ON A DEBTOR'S GUARANTEE</u>

IF YOU FILE A PROOF OF CLAIM BASED ON A GUARANTEE, YOU MUST: (A) ON OR BEFORE THE BAR DATE, FILL-OUT AND RETURN A PROOF OF CLAIM FORM IN THE SAME MANNER AS ALL OTHER CLAIMANTS INCLUDING CHECKING THE APPROPRIATE BOX ON THE PROOF OF CLAIM AND (B) ON OR BEFORE THE QUESTIONNAIRE DEADLINE, LOG ON TO http://www.lehman-claims.com, ENTER THE UNIQUE IDENTIFICATION NUMBER INCLUDED ON THE PROOF OF CLAIM FORM MAILED TO SUCH HOLDER BY THE DEBTORS AND COMPLETE THE ELECTRONIC GUARANTEE QUESTIONNAIRE SUBSTANTIALLY IN THE FORM ATTACHED AS <u>EXHIBIT D</u> TO THE BAR DATE ORDER (THE "<u>GUARANTEE QUESTIONNAIRE</u>") AND ELECTRONICALLY UPLOAD SUPPORTING DOCUMENTATION AND EVIDENCE OF THE UNDERLYING CLAIM AMOUNT ON THE WEBSITE (AS REQUIRED IN THE GUARANTEE QUESTIONNAIRE), RATHER THAN ATTACHING SUCH DOCUMENTS TO THE PROOF OF CLAIM FORM.

A "GUARANTEE" IS A PROMISE, REPRESENTATION OR AGREEMENT TO ANSWER FOR THE PAYMENT OF SOME DEBT OR THE PERFORMANCE OF SOME DUTY IN CASE OF THE FAILURE OF ANOTHER PERSON OR ENTITY WHO IS LIABLE IN THE FIRST INSTANCE.

THE "QUESTIONNAIRE DEADLINE" IS OCTOBER 22, 2009, AT 5:00 PM (PREVAILING EASTERN TIME).

<u>CLAIMS BASED ON A DEBTOR'S GUARANTEE OF A DERIVATIVE CONTRACT WITH A NON-DEBTOR</u>

IF YOU FILE A PROOF OF CLAIM BASED ON A DEBTOR'S GUARANTEE OF A DERIVATIVE CONTRACT ENTERED INTO WITH A NON-DEBTOR, YOU MUST: (A) ON OR BEFORE THE BAR DATE, FILL-OUT AND RETURN A PROOF OF CLAIM FORM IN THE SAME MANNER AS ALL OTHER CLAIMANTS INCLUDING CHECKING BOTH BOXES ON THE PROOF OF CLAIM THAT SUCH CLAIM IS BASED ON BOTH A DERIVATIVE CONTRACT AND BASED ON A GUARANTEE AND (B) ON OR BEFORE THE QUESTIONNAIRE DEADLINE, LOG ON TO http://www.lehman-claims.com, ENTER THE UNIQUE IDENTIFICATION NUMBER INCLUDED ON THE PROOF OF CLAIM FORM MAILED TO SUCH HOLDER BY THE DEBTORS AND COMPLETE THE ELECTRONIC GUARANTEE QUESTIONNAIRE AND ELECTRONICALLY UPLOAD SUPPORTING DOCUMENTATION ON THE WEBSITE (AS REQUIRED IN THE GUARANTEE QUESTIONNAIRE), RATHER THAN ATTACHING SUCH DOCUMENTS TO THE PROOF OF CLAIM FORM AND LOG ON TO http://www.lehman-claims.com, ENTER THE UNIQUE IDENTIFICATION NUMBER INCLUDED ON THE PROOF OF CLAIM FORM MAILED TO SUCH HOLDER BY THE DEBTORS AND COMPLETE THE ELECTRONIC DERIVATIVE QUESTIONNAIRE AND ELECTRONICALLY UPLOAD SUPPORTING DOCUMENTATION ON THE WEBSITE (AS REQUIRED IN THE DERIVATIVE QUESTIONNAIRE), RATHER THAN ATTACHING SUCH DOCUMENTS TO THE PROOF OF CLAIM FORM.

THE "QUESTIONNAIRE DEADLINE" IS OCTOBER 22, 2009, AT 5:00 PM (PREVAILING EASTERN TIME).

If a holder is required to complete the Derivative Questionnaire or Guarantee Questionnaire, such holder need only submit the documentation required by the applicable Questionnaire by the Questionnaire Deadline and need not submit the documentation required by the applicable Questionnaire with such holder's Proof of Claim by the Bar Date.

If any holder files a Proof of Claim based on a Derivative Contract or a Guarantee which for any reason does not have a Unique ID Number, such holder shall still be required to comply with the procedures set forth in the prior two paragraphs, except that instead of entering a Unique ID Number on the website, such holder shall instead indicate on the website that they filed a Proof of Claim that did not have a Unique ID Number.

A holder (or any other party authorized under the Bankruptcy Code and the Bankruptcy Rules to submit a Proof of Claim on behalf of such holder) of a security that is guaranteed by a Debtor shall be required to file a Proof of Claim against such Debtor based on the Guarantee and complete the Guarantee Questionnaire.

Any security that is listed on the Master List of Securities is not a Derivative Contract and the holders of such security are not required to complete the Derivative Questionnaire on account of such security.

The information submitted on the website http://www.lehman-claims.com in respect of Derivative Contracts and Guarantees will not be accessible on the website other than by the party that submitted such information and the Debtors and the Creditors' Committee and their respective advisors and counsel.

The website http://www.lehman-claims.com and the information submitted thereon will remain accessible by the party that submitted such information following the Bar Date and the information submitted on the website will be subject to the same rules and standards as amendments and supplements to proofs of claim.

**6.      CONSEQUENCES OF FAILURE TO FILE A PROOF OF CLAIM BY THE BAR DATE OR COMPLETE THE DERIVATIVE QUESTIONNAIRE PRIOR TO THE QUESTIONNAIRE DEADLINE**

**Except with respect to claims of the type set forth in Section 2 above, any creditor who fails to file a Proof of Claim in accordance with the Bar Date Order on or before the Bar Date, _specifically_, including filling out the Derivative Questionnaire (if applicable) or the Guarantee Questionnaire (if applicable)  and uploading required information to the website http://www.lehman-claims.com  (which Derivative Questionnaire or Guarantee Questionnaire shall not be required to be completed until the Questionnaire Deadline), specifying the applicable Debtor and other requirements set forth in the Bar Date Order, for any claim such creditor holds or wishes to assert against the Debtors, will be forever barred, estopped, and enjoined from asserting such claim (and from filing a Proof of Claim with respect to such claim) against the Debtors and their estates, and their property will be forever discharged from any and all indebtedness or liability with respect to such claim, and the holder of such claim shall not be permitted to vote on any chapter 11 plan or participate in any distribution in the Debtors' chapter 11 cases on account of such claim or to receive further notices regarding such claim or with respect to the Debtors' chapter 11 cases.**

**7.      THE DEBTORS' SCHEDULES AND ACCESS THERETO**

You may be listed as the holder of a claim against the Debtors in the Schedules.  Copies of the Schedules may be examined by interested parties on the Court's electronic docket for the Debtors' chapter 11 cases, which is posted on the Internet at http://www.lehman-docket.com and www.nysb.uscourts.gov (a PACER login and password are required and can be obtained through the PACER Service Center at www.pacer.psc.uscourts.gov).  Copies of the Schedules may also be examined by interested parties between the hours of 9:00 a.m. and 4:30 p.m. (prevailing Eastern Time) at the office of the Clerk of the Bankruptcy Court, United States Bankruptcy Court for the Southern District of New York, One Bowling Green, Room 511, New York, New York 10004.

DATED:      June __, 2009                                                    BY ORDER OF THE COURT
                 New York, New York

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York  10153
(212) 310-8000
Lori R. Fife
Shai Y. Waisman

ATTORNEYS FOR DEBTORS AND
DEBTORS IN POSSESSION

Schedule A

| Debtor | Case Number | Commencement Date |
|---|---|---|
| Lehman Brothers Holdings Inc. | 08-13555 | September 15, 2008 |
| LB 745 LLC | 08-13600 | September 16, 2008 |
| PAMI Statler Arms LLC | 08-13664 | September 23, 2008 |
| Lehman Brothers Commodity Services Inc. | 08-13885 | October 3, 2008 |
| Lehman Brothers Special Financing Inc. | 08-13888 | October 3, 2008 |
| Lehman Brothers OTC Derivatives Inc. | 08-13893 | October 3, 2008 |
| Lehman Brothers Derivatives Products Inc. | 08-13899 | October 5, 2008 |
| Lehman Commercial Paper Inc | 08-13900 | October 5, 2008 |
| Lehman Brothers Commercial Corporation | 08-13901 | October 5, 2008 |
| Lehman Brothers Financial Products Inc. | 08-13902 | October 5, 2008 |
| Lehman Scottish Finance L.P. | 08-13904 | October 5, 2008; |
| CES Aviation LLC | 08-13905 | October 5, 2008 |
| CES Aviation V LLC | 08-13906 | October 5, 2008 |
| CES Aviation IX LLC | 08-13907 | October 5, 2008 |
| East Dover Limited | 08-13908 | October 5, 2008 |
| Luxembourg Residential Properties Loan Finance S.a.r.l. | 09-10108 | January 7, 2009 |
| BNC Mortgage LLC | 09-10137 | January 9, 2009 |
| Structured Asset Securities Corporation | 09-10558 | February 9, 2009 |
| LB Rose Ranch LLC | 09-10560 | February 9, 2009 |
| LB 2080 Kalakaua Owners LLC | 09-12516 | April 23, 2009 |

A024

## **Exhibit B**

**Proof of Claim Form**

**United States Bankruptcy Court/Southern District of New York**

Lehman Brothers Holdings Claims Processing Center
c/o Epiq Bankruptcy Solutions, LLC
FDR Station, P.O. Box 5076
New York, NY 10150-5076

# PROOF OF CLAIM

| In Re:<br>Lehman Brothers Holdings Inc., et al.<br>Debtors. | Chapter 11<br>Case No. 08-13555 (JMP)<br>(Jointly Administered) |
|---|---|
| Name of Debtor Against Which Claim is Held | Case No. of Debtor |

NOTE: This form should not be used to make a claim for an administrative expense arising *after* the commencement of the case.  A request for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503.

**THIS SPACE IS FOR COURT USE ONLY**

Name and address of Creditor: (and name and address where notices should be sent if different from Creditor)

☐ Check this box to indicate that this claim amends a previously filed claim.

**Court Claim Number:**_____
(*If known*)

Filed on:_____

Telephone number:                    Email Address:

Name and address where payment should be sent (if different from above)

☐ Check this box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.

☐ Check this box if you are the debtor or trustee in this case.

Telephone number:                    Email Address:

**NOTICE OF SCHEDULED CLAIM:**
Your Claim is scheduled by the indicated Debtor as:

**1.**     Amount of Claim as of Date Case Filed:  $ _____
If all or part of your claim is secured, complete Item 4 below; however, if all of your claim is unsecured, do not complete item 4.
If all or part of your claim is entitled to priority, complete Item 5.
If all or part of your claim qualifies as an Administrative Expense under 11 U.S.C. §503(b)(9), complete Item 6.
☐     Check this box if all or part of your claim is based on a Derivative Contract.*
☐     Check this box if all or part of your claim is based on a Guarantee.*

**\*IF YOUR CLAIM IS BASED ON AMOUNTS OWED PURSUANT TO EITHER A DERIVATIVE CONTRACT OR A GUARANTEE OF A DEBTOR, YOU MUST ALSO LOG ON TO http://www.lehman-claims.com AND FOLLOW THE DIRECTIONS TO COMPLETE THE APPLICABLE QUESTIONNAIRE AND UPLOAD SUPPORTING DOCUMENTATION OR YOUR CLAIM WILL BE DISALLOWED.**
☐     Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of interest or additional charges. Attach itemized statement of interest or charges to this form or on http://www.lehman-claims.com if claim is a based on a Derivative Contract or Guarantee.

**2.     Basis for Claim:** _____
(See instruction #2 on reverse side.)

**3.     Last four digits of any number by which creditor identifies debtor:** _____
**3a.  Debtor may have scheduled account as:** _____
(See instruction #3a on reverse side.)

**4.     Secured Claim** (See instruction #4 on reverse side.)
Check the appropriate box if your claim is secured by a lien on property or a right of setoff and provide the requested information.
Nature of property or right of setoff: ☐ Real Estate     ☐ Motor Vehicle     ☐ Other
Describe: _____
Value of Property: $_____     Annual Interest Rate _____%
Amount of arrearage and other charges as of time case filed included in secured claim, if any:
$_____  Basis for perfection: _____
**Amount of Secured Claim: $_____     Amount Unsecured: $_____**

**6.     Amount of Claim that qualifies as an Administrative Expense under 11 U.S.C. §503(b)(9): $_____**
(See instruction #6 on reverse side.)

**5.     Amount of Claim Entitled to Priority under 11 U.S.C. §507(a).  If any portion of your claim falls in one of the following categories, check the box and state the amount.**

Specify the priority of the claim:

☐ Domestic support obligations under  11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).

☐ Wages, salaries or commissions (up to $10,950), earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier - 11 U.S.C. § 507(a)(4).

☐ Contributions to an employee benefit plan - 11 U.S.C. § 507(a)(5).

☐ Up to $2,425 of deposits toward purchase, lease, or rental of property or services for personal, family, or household use - 11 U.S.C. § 507(a)(7).

☐ Taxes or penalties owed to governmental units - 11 U.S.C. § 507(a)(8).

☐ Other – Specify applicable paragraph of 11 U.S.C. § 507(a)(_____).

**Amount entitled to priority:**

$_____

**7.     Credits:**  The amount of all payments on this claim has been credited for the purpose of making this proof of claim.
**8.     Documents:**  Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages and security agreements. Attach redacted copies of documents providing evidence of perfection of a security interest.  *(See definition of "redacted" on reverse side.)* If the documents are voluminous, attach a summary.
**DO NOT SEND ORIGINAL DOCUMENTS.  ATTACHED DOCUMENTS MAY BE DESTROYED AFTER SCANNING.**
If the documents are not available, please explain:

**FOR COURT USE ONLY**

| Date: | **Signature:**  The person filing this claim must sign it. Sign and print name and title, if any, of the creditor or other person authorized to file this claim and state address and telephone number if different from the notice address above. Attach copy of power of attorney, if any. |
|---|---|

*Penalty for presenting fraudulent claim:*  Fine of up to $500,000 or imprisonment for up to 5 years, or both.  18 U.S.C. §§ 152 and 3571.

**A026**

# INSTRUCTIONS FOR PROOF OF CLAIM FORM

*The instructions and definitions below are general explanations of the law. In certain circumstances, such as bankruptcy cases not filed voluntarily by the debtor, there may be exceptions to these general rules.*

## Items to be completed in Proof of Claim form

**Name of Debtor, and Case Number:**
Fill in the name of the Debtor in the bankruptcy case, and the bankruptcy case number.

| | | | |
|---|---|---|---|
| 08-13555 | Lehman Brothers Holdings Inc. | 08-13905 | CES Aviation LLC |
| 08-13600 | LB 745 LLC | 08-13906 | CES Aviation V LLC |
| 08-13885 | Lehman Brothers Commodity Services Inc. | 08-13907 | CES Aviation IX LLC |
| 08-13888 | Lehman Brothers Special Financing Inc. | 08-13908 | East Dover Limited |
| 08-13893 | Lehman Brothers OTC Derivatives Inc. | 09-10108 | Luxembourg Residential Properties Loan Finance S.a.r.l. |
| 08-13899 | Lehman Brothers Derivative Products Inc. | 09-10137 | BNC Mortgage LLC |
| 08-13900 | Lehman Commercial Paper Inc. | 09-10558 | Structured Asset Securities Corporation |
| 08-13901 | Lehman Brothers Commercial Corporation | 09-10560 | LB Rose Ranch LLC |
| 08-13902 | Lehman Brothers Financial Products Inc. | 09-12516 | LB 2080 Kalakaua Owners LLC |
| 08-13904 | Lehman Scottish Finance L.P. | 08-13664 | PAMI Statler Arms LLC |

If your Claim is against multiple Debtors, complete a separate form for each Debtor.

**Creditor's Name and Address:**
Fill in the name of the person or entity asserting a claim and the name and address of the person who should receive notices issued during the bankruptcy case. A separate space is provided for the payment address if it differs from the notice address. The creditor has a continuing obligation to keep the court informed of its current address. See Federal Rule of Bankruptcy Procedure (FRBP) 2002(g).

**1. Amount of Claim as of Date Case Filed:**
State the total amount owed to the creditor on the date of the Bankruptcy filing. Follow the instructions concerning whether to complete items 4, 5 and 6. Check the box if interest or other charges are included in the claim.

**2. Basis for Claim:**
State the type of debt or how it was incurred. Examples include goods sold, money loaned, services performed, personal injury/wrongful death, car loan, mortgage note, and credit card.

**3. Last Four Digits of Any Number by Which Creditor Identifies Debtor:**
State only the last four digits of the debtor's account or other number used by the creditor to identify the debtor.

**3a. Debtor May Have Scheduled Account As:**
Use this space to report a change in the creditor's name, a transferred claim, or any other information that clarifies a difference between this proof of claim and the claim as scheduled by the debtor.

**4. Secured Claim:**
Check the appropriate box and provide the requested information if the claim is fully or partially secured. Skip this section if the claim is entirely unsecured. (See DEFINITIONS, below.) State the type and the value of property that secures the claim, attach copies of lien documentation, and state annual interest rate and the amount past due on the claim as of the date of the bankruptcy filing.

**5. Amount of Claim Entitled to Priority Under 11 U.S.C. §507(a).**
If any portion of your claim falls in one or more of the listed categories, check the appropriate box(es) and state the amount entitled to priority. (See DEFINITIONS, below.) A claim may be partly priority and partly non-priority. For example, in some of the categories, the law limits the amount entitled to priority.

**6. Amount of Claim that qualifies as an Administrative Expense under 11 U.S.C. §503(b)(9)**
State the value of any goods received by the debtor within 20 days before the date of commencement in which the goods have been sold to the debtor in the ordinary course of the debtor's business.

**7. Credits:**
An authorized signature on this proof of claim serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

**8. Documents:**
Attach to this proof of claim form redacted copies documenting the existence of the debt and of any lien securing the debt. You may also attach a summary. You must also attach copies of documents that evidence perfection of any security interest. You may also attach a summary. FRBP 3001(c) and (d). Do not send original documents, as attachments may be destroyed after scanning.

**Date and Signature:**
The person filing this proof of claim must sign and date it. FRBP 9011. If the claim is filed electronically, FRBP 5005(a)(2), authorizes courts to establish local rules specifying what constitutes a signature. Print the name and title, if any, of the creditor or other person authorized to file this claim. State the filer's address and telephone number if it differs from the address given on the top of the form for purposes of receiving notices. Attach a complete copy of any power of attorney. Criminal penalties apply for making a false statement on a proof of claim.

---

## DEFINITIONS

**Debtor**
A debtor is the person, corporation, or other entity that has filed a bankruptcy case.

**Creditor**
A creditor is the person, corporation, or other entity owed a debt by the debtor on the date of the bankruptcy filing.

**Claim**
A claim is the creditor's right to receive payment on a debt that was owed by the debtor on the date of the bankruptcy filing. See 11 U.S.C. §101 (5). A claim may be secured or unsecured.

**Proof of Claim**
A proof of claim is a form used by the creditor to indicate the amount of the debt owed by the debtor on the date of the bankruptcy filing. The creditor must file the form with the Claims Agent at the following address:
**Lehman Brothers Holdings Claims Processing**
c/o Epiq Bankruptcy Solutions, LLC
FDR Station, PO Box 5076
New York, NY 10150- 5076

**Secured Claim Under 11 U.S.C. §506(a)**
A secured claim is one backed by a lien on property of the debtor. The claim is secured so long as the creditor has the right to be paid from the property prior to other creditors. The amount of the secured claim cannot exceed the value of the property. Any amount owed to the creditor in excess of the value of the property is an unsecured claim. Examples of liens on property include a mortgage on real estate or a security interest in a car. A lien may be voluntarily granted by a debtor or may be obtained through a court proceeding. In some states, a court judgment is a lien. A claim also may be secured if the creditor owes the debtor money (has a right to setoff).

**Unsecured Claim**
An unsecured claim is one that does not meet the requirements of a secured claim. A claim may be partly unsecured if the amount of the claim exceeds the value of the property on which the creditor has a lien.

**Claim Entitled to Priority Under 11 U.S.C. §507(a)**
Priority claims are certain categories of unsecured Claims that are paid from the available money or property in a bankruptcy case before other unsecured claims.

**Redacted**
A document has been redacted when the person filing it has masked, edited out, or otherwise deleted, certain information. A creditor should redact and use only the last four digits of any social-security, individual's tax identification, or financial-account number, all but the initials of a minor's name and only the year of any person's date of birth.

**Evidence of Perfection**
Evidence of perfection may include a mortgage, lien, certificate of title, financing statement, or other document showing that the lien has been filed or recorded.

**Derivative Contract**
A contract that is any of (i) a "swap agreement" as such term is defined in section 101(53B) of the Bankruptcy Code or (ii) a "forward contract" as such term is defined in section 101(25) of the Bankruptcy Code. A cash-market purchase or sale of a security or loan (i.e. any purchase or sale of a security or loan for settlement within the standard settlement cycle for the relevant market), exchange-traded future or option, securities loan transaction, repurchase agreement in respect of securities or loans, and any guarantee or reimbursement obligations which would otherwise be included in the definition of such terms in the Bankruptcy Code shall not be considered a Derivative Contract for the purposes of this definition nor shall any notes, bonds, or other securities issued by the Debtors or their affiliates (including, but not limited to, Lehman Brothers Holdings Inc., Lehman Brothers Treasury Co. B.V., Lehman Brothers Bankhaus AG, Lehman Brothers Holdings plc, Lehman Brothers Securities N.V., and Lehman Brothers (Luxembourg) Equity Finance S.A.).

**Guarantee**
A promise, representation or agreement to answer for the payment of some debt or the performance of some duty in case of the failure of another person or entity who is liable in the first instance.

---

## INFORMATION

**Acknowledgment of Filing of Claim**
To receive acknowledgment of your filing, you may either enclose a stamped self-addressed envelope and a copy of this proof of claim, or you may access the Claims Agent's system (http://www.lehman-docket.com) to view your filed proof of claim.

**Offers to Purchase a Claim**
Certain entities are in the business of purchasing claims for an amount less than the face value of the claims. One or more of these entities may contact the creditor and offer to purchase the claim. Some of the written communications from these entities may easily be confused with official court documentation or communications from the debtor. These entities do not represent the bankruptcy court or the debtor. The creditor has no obligation to sell its claim. However, if the creditor decides to sell its claim, any transfer of such claim is subject to FRBP 3001(e), and applicable provisions of the Bankruptcy Code (11 U.S.C. § 101 *et seq.*), and any applicable orders of the bankruptcy court.

## Exhibit C

## Derivative Questionnaire

*Please note that information stated on or uploaded on this website is being submitted as part of the Proof of Claim form. As such, criminal penalties apply for making a false statement. The penalty for presenting fraudulent claim is a fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.*

YOU MUST COMPLETE ONE DERIVATIVE QUESTIONNAIRE PER PROOF OF CLAIM BASED ON AMOUNTS OWED PURSUANT TO A MASTER AGREEMENT. IF A MASTER AGREEMENT DOES NOT EXIST, YOU MUST COMPLETE ONE DERIVATIVE QUESTIONNAIRE PER DERIVATIVE CONTRACT.

General:_____

Name of Debtor (drop down of Lehman entities):

Name of Creditor:

Name and address where notices should be sent:

Creditor contact person and phone number:

Name and address where payment should be sent if different from above:

_____

**1. Is the Debtor identified above (i) a counterparty to the derivative contract or (ii) a guarantor or credit support provider? Please identify the counterparties, guarantors and/or credit support providers to the derivative contract.**



**2. Have Termination Agreement(s) related to the allowance of a claim in respect of derivatives been entered into with the debtor?**


If Yes---Enter the amount of the derivative claim $_____

Please attach Termination Agreement and go to ___(end).

If No, proceed to #3.

**3. Have the derivatives matured or been terminated?**

If Yes--Enter the derivative claim amount and each line item included in the calculation thereof on the provided table and provide the information in 4.

If No, STOP HERE.  For Derivative Contracts that have not matured or been terminated, you do not need to complete the rest of the Derivative Questionnaire or submit any of the documents or information requested below.

4. a. <u>Documentation of Transactions.</u>   Please provide copies of all master agreements and schedules thereto, netting agreements, credit support agreements, guarantees and other agreements (other than confirmations) evidencing the transactions, in each case that relate to the claim.

b. <u>Termination Notice.</u>  Please provide a copy of the termination notice, including evidence supporting delivery date of the termination notice.

c. <u>Valuation Statement</u>. Please provide a copy of the valuation statement.  Please identify any collateral that has been posted by any party in connection with the transactions and any claims of set-off against other transactions reflected in the claim.

d. <u>Individual Trade Level Detail</u>.  Please provide with respect to each transaction (i) the valuation date (to the extent not included in your valuation statement) and value and (ii) details for the purpose of identifying and reconciling each transaction (e.g. including, as applicable, trade id, electronic trade reference id, trade type, product, trade date, reference obligation or reference entity, factor and original contract notional amount, quantity/unit of measure, currency,  price or strike price, buy/sell, call or put, cap or floor, effective date, and maturity date. (For the avoidance of doubt, you are not required to submit each and every one of the foregoing)).  Please provide this information in Microsoft Excel format.

e. <u>Trade Valuation Methodology and Quotations</u>.  Please check the box next to each valuation methodology used to support the claim (if multiple methodologies were used, please check multiple boxes and identify the trade population listed in clause d. above to which each valuation method applies):

_____ ISDA Master Agreements Specifying Market Quotation Methodology:  If not already provided in the valuation statement, provide the date and identity of and quotations received from Reference Market-makers or other persons (i.e. name of institution) concerning the transactions.

_____ ISDA Master Agreements Specifying Loss Methodology.  To the extent applicable, if not already provided in the valuation statement, provide the date and identity of and quotations received from Reference Market-makers or other persons (i.e. name of institution) concerning the transactions.

_____ ISDA Master Agreements Specifying Close-Out Amount Methodology.  To the extent applicable, if not already provided in the valuation statement, provide the date and identity of and quotations received from Reference Market-makers or other persons (i.e. name of institution) concerning the transactions.

A029

_____ ISDA Master Agreements Specifying Any Other Methodology.  To the extent applicable, if not already provided in the valuation statement, provide the date and identity of and quotations received from Reference Market-makers or other persons (i.e. name of institution) concerning the transactions.

_____ Non-ISDA Master Agreements. To the extent applicable, if not already provided in the valuation statement, provide the date and identity of and quotations received from Reference Market-makers or other persons (i.e. name of institution) concerning the transactions.

_____ Replacement Transactions:  If you replaced a terminated transaction with a transaction with the same economic terms as the terminated transaction, provide documentation evidencing such replacement transaction and the quotation(s) used, including specifying any cash (or other consideration) paid or received by or to any person to replace the transactions, the name of each entity that effectuated a replacement and when any such transactions were effected.

f. Unpaid Amounts.   Please specify any unpaid amounts and interest accrued thereon included in calculation of any amounts due with respect to the transactions.

g. Collateral.  Please provide CUSIP/ISIN for collateral listed, if applicable, or other information that reasonably identifies collateral reflected in the claim calculation and the valuation of such collateral.  Please provide this information in Microsoft Excel format.

h. Other costs.

       i.      If claim includes other costs, please include a schedule that lists each such cost by vendor and indicates the service provided and amount paid.

       ii.     If claim includes interest charges, please provide calculation in Microsoft Excel format of interest including principal amount, interest rate, term and assumptions.

**Exhibit D**

**Guarantee Questionnaire**

*Please note that information stated on or uploaded on this website is being submitted as part of the Proof of Claim form.  As such, criminal penalties apply for making a false statement.  The penalty for presenting fraudulent claim is a fine of up to $500,000 or imprisonment for up to 5 years, or both.  18 U.S.C. §§ 152 and 3571.*

General: _____

Name of Creditor:

Name and address where notices should be sent:

Creditor contact person and phone number:

Name and address where payment should be sent if different from above:

_____

1. Name of Debtor, or other entity, against which you have a direct claim (the "Obligor"):

2. If such Obligor is in a bankruptcy or insolvency proceeding, administration, receivership, conservatorship, liquidation or similar proceeding (and is not a Debtor in these chapter 11 cases), please provide the proof of claim and any attachments thereto filed against such Obligor or describe the claim against such Obligor if a proof of claim has not yet been filed.

3. List the agreement(s) under which your claim arises against the Obligor and, unless you have uploaded information in compliance with question 4a of the Derivative Questionnaire, provide documentation evidencing your claim <u>and</u> supporting the calculation of the claim amount.*

4. Amount of claim against Obligor: $_____.

5. Name of Debtor that guarantees the payment/obligations of the Obligor against which you have a direct claim (the "Guarantor"):

6. Please upload the specific promise, representation and/or agreement(s) (including any corporate resolutions) under which your claim arises against the Guarantor and describe the obligations/performance that is guaranteed.  If you do not have possession of such document, please upload a written explanation of such guarantee in reasonable detail.  You do not need to comply with this question if you have uploaded information in compliance with question 4a of the Derivative Questionnaire.

7.  Amount of claim against the Guarantor: $_____.

\* Pursuant to Federal Rule of Bankruptcy Procedure 3001(c), if your claim is based on a written agreement, you are required to attach a copy of the writing evidencing such agreement.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
----------------------------------------------------------------x
                                                                :
In re:                                                          :    Chapter 11 Case No.
                                                                :
**LEHMAN BROTHERS HOLDINGS INC., et al.**    :    **08-13555 (JMP)**
                                                                :
                        Debtors.                        :    **(Jointly Administered)**
                                                                :
----------------------------------------------------------------x


**DEBTORS' DISCLOSURE STATEMENT**
**FOR THIRD AMENDED JOINT CHAPTER 11 PLAN**
**OF LEHMAN BROTHERS HOLDINGS INC. AND ITS AFFILIATED**
<u>**DEBTORS PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE**</u>


WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Tel: (212) 310-8000
Fax: (212) 310-8007

Attorneys for Debtors and
Debtors in Possession


Dated: August 31, 2011
New York, New York

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ................................................................................................ 1

II.     OVERVIEW OF THE PLAN ............................................................................. 2

    A.    Summary of the Plan .............................................................................. 2

    B.    Classification, Treatment and Estimated Recovery for Each Class
        Under the Plan ......................................................................................... 5

    C.    Holders of Claims Entitled to Vote ...................................................... 15

    D.    Voting Procedures ................................................................................. 15

    E.    Confirmation Hearing ........................................................................... 16

III.    GENERAL INFORMATION ........................................................................... 18

    A.    Overview of Chapter 11 ........................................................................ 18

    B.    General Information Regarding Lehman .............................................. 19

IV.     THE CHAPTER 11 CASES ............................................................................ 19

    A.    Stabilization of the Business ................................................................ 19

    B.    Creditors' Committee ............................................................................ 20

    C.    Fee Committee ...................................................................................... 21

    D.    Lehman Brothers Inc.'s SIPA Proceeding; Lehman ALI .................... 22

    E.    Sale of the North American Capital Markets and Investment Banking
        Business to Barclays Capital Inc. ......................................................... 23

    F.    Significant Developments During the Chapter 11 Case ....................... 24

        1.    Sale of Investment Management Division and European and
            Asian Operations .................................................................... 24

        2.    Transaction with JPMorgan ................................................... 25

        3.    Appointment of Examiner ...................................................... 28

        4.    Cross-Border Insolvency Protocol / Negotiations With Foreign
            Debtors ................................................................................... 28

            a.    Description of Cross-Border Insolvency Protocol ...... 29

            b.    Settlement Negotiations with Foreign Debtors ........... 29

    G.    Alternative Chapter 11 Plans ............................................................... 31

        1.    Plan Proposed by the Ad Hoc Group ..................................... 31

        2.    Plan Proposed by the Non-Con Plan Proponents ................... 32

A034

## TABLE OF CONTENTS
### (continued)

Page

      3.     Debtors' Oppose the Ad Hoc Plan and the Non-Con Plan ..................... 32

H.    Administration of the Debtors' Assets During the Chapter 11 Plan.................. 33

      1.     Derivative Contracts .............................................................. 33

      2.     Real Estate Assets ................................................................. 34

      3.     Commercial Loans ................................................................. 35

      4.     Private Equity/ Principal Investments...................................... 36

      5.     Bank Platforms...................................................................... 36

I.    Securitization Structures ................................................................ 37

      a.     Pine, Spruce, Verano, SASCO 2008-C2 and Kingfisher............ 37

      b.     The RACERS Transaction ..................................................... 40

J.    Avoidance Actions ...................................................................... 42

K.    Statements in Response to Certain Objections ................................. 42

      1.     Transfers of Securitization Structures' Securities..................... 43

      2.     Capital Contributions ............................................................ 43

      3.     Intercompany-Only Repurchase Transactions .......................... 44

      4.     Allocation of Costs and Expenses........................................... 45

      5.     LBHI's Purchase of Bankhaus' Interests in Notes ................... 45

      6.     Sales or Financings and Perfection of Liens............................. 46

V.    CLAIMS FILED AGAINST THE DEBTORS................................................ 46

A.    Schedules and Statements .............................................................. 46

B.    Claims Bar Date............................................................................ 46

C.    Validity and Enforceability of Guarantee Claims............................. 47

D.    Valuation of Structured Securities Claims....................................... 48

E.    Claims Based on Derivatives Contracts.......................................... 50

      1.     Derivatives Framework........................................................... 50

      2.     Estimate of Allowed Derivatives Claims.................................. 51

F.    Residential Mortgage Loan Representation/Warranty Claims ............ 52

G.    Claims of Federal Home Loan Mortgage Corporation and the Federal National Mortgage Association .......................................................... 53

VI.    DEBTORS' RELATIONSHIP WITH LEHMAN BROTHERS INC ............................ 53

A035

# TABLE OF CONTENTS
## (continued)

Page

VII.   CERTAIN TRANSACTIONS/RELATIONSHIPS WITH LBIE ................................... 54

VIII.  TREATMENT OF INTERNAL REPURCHASE AGREEMENTS ............................. 54

IX.    LAMCO ................................................................................................................. 56

X.     SUMMARY OF THE CHAPTER 11 PLAN ................................................................ 57

    A.   Considerations Regarding the Chapter 11 Plan ............................................ 57

    B.   Rationale Underlying Plan Treatment of Claims ........................................... 58

        1.   Description of the Plan and Compromise of Substantive Consolidation and Related Issues ............................................ 58

            a.   Substantive Consolidation of the Debtors and Their Affiliates ................................................................... 58

            b.   Description of Settlement and Compromise Regarding Substantive Consolidation Included in the Plan ......................... 59

            c.   The Settlement and Compromise is in the Best Interests of the Economic Stakeholders ................................... 61

        2.   Characterization of Certain Claims of LBHI Against Subsidiary Debtors ............................................................... 67

        3.   Claims Filed by Affiliates ............................................................ 69

        4.   Plan Negotiations With Certain Creditors ................................. 70

        5.   Redistribution of Distributions From Subordinated Claims to Claims in Senior Classes ................................................. 73

        6.   Convenience Classes ................................................................. 74

    C.   Classification and Treatment of Claims and Equity Interests ........................... 75

        1.   Treatment of Unclassified Claims ............................................. 75

            a.   Administrative Expense Claims .................................... 75

            b.   Compensation and Reimbursement Claims ................ 76

            c.   Priority Tax Claims ........................................................ 76

        2.   Summary of Classes .................................................................... 78

            a.   Treatment of Classified Claims Against and Equity Interests in LBHI ............................................................ 79

            b.   Treatment of Classified Claims Against and Equity Interests in the Subsidiary Debtors ............................. 88

    D.   Means for Implementation of the Plan ........................................................... 99

iii

# TABLE OF CONTENTS
## (continued)

Page

1. Continued Corporate Existence of Debtors .............................................. 99

2. Revesting of Assets .................................................................................. 99

3. Plan Administrator ................................................................................. 100

    a. Authority of the Plan Administrator ......................................... 100

    b. Liability of Plan Administrator ................................................. 101

    c. Indenture Trustee and Creditors' Committee Members Fees ...................................................................................... 101

4. Treatment of Disputed Claims ............................................................... 101

E. Provisions Governing Distributions ....................................................... 103

1. Obligations to Make Distributions ......................................................... 103

2. Post Petition Interest .............................................................................. 103

3. Method of Distributions Under the Plan ................................................ 103

    a. In General .................................................................................. 103

    b. Distributions of Cash ................................................................ 104

4. Timing of Distributions .......................................................................... 104

    a. Distributions of Available Cash ................................................ 104

    b. Distributions on Claims After Allowance ................................ 104

    c. Claims Register ......................................................................... 105

    d. Time Bar to Cash Payment Rights ............................................ 105

5. Unclaimed Distributions ........................................................................ 105

6. Withholding and Reporting Requirements ............................................. 105

7. Setoff and Recoupment .......................................................................... 106

8. Distributions to Non-Controlled Affiliates ............................................ 106

9. Maximum Distribution ........................................................................... 107

10. Rights of Reimbursement ...................................................................... 108

F. Treatment of Executory Contracts and Unexpired Leases ................... 109

1. Rejected Contracts and Leases of the Debtors ....................................... 109

2. Assumed Contracts and Leases of the Debtors ...................................... 109

3. Right to Modify Schedules of Assumed Contracts ................................ 109

4. Insurance Policies .................................................................................. 110

iv

# TABLE OF CONTENTS
## (continued)

**Page**

| | 5. | Cure of Defaults | 110 |
| | 6. | Bar Date for Filing Proofs of Claim Relating to Executory Contracts and Unexpired Leases Rejected Pursuant to the Plan | 110 |
| G. | | Conditions Precedent to Plan's Confirmation and Effective Date | 110 |
| | 1. | Conditions to Confirmation of the Plan | 110 |
| | 2. | Conditions to Effective Date | 111 |
| | 3. | Waiver of Conditions | 111 |
| H. | | Effect of Confirmation of the Plan | 111 |
| | 1. | Release, Exculpation and Limitation of Liability | 111 |
| | 2. | Discharge | 112 |
| | 3. | Injunction | 112 |
| | 4. | United States Government Exception To Discharge | 113 |
| | 5. | Retention of Litigation Claims and Reservation of Rights | 113 |
| | 6. | Terms of Injunctions or Stays | 113 |
| I. | | Liquidating Trust | 114 |
| | 1. | Certain Provisions Regarding a Liquidating Trust | 114 |
| | 2. | Federal Income Tax Treatment of Liquidating Trust | 115 |
| | 3. | Tax Reporting | 115 |
| | 4. | Dissolution of a Liquidating Trust | 116 |
| J. | | Summary of Other Provisions of Plan | 117 |
| | 1. | Amendment or Modification of the Plan | 117 |
| | 2. | Survival of Debtors' Reimbursement Obligations of Officers and Directors | 117 |
| | 3. | Allocation of Plan Distributions Between Principal and Interest | 118 |
| | 4. | Revocation or Withdrawal of the Plan | 118 |
| | 5. | Post-Effective Date Role of Creditors' Committee | 118 |
| | 6. | Issuance of New Securities | 118 |
| | 7. | Exemption from Securities Laws | 119 |
| | 8. | Exemption from Transfer Taxes | 119 |
| | 9. | Effectuating Documents and Further Transactions | 119 |

# TABLE OF CONTENTS
## (continued)

**Page**

| | | | |
|---|---|---|---|
| | 10. | Retention of Jurisdiction | 119 |
| | 11. | Plan Supplement | 121 |
| | 12. | Post-Effective Date Reporting | 121 |
| | 13. | Payment of Statutory Fees | 122 |
| K. | | Summary of Recovery Analysis Under the Plan | 122 |
| XI. | CONFIRMATION AND CONSUMMATION OF THE PLAN | | 122 |
| A. | | Solicitation of Votes | 122 |
| B. | | The Confirmation Hearing | 123 |
| C. | | Confirmation | 123 |
| | 1. | Acceptance | 124 |
| | 2. | Feasibility | 124 |
| | 3. | Best Interests Test | 125 |
| | 4. | Unfair Discrimination and Fair and Equitable Tests | 127 |
| D. | | Consummation | 127 |
| XII. | CORPORATE GOVERNANCE AND MANAGEMENT OF THE DEBTORS ON THE EFFECTIVE DATE | | 128 |
| A. | | Board of Directors and Management | 128 |
| | 1. | LBHI Board of Directors and Officers | 128 |
| | 2. | Subsidiary Debtor Post-Effective Date Management | 129 |
| | 3. | Plan Trust | 129 |
| | 4. | Plan Administrator | 130 |
| | 5. | Corporate Existence | 130 |
| | 6. | Certificates of Incorporation and By-laws | 130 |
| | 7. | Wind-Down | 130 |
| XIII. | SECURITIES LAWS MATTERS | | 131 |
| XIV. | CERTAIN RISK FACTORS TO BE CONSIDERED | | 131 |
| A. | | Certain Bankruptcy Law Considerations | 132 |
| B. | | Conditions Precedent to Consummation of the Plan | 132 |
| C. | | Asset Sales | 132 |
| D. | | Estimation of Allowed Claims | 133 |

A039

# TABLE OF CONTENTS
### (continued)

Page

E.    Certain Tax Considerations ................................................................. 133

XV.    CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ............. 133

    A.    Consequences to LBHI and Subsidiary Debtors ............................... 134

        1.    Tax Filing Status; Tax Attributes ......................................... 134

        2.    General Discussion of Plan .................................................. 135

            a.    Asset Dispositions ........................................................ 135

            b.    Plan Distributions ........................................................ 135

        3.    Tax Impact of the Plan on the Debtors ................................ 136

            a.    Cancellation of Debt .................................................... 136

            b.    Limitation of NOL Carryforwards and Other Tax Attributes .................................................................. 137

            c.    Non-U.S. Income Tax Matters ..................................... 138

        4.    Transfer of Liquidating Trust Assets to a Liquidating Trust ................. 139

    B.    Consequences to Holders of Claims and LBHI Equity Interests ...................... 139

        1.    Realization and Recognition of Gain or Loss, In General .................... 139

        2.    Holders of Allowed Senior Unsecured Claims, Senior Affiliate Claims, Senior Third-Party Guarantee Claims, Senior Affiliate Guarantee Claims, Convenience Claims, Convenience Guarantee Claims, General Unsecured Claims, Affiliate Claims and Third-Party Guarantee Claims ........................................ 140

        3.    Allocation of Consideration to Interest .................................. 141

    C.    Tax Treatment of a Liquidating Trust and Holders of Beneficial Interests ............................................................................. 141

        1.    Classification of the Liquidating Trust ................................. 141

        2.    General Tax Reporting by the Liquidating Trust and Beneficiaries ..................................................................... 141

        3.    Tax Reporting for Assets Allocable to Disputed Claims ...................... 143

    D.    Withholding on Distributions, and Information Reporting ............................... 144

XVI.    ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN ......................................................................................... 145

    A.    Alternative Plan(s) ................................................................ 145

    B.    Liquidation under Chapter 7 .................................................... 146

**TABLE OF CONTENTS**
**(continued)**

**Page**

XVII.   VOTING PROCEDURES AND REQUIREMENTS ..................................................... 147

    A.   Ballots and Voting Deadline ................................................................. 147

    B.   Parties Entitled to Vote ........................................................................ 148

    C.   Further Information; Additional Copies ............................................... 149

XVIII.  CONCLUSION AND RECOMMENDATION ........................................................... 150

viii

**Exhibits**

| | |
|---|---|
| Exhibit 1 | Third Amended Joint Chapter 11 Plan |
| Exhibit 2A | Balance Sheets of Each Debtor, as of the Applicable Commencement Date |
| Exhibit 2B | Balance Sheets of Each Debtor, as of December 31, 2010 |
| Exhibit 2C | Reconciliation of Cash Flow Estimates (Gross Receipts) to the Balance Sheets, as of December 31, 2010 |
| Exhibit 3 | Condensed Balance Sheets of Woodlands Bank and Aurora Bank, as of March 31, 2011 |
| Exhibit 4 | Recovery Analysis for Each Debtor |
| Exhibit 5 | Liquidation Analysis for Each Debtor |
| Exhibit 6 | Debtors' Estimates of Claims and Claims Data |
| Exhibit 7 | Cash Flow Estimates Through 2014 |
| Exhibit 8A | Significant Balances Among Affiliates |
| Exhibit 8B | Reconciliation of Balance Sheets as of December 31, 2010 and estimated Affiliate Claim Amounts |
| Exhibit 9 | Debtors' Claims Schedule |
| Exhibit 10 | Reallocation of Distributions from Subordinated Notes to Senior Obligations |
| Exhibit 11 | Structured Securities Valuation Methodologies |
| Exhibit 12 | Plan Adjustment Percentages |
| Exhibit 13 | Participating Subsidiary Debtor Convenience Class Distribution Percentage |
| Exhibit 14A | Description of Bankhaus Settlements |
| Exhibit 14B | Bankhaus Settlement Agreement |
| Exhibit 14C | Description of Settlements with the Hong Kong Lehman Entities In Liquidation |
| Exhibit 14D | Settlement Agreement with Hong Kong Lehman Entities In Liquidation |
| Exhibit 14E | Description of Settlement with the Lehman Singapore Entities |
| Exhibit 14F | Settlement Agreement with the Lehman Singapore Entities |
| Exhibit 14G | Description of Settlement with LBT |
| Exhibit 14H | Settlement Agreement with LBT |
| Exhibit 15 | Exchange Rates |
| Exhibit 16 | Summary of Alternative Plans |
| Exhibit 17 | Diagram of Reallocation of Distributions Included in Plan |
| Exhibit 18 | Certain Significant Transactions Regarding Debtors' Assets |
| Exhibit 19 | Description of Business and Capital Structure of Lehman Prior to the Commencement Date |
| Exhibit 20 | List Of Creditors That Have Executed Plan Support Agreements |

## I.  INTRODUCTION

Lehman Brothers Holdings Inc. ("LBHI") and certain of its direct and indirect subsidiaries, as debtors (collectively, the "Debtors"), present this Disclosure Statement pursuant to section 1125 of title 11 of the United States Code (the "Bankruptcy Code") to holders of Claims against and Equity Interests in the Debtors for (i) the solicitation of acceptances of the Debtors' Third Amended Joint Chapter 11 Plan, dated August 31, 2011, as the same may be amended (the "Plan"), filed with the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") and (ii) the hearing to consider confirmation of the Plan ("Confirmation Hearing") scheduled for December 6, 2011 at 10:00 a.m. (prevailing Eastern Time).  The Plan includes, without limitation, the Plan Supplement and all exhibits, supplements, appendices, and schedules, either in its present form or as they may be altered, amended or modified.  Unless otherwise defined herein, all capitalized terms contained herein have the meanings ascribed to them in the Plan.

The key Exhibits attached to this Disclosure Statement include:

- The Plan (Exhibit 1)

- The Balance Sheets of each Debtor (i) as of its applicable Commencement Date; and (ii) as of December 31, 2010 (Exhibits 2A and 2B)

- The Recovery Analysis for each Debtor (Exhibit 4)

- The Liquidation Analysis for each Debtor (Exhibit 5)

- The Debtors' Estimates of Claims and Claims Data (Exhibit 6)

- The Debtors' Cash Flow Estimates Through 2014 (Exhibit 7)

- The Debtors' Claims Schedule (Exhibit 9)

On August 30, 2011, the Bankruptcy Court approved this Disclosure Statement as containing adequate information of a kind and in sufficient detail to enable a hypothetical holder of an Allowed Claim to make an informed judgment whether to accept or reject the Plan (the "Disclosure Statement Order").  APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT, HOWEVER, CONSTITUTE A DETERMINATION BY THE BANKRUPTCY COURT AS TO THE FAIRNESS OR MERITS OF THE PLAN.

A Ballot for the acceptance or rejection of the Plan is included with the Disclosure Statement transmitted to the holders of Claims that the Debtors believe are entitled to vote to accept or reject the Plan.

The Disclosure Statement Order sets forth in detail, among other things, the deadlines, procedures and instructions for voting to accept or reject the Plan and for filing objections to confirmation of the Plan, the record date for voting purposes and the applicable

standards for tabulating Ballots.  In addition, detailed voting instructions accompany each Ballot. Each holder of a Claim entitled to vote on the Plan should read the Disclosure Statement, the Plan, the Disclosure Statement Order and the instructions accompanying the Ballots in their entirety before voting on the Plan.  These documents contain important information concerning the classification of Claims and Equity Interests for voting purposes and how the votes will be tabulated.  No solicitation of votes to accept or reject the Plan may be made except pursuant to section 1125 of the Bankruptcy Code.

## II.     OVERVIEW OF THE PLAN

For a more detailed description of the Plan, refer to section X—"Summary of the Chapter 11 Plan."  Under the Plan, Distributions to holders of Allowed Claims will be funded substantially by the orderly liquidation of the Debtors' assets.  In addition, the Plan is attached hereto as Exhibit 1.

### A.     Summary of the Plan

Since the commencement of LBHI's chapter 11 case, the Debtors have engaged in numerous discussions and meetings with interested parties, including individual and representative groups of both third-party and Affiliate creditors of the various Debtors.  The Debtors' process of negotiating the Plan has been consistent with their goals of achieving confirmation of the Plan on a consensual basis in the most efficient manner.  The Debtors proposed a chapter 11 Plan on January 25, 2011 (the "First Amended Plan") that included a proposed settlement of various legal and factual disputes among the Debtors' creditors.  Two alternative chapter 11 plans were proposed by groups of creditors asserting diametrically opposing views with respect to the substantive consolidation of the Debtors and other issues.

The Debtors convened meetings and participated in intensive negotiations with numerous representative creditors during June, 2011 to pursue a global settlement of the existing issues.  As a result of the meetings and negotiations, the Debtors and the representative groups of creditors, including substantially all of the proponents of the two alternative plans,[1] agreed to the terms of the Plan. The Plan includes economic resolutions of a myriad of issues (the "Plan Issues"), including, but not limited to:

(i)   the potential substantive consolidation of the Debtors and certain of their Affiliates;

(ii)  the characterization of intercompany balances owed to LBHI by Subsidiary Debtors;

(iii) the Allowed Amount of certain Affiliate Claims;

---

[1]  Only the "Steering Committee" of the Ad Hoc Group of Lehman Brothers Creditors (the "Ad Hoc Group") participated in negotiations with the Debtors and other creditors.  The members of the Steering Committee have executed Plan Support Agreements, will cause the Ad Hoc Group to support the Plan and encourage other members of the Ad Hoc Group to execute Plan Support Agreements.

2

    (iv) the ownership and rights of various Debtors and their Affiliates with respect to certain assets; and

    (v) the allocation of costs and expenses among Debtors.

       The Creditors' Committee supports the Plan as the best means to fairly and efficiently resolve the Debtors' Chapter 11 Cases.  The Debtors believe that creditors holding Claims in excess of $100 billion support the Plan.  In addition, 40 parties (and certain of their affiliates), including four of the Debtors' foreign Affiliates have executed Plan Support Agreements (the "Plan Support Agreements") with the Debtors that, subject to solicitation pursuant to section 1125 of the Bankruptcy Code, require the creditors to vote in favor of the Plan.  These creditors have the right to terminate the Plan Support Agreements if the Debtors amend the Plan in a manner that adversely affects their recoveries or other treatment.  A list of the parties that have executed plan support agreements is attached hereto as Exhibit 20.

       In addition, the Debtors and substantially all of the proponents of alternative plans filed in these Chapter 11 Cases have entered into a Stipulation and Order that was approved by the Bankruptcy Court, pursuant to which, among other things, and subject to certain termination rights, each party agrees (a) to stay all discovery currently pending pursuant to the Discovery Protocol Order, (b) not to commence any discovery against any other party to the Stipulation and Order and (c) not to prosecute or seek approval of the alternative plans.

       Many of the entities that have executed or will execute Plan Support Agreements are proponents of alternative plans filed in these Chapter 11 Cases.  The entities that have entered or will enter into Plan Support Agreements do not waive any argument, claim or defense or make any admission with respect to anything contained herein.  In addition, entities that are parties to Plan Support Agreements do not make any representations or warranties as to the accuracy of any of the information contained herein.  The statements made herein represent the views and opinions of the Debtors, and the entities that are party to Plan Support Agreements have not adopted and may not agree with the contents of this Disclosure Statement.

       The Plan does not substantively consolidate the 23 Debtors and Allowed Claims against a Debtor will be satisfied primarily from the assets of that Debtor. However, the Plan takes into consideration the risks of substantive consolidation and protracted litigation and incorporates a global compromise and settlement of the overarching disputes with respect to the Plan Issues.  Litigation of any of the Plan Issues would be vigorously and extensively contested at great expense to the Debtors' estates and their creditors.  Final determinations through such extended litigation would significantly delay Distributions to creditors.  The proposed resolutions of the Plan Issues will reduce the duration of these Chapter 11 Cases and the expenses attendant to such protracted litigation and accelerate distributions to holders of Allowed Claims.   The terms of the compromise and settlement included in the Plan should be considered together as a resolution of all of the Plan Issues.  To implement the resolution of the Plan Issues, the Plan provides for the following:

*Plan Adjustments*

20% of the Distribution to holders of Allowed Claims against LBHI based on Guarantees, excluding Affiliates of LBHI, will automatically be reallocated to holders of Allowed Senior Unsecured Claims and General Unsecured Claims against LBHI. Varying percentages of Distributions to holders of Allowed Claims against LBSF, LCPI, LBCS, LOTC and LBCC will also automatically be reallocated to holders of Allowed Senior Unsecured Claims and General Unsecured Claims against LBHI.

*LBHI Claims Against Subsidiary Debtors*

LBHI will only receive a Distribution on 80% of its Allowed Claim against each of the Subsidiary Debtors that is based on the funding of the operations of the Subsidiary Debtor. In addition, (i) the first $100 million of Distributions that LBHI receives from LCPI on account of such Affiliate Claim against LCPI will automatically be Distributed to holders of Allowed General Unsecured Claims against LCPI in LCPI Class 4A and (ii) the first $100 million of Distributions that LBHI receives from LBSF on account of such Affiliate Claim against LBSF will automatically be Distributed to holders of Allowed General Unsecured Claims against LBSF in LBSF Class 4A.

*LBSF Additional Settlement Amount*

The first $70 million that is recovered by LBSF on its assets in excess of $14,156,000,000 (which is the Total Assets held by LBSF as set forth in the Recovery Analysis attached as Exhibit 4) will be Distributed only to holders of Allowed General Unsecured Claims in LBSF Class 4A and Affiliate Claims of entities other than those of LBHI and the Participating Subsidiary Debtors included in LBSF Class 5C.

*The Racers Claims*

The Racers 2007-A Trust will have an Allowed Claim against (i) LBSF in the amount of $1,947,735,000, (ii) LCPI in the amount of $5,000,000,000 and (iii) LBHI (Guarantee Claim) in the amount of $1,947,735,000. All other Claims filed by the Racers Trusts will be disallowed.

All Distributions received by the Racers 2007-A Trust on account of $1 billion of its Allowed Claims against each of LBSF and LBHI will be automatically reallocated to holders of Allowed Senior Unsecured Claims and General Unsecured Claims against LBHI. 20% of the Distributions to the Racers 2007-A Trust on account of its Allowed Claims against LCPI will automatically be reallocated to holders of Allowed Senior Unsecured Claims and General Unsecured Claims against LBHI.

*Allocation of Costs and Expenses of the Debtors*

The Debtors will enter into an agreement that allocates the costs and expenses of operating the Estates. The agreement will provide, among other things, that LBSF has an Allowed Administrative Expense Claim against LBHI in the amount of $300 million on account of administrative costs.

4

*Allowed Amount of Affiliate Claim of LBT*

LBT will have an Allowed Senior Affiliate Claim against LBHI in the amount of $34,548,000,000.   This amount is significantly less than the amount of claims filed by LBT against LBHI.  All other Claims of LBT against LBHI will be disallowed.

*Allowed Amount of Guarantee Claims Based on Structured Securities Issued or Guaranteed by LBHI*

Pursuant to certain Plan Support Agreements, the Debtors agreed to apply the Structured Securities Valuation Methodologies to all Structured Securities Claims held by such creditors.  In furtherance of that agreement, the Bankruptcy Court approved the procedures for the Debtors to calculate the Allowed amount of all Claims (other than Claims of Affiliates and Claim No. 10082 filed by Wilmington Trust Company) based on structured securities issued or guaranteed by LBHI in accordance with the Structured Securities Valuation Methodologies.  In calculating the proposed Allowed amount of Structured Securities Claims, the Debtors will use the exchange rates in effect on September 15, 2008 as provided in Exhibit 15.  In addition, the Debtors will not contest the validity or enforceability of the guarantee related to any Third-Party Guarantee Claim based on a Structured Security Issued by LBT.

*Derivative Claims*

The Debtors have entered into Termination and Settlement Agreements with 8 of the 13 largest banks that have asserted Claims arising out of the termination of Derivatives Contracts with certain of the Debtors.  Based upon the Derivatives Framework Value, such banks will have Claims in an aggregate Allowed amount of approximately $6.2 billion against certain Participating Subsidiary Debtors and the corresponding guarantee claims in the same amount against LBHI.

**B.      Classification, Treatment and Estimated Recovery for Each Class Under the Plan**

The Claims asserted against each Debtor and Equity Interests in each Debtor are separated into Classes based on the nature of the Claims and legal rights related to the Claim.  A list of the Classes of Claims for each Debtor is set forth in the below table.  The Plan also includes Classes of Convenience Claims for LBHI and the Participating Subsidiary Debtors that provide that holders of such Allowed Claims will receive a Distribution in a fixed amount, in cash, on the Effective Date, or as soon thereafter as is practicable.  The "Participating Subsidiary Debtors" are LCPI, LBSF, LBCC, LBCS and LOTC.   Subordination agreements will be enforced and holders of Claims that have priority over the Subordinated Notes in accordance with the underlying governing documents of the various Subordinated Notes will also receive a Distribution, *pro rata,* of the amount that would have otherwise been distributed to the holders of such Subordinated Notes.  As described above in Section II.A., the Plan provides for certain Distributions to be reallocated from holders of Claims in certain Classes to holders of Claims in other Classes.  A diagram of the Debtors' Plan and the reallocation of certain Distributions is annexed hereto as Exhibit 17.  The table below projects Estimated Recoveries for holders of Allowed Claims against each Debtor.

## SUMMARY OF CLASSIFICATION AND ESTIMATED
## RECOVERY OF CLAIMS AND EQUITY INTERESTS UNDER THE PLAN[2]

### Lehman Brothers Holdings Inc. ("LBHI")

| Class | Type of Claim or Equity Interest | Estimated Recovery[3] | Impairment; Entitlement to Vote |
|---|---|---|---|
| 1 | Priority Non-Tax Claims | 100% | Impaired, Entitled to Vote |
| 2 | Secured Claims | 100% | Impaired, Entitled to Vote |
| 3 | Senior Unsecured Claims | 21.1% | Impaired, Entitled to Vote |
| 4A | Senior Affiliate Claims | 15.6% | Impaired, Entitled to Vote |
| 4B | Senior Affiliate Guarantee Claims | 15.2% | Impaired, Entitled to Vote |
| 5 | Senior Third-Party Guarantee Claims | 12.2% | Impaired, Entitled to Vote |
| 6A | Convenience Claims | 26.0% | Impaired, Entitled to Vote |
| 6B | Convenience Guarantee Claims | 17.0% | Impaired, Entitled to Vote |
| 7 | General Unsecured Claims | 19.9% | Impaired, Entitled to Vote |
| 8 | Affiliate Claims | 14.4% | Impaired, Entitled to Vote |
| 9A | Third-Party Guarantee Claims other than those of the Racers Trusts | 11.5% | Impaired, Entitled to Vote |
| 9B | Third-Party Guarantee Claims of the Racers Trusts | 7.0% | Impaired, Entitled to Vote |
| 10A | Subordinated Class 10A Claims | 0% | Impaired, Not Entitled to Vote, Deemed to Reject |
| 10B | Subordinated Class 10B Claims | 0% | Impaired, Not Entitled to Vote, Deemed to Reject |
| 10C | Subordinated Class 10C Claims | 0% | Impaired, Not Entitled to Vote, Deemed to Reject |
| 11 | Section 510(b) Claims | 0% | Impaired, Not Entitled to Vote, Deemed to Reject |
| 12 | Equity Interests in LBHI | N/A | Impaired, Not Entitled to Vote, Deemed to Reject |

---

[2] Further detail regarding the Estimated Recoveries set forth in the below table is included in the Recovery Analysis and notes thereto annexed hereto as Exhibit 4.

[3] With respect to each of the Debtors, where the Estimated Recovery percentage is shown as "N/A," the amount of Estimated Allowed Claims in such Class is zero dollars.

6

## Lehman Commercial Paper Inc. ("LCPI")

| Class | Type of Claim or Equity Interest | Estimated Recovery | Impairment; Entitlement to Vote |
|---|---|---|---|
| 1 | Priority Non-Tax Claims | 100% | Impaired, Entitled to Vote |
| 2 | Secured Claims | 100% | Impaired, Entitled to Vote |
| 3 | Convenience Claims | 60.0% | Impaired, Entitled to Vote |
| 4A | General Unsecured Claims other than those of Designated Entities | 55.7% | Impaired, Entitled to Vote |
| 4B | General Unsecured Claims of Designated Entities | 48.4% | Impaired, Entitled to Vote |
| 5A | Affiliate Claims of LBHI | 46.0% | Impaired, Entitled to Vote |
| 5B | Affiliate Claims of Participating Subsidiary Debtors | 48.4% | Impaired, Entitled to Vote |
| 5C | Affiliate Claims other than those of LBHI and Participating Subsidiary Debtors | 52.1% | Impaired, Entitled to Vote |
| 6 | Equity Interests | N/A | Impaired, Not Entitled to Vote, Deemed to Reject |

## Lehman Brothers Commodity Services Inc. ("LBCS")

| Class | Type of Claim or Equity Interest | Estimated Recovery | Impairment; Entitlement to Vote |
|---|---|---|---|
| 1 | Priority Non-Tax Claims | 100% | Impaired, Entitled to Vote |
| 2 | Secured Claims | 100% | Impaired, Entitled to Vote |
| 3 | Convenience Claims | 55.0% | Impaired, Entitled to Vote |
| 4 | General Unsecured Claims | 50.8% | Impaired, Entitled to Vote |
| 5A | Affiliate Claims of LBHI | 39.5% | Impaired, Entitled to Vote |
| 5B | Affiliate Claims of Participating Subsidiary Debtors | N/A | Impaired, Entitled to Vote |
| 5C | Affiliate Claims other than those of LBHI and Participating Subsidiary Debtors | 50.8% | Impaired, Entitled to Vote |
| 6 | Equity Interests | N/A | Impaired, Not Entitled to Vote, Deemed to Reject |

US_ACTIVE:\43795376\03\58399.0008

## Lehman Brothers Special Financing Inc. ("LBSF")

| Class | Type of Claim or Equity Interest | Estimated Recovery | Impairment; Entitlement to Vote |
|---|---|---|---|
| 1 | Priority Non-Tax Claims | 100% | Impaired, Entitled to Vote |
| 2 | Secured Claims | 100% | Impaired, Entitled to Vote |
| 3 | Convenience Claims | 32.0% | Impaired, Entitled to Vote |
| 4A | General Unsecured Claims other than those of the Racers Trusts | 27.9% | Impaired, Entitled to Vote |
| 4B | General Unsecured Claims of the Racers Trusts | 14.2% | Impaired, Entitled to Vote |
| 5A | Affiliate Claims of LBHI | 23.9% | Impaired, Entitled to Vote |
| 5B | Affiliate Claims of Participating Subsidiary Debtors | 23.4% | Impaired, Entitled to Vote |
| 5C | Affiliate Claims other than those of LBHI and Participating Subsidiary Debtors | 27.4% | Impaired, Entitled to Vote |
| 6 | Equity Interests | N/A | Impaired, Not Entitled to Vote, Deemed to Reject |

## Lehman Brothers OTC Derivatives Inc. ("LOTC")

| Class | Type of Claim or Equity Interest | Estimated Recovery | Impairment; Entitlement to Vote |
|---|---|---|---|
| 1 | Priority Non-Tax Claims | 100% | Impaired, Entitled to Vote |
| 2 | Secured Claims | 100% | Impaired, Entitled to Vote |
| 3 | Convenience Claims | 34.0% | Impaired, Entitled to Vote |
| 4 | General Unsecured Claims | 29.6% | Impaired, Entitled to Vote |
| 5A | Affiliate Claims of LBHI | 25.8% | Impaired, Entitled to Vote |
| 5B | Affiliate Claims of Participating Subsidiary Debtors | 25.8% | Impaired, Entitled to Vote |
| 5C | Affiliate Claims other than those of LBHI and Participating Subsidiary Debtors | 29.6% | Impaired, Entitled to Vote |
| 6 | Equity Interests | N/A | Impaired, Not Entitled to Vote, Deemed to Reject |

## Lehman Brothers Commercial Corporation ("LBCC")

| Class | Type of Claim or Equity Interest | Estimated Recovery | Impairment; Entitlement to Vote |
|---|---|---|---|
| 1 | Priority Non-Tax Claims | 100% | Impaired, Entitled to Vote |
| 2 | Secured Claims | 100% | Impaired, Entitled to Vote |
| 3 | Convenience Claims | 40.0% | Impaired, Entitled to Vote |
| 4 | General Unsecured Claims | 35.8% | Impaired, Entitled to Vote |
| 5A | Affiliate Claims of LBHI | 0% | Impaired, Entitled to Vote |
| 5B | Affiliate Claims of Participating Subsidiary Debtors | 31.8% | Impaired, Entitled to Vote |
| 5C | Affiliate Claims other than those of LBHI and Participating Subsidiary Debtors | 35.8% | Impaired, Entitled to Vote |
| 6 | Equity Interests | N/A | Impaired, Not Entitled to Vote, Deemed to Reject |

## Lehman Brothers Derivative Products Inc. ("LBDP")

| Class | Type of Claim or Equity Interest | Estimated Recovery | Impairment; Entitlement to Vote |
|---|---|---|---|
| 1 | Priority Non-Tax Claims | 100% | Impaired, Entitled to Vote |
| 2 | Secured Claims | 100% | Impaired, Entitled to Vote |
| 3 | General Unsecured Claims | 100% | Impaired, Entitled to Vote |
| 4A | Affiliate Claims of LBHI | N/A | Impaired, Entitled to Vote |
| 4B | Affiliate Claims other than those of LBHI | 100% | Impaired, Entitled to Vote |
| 5 | Equity Interests | N/A | Impaired, Not Entitled to Vote, Deemed to Reject |

## Lehman Brothers Financial Products Inc. ("LBFP")

| Class | Type of Claim or Equity Interest | Estimated Recovery | Impairment; Entitlement to Vote |
|---|---|---|---|
| 1 | Priority Non-Tax Claims | 100% | Impaired, Entitled to Vote |
| 2 | Secured Claims | 100% | Impaired, Entitled to Vote |
| 3 | General Unsecured Claims | 100% | Impaired, Entitled to Vote |
| 4A | Affiliate Claims of LBHI | 80.0% | Impaired, Entitled to Vote |
| 4B | Affiliate Claims other than those of LBHI | 100% | Impaired, Entitled to Vote |
| 5 | Equity Interests | N/A | Impaired, Not Entitled to Vote, Deemed to Reject |

US_ACTIVE:\43795376\03\58399.0008

## LB 745 LLC ("LB 745")

| Class | Type of Claim or Equity Interest | Estimated Recovery | Impairment; Entitlement to Vote |
|---|---|---|---|
| 1 | Priority Non-Tax Claims | 100% | Impaired, Entitled to Vote |
| 2 | Secured Claims | 100% | Impaired, Entitled to Vote |
| 3 | General Unsecured Claims | 100% | Impaired, Entitled to Vote |
| 4A | Affiliate Claims of LBHI | 79.1% | Impaired, Entitled to Vote |
| 4B | Affiliate Claims other than those of LBHI | N/A | Impaired, Entitled to Vote |
| 5 | Equity Interests | N/A | Impaired, Not Entitled to Vote, Deemed to Reject |

## PAMI Statler Arms LLC ("PAMI Statler")

| Class | Type of Claim or Equity Interest | Estimated Recovery | Impairment; Entitlement to Vote |
|---|---|---|---|
| 1 | Priority Non-Tax Claims | 100% | Impaired, Entitled to Vote |
| 2 | Secured Claims | 100% | Impaired, Entitled to Vote |
| 3 | General Unsecured Claims | 0% | Impaired, Entitled to Vote |
| 4A | Affiliate Claims of LBHI | 0% | Impaired, Entitled to Vote |
| 4B | Affiliate Claims other than those of LBHI | N/A | Impaired, Entitled to Vote |
| 5 | Equity Interests | N/A | Impaired, Not Entitled to Vote, Deemed to Reject |

## CES Aviation LLC ("CES")

| Class | Type of Claim or Equity Interest | Estimated Recovery | Impairment; Entitlement to Vote |
|---|---|---|---|
| 1 | Priority Non-Tax Claims | 100% | Impaired, Entitled to Vote |
| 2 | Secured Claims | 100% | Impaired, Entitled to Vote |
| 3 | General Unsecured Claims | 100% | Impaired, Entitled to Vote |
| 4A | Affiliate Claims of LBHI | 80.0% | Impaired, Entitled to Vote |
| 4B | Affiliate Claims other than those of LBHI | 100% | Impaired, Entitled to Vote |
| 5 | Equity Interests | N/A | Impaired, Not Entitled to Vote, Deemed to Reject |

US_ACTIVE:\43795376\03\58399.0008

## CES Aviation V LLC ("CES V")

| Class | Type of Claim or Equity Interest | Estimated Recovery | Impairment; Entitlement to Vote |
|---|---|---|---|
| 1 | Priority Non-Tax Claims | 100% | Impaired, Entitled to Vote |
| 2 | Secured Claims | 100% | Impaired, Entitled to Vote |
| 3 | General Unsecured Claims | 51.9% | Impaired, Entitled to Vote |
| 4A | Affiliate Claims of LBHI | 41.5% | Impaired, Entitled to Vote |
| 4B | Affiliate Claims other than those of LBHI | 51.9% | Impaired, Entitled to Vote |
| 5 | Equity Interests | N/A | Impaired, Not Entitled to Vote, Deemed to Reject |

## CES Aviation IX LLC ("CES IX")

| Class | Type of Claim or Equity Interest | Estimated Recovery | Impairment; Entitlement to Vote |
|---|---|---|---|
| 1 | Priority Non-Tax Claims | 100% | Impaired, Entitled to Vote |
| 2 | Secured Claims | 100% | Impaired, Entitled to Vote |
| 3 | General Unsecured Claims | 77.1% | Impaired, Entitled to Vote |
| 4A | Affiliate Claims of LBHI | 61.7% | Impaired, Entitled to Vote |
| 4B | Affiliate Claims other than those of LBHI | 77.1% | Impaired, Entitled to Vote |
| 5 | Equity Interests | N/A | Impaired, Not Entitled to Vote, Deemed to Reject |

## East Dover Limited ("East Dover")

| Class | Type of Claim or Equity Interest | Estimated Recovery | Impairment; Entitlement to Vote |
|---|---|---|---|
| 1 | Priority Non-Tax Claims | 100% | Impaired, Entitled to Vote |
| 2 | Secured Claims | 100% | Impaired, Entitled to Vote |
| 3 | General Unsecured Claims | 100% | Impaired, Entitled to Vote |
| 4A | Affiliate Claims of LBHI | 78.9% | Impaired, Entitled to Vote |
| 4B | Affiliate Claims other than those of LBHI | N/A | Impaired, Entitled to Vote |
| 5 | Equity Interests | N/A | Impaired, Not Entitled to Vote, Deemed to Reject |

US_ACTIVE:\43795376\03\58399.0008

A053

**Lehman Scottish Finance L.P. ("LS Finance")**

| Class | Type of Claim or Equity Interest | Estimated Recovery | Impairment; Entitlement to Vote |
|---|---|---|---|
| 1 | Priority Non-Tax Claims | 100% | Impaired, Entitled to Vote |
| 2 | Secured Claims | 100% | Impaired, Entitled to Vote |
| 3 | General Unsecured Claims | N/A | Impaired, Entitled to Vote |
| 4A | Affiliate Claims of LBHI | N/A | Impaired, Entitled to Vote |
| 4B | Affiliate Claims other than those of LBHI | N/A | Impaired, Entitled to Vote |
| 5 | Equity Interests | N/A | Impaired, Not Entitled to Vote, Deemed to Reject |

**Luxembourg Residential Properties Loan Finance S.a.r.l. ("LUXCO")**

| Class | Type of Claim or Equity Interest | Estimated Recovery | Impairment; Entitlement to Vote |
|---|---|---|---|
| 1 | Priority Non-Tax Claims | 100% | Impaired, Entitled to Vote |
| 2 | Secured Claims | 100% | Impaired, Entitled to Vote |
| 3 | General Unsecured Claims | N/A | Impaired, Entitled to Vote |
| 4A | Affiliate Claims of LBHI | N/A | Impaired, Entitled to Vote |
| 4B | Affiliate Claims other than those of LBHI | 16.1% | Impaired, Entitled to Vote |
| 5 | Equity Interests | N/A | Impaired, Not Entitled to Vote, Deemed to Reject |

**BNC Mortgage LLC ("BNC")**

| Class | Type of Claim or Equity Interest | Estimated Recovery | Impairment; Entitlement to Vote |
|---|---|---|---|
| 1 | Priority Non-Tax Claims | 100% | Impaired, Entitled to Vote |
| 2 | Secured Claims | 100% | Impaired, Entitled to Vote |
| 3 | General Unsecured Claims | 100% | Impaired, Entitled to Vote |
| 4A | Affiliate Claims of LBHI | N/A | Impaired, Entitled to Vote |
| 4B | Affiliate Claims other than those of LBHI | 100% | Impaired, Entitled to Vote |
| 5 | Equity Interests | N/A | Impaired, Not Entitled to Vote, Deemed to Reject |

US_ACTIVE:\43795376\03\58399.0008

A054

## LB Rose Ranch LLC ("LB Rose Ranch")

| Class | Type of Claim or Equity Interest | Estimated Recovery | Impairment; Entitlement to Vote |
|---|---|---|---|
| 1 | Priority Non-Tax Claims | 100% | Impaired, Entitled to Vote |
| 2 | Secured Claims | 100% | Impaired, Entitled to Vote |
| 3 | General Unsecured Claims | 61.0% | Impaired, Entitled to Vote |
| 4A | Affiliate Claims of LBHI | N/A | Impaired, Entitled to Vote |
| 4B | Affiliate Claims other than those of LBHI | N/A | Impaired, Entitled to Vote |
| 5 | Equity Interests | N/A | Impaired, Not Entitled to Vote, Deemed to Reject |

## Structured Asset Securities Corporation ("SASCO")

| Class | Type of Claim or Equity Interest | Estimated Recovery | Impairment; Entitlement to Vote |
|---|---|---|---|
| 1 | Priority Non-Tax Claims | 100% | Impaired, Entitled to Vote |
| 2 | Secured Claims | 100% | Impaired, Entitled to Vote |
| 3 | General Unsecured Claims | 50.5% | Impaired, Entitled to Vote |
| 4A | Affiliate Claims of LBHI | 40.4% | Impaired, Entitled to Vote |
| 4B | Affiliate Claims other than those of LBHI | 50.5% | Impaired, Entitled to Vote |
| 5 | Equity Interests | N/A | Impaired, Not Entitled to Vote, Deemed to Reject |

## LB 2080 Kalakaua Owners LLC ("LB 2080")

| Class | Type of Claim or Equity Interest | Estimated Recovery | Impairment; Entitlement to Vote |
|---|---|---|---|
| 1 | Priority Non-Tax Claims | 100% | Impaired, Entitled to Vote |
| 2 | Secured Claims | 100% | Impaired, Entitled to Vote |
| 3 | General Unsecured Claims | 0.8% | Impaired, Entitled to Vote |
| 4A | Affiliate Claims of LBHI | N/A | Impaired, Entitled to Vote |
| 4B | Affiliate Claims other than those of LBHI | 0.8% | Impaired, Entitled to Vote |
| 5 | Equity Interests | N/A | Impaired, Not Entitled to Vote, Deemed to Reject |

US_ACTIVE:\43795376\03\58399.0008

## Merit LLC ("Merit")

| Class | Type of Claim or Equity Interest | Estimated Recovery | Impairment; Entitlement to Vote |
|-------|----------------------------------|--------------------|--------------------------------|
| 1 | Priority Non-Tax Claims | 100% | Impaired, Entitled to Vote |
| 2 | Secured Claims | 100% | Impaired, Entitled to Vote |
| 3 | General Unsecured Claims | N/A | Impaired, Entitled to Vote |
| 4A | Affiliate Claims of LBHI | N/A | Impaired, Entitled to Vote |
| 4B | Affiliate Claims other than those of LBHI | 10.0% | Impaired, Entitled to Vote |
| 5 | Equity Interests | N/A | Impaired, Not Entitled to Vote, Deemed to Reject |

## LB Preferred Somerset LLC ("Preferred Somerset")

| Class | Type of Claim or Equity Interest | Estimated Recovery | Impairment; Entitlement to Vote |
|-------|----------------------------------|--------------------|--------------------------------|
| 1 | Priority Non-Tax Claims | 100% | Impaired, Entitled to Vote |
| 2 | Secured Claims | 100% | Impaired, Entitled to Vote |
| 3 | General Unsecured Claims | 0% | Impaired, Entitled to Vote |
| 4A | Affiliate Claims of LBHI | N/A | Impaired, Entitled to Vote |
| 4B | Affiliate Claims other than those of LBHI | 0% | Impaired, Entitled to Vote |
| 5 | Equity Interests | N/A | Impaired, Not Entitled to Vote, Deemed to Reject |

## LB Somerset LLC ("Somerset")

| Class | Type of Claim or Equity Interest | Estimated Recovery | Impairment; Entitlement to Vote |
|-------|----------------------------------|--------------------|--------------------------------|
| 1 | Priority Non-Tax Claims | 100% | Impaired, Entitled to Vote |
| 2 | Secured Claims | 100% | Impaired, Entitled to Vote |
| 3 | General Unsecured Claims | 0% | Impaired, Entitled to Vote |
| 4A | Affiliate Claims of LBHI | N/A | Impaired, Entitled to Vote |
| 4B | Affiliate Claims other than those of LBHI | 0% | Impaired, Entitled to Vote |
| 5 | Equity Interests | N/A | Impaired, Not Entitled to Vote, Deemed to Reject |

US_ACTIVE:\43795376\03\58399.0008

### C.        Holders of Claims Entitled to Vote

Pursuant to the Bankruptcy Code, only holders of allowed Claims or equity interests in classes of Claims or equity interests that are impaired and that are not deemed to have rejected a plan are entitled to vote to accept or reject the plan.  Classes of Claims or equity interests in which the holders of Claims or equity interests are unimpaired under a plan are deemed to have accepted the plan.  Classes of Claims or equity interests that will not receive or retain any property on account of Claims or equity interests are deemed to have rejected the plan. For a detailed description of the treatment of Claims and Equity Interests under the Plan, see Section X.C— "Classification of Treatment of Claims and Equity Interests" below.

Claims in all Classes under the Plan are impaired and, to the extent Claims in such Classes are Allowed, the holders of such Claims (other than Claims in LBHI Classes 10A, 10B, 10C and 11) will receive Distributions under the Plan.  As a result, holders of Claims in all Classes (other than Claims in LBHI Classes 10A, 10B, 10C and 11) are entitled to vote to accept or reject the Plan.  Holders of Equity Interests in all Debtors are impaired and are deemed to have rejected the Plan.

The Bankruptcy Code defines "acceptance" of a plan by a class of claims as acceptance by creditors in that class that hold at least two-thirds in dollar amount and more than one-half in number of the claims that cast ballots for acceptance of the plan.  For a more detailed description of the requirements for confirmation of the Plan, see Section XI— "Confirmation and Consummation of the Plan" below.

If a Class of Claims or Equity Interests entitled to vote on the Plan rejects the Plan or is deemed to have rejected the Plan, the Debtors reserve the right to amend and revise the Plan or request confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code or both. Section 1129(b) of the Bankruptcy Code enables the confirmation of a chapter 11 plan notwithstanding the rejection of a plan by one or more impaired classes of claims or equity interests.  Under that section, a plan may be confirmed by a bankruptcy court if it complies with section 1129(a) of the Bankruptcy Code and as to the rejecting class does not "discriminate unfairly" and is "fair and equitable" with respect to each rejecting class.  For a more detailed description of the requirements for confirmation of a nonconsensual plan, see Section XI.C.2— "Unfair Discrimination and Fair and Equitable Tests" of this Disclosure Statement.

<u>**THE DEBTORS RECOMMEND THAT ALL HOLDERS OF CLAIMS IN ALL CLASSES VOTE TO ACCEPT THE PLAN.**</u>

### D.        Voting Procedures

The voting deadline is 4:00 p.m., prevailing Eastern Time, November 4, 2011 (the "<u>Voting Deadline</u>")

If you are entitled to vote to accept or reject the Plan, a Ballot is provided for the purpose of voting on the Plan.  If you hold Claims in more than one Class and you are entitled to vote Claims in more than one Class, you will receive Ballots enabling you to vote in each separate Class of Claims.  Instructions for returning Ballots are included with each form of Ballot.

15

If the return envelope provided with your Ballot was addressed to your bank or brokerage firm, please allow sufficient time for that firm to process your vote on a Master Ballot before the Voting Deadline.

Do not return any other documents with your Ballot.

TO BE COUNTED, YOUR BALLOT OR THE MASTER BALLOT CAST ON YOUR BEHALF MUST BE **RECEIVED** BY NO LATER THAN **4:00 P.M. (PREVAILING EASTERN TIME) ON NOVEMBER 4, 2011**.  ANY EXECUTED BALLOT RECEIVED THAT DOES NOT INDICATE EITHER AN ACCEPTANCE OR A REJECTION OF THE PLAN, OR THAT INDICATES BOTH AN ACCEPTANCE AND A REJECTION OF THE PLAN, SHALL NOT BE COUNTED.

Pursuant to the Disclosure Statement Order, the Bankruptcy Court set August 1, 2011 as the record date for holders of Claims and Equity Interests entitled to vote on the Plan (the "Voting Record Date").  Accordingly, only holders of record as of the Voting Record Date that otherwise are entitled to vote under the Plan will receive a Ballot and may vote on the Plan.

If you are a holder of a Claim or Equity Interest entitled to vote on the Plan and you did not receive a Ballot, received a damaged Ballot or lost your Ballot or if you have any questions concerning the Disclosure Statement, the Plan or the procedures for voting on the Plan, please call Epiq Bankruptcy Solutions, LLC at 1-866-879-0688 if you are located in the United States, or 1-503-597-7691 if you are located outside of the United States.

E.    **Confirmation Hearing**

Pursuant to section 1128 of the Bankruptcy Code, the Confirmation Hearing will be held on December 6, 2011 at 10:00 a.m. (prevailing Eastern Time) before the Honorable James M. Peck, United States Bankruptcy Judge, in Room 601, United States Bankruptcy Court for the Southern District of New York, Alexander Hamilton Customs House, One Bowling Green, New York, New York 10004.  The Bankruptcy Court has directed that objections, if any, to confirmation of the Plan must be served and filed so that they are actually filed and received on or before November 4, 2011 at 4:00 p.m. (prevailing Eastern Time) in the manner described below in section XI.B— "The Confirmation Hearing" below.  The Confirmation Hearing may be adjourned from time to time without further notice except for the announcement of the adjournment date made at the Confirmation Hearing or at any subsequent adjourned Confirmation Hearing.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE OF THIS DISCLOSURE STATEMENT UNLESS ANOTHER TIME IS SPECIFIED HEREIN, AND THE DELIVERY OF THIS DISCLOSURE STATEMENT SHALL NOT CREATE AN IMPLICATION THAT THERE HAS BEEN NO CHANGE IN THE INFORMATION STATED SINCE THE DATE OF THIS DISCLOSURE STATEMENT.    HOLDERS OF CLAIMS SHOULD CAREFULLY READ THIS DISCLOSURE STATEMENT IN ITS ENTIRETY, INCLUDING THE EXHIBITS, PRIOR TO VOTING ON THE PLAN.

FOR THE CONVENIENCE OF HOLDERS OF CLAIMS AND EQUITY INTERESTS, THIS DISCLOSURE STATEMENT SUMMARIZES THE TERMS OF THE PLAN.   IF ANY INCONSISTENCY EXISTS BETWEEN THE PLAN AND THE DISCLOSURE STATEMENT, THE TERMS OF THE PLAN ARE CONTROLLING.   THE DISCLOSURE STATEMENT MAY NOT BE RELIED ON FOR ANY PURPOSE OTHER THAN TO DETERMINE WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN, AND NOTHING STATED HEREIN SHALL CONSTITUTE AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, OR BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTORS OR ANY OTHER PARTY, OR BE DEEMED CONCLUSIVE EVIDENCE OF THE TAX OR OTHER LEGAL EFFECTS OF THE PLAN ON THE DEBTORS OR HOLDERS OF CLAIMS OR EQUITY INTERESTS.   CERTAIN OF THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT, BY NATURE, ARE FORWARD-LOOKING AND CONTAIN ESTIMATES AND ASSUMPTIONS.   THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL BE REFLECTIVE OF ACTUAL OUTCOMES.

ALL HOLDERS OF CLAIMS SHOULD CAREFULLY READ AND CONSIDER FULLY THE RISK FACTORS SET FORTH IN SECTION XIV— "CERTAIN RISK FACTORS TO BE CONSIDERED" BELOW BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

SUMMARIES OF CERTAIN PROVISIONS OF AGREEMENTS REFERRED TO IN THIS DISCLOSURE STATEMENT DO NOT PURPORT TO BE COMPLETE AND ARE SUBJECT TO, AND ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO, THE FULL TEXT OF THE APPLICABLE AGREEMENTS, INCLUDING THE DEFINITIONS OF TERMS CONTAINED IN SUCH AGREEMENTS.

THE DEBTORS BELIEVE THAT THE PLAN WILL ENABLE THEM TO ACCOMPLISH THE OBJECTIVES OF CHAPTER 11 AND THAT ACCEPTANCE OF THE PLAN IS IN THE BEST INTERESTS OF THE DEBTORS AND THEIR CREDITORS.

**THE DEBTORS URGE CREDITORS TO VOTE TO ACCEPT THE PLAN.**

**IRS CIRCULAR 230 NOTICE:   TO ENSURE COMPLIANCE WITH IRS CIRCULAR 230, HOLDERS OF CLAIMS AND EQUITY INTERESTS ARE HEREBY NOTIFIED THAT: (A) ANY DISCUSSION OF FEDERAL TAX ISSUES CONTAINED OR REFERRED TO IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY HOLDERS OF CLAIMS AND EQUITY INTERESTS FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON THEM UNDER THE IRC; (B) SUCH DISCUSSION IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING BY THE DEBTORS OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN; AND (C) HOLDERS OF CLAIMS AND EQUITY INTERESTS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.**

The US Trustee has filed an objection to the Disclosure Statement raising various concerns over several sections of the Disclosure Statement [Docket No. 19157]. The Debtors

17

have made certain changes to the Disclosure Statement to address some of the US Trustee's objections. The Debtors and the US Trustee have agreed that consideration of the unresolved objections will be deferred to confirmation of the Plan. Notwithstanding anything to the contrary, the US Trustee's rights to object to any and all provisions of the Plan under the Bankruptcy Code, Bankruptcy Rules, applicable non-bankruptcy law and case law are preserved regardless of whether the US Trustee previously raised the objection to the Disclosure Statement. In addition, any and all rights of the Debtors to oppose such objections are likewise preserved.

## III.   GENERAL INFORMATION

### A.   Overview of Chapter 11

Under chapter 11 of the Bankruptcy Code, a debtor may propose to reorganize or liquidate its business and assets subject to the provisions of the Bankruptcy Code.

In general, a chapter 11 plan (i) divides claims and equity interests into separate classes, (ii) specifies the consideration that each class is to receive under the plan, and (iii) contains other provisions necessary to implement the plan.   Under the Bankruptcy Code, "claims" and "equity interests," rather than "creditors" and "shareholders," are classified because creditors and shareholders may hold claims and equity interests in more than one class.   Under section 1124 of the Bankruptcy Code, a class of claims is "impaired" under a plan unless the plan (i) leaves unaltered the legal, equitable, and contractual rights of each holder of a claim in that class, or (ii) to the extent defaults exist, provides for the cure of existing defaults, reinstatement of the maturity of claims in that class, compensates each holder of a claim for any pecuniary damages incurred as a result of reasonable reliance upon the default, and does not otherwise alter the legal, equitable or contractual rights of each holder of a claim in that class.

The commencement of a chapter 11 case creates an estate that is comprised of all of the legal, contractual and equitable interests of the debtor as of the commencement date.   The Bankruptcy Code provides that the debtor may continue to manage and operate its business and remain in possession of its property as a "debtor in possession."

The consummation of a plan is a principal objective of a chapter 11 case.   A chapter 11 plan sets forth the means for satisfying claims against and interests in a debtor and, if appropriate, the future conduct of the debtor's business or the liquidation of the debtor's remaining assets.   Confirmation of a plan by the bankruptcy court binds the debtor, any person acquiring property under the plan, and any creditor or equity interest holder of a debtor to the terms and provisions of the plan as of the effective date of the plan.

Certain holders of claims against and interests in a debtor are permitted to vote to accept or reject the plan.   Prior to soliciting acceptances of the proposed plan, section 1125 of the Bankruptcy Code requires a debtor to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment to accept or reject the plan.   The Debtors are distributing this Disclosure Statement to holders of Claims against the Debtors that are expected to receive a Distribution under the Plan in satisfaction of the requirements of section 1125 of the Bankruptcy Code.

US_ACTIVE:\43795376\03\58399.0008

**THE DEBTORS ARE NOT PROVIDING THIS DISCLOSURE STATEMENT TO HOLDERS OF CLAIMS IN LBHI CLASSES 10A, 10B, 10C AND 11 OR EQUITY INTERESTS IN THE DEBTORS, INCLUDING THE HOLDERS OF EQUITY INTERESTS IN LBHI, BECAUSE SUCH CLAIMANTS AND EQUITY HOLDERS ARE NOT ELIGIBLE TO VOTE ON THE PLAN AND ARE DEEMED TO HAVE REJECTED THE PLAN.  HOLDERS OF CLAIMS IN LBHI CLASSES 10A, 10B, 10C AND 11 AND HOLDERS OF EQUITY INTERESTS IN ANY OF THE DEBTORS MAY OBTAIN A COPY OF THE DISCLOSURE STATEMENT BY CONTACTING EPIQ BANKRUPTCY SOLUTIONS, LLC AT 1-866-879-0688 IF THEY ARE LOCATED IN THE UNITED STATES, OR 1-503-597-7691 IF THEY ARE LOCATED OUTSIDE OF THE UNITED STATES.**

### B. General Information Regarding Lehman

A general description of Lehman's organization and business prior to LBHI's Commencement Date is included in Exhibit 20 hereto.  As a result of (i) the commencement of the Chapter 11 Cases, (ii) the commencement of a proceeding under the Securities Investors Protection Act of 1970 ("SIPA") for LBI, (iii) the commencement of the insolvency proceedings relating to the Foreign Debtors (as defined below), and (iv) the sale of significant business units and assets after the Commencement Date, the global business of Lehman has significantly changed and no longer resembles the description set forth in Exhibit 20.

## IV.   THE CHAPTER 11 CASES

On September 15, 2008, LBHI commenced its Chapter 11 Case to preserve its assets and maximize value for the benefit of all of its economic stakeholders.  Following the commencement of LBHI's chapter 11 case, several of LBHI's Affiliates commenced insolvency proceedings in their respective countries and are subject to the insolvency laws of their respective jurisdictions.

Following September 15, 2008, the Subsidiary Debtors commenced their own voluntary cases under chapter 11 of the Bankruptcy Code.  The Debtors' Chapter 11 Cases have been consolidated for procedural purposes only and are being jointly administered pursuant to Bankruptcy Rule 1015(b).  The Debtors are authorized to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

### A. Stabilization of the Business

During the initial stages of the Chapter 11 Cases, the Debtors engaged Alvarez & Marsal North America LLC ("A&M") to provide crisis management and other services necessary to the preservation of asset values and the administration of the Chapter 11 Cases. Bryan Marsal was appointed the Chief Restructuring Officer and has since been appointed the Chief Executive Officer.  A&M personnel have led the administration of the Chapter 11 Cases. The Debtors' Chapter 11 Cases were followed by a period of global turmoil in the financial markets, the effects of which have been persistent and which precipitated massive federal intervention to save the financial system.  In that context, the initial phases of the Chapter 11

Cases were tumultuous, hectic in all respects and extraordinarily demanding of all parties involved.

Of primary concern to the Debtors, prior to the involvement of A&M, was avoiding the loss of thousands of jobs, customer dislocation and the significant loss in value that would have resulted from a liquidation of LBI.  LBI was Lehman's primary operating entity for the Lehman North American capital markets and investment banking business.  LBI maintained Lehman's customer accounts, functioned as a broker/dealer registered with and regulated by the SEC and as a result did not qualify to be a debtor under chapter 11 of the Bankruptcy Code.  Rather, LBI was subject to potential liquidation proceedings under SIPA.

Pursuant to arrangements made with the Federal Reserve Bank of New York ("FRBNY") during the evening of Sunday, September 14, 2008, LBI was allowed to continue to function as a broker/dealer financed by the FRBNY.  During the early morning hours of September 15, 2008, Lehman contacted Barclays to explore the possibility of negotiating a sale, in accordance with the Bankruptcy Code, of Lehman's North American capital markets and investment banking businesses operated by LBI.  As a result, huge efforts were dedicated by Lehman to negotiations with Barclays.  At that time, A&M was just beginning to organize its management team.  As a consequence, A&M did not participate in the Barclays negotiations or the finalization of the transaction (other than with respect to the negotiation of the Transition Services Agreement).  The contemplated sale posed a number of problems.  Barclays would not agree to a sale without the protection of a court order because it did not want to expose itself to the risk of potential fraudulent transfer and other claims.  Another problem was time.  As a financial organization, the businesses of Lehman and, in particular, LBI, were extremely sensitive to market forces and potentially a severe and sharp drop in value if the sale were not expeditiously consummated, as expressly conditioned by Barclays.

The sale agreement with Barclays made the cooperation of Securities Investor Protection Corporation essential so that the timeline of the sale process could be coordinated with the commencement of LBI's broker/dealer liquidation under SIPA.  The Bankruptcy Court acted expeditiously, despite objections, and taking into account the urgency and sensitivity of the situation, approved the proposed sale procedures at a hearing on Wednesday, September 17, 2008.  On September 19, 2008, as the sale approval hearing was commencing, SIPC caused LBI to be placed into a proceeding under SIPA that was pursued on a parallel basis with the chapter 11 case of LBHI, including the joint hearing on the sale of the North American capital markets business to Barclays.  The sale preserved a significant number of jobs, enabled customers of LBI access to their accounts, and was the essential first step in establishing the foundation for the Chapter 11 Cases.

B.     **Creditors' Committee**

On September 17, 2008, the United States Trustee for the Southern District of New York (the "US Trustee"), pursuant to section 1102(a)(1) of the Bankruptcy Code, appointed the Creditors' Committee to represent the interests of the unsecured creditors of the Debtors.  The original committee consisted of Wilmington Trust Company, as Indenture Trustee, The Bank of NY Mellon, Mizuho Corporate Bank, Ltd., as Agent, Metropolitan Life Insurance Co., Shinsei Bank, Limited, The Royal Bank of Scotland, PLC, and RR Donnelley & Sons.  The

Creditors' Committee's composition was amended on October 3, 2008, at which time The Royal Bank of Scotland, PLC and RR Donnelley & Sons were replaced with The Vanguard Group and Aegon USA Investment Management, respectively.  The Creditors' Committee composition was reduced to five members on December 15, 2009, when Shinsei Bank, Limited and Aegon USA Investment Management resigned.   On February 9, 2010, the Creditors' Committee was expanded to seven members with the appointment of U.S. Bank, N.A., as Indenture Trustee, and Elliott Management Corp.

Since the appointment of the Creditors' Committee, the Debtors have regularly consulted with the Creditors' Committee and its professionals concerning the administration of the Chapter 11 Cases.  The Debtors have kept the Creditors' Committee and its professionals informed with respect to their operations and have obtained the concurrence of the Creditors' Committee for actions and transactions outside of the ordinary course of the Debtors' business. The Debtors have met with the Creditors' Committee and its advisors on at least a monthly basis, and have participated in many meetings with sub-committees of the Creditors' Committee focused on specific asset classes and related issues on a regular and frequent basis.   The Creditors' Committee and its professionals have participated actively, together with the Debtors and their professionals, in, among other things, reviewing the Debtors' business operations across all of the Debtors' business lines as well as to all matters relating to the administration of the Chapter 11 Cases and the formulation of the Plan.  These meetings occur on an almost daily basis.

The expenses of members of the Creditors' Committee and the fees and expenses of the Creditors' Committee's professionals are administrative expenses of the Debtors in the Chapter 11 Cases, subject to approval by the Bankruptcy Court.

The Debtors also have met and conferred with certain non-statutory groups of creditors and their financial and legal advisors.

### C.     Fee Committee

On May 26, 2009, the Bankruptcy Court entered an order (i) appointing a committee (the "Fee Committee"), among other things, to review the fees incurred by professionals retained in these cases, and (ii) approving a fee protocol by which the Fee Committee would operate [Docket No. 3651].  The Fee Committee consists of four members: (i) a representative of the Debtors, (ii) a representative appointed by the Creditors' Committee, (iii) the US Trustee and (iv) an independent member.

On January 24, 2011, following the resignation of the independent member, the Fee Committee recommended Richard Gitlin to serve as the successor independent member. [Docket No. 14112].  By order of the same date, the Bankruptcy Court approved the appointment of Mr. Gitlin to the Fee Committee [Docket No. 14117].

By order dated April 6, 2011, the Bankruptcy Court authorized the Fee Committee to retain Godfrey & Kahn, S.C. as its counsel [Docket No. 15663].

By order dated April 14, 2011, the Bankruptcy Court approved the implementation of an amended fee protocol (the "Amended Fee Protocol"), under which the composition of the Fee Committee remained the same [Docket No. 15998]. Pursuant to the Amended Fee Protocol, the Fee Committee is charged with: "[m]onitoring, reviewing and, where appropriate, objecting to applications for fees and expenses filed by [retained professionals] … and to "[e]stablish measures to help the Court ensure that compensation and expenses paid by the Estate are reasonable, actual and necessary under the Bankruptcy Code." Amended Fee Protocol at B and C.

The Fee Committee will continue to exist after the Effective Date to perform its duties under the Amended Fee Protocol in connection with all applications for approval of professional fees incurred prior to the Effective Date, and all related proceedings, including hearings on final fee applications.  The Debtors shall pay the reasonable fees and expenses of the Independent Member and Fee Committee Counsel retained by the Fee Committee in connection with the foregoing from and after the Effective Date.  It is anticipated that subsequent to consideration of final fee applications, the Fee Committee will be disbanded.

### D.     Lehman Brothers Inc.'s SIPA Proceeding; Lehman ALI

On the Commencement Date, LBI was a wholly-owned direct subsidiary of LBHI and a broker/dealer registered with the SEC.  Following the Commencement Date, LBHI negotiated and agreed to the sale of substantially all of Lehman's North American capital markets and investment banking business to Barclays.  Barclays declined to acquire certain businesses and assets of LBI, including those relating to derivative products or real estate investments held in various subsidiaries of LBI.  Therefore, on September 19, 2008, prior to the commencement of LBI's proceeding under the SIPA, LBI transferred to Lehman ALI Inc. ("Lehman ALI"), a wholly-owned direct subsidiary of LBHI, all of LBI's interests in the shares of those subsidiaries of LBI.

Pursuant to such transaction, Lehman ALI acquired all of LBI's interest in the shares of:  LCPI, LBSF, LBDP, LBFP, Blue Jay Realty Corporation, FRAH Special Services Inc., LB I Group Inc., LBI India Holdings Mauritius III Limited, LB Leasing Inc., Lehman Brothers (Israel) Inc., Lehman Brothers (Spain) S.A., Lehman Brothers de Venezuela C.A., Lehman Brothers Europe Inc., Lehman Brothers Finance (Japan) Inc., Lehman Brothers Investment Holding Company Inc., Lehman Brothers International Services, Inc., Lehman Brothers Holdings International Inc., Lehman Brothers Investment Management Asia Limited, Lehman Brothers Overseas Inc., Lehman Brothers South Asia Limited (inactive), Lehman Realty & Development Corp., MBR/GP Corp., RIBCO LLC and RIBCO SPC, Inc.  The transfers were intended to preserve the value of the transferred assets and enhance potential recoveries. Subsequent to the transfer, certain of the transferred entities filed for chapter 11 protection.

In exchange for the transfer of the shares of these entities, Lehman ALI provided a note (the "PIK Note") to LBI in an amount equal to the fair market value of the shares of such entities as of September 19, 2008, with such amount to be determined pursuant to a methodology to be agreed to by LBI and Lazard.  As security for the payments due under the PIK Note, Lehman ALI granted LBI a security interest in the stock of the acquired entities and the proceeds of any sale of such shares.  LBI also transferred to Lehman ALI certain patents and trademarks

22

that were owned by LBI but used in the investment management division. In consideration for the transfer of such intellectual property, Lehman ALI issued another note (the "IP PIK Note") to LBI. The amount of the IP PIK Note is equal to the fair market value of the transferred intellectual property as of September 19, 2008, with such amount to be determined pursuant to a methodology to be agreed to by LBI and Lazard. The IP PIK Note is secured by a security interest in the transferred intellectual property.

The Debtors do not believe that Lehman ALI has any liability with respect to the value of the shares of the transferred entities. They also believe that the intellectual property acquired from LBI did not have any value as of September 19, 2008. Accordingly, no liability has been recognized by Lehman ALI on its balance sheet. The trustee appointed to liquidate LBI under SIPA (the "SIPA Trustee") does not concur with the conclusions of the Debtors and has reserved all of his rights with respect to such PIK Notes. As of the date hereof, neither the value, nor the methodology for determining the value of the PIK Note and the IP PIK Note has been agreed among the parties. The Debtors are in discussions with the SIPA Trustee regarding a possible resolution of the disputes. At this time, however, the Debtors cannot predict whether the disputes will be resolved through a consensual settlement or judicial process. It is the Debtors' view that the outcome of these discussions and the resolution of the values, if any, of the notes will not have a material impact on recoveries.

## E. Sale of the North American Capital Markets and Investment Banking Business to Barclays Capital Inc.

On September 16, 2008, one day after the Commencement Date, the Debtors and Barclays entered into an asset purchase agreement (the "Barclays Asset Purchase Agreement") with respect to the sale of all assets (except for certain excluded assets) used in connection with the Debtors' North American capital markets and investment banking business (the "Barclays Purchased Assets"). The sale of the Barclays Purchased Assets was consummated pursuant to an Order of the Bankruptcy Court, dated September 19, 2008 (the "Barclays Sale Order"), and the Barclays Asset Purchase Agreement, as amended on September 19, 2008, and a clarification letter (the "Clarification Letter") dated as of September 20, 2008, and executed on September 22, 2008 [Docket No. 258].

In consideration for the transfer of the Barclays Purchased Assets, Barclays (i) paid approximately $1.3 billion for Lehman's corporate headquarters building and two data centers, (ii) paid $250 million for the goodwill of LBI, (iii) agreed to assume certain liabilities relating to compensation to LBI's employees, transfer taxes and accounts payable in the ordinary course of business, and (iv) agreed to be responsible for approximately $1.5 billion in cure costs as to assumed executory contracts and liabilities under assigned leases. Significant to the agreement was the condition precedent that virtually all domestic employees of LBI, totaling approximately 10,000, had the opportunity to continue their employment on the same terms they had with Lehman through December 31, 2008. In addition, the transfer of the private investment management businesses to Barclays provided an expeditious transfer of thousands of customer accounts to Barclays which enabled such holders to continue to access their accounts.

Certain aspects of the sale of the Barclays Purchased Assets pursuant to the Barclays Asset Purchase Agreement and Clarification Letter were the subject of litigation

23

commenced by LBHI, the Creditors' Committee and the LBI SIPA Trustee against Barclays. Such claims included the contention that certain aspects of the sale were not disclosed to the Bankruptcy Court and resulted in Barclays acquiring more value than otherwise presented to the Bankruptcy Court. LBHI sought the recovery of that value. Barclays opposed the claims made and asserted that LBHI and the SIPA Trustee did not deliver to Barclays certain assets that were required under the Barclays Asset Purchase Agreement.

On February 22, 2011, after a 37-day evidentiary hearing and lengthy briefing by all parties, the Bankruptcy Court issued a 103-page Opinion addressing the various claims raised in the litigation (the "Rule 60(b) Opinion"). While the Bankruptcy Court found that certain aspects of the transaction had not been disclosed to the Bankruptcy Court, the Bankruptcy Court found that any failures to disclose were not intentional and understandable in the context of the financial crisis that permeated the economic environment and the sale process during the week of September 15, 2008. Accordingly, the Bankruptcy Court (i) denied the rule 60(b) motions of LBHI, the LBI SIPA Trustee and the Creditors' Committee; (ii) denied Barclays' motion to the extent it sought delivery of Rule 15c3-3 cash and margin assets; and (iii) granted Barclays' motion to recover the remaining "clearance box assets." (Rule 60(b) Opinion at 9.)

Certain aspects of these and related proceedings have yet to be completed. The SIPA Trustee and Barclays engaged in post-trial motion practice concerning the terms of a proposed order memorializing the Bankruptcy Court's ruling, and such motions have now been decided. On July 15, 2011, the Bankruptcy Court issued orders concerning the Rule 60(b) motions. The parties have since filed several notices of appeal with respect to various aspects of the Rule 60(b) proceedings. LBHI also has filed a summary judgment motion in connection with one of its claims under its adversary complaint, specifically its breach of contract cause of action concerning Barclays' breach of the bonus-payment provisions of the Barclays Asset Purchase Agreement. Barclays has opposed such motion and has sought to dismiss the claim in a cross motion for summary judgment. These motions have been fully briefed and the Bankruptcy Court is set to hear oral argument on these motions on September 7, 2011. Barclays does not agree with all of the matters stated as facts in this section nor with the way that some facts are characterized.

### F.    Significant Developments During the Chapter 11 Case

During the Chapter 11 Cases, the Debtors have continuously reviewed their businesses, owned properties, contracts and loans to determine if it is appropriate and timely to sell or monetize such assets.

### 1.    Sale of Investment Management Division and European and Asian Operations

Due to the crisis in the financial markets and the credit markets that permeated the initial phases of these Chapter 11 Cases, the Debtors determined that it would not be in the best interests of their estates to attempt to dispose of their assets in the then-current market conditions. The depressed market value of many of the Debtors' assets was the result of a crisis of confidence in financial markets and financial institutions rather than the underlying values of the assets. Many of its financial and real estate assets had, at that time, intrinsic value

significantly greater than the market prices as of the Commencement Date. In certain circumstances where the Debtors decided that the prices offered for their assets were fair, or that certain assets were too burdensome or costly to retain, the Debtors sold the assets after consultation with the Creditors' Committee and where appropriate with the approval of the Bankruptcy Court.

In order to preserve the jobs of employees and maximize the value of their assets, Lehman's (i) Investment Management Division, including Neuberger Berman, the fixed income business and the alternative asset management business (such portion, the "IMD Business") and (ii) European and Asian investment banking operations were sold. The IMD Business was purchased by a group comprised of certain members of the management team, senior professionals and portfolio managers of Neuberger Berman. LBHI retained (i) 93% of the preferred equity interests in Neuberger Berman Group, the new entity formed to hold the IMD Business, with an aggregate liquidation preference of $875 million and (ii) 49% of the common equity interests in Neuberger Berman Group (which, as of March 31, 2011 was approximately 48% due to the issuance of additional equity interests). The IMD Management Team retained the remainder of the common equity in Neuberger Berman Group. The transaction resulted in approximately 1,645 employees of the Investment Management Division becoming employees of Neuberger Berman Group or one of its affiliates. As of March 31, 2011, Neuberger Berman Group and its affiliates had approximately $199 billion in assets under management, and had revenues of approximately $1,024 million for the trailing twelve months (net of a $10 million non-recurring gain). The European and Asian investment banking operations were sold to Nomura International Plc ("Nomura"). Although LBHI was not one of the primary sellers of the assets in these transactions, LBHI did receive approximately $60 million from the sale of back office operations in India to Nomura.

## 2.   Transaction with JPMorgan

Prior to the commencement of the Chapter 11 Cases, JPMorgan Chase Bank, N.A. ("JPMorgan") served as Lehman's primary bank and provided clearing services to Lehman's primary broker/dealer, LBI, pursuant to a clearance agreement. Pursuant to this clearance agreement, JPMorgan obtained a security interest in certain accounts LBI maintained at JPMorgan to secure LBI's obligations with respect to transactions executed under the clearance agreement. In August 2008, the clearance agreement was amended to add LBHI, among others, as a party and JPMorgan required that LBHI execute a guaranty in favor of JPMorgan with respect to JPMorgan's clearance exposure to Lehman. On September 9, 2008, JPMorgan required LBHI to execute a series of agreements pursuant to which LBHI purportedly became the guarantor of the obligations of all Lehman entities to JPMorgan and all of its affiliates. In connection with these guaranties, LBHI pledged $8.6 billion of cash and cash equivalents and billions of dollars of securities as collateral to JPMorgan through September 2008.

JPMorgan and its affiliates have filed proofs of Claim against the Debtors and LBI asserting Claims exceeding $29 billion in the aggregate (the "JPMorgan Claims"), and asserting that the JPMorgan Claims are secured primarily by the collateral deposited by LBI, LBHI and other Debtors in connection with the agreements described above. JPMorgan also advised the Debtors that, after September 15, 2008, it set off against the JPMorgan Claims certain collateral deposited by certain of the Debtors. In addition, from time to time, JPMorgan

25

liquidated portions of the collateral and applied the proceeds to reduce the amount of the outstanding JPMorgan Claims. After giving effect to the provisional application of collateral, in March 2010, JPMorgan claimed an outstanding balance of $7.64 billion, against which it continued to hold collateral.

After months of extensive arm's-length negotiation, JPMorgan and certain of its affiliates, and other related persons (the "JPMorgan Entities"), and LBHI, with other Debtors, entered into a Collateral Disposition Agreement (the "CDA"). The CDA provides the Debtors with a means of administering certain remaining unapplied collateral then held by JPMorgan in a manner more conducive to enhancing recoveries and maximizing value for the benefit of the Debtors. Pursuant to the CDA, among other things:

- The JPMorgan Entities reduced the remaining aggregate JPMorgan Claims balance from approximately $7.64 billion to approximately $524 million through provisional application of collateral consisting of certain cash, cash proceeds and principal and income payments received in respect of certain securities and money market funds that JPMorgan has asserted had been pledged by LBHI and LBI to secure such Claims.

- JPMorgan transferred the remaining collateral to LBHI either as direct owner or as subrogee.

- LBHI made a one-time cash payment to JPMorgan of approximately $524 million, equal to the aggregate unpaid balance of the provisionally allowed JPMorgan Claims. Following March 2010, LBHI received approximately $40 million from JPMorgan on certain Claims asserted by LBHI. These amounts effectively reduced the $524 million payment made by LBHI to approximately $484 million.

- JPMorgan had been charging a net interest rate of approximately 2% annually on the outstanding alleged deficit. Based on the approximately $7.7 billion deficit just before implementing the CDA, interest was purportedly accruing at the rate of over $12 million per month. The CDA eliminates any further interest accruals.

- LBHI is subrogated to the JPMorgan Entities's secured and unsecured Claims against LBI and certain other Debtors. Such Claims against other Debtors to which LBHI is subrogated will be classified under the Plan in the same manner as like Claims against such Debtors.

Each Lehman entity reserved all rights and remedies under applicable law, contract or otherwise that it might have against the JPMorgan Entities and JPMorgan Entities reserved all rights and defenses to such claims. The CDA does not prejudice rights and claims of the Debtors, the SIPA Trustee, and the Creditors' Committee to challenge the JPMorgan Claims. It is the intent of the Debtors to vigorously pursue claims against JPMorgan Entities and challenge the amount and validity of certain of the JPMorgan Entities's Claims. The transactions contemplated by the CDA were consummated on March 31, 2010. Additional information regarding the CDA is contained in the Debtors' Motion Pursuant To Section 363 of The Bankruptcy Code and Bankruptcy Rule 6004 For Approval of Collateral Disposition Agreement With JPMorgan Chase Bank, N.A., Et Al. [Docket No. 7269].

Pursuant to the CDA, payments between a Debtor and the JPMorgan Entities will not be made until a final accounting after determination of all disputes between the Debtor and the JPMorgan Entities regarding the validity, amount or nature of the JPMorgan Entities' alleged secured claims with respect to such Debtor.  Following the final accounting with respect to a Debtor, a single net payment would be made by the appropriate party.

If a Debtor makes any general Distributions of its assets to creditors prior to the final accounting with the JPMorgan Entities, that Debtor is required to deposit in a segregated interest bearing account for the benefit of the relevant JPMorgan Entities an amount equal to the maximum net adjustment amount potentially payable by the Debtor to the JPMorgan Entities based on the then known facts.  Such amount is to be agreed in good faith with JPMorgan or determined by the Bankruptcy Court.  Following such Debtor's deposit of funds in a segregated account for the benefit of a JPMorgan Entity, if it is determined by agreement between the Debtor and JPMorgan or an order of the Bankruptcy Court that the funds in such account materially exceed the maximum potential amount of the obligations payable to such JPMorgan Entity by the Debtor based on the then known facts, the excess amount will be released to such Debtor.

The JPMorgan Entities have asserted contingent claims against LBHI and LCPI which may take substantial time to resolve.  The CDA may require that LCPI and LBHI each deposit substantial amounts in segregated accounts if such claims are not resolved prior to the Debtors' distributions to creditors.

On May 26, 2010, LBHI and the Creditors' Committee (the "Plaintiffs") commenced an adversary proceeding against JPMorgan, *Lehman Brothers Holdings Inc. v. JPMorgan Chase Bank, N.A.*, Case No. 10-03266, seeking a judgment that LBHI is entitled to void certain agreements entered into between LBHI and JPMorgan in the weeks prior to LBHI's Commencement Date on the grounds that such agreements were fraudulent transfers and/or unenforceable under state law (the "JPMorgan Adversary Proceeding").  The Plaintiffs further seek to recover $8.6 billion of cash and cash equivalents, certain securities transferred to JPMorgan, and all other damages occasioned by JPMorgan's alleged wrongful conduct under various bankruptcy and state law theories.  JPMorgan has filed counterclaims against LBHI, seeking damages, to the extent that it is found liable on the claims asserted by the Plaintiffs, on the purported basis that JPMorgan was fraudulently induced to provide certain repo-related loans to LBI in the week following LBHI's bankruptcy filing.  JPMorgan's counterclaims further seek indemnification from LBHI for its attorneys' fees incurred in connection with this adversary proceeding.  LBHI intends to vigorously contest JPMorgan's counterclaims. This matter is pending before the Bankruptcy Court.

The following paragraph has been incorporated into the Disclosure Statement at the request of the JPMorgan entities:

*JPMorgan did not participate in the drafting of this Disclosure Statement and disagrees with certain of the descriptions and characterizations contained herein of transactions, litigation, notes, securities, collateral and other matters affecting JPMorgan, including without limitation the CDA, the JPMorgan Adversary Proceeding, Claims held by JPMorgan, the*

*Derivatives Framework, the Examiner's Report and the notes and securities issued by Fenway, Spruce, Verano, Pine, the RACERS Trusts, SASCO 2008-C2 and Kingfisher.  JPMorgan has reserved the right to seek findings of fact and conclusions of law that are inconsistent with such descriptions and characterizations.  In addition, JPMorgan did not participate in the proposed resolution of the substantive consolidation issue and other disputes proposed to be implemented through the Plan, including without limitation the provisions of the Plan reducing the Allowed Claims and recoveries with respect to the RACERS MM Notes, Fenway notes and related claims. JPMorgan has reserved the right to assert that the valuation of such notes and related Claims, as well as any other property returned or transferred to LBHI under the CDA, should not be affected by those compromises.*

### 3.    Appointment of Examiner

On January 16, 2009, the Bankruptcy Court directed the US Trustee to appoint an examiner (the "Examiner") to conduct an investigation into various matters, including (i) whether any Affiliate has colorable claims against LBHI or any other Affiliate for potentially voidable transfers or incurrences of debt; (ii) whether there are colorable claims for breach of fiduciary duties and/or aiding or abetting such breaches against officers and directors of the Debtors in connection with the financial condition of Lehman prior to the Commencement Date; (iii) whether assets of any Affiliates were transferred to Barclays Capital as a result of the Barclays sale creating colorable claims that inure to the benefit of such Affiliates; (iv) the intercompany accounts and transfers among the Debtors and Affiliates during the 30-day period preceding the Commencement Date; (v) the transactions and transfers among the Debtors and prepetition lenders, including JPMorgan, Citigroup, Inc., Bank of America, and the FRBNY; (vi) the transfer of the capital stock of certain subsidiaries of LBI to Lehman ALI on or about September 19, 2008; and (vii) the events that occurred from September 4, 2008 though September 15, 2008, or prior thereto that may have resulted in the commencement of the Chapter 11 Cases.  On January 19, 2009, the US Trustee appointed Anton R. Valukas as the Examiner in the Chapter 11 Cases.  The Bankruptcy Court approved the appointment of the Examiner.  The Examiner engaged Jenner & Block LLP, as his attorneys, and Duff & Phelps, LLC as his financial advisor.  The Examiner filed his report (the "Examiner's Report") on February 8, 2010 consisting of more than 2200 pages, excluding exhibits and appendices.  It is on file in the Bankruptcy Court [Docket No. 7531] and may be accessed by all parties in interest.

### 4.    Cross-Border Insolvency Protocol / Negotiations With Foreign Debtors

Nearly 80 of LBHI's foreign Affiliates have commenced, or in some cases, had initiated against them, a variety of Foreign Proceedings (the "Foreign Debtors") across sixteen foreign jurisdictions and before different courts and governmental, regulatory, or administrative bodies (collectively, with the Bankruptcy Court, the "Tribunals").  In all but the Japanese Foreign Proceedings (where the Foreign Debtors are debtors in possession), liquidators, administrators, trustees, custodians, supervisors, or curators, including the Foreign Administrators, have been appointed to manage the Foreign Debtors' affairs and represent their insolvent estates.

### a.      Description of Cross-Border Insolvency Protocol

Given the integrated and global nature of Lehman's businesses, the Debtors recognized as early as October 2008 that the efficient administration of the Chapter 11 Cases would benefit from cooperation among the Debtors, the Foreign Debtors and Foreign Administrators, and that cooperation and communication among Tribunals would enable effective case management.  In furtherance of that principle, on May 12, 2009, the Debtors and Foreign Administrators from Hong Kong, Singapore, Australia, and Germany executed the Cross-Border Insolvency Protocol for the Lehman Brothers Group of Companies (the "Protocol").  Periodically thereafter, the Foreign Administrators from the Netherlands, the Netherlands-Antilles, Switzerland, and Luxembourg, as well as the SIPA Trustee (collectively with the initial signatories, the "Signatories") joined as signatories to the Protocol.

The Protocol generally provides for (i) the sharing of information among Signatories, (ii) court-to-court communication, (iii) asset preservation mechanisms, (iv) coordinated claims administration and (v) certain special procedures for the resolution of Affiliate Claims.

The Signatories and other participating Affiliates have conducted quarterly, and more recently, monthly meetings to implement the Protocol.  At the first meeting in London, the Debtors proposed that the most efficient and reliable methodology for the reconciliation of intercompany balances would be to use Lehman's books and records as a starting point. However, the last month-end close for the consolidated Lehman group was as of August 31, 2008 – two weeks before the Commencement Date.  Fortunately, in the months that followed the Commencement Date, a global effort was undertaken by a global team of personnel at LBHI, Barclays, Nomura, and LBIE, to perform a full accounting close as of September 14, 2008 (the "Global Close"), i.e., the last trading day prior to the Commencement Date.   The Debtors therefore proposed that the Global Close be used as a starting point and evidentiary basis for the reconciliation of Affiliate Claims.   The parties to the Protocol agreed to the proposal and, essentially, the Global Close has been adopted.

### b.      Settlement Negotiations with Foreign Debtors

Since July of 2010, the Debtors have conducted settlement negotiations with certain Foreign Debtors, seeking, in general, a final agreement on the Allowed amounts and treatment of all Affiliate Claims between and among the Debtors and the Foreign Debtors, as well as certain Debtor-Controlled Entities and/or entities controlled by the Foreign Debtors and an agreement by the Foreign Debtors to support the Plan.

Progress has been made in negotiating settlements of claim amounts with certain Foreign Debtors.   To date, the Debtors have executed a final settlement agreement with Bankhaus, the Hong Kong Lehman Entities In Liquidation, the Lehman Singapore Entities and LBT.  The Debtors are requesting that the Bankruptcy Court approve such settlements pursuant to Bankruptcy Rule 9019 as part of the Plan.

The Debtors are continuing to negotiate settlements with other Foreign Debtors and may enter into settlements with such entities before and after the Effective Date of the Plan.

US_ACTIVE:\43795376\03\58399.0008

If the Debtors enter into settlement agreements with other Foreign Debtors prior to the Effective Date, such settlement agreements will be included in the Plan Supplement.

### (i)     Settlements with Bankhaus

The Debtors have entered into two settlement agreements with Dr. Michael C. Frege, the Foreign Administrator of Bankhaus.  Pursuant to the first settlement agreement (the "Bankhaus Loans Settlement Agreement") (i) the parties settled disputes between LBHI, LCPI, and Lehman ALI (collectively, the "Lehman Parties") and Dr. Frege regarding the ownership of certain loans subject to participations, (ii) the Lehman Parties purchased loans from Bankhaus and (iii) certain claims of Bankhaus against LBHI and LCPI were Allowed.  A description of the terms of the Bankhaus Loans Settlement Agreement is included on Exhibit 14A hereto.

Pursuant to the second settlement agreement (the "Bankhaus Claims Settlement Agreement"), the Debtors and Dr. Frege (a) settled all claims among the Debtors and certain Debtor-Controlled Entities and Bankhaus, (b) subject to certain conditions, Bankhaus agreed to support the Plan and the Debtors agreed to support a plan in Bankhaus's Foreign Proceeding, and (c) LBHI agreed to purchase certain securities owned by Bankhaus.  The Bankhaus Claims Settlement Agreement is subject to (i) the confirmation of a Plan which incorporates the Bankhaus Claims Settlement Agreement and (ii) authority from Bankhaus' Creditors' Committee and Creditors Assembly.  A description of the terms of the Bankhaus Claims Settlement Agreement is included on Exhibit 14A, and an executed copy of the Bankhaus Claims Settlement Agreement is annexed hereto as Exhibit 14B.

### (ii)     Settlements with the Hong Kong Lehman Entities In Liquidation

On July 31, 2011, the Debtors entered into a settlement agreement (the "Hong Kong Settlement Agreement") with the Hong Kong Lehman Entities In Liquidation (as defined therein).  The Hong Kong Settlement Agreement provides for (a) the allowance of certain Claims asserted by certain Hong Kong Lehman Entities In Liquidation against certain of the Debtors, (b) the allowance of certain Claims asserted by the Debtors against certain Hong Kong Lehman Entities In Liquidation, (c) the exchange of mutual releases between the Debtors and the Hong Kong Lehman Entities In Liquidation, and certain other material terms and conditions.  In addition, pursuant to the Hong Kong Settlement Agreement, the Hong Kong Lehman Entities In Liquidation agree to support and vote to accept the Plan.  Certain provisions of the Hong Kong Settlement Agreement is subject to (i) the confirmation of the Plan which incorporates the Hong Kong Settlement Agreement and (ii) the approval of the Hong Kong Settlement Agreement by the High Court of the Hong Kong Special Administrative Region.  A description of the terms of the Hong Kong Settlement Agreement is included on Exhibit 14C, and an executed copy of the Hong Kong Settlement Agreement is annexed hereto as Exhibit 14D.

### (iii)     Settlement with the Lehman Singapore Entities

On August 24, 2011, the Debtors and certain Debtor-Controlled Entities (together, "Lehman US") entered into a settlement agreement (the "Singapore Settlement Agreement") with the Lehman Singapore Liquidation Companies and Lehman Singapore Non-Liquidation

Companies (each as defined therein and together, "Lehman Singapore").  The Singapore Settlement Agreement provides for (a) the settlement of certain Claims between Lehman US and Lehman Singapore, (b) the exchange of mutual releases between Lehman US and Lehman Singapore, and (c) certain other material terms and conditions.  In addition, pursuant to the Singapore Settlement Agreement, Lehman Singapore agrees to support and vote to accept the Plan.  Certain provisions of the Singapore Settlement Agreement are subject to the confirmation of the Plan which incorporates the Singapore Settlement Agreement.  A description of the terms of the Singapore Settlement Agreement is included on Exhibit 14E, and an executed copy of the Singapore Settlement Agreement is annexed hereto as Exhibit 14F.

### (iv)    Settlement with LBT

On August 30, 2011, the Debtors entered into a settlement agreement (the "LBT Settlement Agreement") with Rutger J. Schimmelpenninck and Frédéric Verhoeven, in their capacity as bankruptcy trustees (*curatoren*) for LBT.  The LBT Settlement Agreement provides for (a) the allowance of certain Claims asserted by LBT against LBHI and LBCC, (b) the allowance of certain claims asserted by LBSF and LBCS against LBT, (c) the exchange of mutual releases between the Debtors and LBT, and certain other material terms and conditions. In addition, pursuant to the LBT Settlement Agreement, LBT agrees to support and vote to accept the Plan.  Certain provisions of the LBT Settlement Agreement are subject to (i) the confirmation of the Plan which incorporates the LBT Settlement Agreement and (ii) the approval of the LBT Settlement Agreement by the supervisory judge presiding over the bankruptcy case of LBT.  A description of the terms of the LBT Agreement is included on Exhibit 14G, and an executed copy of the LBT Settlement Agreement is annexed hereto as Exhibit 14H.

### G.    Alternative Chapter 11 Plans

### 1.    Plan Proposed by the Ad Hoc Group

On December 15, 2010, an ad hoc group of LBHI creditors (the "Ad Hoc Group")[4] proposed a joint substantively consolidating chapter 11 plan for all of the Debtors other than Merit, Somerset and Preferred Somerset and a related disclosure statement.  On April 27, 2011, the Ad Hoc Group filed its amended joint substantively consolidating chapter 11 plan (the "Ad Hoc Plan") and an amended disclosure statement (the "Ad Hoc Disclosure Statement"). The Ad Hoc Plan is premised on the Bankruptcy Court ordering substantive consolidation of (a) the Debtors, (b) Lehman Brothers Treasury Co. B.V. ("LBT") and Lehman Brothers Securities N.V. ("LBSN") and (c) certain of the Debtors' foreign Affiliates; *provided*, *however*, if LBT, LBSN or certain of the foreign Affiliates vote to accept the Plan, such Affiliates will not be substantively consolidated with the Debtors.  A summary of the Ad Hoc Plan is included on Exhibit 16 hereto.

---

[4] The Ad Hoc Group consists of California Public Employees' Retirement System, Canyon Capital Advisors LLC, City of Costa Mesa, City of Fremont, County of San Mateo, Fiduciary Counselors Inc., Fir Tree, Inc., Gruss Asset Management, L.P., Owl Creek Asset Management, L.P., on behalf of the funds it manages or advises, Paulson & Co. Inc., Perry Capital LLC, on behalf of one or more investment funds for which it or an affiliate acts as investment advisor or general partner, Taconic Capital Advisors L.P. and Vallejo Sanitation and Flood Control District.

Notwithstanding the unlikely unanimous acceptance by all classes, the Ad Hoc Plan will *require* the prosecution of litigation on substantive consolidation. Even if a Class of creditors votes to accept the Plan, any creditor within an accepting class may object to the substantive consolidation proposed by the Ad Hoc Plan. The Ad Hoc Plan ensures that the Chapter 11 Cases will be consumed with costly and protracted litigation over substantive consolidation and other related issues.

### 2.        Plan Proposed by the Non-Con Plan Proponents

On April 25, 2011, twenty-three creditors (together with certain of their affiliates, the "Non-Con Plan Proponents")[5] proposed a joint chapter 11 plan (the "Non-Con Plan") and related disclosure statement (the "Non-Con Disclosure Statement") for all of the Debtors other than Merit, Somerset and Preferred Somerset that, in direct contrast to the Ad Hoc Plan, does not substantively consolidate the Debtors or any of their Affiliates. The Non-Con Plan gives effect to the separate corporate identity of each of the Debtors. However, the Non-Con Plan rejects the proposed substantive consolidation resolution and related reallocations contained in the Plan, because the Non-Con Plan Proponents assert that there is no basis for the substantive consolidation of the Debtors. Therefore, it is asserted that there is no reason to provide for a corresponding re-distribution of assets. A summary of the Non-Con Plan is included on Exhibit 16 hereto.

Based on an extensive analysis of the facts weighing both in favor and against substantive consolidation, the Debtors' disagree with the Non-Con Plan Proponents' assessment of the risk of substantive consolidation.

### 3.        Debtors' Oppose the Ad Hoc Plan and the Non-Con Plan

Substantially all of the proponents of both the Ad Hoc Plan and the Non-Con Plan have decided to support the Debtors' Plan subject to the terms and conditions of their Plan Support Agreements. However, such parties have not withdrawn the alternative plans. The Debtors, the Ad Hoc Group and substantially all of the Non-Con Plan Proponents have entered into a Stipulation and Order subject to Bankruptcy Court approval pursuant to which the Ad Hoc Plan and the Non-Con Plan Proponents agree not to prosecute their plans or seek the approval of their disclosure statements; *provided however*, that the Ad Hoc Group and the Non-Con Plan Proponents reserve their rights to prosecute their plans if (i) a requisite number of members of the Ad Hoc Group or Non-Con Plan Proponents terminate their Plan Support Agreements or (ii) the Effective Date of the Plan has not occurred on or before March 31, 2012. If pursued, the Debtors oppose the Ad Hoc Plan and the Non-Con Plan. Both of these alternative plans will

---

[5] The Non-Con Plan Proponents are Angelo, Gordon & Co., L.P., Contrarian Capital Management, LLC, Credit Agricole CIB, Credit Suisse International, Cyrus Capital Partners, LP, D. E. Shaw Composite Portfolios, L.L.C., D. E. Shaw Oculus Portfolios, L.L.C., Deutsche Bank AG, Goldentree Asset Management, LP, Goldman Sachs Bank USA (successor by merger to Goldman Sachs Capital Markets, L.P.), Goldman Sachs International, Hayman Capital Management, LP, Knighthead Capital Management, LLC, Mason Capital Management LLC, Morgan Stanley & Co. International plc., Morgan Stanley Capital Services Inc., Mount Kellett Capital Management, Oaktree Capital Management, L.P., The Royal Bank of Scotland plc, Serengeti Asset Management LP, Silver Point Capital, L.P., State Street Bank and Trust Company, and York Capital Management Global Advisors, LLC.

US_ACTIVE:\43795376\03\58399.0008

stimulate significant opposition and extended and costly litigation, and result in delay in the Debtors' Chapter 11 Cases to the prejudice of all economic stakeholders.

### H.    Administration of the Debtors' Assets During the Chapter 11 Plan

Since the Commencement Date, the Debtors have taken numerous steps to maximize the value of their assets. The Debtors assets are generally divided into five separate assets classes: derivative contracts, real estate assets, commercial loans, private equity/principal investments and bank platforms. For further information about the assets held by each of the Debtors, see the balance sheets, dated as of December 31, 2010 attached as Exhibit 2B.[6] For further information regarding certain significant actions taken by the Debtors as to their assets during these Chapter 11 Cases see Exhibit 17 hereto.

### 1.    Derivative Contracts

Prior to the Commencement Date, Lehman entered into derivative transactions both in a trading capacity and as an end-user, conducting its derivative activities through a number of wholly-owned subsidiaries. Its fixed income derivative products business was principally conducted through LBSF and its separately capitalized "AAA" rated subsidiaries, including LBFP and LBDP. Lehman's equity derivative products business was conducted through LBF, LOTC and LBIE, and its commodity and energy derivatives product business was conducted through LBCS. Lehman conducted a significant amount of its spot, forward and option foreign exchange business through LBCC.

The Debtors' derivative assets represent amounts due from counterparties under contracts in which the contractual obligations and values are keyed to one or more underlying assets or indices of asset values (the "Derivative Contracts"). As of the Commencement Date, the Debtors (together with all Debtor-Controlled Entities) were parties to approximately 1.2 million derivative transactions, with approximately 6,500 counterparties

The Debtors have sought to (i) preserve the value of the Derivative Contracts and collect payments on Derivative Contracts as to which amounts are owed to the Debtors, and prevent erosion based on movements in the value of the underlying asset or index of live contracts including hedging of the live contracts and select purchases of notes issued by certain special purpose vehicles and (ii) enter into termination and settlement agreements with respect to Derivative Contracts as to which the Debtors owe money to counterparties. Prior to entering into a settlement agreement in connection with any Derivative Contract, the Debtors, generally, must (i) reconcile the universe of all trades between the Debtors and a particular counterparty, (ii) value each of the transactions under the Derivative Contracts, and (iii) negotiate a settlement amount with the counterparty. Due to the number and complexities of the Derivative Contracts, each step is a particularly arduous process. As of March 31, 2011, the Debtors have reconciled

---

[6] The Debtors' balance sheets dated as of March 31, 2011 are available in the Debtors' Supplemental Monthly Operating Report filed on July 21, 2011 [Docket No. 18713]. If the Debtors had used the information contained in the March 31, 2011 balance sheets, it would have had no material impact on the Recovery Analysis contained in Exhibit 4 of the Disclosure Statement.

99% of their Derivative Contracts, valued 99% of their Derivative Contracts and settled 58.5% of their Derivative Contacts.

Through December 31, 2010, the Debtors (together with their Debtor-Controlled Entities) have collected more than $12.2 billion from counterparties to Derivative Contracts (net of collections on certain Derivative Contracts which collateralize certain notes) and as of December 31, 2010, expect to collect another $5.2 billion of gross cash flows from Derivative Contracts, including recovery of Cash posted as collateral for hedging in respect of Derivative Contracts.  From December 31, 2010 through March 31, 2011, the Debtors (together with their Debtor-Controlled Entities) have collected approximately $327 million of that amount from counterparties to Derivative Contracts.  The recoveries reflected for Derivatives Contracts are estimates based on financial market assumptions, the status of negotiations with counterparties and the Debtors' judgment of the likely resolution of various legal disputes.  Actual recoveries could materially vary from the estimates.

## 2.    Real Estate Assets

As of the Commencement Date, the Debtors held and managed commercial and residential mortgage loans, commercial and residential real estate properties, joint venture equity interests in real estate properties and other real estate related investments ("Real Estate Assets"). These Real Estate Assets include debt, equity interests and real-estate owned ("REO"), located in various markets throughout the United States, Canada, and Europe.  The commercial Real Estate Assets comprise nearly 825 positions across a broad array of product types (office, condo & multi-family apartments, hospitality, and raw land for development).  The residential Real Estate Assets are comprised of approximately 5,000 mortgages, securities and REO positions located predominantly in the United States.

Since the Commencement Date, the Debtors have pursued strategies to create value within the portfolio of Real Estate Assets by stabilizing and controlling real estate assets that have been impaired by broken partnerships, overleveraged capitalizations, operating challenges and pledges.  Once assets are secure, the Debtors and their Affiliates implement asset-level business plans to improve operational and financial stability, and capitalize on cyclical recovery.  This approach to value creation allows for Real Estate Assets to evolve from a state of distress, where opportunistic capital requires higher returns, to a state of stability that will attract a broader array of investors with lower return expectations, multiple exit opportunities, and higher returns to the Debtors' estates.  This approach also allows for the Debtors to take advantage of market opportunities as they arise, rather than force the sale of illiquid assets when options are limited.

A subset of the commercial Real Estate Assets represents a strategic opportunity for value creation and maximization. This defined portfolio includes specific assets where (i) the underlying real estate is in attractive markets, (ii) the Debtors have control or a path to control, and (iii) there are multiple options for monetization including public or private market executions.  Within this portfolio, the Debtors are pursuing business plans to unlock not only the intrinsic asset-level value of underlying assets, but also the portfolio and enterprise values that could result from assembling groups of strategic assets and the associated management platforms.

US_ACTIVE:\43795376\03\58399.0008

The Debtors intend to manage and dispose of the Real Estate Assets in a manner that will maximize the value of such assets for the Debtors' estates. Since the Commencement Date, the Debtors and Debtor-Controlled Entities have collected in excess of $3.0 billion from the Real Estate Assets through March 31, 2011. The Debtors estimate that over the expected wind-down period from January 1, 2011 to December 31, 2014, their estates (together with their Debtor-Controlled Entities) will recover gross proceeds of approximately $13.2 billion from the Real Estate Assets. From December 31, 2010 through March 31, 2011, the Debtors (together with their Debtor-Controlled Entities) collected approximately $490 million of that amount from their Real Estate Assets.

### 3.    Commercial Loans

Lehman was a significant participant in the commercial lending industry prior to the Commencement Date and as of the Commencement Date held a significant amount of commercial loans ("Loans").

The Debtors primary focus has been to reduce the unfunded commitments, settle open loan trades and efficiently manage and collect on the funded Loans. The Debtors have established procedures to enable them to manage and liquidate their portfolio of Loans efficiently. As of March 31, 2011, the Debtors have terminated unfunded commitments on Loans in the aggregate amount of $10.6 billion. With respect to the $3.0 billion in unfunded commitments remaining as of April 30, 2011 (including letters of credit) for Loans, Real Estate Assets, the Banks and Private Equity/ Principal Investments, the Debtors estimate that they may assume agreements which would result in LCPI and LBHI having to make advances on loans with unfunded commitments of approximately $476 million and $14 million, respectively. The assumption of other credit agreements is under consideration.

The Debtors have concluded a comprehensive credit review process of their entire portfolio of loans, and rated each loan according to the Debtors internal methodology. As of December 30, 2010, 9% of the funded loans in the Debtors' portfolio were rated "high grade," 91% of the loans in the portfolio were rated "high yield."[7]

The Debtors have entered into an agreement pursuant to which WCAS│Fraser Sullivan Investment Management, LLC ("Fraser Sullivan") will be hired to manage substantially all of their Loans. The agreement will not become effective until August 31, 2011. Hiring Fraser Sullivan will enable the Debtors to maximize the value of their portfolio of Loans. In the Debtors' discretion, Fraser Sullivan may seek to execute one or more transactions upon which the Debtors will sell certain of their Loans to special purposes vehicles that will issue collateralized loan obligations. The Debtors intend to sell Loans to the special purpose vehicles in exchange for a combination of cash and the economic equity interests in the special purpose vehicles. If pursued, such transaction will enable the Debtors to monetize a portion of their portfolio of Loans while retaining the upside from any increase in the value of the Loans.

---

[7] Certain claims against other chapter 11 debtors or interests in distressed debt, held by the Debtors are included in the Debtors' Loan portfolio, but are not rated by the Debtors.

The Debtors estimate that over the expected wind-down period, their estates (together with their Debtor-Controlled Entities) will recover gross proceeds of approximately $4.8 billion from their portfolio of Loans. From December 31, 2010 through March 31, 2011, the Debtors (together with their Debtor-Controlled Entities) collected approximately $315 million of that amount from their portfolio of Loans.

### 4.     Private Equity/ Principal Investments

Private Equity and Principal Investments include (i) equity and fixed-income direct investments in companies, (ii) general partner interests in asset managers, (iii) limited partner interests in third-party investment funds and (iv) general partner and limited partner or side-by-side interests in Lehman-sponsored investment funds ("Private Equity/Principal Investments"). Prior to the Commencement Date, Lehman's private equity business operated in six major asset classes: merchant banking, real estate, venture capital, credit-related investments, private funds investments and infrastructure. Lehman raised privately-placed funds in these asset classes, for which it acted as a general partner and in which it had general and limited partner or side-by-side interests. In addition, Lehman's principal investments business made other non-fund-related direct investments.

Certain Private Equity/Principal Investments are held as partnership interests, limited liability company interests or other similar interests that are uniquely structured for particular private investments. Therefore these investments are not always liquid and the Debtors may ultimately decide to sell their interests in such investments at a discount. In addition, the Debtors (and their Debtor-Controlled Entities) are the holders of record but not in possession or complete control of certain financial instruments representing Private Equity/ Principal Investments amounting to approximately $431 million in cash flows reflected in the Recovery Analysis, because such financial instruments are held in an account at a Non-Controlled Affiliate. The Debtors (or Debtor-Controlled Entities) are seeking the return of such financial instruments. In certain circumstances, where a financial instrument has been sold or otherwise monetized, the Debtors (or Debtor-Controlled Entities) have entered into arrangements with the applicable Non-Controlled Affiliate regarding the proceeds received in respect of such sale or other monetization pending the outcome of the Debtors (or Debtor-Controlled Entities) claim against and/or negotiations with such parties.

The Debtors estimate that over the estimated wind-down period from January 1, 2011 to December 31, 2014, their estates (together with their Debtor-Controlled Entities) will recover gross proceeds of approximately $9.5 billion from their portfolio of Private Equity/Principal Investments. From December 31, 2010 through March 31, 2011, the Debtors (together with their Debtor-Controlled Entities) collected approximately $300 million of that amount from their portfolio of Private Equity/Principal Investments.

### 5.     Bank Platforms

LBHI is the sole indirect owner of two non-debtor domestic banks (the "Banks"): Woodlands Commercial Bank ("Woodlands Bank") and Aurora Bank FSB ("Aurora Bank"). Woodlands Bank is a Utah chartered industrial bank with operations in Salt Lake City, Utah. Woodlands Bank is subject to the regulatory authority of the Federal Deposit Insurance

Corporation ("FDIC") and the Department of Financial Institutions of the State of Utah.  Aurora Bank operates a multi-asset loan origination, purchasing, and servicing business, with the loan origination business involving the issuance of residential and commercial mortgage, small business, large corporate, and consumer loans.  Aurora Bank wholly owns Aurora Loan Services, LLC ("Aurora Loan Services"), one of the nation's largest residential loan servicing operations.  Aurora Bank is a federally chartered thrift institution subject to the regulatory authority of the Office of Thrift Supervision (the "OTS").  Based on their March 31, 2011 regulatory reports, the values of LBHI's equity interest in Aurora Bank and Woodlands Bank were reported, on a fair value accounting basis, at $892 million and $896 million, respectively, for a combined value of $1.79 billion.  See Exhibit 3 hereto for the Banks' balance sheets as of March 31, 2011.

Both Aurora Bank and Woodlands Bank are required to maintain minimum capital levels under applicable regulations.  Failure to maintain required minimum capital levels would make Aurora Bank and Woodlands Bank susceptible to appointment of the FDIC as receiver to seize and liquidate its assets.  In order to preserve the equity value of both Aurora Bank and Woodlands Bank and avoid the significant losses that could have resulted if the Banks were allowed to fail, since February 2009, LBHI has taken a series of actions to support the Banks' capital levels and preserve the opportunity to realize the fair value of both Banks, each with the full support of the Creditors' Committee.  LBHI agreed to take steps as necessary to maintain the Banks' capital at certain levels and to sell Aurora Bank and to sell or wind-down Woodlands prior to March 2012.  If sales cannot be completed by that date, LBHI will within such period complete the dissolution and wind-down of the Banks by purchasing their respective remaining assets.  Approximately $3.1 billion of claims of the Banks against LBHI were settled and expunged, and the Banks released certain collateral to LBHI.

In total, LBHI's support for the Banks allowed LBHI to avoid approximately $5.1 billion in losses, comprised of an unsecured priority claim of as much as $2.7 billion (as of February 2009 when LBHI made its first capital contribution to the Banks), and approximately $2.4 billion estimated by LBHI as (i) the aggregate liquidation value of both Banks plus (ii) the value of the collateral recovered and now held by the Debtors.  The total investments made in the Banks by LBHI since February 2009 equal approximately $1.6 billion.  As a result, LBHI's support for the Banks has allowed it to preserve approximately $3.4 billion in value for creditors.

## I.    Securitization Structures

### a.    Pine, Spruce, Verano, SASCO 2008-C2 and Kingfisher

In order to increase liquidity, from time to time, the Debtors sold or participated portions of certain real estate loans, commercial loans and equity positions to various special purpose entities, which issued securities backed by the assets and the cash flow therefrom.  In certain cases, LCPI and LBHI acquired securities issued by the special purpose entities and/or the effective equity interests in the issuers.  Of the securitizations that remain outstanding, LCPI and/or LBHI own securities issued by the following: Restructured Asset Securities With Enhanced Returns Series 2007-7-MM Trust ("RACERS MM Trust"), Spruce CCS, Ltd. ("Spruce"), Verano CCS, Ltd. ("Verano"), SASCO 2008-C2 Ltd. ("SASCO 2008-C2") and Kingfisher CDO Ltd. ("Kingfisher", and collectively, the "Securitization Issuers").  A detailed description of the transaction relating to the RACERS MM Trust is included below.

37

A079

Prior to the Commencement Date, certain of the securities issued by these Securitization Issuers were transferred, pledged or sold to LBI, JPMorgan and Bankhaus. In connection with the CDA entered into with the JPMorgan Entities, certain of the securities issued by the Securitization Issuers were turned over to LBHI. As described further on Exhibit 14A hereof, in April 2011, LBHI acquired from Bankhaus certain notes issued by Spruce, Verano and SASCO 2008-C2. The purchase of these notes resulted in LBHI and LCPI collectively holding all outstanding notes issued by each of Spruce, Verano and SASCO 2008-C2. Acquiring all of the notes issued by these issuers eliminates many of the issues that exist between the Debtors and the relevant indenture trustees. The Debtors have terminated the SASCO 2008-C2 securitization and are evaluating the most efficient means to maximize their interests in Spruce and Verano.

In addition, as of December 31, 2010, the Debtors held notes issued by Pine CCS, Ltd. ("Pine"). A substantial portion of the Class A-1 Notes issued by Pine was sold to Barclays Capital Inc. pursuant to the Barclays Asset Purchase Agreement. LCPI retained the economic equity interests in Pine and LBHI retained a portion of the Class A-1 Notes with an approximate outstanding amount of $4 million (including accrued interest). In May 2011, following its purchase of the Class A-1 Notes from Barclays and LBHI, LCPI terminated the Pine securitization. Such transaction will benefit LCPI in two ways: (1) LCPI has the opportunity to realize a profit on the purchase of the Class A-1 Notes from Barclays, and (2) without the restrictions contained in the Pine securitization, LCPI can more efficiently manage and dispose of, as necessary, the commercial loans that were participated to the Pine securitization.

The Debtors continue, in consultation with the Creditors' Committee, to analyze and resolve various issues surrounding the Securitization Issuers. The Debtors have separately tracked cash collections from underlying assets and have reported the cash as restricted cash on their balance sheets. As of December 31, 2010, the Debtors held $1.8 billion of restricted cash related to the Securitization Issuers, excluding the RACERS MM Trust. In the second quarter of 2011, the Debtors released restricted cash held for Spruce and Verano to the trustees, who then remitted this cash plus excess cash that they were holding to the Debtors, as noteholders. Approximately, $1.7 billion was distributed reducing the outstanding note balances for Spruce and Verano. The outstanding principal amount of the notes issued by each Securitization Issuer and the Debtors' interests in each of the Securitization Issuers, as of May 31, 2011, is set forth in the table below. The amounts set forth in the below table exclude any interest accrued and unpaid through the date hereof, but include any unpaid interest that has been added to the principal amounts, "i.e., capitalized interest," in accordance with the terms of the notes.

A080

|  | RACERS MM Trust | Spruce | Verano | SASCO 2008-C2 LLC (6) | Kingfisher |
|---|---|---|---|---|---|
| **Aggregate Outstanding Notional Amount of Securities** (1) | $5,000 million Notes (2) | The Senior Notes have been repaid in full.<br><br>$260 million Mezzanine Notes<br><br>$169 million Subordinated Notes | $264 million Senior Notes<br><br>$200 million Mezzanine Notes<br><br>$271 million Subordinated Notes | $1,472 million Notes<br><br>$1,385 million Preferred Interests | $643 million Class A Notes<br><br>$286 million Class B Notes<br><br>$372 million Subordinated Notes |
| **Percentage of Aggregate Outstanding Securities Owned by LBHI (3)** | None owned, 100% of Notes held by LBHI (3) | 100% of Mezzanine Notes (4) | 100% of Senior Notes (5)<br><br>100% of Mezzanine Notes (4) | 70.7% of Notes (4) (5) | None |
| **Percentage of Aggregate Outstanding Securities Owned by LCPI (3)** | None | 100% of Subordinated Notes (5) | 100% of Subordinated Notes (5) | 29.3% of Notes (5)<br><br>100% of Preferred Interest | 100% of Class A Notes (5) |
| **Percentage of Aggregate Outstanding Securities Owned by Non- Controlled Affiliates or Third Parties** | 100% owned, None held (3) |  |  |  | 100% of Class B Notes<br><br>100% of Subordinated Notes |

(1) Represents balances reported by the trustee as of their closest reporting date to May 31, 2011. Amounts are not reflective of any cash collected by the Debtors as servicer on the underlying assets that is held in restricted cash and has not yet been remitted to the trustee. Amounts are reflective of accrued interest if there is a capitalization of interest feature on the note.

(2) Current trustee statements are not available for RACERS. Aggregate Outstanding Notional Amounts presented are as of the date of issuance and should not differ from amounts as of May 31, 2011, as to the Debtors' knowledge, no principal payments have been made.

(3) The RACERS MM Notes are owned by a Non-Controlled Affiliate but were transferred to and are currently being held by LBHI, which holds the claim related to the RACERS MM Notes as a result of its subrogation under the CDA. Various other notes owned by LCPI are also being held by LBHI under the CDA, but the Debtors expect that LCPI will receive these notes back, as LCPI's exposure to LBHI in relation to JPMorgan claims is contingent upon events that the Debtors deem unlikely to occur.

(4) Purchased by LBHI in April 2011.

(5) JPMorgan has asserted a security interest in these notes. The obligations purportedly secured consist of contingent liabilities of LCPI primarily arising from letters of credit ("LCs") issued pursuant to credit facilities for which LCPI was a lender and JPMorgan, or one of its affiliates, was either the issuer of administrative agent of the LCs. LCPI's current maximum exposure arising from these LCs is $661 million. The Debtors believe LCPI's ultimate exposure, if any, will be minimal. JPMorgan may also assert that its security interest on the notes secures certain obligations of LBI. The Debtors do not believe such a lien could be successfully enforced.

(6) The Debtors have terminated the SASCO 2008-C2 securitization. All contracts between SASCO 2008-C2 and the trustee, servicer and special servicer have been terminated and the notes issued by SASCO 2008-C2 have been terminated. LBHI and LCPI each received preferred membership interests in SASCO 2008-C2, LLC that have substantially identical economic terms to the notes previously held by such entities. In addition, LCPI has received ordinary membership interests in SASCO 2008-C2, LLC providing LCPI substantially the same economic rights it held under the Subordinated Notes. SASCO 2008-C2, LLC continues to exist and holds the same assets that it held prior to this transaction.

US_ACTIVE:\43795376\03\58399.0008

### b.      The RACERS Transaction

### (i)      Description of the RACERS Transaction

In August 2007, certain Debtors and non-debtor affiliates entered into a series of transactions which established two trusts, the Restructured Assets with Enhanced Returns Series 2007-A Trust (the "RACERS A Trust") and the Restructured Assets with Enhanced Returns 2007-7-MM Trust (the "RACERS MM Trust" and, together with the RACERS A Trust, the "RACERS Trusts"). U.S. Bank National Association ("U.S. Bank"), served as trustee of both Trusts. The RACERS A Trust issued a single note which was held by the RACERS MM Trust and which had a fluctuating principal balance which, as of September 23, 2008 and October 6, 2008, was $5 billion. The RACERS MM Trust issued notes that, as of September 23, 2008 and October 6, 2008, had a principal balance of $5 billion.

LCPI entered into a participation agreement (the "RACERS Participation Agreement") with the RACERS A Trust granting participations in a pool of assets (the "Underlying Assets"), principally consisting of corporate loans, mortgage loans and equity interests, that LCPI could adjust from time to time to add or remove specific Underlying Assets, so long as the value of the Underlying Assets equaled at least 105% of the principal amount of the Variable Funding Note (described below).

The RACERS A Trust issued a note (the "Variable Funding Note") to the RACERS MM Trust. The Variable Funding Note bore interest at 7% per annum and had a principal balance that would fluctuate as Underlying Assets were added to or removed from the RACERS Participation Agreement (which principal balance, as of September 23, 2008 and October 6, 2008, is presumed to have been $5 billion).

The RACERS A Trust also entered into a total return swap (the "RACERS A Swap") with LBSF. LBHI guaranteed LBSF's obligations under the RACERS A Swap. Pursuant to the RACERS A Swap and the RACERS Participation Agreement, LCPI's payments under the RACERS Participation Agreement were redirected to LBSF. In exchange, LBSF was required to pay to the RACERS A Trust 7% per annum multiplied by the principal amount of the Variable Funding Note and certain incidental expenses. The RACERS A Swap provided that LBSF would pay the full notional amount of the RACERS A Swap upon early termination of the RACERS A Swap but, in the event of termination of the RACERS A Swap based upon the bankruptcy of LBSF or LBHI, LBSF would not be entitled to any sort of distribution of the Underlying Assets.

The RACERS MM Trust issued notes (the "RACERS MM Notes") that, as of September 23, 2008 and October 6, 2008, had a principal balance of $5 billion and bore interest at a floating rate of one-month LIBOR plus a spread which adjusted annually. The RACERS MM Notes were secured by the Variable Funding Note issued by the RACERS A Trust.

The RACERS MM Trust also entered into a total return swap with LBSF (the "RACERS MM Swap"). LBHI guaranteed LBSF's obligations under the RACERS MM Swap. Pursuant to the RACERS MM Swap, LBSF was to receive all payments from the RACERS A Trust, funded by the payments made by LBSF to the RACERS A Trust under the RACERS A

Swap, and pay to the RACERS MM Trust the floating rate interest due from the RACERS MM Trust to the holders of the RACERS MM Notes and other incidental expenses. The RACERS MM Swap provided that LBSF would pay to the RACERS MM Trust the outstanding principal balance of the RACERS MM Notes plus any accrued and unpaid interest through the day prior to the termination date of the RACERS MM Swap in return for the RACERS MM Trust's payment to LBSF of all payments made by the RACERS A Trust pursuant to the Variable Funding Note.

### (ii)      Transactions With Respect to RACERS Subsequent to the Commencement Date

LCPI engaged in a repurchase agreement with LBI with respect to the RACERS MM Notes prior to the Commencement Date. Ultimately, the RACERS MM Notes were pledged by LBI to JPMorgan to secure certain obligations.

Following the Commencement Date, U.S. Bank, as trustee for the RACERS Trusts, delivered notices to LBSF purporting to declare September 23, 2008 as an early termination date for the RACERS A Swap and the RACERS MM Swap. U.S. Bank, as trustee for the RACERS A Trust, delivered a written demand on LCPI by letter dated September 30, 2008 for assignment and delivery of the Underlying Assets.

LBHI became the holder of the RACERS MM Notes on March 31, 2010 as a result of the CDA.

In August 2010, in order to efficiently administer and maximize the value of the loans and participations that were purportedly participated to RACERS 2007-A, parties in interest, including LBHI, LCPI, LBI and U.S. Bank agreed to modify the transaction documents related to the RACERS Trusts and to replace U.S. Bank with LBHI as the indenture trustee, owner trustee, custodian, administrator and paying agent for the RACERS Trusts. In addition, the parties deemed LCPI to be the owner of the loans and participations at issue and authorized LCPI to administer such assets. All parties reserved all rights with respect to the proceeds of the loans and participations.

### (iii)      Claims Filed Against the Debtors on Behalf of the RACERS Trusts

U.S. Bank, as trustee of the RACERS Trusts, filed proofs of claim (the "RACERS Claims") against each of LBSF, LBHI and LCPI. The RACERS Claims, after excluding immaterial claims for fees and expenses, aggregate in excess of $30 billion.

In evaluating the various RACERS Claims, the Debtors and the Creditors' Committee reviewed whether the transfer of assets pursuant to the RACERS Participation Agreement should be characterized as a sale or a secured financing, and if such transfer was a secured financing whether the RACERS A Trust perfected its security interest. In addition, the Debtors considered whether the perfection or the transfer was avoidable pursuant to the Bankruptcy Code, as the RACERS A Trust perfected its security interest only three days prior to LCPI's Commencement Date. The Debtors reviewed each of the underlying agreements, including the purported guarantee issued by LBHI and the swap agreements entered into by LBSF, to determine whether the agreements were valid and enforceable obligations of such

US_ACTIVE:\43795376\03\58399.0008

Debtors. Parties have asserted opposing views as to whether and the amount by which the RACERS Claims asserted by the (i) RACERS A Trust against LBSF and LBHI should be reduced by any recoveries the RACERS A Trust may receive from LCPI either as a result of a secured or unsecured claim and (ii) RACERS MM Trust should be reduced in connection with any recoveries the RACERS MM Trust ultimately may receive from the RACERS A Trust on account of the Variable Funding Note.

The Allowed amounts of the RACERS Claims against the Debtors are part of the settlement and compromise included in the Plan. See section X.B.4 hereof for a description of the Allowed amount and treatment of such Claims.

### J.    Avoidance Actions

Pursuant to sections 546 and 549 of the Bankruptcy Code the Debtors had two years from the Commencement Date to commence actions under sections 544, 545, 547, 548, 549, 550 and 553 of the Bankruptcy Code to seek to avoid certain payments or transfers of their interests in property made prior to the Commencement Date ("Avoidance Actions"). The Debtors, together with the Creditors' Committee, diligently investigated thousands of transactions to determine whether any potentially avoidable transfers existed.

In instances where the Debtors required additional time to investigate whether a transfer is avoidable, or to negotiate a settlement of a potentially avoidable transfer with the transferee, the Debtors requested an agreement from the recipients tolling the statute of limitations for the commencement of Avoidance Actions. The Debtors entered into tolling agreements with more than 4,100 parties, including the vast majority of the Debtors' Affiliates, including the Foreign Debtors. Certain Affiliate Claims among the Debtors and the Debtor-Controlled Entities may be subject to avoidance actions. The Debtors continue to investigate such Claims.

A number of parties either did not respond to the Debtors' request or refused to enter into tolling agreements with the Debtors. To prevent the loss of avoidance causes of action prior to the expiration of the applicable statute of limitations periods, on September 15, 2010 and periodically thereafter, the Debtors filed approximately 58 avoidance actions naming more than 445 defendants (the "Avoidance Actions").

The Bankruptcy Court has entered an order staying all activity in the Avoidance Actions so that the Debtors could pursue alternative means to resolve their claims against the defendants. The stay will expire on or about January 20, 2012. The stay may be lifted by either (i) the filing of a notice by the Debtors (after consultation with the Creditors' Committee) or such other entity that may be authorized to prosecute the action indicating that there is good cause for the stay to be modified, or (ii) on application to the Bankruptcy Court by a defendant in an Avoidance Action, for good cause.

### K.    Statements in Response to Certain Objections

The statements set forth below in this subsection IV.K. have been incorporated herein in response to the objections to this Disclosure Statement filed by Centerbridge Credit Advisors LLC, Anchorage Capital Group, L.L.C., Monarch Alternative Capital LP, and Danske

US_ACTIVE:\43795376\03\58399.0008

**A084**

Bank A/S London Branch (with respect to section 1 only) (collectively, the "Objectors") for additional information.

## 1.        Transfers of Securitization Structures' Securities

As discussed in section IV.I. herein, prior to its chapter 11 case, LCPI sold or participated portions of certain real estate and commercial loans and, in some cases, equity positions to various Securitization Issuers, including SASCO 2008-C2, Spruce, Verano and Pine. The Securitization Issuers, in turn, issued securities (comprised of both notes evidencing debt of the Securitization Issuers and equity interests in the Securitization Issuers) secured by the underlying assets (or the Securitization Issuers' interests therein) and the proceeds therefrom (the "Notes").

Since LCPI held substantial assets, between June 2008 and August 2008, LBI caused LCPI to transfer billions of dollars in collateral in the form of the Notes to cover JPMorgan's risk-based margin requirements for LBI.  LCPI, however, did not have any direct obligations to JPMorgan.  JPMorgan was, therefore, concerned that LCPI, which was not in privity of contract with JPMorgan and had no direct obligations to JPMorgan (and not LBI or LBHI, each of which was in privity of contract) was posting the collateral with JPMorgan. Accordingly, to alleviate JPMorgan's concerns, beginning in August 2008, LCPI transferred the Notes to LBHI and JPMorgan obtained a guaranty from LBHI for LBI's obligations.  LBHI subsequently pledged some of the Notes to JPMorgan and, upon information and belief, sold the others and transferred the proceeds from the sale of those Notes to JPMorgan, in each case to secure its guaranty obligations.

In exchange, LCPI received a reduction in the amount of its outstanding unsecured intercompany obligations to LBHI corresponding to the face amount of the Notes. The Objectors allege that, at the time of the transactions, the Notes were worth par (or close thereto) while the unsecured intercompany claims against LCPI were worth significantly less than their stated amount because LCPI was insolvent.  As a result, by reducing its intercompany claim by the full face value of the Notes, such Objectors allege, LBHI received a preference, pursuant to section 547 of the Bankruptcy Code, in the amount of the difference between the value of the Notes and the actual, discounted value of the cancelled intercompany claims.

The Debtors dispute these allegations and assert that such transfers do not constitute preferential transfers.  It is the Debtors' position that there are many defenses under section 547(c) of the Bankruptcy Code or otherwise that are available to defeat any attempted avoidance action.  In addition, based upon the information available and the Examiner's Report, there are significant avoidance actions that may be asserted by LBHI against LCPI based upon the encumbered status of Notes transferred and the true value of the Notes.

## 2.        Capital Contributions

During the several months prior to LCPI's chapter 11 filing, LCPI received multiple capital infusions from its parent, LBI.  For example, LBI made two capital infusions for the benefit of LCPI (the "Capital Infusions") — one in July 2008 in the amount of $275 million and one in August 2008 in the amount of $900 million.  LCPI did not record the Capital

Infusions as "assets" on its books and records. Instead, LBI transferred the cash in connection with the Capital Infusions to LBHI, which received the cash on LCPI's behalf. The transfers to LBHI were recorded as satisfying part of LCPI's intercompany obligations to LBHI in the amount of the Capital Infusions.

The Objectors assert that these transfers were preferential transfers satisfying each of the requirements of section 547 of the Bankruptcy Code. The Debtors dispute these allegations and assert that there are many defenses available under section 547(c) or otherwise that may be available to defeat any attempted avoidance action, particularly with respect to earmarked funds as to which LCPI never had control. In addition, LBHI may have Claims against LCPI based on these transactions.

### 3.      Intercompany-Only Repurchase Transactions

As discussed in greater detail in section VIII herein, Intercompany-Only Repurchase Transactions with a Face Amount (as both terms are defined in section VIII) of $2.25 billion are secured by perfected or otherwise unavoidable security interests/liens in the related assets. LCPI was entitled to exercise remedial rights to possess and control the particular assets. However, as of December 31, 2010, LCPI has not taken possession of the assets from LBHI (or in the case of real estate owned ("REO"), a subsidiary of LBHI established to hold the REO) of approximately $1.05 billion, of which $560 million relates to the fair value of the assets as of such date and approximately $494 million relates to cash collected by LBHI arising from the assets between LBHI's Commencement Date and December 31, 2010. The deficiency claim related to these transactions is approximately $169 million, and was calculated using a combination of an internal analysis of the decline in real estate values subsequent to August 31, 2008 (the last valuation of assets performed by Lehman) and an analysis of Commercial Real Estate ETF's and other REIT market indices subsequent to August 31, 2008 through the default date of the repurchase transactions on September 15, 2008.

The Objectors have raised issues regarding why LBHI continues to hold these assets and why LCPI did not take possession of the assets sooner. LBHI only holds these assets for operational, administrative, and bookkeeping purposes in order to facilitate the Debtors' management of the assets without significant disruption. LCPI is treated as the economic owner of the assets and LAMCO has been managing the assets for the direct benefit of LCPI. The underlying assets involved in the repurchase transactions vary from first lien commercial mortgage loans and residential mortgage loans to equity positions and involve hundreds of assets at LBHI and its Debtor-Controlled Entities, ALI and PAMI. The transfer of these assets, specifically the equity positions owned by PAMI, would be operationally costly and burdensome to effectuate and might be detrimental due to default provisions and/or acceleration provisions within joint venture and other agreements.

The Objectors assert that LCPI is entitled to a $1.2 billion super priority administrative expense claim or, at worst, a $1.2 billion general unsecured claim in respect of the diminution in value of the assets during the pendency of the cases. The decline in value of the assets is not attributable to the fact that they continued to be accounted for by LBHI, but resulted from prevailing market conditions. The Debtors do not believe there is a basis for LCPI to assert a claim for adequate protection against LBHI. The Debtors' calculation of LCPI's unsecured

deficiency claim is appropriate because, under the relevant provisions of the Bankruptcy Code, the deficiency claim is to be calculated as of September 15, 2008. Consequently, the Debtors do not believe that LCPI has a claim against LBHI for the $1.2 billion diminution in value of the assets.

As set forth in section VIII herein, certain Intercompany-Only Repurchase Transactions with a face amount of approximately $1.85 billion result in LCPI having general unsecured claims against LBHI because of LCPI's failure to properly perfect the asserted security interests/liens as to a portion of the subject assets.

### 4.    Allocation of Costs and Expenses

In the context of negotiations with creditors, the Debtors agreed that it is appropriate for LBHI to bear a portion of the expenses associated with derivative claims resolution as substantially all have related guaranty claims against LBHI. As to other costs and expenses, all of the Debtors will be parties to the Debtor Allocation Agreement and will share in the allocation of administrative expenses as appropriate. More information regarding the allocation of costs and expense of the Debtors is set forth in section X.B.4.c.—"Allocation of Costs and Expenses of the Debtors" hereof.

### 5.    LBHI's Purchase of Bankhaus' Interests in Notes

As discussed in section IV.F.4.b.—"Settlement Negotiations with Foreign Debtors," and Exhibit 14A attached hereto, the Debtors agreed, as part of the Bankhaus Claims Settlement Agreement, to purchase from Bankhaus Purchased Notes (as that term is defined in Exhibit 14A) issued by certain Securitization Issuers. As described in the motion to approve the Purchased Notes agreements [Docket No. 14743], the Debtors concluded that it was more appropriate for LBHI, rather than LCPI, to purchase the Purchased Notes because the sale of the Purchased Notes directly impacted the claim that Bankhaus holds against LBHI (the "SCA Claim") based on the Security & Collateral Agreement between LBHI and Bankhaus, dated August 15, 2002 (the "SCA"). In summary, pursuant to the SCA, LBHI agreed to post cash collateral to Bankhaus in respect of any losses suffered by Bankhaus if either an asset decreases in value below a certain level, or a borrower under a note held by Bankhaus fails to make a payment when due and payable. The Purchased Notes were among the assets covered by the SCA. Accordingly, a portion of the SCA Claim related to the Purchased Notes and arose from the shortfall in value that Bankhaus suffered on account of such notes. As this shortfall increased, that portion of the SCA Claim that related to the Purchased Notes increased, and vice-versa. Thus, there was a pre-existing correlation between the Purchased Notes and LBHI's liabilities. No similar relationship or connection existed between LCPI and said notes.

In addition to the strategic benefit of ownership of the Purchased Notes, LBHI was able to fix the amount of the portion of the SCA Claim relating to the Purchased Notes and mitigate its liability to Bankhaus on account of the SCA Claim by any increase in the value of the Purchased Notes in excess of the purchase price. For all these reasons, the Debtors concluded that it was appropriate for LBHI, rather than LCPI, to purchase the Purchased Notes. LCPI, as a result of its holding of notes and interests in Spruce, Verano and SASCO 2008-C2, will, nonetheless, realize the benefits resulting from it and LBHI having obtained 100% control

of the capital structures of those Securitization Issuers. More information regarding LBHI's purchase of Bankhaus' interests in the Purchased Notes is set forth in Exhibit 14A, attached hereto.

### 6.    Sales or Financings and Perfection of Liens

The Debtors have analyzed whether the transfers of assets into Pine, Spruce, Verano, SASCO 2008-C2, and the RACERS Trusts were sales or financings and whether, if they were not sales, appropriate steps were taken to perfect a security interest. In each case, other than the RACERS Trusts, the Debtors concluded that the transfers had the attributes of true sales, and that in any case, timely steps were taken to perfect a security interest, so that the applicable trust had an unavoidable perfected security interest in the relevant assets. More information regarding this analysis in relation to the RACERS Trusts is set forth in section IV.I.b.— "The RACERS Transactions" hereof.

## V.    CLAIMS FILED AGAINST THE DEBTORS

### A.    Schedules and Statements

Due to the unprecedented size of the Chapter 11 Cases and the complexity of the Debtors' businesses, composing the Schedules of Assets and Liabilities, Schedules of Current Income and Expenditure, Schedules of Executory Contracts and Leases (the "Schedules"), and Statements of Financial Affairs (collectively, the "Schedules and Statements") was an enormous task. The Schedules reflect all of the Debtors' known liabilities at the time of preparation based on the books and records available at that time. The Debtors initially filed their Schedules and Statements on March 12, 2009 (the Schedules and Statements of certain later filed Debtors were initially filed on later dates).[8] The Debtors amended the Schedules on June 15, 2009. LBHI further amended its Schedules on August 5, 2011 to account for certain debt securities issued by LBHI. The Debtors reserve the right to amend their Schedules and Statements during the remaining pendency of the Chapter 11 Cases.

### B.    Claims Bar Date

On July 2, 2009, the Bankruptcy Court entered an order (the "Bar Date Order"), establishing September 22, 2009 as the deadline (the "Bar Date") for filing proofs of claim against any of the Debtors (other than Merit LLC, LB Somerset LLC and LB Preferred Somerset LLC) in the Chapter 11 Cases. Due to the anticipated large volume, amount and the complicated nature of the Claims that would be filed, the Debtors determined that modified and/or supplementary claim filing procedures were required in certain circumstances. Therefore, the Debtors (i) created a detailed questionnaire for claims based on Derivative Contracts and (ii) created a separate detailed questionnaire for Guarantee Claims. Claimants filing Claims based on Derivative Contacts and Guarantee Claims were required to complete and submit the applicable questionnaires pursuant to the procedures established in the Bar Date Order on a dedicated website. The Bar Date Order established October 22, 2009 as the deadline (the

---

[8] Merit LLC, LB Somerset LLC and LB Preferred Somerset LLC filed their petitions on December 14, 2009 and December 22, 2009, respectively. Statements and Schedules for these Debtors were filed on February 12, 2010.

"Questionnaire Deadline") for the filing of derivative questionnaires and guarantee questionnaires.  The Bar Date for Merit LLC, LB Somerset LLC and LB Preferred Somerset LLC was June 11, 2010.

Furthermore, as an accommodation to holders of certain securities issued by LBHI and its Affiliates, the Debtors established alternative and streamlined Claim filing procedures. The Bar Date Order established November 2, 2009 as the deadline (the "Securities Programs Bar Date") for filing proofs of claim against any of the Debtors in the Chapter 11 Cases based on certain notes (i) issued by LBHI and its Affiliates to retail investors located outside of the United States and (ii) included on a list published on www.lehman-docket.com on July 17, 2009 (the "Lehman Programs Securities").

Over 67,000 proofs of claim asserting Claims against the Debtors have been filed with the Claims Agent appointed by the Bankruptcy Court.  The aggregate amount of Claims filed is approximately $1.2 trillion, including duplicate claims and estimated amounts for unliquidated claims.  The Debtors currently are reviewing, analyzing, and reconciling the filed Claims and, where appropriate, objecting to claims.  Rejection damages Claims associated with executory contracts and unexpired leases that are pending rejection have not yet been asserted or required to be asserted, therefore the amount of filed claims could continue to increase.

The Debtors have filed one hundred eighty-four omnibus objections to proofs of claim.  These objections have resulted in the voluntary withdrawal, reduction, reclassification, disallowance or expungement of approximately 25,000 claims in the aggregate amount of approximately $269 billion.  The Debtors anticipate filing additional objections addressing a substantial portion of the remaining filed proofs of claim.  If the Debtors do not object to a proof of claim by the deadline established in the Plan, the Claim asserted therein will be deemed Allowed and will be treated pursuant to the Plan.

The Debtors may seek to negotiate and settle disputes as to proofs of claim as an alternative to filing objections to the proofs of claim.  To that end, the Debtors have established alternative dispute resolution procedures to facilitate the negotiations and settlement of Claims. Such procedures are intended to avoid expensive and time intensive litigation of Claims and undue delay in the administration of the Chapter 11 Cases.

Annexed hereto as Exhibit 6 is additional information regarding the number and amount of Claims filed against the Debtors.  The Debtors estimate that the aggregate amount of Claims that will ultimately be Allowed against the Debtors is approximately $362 billion.  The estimate of Allowed Claims against each Debtor is set forth on Exhibit 6 annexed hereto.

Unless otherwise noted, the Debtors have utilized the exchange rates set forth on Exhibit 15 annexed hereto in the calculations of amounts owed by and to the Debtors.

### C.    Validity and Enforceability of Guarantee Claims

In the aggregate approximately (a) $315 billion of Guarantee Claims were filed against LBHI by its Affiliates and (b) $255 billion of Guarantee Claims were filed against LBHI by third-parties that are not Affiliates of the Debtors ("Third-Party Guarantee Claims"), in each case including estimated amounts for Claims filed in unliquidated amounts.  Guarantee Claims

US_ACTIVE:\43795376\03\58399.0008

filed by Affiliates consist largely of Claims asserted against LBHI based on (i) a purported guarantee of a specific transaction that an Affiliate entered into with another Affiliate; (ii) LBHI's purported guarantee of all of the obligations of certain of its subsidiaries (such subsidiaries, the "Guaranteed Subsidiaries") pursuant to resolutions adopted pursuant to a Unanimous Written Consent of the Executive Committee of the Board of Lehman Brothers Holdings Inc. (the "Guarantee Resolutions") or (iii) a purported guarantee by LBHI of net worth or asset values.

The Debtors are reviewing each of the Guarantee Claims and considering the circumstances surrounding the entry into the underlying contract or obligation, including whether: (i) the guarantees are valid and enforceable contracts; (ii) the guarantees were properly executed by the appropriate parties; (iii) the claimant was an express or intended beneficiary; (iv) the claimant actually relied upon the guarantee at the time that it transacted business with the primary obligor; and (v) the guarantee is avoidable under chapter 5 of the Bankruptcy Code. With respect to Guarantee Claims based on the Guarantee Resolutions, the Debtors also considered, among other things, whether (a) the Guarantee Resolutions constitute guarantees or contracts between LBHI and the Guaranteed Subsidiaries; (b) the claimant had actual knowledge of the Guarantee Resolutions at the time it transacted with the Guaranteed Subsidiary and (c) additional documentation was required to create an enforceable guarantee.

The Debtors have significant defenses to the enforceability of many of the asserted Guarantee Claims. Evaluation of each Guarantee Claim requires extensive fact-intensive investigation and analysis and could result in substantial discovery among the parties and likely active litigation.[9]

### D.    Valuation of Structured Securities Claims

Lehman issued a significant amount of securities to investors through LBHI and its Foreign Affiliates, including certain (i) structured notes issued by LBT ("LBT Issued Notes"), (ii) certificates and warrants issued by LBSN (the "LBSN Certificates and Warrants"), (iii) structured notes issued by LBHI (the "LBHI Structured Notes"), (iv) structured notes issued by Bankhaus (the "Bankhaus Structured Notes"), (v) structured securities issued by Lehman Brothers (Luxembourg) Equity Finance S.A. (the "LB Lux Structured Securities") and (vi) certificates issued by Lehman Brothers Finance S.A. (the "LB Finance Structured Securities", and collectively with the LBT Issued Notes, the LBSN Certificates and Warrants, the LBHI Structured Notes, the Bankhaus Structured Notes and the LB Lux Structured Securities, the "Structured Securities"). LBT, LBSN, Bankhaus, LBHI, LB Lux and Lehman Brothers Finance S.A. are collectively referred to herein as the "Structured Securities Issuers."

Many of these Structured Securities were issued as part of the European Medium Term Note Program.  These Structured Securities predominately provide that the return at maturity and/or the payment of interest is derived from or linked to the performance of an underlying asset or groups of assets including global indices, single stocks, currencies, interest rates, and various credit derivative instruments and baskets thereof.  In some instances principal

---

[9]  The Debtors' estimates of the claims will ultimately be allowed, and the assumptions underlying such estimates, are set forth in Exhibit 6 of the Disclosure Statement.

and/or interest due under such Structured Securities may be partially or wholly "protected."  The Structured Securities Issuers generally transferred the proceeds of such issuances to LBHI and have asserted a claim against LBHI for such amounts.  A large number of holders of securities issued by Structured Securities Issuers filed claims against LBHI based on its purported guarantee of the Structured Securities (or based directly on the securities in the case of LBHI Structured Notes).

LBHI filed a Form 8-K (the "October 29th 8K") on October 29, 2010 which sets forth the methodology it intended to use for determining the allowed amount of Guarantee Claims filed against it as the alleged guarantor of the LBT Issued Notes.  The methodologies were developed in consultation with the court-appointed administrators of LBT, various individuals and groups of creditors that hold claims against LBHI based on LBT Issued Notes, and the Creditors' Committee. The Debtors also posted to www.lehman-docket.com a list containing the proposed maximum valuation for each LBT Issued Note in accordance with such valuation methodologies and principles.

Based on input from holders of Structured Securities, administrators of the estates of the Structured Securities Issuers and the Creditors' Committee, LBHI modified the methodologies described in the October 29th 8K.  The Structured Securities Valuation Methodologies represent a negotiated resolution of the valuation methodologies initially proposed by the Debtors and the methodologies proposed by various creditors.

Since many of the Structured Securities are similar in nature to the LBT Issued Notes, LBHI will apply the valuation methodologies, as revised, to similar structured securities issued by LBSN, LBHI, Bankhaus, LBF and LB Lux.  A description of the valuation methodologies for the Structured Notes is set forth on Exhibit 11 annexed hereto (the "Structured Securities Valuation Methodologies").[10]  The Structured Securities Valuation Methodologies were utilized to calculate the maximum allowable claim amounts for each Structured Security.  The maximum allowable claim amounts for the Structured Securities were posted on www.lehman-docket.com on January 25, 2011.  The Debtors will re-publish the maximum allowable claim amounts for each Structured Security incorporating a modification to the Structured Securities Valuation Methodologies to convert amounts owed on account of Structured Securities denominated in foreign currencies to U.S. Dollars using the exchange rates in effect on September 15, 2008 and set forth on Exhibit 15 hereto.

Because many of the Structured Securities do not have an indenture trustee that filed a global proof of claim on behalf of a class of individual note holders, individual record and beneficial holders have filed Claims against the Debtors based on Structured Securities.  More than 21,000 Claims asserting claims of approximately $55 billion were filed against the Debtors

---

[10] Nothing herein shall be construed to (i) characterize the Structured Securities as "securities contracts" or "swap agreements" under the Bankruptcy Code, (ii) modify or pertain to the terms of any over-the-counter derivatives or similar contract between LBHI or any of its Affiliates and any other person; or (iii) limit or otherwise modify the application of Section 562 of the Bankruptcy Code to such over-the-counter derivatives or similar contracts.  The Structured Securities Methodology has been developed by LBHI solely for the purpose of determining the Allowed Claims based on valid and timely filed proofs of claim solely for the purposes of voting and Distributions under the Plan.

US_ACTIVE:\43795376\03\58399.0008

based on Structured Securities.  Due to the complexity and idiosyncratic nature of many of the Structured Securities, the filed Claims assert incorrect amounts.  In order to efficiently administer and reconcile these Claims, the Debtors established procedures for the determination of the allowed amount of the claims for the purposes of voting and distributions under the Plan (the "Structured Securities Procedures").  On August 10, 2011, the Bankruptcy Court approved the Structured Securities Procedures.  The Structured Securities Procedures provide that (i) the Debtors will provide individualized notices to each holder of a claim based on a Structured Security that sets forth the Debtors' proposed allowed claim amount for such claim calculated in accordance with the Structured Securities Valuation Methodologies, (ii) claimants will have an opportunity to respond and dispute such proposed amount and (iii) disputes regarding such claim amounts, that are not otherwise settled, may utilize the court-approved alternative dispute resolution procedures.  The Debtors estimate that the Structured Securities Claims will be Allowed in the aggregate amount of approximately $37 billion.  This amount is subject to revision as the Debtors obtain additional information regarding the valuation of certain of the Structured Securities.  The global proof of claim filed by Wilmington Trust Company as indenture trustee on behalf of the holders of securities issued by LBHI under the Indenture, dated September 1, 1987, including the holders of certain LBHI Structured Notes (Claim No. 10082), is expressly excluded from the Structured Securities Procedures.  The Debtors intend to negotiate the allowed claim amount of that Claim with Wilmington Trust Company directly.

On August 6, 2011, the Creditors' Committee filed a statement regarding the Structured Securities Procedures.  This statement was also published on www.lehman-docket.com.  The Creditors' Committee recommends that LBHI creditors read this statement.

### E.    Claims Based on Derivatives Contracts

### 1.    Derivatives Framework

Over a period of several months, the Debtors have engaged in negotiations and participated in discussions with thirteen (13) of their largest derivatives counterparties (the "Big Bank Counterparties") regarding their derivatives claims and certain derivatives guarantee claims against the Debtors (collectively, the "Derivatives Claims").  After an in-depth review and analysis of the Derivatives Claims, the Debtors proposed a common settlement approach for the allowance of the Derivatives Claims of the Big Bank Counterparties pursuant to standardized, uniform and transparent principles and methodologies (the "Derivatives Framework").  The Derivatives Framework establishes:

(i)     common dates and times for calculation of mid market values;

(ii)    a uniform approach to portfolio aggregation to derive groups of netted exposures; and

(iii)   a methodology for the calculation of allowable additional charges.

The Debtors also exchanged information with and considered the comments of the Big Bank Counterparties regarding the Derivatives Framework.  The finalized Derivatives Framework, posted on the Debtors' website www.lehman-docket.com, reflects certain

US_ACTIVE:\43795376\03\58399.0008

A092

modifications and adjustments incorporated by the Debtors based upon their negotiations with the Big Bank Counterparties that engaged with the Debtors.

The Debtors proposed a settlement amount for the allowance of the asserted Derivatives Claims for each of the Big Bank Counterparties calculated pursuant to the Derivatives Framework (the "Proposed Framework Values"). The Big Bank Counterparties disagreed with certain tenets of the Derivatives Framework and asserted that their Claims should be Allowed in amounts in excess of the Proposed Framework Values, including on the basis that the Derivatives Framework applies uniformly to all of their asserted Claims and not to other Derivatives Claims of other parties. Following negotiations between the Debtors and the Big Bank Counterparties, the Debtors and certain Big Bank Counterparties agreed to settle their disputes and avoid protracted litigation and, subject to documentation, the Debtors proposed to Allow the Derivatives Claims of all Big Bank Counterparties in amounts equal to the Proposed Framework Values plus an additional 11.25% (the "Modified Framework Values").

Given the developments with the Big Bank Counterparties, and the success the Debtors have had settling Derivative Claims with parties other than the Big Bank Counterparties, the Debtors determined not to pursue a motion to apply the Derivatives Framework to all parties that have asserted Derivatives Claims against the Debtors as contemplated by the Debtors' First Amended Chapter 11 Plan and Disclosure Statement filed on January 25, 2011 [Docket Nos. 14150 and 14151]. If a Big Bank Counterparty does not accept the Debtors' settlement proposal, the Debtors intend to vigorously contest such counterparty's Derivatives Claims and intend to seek to reduce such claims to amounts lower than those proposed in the Derivatives Framework for purposes of voting on or establishing distribution reserves with respect to the Plan.

## 2.   Estimate of Allowed Derivatives Claims

The Debtors have entered into settlement agreements with 8 Big Bank Counterparties at the Modified Framework Values. These settlement agreements settled approximately $9.6 billion of asserted Claims against the Participating Subsidiary Debtors and the corresponding guarantees Claims against LBHI for approximately $6.2 billion of Allowed Claims and the corresponding guarantee Claim for the same amount of Allowed Claims against LBHI. Each of the settling Big Bank Counterparties is entitled to most favored treatment protection from the Debtors in the event the Debtors later settle with one of the non-settling Big Bank Counterparties under certain circumstances that deviate from the Derivatives Framework and Modified Framework Values in a manner more favorable to the non-settling Big Bank Counterparty. Taking into account the aggregate amount of Derivatives Claims of the Big Bank Counterparties at the Modified Framework Values, the Debtors estimate that the aggregate amount of claims of the approximately top 30 major financial institutions (including the Big Bank Counterparties) that ultimately would be allowed against the Debtors, primarily LBSF with corresponding guarantee claims against LBHI, would be approximately $10.3 billion.

There can be no assurance that the estimated amounts of Derivatives Claims are correct. The actual allowed amounts of such claims may differ from the Debtors' estimates. The Debtors' estimates of claims that will be allowed are subject to various risks, uncertainties and assumptions. Should one or more of these risks or uncertainties materialize or should underlying

varying assumptions prove incorrect, the actual allowed amounts of Derivatives Claims may vary significantly from the projected estimates.

### F.    Residential Mortgage Loan Representation/Warranty Claims

Prior to the Commencement Date, the Debtors were active participants in the market for the repackaging of individual residential mortgage loans into mortgage-backed securities.  The Debtors either originated residential mortgage loans through their subsidiaries or acquired residential mortgage loans from third party originators with the intent either to deposit the loans into special purpose entities established to issue securities secured by pools of mortgage loans or to hold them for the Debtors' own accounts.  The loan purchase and sale agreements ("Loan Purchase and Sale Agreements") pursuant to which the Debtors sold the residential mortgage loans into securitizations or to third parties in many cases include various representations and warranties regarding the nature of the loans, borrowers, properties and other matters.  The Loan Purchase and Sale Agreements also provide that if any loan does not comply with the representations and warranties, the Debtors are obligated to repurchase the loan at the initial purchase price or, if a loss has been sustained, indemnify the purchaser for any loss suffered as a result of purchasing such loan, including any expenses incurred from liquidation of such loan.  The Loan Purchase and Sale Agreements pursuant to which the Debtors acquired many residential mortgage loans also include similar representations and warranties regarding the nature of the loans and similar repurchase obligations on the part of the originator for the benefit of the Debtors.

Parties have filed approximately 1,100 Claims in connection with the Debtors' obligations to repurchase mortgage loans or indemnify the purchasers for losses sustained resulting from breaches of representations, warranties or covenants included in the Loan Purchase and Sale Agreements.  These Claims were mostly filed against LBHI and SASCO, asserting claims of more than $73 billion in the aggregate, not including amounts that may result from contingent claims.

Based on the Debtors review of claims to date, and the Debtors' knowledge regarding the success rate of asserted repurchase and indemnity claims in the market, the Debtors estimate that the amount of Allowed Claims based on the Debtors' repurchase and indemnity obligations for residential mortgage loans could ultimately be approximately $10.4 billion.  The process by which the Debtors estimate valid claims includes filing motions to disqualify those claims where the claimant has submitted insufficient information, frivolous or duplicative claims, or the claimant is either nonresponsive to requests for supporting documentation or unable to provide sufficient documentation.  To arrive at their estimate, the Debtors utilized their past experience analyzing and identifying the rates at which claims asserting breaches of representations and warranties have been validated.  Based upon the current review of supporting documentation and interactions with claimants, the process is expected to eliminate a substantial number and dollar amount of claims.

US_ACTIVE:\43795376\03\58399.0008

### G.     Claims of Federal Home Loan Mortgage Corporation and the Federal National Mortgage Association

The Federal Home Loan Mortgage Corporation ("Freddie Mac") filed a Claim (Claim No. 33568) against LBHI for approximately $1.2 billion based on loans from Freddie Mac to LBHI (the "Freddie Mac Claim").  Freddie Mac asserted that such claim is entitled to be treated as a priority claim under 12 U.S.C. 4617(b)(15)(D).  The Debtors intend to challenge and dispute that such claim is entitled to be treated as a priority claim.   Notwithstanding anything in this Section V.G. or in the Plan to the contrary, nothing herein or in the Plan or the order confirming the Plan shall have any impact on the validity or classification of the Freddie Mac Claim or the right of Freddie Mac to assert that the Freddie Mac Claim is entitled to be treated as a priority claim based on the rights, powers, and privileges of the Federal Housing Finance Agency ("FHFA"), in its statutory capacity as the Conservator of Freddie Mac, under the Housing and Economic Recovery Act of 2008, 12 U.S.C. § 4501 et seq. (2008) ("HERA"), and all rights of Freddie Mac and FHFA are fully preserved in that regard.  In addition, Freddie Mac and FHFA assert that nothing herein or in the Plan or the order confirming the Plan can affect, limit, enjoin or otherwise prejudice FHFA's rights, powers, and privileges under HERA as conservator of Freddie Mac.

The Federal National Mortgage Association ("Fannie Mae" ) filed Claims (Claim No. 29557) against LBHI for an aggregate amount of approximately $19 billion based on Claims arising under certain mortgage selling and servicing contracts, sale and servicing agreements, ISDA Master Agreement and guaranty and under certain securities laws (the "Fannie Mae Claims").  Fannie Mae initially asserted that such claims are entitled to be treated as priority claims under 12 U.S.C. 4617(b)(15)(D).  During the pendency of the Chapter 11 Cases, Fannie Mae has conducted certain investigations in respect of the Fannie Mae Claims in connection with the asserted priority of such claims under 12 U.S.C. 4617(b)(15)(D).  To date, Fannie Mae has determined that it will not assert such priority with respect to approximately $16 billion of such claims and is continuing its due diligence and investigation of the facts, circumstances and documentation related to the priority of the balance of such claims in the approximate amount of $2.7 billion and has not yet determined whether it will pursue such priority in respect of such remaining claims.  The Debtors intend to challenge and dispute that any amount of the Fannie Mae Claims is entitled to be treated as a priority claim.  Notwithstanding anything in this Section V.G. or in the Plan to the contrary, nothing herein or in the Plan or the order confirming the Plan shall have any impact on the validity or classification of the Fannie Mae Claims or the right of Fannie Mae to assert that such remaining portion of the Fannie Mae Claims are entitled to be treated as priority claims based on the rights, powers, and privileges of the FHFA, in its statutory capacity as the Conservator of Fannie Mae, HERA, and all rights of Fannie Mae and FHFA are fully preserved in that regard. In addition, Fannie Mae and FHFA assert that nothing herein or in the Plan or the order confirming the Plan can affect, limit, enjoin or otherwise prejudice FHFA's rights, powers, and privileges under HERA as conservator of Fannie Mae.

## VI.     DEBTORS' RELATIONSHIP WITH LEHMAN BROTHERS INC.

Due to the intertwined nature of the Debtors' businesses and LBI's business prior to the Commencement Date, the Debtors and LBI have asserted significant Claims against each other.  The Debtors filed Claims against LBI (i) as "customers" as such term is defined in SIPA

and (ii) as general unsecured creditors of LBI.  LBI is still reviewing its Claims, and therefore, the Debtors are not able to estimate the recoveries on these Claims.  Certain of the Debtors' Claims against LBI may be subject to subordination agreements entered into prior to the Commencement Date with LBI.  Therefore, as to certain of the Claims, the Debtors will likely only receive a minimal recovery, if any.

## VII.   CERTAIN TRANSACTIONS/RELATIONSHIPS WITH LBIE

LBIE was Lehman's European registered broker/dealer based in the United Kingdom.  LBIE offered a variety of security brokerage services to third parties as well as to various Lehman entities involved in European transactions.  LBIE was placed into administration in the United Kingdom on September 15, 2008.  In connection with the administration of LBIE, the Joint Administrators of LBIE have obtained certain rulings from the English High Court regarding rights and ownership of certain assets held by LBIE to which other Affiliates, including certain Debtors, claim an interest.  The material proceedings are summarized below.

(i)   The English High Court rendered a decision in favor of the Joint Administrators of LBIE, finding that LBIE owns the securities that are subject to the RASCALS (Regulation and Administration of Safe Custody And Global Settlement) arrangement.  All Affiliates which were a party to the proceedings, with the exception of LBI and LBSF, have filed appeals from the RASCALS decision.  The appeals are pending.

(ii)   LBIE is seeking a determination from the English High Court that it cannot be compelled to apply a lien for the benefit of Affiliates against assets it holds on behalf of other Affiliates.  Pursuant to the terms of the custodial arrangement with LBIE, the Debtors have notified LBIE that they intend to request that LBIE assert a lien against the assets of other Affiliates in order to satisfy liabilities owed by any such Affiliates to the Debtors.  Other Affiliates have similarly requested LBIE take similar actions for their benefit. A determination from the English High Court is pending.

(iii)   The English High Court rendered a decision which held that (a) a statutory trust for the benefit of a client comes into existence upon immediate receipt of client money by LBIE; (b) to the extent that there are any identifiable client monies in non-segregated client accounts, these are not part of the client money "pool," and any claims to them by clients are available only to the extent such claims are permissible in accordance with established tracing principles (the "Pooling Issue"); and (c) it is not permissible to "top-up" the client money pool from assets belonging to LBIE's general estate.  The English Court of Appeal reversed the findings on the Pooling Issue so that the client money pool includes client money in all accounts wherever identified, whether in segregated accounts or house accounts.  The decision is being appealed to the English Supreme Court.[11]

## VIII.   TREATMENT OF INTERNAL REPURCHASE AGREEMENTS

Historically, LBHI and certain of its subsidiaries regularly entered into repurchase transactions with LCPI in which LCPI was the buyer and employed the assets subject to the

---

[11] Please refer to Exhibit 6 of the Disclosure Statement for the Debtors' estimates of which claims will ultimately be allowed, which reflect certain assumptions relating to these proceedings.

repurchase agreement to enter into further repurchase transactions with third parties or to obtain secured financing.

Thousands of intercompany repurchase transactions were outstanding as of the Commencement Date.  In general, the first leg of the repurchase – the sale of assets at a fixed price to LCPI – had been effectuated but the second leg of the repurchase – the repurchase of the same assets at a fixed price reflecting a financing cost by the applicable seller – had not been completed.  Assets that were the subject of repurchase transactions included first lien commercial mortgage loans, residential mortgage loans, commercial real estate mezzanine loans, limited partnership and limited liability company interests, and mortgage servicing rights.

Lehman used its "MTS" system to effectuate these transactions.  The MTS System had an automated feature that provided that once an asset was designated as an asset eligible to be financed, the asset automatically became the subject of an overnight repurchase transaction between a Lehman entity and LCPI that renewed each day.

The MTS system recorded the interests of the Lehman entities in the assets involved in the transactions and designated the assets transferred to LCPI as "collateral allocated" to LCPI.  As such, each repurchase transaction was treated as a secured financing.

As of the Commencement Date, there were open repurchase transactions between LBHI, as seller, and LCPI, as buyer as to assets that LCPI had not financed with third parties (the "Intercompany-Only Repurchase Transactions") with an unpaid repurchase price (the "Face Amount") of approximately $4.1 billion.  Roughly the same amount of assets (based on market values included on Lehman's books and records) was transferred from LBHI to LCPI when these transactions were entered into on September 12, 2008.  However, given the market volatility at the time, the transferred assets may have had a lesser value on the date LBHI was obligated to repurchase such assets, which results in a claim of LCPI against LBHI.

Based on the intent of the parties as evidenced by the economic and substantive legal aspects of the Intercompany-Only Repurchase Transaction and applicable legal principles, the Debtors are treating the transactions as secured financings rather than true sales.

For the portion of assets subject to the Intercompany-Only Repurchase Agreement as to which LCPI has a valid and enforceable security interest or lien, LCPI has an Allowed secured claim against LBHI in the amount of the value of the assets, and an Allowed general unsecured deficiency claim against LBHI for the difference between the Face Amount and the value of the assets.  Where LCPI failed to perfect its security interest/liens, and LCPI's security interest is avoidable, LCPI will have only an Allowed general unsecured claim for the Face Amount of the relevant Intercompany-Only Repurchase Transaction.

Intercompany-Only Repurchase Transactions with a Face Amount of $2.25 billion are secured by perfected or otherwise unavoidable security interests/liens in the related assets. LCPI is entitled to exercise remedial rights to possess and control the particular assets. However, as of December 31, 2010, LCPI has not taken possession of the assets but rather has recorded a secured receivable from LBHI (or in the case of real estate owned ("REO"), a

subsidiary of LBHI established to hold the REO) of approximately $1.05 billion, of which $560 million relates to the fair value of the assets as of such date and approximately $494 million of such secured receivable relates to cash collected by LBHI arising from the assets between LBHI's Commencement Date and December 31, 2010. The deficiency claim related to these transactions is approximately $169 million.

Intercompany-Only Repurchase Transactions with a Face Amount of approximately $1.85 billion result in LCPI having general unsecured Claims against LBHI because of LCPI's failure to properly perfect the asserted security interests/liens as to a portion of the subject assets.

On LCPI's Commencement Date, LCPI was party to repurchase transactions with ALI and PAMI with a Face Amount of approximately $3 billion. ALI and PAMI as non-Debtors generally would not be able to avoid unperfected interests; accordingly LCPI has recorded secured receivables from ALI and PAMI (or in the case of REO, a subsidiary thereof) of approximately $94 million and $395 million, respectively, representing the fair value of the related assets as of December 31, 2010. LCPI will have deficiency claims against ALI and PAMI in respect of these repurchase transactions in the aggregate amounts of approximately $158 million and $783 million, respectively.

The secured Claim and deficiency amounts set forth above were calculated based on the best available information and are subject to continuous review and adjustments which may be material.

## IX.    LAMCO

During the Chapter 11 Cases, LBHI developed, by necessity, an infrastructure for the long-term management of the Debtors' long-term investments and assets and LBHI's asset management teams developed the skills required, and an expertise and knowledge base specifically geared to, the management of such long-term investments and distressed assets. The capabilities of LBHI's asset management team are scalable and transferable to the management of other long-term investment assets for third parties as well. In order to maximize the value of the asset management business, LBHI organized new separate but wholly owned subsidiaries to provide management services to the Debtors and, potentially, to third parties. LAMCO Holdings LLC, and its wholly owned subsidiaries, including LAMCO LLC (collectively, "LAMCO") currently provide asset management and administration services to the Debtors and, subject to certain restrictions and approvals, may provide services to third parties. The Debtors transferred to LAMCO a majority of LBHI's asset management employees and certain infrastructure and entered into an asset management agreement with LAMCO. At this time, LAMCO has approximately 300 employees and manages substantially all of the Debtors' non-cash assets.

LAMCO is permitted, under certain circumstances, including upon the agreement of the Creditors Committee, to enter into agreements to manage assets of third parties for a profit that would inure to the benefit of LAMCO's equity holder(s), and ultimately to the benefit of all of the stakeholders in the Debtors. Although LBHI is not currently pursuing a strategic relationship with a third party with respect to LAMCO, including the possibility of selling an equity stake in LAMCO to a potential partner, or otherwise entering into mutually beneficial

ventures and arrangements with third parties, it has reserved the option to be able to do so in the future.

At the discretion of the board of directors of LBHI following the Effective Date and subject to existing agreements, LAMCO may serve as asset manager for certain assets of each of the Debtors under the Plan.  Ownership and ultimate decision making authority with respect to each of the Debtor's assets after the Effective Date will be vested in the applicable Debtor as provided in section 13.1 of the Plan.  On August 17, 2011, the Bankruptcy Court authorized the Debtors to enter into an asset management agreement that anticipates the possible transfer of certain assets to one or more collateralized loan obligation issuers at the discretion of the Debtors.  To the extent that any assets of the Debtors are transferred to collateralized loan obligation issuers, these assets will no longer be managed by LAMCO.

## X.    SUMMARY OF THE CHAPTER 11 PLAN

The Plan is annexed hereto as Exhibit 1 and forms a part of this Disclosure Statement.  The summary of the Plan set forth below is qualified in its entirety by reference to the provisions of the Plan.

### A.    Considerations Regarding the Chapter 11 Plan

The terms of the Plan are the result of extended analyses by the Debtors and their advisors as well as numerous conferences and intensive negotiations with multiple interested parties, including individuals and representative groups of both third party creditors and Affiliates of the Debtors, and the Creditors' Committee.  One of the Debtors' guiding principles in formulating the Plan has been the avoidance of litigation of substantive consolidation and its related issues, the recharacterization of intercompany balances owed to LBHI by Subsidiary Debtors, the Allowed Amount of Affiliate Claims, allocation of costs and expenses among Debtors, and the ownership rights of various Debtors and their Affiliates with respect to certain assets, in order to expedite, in so far as practical, Distributions to holders of Allowed Claims. Prosecution of litigation of the various issues would be costly, complex and time consuming and as well as prolong the Debtors' Chapter 11 Cases.

Accordingly, the Plan includes a settlement and compromise of such issues that will provide holders of Claims recoveries that reflect the relative risks and benefits of the prosecution of the potential litigation to final judgment.  The terms of the compromise and settlement included in the Plan should be considered together as a resolution of all of the Plan Issues.  Although litigation regarding the Plan Issues could produce different absolute or relative recoveries from those proposed by the Plan, such litigation would not be finally resolved for many years, delaying and potentially materially eroding the value of ultimate Distributions to all creditors.

US_ACTIVE:\43795376\03\58399.0008

B. **Rationale Underlying Plan Treatment of Claims**

1. **Description of the Plan and Compromise of Substantive Consolidation and Related Issues**

a. **Substantive Consolidation of the Debtors and Their Affiliates**

The most highly controverted legal issue in the Debtors' Chapter 11 Cases is whether the Debtors and certain or all of their Affiliates should be substantively consolidated (i.e. merged to constitute a single entity of pooled assets and liabilities or be administered as separate distinct independent legal entities). Recoveries to most creditors would vary widely as between the two polar extremes. Certain creditors that would benefit under one of the two extremes have asserted arguments in favor of or against substantive consolidation.

Substantive consolidation is an equitable remedy and would result in the creation of a common pool of assets that all holders of Allowed Claims would share in based upon their respective legal rights. All of the entities in a substantively consolidated group are merged. Other than Secured Claims, intercompany Claims, joint and several liability Claims, guarantee Claims and subsidiary equity or ownership interests are eliminated. Consequently, a creditor of one of the substantively consolidated entities is treated as a creditor of the substantively consolidated entity, and issues of individual corporate ownership of property and individual corporate liability on obligations are no longer pertinent.

Substantive consolidation is a unique equitable remedy and pursuant to legal precedent is to be used sparingly. The proponent of substantive consolidation bears a heavy burden of proof to establish that it would be appropriate to apply the doctrine of substantive consolidation.

In the perspective of the strong convictions of each of the Ad Hoc Group and the Non-Con Plan Proponents as to the applicability of the doctrine and the significant amount of Claims at stake, if either of the Ad Hoc Plan or the Non-Con Plan is pursued, full prosecution of litigation of this issue would result. The litigation would be extremely fact-intensive, consume a substantial amount of money and Distributions to creditors would be significantly delayed. Therefore, the Plan proposes a compromise that would eliminate the necessity of such complex litigation. The Plan does not substantively consolidate the Debtors. However, as to Claims against LBHI, the Plan provides that a portion of the Distributions on Claims that would be eliminated if LBHI and its Affiliates are substantively consolidated is automatically reallocated to holders of claims that would exist following the substantive consolidation and receive a larger recovery in that scenario. As to Claims against the Participating Subsidiary Debtors, the Plan provides that a portion of the Distributions on Claims that would be eliminated or receive a lesser recovery if LBHI and the Participating Subsidiary Debtors were substantively consolidated is also automatically reallocated to holders of Claims against LBHI that would exist following the substantive consolidation and receive a larger recovery in that scenario. The Debtors believe that the compromise included in the Plan balances the risks and provides an equitable solution that is reasonable, fair and efficient means to resolve and avoid the vexatious, multifaceted and protracted litigation and delay that might otherwise occur.

US_ACTIVE:\43795376\03\58399.0008

**A100**

**b.** **Description of Settlement and Compromise Regarding Substantive Consolidation Included in the Plan**

The Plan includes a compromise of substantive consolidation and related issues. The Plan provides for a reallocation of a portion of Distributions from certain classes of creditors that would receive a lower distribution if the Debtors were substantively consolidated to creditors that would benefit from substantive consolidation of the Debtors. The amount of Distributions that are subject to the reallocation in the Plan reflects the joint determination by the Debtors' and the Creditors' Committee that there is a material risk that substantive consolidation might be directed if fully litigated. To avoid that risk, a compromise of the issue is appropriate and in the best interests of all economic stakeholders. The Debtors propose a reallocation of a portion of Distributions based upon at least a 20% risk of substantive consolidation.

The Plan provides that a portion of the Distribution to each holder of (i) an Allowed Senior Third-Party Guarantee Claim and Third-Party Guarantee Claim against LBHI and (other than those of the Racers Trusts) (ii) an Allowed General Unsecured Claim (excluding those of the Racers Trusts against LBSF) against each of the Participating Subsidiary Debtors, a General Unsecured Claim of Designated Entities (i.e. the Racers Trusts and Fenway[12]) against LCPI and an Affiliate Claim (excluding Affiliate Claims of LBHI) against each Participating Subsidiary Debtor (collectively, the "Contributing Classes"), will automatically be reallocated to holders of Senior Unsecured Claims and General Unsecured Claims against LBHI. The portion of Distributions that will be reallocated for each Contributing Class (other than for Classes for Claims of Designated Entities) is calculated by using a weighted average of recoveries under two scenarios: (1) estimated recoveries in a plan that does not provide for substantive consolidation of LBHI and the Participating Subsidiary Debtors ("Non-Con Scenario") and (2) estimated recoveries in a Plan that provides for the substantive consolidation of LBHI and the Participating Subsidiary Debtors ("SubCon Scenario"). To give effect to the settlement of the relative risks of substantive consolidation, the calculations of the recovery amounts in the Non-Con Scenario are weighed at 80% and in the SubCon Scenario are weighed at 20%. The reallocation percentage for each Class is calculated in the following manner: (A) (i) the estimated distribution calculated in accordance with the Non-Con Scenario, *minus* (ii) the sum of the weighted recoveries calculated in accordance with the Non-Con Scenario and the SubCon Scenario, *divided* by (B) the estimated amount distributable in accordance with the Plan prior to any reallocation.

For Affiliate Claims against the Participating Subsidiary Debtors and Guarantee Claims for which a Participating Subsidiary Debtor is the primary obligor, the estimated recoveries if LBHI and the Participating Subsidiary Debtors were substantively consolidated would be zero, since such Claims would be eliminated. Therefore, the above calculation provides for a 20% reallocation by holders of such Claims. Holders of General Unsecured Claims against Participating Subsidiary Debtors would receive a distribution under either scenario, therefore, the above mechanism provides for varying reallocation percentages for Claims against the Participating Subsidiary Debtors depending on the estimated Distributions in the two scenarios. Due to the different amount of assets and liabilities of each Participating Subsidiary Debtor, holders of Claims against some Participating Subsidiary Debtors would be

---

[12] The Fenway Claim means the Claim asserted by LBHI in connection with the Fenway transaction, which shall be Allowed in accordance with Section 6.5(h) of the Plan.

more adversely affected by substantive consolidation than others.  As to Guarantee Claims for which the primary obligor is an entity other than the Participating Subsidiary Debtors, 20% of the Distributions on account of such Allowed Claims will be reallocated. The applicable percentage that will be reallocated for each Class is set forth on Exhibit 12.

The term Plan Adjustment, as used in the Plan and herein, refers to the pool of cash that is reallocated from holders of Claims in one Class to holders of Claims in another Class.  Included in the Plan Adjustment are (i) the amounts calculated in accordance with the preceding two paragraphs, (ii) the Distributions on $1 billion of the Claims of the Racers A Trust against each of LBHI and LBSF, and 20% of the Distribution on the claims of the Racers A Trust against LCPI and (iii) 20% of the Distribution on the claims related to the Fenway transactions against LCPI.

If LBHI Class 3 or 7 are satisfied in full, any Distributions (including the Plan Adjustment) that would otherwise have been paid to LBHI Classes 3 or 7 had such Classes not been paid in full, will be distributed to the holders of Claims in Classes that contributed to the Plan Adjustment in proportion to, and only to the extent of, such Class's Plan Adjustment contributions.  The Plan refers to such amounts that would be returned to the contributing Classes as the Excess Plan Adjustment.  Based on the Distributions estimated by the Debtors as set forth in the Recovery Analysis, it is unlikely that this scenario will arise.

No portion of the Distribution to LBHI on its Affiliate Claims against the Participating Subsidiary Debtors will be reallocated to holders of Claims against LBHI pursuant to the Plan Adjustment.  Instead, as part of the proposed compromise and settlement and the characterization of LBHI's Claim against the Subsidiary Debtors, LBHI shall only receive a Distribution on, and be entitled to setoff, 80% of that portion of LBHI's Claim against a Subsidiary Debtor that relates to the funding of operations of such Subsidiary Debtor.  That amount shall not relate to specific transactions, such as Derivative Contracts or repurchase agreements as described further in section X.B.4— "Reduction of Distribution on LBHI's Claims Against Subsidiary Debtors" below.

The Participating Subsidiary Debtors are generally the Lehman entities that had continuous and active operations prior to the Commencement Date.  Such entities entered into a variety of transactions with multiple counterparties at various times.  In contrast, the Subsidiary Debtors that are not Participating Subsidiary Debtors were generally established to enter into a particular transaction or to hold a particular asset.  Due to the nature of the business and the amount of assets and liabilities of the Participating Subsidiary Debtors as compared to that of all other Subsidiary Debtors, the Plan provides for differing treatment of the Claims against such entities.  LBDP and LBFP were substantial operating entities of Lehman prior to the Commencement Date and have significant assets.  However, LBDP and LBFP were formed to maintain credit ratings of (i) "AAA" from Standard & Poor's and (ii) "Aaa" from Moody's Investors Service Inc. in order to enter into derivative transactions with entities that required such ratings.  Consequently, these Subsidiary Debtors also are distinguishable from the Participating Subsidiary Debtors.

       **c.**       **The Settlement and Compromise is in the Best Interests of the Economic Stakeholders**

       The Plan seeks approval of the proposed settlement and compromise pursuant to Bankruptcy Rule 9019. A Court may approve a compromise and settlement under Bankruptcy Rule 9019, if it determines that the proposed settlement is in the best interests of the estate. *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424 (1968). In the context of evaluating a settlement, the court may approve a settlement so long as the settlement does not "fall below the lowest point in the range of reasonableness." *Cosoff v. Rodman (In re W.T. Grant Co.)*, 699 F.2d 599, 608 (2d Cir. 1983). A court must "evaluate … all … factors relevant to a fair and full assessment of the wisdom of the proposed compromise," *TMT Trailer Ferry*, 390 U.S. at 424-25. In considering a settlement, a court need not conduct a "mini-trial" of the merits of the claims being settled, *W.T. Grant Co.*, 699 F.2d at 608, or conduct an extended full independent investigation. *In re Drexel Burnham Lambert Group, Inc.*, 134 B.R. 493, 496 (Bankr. S.D.N.Y. 1991).

       The Debtors and the Creditors' Committee each considered the relevant facts and applicable legal principles in connection with the proposed settlement and resolution of the issues. The proposed settlement complies with established judicial standards.

       The pertinent facts were considered in the context of the governing precedents in the Second Circuit. The decision in *Union Sav. Bank v. Augie/Restivo Baking Co. (In re Augie/Restivo Baking Co.)*, 860 F.2d 515, 518 (2nd Cir. 1988) established a two-pronged test for determining whether the equitable remedy of substantive consolidation is appropriate: (i) did creditors deal with the entities as a single economic unit and not on the separate identity of the debtors in extending credit or (ii) are the affairs of the debtors so hopelessly entangled that consolidation will benefit all creditors. *See Augie/Restivo*, 860 F2d at 518. *Augie/Restivo* has been construed in numerous subsequent decisions. The previous cases most similar to the Debtors' Chapter 11 Cases are the chapter 11 cases of Drexel Burnham Lambert Group Inc., *et al.* The Debtors have analyzed the substantive consolidation issues in the perspective of the Court's decision in *In re Drexel Burnham Lambert Group, Inc.*, 138, B.R. 723 (Bankr. S.D.N.Y. 1992).

### (i)       Entanglement of The Debtors' Affairs

       In *Drexel,* the Court considered a list of 17 factors to ascertain whether the interrelationships among the debtor entities warranted substantive consolidation. An analysis of the *Drexel* factors in the context of the Debtors' cases underscores that there are many facts that either support or argue against the exercise of the Bankruptcy Court's equitable powers of substantive consolidation. The below table sets forth the *Drexel* factors and applies them to the Lehman enterprise. This table is a summary of the Debtors' analysis and does not purport to capture every fact reviewed by the Debtors.

| Drexel Factor | Facts in Favor of Entanglement | Facts in Opposition of Entanglement |
|---|---|---|
| The assumption by the parent of contractual obligations of its subsidiaries | • LBHI issued guarantees of the obligations of various of the transactions entered into by its subsidiaries.<br><br>• Creditors have alleged that LBHI guaranteed *all* of the obligations of certain of its Affiliates. | LBHI did not guarantee all transactions or obligations of all of its subsidiaries. |
| The sharing of overhead, management, accounting, and other related expenses among the different corporate entities | • Lehman was operated and managed as a group along business lines.<br><br>• The same group of employees was responsible for the accounting of the books and records of all entities.<br><br>• The Debtors shared administrative and back-office functions. | Costs of administrative and back-office functions were allocated across the Lehman enterprise. |
| The existence of intercompany guarantees on loans | LBHI issued guarantees of the obligations of various of the transactions entered into by its subsidiaries. | LBHI did not guarantee all transactions or obligations of all of its subsidiaries. |
| The failure to distinguish between property of each entity | • Property among Lehman was freely transferred as directed by business units and risk management teams.<br><br>• Derivative Contracts entered into by Lehman entities permitted Lehman to transfer the rights and obligations under such contracts to any other Lehman entity without the consent of the counterparty. | • Separate books and records were kept for all active Lehman entities. A staff of 300 Legal Entity Controllers regularly reviewed the books of legal entities, investigated irregularities and reviewed support for accounting entries.<br><br>• SEC required income statements and balance sheets for approximately 10-25 Lehman entities.<br><br>• An IRS form 1120 was prepared, but not filed, for each Lehman entity organized in the United States. |
| Shifting of funds from one company to another without observing corporate formalities | Generally, no notes were issued but interest was charged in connection with intercompany transfers. Cash often did not move in connection with intercompany transactions, instead only electronic entries of payables/receivables were recorded. | • Lehman maintained a robust accounting system and controls and the transactions among Affiliates are generally traceable. The movement of cash and assets between legal entities was recorded on the general ledger.<br><br>• Some transactions among Affiliates were documented pursuant to contracts. |
| Parent paying salaries of employees of subsidiaries | Most employees in the United States were employees of LBI, which acted as a paymaster for Lehman. | Costs of administrative and back-office functions were allocated across the Lehman enterprise. |

| The subsidiary having grossly inadequate capital | • All excess cash held at subsidiaries was moved up to LBHI at the end of each day.<br><br>• Unregulated entities were thinly capitalized. | Regulated entities maintained adequate capital levels. |
|---|---|---|
| The degree of difficulty in segregating and ascertaining individual assets and liabilities | Certain parties have alleged that intercompany disputes exist in relation to intercompany repurchase agreements, loan participations and RACERS, amongst others. | • Separate books and records were kept for all active Lehman entities.  A staff of 300 Legal Entity Controllers regularly reviewed the books of legal entities, investigated irregularities and reviewed support for accounting entries.<br><br>• The Debtors' advisors have, for the most part, been able to successfully disentangle the assets and liabilities of the Debtors. |
| The presence of consolidated financial statements | • With a few exceptions, subsidiaries of LBHI did not have audited financial statements.  All reporting was done on a consolidated basis.<br><br>• Lehman filed consolidated federal income tax returns. | Separate books and records were kept for all active Lehman entities. |
| The parent owning all or a majority of the capital stock of a subsidiary | LBHI, directly or indirectly, owned all of the capital stock of most of its subsidiaries, including the Subsidiary Debtors. | |
| The parent, its affiliates and the subsidiary having common directors or officers | The directors of LBHI's subsidiaries were appointed by LBHI.  Very few of LBHI's subsidiaries had independent directors. | Corporate formalities were generally observed, and the directors and officers appointed at each subsidiary of LBHI approved certain corporate transactions.  Certain Debtors had certain overlapping directors and officers. |
| The parent or its affiliates financing the subsidiary | • Lehman operated under a centralized cash management system.  On a daily basis, LBHI would transfer funds to subsidiaries to cover all of their obligations on an as-needed basis.  Such transfers were recorded as intercompany payables/receivables on the books and records.<br><br>• Occasionally, LBHI issued intercompany loans to subsidiaries, which were recorded with interest rates and maturity dates.<br><br>• Excess cash from the subsidiaries was moved to LBHI at the end of each day. | Various subsidiaries entered into financing transactions with third parties (e.g. LCPI entered into repurchase agreements or sold participations; various foreign Affiliates issued securities). |
| The parent shifting people on and off the subsidiary's board of directors | Directors of the subsidiary entities were appointed at the formation of such entities and then updated at least annually. | Corporate formalities were generally observed in appointing directors of subsidiaries. |

| The subsidiary having substantially no business except that with the parent or its affiliates or no assets except those conveyed to it by the parent or an affiliate | Certain subsidiaries of LBHI, including certain of the Foreign Debtors and non-Debtor Affiliates were utilized to raise capital in foreign currencies to enable Lehman to manage the risk in movements in foreign currencies exchange rates. | Most of the Debtors had a distinct corporate purpose separate from that of LBHI, including, entering into derivative transactions, lending arrangements or specific real estate transactions with third parties. |
|---|---|---|
| The parent referring to the subsidiary as a department or division | Lehman operated in three business units, capital markets, investment banking and investment management, without regard to legal entities. | Separate books and records were kept for all active Lehman entities. |
| The directors of the subsidiary not acting independently in the interest of the subsidiary, but taking direction from the parent | LBHI's board of directors and executive committee had responsibility for Lehman's firm-wide strategy, risk, funding, liquidity, operations and products. One investment committee existed for all Lehman's transactions. | Corporate formalities were generally observed. The boards, stockholder(s) and members of the subsidiaries occasionally approved certain corporate actions, acquisitions, issuance of dividends and capital contributions. |
| The parent, its affiliates and the subsidiary acting from the same business location | • Lehman entities shared offices and operated from the same premises.<br><br>• Certain Debtors or subsidiaries had no employees or premises. | Separate books and records were kept for all active Lehman entities. |

A majority of the factors indicate that Lehman operated as a centralized business enterprise. LBHI acted as the central banker and financed the enterprise providing liquidity for the operations of its thinly capitalized subsidiaries. LBHI guaranteed many of the obligations of its subsidiaries and entered into thousands of intercompany transactions each day. In connection with such activities, LBHI collected excess cash and funded shortfalls on a daily basis. Conversely, certain critical factors such as (i) the ease in segregating and ascertaining individual assets and liabilities of each entity; and (ii) the fact that many of the subsidiaries had significant operations, transacted with third parties and had their own assets, support an argument against a finding of entanglement of the assets and substantive consolidation.

In *Drexel*, the Bankruptcy Court, cited *Augie/Restivo* and noted that "substantive consolidation should be used only after it has been determined that all creditors will benefit because untangling the assets is either impossible or so costly as to consume the assets." *Augie/Restivo* 860 F.2d at 519. Similarly, the Court in *Chem. Bank New York Trust Co. v. Kheel*, 369 F.2d 845, 847 (2nd Cir 1966) stated that substantive consolidation may be used where the "time and expense necessary even to attempt to unscramble the [the assets] are so substantial as to threaten the realization of any net assets for all the creditors." Opponents of substantive consolidation of the Debtors and their Affiliates would argue that while there may be disputes with respect to the ownership of certain assets, such disputes are at the margins, and the resolution of such disputes would likely not be so costly as to significantly consume the assets of the estates. Conversely, the Ad Hoc Group has identified numerous situations in the Ad Hoc Disclosure Statement that protracted and expensive litigation would be necessary to resolve.

64

*Drexel* does not hold that a conclusion on the issue of substantive consolidation is reached by merely counting the number of factors on each side of the ledger, but rather the factors "must be evaluated in the large context of balancing the prejudice resulting from the proposed consolidation against the effect of preserving separate debtor entities" *Drexel* 138 B.R. at 764.

### (ii)    Creditors Perception and Reliance on the Lehman Enterprise as a Single Integrated Enterprise

The second prong of the *Augie/Resivo* test, whether creditors perceived and transacted with Lehman as a single economic unit and did not rely on the separate identities in extending credit, is the subject of conflicting arguments. Facts in support of the argument that creditors relied on the Lehman enterprise operating as a single unit include: (i) generally, creditors of subsidiaries of LBHI did not have access to financial statements of such entities, but rather only access to consolidated financial statements was available; (ii) most subsidiaries of LBHI did not have individual credit ratings or bank accounts; (iii) Lehman presented itself as "Lehman Brothers," a single integrated enterprise; (iv) counterparties to derivative contracts were generally not given a choice of entities with which to transact, did not exhibit any concern in that respect, rather Lehman booked the transaction to an entity of its choice based on the type of transaction; and (v) LBHI's guarantee of the obligations of its subsidiaries under derivative contracts was given as a matter of course and did not need to be requested or negotiated.

Facts asserted in support of the argument that creditors did not rely on the Lehman enterprise operating as a single unit, but rather relied on the separate integrity of each entity include (i) creditors of particular Subsidiary Debtors and Foreign Debtors have alleged that they relied on the corporate separateness of LBHI and its operating Affiliates in order to obtain "structural seniority" by obtaining a separate contract from the relevant Affiliate and a guarantee from LBHI; and (ii) numerous public SEC filings indicated the corporate separateness of LBHI from its Affiliates, including specifically certain of the Subsidiary Debtors and Foreign Debtors.

### (iii)    The Proposed Compromise and Settlement of Substantive Consolidation and Related Issues Should be Approved

Substantive consolidation of the Debtors and their Foreign Affiliates raises several issues. The Foreign Debtors or Foreign Administrators may not be willing or able to surrender the assets under their control to the common pool of assets. In addition, certain Foreign Debtors and their assets are subject to the jurisdiction of regulators or foreign courts. Potentially, the Bankruptcy Court may order an alternative remedy that would have an impact similar to substantive consolidation on the creditors of Foreign Debtors which might influence the decision of the Foreign Debtors and Foreign Administrators as to acceptance of the Plan. For example, to the extent a Foreign Debtor is unable or unwilling to contribute assets to a general pool or otherwise participate in a plan based on substantive consolidation, the Claims of such Foreign Debtor and its controlled Affiliates against the Debtors may be disallowed and expunged. This remedy would reflect the fact that substantive consolidation eliminates all Affiliate Claims.

Contrary to the statements in the Non-Con Disclosure Statement, the Debtors do not concede that the Bankruptcy Court does not have the authority or ability to substantively consolidate LBHI's foreign non-Debtor Affiliates.  Such an order may have practical difficulties as to enforcement.  Nevertheless, it is possible that such remedy may be enforced, or an alternative remedy can be crafted by the Bankruptcy Court that will enable implementation, such as the disallowance of the claims filed by such foreign non-Debtor Affiliates against the Debtors if such entities refuse to contribute their assets to a combined pool.

As evidenced by the opposing views advocated in the Ad Hoc Disclosure Statement and the Non-Con Disclosure Statement, and the Debtors' analysis set forth above, a cognizable dispute exists as to whether the Debtors and their Affiliates should be substantively consolidated with the attendant affects on Guarantee and Affiliate Claims.  Both alternative plan proponents raise some colorable arguments as well as have significant weaknesses.  Litigation by its nature is uncertain and expensive and all parties have significant risk if litigation is pursued.

In considering whether to approve a compromise and settlement, the Bankruptcy Court is required to consider "the complexity, expense and likely duration of such litigation." *TMT Trailer Ferry,* 390 US at 424.  Litigation of the issue of substantive consolidation would be extraordinarily complex.  As evidenced by the analyses that have been undertaken, there are massive amounts of facts and transactions that would have to be evaluated.  Discovery regarding the Debtors' operations prior to the Commencement Date, intercompany relationships, individual transactions and creditor reliance could take months.  In fact, the protocol the Debtors established to enable interested parties to obtain information regarding the Debtors in connection with the Plan is scheduled to take many months to conclude. *See* Docket No. 16003.  Approximately 95 entities are participating in discovery in the context of the Plan pursuant to the established protocol.  Almost certainly, interested parties would require the depositions of dozens of current and former Lehman employees and counterparties. A hearing on the matter would likely include the testimony of numerous witnesses.  Based on the amount at stake in any such litigation, any ruling by the Bankruptcy Court would likely be appealed, causing further expense and delay.  The Debtors' estates would bear significant expense to participate in a litigation that would significantly delay in the Distributions to creditors.  Since the Bankruptcy Court is not required to hold a "mini-trial" of the merits of the claims being settled, *W.T. Grant Co.*, 699 F.2d at 608, approval of the compromise and settlement pursuant to Bankruptcy Rule 9019 is more efficient and advisable than full scale litigation on the issue of substantive consolidation.

The proposed compromise and settlement embodied in the Plan give due consideration to the strengths and weaknesses of potential arguments made by each of the Ad Hoc Group and the Non-Con Plan Proponents.  Taking into account the Plan Adjustment and the certain other aspects of the settlement described below in section X.B.4, Distributions pursuant to the Plan to any particular creditor are no better than the Distributions would be under the best possible judicial determination in favor of such creditor while being no less than the Distributions under the worst possible outcome if such disputes were resolved by judicial determination.  The Debtors and the Creditors' Committee believe the compromise embodied in the Plan is within the range of likely results in the event substantive consolidation was litigated to judgment. The proposed settlement falls well above the lowest point of reasonableness. The compromise and settlement adequately reflects the probability of the results of such litigation, the complexity, expense and likely duration of litigation and are fair, reasonable and equitable to

US_ACTIVE:\43795376\03\58399.0008

**A108**

the Debtors, their economic stakeholders and it satisfies the requirements of Rule 9019 and all applicable legal principles.

### 2.      Characterization of Certain Claims of LBHI Against Subsidiary Debtors

The Debtors' books and records indicate that substantial intercompany payables and receivables existed between and among the Debtors and their non-Debtor Affiliates as of the applicable Commencement Dates.  Prior to the Commencement Dates, in the ordinary course of business, LBHI and its Affiliates entered into numerous transactions with one another that resulted in balances owed to one another.  Such transactions were entered into for a variety of reasons including, the management of risk on a firm-wide basis, funding subsidiaries' operations via a common paymaster, lending funds to Affiliates (both on an unsecured and secured (repo) basis), or entering into transactions with Affiliates.  Substantially all free cash in bank accounts of non-regulated domestic Affiliates was ultimately transferred to LBHI at the close of business each day.  The balances of such intercompany payables and receivables often fluctuated widely as amounts were borrowed and repaid to LBHI.  Significant intercompany balances among the Debtors and certain non-Debtor Affiliates are included on Exhibit 8A annexed hereto.

The Debtors have analyzed a sampling of intercompany balances to determine whether they could be, or should be, Allowed as Claims, subordinated to other Claims or recharacterized as equity contributions.  The Debtors' analysis included the consideration of some, or all, of the following factors (i) the names given to the instruments, if any, evidencing indebtedness; (ii) the presence or absence of a fixed maturity date and schedule of payments; (iii) the presence or absence of an interest rate and interest payments; (iv) the source of repayments; (v) the identity of interest between the borrower and the lender; (vi) the adequacy of the capitalization of the borrower; (vii) the security, if any, for the advances; (viii) the ability of the borrower to obtain financing from outside lending arrangements; (ix) the extent to which the advances were contractually subordinated to the claims of outside creditors; (x) the extent to which advances were used to acquire capital assets; and (xi) the presence or absence of a sinking fund to provide for repayment.

The analysis of Affiliate Claims or balances is a fact-intensive and costly exercise, and a transaction specific consideration of the factors set forth above is particularly challenging with respect to Lehman in light of the hundreds of thousands of intercompany bookkeeping entries that occurred every month.  Given the number of intercompany transactions involved, an analysis of each and every transaction between LBHI and the Subsidiary Debtors would take years to complete.  In addition, the fact that Lehman's general ledger accounts operated on a net basis makes it impossible to trace the cash transfers from Affiliate bank accounts to particular transactions.  Throughout the course of a business day, a Subsidiary Debtor could have conducted hundreds of thousands of transactions with third parties, which were administered through subsystems within Lehman's IT infrastructure, causing LBHI to fund a Subsidiary Debtor or vice versa.  The system did not directly link any particular advance of funds from LBHI to a particular payment of funds from a Subsidiary Debtor.  In many cases, LBHI advanced funds directly to Subsidiary Debtors that were not its direct subsidiaries, such as LBSF, LCPI, LBDP, and LBFP, which were subsidiaries of LBI prior to the Commencement Date.  These transactions raise further complications because it is not clear that advances may be

recharacterized as equity contributions if they are not made from a direct corporate parent or shareholder.

Because of these challenges, in applying their consideration of the above factors to a sampling of intercompany balances, the Debtors focused their analysis on general patterns within Lehman's intercompany funding accounts, which handled most of the daily intercompany activity, such as general operating expenses, derivative related transactions, loan and investment related cash disbursements, as well as certain less frequent transactions, such as the payment of dividends to LBHI, and capitalizations from LBHI to Affiliates.  Different source systems in Lehman's cash management system would typically be associated with different types of intercompany funding, such that the Debtors could observe what percentage of intercompany activity consisted of funding for operations as opposed to capitalizations.  Interest on intercompany account balances in certain source systems was calculated on a nightly basis through an automated system, while interest on other account balances was calculated manually on a monthly basis.  Lehman's general policy on intercompany transfer pricing was that the cost above LIBOR would be born by LBHI, and the intercompany cost of borrowing / lending was the appropriate index rate for each currency transacted.  Thus the cost of capital was bifurcated, with the various subsidiaries bearing the LIBOR cost and LBHI bearing the cost above LIBOR.

Based on the source systems that fed into the sampling of intercompany balances, the Debtors were able to determine that the majority of the intercompany transactions between LBHI and the Subsidiary Debtors consisted of funding for general business purposes.  These accounts effectively operated like a line of credit:  Affiliates could "draw" funds from LBHI as necessary to satisfy their cash needs, creating a payable to LBHI.  When there was excess cash in an Affiliate's account at the close of business, it would be transferred to an LBHI consolidation account creating a receivable from LBHI.  More typically, however, cash paid by an Affiliate would be applied to reduce a preexisting payable to LBHI.  Although debits were applied on an aggregate basis, making it impossible to allocate payments to a particular transaction and determine whether particular amounts due were ever fully satisfied, there was also a significant amount of variability in the aggregate payable that certain Lehman entities owing to LBHI, such that it may be argued that some percentage of the amounts due to LBHI were ultimately satisfied.  The accounts were highly volatile between LBHI and LBSF during the first 8 1/2 months of 2008.  The recorded account balance payable to LBHI from LBSF ranged from a high of $15 billion to a low of $3.4 billion.

The overwhelming majority of intercompany transactions recorded as debt should be treated as debt to LBHI.  Intercompany balances that relate to the funding of specific intercompany transactions (*e.g.*, Derivative Contracts or repurchase agreements) and recorded in separate accounts are the least susceptible to being subordinated or recharacterized as equity contributions since it is more difficult to argue that specific transactions were equity contributions as opposed to debt obligations.   As to the general intercompany funding, there is a material risk that certain loans were provided in a manner that, in litigation, could have characteristics of equity contributions.  Certain transactions also may have been booked through source feeds that are indicative of operations, while others may have been manual entries for disbursements whose characteristics potentially satisfy the factors that are indicative of an equity contribution.

68

**A110**

The Plan provides that LBHI shall only receive a Distribution on, and be entitled to setoff, 80% of that portion of LBHI's Claim against a Subsidiary Debtor that relates to the funding of operations of such Subsidiary Debtor but does not relate to specific transactions, such as Derivative Contracts or repurchase agreements (the "Intercompany Funding Balance").  All Affiliate Claims between and among the Subsidiary Debtors and non-Debtor affiliates will be Allowed in the amounts of recorded intercompany balances set forth on the Debtors' books and records as of applicable Commencement Date, subject to reconciliation.  Included on Debtors' Claims Schedule annexed hereto as Exhibit 9 are the amounts of Allowed Claims LBHI will have against each of the other Debtors.  The Intercompany Funding Balance portion of such Claims is separately identified.  The Debtors' Claim Schedule is incorporated into the Plan and will become effective on the Effective Date.

The Ad Hoc Plan and the Non-Con Plan address the characterization of LBHI's Claims against the Subsidiary Debtors differently.  The substantive consolidation of the Debtors included in the Ad Hoc Plan would eliminate all Affiliate Claims among the Debtors.  The Non-Con Plan does not seek to settle this issue pursuant to the Plan, but rather empowers an appointed representative of the domestic operating companies to represent the creditors of the domestic operating companies in evaluating and settling intercompany claims and other issues affecting the domestic operating companies and their creditors.  The Non-Con Disclosure Statement asserts that certain of the Plan Proponents believe that "a significant portion of the $25 billion claim held by LBHI against LBSF, should be recharacterized as equity contributions rather than debt."  Non-Con Disclosure Statement at 7.

The proposed compromise and settlement between LBHI and each of the Subsidiary Debtors embodied in the Plan as to the characterization of LBHI's Claims against Subsidiary Debtors gives due consideration to the strengths and weaknesses of potential litigation arguments made by each of the Ad Hoc Group and the Non-Con Plan Proponents. Pursuant to the terms of compromise and settlement neither LBHI nor the Subsidiary Debtors are better-off than if a final judgment following litigation either characterized all or none of the Claims as equity.  The proposed compromise embodied in the Plan is within the range of potential results if this issue is prosecuted to judgment. The settlement falls well above the lowest point of reasonableness, is fair, reasonable and equitable to all economic stakeholders and should be approved.

### 3.    Claims Filed by Affiliates

As discussed above in section IV.F.4.b—"Cross Border Insolvency Protocol/Negotiations with Foreign Debtors, Settlement Negotiations" hereof, the Debtors have proposed settlements to various Foreign Debtors regarding the Claims among the parties.  Pursuit of individual settlements with each of their Affiliates in connection with various Claims asserted by the Affiliates against the Debtors and Debtor-Controlled Entities, and the claims asserted by the Debtors and Debtor-Controlled Entities against the Affiliates continues.  The proposed settlements would recognize and settle potential litigation with respect to the various issues, including, without limitation, substantive consolidation, the enforceability and validity of Guarantee Claims and the valuation of various types of Claims, including those based on Derivatives Contracts and Structured Securities.

69

If a Debtor and any non-Debtor Affiliate are unable to agree to the Allowed amount of any Senior Affiliate Claim, Senior Affiliate Guarantee Claim or Affiliate Claim of such non-Debtor Affiliate, the Debtors intend to object to the Allowance of such Claims.  Any such objection shall be determined by the Bankruptcy Court.

Because the Debtors and Debtor-Controlled Entities did not file proofs of Claim against the Debtors, the Claims of the Debtors and Debtor-Controlled Entities shall be based on, among other things, the amounts set forth on the books and records of the Debtors on the applicable Commencement Date, subject to reconciliation and adjustment.  Attached hereto as Exhibit 9 is the Debtors' Claims Schedule that is incorporated into the Plan.  The Debtors' Claims Schedule sets forth the net Claim amounts of each Debtor against another Debtor that will be Allowed pursuant to the Plan.

In addition, the Plan provides that the Debtors and certain of its Affiliates will agree on the ownership of certain assets.  For various risk-management, liquidity and other organizational purposes, prior to the Commencement Date, the Debtors frequently transacted with one another and transferred assets internally.  The Debtors have conducted a review of certain transactions among the Debtors and their Affiliates, including the transactions with the RACERS Trusts, Intercompany-Only Repurchase Agreements, and certain transactions with LBIE and determined the appropriate and relative rights of each party with respect to the subject assets.  A description of these analyses and resulting treatment is set forth in sections IV.I.b— "The RACERS Transaction", VIII— "Treatment of Internal Repurchase Agreements" and VII— "Certain Transactions/Relationships with LBIE" hereof.

Affiliates, including Debtors and Debtor-Controlled Entities, are permitted to setoff their Guarantee Claims, to the extent Allowed, against any claims LBHI has against such Affiliate, in accordance with applicable law.  LBF believes that the foregoing representation notwithstanding, section 13.5 of the Plan impinges upon the setoff rights of non-Debtor Affiliates.   The Debtors disagree with LBF's position.

### 4.      Plan Negotiations With Certain Creditors

During June, 2011, the Debtors engaged in intensive negotiations and hosted meetings with various representative groups of creditors holding Claims against LBHI and various Participating Subsidiary Debtors, with the goal of negotiating consensual terms of the Plan.  During these conferences among the Debtors, their creditors, and their respective legal and financial advisors, the Debtors and certain creditors, primarily holding Senior Unsecured Claims against LBHI, Senior Third-Party Guarantee Claims against LBHI, Third-Party Guarantee Claims against LBHI and General Unsecured Claims against LBSF, reached agreements resulting in a further refinement of the Plan compromise initially proposed by the Debtors.  Although the Debtors continue to believe that their analysis of the relative risks associated with the Plan Issues is correct, the adjustments described above reflect a settlement and economic compromise of the differing views of such risks among the Debtors and creditors.  As a result of these good faith, arms-length negotiations, the Debtors have made the following additional adjustments to the Plan as originally proposed in January 2011:

US_ACTIVE:\43795376\03\58399.0008

(a)    LBHI Claim Against Subsidiary Debtors (LBSF/LCPI Settlement Amounts).  The first $100 million of Distributions that LBHI receives from LCPI on account of its Affiliate Claim against LCPI in LCPI Class 4A will automatically be Distributed to holders of Allowed General Unsecured Claims against LCPI.  The first $100 million of Distributions that LBHI receives from LBSF on account of its Affiliate Claim against LBSF will automatically be Distributed to holders of Allowed General Unsecured Claims against LBSF in LBSF Class 4A.

(b)    LBSF Additional Settlement Amount.  The first $70 million that is recovered by LBSF on its assets in excess of $14,156,000,000 (which is the Total Assets held by LBSF as set forth in the Recovery Analysis attached as Exhibit 4), will be Distributed only to holders of Allowed General Unsecured Claims in LBSF Class 4A and Affiliate Claims of entities other than LBHI and the Participating Subsidiary Debtors, included in LBSF Class 5C.

(c)    Allocation of Costs and Expenses of the Debtors.  The Debtor Allocation Agreement, which will become effective on the Effective Date, will provide, among other things, that LBSF will have an Administrative Expense Claim against LBHI of $300 million on account of administrative costs.  Such Claim shall be satisfied by (a) first, setoff against LBHI's Allowed Administrative Expense Claim against LBSF as of the Effective Date, (b) second, setoff against LBHI's claims arising after the Effective Date for reimbursement by LBSF for post-Effective Date administration costs after reconciliation on a quarterly basis and, if necessary, (c) third, payment of the balance in Cash up to $300 million.

(d)    The Designated Entities Claims.

The Racers 2007-A Trust will have (i) an Allowed Claim against LBSF in the amount of approximately $1,947,735,000, (ii) an Allowed Claim against LCPI in the amount of $5,000,000,000 and (iii) an Allowed Guarantee Claim against LBHI in the amount of approximately $1,947,735,000.  All other Claims of the Racers Trusts will be disallowed.  20% of the Distribution to the Racers 2007-A Trust from LCPI will automatically be reallocated to the holders of Senior Unsecured Claims and General Unsecured Claims against LBHI pursuant to the Plan Adjustment and Distributions made on $1,000,000,000 of the Allowed Claim of Racers Trust against each of LBSF and LBHI will be automatically reallocated to the holders of Senior Unsecured Claims and General Unsecured Claims against LBHI pursuant to the Plan Adjustment.

The unsecured Claims asserted by LBHI against LCPI based on the Fenway transactions will be Allowed as General Unsecured Claims in LCPI Class 4B in the amount of $230 million.  20% of the Distribution to Fenway from LCPI will automatically be reallocated to the holders of Senior Unsecured Claims and General Unsecured Claims against LBHI pursuant to the Plan Adjustment.

(f)    Plan Adjustment Condition.  The reallocation of the Plan Adjustment from various Classes to holders of Allowed Senior Unsecured Claims and General Unsecured Claims against LBHI is no longer conditioned upon the Classes of Allowed Senior Unsecured Claims and General Unsecured Claims against LBHI voting to accept the Plan.

US_ACTIVE:\43795376\03\58399.0008

(g)    LBT's/LBSN's Affiliate Claims.  LBT filed multiple Claims against LBHI and certain of the Subsidiary Debtors in significant amounts.  In full and final settlement of all of LBT's Claims against the Debtors, the Plan provides that LBT will have an Allowed Senior Affiliate Claim against LBHI in the amount of $34,548,000,000 (the "LBT Allowed Claim").  All other Claims of LBT against LBHI will be disallowed.  The LBT Allowed Claim against LBHI shall not be subject to setoff or recoupment by the Debtors.  In addition, the Debtors are not entitled to be reimbursed by LBT, or to be subrogated to any Claims against LBT, relating to any Distributions LBHI makes to holders of Guarantee Claims for which LBT is the primary obligor.

LBSN's Allowed net Claims against LBHI and Distributions thereon shall not be subject to setoff or recoupment by the Debtors.  In addition, the Debtors are not entitled to be reimbursed by LBSN, or to be subrogated to any Claims against LBSN, relating to any Distributions LBHI makes to holders of Guarantee Claims for which LBSN is the primary obligor.

(h)    Third-Party Guarantee Claims Based on LBT/LBSN Issued Notes.  20% of the Distributions to holders of Third-Party Guarantee Claims based on securities issued by LBT or LBSN will be reallocated to holders of Allowed Senior Unsecured Claims and General Unsecured Claims against LBHI.  The First Amended Plan provided for a re-allocation of 30% of such Distributions.

(i)    Structured Securities Valuation Methodologies.  The Debtors shall apply the Structured Securities Valuation Methodologies to all Structured Securities Claims held by any creditor that is party to a valid and enforceable plan support agreement in determining the allowed amount of such Claims.

(j)    Third-Party Guarantee Claims Based on LBT Issued Notes.  In calculating the proposed Allowed amount of Third-Party Guarantee Claims based on LBT Issued Notes, the Debtors previously used the exchange rates in effect on September 11, 2008.  The Debtors have modified the calculation methodologies and utilized the exchange rates that were in effect on LBHI's Commencement Date to calculate such Claims.  This change results in an aggregate increase in the proposed Allowed amounts of such Claims of approximately $382 million.  In addition, the Debtors will not contest the validity or enforceability of any Third-Party Guarantee Claim based on a Structured Security Issued by LBT.

As a result of the settlement and compromise, the Debtors believe creditors holding over $100 billion of Allowed Claims support the Plan.  The Plan negotiation process has resulted in a fair and reasonable compromise of the disparate views with respect to the Plan Issues.  The proposed compromise and settlement, considered in the aggregate give due consideration to the complexity and likely results of potential litigation of the Plan Issues.  Pursuant to the terms of compromise and settlement no party is better-off than they would be following a favorable and final judgment on the Plan Issues.  The proposed compromise embodied in the Plan is within the range of potential results if the issues were prosecuted to judgment. The settlement falls well above the lowest point of reasonableness, is fair, reasonable and equitable to all economic stakeholders and should be approved under Bankruptcy Rule 9019.

US_ACTIVE:\43795376\03\58399.0008

Pursuant to the Plan Support Agreements, the Debtors are obligated to prosecute and pursue the confirmation of the Plan, and the creditors listed on Exhibit 20, subject to being solicited pursuant to Bankruptcy Rule 1125, are required to vote to accept the Plan and not to support any alternative plan filed in these Chapter 11 Cases.   The creditors' obligations to support the Plan are subject to various termination events, including if: (i) the Debtors amend or supplement the Plan in a manner that adversely affects the recoveries or other treatment of such creditor, or (ii) if this Disclosure Statement is not approved by the Bankruptcy Court on or before October 31, 2011, the Plan has not been confirmed (by entry of a confirmation order in form and substance reasonably satisfactory to such creditor) on or before February 29, 2012 or the Plan has not become effective on or prior to March 31, 2012.

## 5.     Redistribution of Distributions From Subordinated Claims to Claims in Senior Classes

LBHI issued certain Subordinated Notes that remain outstanding for which the governing agreements provide that upon the bankruptcy of LBHI, no payments will be made to holders of Subordinated Claims in respect of the Subordinated Notes until all obligations of LBHI designated as "senior" have been satisfied in full.   To give effect to these provisions included in the documents governing the Subordinated Notes, all Distributions under the Plan made by LBHI will be calculated as if each holder of an Allowed Subordinated Claim based on a Subordinated Note were to receive its Pro Rata Share of a Distribution from LBHI; *provided, however*, that amounts that would have been distributed to holders of Allowed Subordinated Claims will automatically be reallocated and distributed to holders of Allowed Senior Unsecured Claims, Allowed Senior Affiliate Claims, Allowed Senior Affiliate Guarantee Claims and Allowed Senior Third-Party Guarantee Claims, in accordance with the terms of the governing agreements.

The governing agreements relating to the Subordinated Notes vary as to the obligations of LBHI that are designated "senior" to such Subordinated Notes.   The Subordinated Notes can be separated into three groups based on the obligations designated "senior" in the respective governing agreements.   "Senior" debt under the governing agreements for all of the Subordinated Notes includes "indebtedness for money borrowed" and "indebtedness evidenced by securities, notes, debentures, bonds or other similar instruments."   In addition, (i) "senior" obligations under Subordinated Notes for two of the groups (12 issuances) is defined to include guarantees of the types of indebtedness described in the previous sentence, and (ii) "senior" obligations under Subordinated Notes for one of the groups (2 issuances) include each of the other issuances of Subordinated Debt.   Certain Subordinated Note indentures provide that LBHI's obligations under such Subordinated Notes are also subordinated to "Other Financial Obligations" (which includes derivatives contracts and guarantees thereof), but only to the extent of any "Excess Proceeds" after the "senior debt" has been satisfied in full.   LBHI's "senior debt" will not be satisfied in full, even after the reallocation from Subordinated Note holders.

To account for such differing provisions regarding "senior" obligations, and to ensure that reallocations from each issuance of Subordinated Debt is properly reallocated only to those Claims that constitute debt "senior" to such Subordinated Note, the Plan includes multiple classes for Claims based on Subordinated Notes and multiple classes for claims entitled to the automatic reallocation of the amounts distributable to the Subordinated Notes.   The Plan

separates Claims based on Subordinated Notes into separate classes and includes the following classes of senior Claims: Senior Unsecured Claims, Senior Affiliate Claims, Senior Affiliate Guarantee Claims and Senior Third-Party Guarantee Claims.   A detailed description of the reallocation from each issuance of Subordinated Notes to the various senior Classes, and the definitions of "senior" obligations in the governing documents for each Subordinated Note is set forth on Exhibit 10, attached hereto.

### 6.    Convenience Classes

The Plans of LBHI and the Participating Subsidiary Debtors include an administrative convenience Class which will include all Senior Unsecured Claims and General Unsecured Claims (other than any Claim on account of a public debt security issued by LBHI, a Claim asserted by a nominee on behalf of one or more beneficial holders of such Claim or a Claim of a Designated Entity) held by a claimant that in the aggregate (i) are Allowed in an amount of fifty thousand dollars ($50,000) or less or (ii) would have been Allowed in an amount greater than fifty thousand dollars ($50,000) but which are reduced to fifty thousand dollars ($50,000) at the election of the claimant or pursuant to a settlement agreement between a claimant and  the applicable Debtor.   LBHI's Plan also includes an administrative convenience Class for Guarantee Claims, which will include all Senior Third-Party Guarantee Claims and Third-Party Guarantee Claims (other than any Claim on account of a public debt security issued by LBHI, a Claim asserted by a nominee on behalf of one or more beneficial holders of such Claim or a Claim of a Designated Entity) held by a claimant that in the aggregate (i) are Allowed in an amount of fifty thousand dollars ($50,000) or less or (ii) would have been Allowed in an amount greater than fifty thousand dollars ($50,000) but which are reduced to fifty thousand dollars ($50,000) at the election of the claimant or pursuant to a settlement agreement between a claimant and  the applicable Debtor.   The eligibility of a Claim for inclusion in the Convenience Class is subject to the following: (1) any Claim that was Allowed in excess of fifty thousand dollars ($50,000) may not be subdivided into multiple Claims of fifty thousand dollars ($50,000) or less for purposes of receiving treatment as a Convenience Claim, (2) Claims in the same Class held by a Creditor will be aggregated for purposes of determining whether such Claims are eligible to be Convenience Claims, (3) Claims acquired after the Commencement Date will not be aggregated unless such Claims are in the same Classes, are held by a Creditor and were originally held by one Creditor, and (4) Claims held by a Creditor prior to the Commencement Date will not be aggregated with Claims acquired by such Creditor after the Commencement Date.

The inclusion of an administrative convenience Class will accelerate Distributions to holders of Claims in such Classes by enabling holders of these claims to receive their Distributions of a fixed amount on the Effective Date or such later date when a Claim is Allowed, or as soon as practicable thereafter.   The convenience Classes will permit the Debtors to make final Distributions on account of Convenience Claims and Convenience Guarantee Claims and avoid the administrative expense of tracking transfers of these Claims, calculating the Distribution to holders on such Claims on each Distribution Date, providing notices to holders of such Claims and preparing and mailing or wiring Distributions to holders of these Claims.   Inclusion in the convenience Class is beneficial to the holders of Claims included in such Class because such holders will receive an accelerated Distribution, and will also receive a Distribution that exceeds the amounts estimated by the Debtors for Distributions to the Classes in

US_ACTIVE:\43795376\03\58399.0008

which such Claims would otherwise be included.  Holders of Claims included in the convenience Class forego any possibility to receive a Distribution greater than the fixed amount to the extent the recoveries exceed the Debtors' estimates.

The Debtors estimate that approximately 13,000 Allowed Claims against the LBHI and the Participating Subsidiary Debtors will be included in the administrative convenience Classes, and the aggregate Distributions on such Claims will be approximately $60 million.   The incremental cost to the Debtors of paying Distributions to holders of Claims in the Convenience Classes in amounts that exceed the estimated Distributions set forth in the Recovery Analysis is approximately $13 million.  In the context of the Debtors' Chapter 11 Cases, such amount is not significant in light of the administrative benefit the Debtors will receive.

### C.    Classification and Treatment of Claims and Equity Interests

The following summarizes the classification and treatment of Claims and Equity Interests under the Plan.

### 1.    Treatment of Unclassified Claims

### a.    Administrative Expense Claims

Administrative Expense Claims are Claims constituting a cost or expense of administration of the Chapter 11 Cases allowed under sections 503(b) and 507(a)(1) of the Bankruptcy Code.   Such Claims include all actual and necessary costs and expenses of preserving the estates of the Debtors, all actual and necessary costs and expenses of operating the business of the Debtors, any indebtedness or obligations incurred or assumed by the Debtors in connection with the conduct of their business, all cure amounts owed in respect of leases and contracts assumed by the Debtors, all compensation and reimbursement of expenses to the extent Allowed by the Bankruptcy Court under section 330 or 503 of the Bankruptcy Code.  Certain creditors may have super-priority claims against the Debtors which are Administrative Expense Claims with priority over other Administrative Expense Claims.  For example, the purchasers of Neuberger Berman in the acquisition described in section V.E.1.a—"Sale of Investment Management Division" of this Disclosure Statement were granted an allowed super-priority administrative expense claim for any claims against LBHI based on LBHI's agreement to indemnify such purchasers pursuant to the applicable purchase agreements.

Except as provided in the next paragraph with respect to ordinary course obligations and in Section X.C.1.b— "Compensation and Reimbursement Claims" of this Disclosure Statement with respect to professional compensation and reimbursement Claims, and to the extent a holder has been paid in full by a Debtor prior to the Effective Date, or agrees to less favorable treatment, Administrative Expense Claims will be paid in full, in Cash, on the later of the Effective Date and the date the Administrative Expense Claim becomes an Allowed Claim, or as soon thereafter as is practicable by the Debtor obligated for the payment of such Administrative Claim.  The Debtors estimate that Allowed Administrative Expense Claims payable on the Effective Date, including, repayments to LBHI from Subsidiary Debtors for operating expenses paid on their behalf, compensation and reimbursement of expenses payable

US_ACTIVE:\43795376\03\58399.0008

to professionals retained in the Chapter 11 Cases, will be approximately $1.5 billion, of which only $90 million represents incurred but unpaid fees to professionals retained by the Debtors in these Chapter 11 Cases.  Also included in the $1.5 billion are amounts to be paid by LBHI to Subsidiary Debtors on account of post-petition funds received by LBHI on behalf of such Subsidiary Debtors, and amounts to be paid by Subsidiary Debtors to LBHI for the reimbursement of cost allocations.  The Debtors may pay amounts in respect of reconciled cure payments under executory contracts and unexpired leases assumed pursuant to the Plan.  The estimated amount of Allowed Administrative Expense Claims does not include amounts subject to asserted rights of setoff held by the Debtors.  In the event such asserted setoff rights are not valid, the aggregate amount of Allowed Administrative Expense Claims may increase.

### b.    Compensation and Reimbursement Claims

Compensation and Reimbursement Claims are Administrative Expense Claims for the compensation of professionals and reimbursement of expenses incurred by such professionals on behalf of the Debtors and the Creditors' Committee, pursuant to sections 105(a), 363(b) 503(b)(2), 503(b)(3), 503(b)(4) and 503(b)(5) of the Bankruptcy Code (the "Compensation and Reimbursement Claims").  All payments to professionals for Compensation and Reimbursement Claims will be made in accordance with the procedures established by the Bankruptcy Code, the Bankruptcy Rules and the Bankruptcy Court relating to the payment of interim and final compensation for services rendered and reimbursement of expenses.  All applications for compensation for services rendered and reimbursement of expenses are subject to approval of the Bankruptcy Court after review by the Fee Committee appointed in the Chapter 11 Cases.

Pursuant to the Plan, each holder of a Compensation and Reimbursement Claim will (i) file its final application for the allowance of compensation for services rendered and reimbursement of expenses incurred by no later than the date that is one hundred twenty (120) days after the Effective Date or such other date as may be fixed by the Bankruptcy Court and (ii) if granted such an award by the Bankruptcy Court, be paid in full in such amounts as are Allowed by the Bankruptcy Court (a) on the date such Compensation and Reimbursement Claim becomes an Allowed Claim, or as soon thereafter as is practicable or (b) upon such other terms as may be mutually agreed upon between such holder of a Compensation and Reimbursement Claim and the Debtors.

### c.    Priority Tax Claims

Except to the extent that a holder of an Allowed Priority Tax Claim has been paid prior to the Effective Date or agrees to less favorable treatment, each holder of an Allowed Priority Tax Claim will receive Cash from one or more of the Debtors obligated for the payment of such Allowed Priority Tax Claim in an amount equal to the Allowed amount of such Priority Tax Claim on the later of the Effective Date and the date such Priority Tax Claim becomes an Allowed Priority Tax Claim, or as soon thereafter as is practicable.

Numerous taxing authorities have filed proofs of claim for pre-petition tax periods against LBHI and the Subsidiary Debtors.  Because certain taxes carry joint and/or several liability, some taxing authorities have filed Priority Tax Claims against multiple Debtors that are duplicative of each other.  However, because the taxing authorities do not collect more than once

for a particular joint and/or several tax liability, the amount of any actual payments in respect of duplicative Allowed Priority Tax Claims will be far less than the total of such duplicative claims (such that the underlying tax liability will in the aggregate only be paid once).

As of December 31, 2010, the relevant bar dates for all taxing authorities have expired. LBHI has made significant progress in resolving and narrowing numerous open federal, state and local tax issues, and various dispute resolution processes are ongoing with relevant taxing authorities. Due in part to these efforts and to additional factors described below, the Debtors expect that the aggregate amount of the Allowed Priority Tax Claims against LBHI and the Subsidiary Debtors for federal, state and local taxes will be significantly less than the aggregate amount set forth in the proofs of claim filed by federal, state and local taxing authorities. As such Claims are resolved, the amount owing will be allocated among the respective Debtors liable on such Claims, taking into account, among other things, historic tax sharing principles. In addition, Affiliate Claims among the Debtors and their subsidiaries are possibly subject to adjustment to reflect the appropriate allocation of any adjustments to consolidated tax returns and relevant state and local tax returns (in each case, including by way of amended returns) of the consolidated tax group of which LBHI is the common parent (the "LBHI Group"), taking into account, among other things, historic tax sharing principles.

Although it is difficult at this stage to precisely predict the expected amount of Allowed Priority Tax Claims, the Debtors currently expect an aggregate amount of Allowed Priority Tax Claims by all federal, state and local taxing authorities of approximately $2 billion. Certain of the Debtors estimate that LBI's portion of these taxes is approximately $1.1 billion. In the event that LBI or a Subsidiary Debtor cannot satisfy its allocable share of Allowed Priority Tax Claims for which other Debtors or their subsidiaries also have liability, LBHI will allocate such amounts among the Debtors and other Lehman Affiliates in an equitable manner.

### (i)     Federal

The IRS filed a proof of claim on December 22, 2010, asserting pre-petition tax claims of approximately $2.2 billion (including interest and penalties) against LBHI in respect of the 2001 through 2007 tax years of the LBHI Group. Because each member of the LBHI Group is severally liable for this $2.2 billion, the IRS has included this liability in each proof of claim it filed against certain of the Subsidiary Debtors (in addition to separate entity claims against certain Subsidiary Debtors). However, the IRS will only collect the amount of the ultimately determined consolidated income tax liability once. As described below, the amount of the Allowed Priority Tax Claim with respect to these tax years may be considerably less than the asserted $2.2 billion.

The IRS Claims reflect the result of the IRS examination of the LBHI Group as of the filing of the claims, including the resolution of several originally disputed issues (resolved through a jointly developed process designed to facilitate the resolution of the outstanding tax disputes). The claims also reflect certain maximum exposures with respect to several disputed federal tax issues that LBHI plans to continue to attempt to resolve through the administrative dispute resolution process and, if necessary, litigation. One issue is already in litigation.

US_ACTIVE:\43795376\03\58399.0008

Significantly, the IRS claims do not account for the carryback of the LBHI Group's 2008 tax year consolidated net operating loss ("NOL") to prior tax years. Moreover, the LBHI Group is due approximately $129 million plus interest from the IRS for the LBHI Group's 1997 through 2000 tax years. Additionally, the LBHI Group paid approximately $350 million in federal income taxes with respect to its tax year 2006. The IRS Claims credit the LBHI Group for the $350 million paid in respect of the 2006 tax year, effectively reducing the amount the IRS asserts against the LBHI Group for that year, and treats the $129 million refund claim with respect to the 1997 through 2000 tax years as an amount that the IRS will setoff against its Claim.

LBHI has reported a substantial consolidated NOL with respect to the LBHI Group's 2008 tax year, and has elected to carry back this NOL for up to five taxable years, to help reduce any federal tax deficiency the IRS may have against the Debtors for such years. For a further discussion, see section XV.A— "Certain Federal Income Tax Consequences of the Plan – Consequences to LBHI and Subsidiary Debtors."

Notwithstanding the Debtors' continuing efforts to mitigate the IRS Claims and successfully resolve outstanding issues, there is a likelihood that the IRS's Priority Tax Claims will be material.

### (ii)    Other Priority Tax Claims

Approximately 120 state, city, and municipal Priority Tax Claims have been filed against LBHI and its Subsidiary Debtors. Although the bar dates for filing state, city, and other local claims have passed, certain claimed amounts might still be adjusted by state and local taxing jurisdictions. As of this date, states, cities and municipalities have filed Priority Tax Claims aggregating approximately $1.9 billion against one or more of the Debtors. Of this amount, approximately $1.2 billion (63%) is attributable to New York State and approximately $627 million (33%) is attributable to New York City for a combined total of $1.827 billion.

On April 20, 2011, LBHI entered into a settlement agreement with New York State for a cash payment amount of $144.1 million, which settlement agreement was approved by the Bankruptcy Court on May 18, 2011. Pursuant to the Bankruptcy Court's order, payment has since been made and the rights of the Debtors and the other Lehman Affiliates to challenge the allocation of such payment has been reserved. This payment has satisfied the New York State claim representing tax years under audit for periods prior to the Commencement Date. The Debtors are also actively engaged in a resolution process with New York City. The Debtors currently believe that the New York City Priority Tax Claims will ultimately be settled for less than the $627 million claimed amount.

### 2.    Summary of Classes

The Plan places all Claims and Equity Interests, except Administrative Expense Claims and Priority Tax Claims, in the classes listed below for all purposes including voting and Distributions. A Claim or Equity Interest is placed in a particular Class only to the extent that it falls within the description of that Class, and is classified in any other Class to the extent that any portion thereof falls within the description of such other Class.

Unless otherwise specified below, holders of Claims in each Class will receive a Pro Rata Share of Available Cash from the Debtor against which they hold an Allowed Claim. For further detail regarding the classification and treatment of the Claims and Equity Interests, see section X.C.— "Classification and Treatment of Claims and Equity Interests" of this Disclosure Statement or the Plan annexed hereto as Exhibit 1.  The Recovery Analysis included as Exhibit 4 hereto sets forth the Debtors' estimates of the amount of Allowed Claims in each Class and the estimated recoveries to holders of Allowed Claims in each Class.

### a.     Treatment of Classified Claims Against and Equity Interests in LBHI

#### (i)      LBHI Class 1- Priority Non-Tax Claims Against LBHI

Priority Non-Tax Claims against LBHI include any Claim against LBHI, other than an Administrative Expense Claim or a Priority Tax Claim, entitled to priority in payment under section 507(a) of the Bankruptcy Code.

Holders of Priority Non-Tax Claims against LBHI will be paid in cash in the full amount of their Allowed Claim under the Plan.  Claims in LBHI Class 1 are impaired by the Plan and are entitled to vote to accept or reject the Plan.

#### (ii)     LBHI Class 2- Secured Claims against LBHI

Holders of Allowed Secured Claims against LBHI will receive a Distribution of, at the option of LBHI, any of (i) payment in Cash by LBHI in full on the later of the Effective Date and the date such Claim becomes an Allowed Claim, or as soon thereafter as is practicable; (ii) the sale or disposition proceeds of the Collateral securing such Allowed Claim to the extent of the value of the Collateral securing such Allowed Claim; (iii) surrender to the holder of such Allowed Claim of the Collateral securing such Allowed Claim; or (iv) such treatment that leaves unaltered the legal, equitable, and contractual rights to which the holder of the Allowed Claim is entitled.  Claims in LBHI Class 2 are impaired by the Plan and are entitled to vote to accept or reject the Plan.

#### (iii)    LBHI Class 3- Senior Unsecured Claims against LBHI

Senior Unsecured Claims against LBHI include any Claim against LBHI that is entitled to a contractual right of priority in payment to all of the Class 10A Subordinated Notes, Class 10B Subordinated Notes and Class 10C Subordinated Notes, but excludes (i) any Claim asserted that is based on an "Other Financial Obligation" (as such term is defined on Exhibit 10 annexed hereto), which is generally defined as Derivative Contracts,  (ii) any Claim asserted against LBHI by an Affiliate of LBHI and (iii) any Guarantee Claim asserted against LBHI by a third-party.

Generally, LBHI Class 3 includes, without limitation, Claims against LBHI primarily with respect to bonds issued by LBHI, most of which bonds were issued pursuant to an indenture as to which The Bank of New York or Wilmington Trust Company serve as indenture trustees.  The Claims in LBHI Class 3 are asserted by parties that are not Affiliates of the Debtors, are not Guarantee Claims and are senior to all Subordinated Notes.  OMX Timber

79

Finance Investments II, LLC and Wells Fargo Bank Northwest, N.A, as Indenture Trustee have asserted that their Claims (Claim Nos. 17120 and 24151, respectively), to the extent Allowed, should be properly classified in LBHI Class 3.  The Debtors are reviewing the classification of these Claims and have agreed to address this issue prior to the Voting Deadline.

In addition to the Distribution of their Pro Rata Share of Available Cash, holders of Allowed Claims in LBHI Class 3 will receive their Pro Rata Share of amounts that, if not for certain contractual subordination language, would have been distributed to holders of Allowed Subordinated Class 10A Claims against LBHI, Allowed Subordinated Class 10B Claims against LBHI and Allowed Subordinated Class 10C Claims against LBHI.  In addition, each holder of Allowed Claims in LBHI Class 3 will also receive its Pro Rata Share of the Plan Adjustment. Claims in LBHI Class 3 are impaired by the Plan and are entitled to vote to accept or reject the Plan.

### (iv)    LBHI Class 4A- Senior Affiliate Claims against LBHI

Senior Affiliate Claims include any Claim filed against LBHI by an Affiliate of LBHI that is entitled to a contractual right of priority in payment to all of the Class 10A Subordinated Notes, Class 10B Subordinated Notes and Class 10C Subordinated Notes, but excludes any (i) Claim that is based on an "Other Financial Obligation" (as such term is defined on Exhibit 10 annexed hereto), which is generally defined as Derivatives Contracts and (ii) Senior Affiliate Guarantee Claim.  Generally, LBHI Class 4A includes, without limitation, Claims filed by Affiliates based on indebtedness for money borrowed by LBHI in the form of any  intercompany loans, securities, notes, debentures, bonds or other similar instruments, and any other amounts due from LBHI in connection with the prepetition cash management system of Lehman.

Each Debtor asserting a Senior Affiliate Claim will have an Allowed Claim in the amount set forth on the Debtors' Claims Schedule.  Each other non-Debtor Affiliate asserting a Senior Affiliate Claim will have an Allowed Claim in the amount agreed to by LBHI and such non-Debtor Affiliate.  If LBHI and a non-Debtor Affiliate are unable to agree on the Allowed Claim amounts, LBHI intends to object to the Claims of such non-Debtor Affiliate.

In addition to the Distribution of their Pro Rata Share of Available Cash, holders of Allowed Claims in LBHI Class 4A will receive their Pro Rata Share of amounts that, if not for certain contractual subordination language, would have been distributed to holders of Allowed Subordinated Class 10A Claims against LBHI, Allowed Subordinated Class 10B Claims against LBHI and Allowed Subordinated Class 10C Claims against LBHI.  Claims in LBHI Class 4A are impaired by the Plan and are entitled to vote to accept or reject the Plan.

### (v)    LBHI Class 4B- Senior Affiliate Guarantee Claims against LBHI

Senior Affiliate Guarantee Claims include any Guarantee Claim asserted by an Affiliate of LBHI that is entitled to a contractual right of priority in payment to the Class 10B Subordinated Notes and Class 10C Subordinated Notes, but not the Class 10A Subordinated Notes, but excludes any Claim that is based on an "Other Financial Obligation" (as such term is

defined on Exhibit 10 annexed hereto), which is generally defined as Derivatives Contracts. Generally, LBHI Class 4B includes, without limitation, Claims filed by Affiliates based on LBHI's purported guarantee of indebtedness for money borrowed by another entity, including any securities, notes, debentures, bonds or other similar instruments issued by an Affiliate of LBHI, and any other amounts due from LBHI in connection with the prepetition cash management system of Lehman.   Many of the Affiliate Guarantee Claims based on the Guarantee Resolutions are included in LBHI Class 4B.

Each Debtor asserting a Senior Affiliate Guarantee Claim will have an Allowed Claim in the amount set forth on the Debtors' Claims Schedule.  Each other non-Debtor Affiliate asserting a Senior Affiliate Guarantee Claim will have an Allowed Claim in the amount agreed to by LBHI and such non-Debtor Affiliate.  If LBHI and a non-Debtor Affiliate are unable to agree on the Allowed Claim amounts, LBHI intends to object to the Claims of such non-Debtor Affiliate.

In addition to the Distribution of their Pro Rata Share of Available Cash, holders of Allowed Claims in LBHI Class 4B will receive their Pro Rata Share of amounts that, if not for certain contractual subordination language, would have been distributed to holders of Allowed Subordinated Class 10B Claims against LBHI and Allowed Subordinated Class 10C Claims against LBHI.  Claims in LBHI Class 4B are impaired by the Plan and are entitled to vote to accept or reject the Plan.

### (vi)    LBHI Class 5-Senior Third-Party Guarantee Claims against LBHI

Senior Third-Party Guarantee Claims include any Guarantee Claim asserted by a party that is not an Affiliate of LBHI, which Claim is entitled to a contractual right of priority in payment to Subordinated Class 10B Claims and Subordinated Class 10C Claims, but not Subordinated Class 10A Claims, but excludes any Claim that is based on an "Other Financial Obligation" (as such term is defined on Exhibit 10 annexed hereto), which is generally defined as Derivatives Contracts.  Generally, LBHI Class 5 includes, without limitation, Claims filed by an entity that is not an Affiliate of LBHI based on LBHI's purported guarantee of indebtedness for money borrowed by another entity, including any securities, notes, debentures, bonds, or other similar instruments issued by an Affiliate of LBHI.  More specifically, LBHI Class 5 also includes Claims against LBHI based on its guarantee of (i) the obligations of an Affiliate under a repurchase agreement and (ii) Structured Securities, in each case that are not filed by an Affiliate of LBHI, (iii) loans, and (iv) securities lending agreements.

In addition to the Distribution of their Pro Rata Share of Available Cash, holders of Allowed Claims in LBHI Class 5 will receive their Pro Rata Share of amounts that, if not for certain contractual subordination language, would have been distributed to holders of Allowed Subordinated Class 10B Claims and Allowed Subordinated Class 10C Claims; provided, however, that 20% of the aggregate Distribution from LBHI (including any redistribution from holders of Allowed Subordinated Claims) on account of Claims in LBHI Class 5 will automatically be reallocated to the holders of Allowed Claims in LBHI Classes 3 and 7, on a *pro rata* basis.  Claims in LBHI Class 5 are impaired by the Plan and are entitled to vote to accept or reject the Plan.

81

### (vii)    LBHI Class 6A- Convenience Claims against LBHI

Convenience Claims against LBHI include any Senior Unsecured Claim or General Unsecured Claim against LBHI, other than a Claim based on a public debt security issued by LBHI or a Claim of a Designated Entity, that is (a) Allowed in an amount of fifty thousand dollars ($50,000) or less or (b) Allowed in an amount greater than fifty thousand dollars ($50,000) but which is reduced to fifty thousand dollars ($50,000) (i) by an irrevocable written election by the holder of such Allowed Claim made on a properly delivered Ballot or (ii) pursuant to a settlement agreement between LBHI and the holder of such Claim entered into after the Voting Deadline; *provided, however*, that any such Claim against LBHI that was Allowed in excess of fifty thousand dollars ($50,000) may not be subdivided into multiple General Unsecured Claims of fifty thousand dollars ($50,000) or less for purposes of receiving treatment as a Convenience Claim.

Each holder of an Allowed Claim in LBHI Class 6A shall receive Cash in an amount equal to 0.26 multiplied by the amount of such Claim, in full and complete satisfaction of such Allowed Claim on the later of the Effective Date and the date such Claim becomes an Allowed Claim, or as soon thereafter as is practicable.  Claims in LBHI Class 6A are impaired by the Plan and are entitled to vote to accept or reject the Plan.

### (viii)    LBHI Class 6B- Convenience Guarantee Claims against LBHI

Convenience Guarantee Claims against LBHI include any Senior Third-Party Guarantee Claim or Third-Party Guarantee Claim against LBHI, other than a Claim based on a public debt security issued by LBHI or a Claim of a Designated Entity, that is (i) Allowed in an amount of fifty thousand dollars ($50,000) or less or (ii) Allowed in an amount greater than fifty thousand dollars ($50,000) but which is reduced to fifty thousand dollars ($50,000) (i) by an irrevocable written election by the holder of such Allowed Claim made on a properly delivered Ballot or (ii) pursuant to a settlement agreement between LBHI and the holder of such Claim entered into after the Voting Deadline; *provided, however*, that any such Claim against LBHI that was Allowed in excess of fifty thousand dollars ($50,000) may not be subdivided into multiple General Unsecured Claims of fifty thousand dollars ($50,000) or less for purposes of receiving treatment as a Convenience Guarantee Claim.

Each holder of an Allowed Claim in LBHI Class 6B shall receive Cash in an amount equal to 0.17 multiplied by the amount of such Claim, in full and complete satisfaction of such Allowed Claim on the later of the Effective Date and the date such Claim becomes an Allowed Claim, or as soon thereafter as is practicable.  Claims in LBHI Class 6B are impaired by the Plan and are entitled to vote to accept or reject the Plan.

### (ix)     LBHI Class 7 - General Unsecured Claims against LBHI

General Unsecured Claims against LBHI include any Claim other than an Administrative Expense Claim, a Priority Tax Claim, a Priority Non-Tax Claim, a Secured Claim, a Senior Unsecured Claim, a Senior Affiliate Claim, a Senior Affiliate Guarantee Claim, a Senior Third-Party Guarantee Claim, a Convenience Claim, an Affiliate Claim, a Third-Party Guarantee Claim, a Subordinated Claim and a Section 510(b) Claim.  Generally, LBHI Class 7 includes, without limitation, (i) Claims of trade vendors, suppliers and service providers and other Claims incurred in the ordinary course of business, (ii) Claims based on prepetition litigation against LBHI, other than Section 510(b) Claims, (iii) Claims based on LBHI's repurchase or indemnification obligations in connection with the sale of residential mortgage loans, (iv) Claims based on LBHI's obligations to employees (other than those claims entitled to priority and included in LBHI Class 1), (v) Claims based on the rejection of leases of non-residential real property and executory contracts, and (vi) Claims based on LBHI's obligations, if any, under prime brokerage agreements.

Each holder of an Allowed Claim in LBHI Class 7 shall receive its Pro Rata Share of Available Cash from LBHI.  Each holder of an Allowed Claim in LBHI Class 7 shall also receive its Pro Rata Share of the Plan Adjustment.  Claims in LBHI Class 7 are impaired by the Plan and are entitled to vote to accept or reject the Plan.

### (x)     LBHI Class 8- Affiliate Claims against LBHI

Affiliate Claims against LBHI include Claims asserted by an Affiliate of LBHI, excluding Administrative Expense Claims, Priority Non-Tax Claims, Secured Claims, Senior Affiliate Claims and Senior Affiliate Guarantee Claims.  Generally, LBHI Class 8 includes, without limitation, (i) all Claims of Affiliates of LBHI that do not qualify as senior obligations under the underlying agreements of the Subordinated Notes and (ii) all Claims filed by Affiliates based on LBHI's purported guarantee of swap agreements, forward agreements, future contracts, option agreements, foreign exchange agreements, commodity agreements, spot transactions, or any other agreement that constitutes a "swap agreement" as such term is defined in section 101(53B) of the Bankruptcy Code or "forward contract" as such term is defined in section 101(25) of the Bankruptcy Code.

Each Debtor asserting an Affiliate Claim will have an Allowed Claim in the amount set forth on the Debtors' Claims Schedule.  Each other non-Debtor Affiliate asserting an Affiliate Claim will have an Allowed Claim in the amount agreed to by LBHI and such non-Debtor Affiliate.  If LBHI and a non-Debtor Affiliate are unable to agree on the Allowed Claim amounts, LBHI intends to object to the Claims of such non-Debtor Affiliate.

Each holder of an Allowed Claim in LBHI Class 8 shall receive its Pro Rata Share of Available Cash from LBHI.  Claims in LBHI Class 8 are impaired by the Plan and are entitled to vote to accept or reject the Plan.

US_ACTIVE:\43795376\03\58399.0008

**(xi)     LBHI Class 9A- Third-Party Guarantee Claims against LBHI Other Than Those of The Racers Trusts**

Third-Party Guarantee Claims include any Guarantee Claim asserted by third-parties that are not Affiliates of the Debtors or a Designated Entity and do not qualify as senior obligations under the underlying the Subordinated Notes.  Generally, LBHI Class 9A includes, without limitation, any Claim based on a purported guarantee by LBHI of the obligation of another entity pursuant to (i) swap agreements, forward agreements, future contracts, option agreements, foreign exchange agreements, commodity agreements, spot transactions, or any other agreement that constitutes a "swap agreement" as such term is defined in section 101(53B) of the Bankruptcy Code or "forward contract" as such term is defined in section 101(25) of the Bankruptcy Code, subject to certain exceptions described in the Plan, or (ii) prime brokerage and similar agreements.

Each holder of an Allowed Claim in LBHI Class 9A shall receive its Pro Rata Share of Available Cash from LBHI; provided, however, that 20% of the aggregate Distribution from LBHI (including any redistribution from holders of Allowed Subordinated Claims) on account of Claims in LBHI Class 9A will automatically be reallocated to the holders of Allowed Claims in LBHI Classes 3 and 7, on a *pro rata* basis.  Claims in LBHI Class 9A are impaired by the Plan and are entitled to vote to accept or reject the Plan.

**(xii)     LBHI Class 9B- Third-Party Guarantee Claims of the Racers Trusts against LBHI**

LBHI Class 9B consists of the Guarantee Claim of the Racers 2007-A Trust against LBHI based on LBHI's Guarantee of the obligations of LBSF under a Derivatives Contract with the Racers 2007-A Trust.

The Racers Trusts shall have an Allowed Claim against LBHI in the amount of $1.947 billion.

The Racers 2007-A Trust shall receive its Pro Rata Share of Available Cash from LBHI; provided however, that the Distributions on $1 billion of the Allowed Claim will automatically be reallocated to the holders of Allowed Claims in LBHI Classes 3 and 7, on a *pro rata* basis.  Claims in LBHI Class 9B are impaired by the Plan and are entitled to vote to accept or reject the Plan.

**(xiii)     LBHI Class 10A- Subordinated Class 10A Claims against LBHI**

Subordinated Class 10A Claims in LBHI Class 10A include any Claim against LBHI arising under any of (a) the Floating Rate Junior Subordinated Deferrable Interest Debentures due 2035 issued pursuant to the Eighth Supplemental Indenture, dated as of August 19, 2005, between LBHI and JPMorgan Chase Bank, as trustee; (b) the Fixed/Floating Rate Subordinated Notes due 2016 Series 5065, issued pursuant to a final term sheet dated as of September 26, 2006 under the Euro Medium-Term Note Program; (c) the Floating Rate Subordinated Notes due 2037 Series EB17, issued pursuant to a final term sheet dated as of January 23, 2007 under the Euro Medium-Term Note Program; (d) the Fixed/Floating Rate

84

Subordinated Notes due 2019 Series 6222, issued pursuant to the final term sheet dated as of February 14, 2007 under the Euro Medium-Term Note Program; or (e) the Floating Rate Subordinated Notes due 2037 Series EB 18, issued pursuant to a final term sheet, dated as of May 30, 2007, under the Euro Medium-Term Note Program (collectively, the "Class 10A Subordinated Notes").

Holders of Allowed Claims in LBHI Class 10A are not expected to receive any Distributions on account of such Claims. Any Distributions that would have been paid to such Claims are automatically reallocated to holders of Allowed Senior Unsecured Claims against LBHI and Allowed Senior Affiliate Claims against LBHI pursuant to provisions of the documents underlying the Class 10A Subordinated Notes. Claims in LBHI Class 10A are impaired by the Plan. Because holders of these Claims are not expected to receive any Distributions on account of such Claims, they are deemed to reject the Plan.

### (xiv)    LBHI Class 10B- Subordinated Class 10B Claims against LBHI

Subordinated Class 10B Claims in LBHI Class 10B include any Claim against LBHI arising under any of (a) the 6.375% subordinated Deferrable Interest Debentures due 2052, issued pursuant to the Fourth Supplemental Indenture, dated as of March 17, 2003, between LBHI and JPMorgan Chase Bank, as trustee; (b) the 6.375% Subordinated Deferrable Interest Debentures due October 2052, issued pursuant to the Fifth Supplemental Indenture, dated as of October 31, 2003, between LBHI and JPMorgan Chase Bank, as trustee; (c) the 6.00% Subordinated Deferrable Interest Debentures due 2053, issued pursuant to the Sixth Supplemental Indenture, dated as of April 22, 2004, between LBHI and JPMorgan Chase Bank, as trustee; (d) the 6.24% Subordinated Deferrable Interest Debentures due 2054, issued pursuant to the Seventh Supplemental Indenture, dated as of January 18, 2005, between LBHI and JPMorgan Chase Bank, as trustee; (e) the 5.75% Subordinated Notes due 2017, issued pursuant to the Ninth Supplemental Indenture, dated as of October 24, 2006, between LBHI and JPMorgan Chase Bank, as trustee; (f) the Fixed and Floating Rate Subordinated Notes Due 2032, issued pursuant to the Tenth Supplemental Indenture, dated as of May 1, 2007, between LBHI and JPMorgan Chase Bank, as trustee; (g) the 6.50% Subordinated Notes Due 2017, issued pursuant to the Thirteenth Supplemental Indenture, dated as of July 19, 2007, between LBHI and The Bank of New York, as trustee; (h) the 6.875% Subordinated Notes Due 2037, issued pursuant to the Fourteenth Supplemental Indenture, dated as of July 19, 2007, between LBHI and The Bank of New York, as trustee; (i) the 6.75% Subordinated Notes Due 2017, issued pursuant to the Fifteenth Supplemental Indenture, dated as of December 21, 2007, between LBHI and The Bank of New York, as trustee; and (j) the 7.50% Subordinated Notes Due 2038, issued pursuant to the Sixteenth Supplemental Indenture, dated as of May 9, 2008, between LBHI and The Bank of New York, as trustee (collectively, the "Class 10B Subordinated Notes").

Holders of Allowed Claims in LBHI Class 10B are not expected to receive any Distributions on account of such Claims. Any Distributions that would have been paid to such Claims are automatically reallocated to holders of Allowed Senior Unsecured Claims against LBHI, Allowed Senior Affiliate Claims against LBHI, Allowed Senior Affiliate Guarantee Claims against LBHI and Allowed Senior Third-Party Guarantee Claims against LBHI against LBHI pursuant to provisions of the documents underlying the Class 10B Subordinated Notes.

85

Claims in LBHI Class 10B are impaired by the Plan. Because holders of these Claims are not expected to receive any Distributions on account of such Claims, they are deemed to reject the Plan.

### (xv)    LBHI Class 10C- Subordinated Class 10C Claims against LBHI

Subordinated Class 10B Claims in LBHI Class 10C include any Claim against LBHI arising under any of (a) the 5.707% Remarketable Junior Subordinated Debentures due 2043, issued pursuant to the Eleventh Supplemental Indenture, dated as of May 17, 2007, between LBHI and U.S. Bank National Association, as trustee; and (b) the Floating Rate Remarketable Junior Subordinated Debentures due 2043, issued pursuant to the Twelfth Supplemental Indenture, dated as of May 17, 2007, between LBHI and U.S. Bank National Association, as trustee (collectively, the "Class 10C Subordinated Notes").

Holders of Allowed Claims in LBHI Class 10C are not expected to receive any Distributions on account of such Claims. Any Distributions that would have been paid to such Claims are automatically reallocated to holders of Allowed Senior Unsecured Claims against LBHI, Allowed Senior Affiliate Claims against LBHI, Allowed Senior Affiliate Guarantee Claims against LBHI, Allowed Senior Third-Party Guarantee Claims against LBHI, Allowed Senior Third-Party Guarantee Claims against LBHI Allowed Subordinated Class 10A Claims against LBHI and Allowed Subordinated Class 10B Claims against LBHI pursuant to provisions of the documents underlying the Class 10C Subordinated Notes. Claims in LBHI Class 10C are impaired by the Plan. Because holders of these Claims are not expected to receive any Distributions on account of such Claims, they are deemed to reject the Plan.

### (xvi)    LBHI Class 11- Section 510(b) Claims

LBHI Class 11 includes Claims arising from the rescission of a purchase or sale of a security (other than an equity security) of the Debtors or an affiliate of the Debtors, for damages arising from the purchase or sale of such security, or for reimbursement or contribution allowed under section 502 of the Bankruptcy Code on account of such a claim.

Holders of Allowed Claims in LBHI Class 11 are not expected to receive any Distributions on account of such Claims. Claims in LBHI Class 11 are impaired by the Plan. Because holders of these Claims are not expected to receive any Distributions on account of such Claims, they are deemed to reject the Plan.

Lead Plaintiffs in two pending class actions assert that they may have claims in this class and/or should be otherwise classified under the Plan:

1.    On July 23, 2008, a class action entitled New Jersey Carpenters Health Fund, et al. v. Lehman XS Trust Series 200S-5N, et al., was filed in the Supreme Court of the State of New York, County of New York. On July 29, 2008 the actions were removed to the United States District Court for the Southern District of New York pursuant to 28 U.S.C. §§1441 and 1446. The case was assigned Case No. 08-6762. Thereafter, another case (08-10686) asserting similar causes of action was filed. These actions

allege certain offering documents for issuance of mortgage backed securities contained material misstatements and omitted material information in violation of Sections 11, 12, and 15 of the Securities Act of 1933.  These actions are stayed with respect to any Debtor defendants.

2. On June 18, 2008, the securities class action In re Lehman Brothers Equity/Debt Securities Litigation, Case No. 08-05523 (LAK) was commenced in the United States District Court for the Southern District of New York by plaintiffs asserting that they purchased certain LBHI debt or equity securities pursuant to materially false and misleading registration statements and prospectuses, and were damaged thereby.  On July 27, 2011, the District Court granted in part and denied in part motions to dismiss the Securities Litigation by the Non-Debtor Defendants.  These actions are stayed with respect to any Debtor defendants.

Nothing in the Plan or in any Order confirming the Plan shall preclude the lead plaintiffs and the putative classes in the above actions from seeking relief to pursue their Claims against the Debtors to the extent of available insurance proceeds.  The Debtors do not concede any liability and do not agree with the allegations in the complaints.  The Debtors reserve any and all rights to contest the claims and to enforce any stay of the actions as against the Debtors.

### (xvii) LBHI Class 12- Equity Interests in LBHI

Equity Interests in LBHI includes any shares of common stock, preferred stock, other form of ownership interest, or any interest or right to convert into such an equity or ownership interest or acquire any equity or ownership interest, including, without limitation, vested and/or unvested restricted stock units, contingent stock awards, contingent equity awards, performance stock units, and stock options or restricted stock awards granted under management ownership plans, that was in existence immediately prior to or on LBHI's Commencement Date. Equity Interests also include Allowed Claims against LBHI arising out of, or relating to, or in connection with any of the foregoing that are subject to section 510(b) of the Bankruptcy Code. Holders of Equity Interests in LBHI are not expected to receive any Distributions under the Plan.

On the Effective Date, all LBHI Stock shall be cancelled and the Plan Trust Stock shall be issued to the Plan Trust which will hold such share for the benefit of the holders of such former LBHI Stock consistent with their former relative priority and economic entitlements; *provided, however*, that the Plan Trust may not exercise any voting rights appurtenant thereto in conflict with Article VII of the Plan.  Each holder of an Equity Interest in LBHI (through their interest in the new share of LBHI common stock or otherwise) shall neither receive nor retain any Property of the Estate or direct interest in Property of the Estate of LBHI or interest in property on account of such Equity Interests; provided, however, that in the event that all Allowed Claims in LBHI Classes 1 through 11 have been satisfied in full in accordance with the Bankruptcy Code and the Plan, each holder of an Equity Interest in LBHI may receive its share of any remaining assets of LBHI consistent with such holder's rights of payment existing immediately prior to the Commencement Date.  Unless otherwise determined by the Plan Administrator, on the date that LBHI's Chapter 11 Case is closed in accordance with Section 6.6 of the Plan, the Plan Trust Stock issued pursuant to this section 4.17(b) of the Plan shall be

deemed cancelled and of no further force and effect provided that such cancellation does not adversely impact the Debtors' estates. The continuing rights of holders of Equity Interests (including through their interest in the Plan Trust Stock or otherwise) will be nontransferable, except by operation of law. Equity Interests in LBHI Class 12 are impaired by the Plan. Because holders of these Equity Interests are not expected to receive any Distributions on account of such Equity Interests, they are deemed to reject the Plan.

### b.  Treatment of Classified Claims Against and Equity Interests in the Subsidiary Debtors

As to each of the Subsidiary Debtors, the Plan generally adopts two common schemes for the classification and treatment of Claims. The scheme for the classification and treatment of Claims applied to each Subsidiary Debtor is dependent upon whether such Subsidiary Debtor is a Participating Subsidiary Debtor. The Plans of LCPI and LBSF have unique provisions and therefore are described separately below.

### (i)  Classification and Treatment for LCPI

### (a)  LCPI Class 1- Priority Non-Tax Claims

Priority Non-Tax Claims include any Claim, other than an Administrative Expense Claim or a Priority Tax Claim, entitled to priority in payment under section 507(a) of the Bankruptcy Code.

Holders of Priority Non-Tax Claims will be paid in cash in the full amount of their Allowed Claim under the Plan. Claims in LCPI Class 1 are impaired by the Plan and are entitled to vote to accept or reject the Plan.

### (b)  LCPI Class 2- Secured Claims

Holders of Allowed Secured Claims will receive a Distribution of, at the option of LCPI, any of (i) payment in Cash in full on the later of the Effective Date and the date such Claim becomes an Allowed Claim, or as soon thereafter as is practicable; (ii) the sale or disposition proceeds of the Collateral securing such Allowed Claim to the extent of the value of the Collateral securing such Allowed Claim; (iii) surrender to the holder of such Allowed Claim of the Collateral securing such Allowed Claim; or (iv) such treatment that leaves unaltered the legal, equitable, and contractual rights to which the holder of the Allowed Claim is entitled. Claims in LCPI Class 2 are impaired by the Plan and are entitled to vote to accept or reject the Plan.

### (c)  LCPI Class 3- Convenience Claims

Convenience Claims include any General Unsecured Claim that is (i) Allowed in an amount of fifty thousand dollars ($50,000) or less or (ii) Allowed in an amount greater than fifty thousand dollars ($50,000) but which is reduced to fifty thousand dollars ($50,000) (i) by an irrevocable written election by the holder of such Allowed Claim made on a properly delivered Ballot or (ii) pursuant to a settlement agreement between LCPI and holder of such Claim entered into after the Voting Deadline; *provided, however*, that any such Claim that was Allowed in

excess of fifty thousand dollars ($50,000) may not be subdivided into multiple Claims of fifty thousand dollars ($50,000) or less for purposes of receiving treatment as a Convenience Claim.

Each holder of an Allowed Claim in LCPI Class 3 shall receive Cash in an amount equal to the applicable Convenience Class Distribution Percentage set forth on Exhibit 13 hereto multiplied by the amount of such Claim, in full and complete satisfaction of such Allowed Claim on the later of the Effective Date and the date such Claim becomes an Allowed Claim, or as soon thereafter as is practicable.  Claims in LCPI Class 3 are impaired by the Plan and are entitled to vote to accept or reject the Plan.

### (d)      LCPI Class 4A- General Unsecured Claims Other Than Those of Designated Entities

General Unsecured Claims in LCPI Class 4A include any Claim against LCPI other than an Administrative Expense Claim, a Priority Tax Claim, a Priority Non-Tax Claim, a Secured Claim, a Convenience Claim or an Affiliate Claim.  Generally, LCPI Class 4A includes, without limitation, (i) Claims based on financing transactions, including repurchase agreements, (ii) Claims based on the rejection of executory contracts, (iii) Claims based on prepetition litigation against LCPI, (iv) Claims of trade vendors, suppliers and service providers and other Claims incurred in the ordinary course of business and (v) Claims based on repurchase or indemnification obligations in connection with the sale of residential mortgage loans.

Each holder of an Allowed Claim in LCPI Class 4A shall receive its Pro Rata Share of Available Cash from LCPI; provided however, that 14% of the aggregate Distribution on account of Claims in LCPI Class 4A will automatically be reallocated to the holders of Allowed Claims in LBHI Classes 3 and 7, on a *pro rata* basis.  Each holder of Allowed Claims in LCPI Class 4A shall also receive its Pro Rata Share of the first $100 million of Distributions made to LBHI on account of its Allowed Affiliate Claim against LCPI.  Claims in LCPI Class 4A are impaired by the Plan and are entitled to vote to accept or reject the Plan.

### (e)      LCPI Class 4B- General Unsecured Claims of Designated Entities

General Unsecured Claims in LCPI Class 4B include any Claim against LCPI asserted by the Racers 2007-A Trust or based on the Fenway transactions other than an Administrative Expense Claim, a Priority Tax Claim, a Priority Non-Tax Claim, a Secured Claim, a Convenience Claim or an Affiliate Claim.

The Claims of the Racers 2007-A Trust will be Allowed in the amount of $5 billion.  The unsecured Claims asserted by LBHI against LCPI based on the Fenway transactions will be Allowed as General Unsecured Claims in LCPI Class 4B in the amount of $230 million.

Each holder of an Allowed Claim in LCPI Class 4B shall receive its Pro Rata Share of Available Cash from LCPI; provided however, that 20% of the aggregate Distribution on account of Claims in LCPI Class 4B will automatically be reallocated to the holders of Allowed Claims in LBHI Classes 3 and 7, on a *pro rata* basis.  Claims in LCPI Class 4B are impaired by the Plan and are entitled to vote to accept or reject the Plan.

US_ACTIVE:\43795376\03\58399.0008

### (f)      LCPI Class 5A- Affiliate Claims of LBHI

Affiliate Claims in LCPI Class 5A include Claims against LCPI asserted by LBHI, other than an Administrative Expense Claim, a Priority Non-Tax Claim, or a Secured Claim.

LBHI will have an Allowed Claim in the amount set forth on Annex 9A of the Debtors' Claims Schedule; *provided* that, LBHI will only participate in Distributions in the amount set forth on Annex 9C of the Debtors' Claims Schedule.

LBHI shall receive its Pro Rata Share of Available Cash from LCPI on account of its Claims included in LCPI Class 5A; *provided* that the first $100 million of Distributions made to LBHI on account of its Allowed Affiliate Claim against LCPI will automatically be reallocated to the holders of Allowed Claims in LCPI Class 4.

### (g)      LCPI Class 5B- Affiliate Claims of Participating Subsidiary Debtors

Affiliate Claims in LCPI Class 5B include Claims against LCPI asserted by another Participating Subsidiary Debtor, other than an Administrative Expense Claim, a Priority Non-Tax Claim, or a Secured Claim.

Each Participating Subsidiary Debtor will have an Allowed Claim in the amount set forth on the Debtors' Claims Schedule.

Each holder of an Allowed Claim in LCPI Class 5B shall receive its Pro Rata Share of Available Cash from LCPI; provided, however, that 20% of the aggregate Distribution on account of Claims in LCPI Class 5B will automatically be reallocated to the holders of Allowed Claims in LBHI Classes 3 and 7, on a *pro rata* basis.  Claims in LCPI Class 5B are impaired by the Plan and are entitled to vote to accept or reject the Plan.

### (h)      LCPI Class 5C- Affiliate Claims Other than Participating Subsidiary Debtors and LBHI

Affiliate Claims in LCPI Class 5C include Claims against LCPI asserted by an Affiliate other than a Participating Subsidiary Debtor, LBHI or a Designated Entity other than an Administrative Expense Claim, a Priority Non-Tax Claim, or a Secured Claim.

Each Subsidiary Debtor asserting a Claim in LCPI Class 5C will have an Allowed Claim in the amount set forth on the Debtors' Claims Schedule.  Each other non-Debtor Affiliate asserting of a Claim in LCPI Class 5C will have an Allowed Claim in the amount agreed to by LCPI and such non-Debtor Affiliate.  If LCPI and a non-Debtor Affiliate are unable to agree on the Allowed Claim amounts, LCPI intends to object to the Claims of such non-Debtor Affiliate.

Each holder of an Allowed Claim in LCPI Class 5C shall receive its Pro Rata Share of Available Cash from LCPI; provided, however, that 14% of the aggregate Distribution on account of Claims in LCPI Class 5C will automatically be reallocated to the holders of

90

Allowed Claims in LBHI Classes 3 and 7, on a *pro rata* basis. Claims in Class LCPI 5C are impaired by the Plan and are entitled to vote to accept or reject the Plan.

### (i)      LCPI Class 6- Equity Interests

Equity Interests includes any shares of common stock, preferred stock, other form of ownership interest, or any interest or right to convert into such an equity or ownership interest or acquire any equity or ownership interest, including, without limitation, vested and/or unvested restricted stock units, contingent stock awards, contingent equity awards, performance stock units, and stock options or restricted stock awards granted under management ownership plans, in LCPI that was in existence immediately prior to or on the Commencement Date for LCPI. Holders of Equity Interests in LCPI are not expected to receive any Distributions under the Plan. The holder of the Equity Interest in LCPI will receive any amounts remaining for Distribution after all Claims against such entities have been satisfied in full in accordance with the Plan. Equity Interests in LCPI Class 6 are impaired by the Plan. Because holders of these Equity Interests are not expected to receive any Distributions on account of such Equity Interests, they are deemed to reject the Plan.

### (ii)      Classification and Treatment for LBSF

### (a)      LBSF Class 1- Priority Non-Tax Claims

Priority Non-Tax Claims include any Claim, other than an Administrative Expense Claim or a Priority Tax Claim, entitled to priority in payment under section 507(a) of the Bankruptcy Code.

Holders of Priority Non-Tax Claims will be paid in cash in the full amount of their Allowed Claim under the Plan. Claims in LBSF Class 1 are impaired by the Plan and are entitled to vote to accept or reject the Plan.

### (b)      LBSF Class 2- Secured Claims

Holders of Allowed Secured Claims will receive a Distribution of, at the option of LBSF, any of (i) payment in Cash in full on the later of the Effective Date and the date such Claim becomes an Allowed Claim, or as soon thereafter as is practicable; (ii) the sale or disposition proceeds of the Collateral securing such Allowed Claim to the extent of the value of the Collateral securing such Allowed Claim; (iii) surrender to the holder of such Allowed Claim of the Collateral securing such Allowed Claim; or (iv) such treatment that leaves unaltered the legal, equitable, and contractual rights to which the holder of the Allowed Claim is entitled. Claims in LBSF Class 2 are impaired by the Plan and are entitled to vote to accept or reject the Plan.

### (c)      LBSF Class 3- Convenience Claims

Convenience Claims include any General Unsecured Claim that is (i) Allowed in an amount of fifty thousand dollars ($50,000) or less or (ii) Allowed in an amount greater than fifty thousand dollars ($50,000) but which is reduced to fifty thousand dollars ($50,000) (i) by an irrevocable written election by the holder of such Allowed Claim made on a properly delivered

Ballot or (ii) pursuant to a settlement agreement between LBSF and holder of such Claim entered into after the Voting Deadline; *provided, however*, that any such Claim that was Allowed in excess of fifty thousand dollars ($50,000) may not be subdivided into multiple Claims of fifty thousand dollars ($50,000) or less for purposes of receiving treatment as a Convenience Claim.

Each holder of an Allowed Claim in LBSF Class 3 shall receive Cash in an amount equal to the applicable Convenience Class Distribution Percentage set forth on Exhibit 13 hereto multiplied by the amount of such Claim, in full and complete satisfaction of such Allowed Claim on the later of the Effective Date and the date such Claim becomes an Allowed Claim, or as soon thereafter as is practicable.  Claims in LBSF Class 3 are impaired by the Plan and are entitled to vote to accept or reject the Plan.

### (d)     LBSF Class 4A- General Unsecured Claims Other Than Those of the Racers Trusts

General Unsecured Claims in LBSF Class 4A include any Claim against LBSF other than an Administrative Expense Claim, a Priority Tax Claim, a Priority Non-Tax Claim, a Secured Claim, a Convenience Claim or an Affiliate Claim.  Generally, LBSF Class 4A includes, without limitation, (i) Claims based on Derivatives Contracts, (ii) Claims based on the rejection of executory contracts, and (iii) Claims based on prepetition litigation against LBSF, and (iv) Claims of trade vendors, suppliers and service providers and other Claims incurred in the ordinary course of business.

Each holder of an Allowed Claim in LBSF Class 4A shall receive its Pro Rata Share of Available Cash from LBSF; <u>provided</u> however, that 6% of the aggregate Distribution on account of Claims in LBSF Class 4A will automatically be reallocated to the holders of Allowed Claims in LBHI Classes 3 and 7, on a *pro rata* basis.  Each holder of an Allowed Claim in LBSF Class 4A shall also receive its Pro Rata Share of (i) the first $100 million of Distributions made to LBHI on account of its Allowed Affiliate Claim against LBSF and (ii) the first $70 million of assets recovered by LBSF in excess of $14.156 billion.  Claims in LBSF Class 4A are impaired by the Plan and are entitled to vote to accept or reject the Plan.

### (e)     LBSF Class 4B- General Unsecured Claims of the Racers Trusts

General Unsecured Claims in LBSF Class 4B include any Claims against LBSF asserted by the Racers Trusts, other than an Administrative Expense Claim, a Priority Tax Claim, a Priority Non-Tax Claim, a Secured Claim, a Convenience Claim or an Affiliate Claim.

The Racers Trusts shall have an Allowed Claim against LBSF in the amount of $1,947,735,000.

The Racers 2007-A Trust shall receive its Pro Rata Share of Available Cash from LBSF; <u>provided</u> <u>however</u>, that the Distributions on $1 billion of the Allowed Claim will automatically be reallocated to the holders of Allowed Claims in LBHI Classes 3 and 7, on a *pro rata* basis.  Claims in LBSF Class 4B are impaired by the Plan and are entitled to vote to accept or reject the Plan.

92

**(f)      LBSF Class 5A- Affiliate Claims of LBHI**

Affiliate Claims in LBSF Class 5A include Claims against LBSF asserted by LBHI, other than an Administrative Expense Claim, a Priority Non-Tax Claim, or a Secured Claim.

LBHI will have an Allowed Claim in the amount set forth on Annex 9A of the Debtors' Claims Schedule; *provided* that, LBHI will only participate in Distributions in the amount set forth on Annex 9C of the Debtors' Claims Schedule.

LBHI shall receive its Pro Rata Share of Available Cash from LBSF on account of its Claims included in LBSF Class 5A; *provided* that the first $100 million of Distributions made to LBHI on account of its Allowed Affiliate Claim against LBSF will automatically be reallocated to the holders of Allowed Claims in LBSF Class 4.  Claims in LBSF Class 5A are impaired by the Plan and are entitled to vote to accept or reject the Plan.

**(g)      LBSF Class 5B- Affiliate Claims of Participating Subsidiary Debtors**

Affiliate Claims in LBSF Class 5B include Claims against LBSF asserted by another Participating Subsidiary Debtor, other than an Administrative Expense Claim, a Priority Non-Tax Claim, or a Secured Claim.

Each Participating Subsidiary Debtor will have an Allowed Claim in the amount set forth on the Debtors' Claims Schedule.

Each holder of an Allowed Claim in LBSF Class 5B shall receive its Pro Rata Share of Available Cash from LBSF; provided, however, that 20% of the aggregate Distribution on account of Claims in LBSF Class 5B will automatically be reallocated to the holders of Allowed Claims in LBHI Classes 3 and 7, on a *pro rata* basis.  Claims in LBSF Class 5B are impaired by the Plan and are entitled to vote to accept or reject the Plan.

**(h)      LBSF Class 5C- Affiliate Claims Other than Those of Participating Subsidiary Debtors and LBHI**

Affiliate Claims in LBSF Class 5C include Claims against LBSF asserted by an Affiliate other than a Participating Subsidiary Debtor and LBHI other than an Administrative Expense Claim, a Priority Non-Tax Claim, or a Secured Claim.

Each Subsidiary Debtor asserting a Claim in LBSF Class 5C will have an Allowed Claim in the amount set forth on the Debtors' Claims Schedule.  Each other non-Debtor Affiliate asserting of a Claim in LBSF Class 5C will have an Allowed Claim in the amount agreed to by LBSF and such non-Debtor Affiliate.  If LBSF and a non-Debtor Affiliate are unable to agree on the Allowed Claim amounts, LBSF intends to object to the Claims of such non-Debtor Affiliate.

US_ACTIVE:\43795376\03\58399.0008

Each holder of an Allowed Claim in LBSF Class 5C shall receive its Pro Rata Share of Available Cash from LBSF; provided, however, that the 6% of the aggregate Distribution on account of Claims in LBSF Class 5C will automatically be reallocated to the holders of Allowed Claims in LBHI Classes 3 and 7, on a *pro rata* basis. Each holder of an Allowed Claim in LBSF Class 5C shall also receive its Pro Rata Share of the first $70 million of assets recovered by LBSF in excess of $14.156 billion. Claims in Class LBSF 5C are impaired by the Plan and are entitled to vote to accept or reject the Plan.

### (i)    LBSF Class 6- Equity Interests

Equity Interests includes any shares of common stock, preferred stock, other form of ownership interest, or any interest or right to convert into such an equity or ownership interest or acquire any equity or ownership interest, including, without limitation, vested and/or unvested restricted stock units, contingent stock awards, contingent equity awards, performance stock units, and stock options or restricted stock awards granted under management ownership plans, in LBSF that was in existence immediately prior to or on the Commencement Date for LBSF. Holders of Equity Interests in LBSF are not expected to receive any Distributions under the Plan. The holder of the Equity Interest in LBSF will receive any amounts remaining for Distribution after all Claims against such entities have been satisfied in full in accordance with the Plan. Equity Interests in LBSF Class 6 are impaired by the Plan. Because holders of these Equity Interests are not expected to receive any Distributions on account of such Equity Interests, they are deemed to reject the Plan.

### (iii)    Classification and Treatment for LBCS, LOTC and LBCC

The following classification and treatment applies with respect to each of LBCS, LOTC and LBCC, in its individual capacity.

### (a)    Class 1- Priority Non-Tax Claims

Priority Non-Tax Claims include any Claim, other than an Administrative Expense Claim or a Priority Tax Claim, entitled to priority in payment under section 507(a) of the Bankruptcy Code.

Holders of Priority Non-Tax Claims will be paid in cash in the full amount of their Allowed Claim under the Plan. Claims in Class 1 are impaired by the Plan and are entitled to vote to accept or reject the Plan.

### (b)    Class 2- Secured Claims

Holders of Allowed Secured Claims will receive a Distribution of, at the option of the applicable Participating Subsidiary Debtor, any of (i) payment in Cash in full on the later of the Effective Date and the date such Claim becomes an Allowed Claim, or as soon thereafter as is practicable; (ii) the sale or disposition proceeds of the Collateral securing such Allowed Claim to the extent of the value of the Collateral securing such Allowed Claim; (iii) surrender to the holder of such Allowed Claim of the Collateral securing such Allowed Claim; or (iv) such treatment that leaves unaltered the legal, equitable, and contractual rights to which the holder of

94

the Allowed Claim is entitled.  Claims in Class 2 are impaired by the Plan and are entitled to vote to accept or reject the Plan.

### (c)      Class 3- Convenience Claims

Convenience Claims include any General Unsecured Claim that is (i) Allowed in an amount of fifty thousand dollars ($50,000) or less or (ii) Allowed in an amount greater than fifty thousand dollars ($50,000) but which is reduced to fifty thousand dollars ($50,000) (i) by an irrevocable written election by the holder of such Allowed Claim made on a properly delivered Ballot or (ii) pursuant to a settlement agreement between the applicable Debtor and holder of such Claim entered into after the Voting Deadline; *provided, however*, that any such Claim that was Allowed in excess of fifty thousand dollars ($50,000) may not be subdivided into multiple Claims of fifty thousand dollars ($50,000) or less for purposes of receiving treatment as a Convenience Claim.

Each holder of an Allowed Claim in Class 3 shall receive Cash in an amount equal to the applicable Convenience Class Distribution Percentage set forth on Exhibit 13 hereto multiplied by the amount of such Claim, in full and complete satisfaction of such Allowed Claim on the later of the Effective Date and the date such Claim becomes an Allowed Claim, or as soon thereafter as is practicable.  Claims in Class 3 are impaired by the Plan and are entitled to vote to accept or reject the Plan.

### (d)      Class 4- General Unsecured Claims

General Unsecured Claims include any Claim other than an Administrative Expense Claim, a Priority Tax Claim, a Priority Non-Tax Claim, a Secured Claim, a Convenience Claim or an Affiliate Claim.  Generally, Class 4 includes, without limitation, (i) Claims based on financing transactions, (ii) Claims based on the rejection of executory contracts, (iii) Claims based on prepetition litigation against a Participating Subsidiary Debtor, (iv) Claims of trade vendors, suppliers and service providers and other Claims incurred in the ordinary course of business and (v) Claims based on repurchase or indemnification obligations in connection with the sale of residential mortgage loans.

Each holder of an Allowed Claim in Class 4 shall receive its Pro Rata Share of Available Cash from such Participating Subsidiary Debtor; provided however, that the applicable Plan Adjustment Percentage set forth on Exhibit 12 hereto of the aggregate Distribution on account of Claims in Class 4 will automatically be reallocated to the holders of Allowed Claims in LBHI Classes 3 and 7, on a *pro rata* basis.  Claims in Class 4 are impaired by the Plan and are entitled to vote to accept or reject the Plan.

### (e)      Class 5A- Affiliate Claims of LBHI

Affiliate Claims in Class 5A include Claims against a Participating Subsidiary Debtor asserted by LBHI, other than an Administrative Expense Claim, a Priority Non-Tax Claim, or a Secured Claim.

US_ACTIVE:\43795376\03\58399.0008

LBHI will have an Allowed Claim in the amount set forth on Annex 9A of the Debtors' Claims Schedule; *provided* that, LBHI will only participate in Distributions in the amount set forth on Annex 9C of the Debtors' Claims Schedule.

LBHI shall receive its Pro Rata Share of Available Cash from such Participating Subsidiary Debtor on account of its Claims included in Class 5A.  Claims in Class 5A are impaired by the Plan and are entitled to vote to accept or reject the Plan.

**(f)     Class 5B- Affiliate Claims of Participating Subsidiary Debtors**

Affiliate Claims in Class 5B include Claims against a Participating Subsidiary Debtor asserted by another Participating Subsidiary Debtor, other than an Administrative Expense Claim, a Priority Non-Tax Claim, or a Secured Claim.

Each Participating Subsidiary Debtor will have an Allowed Claim in the amount set forth on the Debtors' Claims Schedule.

Each holder of an Allowed Claim in Class 5B shall receive its Pro Rata Share of Available Cash from such Participating Subsidiary Debtor; <u>provided</u>, <u>however</u>, that 20% of the aggregate Distribution on account of Claims in Class 5B will automatically be reallocated to the holders of Allowed Claims in LBHI Classes 3 and 7, on a *pro rata* basis.  Claims in Class 5B are impaired by the Plan and are entitled to vote to accept or reject the Plan.

**(g)     Class 5C- Affiliate Claims Other than those of Participating Subsidiary Debtors and LBHI**

Affiliate Claims in Class 5C include Claims against a Participating Subsidiary Debtor asserted by an Affiliate other than a Participating Subsidiary Debtor or LBHI, other than an Administrative Expense Claim, a Priority Non-Tax Claim, or a Secured Claim.

Each Subsidiary Debtor asserting a Claim in Class 5C will have an Allowed Claim in the amount set forth on the Debtors' Claims Schedule.  Each other non-Debtor Affiliate asserting a Claim in Class 5C will have an Allowed Claim in the amount agreed to by the Participating Subsidiary Debtor and such Affiliate.  If the Participating Subsidiary Debtor and a non-Debtor Affiliate are unable to agree on the Allowed Claim amounts, the Participating Subsidiary Debtor intends to object to the Claims of such non-Debtor Affiliate.

Each holder of an Allowed Claim in Class 5C shall receive its Pro Rata Share of Available Cash from such Participating Subsidiary Debtor; <u>provided</u>, <u>however</u>, that the applicable Plan Adjustment Percentage set forth on Exhibit 12 hereto of the aggregate Distribution on account of Claims in Class 5C will automatically be reallocated to the holders of Allowed Claims in LBHI Classes 3 and 7, on a *pro rata* basis.  Claims in Class 5C are impaired by the Plan and are entitled to vote to accept or reject the Plan.

(h)        **Class 6- Equity Interests**

Equity Interests includes any shares of common stock, preferred stock, other form of ownership interest, or any interest or right to convert into such an equity or ownership interest or acquire any equity or ownership interest, including, without limitation, vested and/or unvested restricted stock units, contingent stock awards, contingent equity awards, performance stock units, and stock options or restricted stock awards granted under management ownership plans, in any Debtor that was in existence immediately prior to or on the Commencement Date for such Debtor.  Holders of Equity Interests in Debtors are not expected to receive any Distributions under the Plan.  The holder of the Equity Interest in each Debtor will receive any amounts remaining for Distribution after all Claims against such entities have been satisfied in full in accordance with the Plan.  Equity Interests in Class 6 are impaired by the Plan.  Because holders of these Equity Interests are not expected to receive any Distributions on account of such Equity Interests, they are deemed to reject the Plan.

(iv)        **Classification and Treatment for Subsidiary Debtors That Are Not Participating Subsidiary Debtors.**

The following classification and treatment applies with respect to each of LBFP, LBDP, PAMI Statler, CES, CES V, CES IX, East Dover, LS Finance, LUXCO, BNC, LB Rose Ranch, SASCO, LB 2080, Merit, Preferred Somerset and Somerset in its individual capacity.

(a)        **Class 1- Priority Non-Tax Claims**

Priority Non-Tax Claims include any Claim, other than an Administrative Expense Claim or a Priority Tax Claim, entitled to priority in payment under section 507(a) of the Bankruptcy Code.

Holders of Priority Non-Tax Claims will be paid in cash in the full amount of their Allowed Claim under the Plan.  Claims in Class 1 are impaired by the Plan and are entitled to vote to accept or reject the Plan.

(b)        **Class 2- Secured Claims**

Holders of Allowed Secured Claims will receive a Distribution of, at the option of the applicable Subsidiary Debtor, any of (i) payment in Cash in full on the later of the Effective Date and the date such Claim becomes an Allowed Claim, or as soon thereafter as is practicable; (ii) the sale or disposition proceeds of the Collateral securing such Allowed Claim to the extent of the value of the Collateral securing such Allowed Claim; (iii) surrender to the holder of such Allowed Claim of the Collateral securing such Allowed Claim; or (iv) such treatment that leaves unaltered the legal, equitable, and contractual rights to which the holder of the Allowed Claim is entitled.  Claims in Class 2 are impaired by the Plan and are entitled to vote to accept or reject the Plan.

(c)        **Class 3- General Unsecured Claims**

General Unsecured Claims include any Claim other than an Administrative Expense Claim, a Priority Tax Claim, a Priority Non-Tax Claim, a Secured Claim, and an

Affiliate Claim.  Generally, Class 3 includes, without limitation, (i) Claims based on financing transactions, (ii) Claims based on the rejection of executory contracts, (iii) Claims based on prepetition litigation against a Subsidiary Debtor, (iv) Claims of trade vendors, suppliers and service providers and other Claims incurred in the ordinary course of business and (v) Claims based on repurchase or indemnification obligations in connection with the sale of residential mortgage loans and (vi) Claims based on swap agreements, forward agreements, future contracts, option agreements, foreign exchange agreements, commodity agreements, spot transactions, or any other agreement that constitutes a "swap agreement" as such term is defined in section 101(53B) of the Bankruptcy Code or "forward contract" as such term is defined in section 101(25) of the Bankruptcy Code, subject to certain exceptions described in the Plan.

Each holder of an Allowed General Unsecured Claim shall receive its Pro Rata Share of Available Cash from such Subsidiary Debtor.  Claims in Class 3 are impaired by the Plan and are entitled to vote to accept or reject the Plan.

### (d)      Class 4A- Affiliate Claims of LBHI

Affiliate Claims in Class 4A include Claims against a Subsidiary Debtor asserted by LBHI, other than an Administrative Expense Claim, a Priority Non-Tax Claim, or a Secured Claim.

LBHI will have an Allowed Claim in the amount set forth on Annex 9A of the Debtors' Claims Schedule; *provided* that, LBHI will only participate in Distributions in the amount set forth on Annex 9C of the Debtors' Claims Schedule.

LBHI shall receive its Pro Rata Share of Available Cash from such Subsidiary Debtor.  Claims in Class 4A are impaired by the Plan and are entitled to vote to accept or reject the Plan.

### (e)      Class 4B- Affiliate Claims Other Than Those of LBHI

Affiliate Claims in Class 4B include Claims against a Subsidiary Debtor asserted by an Affiliate other than LBHI, other than an Administrative Expense Claim, a Priority Non-Tax Claim, or a Secured Claim.

Each Subsidiary Debtor asserting a Claim in Class 4B will have an Allowed Claim in the amount set forth on the Debtors' Claims Schedule.  Each other non-Debtor Affiliate asserting of a Claim in Class 4B will have an Allowed Claim in the amount agreed to by the Subsidiary Debtor and such non-Debtor Affiliate.  If a Subsidiary Debtor and a non-Debtor Affiliate are unable to agree on the Allowed Claim amounts, the Subsidiary Debtor intends to object to the Claims of such non-Debtor Affiliate.

Each holder of an Allowed Claim in Class 4B shall receive its Pro Rata Share of Available Cash from such Subsidiary Debtor. Claims in Class 4B are impaired by the Plan and are entitled to vote to accept or reject the Plan.

US_ACTIVE:\43795376\03\58399.0008

**(f)      Class 5- Equity Interests**

Equity Interests includes any shares of common stock, preferred stock, other form of ownership interest, or any interest or right to convert into such an equity or ownership interest or acquire any equity or ownership interest, including, without limitation, vested and/or unvested restricted stock units, contingent stock awards, contingent equity awards, performance stock units, and stock options or restricted stock awards granted under management ownership plans, in any Debtor that was in existence immediately prior to or on the Commencement Date for such Debtor.  Holders of Equity Interests in Debtors (other than LB 745, LS Finance, BNC, LBFP, LBDP, CES and East Dover) are not expected to receive any Distributions under the Plan.  The holder of the Equity Interest in each Debtor will receive any amounts remaining for Distribution after all Claims against such entities have been satisfied in full in accordance with the Plan. Equity Interests in Class 5 are impaired by the Plan.  Because holders of these Equity Interests are not expected to receive any Distributions on account of such Equity Interests, they are deemed to reject the Plan.

**D.      Means for Implementation of the Plan**

**1.      Continued Corporate Existence of Debtors**

On the Effective Date, the Debtors will each maintain their current corporate forms.  After the Effective Date, the Plan Administrator may decide, in its sole discretion, to (a) maintain each Debtor as a corporation in good standing until such time as all aspects of the Plan pertaining to such Debtor have been completed, or (b) at such time as the Plan Administrator considers appropriate and consistent with the implementation of the Plan pertaining to such Debtor, dissolve such Debtor and complete the winding up of such Debtor in accordance with applicable law (including, without limitation, the transfer of all or part of the assets of such Debtor to a Liquidating Trust in accordance with Article X of the Plan), or (c) dissolve any Debtor-Controlled Entity and complete the winding up of such Debtor-Controlled Entity in accordance with applicable law.

**2.      Revesting of Assets**

On the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, all property of the Debtors' estates will vest in the respective Debtor free and clear of all Claims, Liens, encumbrances, charges and other interests, except as provided in the Plan.  From and after the Effective Date, the Debtors, acting through the Plan Administrator, may take any action, including, without limitation, the operation of their businesses, the use, acquisition, sale, lease and disposition of property, and the entry into transactions, agreements, understandings or arrangements, whether in or other than in the ordinary course of business, and execute, deliver, implement, and fully perform any and all obligations, instruments, documents and papers or otherwise in connection with any of the foregoing, free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules and in all respects as if there were no pending cases under any chapter or provision of the Bankruptcy Code, except as explicitly provided in the Plan.

### 3.    Plan Administrator

#### a.    Authority of the Plan Administrator

Pursuant to the Plan, LBHI is appointed as the Plan Administrator for each of the Debtors.

The Plan Administrator will have the authority and right on behalf of each of the Debtors, without the need for Bankruptcy Court approval (unless otherwise indicated), to carry out and implement all provisions of the Plan, including, without limitation, to:

(i)    except to the extent Claims have been previously Allowed, control and effectuate the Claims reconciliation process, including objecting to, seeking to subordinate, compromise or settling any and all Claims against the Debtors subject to Bankruptcy Court approval; *provided, however*, that if the Debtors have been authorized to compromise or settle any Claims against the Debtors by a Final Order, including, without limitation, the Derivatives Procedures Order, the Plan Administrator shall be authorized to compromise or settle such Claims after the Effective Date in accordance with and subject to such Final Order;

(ii)    make Distributions to holders of Allowed Claims in accordance with the Plan;

(iii)    exercise its reasonable business judgment to direct and control the wind down, sale, liquidation and/or abandonment of the assets of the Debtors and/or Debtor-Controlled Entities under the Plan and in accordance with applicable law as necessary to maximize Distributions to holders of Allowed Claims;

(iv)    prosecute all Litigation Claims, including, without limitation, Avoidance Actions, on behalf of the Debtors, and to elect not to pursue any Litigation Claims and whether and when to compromise, settle, abandon, dismiss, or otherwise dispose of any Litigation Claims, as the Plan Administrator may determine is in the best interests of the Debtors.

(v)    make payments to professionals who will continue to perform in their current capacities;

(vi)    retain professionals as necessary to assist in performing its duties under the Plan;

(vii)    maintain the books and records and accounts of the Debtors;

(viii)    invest Cash of the Debtors, including any Cash proceeds realized from the liquidation of any assets of the Debtors, including any Litigation Claims, and any income earned thereon;

(ix)    incur and pay reasonable and necessary expenses of the administration and implementation of the Plan;

(x)    administer each Debtor's tax obligations, including (i) filing tax returns and paying associated obligations, (ii) request, if necessary, an expedited determination of

US_ACTIVE:\43795376\03\58399.0008

any unpaid tax liability of each Debtor or its estate under Bankruptcy Code section 505(b) for all taxable periods of such Debtor ending after the Commencement Date through the liquidation of such Debtor as determined under applicable tax laws and (iii) represent the interest and account of each Debtor or its estate before any taxing authority in all matters including, without limitation, any action, suit, proceeding or audit;

(xi)    prepare and file any and all informational returns, reports, statements, returns or disclosures relating to the Debtors that are required hereunder, by any Governmental Unit or applicable law;

(xii)    determine whether to create a Liquidating Trust for a Debtor or Debtor-Controlled Entity pursuant to section 10.1 of the Plan and which assets of such Debtor to transfer to such Liquidating Trust or to issue New Securities;

(xiii)    pay statutory fees in accordance with the terms of the Plan; and

(xiv)    perform such other duties and functions that are consistent with the implementation of the Plan.

### b.    Liability of Plan Administrator

The Plan Administrator will have no liability whatsoever for any acts or omissions in its capacity as Plan Administrator to the Debtors or holders of Claims against or Equity Interests in the Debtors other than for gross negligence or willful misconduct of the Plan Administrator.  LBHI, solely in its capacity as the Plan Administrator will be indemnified and held harmless by each of the Debtors for any losses incurred in such capacity, except to the extent such losses were the result of the Plan Administrator's gross negligence, willful misconduct, or criminal conduct.

### c.    Indenture Trustee and Creditors' Committee Members Fees

Subject to the entry of the Confirmation Order, the reasonable fees and expenses (including attorneys fees) of (i) the indenture trustee for the Senior Notes and the Subordinated Notes and (ii) the individual members of the Creditors' Committee, in each case, incurred in their capacities as indenture trustee or members of the Creditors' Committee, respectively, shall (a) to the extent accrued and unpaid as of the Confirmation Date, as applicable, be Allowed as Administrative Expense Claims and paid by the Debtors in accordance with the Debtor Allocation Agreement, and (b) to the extent incurred after the Confirmation Date, be Allowed as Administrative Expense Claims and paid by the Debtors on a monthly basis upon the submission of fee statements without further order of the Bankruptcy Court.[13]

### 4.    Treatment of Disputed Claims

The Debtors' rights to object to, oppose and defend against all Claims are fully preserved.  Notwithstanding that a Primary Claim is Allowed against a Primary Obligor, the

---

[13] The US Trustee has objected to this provision of the Plan.

Debtors reserve the right to object to, oppose and defend against all Guarantee Claims.  As of the Effective Date, the Plan Administrator will have the exclusive right to file and prosecute objections to Claims or request estimation hearings.   As of the Effective Date, the Plan Administrator will have the sole authority to compromise, settle, otherwise resolve or withdraw any objections to Claims and compromise, settle or otherwise resolve Disputed Claims without approval of the Bankruptcy Court.  Unless otherwise ordered by the Bankruptcy Court, on and after the Effective Date, the Plan Administrator will file all objections to Claims that are the subject of proofs of Claim or requests for payment filed with the Bankruptcy Court (other than applications for allowances of Compensation and Reimbursement Claims) and serve such objections upon the holder of the Claim as to which the objection is made as soon as is practicable, but in no event later than (i) two (2) years after the Effective Date or (ii) such later date as may be approved by the Bankruptcy Court for cause shown, after notice and a hearing.

If any portion of a Claim is a Disputed Claim, unless the Debtors determine otherwise, no Distribution shall be made on account of such Claim unless and until such Disputed Claim becomes an Allowed Claim.

In making Distributions, the Plan Administrator will, consistent with and subject to section 1124 of the Bankruptcy Code, retain from Available Cash an aggregate amount equal to the Pro Rata Share of Distributions that would have been made to each holder of a Disputed Claim if such Claim were an Allowed Claim against each Debtor in an amount equal to the least of (a) the filed amount of such Disputed Claim, (b) the amount determined, to the extent permitted by the Bankruptcy Code and Bankruptcy Rules, by the Bankruptcy Court for purposes of fixing the amount to be retained for such Claim, and (c) such other amount as may be agreed upon by the holder of such Disputed Claim and the Plan Administrator.  If a Disputed Claim later becomes an Allowed Claim, on the date of the first Distribution that is at least forty-five (45) days (or such fewer days as may be agreed between the applicable Debtor and the holder of the applicable Disputed Claim) after the date on which a Disputed Claim becomes an Allowed Claim, the Debtors shall remit to the holder of such Claim Available Cash equal to the amount that would have been distributed from the Effective Date through and including the date of such Distribution on account of such Allowed Claim had such Claim been allowed as of the Effective Date, together with any interest earned on the lesser of (i) such amount and (ii) the amount retained with respect to such Claim pursuant to the Plan, in each case, but only to the extent that such interest is attributable to the amount of the Allowed Claim; *provided*, that (x) such amount will be paid first out of the Available Cash retained on account of such Allowed Claim and second out of Available Cash other than Available Cash retained on account of other Disputed Claims and (y) if the amount available for Distribution (x) is insufficient to remit all Distributions required to be made to such holder pursuant to this sentence, such holder will receive the amount of such insufficiency on the next subsequent date(s) of Distribution before the holders of any other Claims against such Debtor receive any further Distributions out of Available Cash (other than Available Cash retained on account of other Disputed Claims) from such Debtor.  If a Disputed Claim is disallowed by a final order of the Bankruptcy Court or is Allowed in an amount less than the amount retained with respect to such Claim, any Available Cash that had been retained by the Plan Administrator on account of such Claim shall become Available Cash for Distribution to holders of Allowed Claims.  Unless otherwise ordered by the Bankruptcy Court, Available Cash retained on account of Disputed Claims will not be used by, on behalf of or for the benefit of a Debtor for operating expenses, costs or any purpose other than

as set forth in the Plan.  If the Plan Administrator determines, in its sole discretion, that the value of a Debtor's assets (other than such Debtor's Available Cash) exceeds the amount of Available Cash necessary to be retained on account of Disputed Claims against such Debtor, the Plan Administrator is permitted to, subject to Bankruptcy Court approval, on proper notice to all holders of Disputed Claims against such Debtor, release such Available Cash for Distribution to holders of Allowed Claims and retain, in lieu thereof, such Debtor's non-Cash assets to satisfy its Disputed Claims if such Claims become Allowed Claims.

The Plan Administrator may at any time request on behalf of any Debtor that the Bankruptcy Court estimate any contingent, unliquidated, or Disputed Claim, to the extent permitted by the Bankruptcy Code and Bankruptcy Rules, regardless of whether such Debtor previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection.  In the event that the Bankruptcy Court estimates any contingent, unliquidated or Disputed Claim, the amount so estimated may constitute (i) the Allowed amount of such Claim, (ii) a maximum limitation on such Claim, (iii) the amount to be retained in respect of a Claim or (iv) the amount of such Claim for voting purposes, all as determined by the Bankruptcy Court in accordance with the Bankruptcy Code and Bankruptcy Rules.

### E.    Provisions Governing Distributions

#### 1.    Obligations to Make Distributions

All distributions to be made to the holders of Allowed Claims pursuant to the Plan will receive such distributions from the Plan Administrator (as agent for the Debtors), which will have sole liability with respect thereto.

#### 2.    Post Petition Interest

In accordance with section 502(b)(2) of the Bankruptcy Code  (except as otherwise provided by sections 562 and 502(g)(2) of the Bankruptcy Code), the amount of all unsecured Claims against the Debtors will be calculated as of the Commencement Date.  Except as otherwise explicitly provided in the Plan, no holder of a Claim will be entitled to or will receive postpetition interest on their Claim.

#### 3.    Method of Distributions Under the Plan

##### a.    In General

All distributions under the Plan will be made by the Plan Administrator.  Subject to Bankruptcy Rule 9010, all distributions under the Plan to holders of Claims will be made to the holder of each Allowed Claim at the address of such holder as listed on the Schedules, unless such address has been superseded by a new address as set forth (a) on a proof of claim filed by a holder of an Allowed Claim or (b) in another writing notifying the Plan Administrator (at the addresses set forth in section 15.12 of the Plan) of a change of address.  In the event that any distribution to any such holder is returned as undeliverable, the Plan Administrator shall use reasonable efforts to determine the current address of such holder, but no distribution to such holder shall be made unless and until the Plan Administrator has determined the then current

address of such holder, at which time such distribution shall be made to such holder without interest.

### b.        Distributions of Cash

Other than with respect to a Convenience Claim or Convenience Guarantee Claim, no payment of Cash less than five-hundred dollars ($500) will be made by the Debtors to any holder of an Allowed Claim unless a request therefor is made in writing to the Plan Administrator.  Any payment of Cash under the Plan will, at the Plan Administrator's option, be made by check drawn on a domestic bank or wire transfer

### 4.        Timing of Distributions

### a.        Distributions of Available Cash

Payments and distributions to holders of Claims that are Allowed Claims on the Effective Date will be made on the Effective Date, or as soon thereafter as is practicable following the satisfaction of Allowed Administrative Expense Claims, Allowed Priority Tax Claims, Allowed Priority Non-Tax Claims and Allowed Secured Claims (to the extent the Debtors determine to pay such Allowed Secured Claims in Cash).

After the initial Distribution, each Debtor shall make Distributions of Available Cash in accordance with the Plan to holders of Allowed Claims against such Debtor semi-annually on March 30 and September 30 of each year, provided that each such Distribution in the aggregate is not less than $10,000,000 of such Debtor's Available Cash; provided that, the Plan Administrator may determine, in its sole discretion, to make Distributions in amounts less than $10,000,000 of any Debtor's Available Cash.  Any payment or distribution required to be made under the Plan on a day other than a Business Day will be made on the next succeeding Business Day.

### b.        Distributions on Claims After Allowance

The Plan Administrator may determine, in its sole discretion, not to make a Distribution to the holder of an Allowed Claim on the basis that it has not yet determined whether to object to such Claim and such Claim shall be treated as a Disputed Claim for purposes of Distributions under the Plan until the Plan Administrator (i) determines not to object to such Claim (or the time to object to Claims expires), (ii) agrees with the holder of such Claim to allow such Claim in an agreed upon amount or (iii) objects to such Claim and such Claim is Allowed by a Final Order.  To the extent that a Liquidating Trust is established for a Debtor in accordance with Article X of the Plan, any Distributions to be made to holders of Allowed Claims thereafter shall be made by the Liquidating Trustee to such holders as holders of Liquidating Trust Interests, in accordance with the provisions of the Plan.  Distributions of Cash on account of such Liquidating Trust Interests shall be made in accordance with section 10.7 of the Plan.

### c.        Claims Register

The register of Claims maintained by the Debtors shall remain open after the Effective Date and the Debtors and Plan Administrator shall recognize any transfer of Claims at any time thereafter other than during the period commencing fourteen (14) calendar days prior to and concluding fourteen (14) calendar days after a Distribution Date.  Except as otherwise provided in the Plan, any transfer of a Claim, whether occurring prior to or after the Confirmation Date, shall not affect or alter the classification and treatment of such Claim under the Plan and any such transferred Claim shall be subject to classification and treatment under the Plan as if such Claim were held by the party holding such Claim on the Commencement Date. For example, a claim filed by an Affiliate of the Debtors that is transferred to an entity that is not an Affiliate of the Debtors, will be treated as an Affiliate Claim and included in the applicable Class.

### d.        Time Bar to Cash Payment Rights

Checks issued in respect of Allowed Claims shall be null and void if not negotiated within ninety (90) days after the date of issuance thereof.  Requests for reissuance of any check shall be made to the Plan Administrator by the holder of the Allowed Claim to whom such check originally was issued.  Any claim in respect of such a voided check shall be made on or before ninety (90) days after the expiration of the ninety (90) day period following the date of issuance of such check.  Thereafter, the Distribution amount represented by such voided check shall irrevocably revert to the applicable Debtor as Available Cash for Distribution to holders of Allowed Claims and any claim or demand in respect of such voided check shall be discharged and forever barred from assertion against such Debtor and its property.

### 5.        Unclaimed Distributions

All distributions under the Plan that are unclaimed for a period of six (6) months after distribution thereof will be deemed unclaimed property under section 347(b) of the Bankruptcy Code and revested in the Debtors and any entitlement of any holder of any claim or demand to such distributions will be discharged and forever barred from assertion against such Debtor or its respective property.

### 6.        Withholding and Reporting Requirements

In connection with the Plan and all instruments issued in connection therewith and distributed thereon, the Plan Administrator or the Liquidating Trustee (as applicable) shall comply with all applicable withholding and reporting requirements imposed by any federal, state, or local taxing authority, and all Distributions shall be subject to any such withholding or reporting requirements.  All such amounts withheld and paid to the appropriate Governmental Unit shall be treated as distributed to such holders.  Notwithstanding the above, each holder of an Allowed Claim or Liquidating Trust Interest that is to receive a Distribution shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any Governmental Unit, including income, withholding and other tax obligations, on account of such Distribution.  The Plan Administrator or the Liquidating Trustee (as applicable), has the right, but not the obligation, not to make a Distribution until such holder has made arrangements

satisfactory to such issuing or disbursing party for payment of any such tax obligations. The Plan Administrator or the Liquidating Trustee (as applicable), may require, as a condition to receipt of a Distribution, that the holder of an Allowed Claim or Liquidating Trust Interest provide a completed Form W-8, W-9 and/or other tax information deemed necessary in the sole discretion of the Plan Administrator or Liquidating Trustee, as applicable to each such holder; provided that if the Plan Administrator or Liquidating Trustee (as applicable) makes such a request and the holder fails to comply before the date that is 180 days after the request is made, the amount of such Distribution shall irrevocably revert to the applicable Debtor or Liquidating Trust and any Claim in respect of such Distribution shall be discharged and forever barred from assertion against such Debtor, Liquidating Trust, or its respective property.

### 7.    Setoff and Recoupment

Any Debtor may setoff against or recoup from any Claim and the payments to be made pursuant to the Plan in respect of such Claim, any Claims of any nature whatsoever that the Debtor may have against the claimant; *provided, however*, that the claimant is provided written notice of the proposed setoff or recoupment at least ten (10) Business Days prior thereto, and, if such claimant files a written objection to such proposed setoff or recoupment, the Debtor shall not proceed with the setoff or recoupment absent the withdrawal of such objection or the entry of a Final Order overruling such objection but may withhold such payment pending resolution of such objection. Neither the failure of a Debtor to setoff against or recoup from any Claim, nor the allowance of any Claim will constitute a waiver or release by the Debtor of any such Claim the Debtor may have against such claimant.

### 8.    Distributions to Non-Controlled Affiliates

Except as otherwise agreed by the Debtors and a Non-Controlled Affiliate, the Plan Administrator may determine, in its sole discretion, to withhold all or a portion of a Distribution to a Non-Controlled Affiliate if such Distribution would be distributed by such Non-Controlled Affiliate to satisfy a Claim of a different Non-Controlled Affiliate against which a Debtor has a Claim but the latter Non-Controlled Affiliate has refused to honor such Claim of a Debtor without subordination, reduction or offset unless (a) otherwise agreed to by the Plan Administrator or (b) the priority and amount of a Debtor's Claim against the latter Non-Controlled Affiliate has been determined by Final Order. There are numerous intercompany claims among the Debtors and their Affiliates, resulting in certain of such claims being circular. This provision is intended to enable the Plan Administrator to withhold a portion of a payment to an Affiliate if one of the Affiliates in the circular chain that owes amounts back to a Debtor refuses to honor, or seeks to subordinate, a Debtor's claims. This provision does not apply to the Affiliate Claims of LBT or LBSN against a Debtor.

LBF believes that the Plan cannot be confirmed unless section 8.15 of the Plan is substantially modified because LBF believes that as drafted, section 8.15 violates, among other principles of law, section 1123(a)(4) of the Bankruptcy Code and principles of comity. The Debtors disagree with LBF's position.

US_ACTIVE:\43795376\03\58399.0008

9.      **Maximum Distribution**

An (i) Allowed Claim that receives Distributions (excluding any Distributions contributed to the Plan Adjustment on account of such Allowed Claim) in the Allowed amount of such Claim or (ii) Allowed Guarantee Claim that receives Distributions (excluding any Distributions contributed to the Plan Adjustment on account of such Allowed Guarantee Claim) that combined with Distributions or other consideration provided on the corresponding Primary Claim (excluding any Distributions contributed to the Plan Adjustment on account of such Primary Claim)  equal the Allowed amount of such Guarantee Claim (or such amount as may be agreed to by a holder and the Debtors), will be deemed satisfied in full as to such Allowed Claim or Allowed Guarantee Claim against the applicable Debtor.  To the extent that an Allowed Guarantee Claim is deemed satisfied in full, LBHI will be entitled to receive such Distributions or consideration on account of the corresponding Primary Claim as subrogee to the extent of LBHI's Distribution on account of such Guarantee Claim less any amounts received by LBHI by way of disgorgement.  Except as specifically provided with respect to LBHI's rights of subrogation set forth above, nothing contained in the Plan in any way affects the rights of the holder of a Guarantee Claim with respect to a corresponding Primary Claim against a Primary Obligor that is not a Debtor.

An Allowed Claim will not be entitled to receive a Distribution (excluding any Distributions contributed to the Plan Adjustment on account of such Allowed Claim) in excess of the Allowed amount of such Claim.  A holder of an Allowed Guarantee Claim will not be entitled to receive a Distribution (excluding any Distributions contributed by such holder to the Plan Adjustment on account of such Allowed Guarantee Claim) that combined with Distributions or other consideration provided on the corresponding Primary Claim (excluding any Distributions contributed to the Plan Adjustment on account of such Primary Claim) are in excess of the Allowed amount of the Guarantee Claim (or such amount as may be agreed to by a holder and the Debtors).

The Plan Administrator may, in its sole discretion, request that a holder of an Allowed Guarantee Claim for which the Primary Obligor on the corresponding Primary Claim is neither a Subsidiary Debtor nor LBT, certify in writing and provide evidence reasonably satisfactory to the Plan Administrator to confirm whether (i) the Primary Claim has been Allowed or disallowed against the Primary Obligor, and, if Allowed, the amount of such Allowed Primary Claim, (ii) the Primary Claim is disputed or subject to objection by a Foreign Administrator or other party, (iii) the consideration, if any, received to date on account of such Allowed Primary Claim from the Primary Obligor, (iv) such holder has been notified by or on behalf of the Primary Obligor of any future distributions or payment anticipated or estimated to be made on account of such Primary Claim from the Primary Obligor or (v) the holder (A) has sufficient assets to satisfy an order or judgment to disgorge any Distributions received with respect to such Allowed Guarantee Claim if it is ultimately determined that such holder is required to disgorge all or a portion of such Distributions and (B) will submit to the jurisdiction of the Bankruptcy Court for purposes of such order or judgment and will not contest the enforcement of such order or judgment in any foreign jurisdiction.  If the holder does not also certify, in addition to the foregoing, that the holder has sufficient assets in the United States of America to satisfy an order to disgorge any Distributions with respect to such Allowed Guarantee Claim, unless the Bankruptcy Court orders otherwise, the Plan Administrator may

require that the holder post security for any obligation to disgorge Distributions made to such holder on account of such Allowed Guarantee Claim as a condition to the receipt of future Distributions on such Claim if the Plan Administrator reasonably determines that such security is necessary to ensure the recovery of any amount of Distributions made by LBHI to such holder that is ordered to be disgorged.

If (i) the Plan Administrator determines, based on the foregoing, that an Allowed Guarantee Claim has been satisfied in full in accordance with Section 8.13(a) of the Plan, then unless the Bankruptcy Court orders otherwise, no Distributions will thereafter be made on account of such Allowed Guarantee Claim, or (ii) the holder of an Allowed Guarantee Claim does not comply with the requirements set forth in Section 8.13 of the Plan, then unless the Bankruptcy Court orders otherwise, the Plan Administrator will not be required to make Distributions on account of such Allowed Guarantee Claim; *provided* that nothing in the Plan will preclude a holder of an Allowed Guarantee Claim from challenging the determination of the Plan Administrator in the Bankruptcy Court; *provided, further,* that the Plan Administrator will reserve Distributions with respect to such Allowed Guarantee Claim and, unless such Allowed Guarantee Claim has been satisfied in full in accordance with Section 8.13(a) of the Plan, promptly after compliance with this section the Plan Administrator will remit to the holder of such Allowed Guarantee Claim the lesser of (x) the amount reserved on account of such Allowed Guarantee Claim or (y) the amount necessary to satisfy such Allowed Guarantee Claim in full in accordance with Section 8.13(a) of the Plan.

To the extent that any Debtor has Available Cash after all Allowed Claims against that Debtor have been satisfied in full in accordance with Section 8.13(a) of the Plan, each holder of each such Allowed Claim will receive its Pro Rata Share of further Distributions, if any, to the fullest extent permissible under the Bankruptcy Code in satisfaction of postpetition interest on the Allowed amount of such Claims at the rate applicable in the contract or contracts on which such Allowed Claim is based (or, absent such contractual rate, at the statutory rate) until such time as all postpetition interest on all such Allowed Claims has been paid in full.

For purposes of determining whether an Allowed Claim has been satisfied in full, all Distributions or other consideration provided by a Primary Obligor in a currency other than the U.S. Dollar will be converted to the U.S. Dollar applying the existing exchange rate derived from Reuters existing at approximately 3:00 p.m. GMT on the Confirmation Date. Nothing contained in the Plan affects the applicable exchange rate for determining the Allowed amount of any Claim under section 502(b) of the Bankruptcy Code.

## 10.     Rights of Reimbursement

Except as otherwise agreed by the Debtors, to the extent that a Debtor now has or becomes legally entitled to be subrogated to the rights of any Creditor on account of Distributions made to such Creditor, including, without limitation, on account of any Distributions made to holders of Allowed Guarantee Claims, (a) such Creditor will be deemed to have consented to the subrogation of its right against any third-party, including, without limitation, a Primary Obligor, that may be obligated to reimburse or indemnify the Debtor for all or a portion of such Distribution, or (b) the Debtor will have all rights, title and power as

108

subrogee of the Creditor against any such third-party, including, without limitation, a Primary Obligor, to the fullest extent permitted by applicable law.

Except as otherwise agreed by the Debtors, the Debtors' rights to assert and prosecute Litigation Claims for reimbursement, indemnification, recoupment or any other similar right, including, without limitation, any right to setoff with respect to any of the foregoing, against any entity, including, without limitation, a Primary Obligor, on account of Distributions made to the holders of Allowed Claims or Allowed Guarantee Claims shall be fully preserved to the fullest extent permitted by applicable law.

### F.     Treatment of Executory Contracts and Unexpired Leases

The Bankruptcy Code grants the Debtors the power, subject to the approval of the Bankruptcy Court, to assume or reject executory contracts and unexpired leases.  If an executory contract or unexpired lease is rejected, the counterparty to such contract or lease agreement may file a Claim for damages incurred by reason of the rejection.  In the case of rejection of leases of real property, such damage Claims are subject to certain limitations imposed by the Bankruptcy Code.

### 1.     Rejected Contracts and Leases of the Debtors

Pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, all executory contracts and unexpired leases that exist between a Debtor and any person or entity shall be deemed rejected by such Debtor, as of the Effective Date, except for any executory contract or unexpired lease (i) that has been assumed pursuant to an Order of the Bankruptcy Court entered prior to the Effective Date, (ii) as to which a motion for approval of the assumption or rejection of such executory contract or unexpired lease has been filed prior to the Confirmation Date, or (iii) that is specifically designated in the Plan Supplement as a contract or lease to be assumed by the Debtor.

### 2.     Assumed Contracts and Leases of the Debtors

Entry of the Confirmation Order shall, subject to and upon the occurrence of the Effective Date, constitute (i) the approval, pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, of the assumption of the executory contracts and unexpired leases assumed or assumed and assigned pursuant to the Plan and (ii) the approval, pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, of the rejection of the executory contracts and unexpired leases rejected pursuant to the Plan.  To the extent any provision of an executory contract or unexpired lease to be assumed by any of the Debtors under the Plan limits such Debtor's ability to assign such executory contract or unexpired lease, the effectiveness of such provision shall be limited or nullified to the full extent provided in section 365(f) of the Bankruptcy Code.

### 3.     Right to Modify Schedules of Assumed Contracts

The Debtors reserve the right, on or prior to the Confirmation Date, to amend the Plan Supplement to remove any executory contract or unexpired lease therefrom or add any executory contract or unexpired lease thereto, in which event such executory contract(s) or unexpired lease(s) will, as of the Effective Date, be deemed to be, respectively, rejected or

assumed.  The Debtors will provide notice of any amendments to the Plan Supplement to the parties to the executory contracts and unexpired leases affected thereby.  The listing of or failure to list a document in the Plan Supplement will not constitute an admission by the Debtors that such document is or is not an executory contract or an unexpired lease or that the Debtors have any liability thereunder.

**4.     Insurance Policies**

To the extent that any of the Debtors' insurance policies and any agreements, documents or instruments with insurers relating thereto constitute executory contracts, such contracts shall be deemed assumed under the Plan.  The treatment of the Debtors' insurance policies and any agreements, documents or instruments relating thereto as executory contracts under the Plan will not constitute or be deemed a waiver of any Litigation Claim that the Debtors may hold against any entity, including, without limitation, the insurer under any of the Debtors' policies of insurance.

**5.     Cure of Defaults**

Except as may otherwise be agreed to by the parties, within thirty (30) days after the Effective Date, the Debtors will cure any and all undisputed defaults under any executory contract or unexpired lease assumed by the Debtors pursuant to the Plan, in accordance with section 365(b) of the Bankruptcy Code.  All disputed defaults that are required to be cured will be cured either within thirty (30) days of the entry of a Final Order determining the amount, if any, of the Debtor's liability with respect thereto or as may otherwise be agreed to by the parties.

**6.     Bar Date for Filing Proofs of Claim Relating to Executory Contracts and Unexpired Leases Rejected Pursuant to the Plan**

Claims arising out of the rejection of an executory contract or unexpired lease pursuant to the Plan must be filed with the Bankruptcy Court and served upon the Debtors no later than forty-five (45) days after the later of (i) notice of entry of an order approving the rejection of such executory contract or unexpired lease, (ii) notice of entry of the Confirmation Order and the occurrence of the Effective Date, and (iii) notice of an amendment to the Plan Supplement relating to such executory contract or unexpired lease.  Except as set forth in the preceding sentence, all such Claims must otherwise comply with the provisions of the Bar Date Order.  All such Claims not filed in accordance with the foregoing and within such time will be forever barred from assertion against the Debtors and their estates.

**G.     Conditions Precedent to Plan's Confirmation and Effective Date**

**1.     Conditions to Confirmation of the Plan**

Confirmation of the Plan with respect to each Debtor is conditioned on:

(a)     the Bankruptcy Court having entered a Confirmation Order with respect to the Plan for LBHI and all of the Participating Subsidiary Debtors in form and substance satisfactory to the respective Debtor and the Creditors' Committee; and

(b)     The Bankruptcy Court shall have entered an order granting the Structured Securities Procedures Motion in form and substance satisfactory to the Debtors and the Creditors' Committee.

## 2.     Conditions to Effective Date

The Plan will not become effective unless and until the following conditions will have been satisfied pursuant to the Plan:

(a)     the Confirmation Order, in form and substance acceptable to the Debtors and the Creditors' Committee shall have been signed by the judge presiding over the Chapter 11 Cases, and there shall not be a stay or injunction in effect with respect thereto;

(b)     all actions and all agreements, instruments or other documents necessary to implement the terms and provisions of the Plan shall have been effected or executed and delivered, as applicable, in form and substance satisfactory to the Debtors;

(c)     all authorizations, consents and regulatory approvals, if any, required by the Debtors in connection with the consummation of the Plan have been obtained and not revoked; and

(d)     the certificate of incorporation and by-laws of the Debtors shall have been amended to the extent necessary to effectuate the Plan.

## 3.     Waiver of Conditions

The Debtors, with the consent of the Creditors' Committee, and to the extent not prohibited by applicable law, may waive the occurrence of the conditions precedent to the confirmation and effectiveness of the Plan set forth above.  Any such waiver may be effected at any time, without notice, without leave or order of the Bankruptcy Court, and without any formal action other than proceeding to consummate the Plan.

## H.     Effect of Confirmation of the Plan

## 1.     Release, Exculpation and Limitation of Liability

On and after the Effective Date, the Debtors and all entities who have held, hold or may hold Claims against or Equity Interests in any or all of the Debtors (whether proof of such Claims or Equity Interests has been filed or not), along with their respective present or former employees, agents, officers, directors or principals, shall be deemed to have released (a) the Released Parties[14] from, and none of the Released Parties shall have or incur any liability for,

---

[14]  Released Parties means, collectively, and in each case, solely in such capacity, the Debtors, the Independent Directors, the Plan Administrator, the Creditors' Committee, each current and former member of the Creditors' Committee and, with respect to each of the foregoing, their respective officers, directors, managers, members, accountants, financial advisors, investment bankers, agents, restructuring advisors, attorneys, representatives or other professionals serving during the pendency of the Chapter 11 Cases (solely in their capacity as officers, directors, managers, members, accountants, financial advisors, investment bankers, agents, restructuring advisors, attorneys, representatives or other professionals serving during the pendency of the Chapter 11 Cases).

any Claim for, Cause of Action for or other assertion of liability for any act taken or omitted to be taken during the Chapter 11 Cases in connection with, or arising out of, the Chapter 11 Cases, the negotiation, formulation, dissemination, confirmation, consummation or administration of the Plan, property to be distributed under the Plan or any other act or omission in connection with the Chapter 11 Cases, the Plan, the Disclosure Statement, the Plan Support Agreements or any contract, instrument, document or other agreement related thereto and (b) the PSA Creditors from, and none of the PSA Creditors will have or incur any liability for, any Claim for, Cause of Action for or other assertion of liability for any act taken or omitted to be taken in connection with, or arising out of, the negotiation, formulation, dissemination or confirmation, consummation or administration of the Plan, or any other act or omission in connection with the Plan, the Disclosure Statement, the Plan Support Agreements, including the filing of any alternative chapter 11 plan and any determination to not pursue solicitation or confirmation of such alternative plan or any contract, instrument, document or other agreement related thereto; *provided, however*, that (i) in no event shall any Litigation Claim, Cause of Action or other Claim or assertion of liability against any Released Party or PSA Creditor for any act taken or omitted to be taken prior to the Commencement Date be released by the Plan, (ii) nothing herein shall affect or release any obligation of the Debtors under the Plan, and (iii) nothing in the Plan shall affect the liability of any person that otherwise would result from any such act or omission to the extent such act or omission is determined by a Final Order to have constituted willful misconduct or gross negligence*; provided, further*, that nothing in this Plan shall limit the liability of the professionals of the Debtors, the Creditors' Committee or the PSA Creditors to their respective clients pursuant to N.Y. Comp. Codes R. & Regs. tit. 22 § 1200.8, Rule 1.8(h)(1)(2009).

### 2.      Discharge

Except as expressly provided in the Plan, upon the date that all Distributions under the Plan have been made, (a) each holder (as well as any trustees and agents on behalf of each holder) of a Claim against or Equity Interest in a Debtor shall be deemed to have forever waived, released and discharged the Debtors, to the fullest extent permitted by section 1141 of the Bankruptcy Code, of and from any and all Claims, Equity Interests, rights and liabilities that arose prior to the Effective Date and (b) all such holders shall be forever precluded and enjoined, pursuant to section 524 of the Bankruptcy Code, from prosecuting or asserting any discharged Claim against or terminated Equity Interest in the Debtors.

### 3.      Injunction

Except as expressly provided in the Plan, the Confirmation Order, or a separate order of the Bankruptcy Court, all entities who have held, hold or may hold Claims against or Equity Interests in any or all of the Debtors and other parties in interest (whether proof of such Claims or Equity Interests has been filed or not), along with their respective present or former employees, agents, officers, directors or principals, are permanently enjoined, on and after the Effective Date, solely with respect to any Claims and Causes of Action which are extinguished or released pursuant to the Plan from (i) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including, without limitation, any proceeding in a judicial, arbitral, administrative or other forum) against or affecting the Released Parties or the property of any of the Released Parties, (ii) enforcing,

levying, attaching (including, without limitation, any prejudgment attachment), collecting, or otherwise recovering by any manner or means, whether directly or indirectly, any judgment, award, decree, or order against the Released Parties or the property of any of the Released Parties, (iii) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against the Released Parties or the property of any of the Released Parties, (iv) asserting any right of setoff, directly or indirectly, against any obligation due the Released Parties or the property of any of the Released Parties, except as contemplated or allowed by the Plan; (v) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan; and (vi) taking any actions to interfere with the implementation or consummation of the Plan.

### 4.   United States Government Exception To Discharge

As to the United States, its agencies, departments or agents, nothing in the Plan or Confirmation Order shall discharge, release or otherwise preclude: (a) any liability of the Debtors arising on or after the Effective Date; (b) any liability that is not a Claim against a Debtor; (c) any valid right of setoff or recoupment; or (d) any liability of the Debtors arising under environmental or criminal laws as the owner or operator of property that such Debtor owns after the Effective Date. The discharge and injunction provisions contained in the Plan and Confirmation Order are not intended and shall not be construed to bar the United States from, subsequent to the Effective Date, pursuing any police or regulatory action.

### 5.   Retention of Litigation Claims and Reservation of Rights

Except as expressly provided in the Plan, nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or the relinquishment of any rights, defenses or Litigation Claims that the Debtors may have or choose to assert on behalf of their respective estates under any provision of the Bankruptcy Code or any applicable nonbankruptcy law that the Debtors had prior to the Effective Date, including, without limitation, (a) any and all Claims against any person or entity, to the extent such person or entity asserts a crossclaim, counterclaim, and/or Claim for setoff which seeks affirmative relief against the Debtors, their officers, directors, or representatives, (b) any and all Claims or rights arising under any tax sharing agreement among the Debtors and their Affiliates (including the tax sharing agreement among the Debtors and LBI based on their regular and consistent course of conduct over many years), (c) any and all Claims for reimbursement of costs incurred for the benefit of any Affiliate, including in connection with the disposition of an Affiliate's assets; (d) any and all Avoidance Actions, and (e) any right of setoff or other legal or equitable defense and remedies. The Debtors shall have, retain, reserve, and may assert all such rights, defenses or Litigation Claims after the Effective Date fully as if the Chapter 11 Cases had not been commenced.

### 6.   Terms of Injunctions or Stays

Unless otherwise provided in the Plan, the Confirmation Order, or a separate order of the Bankruptcy Court, all injunctions or stays arising under or entered during the Chapter 11 Cases under section 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the closing of all of the Chapter 11 Cases.

### I.    Liquidating Trust

### 1.    Certain Provisions Regarding a Liquidating Trust

After the Effective Date, and only if the Plan Administrator determines that one or more Liquidating Trusts are in the best interests of one or more Debtors and holders of Allowed Claims against and Equity Interests in such Debtors, the Plan Administrator and a Liquidating Trustee will execute a Liquidating Trust Agreement, and will take all other necessary steps to establish a Liquidating Trust and Liquidating Trust Interests therein, which will be for the benefit of the Liquidating Trust Beneficiaries.  In the event of any conflict between the terms of section 10.1 of the Plan and the terms of a Liquidating Trust Agreement as such conflict relates to the establishment of a Liquidating Trust, the terms of section 10.1 of the Plan will govern. Liquidating Trust Agreements may provide powers, duties and authorities in addition to those explicitly stated herein, but only to the extent that such powers, duties, and authorities do not affect the status of the Liquidating Trust as a "liquidating trust" for United States federal income tax purposes.

Each Liquidating Trust will be established for the sole purpose of liquidating and distributing the assets of the Debtor contributed to such Liquidating Trust in accordance with Treasury Regulation section 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business.

Each Liquidating Trust will consist of Liquidating Trust Assets.  After the creation of a Liquidating Trust pursuant to section 10.1 of the Plan, the Plan Administrator will transfer all of the Liquidating Trust Assets to a Liquidating Trust.  The Liquidating Trust Assets may be transferred subject to certain liabilities, as provided in a Liquidating Trust Agreement. Such transfer will be exempt from any stamp, real estate transfer, mortgage reporting, sales, use or other similar tax pursuant to section 1146(a) of the Bankruptcy Code.

A Liquidating Trustee will have the same authority in respect of all taxes of the Debtors, and to the same extent, as if a Liquidating Trustee were the Debtor.

A Liquidating Trustee may invest Cash (including any earnings thereon or proceeds therefrom); provided, however, that such investments are investments permitted to be made by a "liquidating trust" within the meaning of Treasury Regulation section 301.7701-4(d), as reflected therein, or under applicable IRS guidelines, rulings or other controlling authorities.

A Liquidating Trustee is required to distribute to the holders of Allowed Claims on account of their Liquidating Trust Interests, on a semi-annual basis, all Available Cash (including any Cash received from the Debtors and treating any permissible investment as Cash for purposes section 10.7 of the Plan), less such amounts that may be reasonably necessary to (a) meet contingent liabilities and to maintain the value of the Liquidating Trust Assets during liquidation, (b) pay reasonable incurred or anticipated expenses (including, but not limited to, any taxes imposed on or payable by the Debtors or a Liquidating Trust or in respect of Liquidating Trust Assets), or (c) satisfy other liabilities incurred or anticipated by a Liquidating Trust in accordance with the Plan or a Liquidating Trust Agreement; provided, however, that a Liquidating Trustee will not be required to make a Distribution pursuant to section 10.7 of the

Plan if such Liquidating Trustee determines that the expense associated with making the Distribution would likely utilize a substantial portion of the amount to be distributed, thus making the Distribution impracticable.

### 2. Federal Income Tax Treatment of Liquidating Trust

For all United States federal income tax purposes, all parties (including, without limitation, the Debtors, a Liquidating Trustee and the Liquidating Trust Beneficiaries) will treat the transfer of Liquidating Trust Assets to a Liquidating Trust as (1) a transfer of Liquidating Trust Assets (subject to any obligations relating to those assets) directly to Liquidating Trust Beneficiaries (other than to the extent Liquidating Trust Assets are allocable to Disputed Claims), followed by (2) the transfer by such beneficiaries to a Liquidating Trust of Liquidating Trust Assets in exchange for Liquidating Trust Interests.  Accordingly, Liquidating Trust Beneficiaries will be treated for United States federal income tax purposes as the grantors and owners of their respective share of Liquidating Trust Assets (other than such Liquidating Trust Assets as are allocable to Disputed Claims).  The foregoing treatment will also apply, to the extent permitted by applicable law, for state and local income tax purposes.

### 3. Tax Reporting

A Liquidating Trustee will file tax returns for a Liquidating Trust treating such Liquidating Trust as a grantor trust pursuant to Treasury Regulation section 1.671-4(a) and in accordance with the Plan.  A Liquidating Trustee also will annually send to each holder of a Liquidating Trust Interest a separate statement regarding the receipts and expenditures of the Liquidating Trust as relevant for U.S. federal income tax purposes and will instruct all such holders to use such information in preparing their U.S. federal income tax returns or to forward the appropriate information to such holder's underlying beneficial holders with instructions to utilize such information in preparing their U.S. federal income tax returns.

Allocations of Liquidating Trust taxable income among Liquidating Trust Beneficiaries (other than taxable income allocable to any assets allocable to, or retained on account of, Disputed Claims) will be determined by reference to the manner in which an amount of Cash representing such taxable income would be distributed (were such Cash permitted to be distributed at such time) if, immediately prior to such deemed Distribution, a Liquidating Trust had distributed all its assets (valued at their tax book value, other than assets allocable to Disputed Claims) to the holders of Liquidating Trust Interests, adjusted for prior taxable income and loss and taking into account all prior and concurrent Distributions from such Liquidating Trust.  Similarly, taxable loss of a Liquidating Trust will be allocated by reference to the manner in which an economic loss would be borne immediately after a hypothetical liquidating distribution of the remaining Liquidating Trust Assets.  The tax book value of Liquidating Trust Assets for purpose of this paragraph will equal their fair market value on the date Liquidating Trust Assets are transferred to a Liquidating Trust, adjusted in accordance with tax accounting principles prescribed by the IRC, the applicable Treasury Regulations, and other applicable administrative and judicial authorities and pronouncements.

As soon as reasonably practicable after Liquidating Trust Assets are transferred to a Liquidating Trust, a Liquidating Trustee will make a good faith valuation of such Liquidating

Trust Assets. Such valuation will be made available from time to time to all parties to a Liquidating Trust (including, without limitation, the Debtors and Liquidating Trust Beneficiaries), to the extent relevant to such parties for tax purposes, and will be used consistently by such parties for all United States federal income tax purposes.

Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt by a Liquidating Trustee of a private letter ruling if a Liquidating Trustee so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by a Liquidating Trustee), a Liquidating Trustee (i) may timely elect to treat any Liquidating Trust Assets allocable to Disputed Claims as a "disputed ownership fund" governed by Treasury Regulation section § 1.468B-9, and (ii) to the extent permitted by applicable law, will report consistently for state and local income tax purposes. If a "disputed ownership fund" election is made, all parties (including a Liquidating Trustee, the Debtors and the Liquidating Trust Beneficiaries) will report for United States federal, state and local income tax purposes consistently with the foregoing.

A Liquidating Trustee will be responsible for payment, out of the Liquidating Trust Assets, of any taxes imposed on the Liquidating Trust or its assets.

A Liquidating Trustee may request an expedited determination of taxes of a Liquidating Trust, including any reserve for Disputed Claims, or of the Debtor as to whom such Liquidating Trust was established, under section 505(b) of the Bankruptcy Code for all tax returns filed for, or on behalf of, such Liquidating Trust or the Debtor for all taxable periods through the dissolution of such Liquidating Trust

### 4.    Dissolution of a Liquidating Trust

A Liquidating Trustee and Liquidating Trust will be discharged or dissolved, as the case may be, at such time as (i) all Liquidating Trust Assets have been distributed pursuant to the Plan and a Liquidating Trust Agreement, (ii) a Liquidating Trustee determines, in its sole discretion, that the administration of any remaining Liquidating Trust Assets is not likely to yield sufficient additional Liquidating Trust proceeds to justify further pursuit, or (iii) all Distributions required to be made by a Liquidating Trustee under the Plan and a Liquidating Trust Agreement have been made; provided, however, that in no event will a Liquidating Trust be dissolved later than three (3) years from the creation of such Liquidating Trust pursuant to section 10.1 of the Plan unless the Bankruptcy Court, upon motion within the six-month period prior to the third (3rd) anniversary (or within the six-month period prior to the end of an extension period), determines that a fixed period extension (not to exceed three (3) years, together with any prior extensions, without a favorable private letter ruling from the IRS or an opinion of counsel satisfactory to a Liquidating Trustee that any further extension would not adversely affect the status of the trust as a liquidating trust for United States federal income tax purposes) is necessary to facilitate or complete the recovery and liquidation of the Liquidating Trust Assets.

If at any time a Liquidating Trustee determines, in reliance upon such professionals as such Liquidating Trustee may retain, that the expense of administering a Liquidating Trust so as to make a final Distribution to the Liquidating Trust Beneficiaries is likely to exceed the value of the assets remaining in such Liquidating Trust, such Liquidating

Trustee may apply to the Bankruptcy Court for authority to (i) reserve any amount necessary to dissolve the Liquidating Trust, (ii) donate any balance to a charitable organization (A) described in section 501(c)(3) of the IRC, (B) exempt from United States federal income tax under section 501(a) of the IRC, (C) not a "private foundation", as defined in section 509(a) of the IRC, and (D) that is unrelated to the Debtors, the Liquidating Trust, and any insider of the Liquidating Trustee, and (iii) dissolve the Liquidating Trust

### J.    Summary of Other Provisions of Plan

The following subsections summarize certain other significant provisions of the Plan.  The Plan should be referred to for the complete text of these and other provisions of the Plan.

### 1.    Amendment or Modification of the Plan

Subject to the terms and conditions of the Plan Support Agreements, alterations, amendments or modifications of or to the Plan may be proposed in writing by the Debtors at any time prior to the Confirmation Date, provided that the Plan, as altered, amended or modified, satisfies the conditions of sections 1122 and 1123 of the Bankruptcy Code, and the Debtors shall have complied with section 1125 of the Bankruptcy Code.  Subject to the terms and conditions of the Plan Support Agreements, the Plan may be altered, amended or modified at any time after the Confirmation Date and before substantial consummation, provided that the Plan, as altered, amended or modified, satisfies the requirements of sections 1122 and 1123 of the Bankruptcy Code and the Bankruptcy Court, after notice and a hearing, confirms the Plan, as altered, amended or modified, under section 1129 of the Bankruptcy Code.  A holder of a Claim that has accepted the Plan shall be deemed to have accepted the Plan, as altered, amended or modified, to. the proposed alteration, amendment or modification does not adversely change the treatment of the Claim of such holder as provided in Bankruptcy Rule 3019.

### 2.    Survival of Debtors' Reimbursement Obligations of Officers and Directors

The obligations of each Debtor to indemnify, defend, reimburse or limit the liability of (i) directors, officers and any other employee who is held responsible for obligations of the Debtor incurred after the Commencement Date who are directors, officers or employees of such Debtor or a Debtor-Controlled Entity on or after the Commencement Date and (ii) Released Parties, respectively, against any Claims or Causes of Action as provided in the Debtor's articles of organization, certificates of incorporation, bylaws, other organizational documents or applicable law, will survive confirmation of the Plan, will be assumed by such Debtor and will remain in effect after the Effective Date.  Any such assumed obligations owed in connection with an event occurring after the Commencement Date shall be paid as an Administrative Expense under the Plan.  Any such assumed obligation owed in connection with an event occurring before the Commencement Date shall be treated as pre-petition Claims under the Plan.  Nothing in the Plan shall in any way limit, modify, alter, or amend the Debtors' limitation of liability of the Independent Directors set forth in section 10.1 of the Restated Certificate of Incorporation.

117

### 3. Allocation of Plan Distributions Between Principal and Interest

Pursuant to the Plan, to the extent that any Allowed Claim entitled to a distribution under the Plan is comprised of indebtedness and accrued but unpaid interest thereon, such distribution shall be allocated first to the principal amount of the Claim (as determined for federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claim, to accrued but unpaid interest.

### 4. Revocation or Withdrawal of the Plan

Subject to the terms and conditions of the Plan Support Agreements, the Debtors reserve the right to revoke or withdraw the Plan prior to the Confirmation Date. If the Debtors revoke or withdraw the Plan prior to the Confirmation Date, then the Plan shall be deemed null and void. In such event, nothing contained in the Plan shall constitute or be deemed a waiver or release of any Claims by or against the Debtors or any other person or to prejudice in any manner the rights of the Debtors or any person in any further proceedings involving the Debtors.

### 5. Post-Effective Date Role of Creditors' Committee

On the Effective Date, the Creditors' Committee will be dissolved for all purposes other than (i) implementation of the Plan through the date of the initial Distribution in accordance with Section 8.3 of the Plan, (ii) defending any appeals from the Confirmation Order to final disposition of such appeals, and (iii) all matters relating to professional fees and the fee committee appointed in the Debtors' Chapter 11 Cases for the period prior to the Effective Date. Following the Effective Date, the litigation and derivatives subcommittees of the Creditors' Committee may continue functioning for the limited purposes of (i) resolving pending litigation and (ii) subject to approval of the post-Effective Date board of directors of LBHI, other litigation and derivatives matters as to which, currently, the subcommittees are involved, and shall be recommended by the applicable subcommittee and the Plan Administrator. Other than with respect to the foregoing, the members of the Creditors' Committee will be released and discharged of and from all further authority, duties, responsibilities, and obligations related to and arising from and in connection with the Chapter 11 Cases, and the retention or employment of the Creditors' Committee's attorneys, accountants, and other agents shall terminate. The Debtors will pay the reasonable fees and expenses of the professionals retained by and will reimburse the members of the remaining subcommittees for reasonable disbursements incurred, including the reasonable fees of counsel, in connection with the foregoing from and after the Effective Date. If a member of a subcommittee becomes unable to serve on a subcommittee or resigns after the Effective Date, the remaining members may replace such member, continue to discharge the subcommittee's roles, or dissolve by a majority vote of the remaining members. Each of the subcommittees shall be deemed dissolved upon the earliest to occur of (i) voluntary agreement of the members of the subcommittee, (ii) the completion of the subcommittee's responsibilities, and (iv) the Closing Date.

### 6. Issuance of New Securities

In the discretion of the Plan Administrator, each Debtor or Debtor Controlled-Entity (a) may form and transfer certain assets of the Debtors and/or Debtor Controlled Entities

to new (or utilize existing) entities, including, without limitation, one or more separately managed partnerships, REITs or other investment vehicles, to hold certain real estate or other assets of the Debtors and/or Debtor-Controlled Entities and, (b) may, in connection therewith, issue New Securities for Distribution under the Plan. In the event that the Plan Administrator determines to issue New Securities, each holder of Allowed Claims or Equity Interests against a Debtor that contributed assets to the entity issuing New Securities shall receive the relevant New Securities as Distributions in accordance with the Plan. The New Securities shall be valued as of the date of the issuance and the holders of Allowed Claims or Equity Interests receiving such New Securities shall be deemed satisfied to the extent of the value of the New Securities.

### 7.    Exemption from Securities Laws

To the maximum extent provided by section 1145 of the Bankruptcy Code and applicable non-bankruptcy law, the issuance under the Plan of any New Securities or Liquidating Trust Interests will be exempt from registration under the Securities Act of 1933, as amended, and all rules and regulations promulgated thereunder and any other applicable non-bankruptcy law or regulation.

### 8.    Exemption from Transfer Taxes

Pursuant to section 1146(a) of the Bankruptcy Code, (a) the issuance, transfer, or exchange of notes or equity securities, (b) the creation of any mortgage, deed of trust, lien, pledge, or other security interest, (c) the making or assignment of or surrender of any lease or sublease, or (d) the making of or delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with the Plan, and any merger agreements, agreements of restructuring, disposition, liquidation or dissolution, any deeds, bills of sale, transfers of tangible property, or assignments executed in connection with any disposition of assets contemplated by the Plan (including by a Liquidating Trust), shall not be subject to any stamp, real estate transfer, mortgage recording, sales, use or other similar tax.

### 9.    Effectuating Documents and Further Transactions

Pursuant to the Plan, each of the Debtors and the Debtors is authorized to execute, deliver, file or record such contracts, instruments, releases, indentures and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan and any securities issued pursuant to the Plan.

### 10.    Retention of Jurisdiction

Following the Confirmation Date, the Bankruptcy Court will retain exclusive jurisdiction of all matters arising under, arising out of, or related to, the Chapter 11 Cases and the Plan pursuant to, and for the purposes of, sections 105(a) and 1142 of the Bankruptcy Code and for, among other things, the following purposes:

(a)    To hear and determine any motions for the assumption, assumption and assignment or rejection of executory contracts or unexpired leases and the allowance of any Claims resulting therefrom;

(b)      To determine any and all adversary proceedings, applications and contested matters relating to the Chapter 11 Cases;

(c)      To hear and determine any objection to or motion to estimate Claims;

(d)      To enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified, or vacated;

(e)      To issue such orders in aid of execution of the Plan to the extent authorized by section 1142 of the Bankruptcy Code;

(f)      To consider any modifications of the Plan, to cure any defect or omission or reconcile any inconsistency in any order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

(g)      To hear and determine all applications for compensation and reimbursement of expenses of professionals under sections 330, 331 and 503(b) of the Bankruptcy Code;

(h)      To hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan and any agreements or documents incorporated or contemplated by the Plan, including, without limitation, Sections 6.4, 6.5, 13.3, 13.4 and 13.5 of the Plan;

(i)      To issue injunctions, enter and implement other orders, and take such other actions as may be necessary or appropriate to restrain interference by any person with the consummation, implementation or enforcement of the Plan, the Confirmation Order, or any other order of the Bankruptcy Court;

(j)      To hear and determine any actions brought against the Plan Administrator in connection with the Plan, including without limitation, any action relating to Distributions;

(k)      To hear and determine any actions brought to recover all assets of the Debtors and property of the estates, wherever located; *provided, however*, that this provision shall not limit the jurisdiction of a foreign court or tribunal overseeing a Foreign Proceeding;

(l)      To hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code, including any requests for expedited determinations under section 505(b) of the Bankruptcy Code filed, or to be filed, with respect to tax returns of the Debtors and of any Liquidating Trusts for any and all taxable periods ending after the Commencement Date through the Closing Date;

(m)      To hear all matters relating to Article XII of the Plan, including, without limitation, all matters relating to the releases, exculpation, and injunction granted thereunder;

(n)      To hear all matters relating to the Plan Trust;

(o)     To hear any other matter consistent with the provisions of the Bankruptcy Code; and

(p)     To enter a final decree closing the Chapter 11 Cases.

### 11.     Plan Supplement

The Debtor Allocation Agreement, the amended certificate and by-laws of the Debtors (if any) in accordance with Section 7.7 of the Plan, the Plan Trust Agreement, a list of any contracts or leases to be assumed, or assumed and assigned, by the Debtors in accordance with section 11.1 of the Plan, any settlement agreement among any of the Debtors and a Non-Controlled Affiliate in accordance with section 6.5(b)(iv) of the Plan, and any settlement agreement among any of the Debtors and a Creditor in accordance with Section 6.5(j) of the Plan will be contained in the Plan Supplement that is filed with the Clerk of the Bankruptcy Court at least ten (10) days prior to the Voting Deadline.  Upon its filing with the Bankruptcy Court, the Plan Supplement may be obtained on the Debtors' independent website at www.lehman-docket.com or by request to the Debtors in accordance with section 15.12 of the Plan.

### 12.     Post-Effective Date Reporting

Beginning the first month-end and first quarter-end following the Effective Date and until the Closing Date, the Plan Administrator is obligated to file with the Bankruptcy Court (i) within thirty (30) days after the end of each month, a Monthly Operating Report for such month, (ii) within one-hundred-twenty (120) days after the end of each quarter, a Quarterly Report for such quarter, and (iii) on an annual basis for two (2) years and thereafter on a semiannual basis, a Reconciliation of Cash Flow Estimates Report and a description of collections by the Debtors and a comparison of performance relative to forecasted collections and estimates of future costs and expenses of administration; *provided, however*, that, in each case, the Plan Administrator or the board of directors or manager for a Debtor, as applicable, is permitted to elect to modify or include less information in such reports than otherwise required by the Plan if the Plan Administrator or the board of directors or manager for a Debtor, as applicable, determines, in its reasonable discretion, that disclosing any such information would be unduly burdensome, such information is or has become immaterial or no longer meaningful, as the activities of the Debtor(s) evolve such disclosure could place the Debtor(s) in a competitive or negotiation disadvantage, or such disclosure is precluded by confidentiality limitations.  The Debtors will include in their monthly reports all payments made to creditors under the Plan and disbursements made in the ordinary course of business on an aggregate, monthly basis for each Debtor.

Information included in the various reports includes, among other things, information regarding the Debtors' financial condition, significant transactions, liquidation of assets, reconciliation of claims, ongoing litigations and material costs and expenses incurred by the Debtors in their operations.  The Debtors will also provide information regarding their cash flows.

US_ACTIVE:\43795376\03\58399.0008

13.     **Payment of Statutory Fees**

On the Effective Date and thereafter, the Plan Administrator and any Liquidating Trustee thereafter appointed, will pay all fees incurred pursuant to Section 1930 of title 28, United States Code, together with interest, if any, pursuant to Section 3717 of title 31, United States Code for each Debtor's case, or until such time as a final decree is entered closing a particular Debtor's case, a Final Order converting such Debtor's case to a case under Chapter 7 of the Bankruptcy Code or a Final Order dismissing such Debtor's case is entered.

K.     **Summary of Recovery Analysis Under the Plan**

The Recovery Analysis setting forth the estimated Claim and estimated recoveries for each Class is annexed hereto as Exhibit 4.

The Debtors indicated on Exhibit "A" to LBHI's Voluntary Petition for chapter 11 that as of May 31, 2008, LBHI and its Affiliates had approximately $639 billion of assets and approximately $613 billion of liabilities.  As indicated on the Exhibit 4 annexed hereto, the estimated aggregate gross recovery (before the payment of any Claims or expenses) following an orderly liquidation of the Debtors' assets is approximately $63 billion.  The substantial decrease in the aggregate value of the assets is a result of (i) the exclusion of assets of the Non-Controlled Affiliates, (ii) the termination of secured financings, such as repurchase agreements, pursuant to which Lehman retained the subject securities on its balance sheet and also included the sale proceeds and the obligation to repurchase the securities, (iii) market value changes and (iv) alternate valuation methodologies.

The estimated recoveries included in the "Summary of Classification and Estimated Recovery of Claims and Equity Interests Under the Plan" included in section II.B hereof is based on recoveries to each Class of creditors for each Debtor on an undiscounted cash flow basis.

Exhibit 2C annexed hereto includes a table reconciling the information included in the Recovery Analysis with the information included in the Debtors' balance sheets, as of December 31, 2010.  Exhibit 2C displays modifications to the information included in the Recovery Analysis, the effect of which results in the information displayed in the balance sheets included as Exhibit 2B.

XI.     **CONFIRMATION AND CONSUMMATION OF THE PLAN**

Under the Bankruptcy Code, the following steps must be taken to confirm the Plan:

A.     **Solicitation of Votes**

In accordance with sections 1126 and 1129 of the Bankruptcy Code, the Claims in all Classes of the Plan are impaired, and the holders of Allowed Claims in each of these Classes other than LBHI Classes 10A, 10B, 10C and 11 are entitled to vote to accept or reject the Plan. The holders of Claims in LBHI Classes 10A, 10B, 10C and 11 will not receive any distributions under the Plan and are conclusively presumed to have rejected the Plan.  The holder of the

Equity Interest in each of the Debtors is impaired and is conclusively presumed to have rejected the Plan.

As to the classes of Claims entitled to vote on a plan, the Bankruptcy Code defines acceptance of a plan by a class of creditors as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of the Claims of that class that have timely voted to accept or reject a plan.

A vote may be disregarded if the Bankruptcy Court determines, after notice and a hearing, that acceptance or rejection was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

Any creditor in an impaired Class (i) whose Claim has been listed by the Debtors in the Schedules filed with the Bankruptcy Court (provided that such Claim has not been scheduled as disputed, contingent or unliquidated) or (ii) who filed a proof of claim on or before the Bar Date or Securities Programs Bar Date, as applicable, or any proof of claim filed within any other applicable period of limitations or with leave of the Bankruptcy Court, which Claim is not the subject of an objection or request for estimation, is entitled to vote on the Plan.

### B.    The Confirmation Hearing

The Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a confirmation hearing.  The Confirmation Hearing in respect of the Plan has been scheduled for December 6, 2011, commencing at 10:00 a.m. Eastern Time, before the Honorable James M. Peck, United States Bankruptcy Judge, at the United States District Court for the Southern District of New York, Room 601, Alexander Hamilton Customs House, One Bowling Green, New York, New York  10004.  The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement of the adjourned date made at the Confirmation Hearing.  Any objection to confirmation must be made in writing and specify in detail the name and address of the objector, all grounds for the objection and the amount of the Claim or amount and description of the Equity Interest held by the objector.  Any such objection must be filed with the Bankruptcy Court and served in accordance with the Disclosure Statement Order and the Second Amended Case Management Order, dated June 17, 2010, on or before November 4, 2011 at 4:00 p.m, Eastern Time.  Objections to confirmation of the Plan are governed by Bankruptcy Rule 9014.

### C.    Confirmation

At the Confirmation Hearing, the Bankruptcy Court will confirm the Plan only if all of the requirements of section 1129 of the Bankruptcy Code are met.  Among the requirements for confirmation of a plan are that the plan is (i) feasible, (ii) in the "best interests" of creditors and stockholders that are impaired under the plan, and (iii) accepted by all impaired classes of Claims and equity interests or, if rejected by an impaired class, that the plan "does not discriminate unfairly" and is "fair and equitable" as to such class.

1.      **Acceptance**

The Claims in all Classes of the Plan are impaired under the Plan and, other than Claims in LBHI Classes 10A, 10B, 10C and 11, are entitled to vote to accept or reject the Plan. Claims in LBHI Classes 10A, 10B, 10C and 11 and Equity Interests in each Debtor are receiving no distributions under the Plan and, therefore, are conclusively presumed to have voted to reject the Plan. Equity Interests in each Debtor are impaired under the Plan and are conclusively presumed to have voted to reject the Plan.

If any impaired Class of Claims entitled to vote does not accept the Plan by the requisite statutory majority provided in section 1126(c) of the Bankruptcy Code, the Debtors reserve the right to amend the Plan in accordance with section 15.7 of the Plan or undertake to have the Bankruptcy Court confirm the Plan under section 1129(b) of the Bankruptcy Code or both. With respect to impaired Classes of Claims that are deemed to reject the Plan, the Debtors shall request that the Bankruptcy Court confirm the Plan under section 1129(b) of the Bankruptcy Code. The determination as to whether to seek confirmation of the Plan under such circumstances will be announced before or at the Confirmation Hearing.

2.      **Feasibility**

The Bankruptcy Code permits a plan to be confirmed if it is not likely to be followed by liquidation or the need for further financial reorganization. This is the "feasibility" test that must be determined by the Bankruptcy Court.

Since the Debtors' Plan contemplates a liquidation, for purposes of determining whether the Plan meets this requirement, the Debtors have analyzed their ability to meet their obligations under the Plan over the expected period of liquidation. As part of this analysis, the Debtors have prepared cash flow estimates for each of the Debtors for the four year period ending December 31, 2014 (the "Projection Period") and liquidation analyses for each Debtor. These cash flow estimates, and the assumptions on which they are based are included in Exhibit 7 annexed hereto. Based upon such estimates, the Debtors anticipate that they will be able to make all payments required pursuant to the Plan and, therefore, after confirmation of the Plan they will be able to liquidate their assets and make Distributions as contemplated. The Debtors expect that the liquidation of their assets and Claims reconciliation will take longer than the Projection Period.

The Debtors have prepared these cash flow estimates, based upon certain reasonable assumptions under the circumstances. Those assumptions considered to be significant are described in the cash flow estimates, which are annexed as Exhibit 7. The cash flow estimates have not been examined or compiled by independent accountants. The Debtors make no representation as to the accuracy of the cash flow estimates or their ability to achieve the results. Many of the assumptions on which the cash flow estimates are based are subject to significant uncertainties. Inevitably, some assumptions will not materialize and unanticipated events and circumstances may affect the actual financial results. Therefore, the actual results achieved throughout the Projection Period may vary from the estimated results and the variations may be material. All holders of Claims that are entitled to vote to accept or reject the Plan are

urged to examine carefully all of the assumptions on which the cash flow estimates are based in connection with their evaluation of the Plan.

### 3.    Best Interests Test

Even if the Plan is accepted by all holders of Claims entitled to vote on the Plan, the Bankruptcy Code requires that the Bankruptcy Court, as a condition to confirming the Plan, find that the Plan is in the best interests of all holders of Claims and Equity Interests that are Impaired by the Plan and that have not accepted the Plan. The "best interests" test, as set forth in section 1129(a)(7) of the Bankruptcy Code, requires the Bankruptcy Court to find either that all members of an Impaired Class of Claims or Equity Interests have accepted the Plan in the requisite majorities required by section 1126 of the Bankruptcy Code or that the Plan will provide a member who has not accepted the Plan with a recovery of property of a value, as of the Effective Date of the Plan, that is not less than the amount that such holder would receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code on such date.

To calculate the probable distribution to members of each Impaired Class of Claims and Equity Interests if the Debtors were liquidated under chapter 7, the Bankruptcy Court must first determine the aggregate dollar amount that would be generated from the disposition of the Debtors' assets if their Chapter 11 Cases were converted to chapter 7 cases under the Bankruptcy Code. This "liquidation value" would consist primarily of the proceeds from liquidating the Debtors' assets by a chapter 7 trustee.

The amount of liquidation value available to creditors would be reduced by the costs and expenses of liquidation, as well as by other administrative expenses and costs of both the Chapter 7 cases and the Chapter 11 Cases. Costs of a liquidation of the Debtors under chapter 7 of the Bankruptcy Code would include the compensation of a chapter 7 trustee, as well as of counsel and other professionals retained by the trustee, asset disposition expenses, all unpaid expenses incurred by the Debtors in the Chapter 11 Cases (such as compensation of attorneys, financial advisors, and accountants) that are allowed in the chapter 7 cases, litigation costs and Claims arising from the operations of the Debtors during the pendency of the Chapter 11 Cases. The liquidation itself would trigger certain priority payments that otherwise would not be due in the ordinary course of business. Those priority Claims would be paid in full from the liquidation proceeds before the balance would be made available to pay other Claims or to make any distribution in respect of Equity Interests. The liquidation under chapter 7 would also prompt the rejection of executory contracts and unexpired leases and thereby create a significantly greater amount of Unsecured Claims.

As of January 1, 2011, the Debtors have post petition employment agreements with approximately 413 employees, who spent a significant amount of time analyzing and reviewing the Debtors' assets and have built infrastructures to manage such assets. A chapter 7 trustee would have the option of either retaining current employees of the Debtors or rejecting the contracts of some or all of the Debtors' employees. If the chapter 7 trustee decides that only a fraction of such employees are required to liquidate the assets, and therefore rejects such employment contracts, the Debtors would incur additional administrative expenses from the rejection of post petition contracts which expenses would be paid prior to Classes of Claims.

US_ACTIVE:\43795376\03\58399.0008

Furthermore, due to the complexity and size of the Debtors' assets it would take the chapter 7 trustee months to analyze and review the assets, incurring additional expenses on the estate.

The additional Claims and expenses that would be incurred during a chapter 7 liquidation, the recoveries that the Debtors would receive from the expeditious liquidation of their assets is likely to be substantially less than the recoveries if the Debtors hold such assets and dispose of them over a longer period of time. While the financial markets have improved since the period immediately following the Commencement Date, in the Debtors' business judgment, the liquidation of the assets under the current market conditions would result in the Debtors' taking a substantial discount on the value of their assets.

In a chapter 7 liquidation, no junior class of Claims or Equity Interests may be paid unless all classes of Claims or Equity Interests senior to such junior class are paid in full. Section 510(a) of the Bankruptcy Code provides that subordination agreements are enforceable in a bankruptcy case to the same extent that such subordination agreements are enforceable under applicable non-bankruptcy law. Therefore, no class of Claims or Equity Interests that is contractually subordinated to another class would receive any payment on account of its Claims or Equity Interests, unless and until such senior classes are paid in full.

Once the Bankruptcy Court ascertains the recoveries in liquidation of the Debtors' secured and priority creditors, it would then determine the probable distribution to unsecured creditors from the remaining available proceeds of the liquidation. If this probable distribution has a value greater than the value of distributions to be received by the unsecured creditors under the Plan, then the Plan is not in the best interests of creditors and cannot be confirmed by the Bankruptcy Court.

After considering the effects that a chapter 7 liquidation would have on the ultimate proceeds available for distribution to creditors in the Chapter 11 Cases, including (i) the costs and expenses of a liquidation under chapter 7 arising from fees payable to a trustee in bankruptcy and professional advisors to such trustee, (ii) the erosion in value of assets in a chapter 7 case in the context of the expeditious liquidation required under chapter 7 and the "forced sale" atmosphere that would prevail and (iii) the substantial increases in Claims that would be satisfied on a priority basis or on parity with creditors in the Chapter 11 Cases, the Debtors expect that holders of Allowed Claims in each Class will receive a recovery as a result of the confirmation of the Plan that is greater than such holder would receive pursuant to the liquidation of the Debtors under chapter 7.

The Liquidation Analysis is annexed hereto as Exhibit 5. The information set forth in Exhibit 5 provides a summary of the liquidation values of the Debtors' assets, assuming a chapter 7 liquidation in which a trustee appointed by the Bankruptcy Court would liquidate the assets of the Debtors' estates. The Liquidation Analysis assumes that a trustee would implement the same settlement and compromise included in the Plan. Reference should be made to the Liquidation Analysis for a complete discussion and presentation of the Liquidation Analysis.

Underlying the Liquidation Analysis are a number of estimates and assumptions that, although developed and considered reasonable by the Debtors, are inherently subject to significant economic and competitive uncertainties and contingencies beyond the control of the

126

Debtors.  The Liquidation Analysis also is based on assumptions with regard to liquidation decisions that are subject to change.  Accordingly, the values reflected might not be realized if the Debtors were, in fact, to undergo such a liquidation.

### 4.      Unfair Discrimination and Fair and Equitable Tests

To obtain nonconsensual confirmation of the Plan, it must be demonstrated to the Bankruptcy Court that the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to each impaired, nonaccepting Class.  The Bankruptcy Code provides a non-exclusive definition of the phrase "fair and equitable."  The Bankruptcy Code establishes "cram down" tests for secured creditors, unsecured creditors and equity holders, as follows:

Secured Creditors.  Either (i) each impaired secured creditor retains its liens securing its secured Claim and receives on account of its secured Claim deferred cash payments having a present value equal to the amount of its allowed secured Claim, (ii) each impaired secured creditor realizes the "indubitable equivalent" of its allowed secured Claim or (iii) the property securing the Claim is sold free and clear of liens with such liens to attach to the proceeds of the sale and the treatment of such liens on proceeds to be as provided in clause (i) or (ii) above.

Unsecured Creditors.  Either (i) each impaired unsecured creditor receives or retains under the plan property of a value equal to the amount of its allowed Claim or (ii) the holders of Claims and interests that are junior to the Claims of the dissenting class will not receive any property under the plan.

Equity Interests.  Either (i) each holder of an equity interest will receive or retain under the plan property of a value equal to the greater of the fixed liquidation preference to which such holder is entitled, or the fixed redemption price to which such holder is entitled or the value of the interest or (ii) the holder of an interest that is junior to the nonaccepting class will not receive or retain any property under the plan.

A plan of reorganization does not "discriminate unfairly" with respect to a nonaccepting class if the value of the cash and/or securities to be distributed to the nonaccepting class is equal to, or otherwise fair when compared to, the value of the distributions to other classes whose legal rights are the same as those of the nonaccepting class.

### D.      Consummation

The Plan will be consummated on the Effective Date.  The Effective Date of the Plan will occur on the first Business Day on which the conditions precedent to the effectiveness of the Plan, as set forth in section 12.2 of the Plan, have been satisfied or waived by the Debtors pursuant to section 12.3 of the Plan.  For a more detailed discussion of the conditions precedent to the Plan and the consequences of the failure to meet such conditions, see section X.G— "Conditions Precedent to the Plan's Confirmation and Effective Date" of the Disclosure Statement.

The Plan is to be implemented pursuant to its terms, consistent with the provisions of the Bankruptcy Code.

## XII.   CORPORATE GOVERNANCE AND MANAGEMENT OF THE DEBTORS ON THE EFFECTIVE DATE

Pursuant to the Plan, on the Effective Date, the management, control, and operation of the Debtors will be the general responsibility of their respective Boards of Directors.

### A.   Board of Directors and Management

### 1.   LBHI Board of Directors and Officers

Following the Effective Date, the board of directors of LBHI shall consist of seven persons.  The initial board of directors of LBHI shall be selected by the Director Selection Committee.  Each of the initial directors of LBHI shall have initial and, if reelected, subsequent terms of one year.  A director of LBHI may be removed from office by the Plan Trust with cause.  Subject to death, incapacity, resignation or removal for cause and reelection by the Plan Trust in accordance with the Plan Trust Agreement, the initial directors shall serve as the board of directors of LBHI through the Closing Date.  Upon expiration of the term of a director of LBHI or his or her resignation, death or removal for cause, the election of such director or a replacement director shall be determined by action of the Plan Trust as sole shareholder of LBHI. At or before the Confirmation Hearing, the Debtors will disclose any identified directors in compliance with section 1129(a)(5) of the Bankruptcy Code.

(b)   The Director Selection Committee shall be comprised of the following nine (9) members:

(i)   Rutger Schimmelpenninck (in his capacity as co-bankruptcy trustee (curatoren) for LBT); (ii) the LBB Administrator; (iii) the Debtors; (iv) each of the co-chairs of the Creditors' Committee (each of whom shall exercise his or her independent business judgment in the selection of directors and not act at the direction of the Creditors' Committee); (v) an individual chosen by the Opco Plan Proponents who are PSA Creditors; (vi) an individual chosen by the members of the group of creditors commonly referred to as the Ad Hoc Group of Lehman Brothers Creditors that are PSA Creditors; and (vii) two individuals chosen collectively by the following PSA Creditors: Carval Investors UK Limited, Davidson Kempner Capital Management LLC, Elliott Management Corporation, King Street Capital Management LP., Och-Ziff Capital Management Group LLC, The Baupost Group LLC and Varde Partners LP.

Following the Effective Date, the board of directors of LBHI shall, in addition to its other duties, be responsible for (i) instructing and supervising the Debtors and the Plan Administrator with respect to their responsibilities under the Plan; (ii) reviewing and approving the prosecution of adversary and other proceedings, if any, including approving proposed settlements thereof; (iii) reviewing and approving objections to and proposed settlements of Disputed Claims; and (iv) performing such other duties that may be necessary and proper to assist the Debtors and the Plan Administrator and their retained professionals.  In its discretion,

US_ACTIVE:\43795376\03\58399.0008

following the Effective Date, the board of directors of LBHI may also delegate any duties assigned to the Plan Administrator to any other committee, entity or individual.

## 2.      Subsidiary Debtor Post-Effective Date Management

Following the Effective Date, the board of directors of LBSF and LCPI will each consist of three (3) individuals as follows: (i) an individual who is a concurrently serving member of the LBHI board of directors that is selected by the LBHI board of directors; (ii) an individual who is a concurrently serving member of the LBHI board of directors and, in the case of LBSF or LCPI, acceptable to the Opco Plan Proponents who are PSA Creditors; and (iii) an individual who is selected by the individuals selected pursuant to (i) and (ii) of this section and who is independent from LBHI, the members of the Director Selection Committee and, in the case of LBSF, LBSF or in the case of LCPI, LCPI.

Each of the initial directors of LBSF and LCPI shall have initial and, if reelected, subsequent terms of one year. A director of LBSF and LCPI may be removed from office by Lehman ALI (as directed by LBHI) only for cause. Upon the resignation, death, incapacity or removal for cause of a director of LBSF or LCPI, the election of a replacement director shall be determined by action of Lehman ALI (as directed by LBHI); *provided* that at all times the LBSF and LCPI boards of directors must be comprised of individuals that satisfy the requirements of section 7.3(a) of the Plan.

Following the Effective Date, the respective boards of directors or managers, as applicable, of the Subsidiary Debtors, other than LBSF and LCPI, shall consist of one individual who shall be a concurrently serving member of the LBHI board of directors. Each of the initial directors or managers of the Subsidiary Debtors, other than LBSF and LCPI, shall have initial and, if reelected, subsequent terms of one year. Thereafter, LBHI or the Subsidiary Debtor or Debtor-Controlled Entity that is the sole shareholder of the relevant Subsidiary Debtor shall elect successors of the then-serving members of the boards or managers for such Subsidiary Debtor at each annual meeting or upon the removal or resignation of such individuals. LBHI or the Subsidiary Debtor or Debtor-Controlled Entity that is the sole shareholder of the relevant Subsidiary Debtor shall also have the power to act by written consent to remove any director or manager of such Subsidiary Debtor at any time with or without cause.

## 3.      Plan Trust

For securities laws purposes, and in order to preserve NOLs and certain other valuable tax attributes[15] that will maximize assets and thereby recoveries to creditors, the Plan Trust will be established on the Effective Date and continue in existence until the Closing Date. The Plan Trustees will be the members of the Director Selection Committee. Each of the Plan Trustees will continue in such capacity until he or she ceases to be a Plan Trustee in accordance with the terms and conditions set forth in the Plan Trust Agreement. In the event of a vacancy in the office of Plan Trustee, the remaining Plan Trustees will by majority vote of the remaining Plan Trustees fill the vacancy if in their discretion the circumstances of the Plan Trust warrant

---

[15] For further discussion of the Plan Trust, see section XV.A.3.b, "Limitations of NOL Carryforwards and Other Tax Attributes."

doing so.  The Plan Trust shall exercise voting rights associated with the Plan Trust Stock in furtherance of the orderly liquidation of the Debtors and compliance with the provisions of the Plan.  The sole purpose of the Plan Trust shall be to hold the Plan Trust Stock as provided in Section 4.16(b).

The Plan Trust Agreement will provide that (i) at such time as a vacancy on the board of directors of LBHI is to be filled or there is a vote on the election of a director upon the expiration of a director's term of office, the Plan Trust will fill such vacancy by majority vote of the Plan Trustees and (ii) at all other times, the Plan Trust may act, by majority vote of the Plan Trustees, to remove and replace directors, with cause.

## 4.      Plan Administrator

The Plan Administrator will have the rights and powers of a debtor-in-possession under section 1107 of the Bankruptcy Code, and such other rights, powers and duties incident to causing the performance of the Debtors' obligations under the Plan.  The Plan Administrator shall continue to exist until entry of a Final Order by the Bankruptcy Court closing the Chapter 11 Cases pursuant to section 350(a) of the Bankruptcy Code.

## 5.      Corporate Existence

After the Effective Date, the Plan Administrator may decide, to (a) maintain each Debtor as a corporation in good standing until such time as all aspects of the Plan pertaining to such Debtor have been completed, or (b) at such time as the Plan Administrator considers appropriate and consistent with the implementation of the Plan pertaining to such Debtor, dissolve such Debtor and complete the winding up of such Debtor without the necessity for any other or further actions to be taken by or on behalf of such dissolving Debtor or its shareholder or any payments to be made in connection therewith subject to the filing of a certificate of dissolution with the appropriate governmental authorities (including, without limitation, the transfer of all or part of the assets of such Debtor to a liquidating trust), or (c) dissolve any Debtor-Controlled Entity and complete the winding up of such Debtor-Controlled Entity in accordance with applicable law; *provided, however,* that the foregoing does not limit the Plan Administrator's ability to otherwise abandon an interest in a Debtor-Controlled Entity.

## 6.      Certificates of Incorporation and By-laws

The certificate of incorporation and by-laws of each Debtor will be amended as of the Effective Date to the extent necessary to carry out the provisions of the Plan.  The proposed forms of the Debtors Certificate of Incorporation and the Debtors By-laws will be contained in the Plan Supplement.

## 7.      Wind-Down

After the Effective Date, pursuant to the Plan, the Plan Administrator shall wind-down, sell and otherwise liquidate assets of the Debtors and/or Debtor-Controlled Entities.  The wind-down, sale and liquidation of each of such Debtor's assets (as determined for federal income tax purposes) shall occur over a period of three years after the Effective Date (it being understood that such liquidation may include the transfer of all or part of the assets of such

US_ACTIVE:\43795376\03\58399.0008

Debtor to one or more Liquidating Trusts within the meaning of Treas. Reg. § 301.7701-4); *provided, however*, that the wind-down and liquidation may extend over a longer period of time if the Debtors receives a private letter ruling or other equivalent guidance from the IRS from which the Plan Administrator reasonably concludes that the continued wind-down and liquidation should not result in a reduction or limitation of the Debtors' tax attributes for federal income tax purposes that materially impairs the expected actual use of such tax attributes.  See section X.I—"Liquidating Trust" and section XV— "Certain Federal Income Tax Consequences of the Plan" for further information.

## XIII.   SECURITIES LAWS MATTERS

For securities laws purposes, and in order to preserve NOLs and certain other valuable tax attributes[16] that will maximize assets and thereby recoveries to creditors, on the Effective Date all existing Equity Interests in LBHI shall be cancelled and one new share of LBHI's common stock shall be issued to the Plan Trust which will hold such share for the benefit of the holders of such former Equity Interests consistent with their former economic entitlements.  On the Effective Date all existing Equity Interests in each of the Debtors other than LBHI shall be retained by such holder and only cancelled if and when such Debtor is dissolved in accordance with the Plan.  In the event that all Allowed Claims against such Debtor have been satisfied in full in accordance with the Plan, each holder of an Equity Interest in such Debtor may receive its Pro Rata Equity Share of any remaining assets of such Debtor.

Holders of Equity Interests should consult their own advisors regarding any securities law consequences of the treatment of their Equity Interest under the Plan.

## XIV.   CERTAIN RISK FACTORS TO BE CONSIDERED

**HOLDERS OF CLAIMS AGAINST THE DEBTORS SHOULD READ AND CONSIDER CAREFULLY THE FACTORS SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT (AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH AND/OR INCORPORATED BY REFERENCE HEREIN), PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN.  THESE RISK FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION.**

**NO REPRESENTATIONS CONCERNING OR RELATED TO THE DEBTORS, THE CHAPTER 11 CASES, OR THE PLAN ARE AUTHORIZED BY THE BANKRUPTCY COURT OR THE BANKRUPTCY CODE, OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT. ANY REPRESENTATIONS OR INDUCEMENTS MADE TO SECURE YOUR ACCEPTANCE OR REJECTION OF THE PLAN THAT ARE OTHER THAN AS CONTAINED IN, OR INCLUDED WITH, THIS DISCLOSURE STATEMENT SHOULD NOT BE RELIED UPON BY YOU IN ARRIVING AT YOUR DECISION.**

---

[16] For further discussion of these tax attributes, see section XV.A.3.b, "Limitations of NOL Carryforwards and Other Tax Attributes."

### A.    Certain Bankruptcy Law Considerations

It is not possible to predict with certainty the length of the Chapter 11 Cases or to assure that the Plan will be confirmed.  Even if all voting Classes vote in favor of the Plan and the requirements for "cramdown" are met with respect to any Class deemed to have rejected the Plan, the Bankruptcy Court, which may exercise substantial discretion as a court of equity, may choose not to confirm the Plan.  As discussed in Section XI— "Confirmation and Consummation of the Plan" of the Disclosure Statement, section 1129 of the Bankruptcy Code requires, among other things, a showing that the with respect to each Class, such Class either (i) has voted to accept the Plan or (ii) the value of distributions to dissenting Classes of Claims and Equity Interests will not be less than the value such holders would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.  Although the Debtors expect that the Plan will meet such test with respect to all Classes for each Debtor, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

Even if the Plan is confirmed, the prolongation of the Chapter 11 Cases may have an adverse effect on the Debtors' businesses and ultimate recovery on the Debtors' assets.  Prolonged Chapter 11 Cases will result in the Debtors' incurrence of substantial additional Administrative Expense Claims and Claims for professional's fees and expenses and will require the Debtors to continue to devote substantial time and energy to the Chapter 11 Cases which would otherwise be directed at efficiently operating the Debtors' distribution process and marketing the Debtors' assets to augment the value of the Debtors' Estates.

Through July 31, 2011, the Debtors have incurred approximately $1.37 billion in professional fees and expenses, inclusive of fees and expenses for professionals retained by the Debtors, the Creditors' Committee, and the Court-appointed Examiner, and the Court-appointed Fee Committee, as well as $1.48 million paid to the US Trustee for its quarterly fees.  The Debtors anticipate incurring an additional $310 million through the Effective Date of the Plan, including $450,000 in US Trustee quarterly fees.

### B.    Conditions Precedent to Consummation of the Plan

The Plan provides for certain conditions that must be satisfied (or waived) prior to Confirmation of the Plan and for certain other conditions that must be satisfied (or waived) prior to the Effective Date.  As of the date of this Disclosure Statement, there can be no assurance that any or all of the conditions in the Plan will be satisfied (or waived).  Accordingly, there can be no assurance that the Plan will be confirmed by the Bankruptcy Court, and if the Plan is confirmed, there can be no assurance that the Plan will be consummated.

### C.    Asset Sales

Under the Plan, distributions to holders of Allowed Claims will be funded substantially by the liquidation of the Debtors' assets.  Although the Debtors will seek to maximize the price they receive for their assets, it is impossible to predict with certainty the value that the Debtors will receive and the resulting distributions.

132

D.      **Estimation of Allowed Claims**

There can be no assurance that the estimated amounts of Claims set forth in this Disclosure Statement are correct, and the actual Allowed amounts of Claims may differ from estimates.  Because the estimated amounts are based solely upon (i) a review of the Debtors' books and records, (ii) a review of the Claims, (iii) the Debtors' estimates as to additional Claims that may be filed in the Chapter 11 Cases or that would arise in the event of a conversion of the cases from chapter 11 to chapter 7 and (iv) the Debtors' estimates of Claims that will be Allowed following the objections to Claims by the Debtors, such estimated amounts are subject to certain risks, uncertainties and assumptions.   Should one or more of these risks or uncertainties materialize or should underlying assumptions prove incorrect, the actual Allowed amounts of Claims may vary from those estimated therein.

E.      **Certain Tax Considerations**

There are a number of material income tax considerations, risks and uncertainties associated with consummation of the Plan.  Holders of Eligible Claims and other interested parties should read carefully the discussion set forth in Article XVI — "Certain Federal Income Tax Consequences of the Plan" for a discussion of certain federal income tax consequences of the transactions contemplated under the Plan.

**XV.   CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN**

The following discussion summarizes certain material federal income tax consequences of the implementation of the Plan to the Debtors and to certain holders of Allowed Claims.  This summary does not address the federal income tax consequences to holders of Claims who are deemed to have rejected the Plan in accordance with the provisions of section 1126(g) of the Bankruptcy Code, or holders whose Claims are entitled to payment in full in Cash.

This summary is based on the Internal Revenue Code ("IRC"), existing and proposed Treasury Regulations, judicial decisions, and published administrative rules and pronouncements of the IRS as in effect on the date hereof, all of which are subject to change, possibly on a retroactive basis.  Any such change could significantly affect the federal income tax consequences described below.

The federal income tax consequences of the Plan are complex and are subject to significant uncertainties at this time.  The Debtors have not requested an opinion of counsel with respect to any of the tax aspects of the Plan.  The Debtors have, however, requested a ruling from the IRS concerning certain, but not all, of the federal income tax consequences of the Plan to the Debtors.  There is no assurance that a favorable ruling will be obtained, and the consummation of the Plan is not conditioned upon the issuance of such a ruling.  This summary does not address state, local or foreign income or other tax consequences of the Plan, nor does it purport to address the federal income tax consequences of the Plan to special classes of taxpayers (such as non-U.S. persons, broker-dealers, banks, mutual funds, insurance companies, financial institutions, thrifts, small business investment companies, regulated investment companies, real estate investment trusts, tax-exempt organizations, individual retirement and other tax-deferred

accounts, any other Debtor entity, persons holding securities as part of a hedging, straddle, conversion or constructive sale transaction or other integrated investment, traders in securities that elect to use a mark-to-market method of accounting for their security holding, certain expatriates or former long term residents of the United States, persons whose functional currency is not the U.S. dollar, persons who received Common Stock of LBHI as compensation, or pass-through entities or investors in pass-through entities).

The following discussion generally assumes that the Plan will be treated as a plan of liquidation of the Debtors for U.S. federal income tax purposes, and that all distributions to holders of Claims will be taxed accordingly.

**ACCORDINGLY, THE FOLLOWING SUMMARY IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING OR FOR ADVICE BASED UPON THE PARTICULAR CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM. EACH HOLDER OF A CLAIM OR EQUITY INTEREST IS URGED TO CONSULT ITS OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL AND FOREIGN INCOME AND OTHER TAX CONSEQUENCES APPLICABLE TO IT UNDER THE PLAN.**

*IRS Circular 230 Notice:  To ensure compliance with IRS Circular 230, holders of Claims and Equity Interests  are hereby notified that: (a) any discussion of federal tax issues contained or referred to in this Disclosure Statement is not intended or written to be used, and cannot be used, by holders of Claims and Equity Interests for the purpose of avoiding penalties that may be imposed on them under the IRC; (b) such discussion is written in connection with the promotion or marketing by the Debtors of the transactions or matters addressed herein; and (c) holders of Claims and Equity Interests should seek advice based on their particular circumstances from an independent tax advisor.*

### A.    Consequences to LBHI and Subsidiary Debtors

#### 1.    Tax Filing Status; Tax Attributes

LBHI, on behalf of itself and the other members of the LBHI Group, including the domestic Subsidiary Debtors and other LBHI directly and indirectly owned corporations, including LBI, file a federal income tax return on a consolidated basis.  For the tax year ended December 31, 2008, for federal income tax purposes, the LBHI Group reported a consolidated NOL of approximately $48 billion.  For the tax year ended December 31, 2009, the Debtors' federal consolidated income tax return reflected an additional NOL of approximately $5 billion. Under recent legislation, LBHI elected to carry back its 2008 NOL for five tax years.  The loss carried back to 2003, the fifth previous tax year, is limited to 50% of the taxable income reported for that year.  For the tax year that ended December 31, 2010, the Debtors believe the LBHI Group will also report an additional NOL.  Based on a historic stock ownership analysis for purposes of the NOL change-in-ownership rules under section 382 of the IRC (described below in section A.3.b.ii), as well as a Bankruptcy Court order imposing certain restrictions on the trading of LBHI's equity, the Debtors believe that no limitation under section 382 currently applies to the consolidated NOL carryforwards of the LBHI Group.  Though there is generally a limitation on the amount of NOLs that can offset income for alternative minimum tax ("AMT")

purposes, pursuant to an IRS Notice, taxpayers availing themselves of the five-year NOL carryback described above are not subject to this limitation with respect to such qualifying NOL, regardless of whether the NOL is carried back or carried forward.  However, the amount and use of any NOLs, as well as the application of any limitations, remain subject to review and adjustment by the IRS (including the carry back of a portion of such NOLs to help reduce any prior year tax adjustments).  See Section X.C.1.c.(i)—"Priority Tax Claims, Federal," above (describing the current status of federal income tax audits).  The tax impact of the Plan on the NOLs and other tax attributes of the LBHI Group is discussed in Section A.3. below.

Prior to April 1, 2010, LBHI and LBI owned a significant number of non-economic residual REMIC (real estate mortgage investment conduit) interests.  These REMIC interests produced net excess inclusion income, which represents phantom taxable income to its holders and cannot be offset by other deductions, including an NOL.  During 2010, ownership of the REMIC interests was transferred to a third party.

LBI, currently a member of the LBHI Group, and certain other significant foreign subsidiaries that were owned by LBHI prior to bankruptcy and continue to be owned by LBHI now, are in separate bankruptcy administrations or liquidation proceedings that are not under the Debtors' control.  The proceedings in those various administrations might result in the LBHI Group having to recognize taxable income or having to relinquish foreign tax credits (including previously utilized foreign tax credits), among other things.  Given the Debtors' lack of visibility and control into these various administrations, the Debtors do not have the ability to manage the tax consequences to them associated with these various administrations.   The impact of these and other tax events could be material to the Debtors.

## 2.    General Discussion of Plan

The Plan sets forth a plan for resolution of the outstanding Claims against and Equity Interests in the Debtors.  The Plan recognizes the corporate existence and integrity of each Debtor and Allowed Claims against a Debtor will generally be satisfied from the assets of each such Debtor.

### a.    Asset Dispositions

The Plan does not specify the manner in which assets will be disposed of in order to satisfy Claims.   However, that notwithstanding, certain assets may be disposed of over time during the pendency of the Plan that may produce taxable income.  LBHI's NOL carryforward should generally be available to offset any tax gains or operating income that might be realized over time from the Debtor's business operations and disposition of certain of the Debtor's assets, subject to the potential application of section 382 of the IRC, as discussed below.  See Section A.3.b.ii.— "Section 382 Limitations– Possible Application to the LBHI Group."

### b.    Plan Distributions

The Plan calls for Allowed Administrative Expense Claims and Allowed Priority Tax Claims to be paid in Cash in full.

For LBHI, the Plan provides for distributions of Available Cash to each of the following LBHI's claimants:  Priority Non-Tax Claims, Secured Claims, Senior Unsecured Claims, Senior Affiliate Claims, Senior Affiliate Guarantee Claims, Senior Third-Party Guarantee Claims, Convenience Claims, Convenience Guarantee Claims, General Unsecured Claims, Affiliate Claims and Third-Party Guarantee Claims.  Pursuant to the Plan, a portion of the Distributions otherwise payable to holders of Senior Third-Party Guarantee Claims and Third-Party Guarantee Claims will be reallocated to certain other Claims against LBHI until the other Claims are paid in full; thereafter, the holders of Senior Third-Party Guarantee Claims and Third-Party Guarantee Claims would be entitled to receive additional distributions from amounts that would otherwise have been payable to such other Claims absent the reallocation.  In the event that all Allowed Claims against LBHI have been satisfied in full in accordance with the Bankruptcy Code and the Plan, each holder of an Equity Interest in LBHI may receive its share of any remaining assets in LBHI.

For each Subsidiary Debtor, the Plan provides for a distribution of Available Cash to each of the following Allowed Claims against such Subsidiary Debtor: Priority Non-Tax Claims, Secured Claims (or alternatively, its collateral), Convenience Claims (if applicable), General Unsecured Claims, and Affiliate Claims.  Pursuant to the Plan, a portion of the Distributions otherwise payable to holders of certain Claims against Subsidiary Debtors will be reallocated to one or more other Claims against the Debtors until such other Claims are paid in full; thereafter, the holders of Claims subject to reallocation would be entitled to receive additional distributions from amounts that would otherwise have been payable to the Claims that benefited from the reallocation.  In the event that all Allowed Claims against a Subsidiary Debtor have been satisfied in full in accordance with the Bankruptcy Code and the Plan, each holder of an Equity Interest in such Subsidiary Debtor may receive its Pro Rata Share of any remaining assets in such Subsidiary Debtor.

### 3.      Tax Impact of the Plan on the Debtors

#### a.      Cancellation of Debt

The IRC provides that a debtor in a bankruptcy case must reduce certain of its tax attributes – such as current year NOLs, NOL carryforwards, tax credits, capital losses and tax basis in assets – by the amount of any cancellation of debt ("COD") incurred that arises by reason of the discharge of the debtor's indebtedness.  Under applicable Treasury Regulations, the reduction in certain tax attributes (such as NOL carryforwards) occurs under consolidated return principles, as in the case of the Debtors who are members of the LBHI Group.  COD is the amount by which the adjusted issue price of indebtedness discharged exceeds the sum of the amount of cash, the issue price of any debt instrument and the fair market value of any other property given in exchange therefor, subject to certain statutory or judicial exceptions that can apply to limit the amount of COD (such as where the payment of the cancelled debt would have given rise to a tax deduction).  Settlement of a guarantee claim should not give rise to COD.  Any reduction in tax attributes under the COD rules does not occur until the end of the tax year after such attributes have been applied to determine the tax in the year of discharge or, in the case of asset basis reduction, the first day of the taxable year following the tax year in which the COD occurs.

Consistent with the intended treatment of the Plan as a plan of liquidation for federal income tax purposes, the Debtors have sought a ruling from the IRS that no COD should be incurred by a Debtor as a result of the implementation of the Plan prior to the disposition by such Debtor of all or substantially all of its assets (other than to the extent any Allowed Claim's distribution is subject to a maximum amount (such as the Convenience Claims and Convenience Guarantee Claims), or has been or is separately settled for less than its carrying value).  In such case, the reduction of tax attributes resulting from such COD (which, as indicated above, only occurs as of the end of the tax year in which the COD occurs) generally should not have a material impact on the Debtors.  There can be no assurance that the IRS will issue a favorable ruling on these matters and thus there can be no assurance that all or a substantial amount of the COD will not be incurred earlier due to, among other things, a lack of direct authoritative guidance as to when COD occurs in the context of a liquidating Chapter 11 plan.

### b.    Limitation of NOL Carryforwards and Other Tax Attributes

### (i)    Section 382 Limitations – General

Under section 382 of the IRC, if a corporation (or consolidated group) undergoes an "ownership change," the amount of its pre-change losses (including NOL carryforwards from periods before the ownership change and certain losses or deductions which are "built-in" (i.e., economically accrued but unrecognized) as of the date of the ownership change) that may be utilized to offset future taxable income generally is subject to an annual limitation.

In general, the amount of this annual limitation is equal to the product of (i) the fair market value of the stock of the corporation (or, in the case of a consolidated group, the common parent) immediately before the ownership change (with certain adjustments) multiplied by (ii) the "long-term tax-exempt rate" in effect for the month in which the ownership change occurs (for example, 4.30% for ownership changes occurring in July 2011).  For a corporation (or consolidated group) in bankruptcy that undergoes the ownership change pursuant to a confirmed bankruptcy plan, the stock value generally is determined immediately after (rather than before) the ownership change by taking into account the surrender or cancellation of creditors' claims, also with certain adjustments.  The annual limitation can potentially be increased by the amount of certain recognized built-in gains, as discussed below. Notwithstanding the general rule, if the corporation (or the consolidated group) does not continue its historic business or use a significant portion of its historic assets in a new business for two years after the ownership change, the annual limitation resulting from the ownership change is zero, thereby precluding any utilization of the corporation's pre-change losses (absent any increases due to any recognized built-in gains).

As indicated above, section 382 of the IRC also limits the deduction of certain built-in losses recognized subsequent to the date of the ownership change.  If a loss corporation (or consolidated group) has a net unrealized built-in loss at the time of an ownership change (taking into account most assets and items of "built-in" income and deduction), then any built-in losses recognized during the following five years (up to the amount of the original net unrealized built-in loss) generally will be treated as pre-change losses and similarly will be subject to the annual limitation.  Conversely, if the loss corporation (or consolidated group) has a net unrealized built-in gain at the time of an ownership change, any built-in gains recognized during

the following five years (up to the amount of the original net unrealized built-in gain) generally will increase the annual limitation in the year recognized, such that the loss corporation (or consolidated group) would be permitted to use its pre-change losses against such built-in gain income in addition to its regular annual allowance. In general, a loss corporation's (or consolidated group's) net unrealized built-in gain or loss will be deemed to be zero unless it is greater than the lesser of (i) $10 million or (ii) 15% of the fair market value of its assets (with certain adjustments) before the ownership change. Due to the Debtors' utilization of the mark-to-market method of accounting, the Debtors do not expect the majority of assets will have either built-in-gains or built-in-losses.

**(ii)      Section 382 Limitations – Possible Application to the**

**LBHI Group**

In light of the foregoing, the LBHI Group's ability to utilize certain NOLs (and carryforwards thereof) and certain other tax attributes would be potentially subject to limitation if LBHI were to undergo an "ownership change" within the meaning of section 382 of the IRC by reason of the implementation of the Plan or otherwise. As indicated above, based on a historic section 382 analysis of the changes in LBHI's stock ownership, as well as the order entered by the Bankruptcy Court effective November 5, 2008 imposing certain restrictions on the trading of LBHI's equity, the Debtors believe that no ownership change under section 382 has occurred to date, nor will occur prior to the Effective Date, that would limit the availability of the tax attributes of the LBHI Group to offset such taxable income. Moreover, pursuant to the Plan, the holders of Equity Interests will maintain their economic interests in any residual assets of the Debtors after the satisfaction of all Allowed Claims, which economic interests will be nontransferable. Accordingly, consistent with the intended treatment of the Plan as a plan of liquidation for federal income tax purposes, the Debtors do not believe that the Plan should result in an ownership change of the LBHI Group. The Debtors have requested a ruling from the IRS to confirm this treatment. There is no assurance that the IRS will rule favorably and thus, due to a lack of direct authoritative guidance in the context of a liquidating Chapter 11 plan, there is no assurance that the IRS would not successfully assert a contrary position (including with respect to the treatment for federal income tax purposes of the holders of Claims as continuing creditors and not as effective equity holders of LBHI throughout the liquidation process). If, notwithstanding the Debtors' position, an ownership change were considered to occur, the Debtors could incur a material amount of federal income tax unless (1) the Debtors' assets are distributed pursuant to the Plan on or before the date of such ownership change or (2) the amount of the annual limitation (taking into account the increase therein for certain recognized built-in gains) is large enough to permit the LBHI Group to utilize an amount of NOL carryforwards and other attributes sufficient to offset such income tax.

**c.      Non-U.S. Income Tax Matters**

Historically, LBHI and its Affiliates conducted their business activities on a global basis, with offices located throughout the world, through both non-U.S. entities and non-U.S. branch operations of domestic entities. At present, the LBHI Group continues to maintain material debt and equity positions in many of these non-U.S. entities, notwithstanding the fact that most of such Affiliates are currently under separate legal administration or receivership and collectability is, consequently, uncertain. Importantly, however, given the current U.S. tax

138

profile of the LBHI Group, any future remittance received from any such separate administration or receivership in satisfaction of historic debt and/or equity positions may be subject to host country, non-U.S. withholding taxes, thereby reducing the amounts available for distribution to creditors by LBHI and the Subsidiary Debtor estates.

### 4.    Transfer of Liquidating Trust Assets to a Liquidating Trust

As indicated above, anytime after the Effective Date throughout the period permitted for the liquidation of the Debtors under section 7.6 of the Plan (i.e., at least three years), the Plan Administrator may, if he determines that a Liquidating Trust is in the best interests of a Debtor and holders of Allowed Claims against and Equity Interests in such Debtor, transfer some or all of a Debtor's assets to a Liquidating Trust on behalf of all or a portion of the respective claimants and/or holders of Equity Interests of such Debtor.  The transfer of assets by the Plan Administrator to a Liquidating Trust may result in the recognition of gain or loss by the Debtor, depending in part on the value of such assets on the date of such transfer to the Liquidating Trust relative to the Debtor's tax basis in such assets.  As indicated above, due to the Debtors' utilization of the mark-to-market method of accounting, the majority of assets are not expected to have either built-in-gains or built-in-losses.

### B.    Consequences to Holders of Claims and LBHI Equity Interests

### 1.    Realization and Recognition of Gain or Loss, In General

The federal income tax consequences of the implementation of the Plan to a holder of a Claim or LBHI Equity Interest will depend, among other things, upon the origin of the holder's Claim, when the holder receives payment in respect of such Claim or Equity Interest, whether the holder reports income using the accrual or cash method of tax accounting, whether the holder acquired its Claim at a discount, whether the holder has taken a bad debt deduction or worthless security deduction with respect to such Claim or Equity Interest, and whether (as intended and herein assumed) the Plan is treated as a plan of liquidation for federal income tax purposes.  A holder of an LBHI Equity Interest should consult its tax advisor regarding the timing and amount of any potential worthless stock loss.

Generally, a holder of an Allowed Claim will realize gain or loss on the exchange under the Plan of its Allowed Claim for Cash or other property (including any Liquidating Trust Interests), in an amount equal to the difference between (i) the sum of the amount of any Cash and the fair market value on the date of the exchange of any other property received by the holder, including, as discussed below, any beneficial interests in a Liquidating Trust (other than any consideration attributable to a Claim for accrued but unpaid interest) and (ii) the adjusted tax basis of the Allowed Claim exchanged therefor (other than basis attributable to accrued but unpaid interest previously included in the holder's taxable income).  With respect to the treatment of accrued but unpaid interest and amounts allocable thereto, see Section B.3.— "Allocation of Consideration of Interest."

When gain or loss is recognized as discussed below, such gain or loss may be long-term capital gain or loss if the Claim or Equity Interest disposed of is a capital asset in the hands of the holder and has been held for more than one year.  Each holder of an Allowed Claim

or Equity Interest should consult its own tax advisor to determine whether gain or loss recognized by such holder will be long-term capital gain or loss and the specific tax effect thereof on such holder.

As discussed below (see Section C.1— "Tax Treatment of a Liquidating Trust and Holders of Beneficial Interests"), each holder of an Allowed Claim that receives a beneficial interest in the Liquidating Trust (if and when established) will be treated for U.S. federal income tax purposes as directly receiving, and as a direct owner of, its respective share of the Liquidating Trust Assets (consistent with its economic rights in the trust).  Pursuant to the Plan, the Liquidating Trustee will in good faith value the assets transferred to the Liquidating Trust, and all parties to the Liquidating Trust (including holders of Claims and Equity Interests receiving Liquidating Trust Interests) must consistently use such valuation for all U.S. federal income tax purposes.

A holder's share of any proceeds received by a Liquidating Trust upon the sale or other disposition of the assets of the Liquidating Trust (other than any such amounts received as a result of the subsequent disallowance of Disputed Claims or the reallocation among holders of Allowed Claims of undeliverable Plan distributions) should not be included, for federal income tax purposes, in the holder's amount realized in respect of its Allowed Claim but should be separately treated as amounts realized in respect of such holder's ownership interest in the underlying assets of the Liquidating Trust.  See Section C.1— "Tax Treatment of Liquidating Trust and Holders of Beneficial Interests," below.

A holder's tax basis in its respective share of the Liquidating Trust Assets will equal the fair market value of such interest, and the holder's holding period generally will begin the day following the establishment of a Liquidating Trust.

## 2. Holders of Allowed Senior Unsecured Claims, Senior Affiliate Claims, Senior Third-Party Guarantee Claims, Senior Affiliate Guarantee Claims, Convenience Claims, Convenience Guarantee Claims, General Unsecured Claims, Affiliate Claims and Third-Party Guarantee Claims

Pursuant to the Plan, a holder of an Allowed Senior Unsecured Claim, Senior Affiliate Claim, Senior Affiliate Guarantee Claim, Senior Third-Party Guarantee Claim, Convenience Claim, Convenience Guarantee Claim, General Unsecured Claim, Affiliate Claim and Third-Party Guarantee Claim will receive its Pro Rata Share of Distributions from time to time (not to exceed the amount of its Allowed Claim).  The holder of any such Allowed Claim generally will realize gain or loss in an amount equal to the difference, if any, between (a) the amount of Cash and the fair market value of any other property received in the exchange (other than amounts allocable to accrued but unpaid interest) and (b) the holder's adjusted tax basis in the Claim (other than in respect of accrued but unpaid interest).  In the case of a guarantee claim, amounts received generally would be aggregated with any amounts received on the holder's primary claim.  It is possible that any loss, or a portion of any gain, realized by a holder of a Claim may have to be deferred until all of the distributions to such holder are received.

140

As discussed in the next section, the amount of Cash or other property received in respect of Claims for accrued but unpaid interest will be taxed as ordinary income, except to the extent previously included in income by a holder under his method of accounting.

### 3.    Allocation of Consideration to Interest

Pursuant to the section 8.12 of the Plan, all distributions in respect of Allowed Claims will be allocated first to the principal amount of the Allowed Claim (as determined for federal income tax purposes), with any excess allocated to accrued but unpaid interest. However, there is no assurance that such allocation would be respected by the IRS for federal income tax purposes.  In general, to the extent any amount received (whether stock, cash, or other property) by a holder of a debt instrument is received in satisfaction of accrued interest during its holding period, such amount will be taxable to the holder as interest income (if not previously included in the holder's gross income under the holder's normal method of accounting).  Conversely, a holder generally recognizes a deductible loss to the extent any accrued interest claimed was previously included in its gross income and is not paid in full.  Each holder of an Allowed Claim is urged to consult its own tax advisor regarding the allocation of consideration and the taxation or deductibility of unpaid interest for tax purposes.

### C.    Tax Treatment of a Liquidating Trust and Holders of Beneficial  Interests

### 1.    Classification of the Liquidating Trust

A Liquidating Trust, if created pursuant to the Plan, is intended to qualify as a "liquidating trust" for U.S. federal income tax purposes.  In general, a liquidating trust is not a separate taxable entity, but rather is treated for U.S. federal income tax purposes as a "grantor trust" (i.e., all income and loss is taxed directly to the liquidating trust beneficiaries).  However, merely establishing a trust as a liquidating trust does not ensure that it will be treated as a grantor trust for U.S. federal income tax purposes.  The IRS, in Revenue Procedure 94-45, 1994-2 C.B. 684, set forth the general criteria for obtaining an IRS ruling as to the grantor trust status of a liquidating trust under a chapter 11 plan.   Any such Liquidating Trust will be structured to comply with such general criteria.  Pursuant to the Plan, and in conformity with Revenue Procedure 94-45, all parties (including, without limitation, the Debtors, the Liquidating Trustee, holders of Allowed Claims and Equity Interests, and the Liquidating Trust Beneficiaries) will be required to treat, for U.S. federal income tax purposes, the Liquidating Trust as a grantor trust of which the Liquidating Trust Beneficiaries are the owners and grantors.  The following discussion assumes that any such Liquidating Trust will be so respected for U.S. federal income tax purposes.  However, no opinion of counsel has been requested, and the Debtors or Liquidating Trustee may or may not obtain a ruling from the IRS, concerning the tax status of the Liquidating Trust as a grantor trust.  Accordingly, there can be no assurance that the IRS would not take a contrary position.  If the IRS were to challenge successfully the classification of a Liquidating Trust, the U.S. federal income tax consequences to the Liquidating Trust, the Liquidating Trust Beneficiaries and the Debtors could vary from those discussed herein (including the potential for an entity-level tax on income of the Liquidating Trust).

### 2.    General Tax Reporting by the Liquidating Trust and Beneficiaries

For all U.S. federal income tax purposes, all parties (including, without limitation, the Debtors, the Liquidating Trustee, holders of Allowed Claims and Equity Interests, and the Liquidating Trust Beneficiaries) must treat the transfer of the Liquidating Trust Assets to the Liquidating Trust in accordance with the terms of the Plan. Pursuant to the Plan, the Liquidating Trust Assets (other than assets allocable to Disputed Claims) are treated, for U.S. federal income tax purposes, as having been transferred, subject to any obligations relating to those assets, directly to the holders of the respective Claims or Equity Interests receiving Liquidating Trust Interests (with each holder receiving an undivided interest in such assets in accordance with their economic interests in such assets), followed by the transfer by the holders of such assets to the Liquidating Trust in exchange for the Liquidating Trust Interests. Accordingly, all parties must treat the Liquidating Trust as a grantor trust of which the holders of Liquidating Trust Interests are the owners and grantors, and treat the Liquidating Trust Beneficiaries as the direct owners of an undivided interest in the Liquidating Trust Assets (other than any assets allocable to Disputed Claims), consistent with their economic interests therein, for all U.S. federal income tax purposes.

Allocations of taxable income of the Liquidating Trust (other than taxable income allocable to any assets allocable to, or retained on account of, Disputed Claims) among the Liquidating Trust Beneficiaries shall be determined by reference to the manner in which an amount of cash equal to such taxable income would be distributed (were such cash permitted to be distributed at such time) if, immediately prior to such deemed distribution, the Liquidating Trust had distributed all its assets (valued at their tax book value, and other than assets allocable to Disputed Claims) to the Liquidating Trust Beneficiaries, adjusted for prior taxable income and loss and taking into account all prior and concurrent distributions from the Liquidating Trust. Similarly, taxable loss of the Liquidating Trust shall be allocated by reference to the manner in which an economic loss would be borne immediately after a liquidating distribution of the remaining Liquidating Trust Assets. The tax book value of the Liquidating Trust Assets for this purpose shall equal their fair market value on the date of the transfer of the Liquidating Trust Assets to the Liquidating Trust, adjusted in accordance with tax accounting principles prescribed by the IRC, applicable Treasury Regulations, and other applicable administrative and judicial authorities and pronouncements.

As soon as reasonably practicable after the transfer of the Liquidating Trust Assets to the Liquidating Trust, the Liquidating Trustee shall make a good faith valuation of the Liquidating Trust Assets. All parties to the Liquidating Trust (including, without limitation, the Debtors, holders of Allowed Claims and Equity Interests, and the Liquidating Trust Beneficiaries) must consistently use such valuation for all U.S. federal income tax purposes. The valuation will be made available, from time to time, as relevant for tax reporting purposes.

Taxable income or loss allocated to a Liquidating Trust Beneficiary will be treated as income or loss with respect to such Liquidating Trust Beneficiary's undivided interest in the Liquidating Trust Assets, and not as income or loss with respect to its prior Allowed Claim or Equity Interest. The character of any income and the character and ability to use any loss will depend on the particular situation of the Liquidating Trust Beneficiary. It is currently unknown whether and to what extent the Liquidating Trust Interests will be transferable.

The U.S. federal income tax obligations of a holder with respect to its Liquidating Trust Interest are not dependent on the Liquidating Trust distributing any cash or other proceeds. Thus, a holder may incur a U.S. federal income tax liability with respect to its allocable share of Liquidating Trust income even if the Liquidating Trust does not make a concurrent distribution to the holder.  In general, other than in respect of cash retained on account of Disputed Claims and distributions resulting from undeliverable distributions (the subsequent distribution of which still relates to a holder's Allowed Claim), a distribution of cash by the Liquidating Trust will not be separately taxable to a Liquidating Trust Beneficiary since the beneficiary is already regarded for federal income tax purposes as owning the underlying assets (and was taxed at the time the cash was earned or received by the Liquidating Trust).  Holders are urged to consult their tax advisors regarding the appropriate federal income tax treatment of any subsequent distributions of cash originally retained by the Liquidating Trust on account of Disputed Claims.

The Liquidating Trustee will comply with all applicable governmental withholding requirements (see section 8.8 of the Plan).  Thus, in the case of any Liquidating Trust Beneficiaries that are not U.S. persons, the Liquidating Trustee may be required to withhold up to 30% of the income or proceeds allocable to such persons, depending on the circumstances (including whether the type of income is subject to a lower treaty rate).  As indicated above, the foregoing discussion of the U.S. federal income tax consequences of the Plan does not generally address the consequences to non-U.S. holders; accordingly, such holders should consult their tax advisors with respect to the U.S. federal income tax consequences of the Plan, including owning an interest in the Liquidating Trust.

The Liquidating Trustee will file with the IRS tax returns for the Liquidating Trust consistent with its classification as a granter trust pursuant to Treasury Regulation section 1.671-4(a).  Except as discussed below with respect to any reserve for Disputed Claims, the Liquidating Trustee also will send annually to each holder of a Liquidating Trust Interest a separate statement regarding the receipts and expenditures of the Liquidating Trust as relevant for U.S. federal income tax purposes and will instruct all such holders to use such information in preparing their U.S. federal income tax returns or to forward the appropriate information to such holder's underlying beneficial holders with instructions to utilize such information in preparing their U.S. federal income tax returns.

### 3.      Tax Reporting for Assets Allocable to Disputed Claims

Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt by the Liquidating Trustee of an IRS private letter ruling if the Liquidating Trustee so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by the Liquidating Trustee), the Liquidating Trustee (A) may elect to treat any Liquidating Trust Assets allocable to, or retained on account of, Disputed Claims as a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9, and (B) to the extent permitted by applicable law, will report consistently for state and local income tax purposes.

Accordingly, if a "disputed ownership fund" election is made, any amounts allocable to, or retained on account of, Disputed Claims will be subject to tax annually on a separate entity basis on any net income earned with respect to the Liquidating Trust Assets in

such reserves, and all distributions from such assets (which distributions will be net of the expenses relating to the retention of such assets) will be treated as received by holders in respect of their Claims as if distributed by the Debtors.  All parties (including, without limitation, the Debtors, the Liquidating Trustee and the Liquidating Trust Beneficiaries) will be required to report for tax purposes consistently with the foregoing.

### D.    Withholding on Distributions, and Information Reporting

All distributions to holders of Allowed Claims under the Plan are subject to any applicable tax withholding, including employment tax withholding.  Under federal income tax law, interest, dividends, and other reportable payments may, under certain circumstances, be subject to "backup withholding" at the then applicable withholding rate (currently 28%).  Backup withholding generally applies if the holder (a) fails to furnish its social security number or other taxpayer identification number, (b) furnishes an incorrect taxpayer identification number, (c) fails properly to report interest or dividends, or (d) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the tax identification number provided is its correct number and that it is not subject to backup withholding.  Backup withholding is not an additional tax but merely an advance payment, which may be refunded to the extent it results in an overpayment of tax.  Certain persons are exempt from backup withholding, including, in certain circumstances, corporations and financial institutions.  These categories are very broad; however, there are numerous exceptions.  Holders of Allowed Claims are urged to consult their tax advisors regarding the Treasury Regulations governing backup withholding and whether the transactions contemplated by the Plan would be subject to these Treasury Regulations.

In addition, a holder of an Allowed Claim or a Liquidating Trust Beneficiary that is a *not* a U.S. person may be subject to up to 30% withholding, depending on, among other things, the particular type of income and whether the type of income is subject to a lower treaty rate.  As to certain Claims, it is possible that withholding may be required with respect to Distributions by the Debtors even if no withholding would have been required if payment was made prior to the Chapter 11 Cases.  *A non-U.S. holder may also be subject to other adverse consequences in connection with the implementation of the Plan.  As discussed above, the foregoing discussion of the U.S. federal income tax consequences of the Plan does not generally address the consequences to non-U.S. holders.  Holders are urged to consult their tax advisors regarding potential withholding on Distributions by the Debtors or payments from the Liquidating Trustee.*

In addition, Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds.  Holders are urged to consult their tax advisors regarding these Treasury Regulations and whether the transactions contemplated by the Plan would be subject to these Treasury Regulations and require disclosure on the holder's tax returns.

US_ACTIVE:\43795376\03\58399.0008

## XVI.    ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

The Plan affords holders of Allowed Claims the potential for the greatest realization on the Debtors' assets and, therefore, is in the best interests of such holders. If, however, the requisite acceptances are not received, or the requisite acceptances are received but the Plan is not subsequently confirmed and consummated, the theoretical alternatives include: (i) formulation of an alternative plan or plans of reorganization or (ii) liquidation of all of the Debtors under chapter 7 of the Bankruptcy Code.

### A.    Alternative Plan(s)

The Debtors have evaluated numerous alternatives in connection with the Plan. After evaluating these alternatives the Debtors concluded that the Plan, assuming confirmation and successful implementation, is the best alternative to maximize recoveries by holders of Claims. If the Plan is not confirmed, alternative plans proposed by the Debtors or any other party may contemplate global substantive consolidation of the Debtors, strict recognition of the Debtors as separate corporate entities, or a compromise and settlement that differs from the economic proposal embodied by the Plan.

An alternative chapter 11 plan has been filed by each of (i) the Ad Hoc Group which provides for the substantive consolidation of the Debtors and certain of its non-Debtor foreign Affiliates and (ii) the Non-Con Plan Proponents which does not substantively consolidate the Debtors and their Affiliates but instead strictly recognizes the corporate integrity of each of the Debtors.

An alternative plan that seeks to substantively consolidate the Debtors' estates generally would result in (i) the consolidation of the assets and liabilities of the Debtors; (ii) the elimination of Affiliate Claims, subsidiary equity or ownership interests, multiple creditor Claims, joint and several liability Claims and Guarantee Claims; and (iii) the payment of allowed Claims from a common pool of assets. Specifically related to the Debtors' Chapter 11 Cases and Claims, it is likely that Affiliate Claims and Guarantee Claims would be disregarded and the Debtors would not make any distributions in respect thereof.

An alternative plan that does not substantively consolidate the Debtors and their Affiliates but instead strictly recognizes the corporate integrity of each of the Debtors would yield a very divergent result from the plan based on substantive consolidation. In a plan that strictly recognizes the corporate integrity of the Debtors, all Allowed Guarantee Claims and Affiliate Claims would be recognized in full and receive distributions based on their full amount. Holders of Allowed Claims of a particular Debtor would be entitled to receive a Distribution only from the assets of that particular Debtor. In the Debtors' Chapter 11 Cases, in a plan that strictly recognizes the corporate integrity of each Debtor, the holders of Allowed Claims of the different Debtors would receive disparate Distributions, as certain Debtors have more assets or liabilities than others. As the ultimate parent company for Lehman, LBHI issued various guarantees and had significant Intercompany liabilities. As compared to Distributions under the Plan, distributions by LBHI would be greatly diluted and spread across a large group of holders

145

of Allowed Claims based on direct obligations of LBHI, Guarantees Claims and Affiliate Claims.

A plan (i) based on substantive consolidation or (ii) that strictly recognizes the corporate integrity of each Debtor, would both invite protracted litigation with respect to such determination and the Claims which would take years to resolve.  Any additional distributions received by a particular Class under such plan would be diminished by the time value of money from having waited years to receive such payments.

If the Plan is not confirmed, the Debtors may remain in chapter 11 for an extended period of time and incur significant additional expenses in the management of their assets.  The Plan enables holders of Allowed Claims to realize a fair and equitable recovery and value under the circumstances, and the best opportunity for an expeditious conclusion of these atypical Chapter 11 Cases.

### B.    Liquidation under Chapter 7

If no plan is confirmed, the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be elected or appointed to liquidate all of the Debtors' assets for distribution to creditors in accordance with the priorities established by the Bankruptcy Code.  It is impossible to predict precisely how the proceeds of the liquidation would be distributed to the respective holders of Claims against or Equity Interests in the Debtors.

In liquidation under Chapter 7, before creditors received any distribution, additional administrative expenses involved in the appointment of a trustee or trustees and attorneys, accountants and other professionals to assist such trustees would cause a substantial diminution in the value of the Debtors' assets.  The assets available for distribution to creditors would be sold at distressed prices and reduced by such additional expenses and by Claims, some of which would be entitled to priority, which would arise by reason of the liquidation and from the rejection of leases and other executory contracts in connection with the cessation of operations and the failure to realize the greater orderly liquidation value of the Debtors' assets.

In a liquidation under chapter 11, the Debtors' assets could be sold in an orderly fashion over a more extended period of time than in a liquidation under chapter 7.  Thus, a Chapter 11 liquidation is likely to result in greater recoveries than in a chapter 7 liquidation for all Classes.  In addition, the Plan provides that initial distributions from the liquidation of the Debtors could be made earlier pursuant to the Plan, if confirmed, than distributions could be made in a liquidation of such Debtors under chapter 7.

THE PLAN AFFORDS SUBSTANTIALLY GREATER BENEFITS TO HOLDERS OF IMPAIRED CLAIMS THAN WOULD ANY OTHER REASONABLY CONFIRMABLE REORGANIZATION PLAN OR LIQUIDATION UNDER ANY CHAPTER OF THE BANKRUPTCY CODE.

The Liquidation Analysis, prepared by the Debtors with their financial advisors and attached hereto as Exhibit 5, is premised upon a liquidation in a chapter 7 case.  In the analysis, the Debtors have taken into account the nature, status, and underlying value of the

assets of the Debtors, the ultimate realizable value of such assets, and the extent to which the assets are subject to liens and security interests.

THE RECOVERIES ESTIMATED TO BE AVAILABLE IN LIQUIDATION ARE NOT LIKELY TO AFFORD HOLDERS OF CLAIMS AS GREAT A REALIZATION POTENTIAL AS DOES THE PLAN.

## XVII.   VOTING PROCEDURES AND REQUIREMENTS

### A.      **Ballots and Voting Deadline**

The Debtors solicitation and voting procedures were approved pursuant to the Disclosure Statement Order.  The Disclosure Statement Order contains a detailed description of the solicitation, voting and tabulation procedures that will be utilized by the Debtors in these Chapter 11 Cases.

A Ballot for the acceptance or rejection of the Plan is included with the Disclosure Statement transmitted to the holders of Claims that the Debtors believe may be entitled to vote to accept or reject the Plan.   BEFORE COMPLETING YOUR BALLOT, PLEASE READ CAREFULLY THE VOTING INSTRUCTION SHEET THAT ACCOMPANIES THE BALLOT.

If you hold Claims in more than one Class and you are entitled to vote Claims in more than one Class, you will receive separate Ballots, which must be used for each separate Class of Claims.  Instructions for returning Ballots are included with each form of Ballot.  If the return envelope provided with your Ballot was addressed to your bank or brokerage firm, please allow sufficient time for that firm to process your vote on a Master Ballot before the Voting Deadline.

TO BE COUNTED, YOUR BALLOT OR THE (MASTER BALLOT CAST ON YOUR BEHALF) THE PLAN MUST BE **RECEIVED** BY NO LATER THAN **4:00 P.M. (PREVAILING EASTERN TIME) ON NOVEMBER 4, 2011.**  ANY EXECUTED BALLOT RECEIVED THAT DOES NOT INDICATE EITHER AN ACCEPTANCE OR A REJECTION OF THE PLAN, OR THAT INDICATES BOTH AN ACCEPTANCE AND A REJECTION OF THE PLAN SHALL NOT BE COUNTED.

Pursuant to the Disclosure Statement Order, the Bankruptcy Court set August 1, 2011 as the record date for holders of Claims and Equity Interests entitled to vote on the Plan (the "Voting Record Date").  Accordingly, only holders of record as of the Voting Record Date that otherwise are entitled to vote under the Plan will receive a Ballot and may vote on the Plan.

SPECIAL NOTE TO CREDITORS VOTING A FILED OR SCHEDULED CLAIM: YOUR BALLOT MAY SET FORTH A CLAIM AMOUNT THAT IS BASED EITHER ON YOUR PROOF OF CLAIM OR DEBTORS' SCHEDULES OF LIABILITIES. BY INCLUDING SUCH CLAIM AMOUNT, DEBTORS ARE NOT ADMITTING THAT YOU HAVE A CLAIM IN THE STATED AMOUNT AND ARE NOT WAIVING ANY RIGHTS THEY MAY HAVE TO OBJECT TO YOUR VOTING OF THE CLAIM IN SUCH AMOUNT OR YOUR RECOVERY UNDER THE PLAN BASED ON SUCH AMOUNT.

147

### B.     Parties Entitled to Vote

Generally, any holder of an Allowed Claim against or Equity Interest in any of the Debtors as of the Voting Record Date whose Claim or Equity Interest has not previously been disallowed by the Bankruptcy Court is entitled to vote to accept or reject the Plan if such Claim or Equity Interest is Impaired under the Plan.  Under section 1124 of the Bankruptcy Code, a class of Claims or Equity Interests is deemed to be "Impaired" under a plan unless (i) the plan leaves unaltered the legal, equitable and contractual rights to which such Claim or Equity Interest entitles the holder thereof or (ii) notwithstanding any legal right to an accelerated payment of such Claim or Equity Interest, the plan cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such Claim or Equity Interest as it existed before the default.

A holder of a Claim or Equity Interest may vote to accept or reject a plan if the Claim or Equity Interest is "allowed," which means generally that no party-in-interest has objected to such Claim or Equity Interest, and the Claim or Equity Interest is Impaired by the plan.  If, however, the holder of an Impaired Claim or Equity Interest will not receive or retain any property under the plan on account of such Claim or Equity Interest, the Bankruptcy Code deems such holder to have rejected the plan, and, accordingly, holders of such Claims and Equity Interests do not actually vote on the plan.  If a Claim or Equity Interest is not Impaired by the plan, the Bankruptcy Code deems the holder of such Claim or Equity Interest to have accepted the plan and, accordingly, holders of such Claims and Equity Interests are not entitled to vote on the plan.  The Plan does not include any Classes or Equity Interests that are not Impaired.

Holders of Claims in LBHI Classes 10A, 10B, 10C and 11 are Impaired but will not receive or retain any property under the Plan on account of their Claims.  All Holders of Equity Interests in the Debtors are impaired.  Accordingly, under section 1126(g) of the Bankruptcy Code, Classes LBHI Class 10A, 10B, 10C and 11 and Equity Interests in all Debtors are deemed to have rejected the Plan and are not entitled to vote in respect of the Plan.  Therefore, in accordance with sections 1126 and 1129 of the Bankruptcy Code, the Debtors are only soliciting acceptances from holders of Claims in all other Classes.

Any Claim or Equity Interest as to which an objection has been filed is not entitled to vote, unless the Bankruptcy Court, upon application of the holder to whose Claim or Equity Interest an objection has been made temporarily allows such Claim or Equity Interest to the extent that it deems proper for the purpose of accepting or rejecting the Plan.  A vote may be disregarded if the Bankruptcy Court determines, pursuant to section 1126(e) of the Bankruptcy Code, that it was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

## C.     Further Information; Additional Copies

        If you have any questions or require further information about the voting procedure for voting your Claim or about the solicitation materials, or if you wish to obtain an additional copy of the Plan, this Disclosure Statement, or any exhibits to such documents (at your own expense, unless otherwise specifically required by Federal Rule of Bankruptcy Procedure 3017(d)), please contact the Solicitation Agent:

**Epiq Bankruptcy Solutions, LLC**
**Attn: Lehman Ballot Processing Center**
**757 Third Avenue, 3rd Floor**
**New York, New York 10017**
**U.S.: 1-866-879-0688 or International: 1-503-597-7691**

US_ACTIVE:\43795376\03\58399.0008

**A191**

## XVIII. CONCLUSION AND RECOMMENDATION

Confirmation and implementation of the Plan is preferable to any of the alternatives described above because it will provide the greatest recoveries to holders of Allowed Claims.   Other alternatives would involve significant delay, uncertainty and substantial additional administrative costs.  The Debtors urge holders of impaired Claims entitled to vote on the Plan to accept the Plan and to evidence such acceptance by returning their Ballots so that they will be received no later than 4:00 p.m., Eastern Time, on November 4, 2011.

Dated:   New York, New York
         August 31, 2011

LEHMAN BROTHERS HOLDINGS INC.


By: _____/s/ John Suckow_____
       Name:  John Suckow
       Title:  President and Chief Operating Officer


LB 745 LLC


By: _____/s/ John Suckow_____
       Name:  John Suckow
       Title:  President and Chief Operating Officer


PAMI STATLER ARMS LLC


By: _____/s/ John Suckow_____
       Name:  John Suckow
       Title:  Authorized Signatory


LEHMAN BROTHERS COMMODITY SERVICES INC.


By: _____/s/ John Suckow_____
       Name:  John Suckow
       Title:  President and Chief Operating Officer

LEHMAN BROTHERS SPECIAL FINANCING INC.


By: _____/s/ John Suckow_____
       Name:  John Suckow
       Title:  President and Chief Operating Officer


LEHMAN BROTHERS OTC DERIVATIVES INC.


By: _____/s/ John Suckow_____
       Name:  John Suckow
       Title:  President and Chief Operating Officer


LEHMAN BROTHERS DERIVATIVE PRODUCTS INC.


By: _____/s/ Daniel Ehrmann_____
       Name:  Daniel Ehrmann
       Title:  Vice President


LEHMAN COMMERCIAL PAPER INC.


By: _____/s/ John Suckow_____
       Name:  John Suckow
       Title:  President and Chief Operating Officer


LEHMAN BROTHERS COMMERCIAL CORP.


By: _____/s/ John Suckow_____
       Name:  John Suckow
       Title:  President and Chief Operating Officer


LEHMAN BROTHERS FINANCIAL PRODUCTS INC.


By: _____/s/ Daniel Ehrmann_____
       Name:  Daniel Ehrmann
       Title:  Vice President

151

**A193**

CES AVIATION LLC


By: _____/s/ John Suckow_____
     Name:  John Suckow
     Title:  President and Chief Operating Officer

CES AVIATION V LLC


By: _____/s/ John Suckow_____
     Name:  John Suckow
     Title:  President and Chief Operating Officer


CES AVIATION IX LLC


By: _____/s/ John Suckow_____
     Name:  John Suckow
     Title:  President and Chief Operating Officer


EAST DOVER LIMITED


By: _____/s/ Daniel Ehrmann_____
     Name:  Daniel Ehrmann
     Title:  Duly Authorized Officer


LEHMAN SCOTTISH FINANCE L.P., by its general
  partner Property Asset Management Inc.


By: _____/s/ John Suckow_____
     Name:  John Suckow
     Title:  President and Chief Operating Officer


LUXEMBOURG RESIDENTIAL PROPERTIES LOAN
FINANCE S.A.R.L.


By: _____/s/ Daniel Ehrmann_____
     Name:  Daniel Ehrmann
     Title:  Manager

152

BNC MORTGAGE LLC


By:     /s/ John Suckow
        Name:  John Suckow
        Title:  Authorized Signatory


LB ROSE RANCH LLC


By:        /s/ John Suckow
        Name:  John Suckow
        Title:  Authorized Signatory


STRUCTURED ASSET SECURITIES CORPORATION


By:     /s/ John Suckow
        Name:  John Suckow
        Title:  President and Chief Operating Officer


LB 2080 KALAKAUA OWNERS LLC, by its managing member PAMI LLC


By:     /s/ John Suckow
        Name:  John Suckow
        Title:  President and Chief Operating Officer


MERIT, LLC, by its Manager
LEHMAN COMMERCIAL PAPER INC.


By:     /s/ John Suckow
        Name:  John Suckow
        Title:  President and Chief Operating Officer

LB SOMERSET LLC, by its managing member
PAMI LLC


By: _____/s/ John Suckow_____
        Name:  John Suckow
        Title:  President and Chief Operating Officer


LB PREFERRED SOMERSET LLC, by its managing
member PAMI LLC


By: _____/s/ John Suckow_____
        Name:  John Suckow
        Title:  President and Chief Operating Officer

US_ACTIVE:\43795376\03\58399.0008

**A196**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

----------------------------------------------------------------x
                                         :

In re                              :          **Chapter 11 Case No.**
                                           :

**LEHMAN BROTHERS HOLDINGS INC.,** *et al.,*  :          **08-13555 (JMP)**
                                           :

                   **Debtors.**         :          **(Jointly Administered)**
                                           :

----------------------------------------------------------------x


### MODIFIED THIRD AMENDED JOINT CHAPTER 11 PLAN OF
### LEHMAN BROTHERS HOLDINGS INC. AND ITS AFFILIATED DEBTORS

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Tel: (212) 310-8000
Fax: (212) 310-8007

Attorneys for Debtors and
Debtors in Possession

Dated: New York, New York
       November 29, 2011

# TABLE OF CONTENTS

**Page**

ARTICLE I        DEFINITIONS AND CONSTRUCTION OF TERMS...................... 1

ARTICLE II       TREATMENT OF ADMINISTRATIVE EXPENSE CLAIMS
                 AND PRIORITY TAX CLAIMS ...................................... 17

2.1    Administrative Expense Claims........................................ 17

2.2    Professional Compensation and Reimbursement Claims ...................... 17

2.3    Priority Tax Claims.................................................. 18

ARTICLE III      CLASSIFICATION OF CLAIMS AND EQUITY
                 INTERESTS ...................................................... 18

3.1    LBHI ............................................................. 18

3.2    LCPI ............................................................. 19

3.3    LBCS ............................................................. 19

3.4    LBSF ............................................................. 19

3.5    LOTC ............................................................. 20

3.6    LBCC ............................................................. 20

3.7    LBDP ............................................................. 20

3.8    LBFP ............................................................. 21

3.9    LB 745 ............................................................ 21

3.10   PAMI Statler ...................................................... 21

3.11   CES .............................................................. 21

3.12   CES V ............................................................ 22

3.13   CES IX ........................................................... 22

3.14   East Dover ........................................................ 22

3.15   LS Finance ........................................................ 22

3.16   LUXCO ............................................................ 23

3.17   BNC .............................................................. 23

3.18   LB Rose Ranch ..................................................... 23

3.19   SASCO ............................................................ 23

3.20   LB 2080 ........................................................... 24

3.21   Merit ............................................................. 24

3.22   Preferred Somerset ................................................. 24

# TABLE OF CONTENTS
## (continued)

| | | Page |
|---|---|---|
| 3.23 | Somerset................................................................................................ | 24 |
| ARTICLE IV | TREATMENT OF CLAIMS AGAINST AND EQUITY INTERESTS IN LBHI............................................................ | 25 |
| 4.1 | LBHI Class 1 – Priority Non-Tax Claims against LBHI........................ | 25 |
| 4.2 | LBHI Class 2 – Secured Claims against LBHI...................................... | 25 |
| 4.3 | LBHI Class 3 – Senior Unsecured Claims against LBHI....................... | 25 |
| 4.4 | LBHI Class 4A – Senior Affiliate Claims against LBHI....................... | 25 |
| 4.5 | LBHI Class 4B – Senior Affiliate Guarantee Claims against LBHI ....... | 26 |
| 4.6 | LBHI Class 5 – Senior Third-Party Guarantee Claims against LBHI ................................................................................................ | 26 |
| 4.7 | LBHI Class 6A – Convenience Claims against LBHI............................ | 26 |
| 4.8 | LBHI Class 6B – Convenience Guarantee Claims against LBHI........... | 26 |
| 4.9 | LBHI Class 7 – General Unsecured Claims against LBHI..................... | 27 |
| 4.10 | LBHI Class 8 – Affiliate Claims against LBHI .................................... | 27 |
| 4.11 | LBHI Class 9A – Third-Party Guarantee Claims against LBHI............. | 27 |
| 4.12 | LBHI Class 9B – Third-Party Guarantee Claims of the Racers Trusts against LBHI ............................................................................ | 27 |
| 4.13 | LBHI Class 10A – Subordinated Class 10A Claims against LBHI......... | 27 |
| 4.14 | LBHI Class 10B – Subordinated Class 10B Claims against LBHI ........ | 28 |
| 4.15 | LBHI Class 10C – Subordinated Class 10C Claims against LBHI ........ | 28 |
| 4.16 | LBHI Class 11 – Section 510(b) Claims against LBHI ......................... | 28 |
| 4.17 | LBHI Class 12 – Equity Interests in LBHI ........................................... | 28 |
| ARTICLE V | TREATMENT OF CLAIMS AGAINST AND EQUITY INTERESTS IN SUBSIDIARY DEBTORS .................................... | 29 |
| 5.1 | LCPI Class 1 – Priority Non-Tax Claims against LCPI ........................ | 29 |
| 5.2 | LCPI Class 2 – Secured Claims against LCPI ...................................... | 29 |
| 5.3 | LCPI Class 3 – Convenience Claims against LCPI ............................... | 30 |
| 5.4 | LCPI Class 4A – General Unsecured Claims other than those of Designated Entities against LCPI ....................................................... | 30 |
| 5.5 | LCPI Class 4B – General Unsecured Claims of Designated Entities against LCPI.................................................................................... | 30 |
| 5.6 | LCPI Class 5A – Affiliate Claims of LBHI against LCPI..................... | 30 |

## TABLE OF CONTENTS
### (continued)

5.7    LCPI Class 5B – Affiliate Claims of Participating Subsidiary Debtors against LCPI ............................................................. 31

5.8    LCPI Class 5C – Affiliate Claims other than those of Participating Debtors against LCPI ................................................................ 31

5.9    LCPI Class 6 – Equity Interests in LCPI ................................................ 31

5.10   LBCS Class 1 – Priority Non-Tax Claims against LBCS ...................... 31

5.11   LBCS Class 2 – Secured Claims against LBCS ................................... 32

5.12   LBCS Class 3 – Convenience Claims against LBCS ............................ 32

5.13   LBCS Class 4 – General Unsecured Claims against LBCS .................. 32

5.14   LBCS Class 5A – Affiliate Claims of LBHI against LBCS ................... 32

5.15   LBCS Class 5B – Affiliate Claims of Participating Subsidiary Debtors against LBCS ............................................................. 33

5.16   LBCS Class 5C – Affiliate Claims other than those of Participating Debtors against LBCS ........................................................ 33

5.17   LBCS Class 6 – Equity Interests in LBCS ............................................ 33

5.18   LBSF Class 1 – Priority Non-Tax Claims against LBSF ...................... 33

5.19   LBSF Class 2 – Secured Claims against LBSF ..................................... 34

5.20   LBSF Class 3 – Convenience Claims against LBSF .............................. 34

5.21   LBSF Class 4A – General Unsecured Claims other than those of the Racers Trusts against LBSF ...................................................... 34

5.22   LBSF Class 4B – General Unsecured Claims of the Racers Trusts against LBSF ................................................................. 34

5.23   LBSF Class 5A – Affiliate Claims of LBHI against LBSF ................... 35

5.24   LBSF Class 5B – Affiliate Claims of Participating Subsidiary Debtors against LBSF .............................................................. 35

5.25   LBSF Class 5C – Affiliate Claims other than those of Participating Debtors against LBSF ........................................................ 35

5.26   LBSF Class 6 – Equity Interests in LBSF ............................................. 35

5.27   LOTC Class 1 – Priority Non-Tax Claims against LOTC ..................... 36

5.28   LOTC Class 2 – Secured Claims against LOTC .................................... 36

5.29   LOTC Class 3 – Convenience Claims against LOTC ............................ 36

5.30   LOTC Class 4 – General Unsecured Claims against LOTC ................... 36

US_ACTIVE:¥43869458¥01¥58399.0008

# TABLE OF CONTENTS
## (continued)

5.31    LOTC Class 5A – Affiliate Claims of LBHI against LOTC ................... 37

5.32    LOTC Class 5B – Affiliate Claims of Participating Subsidiary
Debtors against LOTC ................................................................................ 37

5.33    LOTC Class 5C – Affiliate Claims other than those of Participating
Debtors against LOTC ................................................................................ 37

5.34    LOTC Class 6 – Equity Interests in LOTC ................................................ 37

5.35    LBCC Class 1 – Priority Non-Tax Claims against LBCC ...................... 38

5.36    LBCC Class 2 – Secured Claims against LBCC .................................... 38

5.37    LBCC Class 3 – Convenience Claims against LBCC ............................ 38

5.38    LBCC Class 4 – General Unsecured Claims against LBCC ................... 38

5.39    LBCC Class 5A – Affiliate Claims of LBHI against LBCC ................... 39

5.40    LBCC Class 5B – Affiliate Claims of Participating Subsidiary
Debtors against LBCC ................................................................................ 39

5.41    LBCC Class 5C – Affiliate Claims other than those of Participating
Debtors against LBCC ................................................................................ 39

5.42    LBCC Class 6 – Equity Interests in LBCC ............................................... 39

5.43    LBDP Class 1 – Priority Non-Tax Claims against LBDP ...................... 40

5.44    LBDP Class 2 – Secured Claims against LBDP ..................................... 40

5.45    LBDP Class 3 – General Unsecured Claims against LBDP ................... 40

5.46    LBDP Class 4A – Affiliate Claims of LBHI against LBDP ................... 40

5.47    LBDP Class 4B – Affiliate Claims other than those of LBHI
against LBDP. ............................................................................................. 41

5.48    LBDP Class 5 – Equity Interests in LBDP ............................................... 41

5.49    LBFP Class 1 – Priority Non-Tax Claims against LBFP ...................... 41

5.50    LBFP Class 2 – Secured Claims against LBFP ..................................... 41

5.51    LBFP Class 3 – General Unsecured Claims against LBFP ................... 42

5.52    LBFP Class 4A – Affiliate Claims of LBHI against LBFP ................... 42

5.53    LBFP Class 4B – Affiliate Claims other than those of LBHI
against LBFP ............................................................................................... 42

5.54    LBFP Class 5 – Equity Interests in LBFP ............................................... 42

5.55    LB 745 Class 1 – Priority Non-Tax Claims against LB 745 ................... 42

5.56    LB 745 Class 2 – Secured Claims against LB 745 ................................. 43

# TABLE OF CONTENTS
## (continued)

Page

5.57   LB 745 Class 3 – General Unsecured Claims against LB 745 ............... 43

5.58   LB 745 Class 4A – Affiliate Claims of LBHI against LB 745 ............... 43

5.59   LB 745 Class 4B – Affiliate Claims other than those of LBHI against LB 745 ......................................................................... 43

5.60   LB 745 Class 5 – Equity Interests in LB 745 .......................................... 44

5.61   PAMI Statler Class 1 – Priority Non-Tax Claims against PAMI Statler ........................................................................................ 44

5.62   PAMI Statler Class 2 – Secured Claims against PAMI Statler .............. 44

5.63   PAMI Statler Class 3 – General Unsecured Claims against PAMI Statler ........................................................................................ 45

5.64   PAMI Statler Class 4A – Affiliate Claims of LBHI against PAMI Statler ........................................................................................ 45

5.65   PAMI Statler Class 4B – Affiliate Claims other than those of LBHI against PAMI Statler ............................................................... 45

5.66   PAMI Statler Class 5 – Equity Interests in PAMI Statler....................... 45

5.67   CES Class 1 – Priority Non-Tax Claims against CES............................. 45

5.68   CES Class 2 – Secured Claims against CES............................................ 46

5.69   CES Class 3 – General Unsecured Claims against CES........................... 46

5.70   CES Class 4A – Affiliate Claims of LBHI against CES ......................... 46

5.71   CES Class 4B – Affiliate Claims other than those of LBHI against CES ............................................................................................. 46

5.72   CES Class 5 – Equity Interests in CES .................................................... 47

5.73   CES V Class 1 – Priority Non-Tax Claims against CES V ..................... 47

5.74   CES V Class 2 – Secured Claims against CES V .................................... 47

5.75   CES V Class 3 – General Unsecured Claims against CES V .................. 47

5.76   CES V Class 4A – Affiliate Claims of LBHI against CES V.................. 48

5.77   CES V Class 4B – Affiliate Claims other than those of LBHI against CES V .......................................................................................... 48

5.78   CES V Class 5 – Equity Interests in CES V ............................................ 48

5.79   CES IX Class 1 – Priority Non-Tax Claims against CES IX .................. 48

5.80   CES IX Class 2 – Secured Claims against CES IX ................................. 49

5.81   CES IX Class 3 – General Unsecured Claims against CES IX .............. 49

A202

# TABLE OF CONTENTS
## (continued)

Page

5.82    CES IX Class 4A – Affiliate Claims of LBHI against CES IX .............. 49

5.83    CES IX Class 4B – Affiliate Claims other than those of LBHI against CES IX ......................................................................................... 49

5.84    CES IX Class 5 – Equity Interests in CES IX ......................................... 49

5.85    East Dover Class 1 – Priority Non-Tax Claims against East Dover ........ 50

5.86    East Dover Class 2 – Secured Claims against East Dover ...................... 50

5.87    East Dover Class 3 – General Unsecured Claims against East Dover ......................................................................................................... 50

5.88    East Dover Class 4A – Affiliate Claims of LBHI against East Dover ......................................................................................................... 51

5.89    East Dover Class 4B – Affiliate Claims other than those of LBHI against East Dover .................................................................................. 51

5.90    East Dover Class 5 – Equity Interests in East Dover ............................. 51

5.91    LS Finance Class 1 – Priority Non-Tax Claims against LS Finance ....... 51

5.92    LS Finance Class 2 – Secured Claims against LS Finance ..................... 52

5.93    LS Finance Class 3 – General Unsecured Claims against LS Finance ................................................................................................... 52

5.94    LS Finance Class 4A – Affiliate Claims of LBHI against LS Finance ................................................................................................... 52

5.95    LS Finance Class 4B – Affiliate Claims other than those of LBHI against LS Finance ................................................................................. 52

5.96    LS Finance Class 5 – Equity Interests in LS Finance ............................. 53

5.97    LUXCO Class 1 – Priority Non-Tax Claims against LUXCO ................ 53

5.98    LUXCO Class 2 – Secured Claims against LUXCO ............................... 53

5.99    LUXCO Class 3 – General Unsecured Claims against LUXCO ............. 53

5.100   LUXCO Class 4A – Affiliate Claims of LBHI against LUXCO ............. 54

5.101   LUXCO Class 4B – Affiliate Claims other than those of LBHI against LUXCO ...................................................................................... 54

5.102   LUXCO Class 5 – Equity Interests in LUXCO ...................................... 54

5.103   BNC Class 1 – Priority Non-Tax Claims against BNC .......................... 54

5.104   BNC Class 2 – Secured Claims against BNC ......................................... 55

5.105   BNC Class 3 – General Unsecured Claims against BNC ....................... 55

A203

# TABLE OF CONTENTS
## (continued)

Page

5.106    BNC Class 4A – Affiliate Claims of LBHI against BNC ...................... 55

5.107    BNC Class 4B – Affiliate Claims other than those of LBHI against BNC ................................................................................................... 55

5.108    BNC Class 5 – Equity Interests in BNC .................................................. 55

5.109    LB Rose Ranch Class 1 – Priority Non-Tax Claims against LB Rose Ranch .................................................................................................. 56

5.110    LB Rose Ranch Class 2 – Secured Claims against LB Rose Ranch ........ 56

5.111    LB Rose Ranch Class 3 – General Unsecured Claims against LB Rose Ranch .................................................................................................. 56

5.112    LB Rose Ranch 4A – Affiliate Claims of LBHI against LB Rose Ranch ................................................................................................................ 57

5.113    LB Rose Ranch Class 4B – Affiliate Claims other than those of LBHI against LB Rose Ranch ................................................................... 57

5.114    LB Rose Ranch Class 5 – Equity Interests in LB Rose Ranch ................ 57

5.115    SASCO Class 1 – Priority Non-Tax Claims against SASCO .................. 57

5.116    SASCO Class 2 – Secured Claims against SASCO ................................. 58

5.117    SASCO Class 3 – General Unsecured Claims against SASCO ............... 58

5.118    SASCO Class 4A – Affiliate Claims of LBHI against SASCO .............. 58

5.119    SASCO Class 4B – Affiliate Claims other than those of LBHI against SASCO ............................................................................................ 58

5.120    SASCO Class 5 – Equity Interests in SASCO ........................................ 58

5.121    LB 2080 Class 1 – Priority Non-Tax Claims against LB 2080 .............. 59

5.122    LB 2080 Class 2 – Secured Claims against LB 2080 ............................. 59

5.123    LB 2080 Class 3 – General Unsecured Claims against LB 2080 ............ 59

5.124    LB 2080 Class 4A – Affiliate Claims of LBHI against LB 2080 ............ 59

5.125    LB 2080 Class 4B – Affiliate Claims other than those of LBHI against LB 2080 ........................................................................................... 60

5.126    LB 2080 Class 5 – Equity Interests in LB 2080 ..................................... 60

5.127    Merit Class 1 – Priority Non-Tax Claims against Merit ......................... 60

5.128    Merit Class 2 – Secured Claims against Merit ........................................ 60

5.129    Merit Class 3 – General Unsecured Claims against Merit ...................... 61

5.130    Merit Class 4A – Affiliate Claims of LBHI against Merit ..................... 61

A204

# TABLE OF CONTENTS
## (continued)

Page

5.131   Merit Class 4B – Affiliate Claims other than those of LBHI against Merit .......................................................................................... 61

5.132   Merit Class 5 – Equity Interests in Merit ................................. 61

5.133   Preferred Somerset Class 1 – Priority Non-Tax Claims against Preferred Somerset ............................................................. 62

5.134   Preferred Somerset Class 2 – Secured Claims against Preferred Somerset ............................................................. 62

5.135   Preferred Somerset Class 3 – General Unsecured Claims against Preferred Somerset ............................................................. 62

5.136   Preferred Somerset Class 4A – Affiliate Claims of LBHI against Preferred Somerset ............................................................. 62

5.137   Preferred Somerset Class 4B – Affiliate Claims other than those of LBHI against Preferred Somerset ............................................. 63

5.138   Preferred Somerset Class 5 – Equity Interests in Preferred Somerset ............................................................. 63

5.139   Somerset Class 1 – Priority Non-Tax Claims against Somerset ............. 63

5.140   Somerset Class 2 – Secured Claims against Somerset ........................... 63

5.141   Somerset Class 3 – General Unsecured Claims against Somerset ........... 64

5.142   Somerset Class 4A – Affiliate Claims of LBHI against Somerset .......... 64

5.143   Somerset Class 4B – Affiliate Claims other than those of LBHI against Somerset ............................................................. 64

5.144   Somerset Class 5 – Equity Interests in Somerset ................................... 64

ARTICLE VI        IMPLEMENTATION OF THE PLAN ............................................. 65

6.1   Plan Administrator .................................................................... 65

6.2   LAMCO ...................................................................................... 66

6.3   Debtor Allocation Agreement ................................................... 66

6.4   Redistribution of Subordinated Claims Recoveries ................................. 67

6.5   Plan Settlement ......................................................................... 67

6.6   Closing of Chapter 11 Case ...................................................... 70

6.7   Indenture Trustee and Creditors' Committee Members Fees .................... 70

ARTICLE VII       CORPORATE GOVERNANCE ....................................................... 70

7.1   Corporate Form .......................................................................... 70

A205

# TABLE OF CONTENTS
## (continued)

**Page**

| | | |
|---|---|---|
| 7.2 | LBHI Board of Directors and Officers | 70 |
| 7.3 | Subsidiary Debtor Post-Effective Date Management | 71 |
| 7.4 | Plan Trust. | 72 |
| 7.5 | Corporate Existence | 73 |
| 7.6 | Wind-Down | 73 |
| 7.7 | Certificate of Incorporation and By-Laws | 73 |
| 7.8 | Stock Trading Restrictions | 73 |
| ARTICLE VIII | PROVISIONS REGARDING VOTING AND DISTRIBUTIONS UNDER THE PLAN | 74 |
| 8.1 | Voting of Claims | 74 |
| 8.2 | Nonconsensual Confirmation | 74 |
| 8.3 | Distributions of Available Cash | 74 |
| 8.4 | Disputed Claims Holdback. | 74 |
| 8.5 | Minimum Distribution and Manner of Payment | 75 |
| 8.6 | Distributions Free and Clear | 76 |
| 8.7 | Delivery of Distributions and Undeliverable Distributions | 76 |
| 8.8 | Withholding and Reporting Requirements | 76 |
| 8.9 | Time Bar to Cash Payment Rights | 77 |
| 8.10 | Setoffs and Recoupment | 77 |
| 8.11 | Claims Register | 77 |
| 8.12 | Allocation of Distributions | 77 |
| 8.13 | Maximum Distribution | 77 |
| 8.14 | Rights of Reimbursement | 79 |
| 8.15 | Distributions to Non-Controlled Affiliates | 80 |
| ARTICLE IX | PROCEDURES FOR TREATING DISPUTED CLAIMS | 80 |
| 9.1 | Objections | 80 |
| 9.2 | No Distributions Pending Allowance | 80 |
| 9.3 | Estimation of Claims | 80 |
| 9.4 | Resolution of Disputed Claims | 81 |

# TABLE OF CONTENTS
## (continued)

| | | Page |
|---|---|---|
| ARTICLE X | LIQUIDATING TRUST | 81 |
| 10.1 | Execution of Liquidating Trust Agreement | 81 |
| 10.2 | Purpose of the Liquidating Trust | 81 |
| 10.3 | Liquidating Trust Assets | 81 |
| 10.4 | Administration of the Liquidating Trust | 81 |
| 10.5 | Liquidating Trustee's Tax Power for Debtors | 82 |
| 10.6 | Cash Investments | 82 |
| 10.7 | Distribution of Liquidating Trust Interests | 82 |
| 10.8 | Federal Income Tax Treatment of Liquidating Trust | 82 |
| 10.9 | Tax Reporting | 82 |
| 10.10 | Dissolution | 84 |
| ARTICLE XI | TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES | 84 |
| 11.1 | Executory Contracts and Unexpired Leases | 84 |
| 11.2 | Approval of Assumption and Rejection of Executory Contracts and Unexpired Leases | 85 |
| 11.3 | Cure of Defaults | 85 |
| 11.4 | Bar Date for Filing Proofs of Claim Relating to Executory Contracts and Unexpired Leases Rejected Pursuant to the Plan | 85 |
| 11.5 | Insurance Policies | 85 |
| 11.6 | Indemnification Obligations | 86 |
| ARTICLE XII | EFFECTIVENESS OF THE PLAN | 86 |
| 12.1 | Conditions Precedent to the Confirmation of the Plan | 86 |
| 12.2 | Conditions Precedent to the Effective Date of the Plan | 86 |
| 12.3 | Waiver of Conditions | 86 |
| ARTICLE XIII | EFFECTS OF CONFIRMATION | 87 |
| 13.1 | Vesting of Assets | 87 |
| 13.2 | Binding Effect | 87 |
| 13.3 | Release and Exculpation | 87 |
| 13.4 | Discharge | 88 |
| 13.5 | Injunction | 88 |

# TABLE OF CONTENTS
## (continued)

Page

| | | |
|---|---|---|
| 13.6 | United States Government | 89 |
| 13.7 | Terms of Injunctions or Stays | 89 |
| 13.8 | Retention of Litigation Claims and Reservation of Rights | 89 |
| 13.9 | Barclays Sale Order. | 89 |
| 13.10 | No Waiver of Rights and Defenses. | 89 |
| ARTICLE XIV | RETENTION OF JURISDICTION | 90 |
| 14.1 | Retention of Jurisdiction | 90 |
| ARTICLE XV | MISCELLANEOUS PROVISIONS | 91 |
| 15.1 | Post-Effective Date Role of Creditors' Committee and Fee Committee | 91 |
| 15.2 | Issuance of New Securities | 92 |
| 15.3 | Exemption from Securities Laws | 92 |
| 15.4 | Exemption from Transfer Taxes | 92 |
| 15.5 | Plan Supplement | 93 |
| 15.6 | Post-Effective Date Reporting. | 93 |
| 15.7 | Payment of Statutory Fees. | 94 |
| 15.8 | Amendment or Modification of Plan | 94 |
| 15.9 | Withdrawal or Revocation of the Plan | 95 |
| 15.10 | Courts of Competent Jurisdiction | 95 |
| 15.11 | Transactions on Business Days | 95 |
| 15.12 | Notices | 95 |
| 15.13 | Severability | 96 |
| 15.14 | Governing Law | 96 |
| 15.15 | Headings | 96 |
| 15.16 | Exhibits | 96 |
| 15.17 | Successors and Assigns | 96 |

A208

## Schedules

Plan Adjustment Percentages....................................................................Schedule 1

Debtors' Claims Schedule.........................................................................Schedule 2

Bankhaus Settlement Agreement...............................................................Schedule 3

PSA Creditors ...........................................................................................Schedule 4

Hong Kong Settlement Agreement............................................................Schedule 5

LBT Settlement Agreement ......................................................................Schedule 6

Singapore Settlement Agreement ..............................................................Schedule 7

# ARTICLE I
## Definitions and Construction of Terms

<u>Definitions</u>.   As used in the Plan, the following terms shall have the respective meanings specified below:

1.1   <u>Administrative Expense Claim</u> means any right to payment constituting a cost or expense of administration of any of the Chapter 11 Cases under sections 503(b) and 507(a)(2) of the Bankruptcy Code, including, without limitation, any actual and necessary expenses of preserving the estates of the Debtors, any actual and necessary expenses of operating the businesses of the Debtors, any indebtedness or obligations incurred or assumed by the Debtors in connection with the conduct of their business from and after the Commencement Date, all compensation and reimbursement of expenses to the extent Allowed by the Bankruptcy Court under sections 330 or 503 of the Bankruptcy Code.

1.2   <u>Affiliate</u> shall have the meaning assigned to such term in section 101(2) of the Bankruptcy Code, excluding a Designated Entity.

1.3   <u>Affiliate Claim</u> means (a) in the case of LBHI, any Claim asserted by an Affiliate of LBHI, other than an Administrative Expense Claim, a Priority Non-Tax Claim, a Secured Claim, a Senior Affiliate Claim or a Senior Affiliate Guarantee Claim, or (b) in the case of a Subsidiary Debtor, any Claim asserted by an Affiliate of that Subsidiary Debtor, other than an Administrative Expense Claim, a Priority Non-Tax Claim or a Secured Claim.

1.4   <u>Allowed</u> means, with reference to any Claim against the Debtors, (a) any Claim that has been listed by the Debtors in their Schedules, as such Schedules may be amended by the Debtors from time to time in accordance with Bankruptcy Rule 1009, as liquidated in amount and not disputed or contingent and for which no contrary proof of claim has been filed, (b) any Claim allowed hereunder, (c) any Claim that is not Disputed, (d) any Claim that is compromised, settled, or otherwise resolved pursuant to the authority granted to the Debtors pursuant to a Final Order of the Bankruptcy Court, including, without limitation, the Derivatives Procedures Order, or under <u>Section 9.4</u> of the Plan, or (e) any Claim that, if Disputed, has been Allowed by Final Order; *provided*, *however*, that Claims allowed solely for the purpose of voting to accept or reject the Plan pursuant to an order of the Bankruptcy Court shall not be considered "Allowed Claims" hereunder.  Unless otherwise specified herein or by order of the Bankruptcy Court, "Allowed Administrative Expense Claim" or "Allowed Claim" shall not, for any purpose under the Plan, include interest on such Administrative Expense Claim or Claim from and after the Commencement Date.  For purposes of a Foreign Proceeding, an Allowed Claim includes a Claim that has been accepted or allowed in a Foreign Proceeding by settlement with a Foreign Administrator or Final Order of a court of competent jurisdiction.

1.5   <u>Available Cash</u> means (a) all Cash of a Debtor realized from its business operations, the sale or other disposition of its assets, the interest earned on its invested funds, recoveries from Litigation Claims or from any other source or otherwise less (b) the amount of Cash (i) necessary to pay holders of Allowed Administrative Expense Claims, Priority Tax Claims, Priority Non-Tax Claims, Secured Claims, Convenience Claims and Convenience Guarantee Claims against such Debtor in accordance with the Plan, and (ii) estimated and

reserved by such Debtor to (A) adequately fund the reasonable and necessary projected costs to carry out the provisions of the Plan with respect to such Debtor on and after the Effective Date, (B) pay all fees payable under section 1930 of chapter 123 of title 28 of the United States Code and (C) fund and maintain any postpetition reserve requirements in connection with any agreements or otherwise. Available Cash shall include the applicable portions of (i) excess amounts retained for Disputed Claims that become available in accordance with <u>Section 8.4</u> of the Plan, (ii) amounts represented by undeliverable Distributions in accordance with <u>Section 8.7</u>, or (iii) amounts attributable to voided checks in accordance with <u>Section 8.9</u> of the Plan.

1.6     <u>Avoidance Actions</u> means any actions commenced or that may be commenced before or after the Effective Date pursuant to sections 544, 545, 547, 548, 549, 550, 551 or 553 of the Bankruptcy Code.

1.7     <u>Ballot</u> means the form distributed to each holder of an impaired Claim that is entitled to vote to accept or reject the Plan.

1.8     <u>Bankhaus Settlement Agreement</u> means that certain Amended and Restated Settlement Agreement, dated March 1, 2011, among the Debtors and certain Debtor-Controlled Entities and the LBB Administrator, as amended by that certain Amendment #1, dated March 18, 2011, to the Amended and Restated Settlement Agreement, which are annexed hereto as <u>Schedule 3</u>.

1.9     <u>Bankruptcy Code</u> means title 11 of the United States Code, as amended from time to time, as applicable to the Chapter 11 Cases.

1.10    <u>Bankruptcy Court</u> means the United States Bankruptcy Court for the Southern District of New York having jurisdiction over the Chapter 11 Cases.

1.11    <u>Bankruptcy Rules</u> means the Federal Rules of Bankruptcy Procedure, as promulgated by the United States Supreme Court under section 2072 of title 28 of the United States Code, and any Local Rules of the Bankruptcy Court.

1.12    <u>Barclays Sale Order</u> means the *Order Under 11 U.S.C. § § 105(a), 363, and 365 and Federal Rules of Bankruptcy Procedure 2002, 6004 and 6006 Authorizing and Approving (A) the Sale of Purchased Assets Free and Clear of Liens and Other Interests and (B) Assumption and Assignment of Executory Contracts and Unexpired Leases*, entered by the Bankruptcy Court on September 20, 2008 in the Chapter 11 Cases [Docket No. 258] and the concurrent order entered in the LBI Proceeding on September 19, 2008 [Case No. 08-1420; Docket No. 3].

1.13    <u>Bar Date Order</u> means the *Order Pursuant to Section 502(b)(9) of the Bankruptcy Code and Bankruptcy Rule 3003(c)(3) Establishing the Deadline for Filing Proofs of Claim, Approving the Form and Manner of Notice thereof and Approving the Proof of Claim Form* approved and entered by the Bankruptcy Court on July 2, 2009 [Docket No. 4271], as the same may be amended from time to time.

1.14    <u>BNC</u> means BNC Mortgage LLC.

1.15    Business Day means any day other than a Saturday, a Sunday, and any other day on which commercial banks in New York, New York are required or authorized to close by law or executive order.

1.16    Cash means legal tender of the United States of America.

1.17    Causes of Action means, without limitation, any and all actions, causes of action, controversies, liabilities, obligations, rights, suits, damages, judgments, Claims, and demands whatsoever, whether known or unknown, reduced to judgment, liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, secured or unsecured, assertable directly or derivatively, existing or hereafter arising, in law, equity, or otherwise, based in whole or in part upon any act or omission or other event occurring prior to the Effective Date.

1.18    CES means CES Aviation LLC.

1.19    CES V means CES Aviation V LLC.

1.20    CES IX means CES Aviation IX LLC.

1.21    Chapter 11 Cases means the voluntary cases commenced by the Debtors under chapter 11 of the Bankruptcy Code, which are being jointly administered and are currently pending before the Bankruptcy Court, styled *In re Lehman Brothers Holdings Inc., et al.*, Chapter 11 Case No. 08-13555 (JMP).

1.22    Claim shall have the meaning assigned to such term in section 101(5) of the Bankruptcy Code.

1.23    Class means a category of holders of Claims or Equity Interests as set forth in Article III of the Plan.

1.24    Class 10A Subordinated Notes means, collectively, (a) the Floating Rate Junior Subordinated Deferrable Interest Debentures due 2035 issued pursuant to the Eighth Supplemental Indenture, dated as of August 19, 2005, between LBHI and JPMorgan Chase Bank, as trustee; (b) the Fixed/Floating Rate Subordinated Notes due 2016 Series 5065, issued pursuant to a final term sheet dated as of September 26, 2006 under the Euro Medium-Term Note Program; (c) the Floating Rate Subordinated Notes due 2037 Series EB17, issued pursuant to a final term sheet dated as of January 23, 2007 under the Euro Medium-Term Note Program; (d) the Fixed/Floating Rate Subordinated Notes due 2019 Series 6222, issued pursuant to the final term sheet dated as of February 14, 2007 under the Euro Medium-Term Note Program; and (e) the Floating Rate Subordinated Notes due 2037 Series EB 18, issued pursuant to a final term sheet, dated as of May 30, 2007, under the Euro Medium-Term Note Program.

1.25    Class 10B Subordinated Notes means, collectively, (a) the 6.375% Subordinated Deferrable Interest Debentures due 2052, issued pursuant to the Fourth Supplemental Indenture, dated as of March 17, 2003, between LBHI and JPMorgan Chase Bank, as trustee; (b) the 6.375% Subordinated Deferrable Interest Debentures due October 2052, issued pursuant to the Fifth Supplemental Indenture, dated as of October 31, 2003, between LBHI and JPMorgan Chase Bank, as trustee; (c) the 6.00% Subordinated Deferrable Interest Debentures due 2053, issued

A212

pursuant to the Sixth Supplemental Indenture, dated as of April 22, 2004, between LBHI and JPMorgan Chase Bank, as trustee; (d) the 6.24% Subordinated Deferrable Interest Debentures due 2054, issued pursuant to the Seventh Supplemental Indenture, dated as of January 18, 2005, between LBHI and JPMorgan Chase Bank, as trustee; (e) the 5.75% Subordinated Notes due 2017, issued pursuant to the Ninth Supplemental Indenture, dated as of October 24, 2006, between LBHI and JPMorgan Chase Bank, as trustee; (f) the Fixed and Floating Rate Subordinated Notes Due 2032, issued pursuant to the Tenth Supplemental Indenture, dated as of May 1, 2007, between LBHI and JPMorgan Chase Bank, as trustee; (g) the 6.50% Subordinated Notes Due 2017, issued pursuant to the Thirteenth Supplemental Indenture, dated as of July 19, 2007, between LBHI and The Bank of New York, as trustee; (h) the 6.875% Subordinated Notes Due 2037, issued pursuant to the Fourteenth Supplemental Indenture, dated as of July 19, 2007, between LBHI and The Bank of New York, as trustee; (i) the 6.75% Subordinated Notes Due 2017, issued pursuant to the Fifteenth Supplemental Indenture, dated as of December 21, 2007, between LBHI and The Bank of New York, as trustee; and (j) the 7.50% Subordinated Notes Due 2038, issued pursuant to the Sixteenth Supplemental Indenture, dated as of May 9, 2008, between LBHI and The Bank of New York, as trustee.

1.26    Class 10C Subordinated Notes means, collectively, (a) the 5.707% Remarketable Junior Subordinated Debentures due 2043, issued pursuant to the Eleventh Supplemental Indenture, dated as of May 17, 2007, between LBHI and U.S. Bank National Association, as trustee; and (b) the Floating Rate Remarketable Junior Subordinated Debentures due 2043, issued pursuant to the Twelfth Supplemental Indenture, dated as of May 17, 2007, between LBHI and U.S. Bank National Association, as trustee.

1.27    Closing Date means the date upon which all of the Chapter 11 Cases have been closed in accordance with Section 6.6 of the Plan.

1.28    Collateral means any property or interest in Property of the Estates of the Debtors subject to a Lien to secure the payment of a Claim, which Lien is not subject to avoidance or otherwise invalid and unenforceable under the Bankruptcy Code or applicable non-bankruptcy law.

1.29    Commencement Date means (a) September 15, 2008 with respect to LBHI, (b) September 16, 2008 with respect to LB 745, (c) September 23, 2008 with respect to PAMI Statler, (d) October 3, 2008 with respect to LBCS, LBSF and LOTC, (d) October 5, 2008 with respect to LBDP, LCPI, LBCC, LBFP, CES, CES V, CES IX, East Dover and LS Finance, (e) January 7, 2009 with respect to LUXCO, (f) January 9, 2009 with respect to BNC, (g) February 9, 2009 with respect to SASCO and LB Rose Ranch, (h) April 23, 2009 with respect to LB 2080, (i) December 14, 2009 with respect to Merit, and (j) December 22, 2009 with respect to Somerset and Preferred Somerset.

1.30    Confirmation Date means the date upon which the Bankruptcy Court enters a Confirmation Order on the docket of the Chapter 11 Cases as applicable to each Debtor.

1.31    Confirmation Hearing means the hearing held by the Bankruptcy Court, as the same may be continued from time to time, to consider confirmation of the Plan.

A213

1.32    Confirmation Order means an order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code as applicable to each Debtor.

1.33    Contributing Class means each of LBHI Class 5, LBHI Class 9A, LCPI Class 4A, LCPI Class 4B, LCPI Class 5B, LCPI Class 5C, LBCS Class 4, LBCS Class 5B, LBCS Class 5C, LBSF Class 4A, LBSF Class 5B, LBSF Class 5C, LOTC Class 4, LOTC Class 5B, LOTC Class 5C, LBCC Class 4, LBCC Class 5B and LBCC Class 5C.

1.34    Convenience Claim means any Senior Unsecured Claim or General Unsecured Claim other than a Claim on account of a public debt security issued by LBHI, a Claim asserted by a nominee on behalf of one or more beneficial holders of such Claim or a Claim of a Designated Entity that is (a) Allowed in an amount of fifty thousand dollars ($50,000) or less or (b) Allowed in an amount greater than fifty thousand dollars ($50,000) but which is reduced to fifty thousand dollars ($50,000) (i) by an irrevocable written election by the holder of such Allowed Claim made on a properly delivered Ballot or (ii) pursuant to a settlement agreement between the applicable Debtor and holder of such Claim entered into after the Voting Deadline; *provided, however* that (1) any Claim that was Allowed in excess of fifty thousand dollars ($50,000) may not be subdivided into multiple Claims of fifty thousand dollars ($50,000) or less for purposes of receiving treatment as a Convenience Claim, (2) Claims in the same Class held by a Creditor shall be aggregated for purposes of determining whether such Claims are eligible to be Convenience Claims, (3) Claims acquired after the Commencement Date shall not be aggregated unless such Claims are in the same Classes, are held by a Creditor and were originally held by one Creditor, and (4) Claims held by a Creditor prior to the Commencement Date shall not be aggregated with Claims acquired by such Creditor after the Commencement Date.

1.35    Convenience Guarantee Claim means any Senior Third-Party Guarantee Claim or Third-Party Guarantee Claim other than a Claim on account of a public debt security issued by LBHI, a Claim asserted by a nominee on behalf of one or more beneficial holders of such Claim or a Claim of a Designated Entity that is (a) Allowed in an amount of fifty thousand dollars ($50,000) or less or (b) Allowed in an amount greater than fifty thousand dollars ($50,000) but which is reduced to fifty thousand dollars ($50,000) (i) by an irrevocable written election by the holder of such Allowed Claim made on a properly delivered Ballot or (ii) pursuant to a settlement agreement between the applicable Debtor and holder of such Claim entered into after the Voting Deadline; *provided, however* that (1) any Claim that was Allowed in excess of fifty thousand dollars ($50,000) may not be subdivided into multiple Claims of fifty thousand dollars ($50,000) or less for purposes of receiving treatment as a Convenience Guarantee Claim, (2) Claims in the same Class held by a Creditor shall be aggregated for purposes of determining whether such Claims are eligible to be Convenience Guarantee Claims, (3) Claims acquired after the Commencement Date shall not be aggregated unless such Claims are in the same Classes, are held by a Creditor and were originally held by one Creditor, and (4) Claims held by a Creditor prior to the Commencement Date shall not be aggregated with Claims acquired by such Creditor after the Commencement Date.

1.36    Creditor shall have the meaning assigned to such term in section 101(10) of the Bankruptcy Code.

1.37 <u>Creditors' Committee</u> means the statutory committee of unsecured creditors appointed in the Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code.

1.38 <u>Debtor</u> means BNC, CES, CES V, CES IX, East Dover, LB 745, LB 2080, LB Rose Ranch, LBCC, LBCS, LBDP, LBFP, LBHI, LBSF, LCPI, LOTC, LS Finance, LUXCO, Merit, PAMI Statler, Preferred Somerset, SASCO and Somerset, each in its individual capacity as debtor and debtor in possession in its Chapter 11 Case pursuant to sections 101(13), 1107(a) and 1108 of the Bankruptcy Code.

1.39 <u>Debtor Allocation Agreement</u> means the agreement contained in the Plan Supplement among two or more of the Debtors that identifies, allocates and sets forth other agreed rights and obligations with respect to (a) the costs and benefits of Jointly Owned Litigation Claims, (b) commonly held tax benefits and obligations, (c) expenses of administration of the Chapter 11 Cases, and (d) certain other inter-Debtor related issues.

1.40 <u>Debtors' Claims Schedule</u> means the schedule attached hereto as <u>Schedule 2</u> setting forth the amounts of Senior Affiliate Claims, Senior Affiliate Guarantee Claims or Affiliate Claims, as applicable, of a Debtor against another Debtor.

1.41 <u>Debtor-Controlled Entity</u> means a non-Debtor Affiliate of the Debtors that is managed and controlled by a Debtor as of the Effective Date.

1.42 <u>Designated Entity</u> means each of the Racers Trusts and the holder of the Fenway Claims.

1.43 <u>Derivatives Procedures Order</u> means the *Order Pursuant to Sections 105 and 365 of the Bankruptcy Code to Establish Procedures for the Settlement or Assumption or Assignment of Prepetition Derivatives Contracts*, approved and entered by the Bankruptcy Court on December 16, 2008 [Docket No. 2257], as amended or may be amended from time to time.

1.44 <u>Director Selection Committee</u> means the committee established pursuant to <u>Section 7.2(b)</u> of the Plan, the members of which are identified in the Plan Supplement.

1.45 <u>Disclosure Statement</u> means that certain disclosure statement relating to the Plan, including, without limitation, all exhibits and schedules thereto, as approved by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code.

1.46 <u>Disputed</u> means, with reference to any Claim, (a) any Claim proof of which was timely and properly filed that is (i) disputed in whole or in part under the Plan, including, without limitation, any Senior Affiliate Claim, Senior Affiliate Guarantee Claim or Affiliate Claim that is not Allowed in accordance with <u>Section 6.5(b)</u> of the Plan, or (ii) as to which a timely objection and/or request for estimation has been interposed, which objection and/or request for estimation has not been withdrawn or determined by a Final Order, or (b) any Claim, proof of which was required to be filed by the Bar Date Order or another Final Order of the Bankruptcy Court in a form and manner proscribed in such order, but as to which a proof of Claim was not timely or properly filed.

1.47    Distribution means any initial or subsequent payment or transfer made under the Plan.

1.48    Distribution Date means any date on which a Distribution is made upon at least thirty (30) Business Days written notice filed on the docket of the Chapter 11 Cases or otherwise communicated to holders of Allowed Claims.

1.49    East Dover means East Dover Limited.

1.50    Effective Date means the first Business Day on which the conditions to effectiveness of the Plan set forth in Article XII have been satisfied or waived and on which the Plan shall become effective with respect to a Debtor.

1.51    Equity Interest means (a) shares of common stock, preferred stock, other forms of ownership interest, or any other equity security (as defined in section 101(16) of the Bankruptcy Code) in any Debtor that was in existence immediately prior to or on the Commencement Date for such Debtor, and (b) Allowed Claims against LBHI arising out of, relating to, or in connection with any of the foregoing that are subject to section 510(b) of the Bankruptcy Code.

1.52    Excess LBSF Settlement Amount means the Distributions, if any, made in accordance with the last sentence of Section 6.5(f) of the Plan to holders of Allowed Claims in LBSF Class 5A in the event holders of Allowed Claims in LBSF Class 4A are satisfied in full.

1.53    Excess LCPI Settlement Amount means the Distributions, if any, made in accordance with the last sentence of Section 6.5(e) of the Plan to holders of Allowed Claims in LCPI Class 5A in the event holders of Allowed Claims in LCPI Class 4A are satisfied in full.

1.54    Excess Plan Adjustment means the Distributions (including the Plan Adjustment), if any, made in accordance with the last sentence of Section 6.5(a) of the Plan in the event that holders of Allowed Claims in an LBHI Class 3 or LBHI Class 7 are satisfied in full to Participating Debtors for the exclusive benefit of (i) holders of Allowed Claims in such Participating Debtors' Contributing Classes and, in addition to the foregoing, (ii) (A) in the case of LBHI, LBHI Class 9B or (B) in the case of LBSF, LBSF Class 4B.

1.55    Excess Plan Adjustment Portion means, with respect to each Contributing Class and LBHI Class 9B and LBSF Class 4B, (a) if the Excess Plan Adjustment is equal to the Plan Adjustment, the portion of the Plan Adjustment contributed by such Contributing Class, LBHI Class 9B or LBSF Class 4B and (b) if the Excess Plan Adjustment is less than the Plan Adjustment, the portion of the Excess Plan Adjustment that bears the same relationship to the Excess Plan Adjustment as the portion of the Plan Adjustment contributed by such Contributing Class, LBHI Class 9B or LBSF Class 4B bears to the Plan Adjustment, contributed by all Contributing Classes and LBHI Class 9B and LBSF Class 4B.

1.56    Fenway Claim means the Claim asserted by LBHI in connection with the Fenway transaction, which shall be Allowed in accordance with Section 6.5(h) of the Plan.

1.57    Final Order means an order of the Bankruptcy Court or any other court of competent jurisdiction as to which the time to appeal, petition for certiorari, or move for

A216

reargument or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for reargument or rehearing shall then be pending or as to which any right to appeal, petition for certiorari, reargue, or rehear shall have been waived in writing in form and substance satisfactory to the Debtors or, in the event that an appeal, writ of certiorari, or reargument or rehearing thereof has been sought, such order of the Bankruptcy Court or other court of competent jurisdiction shall have been determined by the highest court to which such order was appealed, or certiorari, reargument, or rehearing shall have been denied and the time to take any further appeal, petition for certiorari, or move for reargument or rehearing shall have expired; *provided*, *however*, that the possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules or applicable law, may be filed with respect to such order shall not cause such order not to be a Final Order.

1.58    Foreign Administrator means each of the persons or entities that is managing the affairs and representing the insolvency estate of a Non-Controlled Affiliate that is subject to a Foreign Proceeding.

1.59    Foreign Proceeding means an insolvency, administration, liquidation, rehabilitation, receivership or like proceeding commenced by or initiated against a Non-Controlled Affiliate in a jurisdiction outside of the United States.

1.60    General Unsecured Claim means, (a) in the case of LBHI, any Claim other than an Administrative Expense Claim, a Priority Tax Claim, a Priority Non-Tax Claim, a Secured Claim, a Senior Unsecured Claim, a Senior Affiliate Claim, a Senior Affiliate Guarantee Claim, a Senior Third-Party Guarantee Claim, an Affiliate Claim, a Third-Party Guarantee Claim, a Subordinated Claim or a Section 510(b) Claim, or (b) in the case of each Subsidiary Debtor, any Claim other than an Administrative Expense Claim, a Priority Tax Claim, a Priority Non-Tax Claim, a Secured Claim or an Affiliate Claim.

1.61    Governmental Unit shall have the meaning assigned to such term in section 101(27) of the Bankruptcy Code.

1.62    Guarantee Claim means a Claim asserted against LBHI on the basis of a guarantee, promise, pledge, indemnity or similar agreement by LBHI (a) to satisfy an obligation or liability of another entity or (b) with respect to asset values, collection or net worth of another entity.

1.63    Hong Kong Lehman Entities In Liquidation shall have the meaning assigned to such term in the Hong Kong Settlement Agreement.

1.64    Hong Kong Settlement Agreement means that certain Settlement and Plan Support Agreement, dated July 31, 2011, among the Debtors and the Hong Kong Lehman Entities In Liquidation, which is annexed hereto as Schedule 5.

1.65    Independent Directors means Michael L. Ainslie, John F. Akers, Roger S. Berlind, Thomas H. Cruikshank, Marsha Johnson Evans, Sir Christopher Gent, Jerry A. Grundhofer, Roland A. Hernandez, Henry Kaufman and John D. Macomber.

1.66    <u>Intercompany Funding Balance</u> means that portion of LBHI's Claim against a Subsidiary Debtor, in the amount reflected on page 3 of the Debtors' Claims Schedule, that relates to the funding of operations of such Subsidiary Debtor but does not relate to specific transactions, such as derivative contracts or repurchase agreements.

1.67    <u>IRS</u> means the Internal Revenue Service.

1.68    <u>Jointly Owned Litigation Claims</u> means any Litigation Claims that may be, are or are asserted to be owned, either jointly or individually, by one or more of the Debtors.

1.69    <u>LAMCO</u> means LAMCO Holdings LLC and its subsidiary Affiliates.

1.70    <u>LB 745</u> means LB 745 LLC.

1.71    <u>LB 2080</u> means LB 2080 Kalakaua Owners LLC.

1.72    <u>LBB</u> means Lehman Brothers Bankhaus AG (in Insolvenz).

1.73    <u>LBB Administrator</u> means Dr. Michael C. Frege in his capacity as insolvency administrator (*Insolvenzverwalter*) of LBB.

1.74    <u>LBCC</u> means Lehman Brothers Commercial Corporation.

1.75    <u>LBCS</u> means Lehman Brothers Commodities Services Inc.

1.76    <u>LBDP</u> means Lehman Brothers Derivative Products Inc.

1.77    <u>LBFP</u> means Lehman Brothers Financial Products Inc.

1.78    <u>LBHI</u> means Lehman Brothers Holdings Inc.

1.79    <u>LBHI Stock</u> means the common or preferred stock of LBHI outstanding on the Effective Date.

1.80    <u>LBI</u> means Lehman Brothers Inc.

1.81    <u>LBI Proceeding</u> means the proceeding commenced under the Securities Investor Protection Act of 1970, as amended, with respect to LBI.

1.82    <u>LB Rose Ranch</u> means LB Rose Ranch LLC.

1.83    <u>LBSF</u> means Lehman Brothers Special Financing Inc.

1.84    <u>LBSF Additional Settlement Amount</u> means the first $70 million that is recovered by LBSF in respect of "Total Assets" in excess of $14,156,000,000, the amount of "Total Assets" of LBSF estimated in Exhibit 4 to the Disclosure Statement, dated June 29, 2011, which shall be distributed to only holders of Allowed Claims in LBSF Class 4A and LBSF Class 5C in accordance with <u>Section 6.5(d)</u> of the Plan.

1.85     LBSF Settlement Amount means the first $100 million of Distributions made to LBHI on account of its Allowed Affiliate Claim against LBSF that shall be automatically redistributed in accordance with Section 6.5(f) of the Plan.

1.86     LBSN means Lehman Brothers Securities N.V.

1.87     LBT means Lehman Brothers Treasury Co. B.V.

1.88     LBT Trustees means Rutger J. Schimmelpenninck and Frédéric Verhoeven, in their capacity as bankruptcy trustees (curatoren) for LBT.

1.89     LBT Settlement Agreement that certain Settlement Agreement, dated August 30, 2011, among the Debtors and the LBT Trustees, which is annexed hereto as Schedule 6.

1.90     LCPI means Lehman Commercial Paper Inc.

1.91     LCPI Settlement Amount means the first $100 million of Distributions made to LBHI on account of its Allowed Affiliate Claim against LCPI that shall be automatically redistributed in accordance with Section 6.5(e) of the Plan.

1.92     Lehman means LBHI together with all of its direct and indirect Affiliates existing on or after the LBHI Commencement Date.

1.93     Lehman ALI means Lehman ALI Inc.

1.94     Lehman Singapore Entities means the Lehman Singapore Liquidation Companies and the Lehman Singapore Non-Liquidation Companies as such terms are defined in the Singapore Settlement Agreement.

1.95     Lien shall have the meaning assigned to such term in section 101(37) of the Bankruptcy Code.

1.96     Liquidating Trust means a trust that may be created after the Effective Date in accordance with the provisions of Article X of the Plan and a Liquidating Trust Agreement for the benefit of holders of Allowed Claims or Equity Interests and as determined by the Plan Administrator consistent with the purposes of any such Liquidating Trust pursuant to Section 10.2 of the Plan.

1.97     Liquidating Trust Agreement means an agreement evidencing the terms and provisions governing a Liquidating Trust that shall be entered into prior to the establishment of such Liquidating Trust and pursuant to which a Liquidating Trustee shall manage and administer Liquidating Trust Assets.

1.98     Liquidating Trust Assets means the assets of a Debtor or Debtor-Controlled Entity to be transferred to a Liquidating Trust as may be determined by the Plan Administrator, which shall be described in a Liquidating Trust Agreement.

1.99    Liquidating Trust Beneficiaries means those holders of Allowed Claims against or Equity Interests in a Debtor to the extent such holders receive Liquidating Trust Interests.

1.100    Liquidating Trustee means the person or entity appointed by the Plan Administrator prior to the creation of a Liquidating Trust to administer such Liquidating Trust in accordance with the provisions of Article X of the Plan and a Liquidating Trust Agreement; provided, however, that under no circumstance shall a Liquidating Trustee be a director or officer with respect to any entity over which the Liquidating Trust has control.

1.101    Liquidating Trust Interests means the non-certificated beneficial interests of a Liquidating Trust allocable to holders of Allowed Claims and/or Equity Interests in accordance with the terms and conditions of a Liquidating Trust Agreement, which may or may not be transferable.

1.102    Litigation Claims means any and all Causes of Action held by a Debtor.

1.103    LOTC means Lehman Brothers OTC Derivatives Inc.

1.104    LS Finance means Lehman Scottish Finance L.P.

1.105    LUXCO means Luxembourg Residential Properties Loan Finance S.a.r.l.

1.106    Merit means Merit, LLC.

1.107    New Securities means the securities that may be distributed by a Debtor or Debtor-Controlled Entity after the Effective Date to the holders of Allowed Claims against or Equity Interests in such Debtor representing an interest in an existing or newly formed entity of a Debtor or Debtor-Controlled Entity pursuant to and in a manner consistent with Section 15.2 of the Plan.

1.108    Non-Controlled Affiliate means an Affiliate of the Debtors that is not currently managed and controlled by a Debtor as of the Effective Date, including, without limitation, all Affiliates that are subject to a Foreign Proceeding and LBI.

1.109    Opco Plan Proponents means those entities that are "Non-Consolidation Plan Proponents," as identified in Schedule A to the *Joint Chapter 11 Plan For Lehman Brothers Holdings Inc. and Its Affiliated Debtors Other Than Merit, LLC, LB Somerset, LLC and LB Preferred Somerset LLC Proposed by Non-Consolidation Plan Proponents*, filed on April 25, 2011 [Docket No. 16229], that have Claims against LBSF and LCPI.

1.110    Ordinary Course Professional Order means the *Amended Order Pursuant to Sections 105(a), 327, 328, and 330 of the Bankruptcy Code Authorizing the Debtors to Employ Professionals Utilized in the Ordinary Course of Business*, approved and entered by the Bankruptcy Court on March 25, 2010 [Docket No. 7822], as the same may be amended from time to time.

1.111    PAMI Statler means PAMI Statler Arms LLC.

A220

1.112   Participating Debtors means LBHI together with each of the Participating Subsidiary Debtors.

1.113   Participating Subsidiary Debtor means LCPI, LBSF, LOTC, LBCC or LBCS.

1.114   Plan means, collectively, the chapter 11 plans of each of the Debtors, and (where specified herein) individually, the chapter 11 plan of each Debtor, including, without limitation, the Plan Supplement and all exhibits, supplements, appendices, and schedules hereto, either in its present form or as each of the foregoing may be altered, amended or modified from time to time.

1.115   Plan Administrator means LBHI pursuant to the authority granted in Section 6.1 of the Plan.

1.116   Plan Adjustment means the sum of (a) the Racers Adjustment and (b) the sum of (i) each of the Distributions (excluding Distributions on account of the LBSF Settlement Amount, the LBSF Additional Settlement Amount and the LCPI Settlement Amount) made to holders of Allowed Claims in each Contributing Class, multiplied by (ii) the Plan Adjustment Percentage applicable to each such Contributing Class, that shall be redistributed in accordance with Section 6.5(a) of the Plan.

1.117   Plan Adjustment Percentage means the percentage applicable to a Contributing Class of a Participating Debtor as set forth on Schedule 1 hereto.

1.118   Plan Supplement means the document containing the forms of documents specified in Section 15.5 of the Plan.

1.119   Plan Support Agreement means an agreement to support the Plan that has been or will be executed by a PSA Creditor.

1.120   Plan Trust means the trust established under New York law to hold the Plan Trust Stock on and after the Effective Date.

1.121   Plan Trust Agreement means the agreement contained in the Plan Supplement creating and setting forth the terms and conditions that shall govern the Plan Trust.

1.122   Plan Trust Stock means one new share of LBHI common stock to be issued to the Plan Trust upon cancellation of the LBHI Stock in accordance with Section 4.17(b) of the Plan.

1.123   Plan Trustee means any of the persons acting as trustee of the Plan Trust pursuant to Section 7.4 of the Plan.

1.124   Preferred Somerset means LB Preferred Somerset LLC.

1.125   Primary Claim means a Claim against a Primary Obligor for which a corresponding Guarantee Claim has been asserted.

1.126   Primary Obligor means an entity other than LBHI that is purportedly obligated or liable on a Claim with respect to which a Guarantee Claim has been asserted.

1.127    Priority Non-Tax Claim means any Claim, other than an Administrative Expense Claim or a Priority Tax Claim, entitled to priority in payment under section 507(a) of the Bankruptcy Code or, to the extent applicable, 12 U.S.C. § 4617(b)(15).

1.128    Priority Tax Claim means any Claim of a Governmental Unit of the kind entitled to priority in payment as specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code.

1.129    Property of the Estate means all property of a Debtor pursuant to section 541 of the Bankruptcy Code.

1.130    Pro Rata Share means with respect to an Allowed Claim or Equity Interest (a) within the same Class, the proportion that an Allowed Claim or Equity Interest bears to the sum of all Allowed Claims and Disputed Claims or Allowed Equity Interests and Disputed Equity Interests within such Class, or (b) among all Classes, the proportion that a Class of Allowed Claims bears to the sum of all Allowed Claims and Disputed Claims; provided, however, that Administrative Expense Claims, Priority Tax Claims, Priority Non-Tax Claims, Secured Claims, Convenience Claims, Convenience Guarantee Claims and section 510(b) Claims shall not be considered for purposes of "Pro Rata Share" among all Classes; provided, further, however, that only the following Claims shall be considered in the determination of "Pro Rata Share" among all Classes with respect to the following Distributions:

(i)    Available Cash in the case of LBHI:  Senior Unsecured Claims, Senior Affiliate Claims, Senior Affiliate Guarantee Claims, Senior Third-Party Guarantee Claims, General Unsecured Claims, Affiliate Claims, Third-Party Guarantee Claims and Subordinated Claims.

(ii)    Available Cash in the case of a Subsidiary Debtor:  General Unsecured Claims and Affiliate Claims.

(iii)    LBSF Settlement Amount: General Unsecured Claims against LBSF other than Claims of any of the Racers Trusts.

(iv)    LBSF Additional Settlement Amount: (1) General Unsecured Claims against LBSF other than Claims of any of the Racers Trusts, and (2) Affiliate Claims against LBSF other than Claims of any of the Participating Debtors.

(v)    LCPI Settlement Amount:  General Unsecured Claims against LCPI other than Claims of any Designated Entity.

(vi)    Plan Adjustment:  Senior Unsecured Claims against LBHI and General Unsecured Claims against LBHI.

(vii)    Subordinated Class 10A Distribution:  Senior Unsecured Claims and Senior Affiliate Claims.

(viii)    Subordinated Class 10B Distribution:  Senior Unsecured Claims, Senior Affiliate Claims, Senior Affiliate Guarantee Claims and Senior Third-Party Guarantee Claims.

(ix)    Subordinated Class 10C Distribution:  Senior Unsecured Claims, Senior Affiliate Claims, Senior Affiliate Guarantee Claims, Senior Third-Party Guarantee Claims, Subordinated Class 10A Claims and Subordinated Class 10B Claims.

1.131    PSA Creditor means any Creditor identified on Schedule 4 (as the same may be amended from time to time) that is a party to a Plan Support Agreement with the Debtors that has not been terminated, and the Ad Hoc Group of Lehman Brothers Creditors, and each former, current and future member thereof that executes a Plan Support Agreement prior to the hearing to consider approval of the Disclosure Statement, and each of its officers, directors, managers, members, accountants, financial advisors, investment bankers, agents, restructuring advisors, attorneys, representatives or other professionals serving during the pendency of the Chapter 11 Cases (solely in their capacity as officers, directors, managers, members, accountants, financial advisors, investment bankers, agents, restructuring advisors, attorneys, representatives or other professionals serving during the pendency of the Chapter 11 Cases).

1.132    Racers 2007-A Trust means the Restructured Assets with Enhanced Returns Series 2007-A Trust.

1.133    Racers Adjustment means the Distributions made to the Racers 2007-A Trust on account of (a) in the case of LBSF, $1 billion of its Allowed Claim against LBSF or (b) in the case of LBHI, $1 billion of its Allowed Guarantee Claim against LBHI.

1.134    Racers MM Trust means the Restructured Assets with Enhanced Returns 2007-7-MM Trust.

1.135    Racers Trusts means the Racers 2007-A Trust and the Racers MM Trust.

1.136    Released Parties means, collectively, and in each case, solely in such capacity, the Debtors, the Independent Directors, the Plan Administrator, the Creditors' Committee, each current and former member of the Creditors' Committee and, with respect to each of the foregoing, their respective officers, directors, managers, members, accountants, financial advisors, investment bankers, agents, restructuring advisors, attorneys, representatives or other professionals serving during the pendency of the Chapter 11 Cases (solely in their capacity as officers, directors, managers, members, accountants, financial advisors, investment bankers, agents, restructuring advisors, attorneys, representatives or other professionals serving during the pendency of the Chapter 11 Cases).

1.137    SASCO means Structured Asset Securities Corporation.

1.138    Schedules means the schedules of assets and liabilities, schedules of current income and current expenditures and the statements of financial affairs filed by the Debtors as required by section 521 of the Bankruptcy Code and Bankruptcy Rule 1007, including any supplements or amendments thereto through the Confirmation Date.

1.139    Secured Claim means any Claim (a) to the extent reflected in the Schedules or upon a proof of Claim as a Secured Claim, which is secured by a Lien on Collateral to the extent of the value of such Collateral, as determined in accordance with section 506(a) of the

A223

Bankruptcy Code or (b) that is subject to a valid right of setoff pursuant to section 553 of the Bankruptcy Code.

1.140    Section 510(b) Claim means any Claim against LBHI that is subject to section 510(b) of the Bankruptcy Code other than any Claim arising out of, relating to, or in connection with Equity Interests in LBHI.

1.141    Senior Affiliate Claim means any Claim asserted by an Affiliate of LBHI that is entitled to a contractual right of priority in payment to all Subordinated Claims (excluding an "Other Financial Obligation" as defined in the Class 10B Subordinated Notes or Class 10C Subordinated Notes), other than a Senior Affiliate Guarantee Claim.

1.142    Senior Affiliate Guarantee Claim means any Guarantee Claim asserted by an Affiliate of LBHI that is entitled to a contractual right of priority in payment to Subordinated Class 10B Claims and Subordinated Class 10C Claims, but not Subordinated Class 10A Claims (excluding an "Other Financial Obligation" as defined in the Class 10B Subordinated Notes or Class 10C Subordinated Notes).

1.143    Senior Notes means, collectively, the various notes issued by LBHI as to which Wilmington Trust Co. serves as indenture trustee.

1.144    Senior Third-Party Guarantee Claim means any Guarantee Claim asserted by a third-party that is not an Affiliate of LBHI that is entitled to a contractual right of priority in payment to Subordinated Class 10B Claims and Subordinated Class 10C Claims, but not Subordinated Class 10A Claims (excluding an "Other Financial Obligation" as defined in the Class 10B Subordinated Notes or Class 10C Subordinated Notes).

1.145    Senior Unsecured Claim means any Claim against LBHI that is entitled to a contractual right of priority in payment to all Subordinated Claims (excluding an "Other Financial Obligation" as defined in the Class 10B Subordinated Notes or Class 10C Subordinated Notes), other than a Senior Affiliate Claim, Senior Affiliate Guarantee Claim and Senior Third-Party Guarantee Claim.

1.146    Singapore Settlement Agreement means that certain Settlement Agreement, dated August 24, 2011, among the Debtors, certain Debtor-Controlled Entities and the Lehman Singapore Entities, which is annexed hereto as Schedule 7.

1.147    SIPA Trustee means James W. Giddens as trustee appointed under the Securities Investor Protection Act of 1970 to administer LBI's estate.

1.148    Somerset means LB Somerset LLC.

1.149    Stock Trading Restrictions Order means the *Order Pursuant to Sections 105(a) and 362 of the Bankruptcy Code Approving Restrictions on Certain Transfers of Interests in the Debtors' Estates and Establishing Notification Procedures Relating Thereto* [Docket No. 1386], as the same may be amended from time to time.

A224

1.150    Structured Securities Claims means the Claims against LBHI arising out of structured securities issued or guaranteed by LBHI, which Claims are listed in Exhibit A to the Structured Securities Motion.

1.151    Structured Securities Motion means the *Motion Pursuant to Sections 105(a) and 502(b) of the Bankruptcy Code and Bankruptcy Rule 9019 for Approval of Procedures for Determining the Allowed Amount of Claims Filed Based on Structured Securities Issued or Guaranteed by Lehman Brothers Holdings Inc.*, filed substantially contemporaneously with the Plan.

1.152    Structured Securities Order means an order of the Bankruptcy Court granting the Structured Securities Motion and approving the procedures for the allowance of Structured Securities Claims pursuant to the Structured Securities Valuation Methodologies.

1.153    Structured Securities Valuation Methodologies means the methodologies annexed as Exhibit 11 to the Disclosure Statement for the valuation of Structured Securities Claims.

1.154    Subordinated Class 10A Distribution means the total Distribution that would have been made to holders of Allowed Subordinated Class 10A Claims but for the reallocation of such Distribution pursuant to Section 6.4 of the Plan.

1.155    Subordinated Class 10B Distribution means the total Distribution that would have been made to holders of Allowed Subordinated Class 10B Claims but for the reallocation of such Distribution pursuant to Section 6.4 of the Plan.

1.156    Subordinated Class 10C Distribution means the total Distribution that would have been made to holders of Allowed Subordinated Class 10C Claims but for the reallocation of such Distribution pursuant to Section 6.4 of the Plan.

1.157    Subordinated Claim means any Subordinated Class 10A Claim, Subordinated Class 10B Claim or Subordinated Class 10C Claim.

1.158    Subordinated Class 10A Claim means any Claim against LBHI arising under the Class 10A Subordinated Notes.

1.159    Subordinated Class 10B Claim means any Claim against LBHI arising under the Class 10B Subordinated Notes.

1.160    Subordinated Class 10C Claim means any Claim against LBHI arising under the Class 10C Subordinated Notes.

1.161    Subordinated Notes means, collectively, the Class 10A Subordinated Notes, Class 10B Subordinated Notes and Class 10C Subordinated Notes.

1.162    Subsidiary Debtor means each of the Debtors other than LBHI.

1.163    Third-Party Guarantee Claim means any Guarantee Claim asserted by an entity that is not an Affiliate of LBHI other than a Senior Third-Party Guarantee Claim.

1.164  Voting Deadline means the date fixed by the Bankruptcy Court as the last date upon which holders of Claims may vote to accept or reject the Plan

Rules of Construction.  Wherever from the context it appears appropriate, each term stated in either the singular or the plural shall include both the singular and the plural and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and neuter.  Unless otherwise specified, all section, article, schedule, or exhibit references in the Plan are to the respective Section in, Article of, Schedule to, or Exhibit to, the Plan.  The words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to the Plan as a whole and not to any particular section, subsection, or clause contained in the Plan.  The rules of construction contained in section 102 of the Bankruptcy Code shall apply to the construction of the Plan.  The headings in the Plan are for convenience of reference only and shall not limit or otherwise affect the provisions of the Plan.

## ARTICLE II
## Treatment of Administrative
## Expense Claims and Priority Tax Claims

2.1  Administrative Expense Claims.  Except to the extent that a holder of an Allowed Administrative Expense Claim has been paid by a Debtor prior to the Effective Date or agrees to less favorable treatment, each holder of an Allowed Administrative Expense Claim shall receive Cash from the Debtor obligated for the payment of such Allowed Administrative Expense Claim in an amount equal to the Allowed amount of such Administrative Expense Claim on the later of the Effective Date and the date such Administrative Expense Claim becomes an Allowed Administrative Expense Claim, or as soon thereafter as is practicable; *provided*, *however*, that Allowed Administrative Expense Claims representing liabilities incurred in the ordinary course of business by a Debtor or other obligations incurred by such Debtor shall be paid in full and performed by such Debtor in the ordinary course of business in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing, or other documents relating to such transactions.

2.2  Professional Compensation and Reimbursement Claims.  Other than a professional retained by the Debtors pursuant to the Ordinary Course Professional Order, any entity seeking an award of the Bankruptcy Court of compensation for services rendered and/or reimbursement of expenses incurred on behalf of the Debtors and the Creditors' Committee through and including the Effective Date under section 105(a), 363(b), 503(b)(2), 503(b)(3), 503(b)(4) or 503(b)(5) of the Bankruptcy Code shall (a) file its final application for allowance of such compensation and/or reimbursement by no later than the date that is 120 days after the Effective Date or such other date as may be fixed by the Bankruptcy Court, and (b) be paid by or on behalf of the Debtor in full and in Cash in the amounts Allowed upon (i) the date the order granting such award becomes a Final Order, or as soon thereafter as practicable, or (ii) such other terms as may be mutually agreed upon by the claimant and the Debtor obligated for the payment of such Allowed Claim.  The Debtors are authorized to pay compensation for professional services rendered and reimburse expenses incurred on behalf of the Debtors and the Creditors' Committee after the Effective Date in the ordinary course and without Bankruptcy Court approval.

2.3    <u>Priority Tax Claims</u>.  Except to the extent that a holder of an Allowed Priority Tax Claim has been paid prior to the Effective Date or agrees to less favorable treatment, each holder of an Allowed Priority Tax Claim shall receive from one or more of the Debtors obligated for the payment of such Allowed Priority Tax Claim, and at the sole option of such Debtor(s), (i) Cash in an amount equal to the Allowed amount of such Priority Tax Claim on the later of the Effective Date and the date such Priority Tax Claim becomes an Allowed Priority Tax Claim, or as soon thereafter as is practicable, or (ii) equal Cash payments to be made initially on the Effective Date or as soon thereafter as practicable and semi-annually thereafter in an aggregate amount equal to such Allowed Priority Tax Claim, together with interest at a fixed annual rate determined under applicable non-bankruptcy law, over a period from the Effective Date through the fifth (5th) anniversary after the Commencement Date; *provided*, *however*, that such election shall be without prejudice to the Debtor's right to prepay such Allowed Priority Tax Claim in full or in part without penalty.

**ARTICLE III**
**<u>Classification Of Claims And Equity Interests</u>**

Claims against the Debtors, other than Administrative Expense Claims and Priority Tax Claims, and Equity Interests are classified for all purposes (unless otherwise specified), including voting and Distribution pursuant to the Plan, as follows:

3.1    <u>LBHI</u>

| <u>Class</u> | <u>Designation</u> | <u>Impairment</u> | <u>Entitlement to Vote</u> |
|---|---|---|---|
| 1 | Priority Non-Tax Claims | Impaired | Yes |
| 2 | Secured Claims | Impaired | Yes |
| 3 | Senior Unsecured Claims | Impaired | Yes |
| 4A | Senior Affiliate Claims | Impaired | Yes |
| 4B | Senior Affiliate Guarantee Claims | Impaired | Yes |
| 5 | Senior Third-Party Guarantee Claims | Impaired | Yes |
| 6A | Convenience Claims | Impaired | Yes |
| 6B | Convenience Guarantee Claims | Impaired | Yes |
| 7 | General Unsecured Claims | Impaired | Yes |
| 8 | Affiliate Claims | Impaired | Yes |
| 9A | Third-Party Guarantee Claims other than of the Racers Trusts | Impaired | Yes |
| 9B | Third-Party Guarantee Claims of the Racers Trusts | Impaired | Yes |
| 10A | Subordinated Class 10A Claims | Impaired | No (deemed to reject) |
| 10B | Subordinated Class 10B Claims | Impaired | No (deemed to reject) |
| 10C | Subordinated Class 10C Claims | Impaired | No (deemed to reject) |
| 11 | Section 510(b) Claims | Impaired | No (deemed to reject) |
| 12 | Equity Interests | Impaired | No (deemed to reject) |

A227

### 3.2    LCPI

| Class | Designation | Impairment | Entitlement to Vote |
|---|---|---|---|
| 1 | Priority Non-Tax Claims | Impaired | Yes |
| 2 | Secured Claims | Impaired | Yes |
| 3 | Convenience Claims | Impaired | Yes |
| 4A | General Unsecured Claims other than those of Designated Entities | Impaired | Yes |
| 4B | General Unsecured Claims of Designated Entities | Impaired | Yes |
| 5A | Affiliate Claims of LBHI | Impaired | Yes |
| 5B | Affiliate Claims of Participating Subsidiary Debtors | Impaired | Yes |
| 5C | Affiliate Claims other than those of Participating Debtors | Impaired | Yes |
| 6 | Equity Interests | Impaired | No (deemed to reject) |

### 3.3    LBCS

| Class | Designation | Impairment | Entitlement to Vote |
|---|---|---|---|
| 1 | Priority Non-Tax Claims | Impaired | Yes |
| 2 | Secured Claims | Impaired | Yes |
| 3 | Convenience Claims | Impaired | Yes |
| 4 | General Unsecured Claims | Impaired | Yes |
| 5A | Affiliate Claims of LBHI | Impaired | Yes |
| 5B | Affiliate Claims of Participating Subsidiary Debtors | Impaired | Yes |
| 5C | Affiliate Claims other than those of Participating Debtors | Impaired | Yes |
| 6 | Equity Interests | Impaired | No (deemed to reject) |

### 3.4    LBSF

| Class | Designation | Impairment | Entitlement to Vote |
|---|---|---|---|
| 1 | Priority Non-Tax Claims | Impaired | Yes |
| 2 | Secured Claims | Impaired | Yes |
| 3 | Convenience Claims | Impaired | Yes |
| 4A | General Unsecured Claims other than those of the Racers Trusts | Impaired | Yes |
| 4B | General Unsecured Claims of the Racers Trusts | Impaired | Yes |
| 5A | Affiliate Claims of LBHI | Impaired | Yes |
| 5B | Affiliate Claims of Participating Subsidiary Debtors | Impaired | Yes |
| 5C | Affiliate Claims other than those of Participating Debtors | Impaired | Yes |

**A228**

| Class | Designation | Impairment | Entitlement to Vote |
|---|---|---|---|
| 6 | Equity Interests | Impaired | No (deemed to reject) |

### 3.5   LOTC

| Class | Designation | Impairment | Entitlement to Vote |
|---|---|---|---|
| 1 | Priority Non-Tax Claims | Impaired | Yes |
| 2 | Secured Claims | Impaired | Yes |
| 3 | Convenience Claims | Impaired | Yes |
| 4 | General Unsecured Claims | Impaired | Yes |
| 5A | Affiliate Claims of LBHI | Impaired | Yes |
| 5B | Affiliate Claims of Participating Subsidiary Debtors | Impaired | Yes |
| 5C | Affiliate Claims other than those of Participating Debtors | Impaired | Yes |
| 6 | Equity Interests | Impaired | No (deemed to reject) |

### 3.6   LBCC

| Class | Designation | Impairment | Entitlement to Vote |
|---|---|---|---|
| 1 | Priority Non-Tax Claims | Impaired | Yes |
| 2 | Secured Claims | Impaired | Yes |
| 3 | Convenience Claims | Impaired | Yes |
| 4 | General Unsecured Claims | Impaired | Yes |
| 5A | Affiliate Claims of LBHI | Impaired | Yes |
| 5B | Affiliate Claims of Participating Subsidiary Debtors | Impaired | Yes |
| 5C | Affiliate Claims other than those of Participating Debtors | Impaired | Yes |
| 6 | Equity Interests | Impaired | No (deemed to reject) |

### 3.7   LBDP

| Class | Designation | Impairment | Entitlement to Vote |
|---|---|---|---|
| 1 | Priority Non-Tax Claims | Impaired | Yes |
| 2 | Secured Claims | Impaired | Yes |
| 3 | General Unsecured Claims | Impaired | Yes |
| 4A | Affiliate Claims of LBHI | Impaired | Yes |
| 4B | Affiliate Claims other than those of LBHI | Impaired | Yes |
| 5 | Equity Interests | Impaired | No (deemed to reject) |

A229

### 3.8    LBFP

| Class | Designation | Impairment | Entitlement to Vote |
|-------|-------------|------------|---------------------|
| 1 | Priority Non-Tax Claims | Impaired | Yes |
| 2 | Secured Claims | Impaired | Yes |
| 3 | General Unsecured Claims | Impaired | Yes |
| 4A | Affiliate Claims of LBHI | Impaired | Yes |
| 4B | Affiliate Claims other than those of LBHI | Impaired | Yes |
| 5 | Equity Interests | Impaired | No (deemed to reject) |

### 3.9    LB 745

| Class | Designation | Impairment | Entitlement to Vote |
|-------|-------------|------------|---------------------|
| 1 | Priority Non-Tax Claims | Impaired | Yes |
| 2 | Secured Claims | Impaired | Yes |
| 3 | General Unsecured Claims | Impaired | Yes |
| 4A | Affiliate Claims of LBHI | Impaired | Yes |
| 4B | Affiliate Claims other than those of LBHI | Impaired | Yes |
| 5 | Equity Interests | Impaired | No (deemed to reject) |

### 3.10    PAMI Statler

| Class | Designation | Impairment | Entitlement to Vote |
|-------|-------------|------------|---------------------|
| 1 | Priority Non-Tax Claims | Impaired | Yes |
| 2 | Secured Claims | Impaired | Yes |
| 3 | General Unsecured Claims | Impaired | Yes |
| 4A | Affiliate Claims of LBHI | Impaired | Yes |
| 4B | Affiliate Claims other than those of LBHI | Impaired | Yes |
| 5 | Equity Interests | Impaired | No (deemed to reject) |

### 3.11    CES

| Class | Designation | Impairment | Entitlement to Vote |
|-------|-------------|------------|---------------------|
| 1 | Priority Non-Tax Claims | Impaired | Yes |
| 2 | Secured Claims | Impaired | Yes |
| 3 | General Unsecured Claims | Impaired | Yes |
| 4A | Affiliate Claims of LBHI | Impaired | Yes |
| 4B | Affiliate Claims other than those of LBHI | Impaired | Yes |
| 5 | Equity Interests | Impaired | No (deemed to reject) |

**A230**

### 3.12   CES V

| Class | Designation | Impairment | Entitlement to Vote |
|---|---|---|---|
| 1 | Priority Non-Tax Claims | Impaired | Yes |
| 2 | Secured Claims | Impaired | Yes |
| 3 | General Unsecured Claims | Impaired | Yes |
| 4A | Affiliate Claims of LBHI | Impaired | Yes |
| 4B | Affiliate Claims other than those of LBHI | Impaired | Yes |
| 5 | Equity Interests | Impaired | No (deemed to reject) |

### 3.13   CES IX

| Class | Designation | Impairment | Entitlement to Vote |
|---|---|---|---|
| 1 | Priority Non-Tax Claims | Impaired | Yes |
| 2 | Secured Claims | Impaired | Yes |
| 3 | General Unsecured Claims | Impaired | Yes |
| 4A | Affiliate Claims of LBHI | Impaired | Yes |
| 4B | Affiliate Claims other than those of LBHI | Impaired | Yes |
| 5 | Equity Interests | Impaired | No (deemed to reject) |

### 3.14   East Dover

| Class | Designation | Impairment | Entitlement to Vote |
|---|---|---|---|
| 1 | Priority Non-Tax Claims | Impaired | Yes |
| 2 | Secured Claims | Impaired | Yes |
| 3 | General Unsecured Claims | Impaired | Yes |
| 4A | Affiliate Claims of LBHI | Impaired | Yes |
| 4B | Affiliate Claims other than those of LBHI | Impaired | Yes |
| 5 | Equity Interests | Impaired | No (deemed to reject) |

### 3.15   LS Finance

| Class | Designation | Impairment | Entitlement to Vote |
|---|---|---|---|
| 1 | Priority Non-Tax Claims | Impaired | Yes |
| 2 | Secured Claims | Impaired | Yes |
| 3 | General Unsecured Claims | Impaired | Yes |
| 4A | Affiliate Claims of LBHI | Impaired | Yes |
| 4B | Affiliate Claims other than those of LBHI | Impaired | Yes |
| 5 | Equity Interests | Impaired | No (deemed to reject) |

A231

08-13555-scc    Case 1:20-cv-02763-AJN    Doc 22878-3    Filed 11/29/11    Document 5    Entered 11/29/11 12:05:56    Page 238 of 573    Main Document

Pg 36 of 262

### 3.16    LUXCO

| Class | Designation | Impairment | Entitlement to Vote |
|-------|-------------|------------|---------------------|
| 1 | Priority Non-Tax Claims | Impaired | Yes |
| 2 | Secured Claims | Impaired | Yes |
| 3 | General Unsecured Claims | Impaired | Yes |
| 4A | Affiliate Claims of LBHI | Impaired | Yes |
| 4B | Affiliate Claims other than those of LBHI | Impaired | Yes |
| 5 | Equity Interests | Impaired | No (deemed to reject) |

### 3.17    BNC

| Class | Designation | Impairment | Entitlement to Vote |
|-------|-------------|------------|---------------------|
| 1 | Priority Non-Tax Claims | Impaired | Yes |
| 2 | Secured Claims | Impaired | Yes |
| 3 | General Unsecured Claims | Impaired | Yes |
| 4A | Affiliate Claims of LBHI | Impaired | Yes |
| 4B | Affiliate Claims other than those of LBHI | Impaired | Yes |
| 5 | Equity Interests | Impaired | No (deemed to reject) |

### 3.18    LB Rose Ranch

| Class | Designation | Impairment | Entitlement to Vote |
|-------|-------------|------------|---------------------|
| 1 | Priority Non-Tax Claims | Impaired | Yes |
| 2 | Secured Claims | Impaired | Yes |
| 3 | General Unsecured Claims | Impaired | Yes |
| 4A | Affiliate Claims of LBHI | Impaired | Yes |
| 4B | Affiliate Claims other than those of LBHI | Impaired | Yes |
| 5 | Equity Interests | Impaired | No (deemed to reject) |

### 3.19    SASCO

| Class | Designation | Impairment | Entitlement to Vote |
|-------|-------------|------------|---------------------|
| 1 | Priority Non-Tax Claims | Impaired | Yes |
| 2 | Secured Claims | Impaired | Yes |
| 3 | General Unsecured Claims | Impaired | Yes |
| 4A | Affiliate Claims of LBHI | Impaired | Yes |
| 4B | Affiliate Claims other than those of LBHI | Impaired | Yes |
| 5 | Equity Interests | Impaired | No (deemed to reject) |

A232

### 3.20    LB 2080

| Class | Designation | Impairment | Entitlement to Vote |
|---|---|---|---|
| 1 | Priority Non-Tax Claims | Impaired | Yes |
| 2 | Secured Claims | Impaired | Yes |
| 3 | General Unsecured Claims | Impaired | Yes |
| 4A | Affiliate Claims of LBHI | Impaired | Yes |
| 4B | Affiliate Claims other than those of LBHI | Impaired | Yes |
| 5 | Equity Interests | Impaired | No (deemed to reject) |

### 3.21    Merit

| Class | Designation | Impairment | Entitlement to Vote |
|---|---|---|---|
| 1 | Priority Non-Tax Claims | Impaired | Yes |
| 2 | Secured Claims | Impaired | Yes |
| 3 | General Unsecured Claims | Impaired | Yes |
| 4A | Affiliate Claims of LBHI | Impaired | Yes |
| 4B | Affiliate Claims other than those of LBHI | Impaired | Yes |
| 5 | Equity Interests | Impaired | No (deemed to reject) |

### 3.22    Preferred Somerset

| Class | Designation | Impairment | Entitlement to Vote |
|---|---|---|---|
| 1 | Priority Non-Tax Claims | Impaired | Yes |
| 2 | Secured Claims | Impaired | Yes |
| 3 | General Unsecured Claims | Impaired | Yes |
| 4A | Affiliate Claims of LBHI | Impaired | Yes |
| 4B | Affiliate Claims other than those of LBHI | Impaired | Yes |
| 5 | Equity Interests | Impaired | No (deemed to reject) |

### 3.23    Somerset

| Class | Designation | Impairment | Entitlement to Vote |
|---|---|---|---|
| 1 | Priority Non-Tax Claims | Impaired | Yes |
| 2 | Secured Claims | Impaired | Yes |
| 3 | General Unsecured Claims | Impaired | Yes |
| 4A | Affiliate Claims of LBHI | Impaired | Yes |
| 4B | Affiliate Claims other than those of LBHI | Impaired | Yes |
| 5 | Equity Interests | Impaired | No (deemed to reject) |

A233

# ARTICLE IV
## Treatment of Claims Against and Equity Interests in LBHI

4.1 <u>LBHI Class 1 – Priority Non-Tax Claims against LBHI.</u>

(a) <u>Impairment and Voting.</u> LBHI Class 1 is impaired by the Plan. Each holder of an Allowed Claim in LBHI Class 1 is entitled to vote to accept or reject the Plan.

(b) <u>Distributions.</u> Except to the extent that the holder of an Allowed Claim in LBHI Class 1 agrees to less favorable treatment or has been paid by or on behalf of LBHI on account of such Claim prior to the Effective Date, on the later of the Effective Date and the date such Claim becomes Allowed, or as soon thereafter as is practicable, each holder of an Allowed Claim in LBHI Class 1 shall be paid by LBHI in Cash in full.

4.2 <u>LBHI Class 2 – Secured Claims against LBHI.</u>

(a) <u>Impairment and Voting.</u> LBHI Class 2 is impaired by the Plan. Each holder of an Allowed Claim in LBHI Class 2 is entitled to vote to accept or reject the Plan.

(b) <u>Distributions.</u> Except to the extent that the holder of an Allowed Claim in LBHI Class 2 agrees to less favorable treatment, each holder of an Allowed Claim in LBHI Class 2 shall be satisfied by, at the option of LBHI: (i) payment in Cash by LBHI in full on the later of the Effective Date and the date such Claim becomes Allowed, or as soon thereafter as is practicable; (ii) the sale or disposition proceeds of the Collateral securing such Allowed Claim to the extent of the value of the Collateral securing such Allowed Claim; (iii) surrender to the holder of such Allowed Claim of the Collateral securing such Allowed Claim; or (iv) such treatment that leaves unaltered the legal, equitable, and contractual rights to which the holder of the Allowed Claim is entitled. In the event an Allowed Claim in LBHI Class 2 is treated under clause (i) or (ii) above, the Liens securing such Claim shall be deemed released and extinguished without further order of the Bankruptcy Court.

4.3 <u>LBHI Class 3 – Senior Unsecured Claims against LBHI.</u>

(a) <u>Impairment and Voting.</u> LBHI Class 3 is impaired by the Plan. Each holder of an Allowed Claim in LBHI Class 3 is entitled to vote to accept or reject the Plan.

(b) <u>Distributions.</u> Each holder of an Allowed Claim in LBHI Class 3 shall receive its Pro Rata Share of (i) Available Cash from LBHI, (ii) Subordinated Class 10A Distribution, (iii) Subordinated Class 10B Distribution, (iv) Subordinated Class 10C Distribution and (v) the Plan Adjustment.

4.4 <u>LBHI Class 4A – Senior Affiliate Claims against LBHI.</u>

(a) <u>Impairment and Voting.</u> LBHI Class 4A is impaired by the Plan. Each holder of an Allowed Claim in LBHI Class 4A is entitled to vote to accept or reject the Plan.

(b) <u>Distributions.</u> Subject to <u>Section 6.5(b)</u> of the Plan, each holder of an Allowed Claim in LBHI Class 4A shall receive its Pro Rata Share of (i) Available Cash from

25

LBHI, (ii) Subordinated Class 10A Distribution, (iii) Subordinated Class 10B Distribution and (iv) Subordinated Class 10C Distribution.

    4.5    <u>LBHI Class 4B – Senior Affiliate Guarantee Claims against LBHI</u>.

    (a)    <u>Impairment and Voting</u>.  LBHI Class 4B is impaired by the Plan.  Each holder of an Allowed Claim in LBHI Class 4B is entitled to vote to accept or reject the Plan.

    (b)    <u>Distributions</u>.  Subject to <u>Section 6.5(b)</u> of the Plan, each holder of an Allowed Claim in LBHI Class 4B shall receive its Pro Rata Share of (i) Available Cash from LBHI, (ii) Subordinated Class 10B Distribution and (iii) Subordinated Class 10C Distribution.

    4.6    <u>LBHI Class 5 – Senior Third-Party Guarantee Claims against LBHI</u>.

    (a)    <u>Impairment and Voting</u>.  LBHI Class 5 is impaired by the Plan.  Each holder of an Allowed Claim in LBHI Class 5 is entitled to vote to accept or reject the Plan.

    (b)    <u>Distributions</u>.  Each holder of an Allowed Claim in LBHI Class 5 shall receive its Pro Rata Share of (i) (A) Available Cash from LBHI, (B) Subordinated Class 10B Distribution and (C) Subordinated Class 10C Distribution; *provided*, *however*, that the applicable Plan Adjustment Percentage of the Distributions set forth in clauses (A), (B) and (C) above shall be automatically redistributed pursuant to <u>Section 6.5(a)</u> of the Plan, and (ii) the Excess Plan Adjustment Portion with respect to LBHI Class 5.

    4.7    <u>LBHI Class 6A – Convenience Claims against LBHI</u>.

    (a)    <u>Impairment and Voting</u>.  LBHI Class 6A is impaired by the Plan.  Each holder of an Allowed Claim in LBHI Class 6A is entitled to vote to accept or reject the Plan.

    (b)    <u>Distributions</u>.  Each holder of an Allowed Claim in LBHI Class 6A shall receive Cash from LBHI in an amount equal to .26 multiplied by the amount of such Claim, in full and complete satisfaction of such Allowed Claim, on the later of the Effective Date and the date such Claim becomes an Allowed Claim, or as soon thereafter as is practicable.

    4.8    <u>LBHI Class 6B – Convenience Guarantee Claims against LBHI</u>.

    (a)    <u>Impairment and Voting</u>.  LBHI Class 6B is impaired by the Plan.  Each holder of an Allowed Claim in LBHI Class 6B is entitled to vote to accept or reject the Plan.

    (b)    <u>Distributions</u>.  Each holder of an Allowed Claim in LBHI Class 6B shall receive Cash from LBHI in an amount equal to .17 multiplied by the amount of such Claim, in full and complete satisfaction of such Allowed Claim, on the later of the Effective Date and the date such Claim becomes an Allowed Claim, or as soon thereafter as is practicable.

4.9    LBHI Class 7 – General Unsecured Claims against LBHI.

(a)    Impairment and Voting.  LBHI Class 7 is impaired by the Plan.  Each holder of an Allowed Claim in LBHI Class 7 is entitled to vote to accept or reject the Plan.

(b)    Distributions.  Each holder of an Allowed Claim in LBHI Class 7 shall receive its Pro Rata Share of (i) Available Cash from LBHI and (ii) the Plan Adjustment.

4.10    LBHI Class 8 – Affiliate Claims against LBHI.

(a)    Impairment and Voting.  LBHI Class 8 is impaired by the Plan.  Each holder of an Allowed Claim in LBHI Class 8 is entitled to vote to accept or reject the Plan.

(b)    Distributions.  Subject to Section 6.5(b) of the Plan, each holder of an Allowed Claim in LBHI Class 8 shall receive its Pro Rata Share of Available Cash from LBHI.

4.11    LBHI Class 9A – Third-Party Guarantee Claims against LBHI.

(a)    Impairment and Voting.  LBHI Class 9A is impaired by the Plan.  Each holder of an Allowed Claim in LBHI Class 9A is entitled to vote to accept or reject the Plan.

(b)    Distributions.  Each holder of an Allowed Claim in LBHI Class 9A shall receive from LBHI its Pro Rata Share of (i) Available Cash; *provided*, *however*, that the applicable Plan Adjustment Percentage of such Distribution shall be automatically redistributed pursuant to Section 6.5(a) of the Plan, and (ii) the Excess Plan Adjustment Portion with respect to LBHI Class 9A.

4.12    LBHI Class 9B – Third-Party Guarantee Claims of the Racers Trusts against LBHI.

(a)    Impairment and Voting.  LBHI Class 9B is impaired by the Plan.  Each holder of an Allowed Claim in LBHI Class 9B is entitled to vote to accept or reject the Plan.

(b)    Distributions.  Subject to Section 6.5(g) of the Plan, each holder of an Allowed Claim in LBHI Class 9B shall receive from LBHI its Pro Rata Share of (i) Available Cash; *provided, however*, that the Racers Adjustment shall be automatically redistributed pursuant to Section 6.5(a) of the Plan, and (ii) the Excess Plan Adjustment Portion with respect to LBHI Class 9B.

4.13    LBHI Class 10A – Subordinated Class 10A Claims against LBHI.

(a)    Impairment and Voting.  LBHI Class 10A is impaired by the Plan.  Each holder of an Allowed Claim in LBHI Class 10A is not entitled to vote to accept or reject the Plan and is conclusively deemed to have rejected the Plan.

(b)    Distributions.  Holders of Allowed Claims in LBHI Class 10A shall not receive any Distributions on account of such Claims unless and until all holders of Allowed Claims in LBHI Class 3 and LBHI Class 4A are satisfied in full, in which case each holder of an

A236

Allowed Claim in LBHI Class 10A shall receive its Pro Rata Share of (i) Available Cash from LBHI and (ii) Subordinated Class 10C Distribution.

4.14    LBHI Class 10B – Subordinated Class 10B Claims against LBHI.

(a)    Impairment and Voting.    LBHI Class 10B is impaired by the Plan.    Each holder of an Allowed Claim in LBHI Class 10B is not entitled to vote to accept or reject the Plan and is conclusively deemed to have rejected the Plan.

(b)    Distributions.    Holders of Allowed Claims in LBHI Class 10B shall not receive any Distributions on account of such Claims unless and until all holders of Allowed Claims in LBHI Class 3, LBHI Class 4A, LBHI Class 4B and LBHI Class 5 are satisfied in full, in which case each holder of an Allowed Claim in LBHI Class 10B shall receive its Pro Rata Share of (i) Available Cash from LBHI and (ii) Subordinated Class 10C Distribution.

4.15    LBHI Class 10C – Subordinated Class 10C Claims against LBHI.

(a)    Impairment and Voting.    LBHI Class 10C is impaired by the Plan.    Each holder of an Allowed Claim in LBHI Class 10C is not entitled to vote to accept or reject the Plan and is conclusively deemed to have rejected the Plan.

(b)    Distributions.    Holders of Allowed Claims in LBHI Class 10C shall not receive any Distributions on account of such Claims unless and until all holders of Allowed Claims in LBHI Class 3, LBHI Class 4A, LBHI Class 4B, LBHI Class 5, LBHI Class 10A and LBHI Class 10B are satisfied in full, in which case each holder of an Allowed Claim in LBHI Class 10C shall receive its Pro Rata Share of Available Cash from LBHI.

4.16    LBHI Class 11 – Section 510(b) Claims against LBHI.

(a)    Impairment and Voting.    LBHI Class 11 is impaired by the Plan.    Each holder of an Allowed Claim in LBHI Class 11 is not entitled to vote to accept or reject the Plan and is conclusively deemed to have rejected the Plan.

(b)    Distributions.    Holders of Allowed Claims in LBHI Class 11 shall not receive any Distributions on account of such Claims unless and until all holders of Allowed Claims against LBHI other than Claims in LBHI Class 11 are satisfied in full, in which case each holder of an Allowed Claim in LBHI Class 11 shall receive its Pro Rata Share of Available Cash from LBHI.

4.17    LBHI Class 12 – Equity Interests in LBHI.

(a)    Impairment and Voting.    LBHI Class 12 is impaired by the Plan.    Each holder of an Equity Interest in LBHI Class 12 is not entitled to vote to accept or reject the Plan and is conclusively deemed to have rejected the Plan.

(b)    Stock Exchange.    On the Effective Date, all LBHI Stock shall be cancelled and the Plan Trust Stock shall be issued to the Plan Trust which will hold such share for the benefit of the holders of such former LBHI Stock consistent with their former relative

priority and economic entitlements; *provided*, *however*, that the Plan Trust may not exercise any voting rights appurtenant thereto in conflict with Article VII of the Plan.  On or promptly after the Effective Date, the Plan Administrator shall file with the Securities and Exchange Commission a Form 15 for the purpose of terminating the registration of any of LBHI's publicly traded securities.

(c)    Distributions.  Each holder of an Equity Interest in LBHI (through their interest in the new share of LBHI common stock or otherwise) shall neither receive nor retain any Property of the Estate or direct interest in Property of the Estate of LBHI on account of such Equity Interests; *provided*, *however*, that in the event that all Allowed Claims in LBHI Classes 1 through 11 have been satisfied in full in accordance with the Bankruptcy Code and the Plan, each holder of an Equity Interest in LBHI may receive its share of any remaining assets of LBHI consistent with such holder's rights of payment existing immediately prior to the Commencement Date.  Unless otherwise determined by the Plan Administrator, on the date that LBHI's Chapter 11 Case is closed in accordance with Section 6.6 of the Plan, the Plan Trust Stock issued pursuant to subsection (b) above shall be deemed cancelled and of no further force and effect provided that such cancellation does not adversely impact the Debtors' estates.

(d)    Non-Transferable.  The continuing rights of holders of Equity Interests (including through their interest in the Plan Trust Stock or otherwise) shall be nontransferable except by operation of law.

## ARTICLE V
## Treatment of Claims Against and Equity Interests in Subsidiary Debtors

5.1    LCPI Class 1 – Priority Non-Tax Claims against LCPI.

(a)    Impairment and Voting.  LCPI Class 1 is impaired by the Plan.  Each holder of an Allowed Claim in LCPI Class 1 is entitled to vote to accept or reject the Plan.

(b)    Distributions.   Except to the extent that the holder of an Allowed Claim in LCPI Class 1 agrees to less favorable treatment or has been paid by or on behalf of LCPI on account of such Claim prior to the Effective Date, on the later of the Effective Date and the date such Claim becomes Allowed, or as soon thereafter as is practicable, each holder of an Allowed Claim in LCPI Class 1 shall be paid by LCPI in Cash in full.

5.2    LCPI Class 2 – Secured Claims against LCPI.

(a)    Impairment and Voting.  LCPI Class 2 is impaired by the Plan.  Each holder of an Allowed Claim in LCPI Class 2 is entitled to vote to accept or reject the Plan.

(b)    Distributions.   Except to the extent that the holder of an Allowed Claim in LCPI Class 2 agrees to less favorable treatment, each holder of an Allowed Claim in LCPI Class 2 shall be satisfied by, at the option of LCPI:   (i) payment in Cash by LCPI in full on the later of the Effective Date and the date such Claim becomes Allowed, or as soon thereafter as is practicable; (ii) the sale or disposition proceeds of the Collateral securing such Allowed Claim to the extent of the value of the Collateral securing such Allowed Claim; (iii) surrender to the holder of such Allowed Claim of the Collateral securing such Allowed Claim; or (iv) such

A238

treatment that leaves unaltered the legal, equitable, and contractual rights to which the holder of the Allowed Claim is entitled. In the event an Allowed Claim in LCPI Class 2 is treated under clause (i) or (ii) above, the Liens securing such Claim shall be deemed released and extinguished without further order of the Bankruptcy Court.

5.3 <u>LCPI Class 3 – Convenience Claims against LCPI.</u>

(a) <u>Impairment and Voting</u>. LCPI Class 3 is impaired by the Plan. Each holder of an Allowed Claim in LCPI Class 3 is entitled to vote to accept or reject the Plan.

(b) <u>Distributions</u>. Each holder of an Allowed Claim in LCPI Class 3 shall receive Cash from LCPI in an amount equal to .60 multiplied by the amount of such Claim, in full and complete satisfaction of such Allowed Claim, on the later of the Effective Date and the date such Claim becomes an Allowed Claim, or as soon thereafter as is practicable.

5.4 <u>LCPI Class 4A – General Unsecured Claims other than those of Designated Entities against LCPI.</u>

(a) <u>Impairment and Voting</u>. LCPI Class 4A is impaired by the Plan. Each holder of an Allowed Claim in LCPI Class 4A is entitled to vote to accept or reject the Plan.

(b) <u>Distributions</u>. Each holder of an Allowed Claim in LCPI Class 4A shall receive its Pro Rata Share (i) from LCPI of (A) Available Cash; *provided*, *however*, that the applicable Plan Adjustment Percentage of such Distribution shall be automatically redistributed pursuant to <u>Section 6.5(a)</u> of the Plan, and (B) the Excess Plan Adjustment Portion with respect to LCPI Class 4A, and (ii) the LCPI Settlement Amount.

5.5 <u>LCPI Class 4B – General Unsecured Claims of Designated Entities against LCPI.</u>

(a) <u>Impairment and Voting</u>. LCPI Class 4B is impaired by the Plan. Each holder of an Allowed Claim in LCPI Class 4B is entitled to vote to accept or reject the Plan.

(b) <u>Distributions</u>. Subject to <u>Sections 6.5(g)</u> or <u>6.5(h)</u>, each holder of an Allowed Claim in LCPI Class 4B shall receive from LCPI its Pro Rata Share of (i) Available Cash; *provided*, *however*, that the applicable Plan Adjustment Percentage of such Distribution shall be automatically redistributed pursuant to <u>Section 6.5(a)</u> of the Plan, and (ii) the Excess Plan Adjustment Portion with respect to LCPI Class 4B.

5.6 <u>LCPI Class 5A – Affiliate Claims of LBHI against LCPI.</u>

(a) <u>Impairment and Voting</u>. LCPI Class 5A is impaired by the Plan. LBHI is entitled to vote to accept or reject the Plan.

(b) <u>Distributions</u>. Subject to <u>Sections 6.5(b)</u> and <u>6.5(c)</u> of the Plan, LBHI shall receive from LCPI (i) its Pro Rata Share of Available Cash; *provided, however*, that the LCPI Settlement Amount shall be automatically redistributed pursuant to <u>Section 6.5(e)</u> of the Plan, and (ii) the Excess LCPI Settlement Amount.

A239

5.7    LCPI Class 5B – Affiliate Claims of Participating Subsidiary Debtors against LCPI.

      (a)    Impairment and Voting.  LCPI Class 5B is impaired by the Plan.  Each holder of an Allowed Claim in LCPI Class 5B is entitled to vote to accept or reject the Plan.

      (b)    Distributions.  Subject to Section 6.5(b) of the Plan, each holder of an Allowed Claim in LCPI Class 5B shall receive from LCPI its Pro Rata Share of (i) Available Cash; provided, however, that the applicable Plan Adjustment Percentage of such Distribution shall be automatically redistributed pursuant to Section 6.5(a) of the Plan, and (ii) the Excess Plan Adjustment Portion with respect to LCPI Class 5B.

5.8    LCPI Class 5C – Affiliate Claims other than those of Participating Debtors against LCPI.

      (a)    Impairment and Voting.  LCPI Class 5C is impaired by the Plan.  Each holder of an Allowed Claim in LCPI Class 5C is entitled to vote to accept or reject the Plan.

      (b)    Distributions.  Subject to Section 6.5(b) of the Plan, each holder of an Allowed Claim in LCPI Class 5C shall receive from LCPI its Pro Rata Share of (i) Available Cash; provided, however, that the applicable Plan Adjustment Percentage of such Distribution shall be automatically redistributed pursuant to Section 6.5(a) of the Plan, and (ii) the Excess Plan Adjustment Portion with respect to LCPI Class 5C.

5.9    LCPI Class 6 – Equity Interests in LCPI.

      (a)    Impairment and Voting.  LCPI Class 6 is impaired by the Plan.  Each holder of an Equity Interest in LCPI Class 6 is not entitled to vote to accept or reject the Plan and is conclusively deemed to have rejected the Plan.

      (b)    Distributions.  Equity Interests in LCPI shall be cancelled if and when LCPI is dissolved in accordance with Section 7.4 of the Plan.  Each holder of an Equity Interest in LCPI shall neither receive nor retain any Property of the Estate or direct interest in Property of the Estate of LCPI on account of such Equity Interests thereafter; provided, however, that in the event that all Allowed Claims against LCPI have been satisfied in full in accordance with the Bankruptcy Code and the Plan, each holder of an Equity Interest in LCPI may receive its Pro Rata Share of any remaining assets in LCPI.

5.10    LBCS Class 1 – Priority Non-Tax Claims against LBCS.

      (a)    Impairment and Voting.  LBCS Class 1 is impaired by the Plan.  Each holder of an Allowed Claim in LBCS Class 1 is entitled to vote to accept or reject the Plan.

      (b)    Distributions.  Except to the extent that the holder of an Allowed Claim in LBCS Class 1 agrees to less favorable treatment or has been paid by or on behalf of LBCS on account of such Claim prior to the Effective Date, on the later of the Effective Date and the date such Claim becomes Allowed, or as soon thereafter as is practicable, each holder of an Allowed Claim in LBCS Class 1 shall be paid by LBCS in Cash in full.

5.11    LBCS Class 2 – Secured Claims against LBCS.

(a)    Impairment and Voting.  LBCS Class 2 is impaired by the Plan.  Each holder of an Allowed Claim in LBCS Class 2 is entitled to vote to accept or reject the Plan.

(b)    Distributions.   Except to the extent that the holder of an Allowed Claim in LBCS Class 2 agrees to less favorable treatment, each holder of an Allowed Claim in LBCS Class 2 shall be satisfied by, at the option of LBCS:   (i) payment in Cash by LBCS in full on the later of the Effective Date and the date such Claim becomes Allowed, or as soon thereafter as is practicable; (ii) the sale or disposition proceeds of the Collateral securing such Allowed Claim to the extent of the value of the Collateral securing such Allowed Claim; (iii) surrender to the holder of such Allowed Claim of the Collateral securing such Allowed Claim; or (iv) such treatment that leaves unaltered the legal, equitable, and contractual rights to which the holder of the Allowed Claim is entitled.   In the event an Allowed Claim in LBCS Class 2 is treated under clause (i) or (ii) above, the Liens securing such Claim shall be deemed released and extinguished without further order of the Bankruptcy Court.

5.12    LBCS Class 3 – Convenience Claims against LBCS.

(a)    Impairment and Voting.  LBCS Class 3 is impaired by the Plan.  Each holder of an Allowed Claim in LBCS Class 3 is entitled to vote to accept or reject the Plan.

(b)    Distributions.  Each holder of an Allowed Claim in LBCS Class 3 shall receive Cash from LBCS in an amount equal to .55 multiplied by the amount of such Claim, in full and complete satisfaction of such Allowed Claim, on the later of the Effective Date and the date such Claim becomes an Allowed Claim, or as soon thereafter as is practicable.

5.13    LBCS Class 4 – General Unsecured Claims against LBCS.

(a)    Impairment and Voting.  LBCS Class 4 is impaired by the Plan.  Each holder of an Allowed Claim in LBCS Class 4 is entitled to vote to accept or reject the Plan.

(b)    Distributions.  Each holder of an Allowed Claim in LBCS Class 4 shall receive from LBCS its Pro Rata Share of (i) Available Cash; *provided*, *however*, that the applicable Plan Adjustment Percentage of such Distribution shall be automatically redistributed pursuant to Section 6.5(a) of the Plan, and (ii) the Excess Plan Adjustment Portion with respect to LBCS Class 4.

5.14    LBCS Class 5A – Affiliate Claims of LBHI against LBCS.

(a)    Impairment and Voting.  LBCS Class 5A is impaired by the Plan.  LBHI is entitled to vote to accept or reject the Plan.

(b)    Distributions.  Subject to Sections 6.5(b) and 6.5(c) of the Plan, LBHI shall receive its Pro Rata Share of Available Cash from LBCS.

A241

5.15 <u>LBCS Class 5B – Affiliate Claims of Participating Subsidiary Debtors against LBCS</u>.

(a) <u>Impairment and Voting</u>. LBCS Class 5B is impaired by the Plan. Each holder of an Allowed Claim in LBCS Class 5B is entitled to vote to accept or reject the Plan.

(b) <u>Distributions</u>. Subject to <u>Section 6.5(b)</u> of the Plan, each holder of an Allowed Claim in LBCS Class 5B shall receive from LBCS its Pro Rata Share of (i) Available Cash; *provided*, *however*, that the applicable Plan Adjustment Percentage of such Distribution shall be automatically redistributed pursuant to <u>Section 6.5(a)</u> of the Plan, and (ii) the Excess Plan Adjustment Portion with respect to LBCS Class 5B.

5.16 <u>LBCS Class 5C – Affiliate Claims other than those of Participating Debtors against LBCS</u>.

(a) <u>Impairment and Voting</u>. LBCS Class 5C is impaired by the Plan. Each holder of an Allowed Claim in LBCS Class 5C is entitled to vote to accept or reject the Plan.

(b) <u>Distributions</u>. Subject to <u>Section 6.5(b)</u> of the Plan, each holder of an Allowed Claim in LBCS Class 5C shall receive from LBCS its Pro Rata Share of (i) Available Cash; *provided*, *however*, that the applicable Plan Adjustment Percentage of such Distribution shall be automatically redistributed pursuant to <u>Section 6.5(a)</u> of the Plan, and (ii) the Excess Plan Adjustment Portion with respect to LBCS Class 5C.

5.17 <u>LBCS Class 6 – Equity Interests in LBCS</u>.

(a) <u>Impairment and Voting</u>. LBCS Class 6 is impaired by the Plan. Each holder of an Equity Interest in LBCS Class 6 is not entitled to vote to accept or reject the Plan and is conclusively deemed to have rejected the Plan.

(b) <u>Distributions</u>. Equity Interests in LBCS shall be cancelled if and when LBCS is dissolved in accordance with <u>Section 7.4</u> of the Plan. Each holder of an Equity Interest in LBCS shall neither receive nor retain any Property of the Estate or direct interest in Property of the Estate of LBCS on account of such Equity Interests thereafter; *provided*, *however*, that in the event that all Allowed Claims against LBCS have been satisfied in full in accordance with the Bankruptcy Code and the Plan, each holder of an Equity Interest in LBCS may receive its Pro Rata Share of any remaining assets in LBCS.

5.18 <u>LBSF Class 1 – Priority Non-Tax Claims against LBSF</u>.

(a) <u>Impairment and Voting</u>. LBSF Class 1 is impaired by the Plan. Each holder of an Allowed Claim in LBSF Class 1 is entitled to vote to accept or reject the Plan.

(b) <u>Distributions</u>. Except to the extent that the holder of an Allowed Claim in LBSF Class 1 agrees to less favorable treatment or has been paid by or on behalf of LBSF on account of such Claim prior to the Effective Date, on the later of the Effective Date and the date such Claim becomes Allowed, or as soon thereafter as is practicable, each holder of an Allowed Claim in LBSF Class 1 shall be paid by LBSF in Cash in full.

5.19  LBSF Class 2 – Secured Claims against LBSF.

(a)  <u>Impairment and Voting</u>.  LBSF Class 2 is impaired by the Plan.  Each holder of an Allowed Claim in LBSF Class 2 is entitled to vote to accept or reject the Plan.

(b)  <u>Distributions</u>.  Except to the extent that the holder of an Allowed Claim in LBSF Class 2 agrees to less favorable treatment, each holder of an Allowed Claim in LBSF Class 2 shall be satisfied by, at the option of LBSF:  (i) payment in Cash by LBSF in full on the later of the Effective Date and the date such Claim becomes Allowed, or as soon thereafter as is practicable; (ii) the sale or disposition proceeds of the Collateral securing such Allowed Claim to the extent of the value of the Collateral securing such Allowed Claim; (iii) surrender to the holder of such Allowed Claim of the Collateral securing such Allowed Claim; or (iv) such treatment that leaves unaltered the legal, equitable, and contractual rights to which the holder of the Allowed Claim is entitled.   In the event an Allowed Claim in LBSF Class 2 is treated under clause (i) or (ii) above, the Liens securing such Claim shall be deemed released and extinguished without further order of the Bankruptcy Court.

5.20  <u>LBSF Class 3 – Convenience Claims against LBSF</u>.

(a)  <u>Impairment and Voting</u>.  LBSF Class 3 is impaired by the Plan.  Each holder of an Allowed Claim in LBSF Class 3 is entitled to vote to accept or reject the Plan.

(b)  <u>Distributions</u>.  Each holder of an Allowed Claim in LBSF Class 3 shall receive Cash from LBSF in an amount equal to .32 multiplied by the amount of such Claim, in full and complete satisfaction of such Allowed Claim, on the later of the Effective Date and the date such Claim becomes an Allowed Claim, or as soon thereafter as is practicable.

5.21  <u>LBSF Class 4A – General Unsecured Claims other than those of the Racers Trusts against LBSF</u>.

(a)  <u>Impairment and Voting</u>.  LBSF Class 4A is impaired by the Plan.  Each holder of an Allowed Claim in LBSF Class 4A is entitled to vote to accept or reject the Plan.

(b)  <u>Distributions</u>.  Each holder of an Allowed Claim in LBSF Class 4A shall receive its Pro Rata Share (i) from LBSF of (A) Available Cash; *provided*, *however*, that the applicable Plan Adjustment Percentage of such Distribution shall be automatically redistributed pursuant to <u>Section 6.5(a)</u> of the Plan, (B) the Excess Plan Adjustment Portion with respect to LBSF Class 4A, and (C) the LBSF Additional Settlement Amount, and (ii) the LBSF Settlement Amount.

5.22  <u>LBSF Class 4B – General Unsecured Claims of the Racers Trusts against LBSF</u>.

(a)  <u>Impairment and Voting</u>.  LBSF Class 4B is impaired by the Plan.  Each holder of an Allowed Claim in LBSF Class 4B is entitled to vote to accept or reject the Plan.

(b)  <u>Distributions</u>.  Subject to <u>Sections 6.5(d)</u> and <u>6.5(g)</u> of the Plan, each holder of an Allowed Claim in LBSF Class 4B shall receive from LBSF its Pro Rata Share of (i) Available Cash; *provided, however*, that the Racers Adjustment shall be automatically

A243

redistributed pursuant to Section 6.5(a) of the Plan, and (ii) the Excess Plan Adjustment Portion with respect to LBSF Class 4B.

5.23    LBSF Class 5A – Affiliate Claims of LBHI against LBSF.

(a)    Impairment and Voting.    LBSF Class 5A is impaired by the Plan.    LBHI is entitled to vote to accept or reject the Plan.

(b)    Distributions.    Subject to Sections 6.5(b), 6.5(c) and 6.5(d) of the Plan, LBHI shall receive from LBSF (i) its Pro Rata Share of Available Cash; *provided, however*, that the LBSF Settlement Amount shall be automatically redistributed pursuant to Section 6.5(f) of the Plan, and (ii) the Excess LBSF Settlement Amount.

5.24    LBSF Class 5B – Affiliate Claims of Participating Subsidiary Debtors against LBSF.

(a)    Impairment and Voting.    LBSF Class 5B is impaired by the Plan.    Each holder of an Allowed Claim in LBSF Class 5B is entitled to vote to accept or reject the Plan.

(b)    Distributions.    Subject to Sections 6.5(b) and 6.5(d) of the Plan, each holder of an Allowed Claim in LBSF Class 5B shall receive from LBSF its Pro Rata Share of (i) Available Cash; *provided*, *however*, that the applicable Plan Adjustment Percentage of such Distribution shall be automatically redistributed pursuant to Section 6.5(a) of the Plan, and (ii) the Excess Plan Adjustment Portion with respect to LBSF Class 5B.

5.25    LBSF Class 5C – Affiliate Claims other than those of Participating Debtors against LBSF.

(a)    Impairment and Voting.    LBSF Class 5C is impaired by the Plan.    Each holder of an Allowed Claim in LBSF Class 5C is entitled to vote to accept or reject the Plan.

(b)    Distributions.    Subject to Section 6.5(b) of the Plan, each holder of an Allowed Claim in LBSF Class 5C shall receive from LBSF its Pro Rata Share of (i) Available Cash; *provided*, *however*, that the applicable Plan Adjustment Percentage of such Distribution shall be automatically redistributed pursuant to Section 6.5(a) of the Plan, (ii) the Excess Plan Adjustment Portion with respect to LBSF Class 5C and (iii) the LBSF Additional Settlement Amount.

5.26    LBSF Class 6 – Equity Interests in LBSF.

(a)    Impairment and Voting.    LBSF Class 6 is impaired by the Plan.    Each holder of an Equity Interest in LBSF Class 6 is not entitled to vote to accept or reject the Plan and is conclusively deemed to have rejected the Plan.

(b)    Distributions.    Equity Interests in LBSF shall be cancelled if and when LBSF is dissolved in accordance with Section 7.4 of the Plan.    Each holder of an Equity Interest in LBSF shall neither receive nor retain any Property of the Estate or direct interest in Property of the Estate of LBSF on account of such Equity Interests thereafter; *provided*, *however*, that in

the event that all Allowed Claims against LBSF have been satisfied in full in accordance with the Bankruptcy Code and the Plan, each holder of an Equity Interest in LBSF may receive its Pro Rata Share of any remaining assets in LBSF.

5.27    LOTC Class 1 – Priority Non-Tax Claims against LOTC.

(a)    Impairment and Voting.  LOTC Class 1 is impaired by the Plan.  Each holder of an Allowed Claim in LOTC Class 1 is entitled to vote to accept or reject the Plan.

(b)    Distributions.   Except to the extent that the holder of an Allowed Claim in LOTC Class 1 agrees to less favorable treatment or has been paid by or on behalf of LOTC on account of such Claim prior to the Effective Date, on the later of the Effective Date and the date such Claim becomes Allowed, or as soon thereafter as is practicable, each holder of an Allowed Claim in LOTC Class 1 shall be paid by LOTC in Cash in full.

5.28    LOTC Class 2 – Secured Claims against LOTC.

(a)    Impairment and Voting.  LOTC Class 2 is impaired by the Plan.  Each holder of an Allowed Claim in LOTC Class 2 is entitled to vote to accept or reject the Plan.

(b)    Distributions.   Except to the extent that the holder of an Allowed Claim in LOTC Class 2 agrees to less favorable treatment, each holder of an Allowed Claim in LOTC Class 2 shall be satisfied by, at the option of LOTC:  (i) payment in Cash by LOTC in full on the later of the Effective Date and the date such Claim becomes Allowed, or as soon thereafter as is practicable; (ii) the sale or disposition proceeds of the Collateral securing such Allowed Claim to the extent of the value of the Collateral securing such Allowed Claim; (iii) surrender to the holder of such Allowed Claim of the Collateral securing such Allowed Claim; or (iv) such treatment that leaves unaltered the legal, equitable, and contractual rights to which the holder of the Allowed Claim is entitled.   In the event an Allowed Claim in LOTC Class 2 is treated under clause (i) or (ii) above, the Liens securing such Claim shall be deemed released and extinguished without further order of the Bankruptcy Court.

5.29    LOTC Class 3 – Convenience Claims against LOTC.

(a)    Impairment and Voting.  LOTC Class 3 is impaired by the Plan.  Each holder of an Allowed Claim in LOTC Class 3 is entitled to vote to accept or reject the Plan.

(b)    Distributions.  Each holder of an Allowed Claim in LOTC Class 3 shall receive Cash from LOTC in an amount equal to .34 multiplied by the amount of such Claim, in full and complete satisfaction of such Allowed Claim, on the later of the Effective Date and the date such Claim becomes an Allowed Claim, or as soon thereafter as is practicable.

5.30    LOTC Class 4 – General Unsecured Claims against LOTC.

(a)    Impairment and Voting.  LOTC Class 4 is impaired by the Plan.  Each holder of an Allowed Claim in LOTC Class 4 is entitled to vote to accept or reject the Plan.

A245

(b) <u>Distributions</u>. Each holder of an Allowed Claim in LOTC Class 4 shall receive from LOTC its Pro Rata Share of (i) Available Cash; *provided*, *however*, that the applicable Plan Adjustment Percentage of such Distribution shall be automatically redistributed pursuant to <u>Section 6.5(a)</u> of the Plan, and (ii) the Excess Plan Adjustment Portion with respect to LOTC Class 4.

5.31 <u>LOTC Class 5A – Affiliate Claims of LBHI against LOTC</u>.

(a) <u>Impairment and Voting</u>. LOTC Class 5A is impaired by the Plan. LBHI is entitled to vote to accept or reject the Plan.

(b) <u>Distributions</u>. Subject to <u>Sections 6.5(b)</u> and <u>6.5(c)</u> of the Plan, LBHI shall receive its Pro Rata Share of Available Cash from LOTC.

5.32 <u>LOTC Class 5B – Affiliate Claims of Participating Subsidiary Debtors against LOTC</u>.

(a) <u>Impairment and Voting</u>. LOTC Class 5B is impaired by the Plan. Each holder of an Allowed Claim in LOTC Class 5B is entitled to vote to accept or reject the Plan.

(b) <u>Distributions</u>. Subject to <u>Section 6.5(b)</u> of the Plan, each holder of an Allowed Claim in LOTC Class 5B shall receive from LOTC its Pro Rata Share of (i) Available Cash; *provided*, *however*, that the applicable Plan Adjustment Percentage of such Distribution shall be automatically redistributed pursuant to <u>Section 6.5(a)</u> of the Plan, and (ii) the Excess Plan Adjustment Portion with respect to LOTC Class 5B.

5.33 <u>LOTC Class 5C – Affiliate Claims other than those of Participating Debtors against LOTC</u>.

(a) <u>Impairment and Voting</u>. LOTC Class 5C is impaired by the Plan. Each holder of an Allowed Claim in LOTC Class 5C is entitled to vote to accept or reject the Plan.

(b) <u>Distributions</u>. Subject to <u>Section 6.5(b)</u> of the Plan, each holder of an Allowed Claim in LOTC Class 5C shall receive from LOTC its Pro Rata Share of (i) Available Cash; *provided*, *however*, that the applicable Plan Adjustment Percentage of such Distribution shall be automatically redistributed pursuant to <u>Section 6.5(a)</u> of the Plan, and (ii) the Excess Plan Adjustment Portion with respect to LOTC Class 5C.

5.34 <u>LOTC Class 6 – Equity Interests in LOTC</u>.

(a) <u>Impairment and Voting</u>. LOTC Class 6 is impaired by the Plan. Each holder of an Equity Interest in LOTC Class 6 is not entitled to vote to accept or reject the Plan and is conclusively deemed to have rejected the Plan.

(b) <u>Distributions</u>. Equity Interests in LOTC shall be cancelled if and when LOTC is dissolved in accordance with <u>Section 7.4</u> of the Plan. Each holder of an Equity Interest in LOTC shall neither receive nor retain any Property of the Estate or direct interest in Property of the Estate of LOTC on account of such Equity Interests thereafter; *provided*, *however*, that in

the event that all Allowed Claims against LOTC have been satisfied in full in accordance with the Bankruptcy Code and the Plan, each holder of an Equity Interest in LOTC may receive its Pro Rata Share of any remaining assets in LOTC.

5.35    LBCC Class 1 – Priority Non-Tax Claims against LBCC.

(a)    Impairment and Voting.  LBCC Class 1 is impaired by the Plan.  Each holder of an Allowed Claim in LBCC Class 1 is entitled to vote to accept or reject the Plan.

(b)    Distributions.  Except to the extent that the holder of an Allowed Claim in LBCC Class 1 agrees to less favorable treatment or has been paid by or on behalf of LBCC on account of such Claim prior to the Effective Date, on the later of the Effective Date and the date such Claim becomes Allowed, or as soon thereafter as is practicable, each holder of an Allowed Claim in LBCC Class 1 shall be paid by LBCC in Cash in full.

5.36    LBCC Class 2 – Secured Claims against LBCC.

(a)    Impairment and Voting.  LBCC Class 2 is impaired by the Plan.  Each holder of an Allowed Claim in LBCC Class 2 is entitled to vote to accept or reject the Plan.

(b)    Distributions.  Except to the extent that the holder of an Allowed Claim in LBCC Class 2 agrees to less favorable treatment, each holder of an Allowed Claim in LBCC Class 2 shall be satisfied by, at the option of LBCC:  (i) payment in Cash by LBCC in full on the later of the Effective Date and the date such Claim becomes Allowed, or as soon thereafter as is practicable; (ii) the sale or disposition proceeds of the Collateral securing such Allowed Claim to the extent of the value of the Collateral securing such Allowed Claim; (iii) surrender to the holder of such Allowed Claim of the Collateral securing such Allowed Claim; or (iv) such treatment that leaves unaltered the legal, equitable, and contractual rights to which the holder of the Allowed Claim is entitled.  In the event an Allowed Claim in LBCC Class 2 is treated under clause (i) or (ii) above, the Liens securing such Claim shall be deemed released and extinguished without further order of the Bankruptcy Court.

5.37    LBCC Class 3 – Convenience Claims against LBCC.

(a)    Impairment and Voting.  LBCC Class 3 is impaired by the Plan.  Each holder of an Allowed Claim in LBCC Class 3 is entitled to vote to accept or reject the Plan.

(b)    Distributions.  Each holder of an Allowed Claim in LBCC Class 3 shall receive Cash from LBCC in an amount equal to .49 multiplied by the amount of such Claim, in full and complete satisfaction of such Allowed Claim, on the later of the Effective Date and the date such Claim becomes an Allowed Claim, or as soon thereafter as is practicable.

5.38    LBCC Class 4 – General Unsecured Claims against LBCC.

(a)    Impairment and Voting.  LBCC Class 4 is impaired by the Plan.  Each holder of an Allowed Claim in LBCC Class 4 is entitled to vote to accept or reject the Plan.

(b)    Distributions.  Each holder of an Allowed Claim in LBCC Class 4 shall receive from LBCC its Pro Rata Share of (i) Available Cash; *provided*, *however*, that the applicable Plan Adjustment Percentage of such Distribution shall be automatically redistributed pursuant to Section 6.5(a) of the Plan, and (ii) the Excess Plan Adjustment Portion with respect to LBCC Class 4.

5.39    LBCC Class 5A – Affiliate Claims of LBHI against LBCC.

(a)    Impairment and Voting.  LBCC Class 5A is impaired by the Plan.  LBHI is entitled to vote to accept or reject the Plan.

(b)    Distributions.  Subject to Sections 6.5(b) and 6.5(c) of the Plan, LBHI shall receive its Pro Rata Share of Available Cash from LBCC.

5.40    LBCC Class 5B – Affiliate Claims of Participating Subsidiary Debtors against LBCC.

(a)    Impairment and Voting.  LBCC Class 5B is impaired by the Plan.  Each holder of an Allowed Claim in LBCC Class 5B is entitled to vote to accept or reject the Plan.

(b)    Distributions.  Subject to Section 6.5(b) of the Plan, each holder of an Allowed Claim in LBCC Class 5B shall receive from LBCC its Pro Rata Share of (i) Available Cash; *provided*, *however*, that the applicable Plan Adjustment Percentage of such Distribution shall be automatically redistributed pursuant to Section 6.5(a) of the Plan, and (ii) the Excess Plan Adjustment Portion with respect to LBCC Class 5B.

5.41    LBCC Class 5C – Affiliate Claims other than those of Participating Debtors against LBCC.

(a)    Impairment and Voting.  LBCC Class 5C is impaired by the Plan.  Each holder of an Allowed Claim in LBCC Class 5C is entitled to vote to accept or reject the Plan.

(b)    Distributions.  Subject to Section 6.5(b) of the Plan, each holder of an Allowed Claim in LBCC Class 5C shall receive from LBCC its Pro Rata Share of (i) Available Cash; *provided*, *however*, that the applicable Plan Adjustment Percentage of such Distribution shall be automatically redistributed pursuant to Section 6.5(a) of the Plan, and (ii) the Excess Plan Adjustment Portion with respect to LBCC Class 5C.

5.42    LBCC Class 6 – Equity Interests in LBCC.

(a)    Impairment and Voting.  LBCC Class 6 is impaired by the Plan.  Each holder of an Equity Interest in LBCC Class 6 is not entitled to vote to accept or reject the Plan and is conclusively deemed to have rejected the Plan.

(b)    Distributions.  Equity Interests in LBCC shall be cancelled if and when LBCC is dissolved in accordance with Section 7.4 of the Plan.  Each holder of an Equity Interest in LBCC shall neither receive nor retain any Property of the Estate or direct interest in Property of the Estate of LBCC on account of such Equity Interests thereafter; *provided*, *however*, that in

the event that all Allowed Claims against LBCC have been satisfied in full in accordance with the Bankruptcy Code and the Plan, each holder of an Equity Interest in LBCC may receive its Pro Rata Share of any remaining assets in LBCC.

5.43    LBDP Class 1 – Priority Non-Tax Claims against LBDP.

(a)    Impairment and Voting.  LBDP Class 1 is impaired by the Plan.  Each holder of an Allowed Claim in LBDP Class 1 is entitled to vote to accept or reject the Plan.

(b)    Distributions.  Except to the extent that the holder of an Allowed Claim in LBDP Class 1 agrees to less favorable treatment or has been paid by or on behalf of LBDP on account of such Claim prior to the Effective Date, on the later of the Effective Date and the date such Claim becomes Allowed, or as soon thereafter as is practicable, each holder of an Allowed Claim in LBDP Class 1 shall be paid by LBDP in Cash in full.

5.44    LBDP Class 2 – Secured Claims against LBDP.

(a)    Impairment and Voting.  LBDP Class 2 is impaired by the Plan.  Each holder of an Allowed Claim in LBDP Class 2 is entitled to vote to accept or reject the Plan.

(b)    Distributions.  Except to the extent that the holder of an Allowed Claim in LBDP Class 2 agrees to less favorable treatment, each holder of an Allowed Claim in LBDP Class 2 shall be satisfied by, at the option of LBDP:  (i) payment in Cash by LBDP in full on the later of the Effective Date and the date such Claim becomes Allowed, or as soon thereafter as is practicable; (ii) the sale or disposition proceeds of the Collateral securing such Allowed Claim to the extent of the value of the Collateral securing such Allowed Claim; (iii) surrender to the holder of such Allowed Claim of the Collateral securing such Allowed Claim; or (iv) such treatment that leaves unaltered the legal, equitable, and contractual rights to which the holder of the Allowed Claim is entitled.  In the event an Allowed Claim in LBDP Class 2 is treated under clause (i) or (ii) above, the Liens securing such Claim shall be deemed released and extinguished without further order of the Bankruptcy Court.

5.45    LBDP Class 3 – General Unsecured Claims against LBDP.

(a)    Impairment and Voting.  LBDP Class 3 is impaired by the Plan.  Each holder of an Allowed Claim in LBDP Class 3 is entitled to vote to accept or reject the Plan.

(b)    Distributions.  Each holder of an Allowed Claim in LBDP Class 3 shall receive its Pro Rata Share of Available Cash from LBDP.

5.46    LBDP Class 4A – Affiliate Claims of LBHI against LBDP.

(a)    Impairment and Voting.  LBHI is entitled to vote to accept or reject the Plan.

(b)    Distributions.  Subject to Sections 6.5(b) and 6.5(c) of the Plan, LBHI shall receive its Pro Rata Share of Available Cash from LBDP.

A249

5.47   LBDP Class 4B – Affiliate Claims other than those of LBHI against LBDP.

(a)   Impairment and Voting.  LBDP Class 4B is impaired by the Plan.  Each holder of an Allowed Claim in LBDP Class 4B is entitled to vote to accept or reject the Plan.

(b)   Distributions.  Subject to Section 6.5(b) of the Plan, each holder of an Allowed Claim in LBDP Class 4B shall receive its Pro Rata Share of Available Cash from LBDP.

5.48   LBDP Class 5 – Equity Interests in LBDP.

(a)   Impairment and Voting.  LBDP Class 5 is impaired by the Plan.  Each holder of an Equity Interest in LBDP Class 5 is not entitled to vote to accept or reject the Plan and is conclusively deemed to have rejected the Plan.

(b)   Distributions.  Equity Interests in LBDP shall be cancelled if and when LBDP is dissolved in accordance with Section 7.4 of the Plan.   Each holder of an Equity Interest in LBDP shall neither receive nor retain any Property of the Estate or direct interest in Property of the Estate of LBDP on account of such Equity Interests thereafter; *provided*, *however*, that in the event that all Allowed Claims against LBDP have been satisfied in full in accordance with the Bankruptcy Code and the Plan, each holder of an Equity Interest in LBDP may receive its Pro Rata Share of any remaining assets in LBDP.

5.49   LBFP Class 1 – Priority Non-Tax Claims against LBFP.

(a)   Impairment and Voting.  LBFP Class 1 is impaired by the Plan.  Each holder of an Allowed Claim in LBFP Class 1 is entitled to vote to accept or reject the Plan.

(b)   Distributions.   Except to the extent that the holder of an Allowed Claim in LBFP Class 1 agrees to less favorable treatment or has been paid by or on behalf of LBFP on account of such Claim prior to the Effective Date, on the later of the Effective Date and the date such Claim becomes Allowed, or as soon thereafter as is practicable, each holder of an Allowed Claim in LBFP Class 1 shall be paid by LBFP in Cash in full.

5.50   LBFP Class 2 – Secured Claims against LBFP.

(a)   Impairment and Voting.  LBFP Class 2 is impaired by the Plan.  Each holder of an Allowed Claim in LBFP Class 2 is entitled to vote to accept or reject the Plan.

(b)   Distributions.   Except to the extent that the holder of an Allowed Claim in LBFP Class 2 agrees to less favorable treatment, each holder of an Allowed Claim in LBFP Class 2 shall be satisfied by, at the option of LBFP:   (i) payment in Cash by LBFP in full on the later of the Effective Date and the date such Claim becomes Allowed, or as soon thereafter as is practicable; (ii) the sale or disposition proceeds of the Collateral securing such Allowed Claim to the extent of the value of the Collateral securing such Allowed Claim; (iii) surrender to the holder of such Allowed Claim of the Collateral securing such Allowed Claim; or (iv) such treatment that leaves unaltered the legal, equitable, and contractual rights to which the holder of the Allowed Claim is entitled.   In the event an Allowed Claim in LBFP Class 2 is treated under

A250

clause (i) or (ii) above, the Liens securing such Claim shall be deemed released and extinguished without further order of the Bankruptcy Court.

5.51    LBFP Class 3 – General Unsecured Claims against LBFP.

(a)    Impairment and Voting.  LBFP Class 3 is impaired by the Plan.  Each holder of an Allowed Claim in LBFP Class 3 is entitled to vote to accept or reject the Plan.

(b)    Distributions.  Each holder of an Allowed Claim in LBFP Class 3 shall receive its Pro Rata Share of Available Cash from LBFP.

5.52    LBFP Class 4A – Affiliate Claims of LBHI against LBFP.

(a)    Impairment and Voting.  LBFP Class 4A is impaired by the Plan.  LBHI is entitled to vote to accept or reject the Plan.

(b)    Distributions.  Subject to Sections 6.5(b) and 6.5(c) of the Plan, LBHI shall receive its Pro Rata Share of Available Cash from LBFP.

5.53    LBFP Class 4B – Affiliate Claims other than those of LBHI against LBFP.

(a)    Impairment and Voting.  LBFP Class 4B is impaired by the Plan.  Each holder of an Allowed Claim in LBFP Class 4B is entitled to vote to accept or reject the Plan.

(b)    Distributions.  Subject to Section 6.5(b) of the Plan, each holder of an Allowed Claim in LBFP Class 4B shall receive its Pro Rata Share of Available Cash from LBFP.

5.54    LBFP Class 5 – Equity Interests in LBFP.

(a)    Impairment and Voting.  LBFP Class 5 is impaired by the Plan.  Each holder of an Equity Interest in LBFP Class 5 is not entitled to vote to accept or reject the Plan and is conclusively deemed to have rejected the Plan.

(b)    Distributions.  Equity Interests in LBFP shall be cancelled if and when LBFP is dissolved in accordance with Section 7.4 of the Plan.  Each holder of an Equity Interest in LBFP shall neither receive nor retain any Property of the Estate or direct interest in Property of the Estate of LBFP on account of such Equity Interests thereafter; *provided*, *however*, that in the event that all Allowed Claims against LBFP have been satisfied in full in accordance with the Bankruptcy Code and the Plan, each holder of an Equity Interest in LBFP may receive its Pro Rata Share of any remaining assets in LBFP.

5.55    LB 745 Class 1 – Priority Non-Tax Claims against LB 745.

(a)    Impairment and Voting.  LB 745 Class 1 is impaired by the Plan.  Each holder of an Allowed Claim in LB 745 Class 1 is entitled to vote to accept or reject the Plan.

(b)    Distributions.  Except to the extent that the holder of an Allowed Claim in LB 745 Class 1 agrees to less favorable treatment or has been paid by or on behalf of LB 745 on

A251

account of such Claim prior to the Effective Date, on the later of the Effective Date and the date such Claim becomes Allowed, or as soon thereafter as is practicable, each holder of an Allowed Claim in LB 745 Class 1 shall be paid by LB 745 in Cash in full.

5.56    LB 745 Class 2 – Secured Claims against LB 745.

(a)    Impairment and Voting.  LB 745 Class 2 is impaired by the Plan.  Each holder of an Allowed Claim in LB 745 Class 2 is entitled to vote to accept or reject the Plan.

(b)    Distributions.   Except to the extent that the holder of an Allowed Claim in LB 745 Class 2 agrees to less favorable treatment, each holder of an Allowed Claim in LB 745 Class 2 shall be satisfied by, at the option of LB 745:  (i) payment in Cash by LB 745 in full on the later of the Effective Date and the date such Claim becomes Allowed, or as soon thereafter as is practicable; (ii) the sale or disposition proceeds of the Collateral securing such Allowed Claim to the extent of the value of the Collateral securing such Allowed Claim; (iii) surrender to the holder of such Allowed Claim of the Collateral securing such Allowed Claim; or (iv) such treatment that leaves unaltered the legal, equitable, and contractual rights to which the holder of the Allowed Claim is entitled.  In the event an Allowed Claim in LB 745 Class 2 is treated under clause (i) or (ii) above, the Liens securing such Claim shall be deemed released and extinguished without further order of the Bankruptcy Court.

5.57    LB 745 Class 3 – General Unsecured Claims against LB 745.

(a)    Impairment and Voting.  LB 745 Class 3 is impaired by the Plan.  Each holder of an Allowed Claim in LB 745 Class 3 is entitled to vote to accept or reject the Plan.

(b)    Distributions.  Each holder of an Allowed Claim in LB 745 Class 3 shall receive its Pro Rata Share of Available Cash from LB 745.

5.58    LB 745 Class 4A – Affiliate Claims of LBHI against LB 745.

(a)    Impairment and Voting.  LB 745 Class 4A is impaired by the Plan.  LBHI is entitled to vote to accept or reject the Plan.

(b)    Distributions.  Subject to Sections 6.5(b) and 6.5(c) of the Plan, LBHI shall receive its Pro Rata Share of Available Cash from LB 745.

5.59    LB 745 Class 4B – Affiliate Claims other than those of LBHI against LB 745.

(a)    Impairment and Voting.  LB 745 Class 4B is impaired by the Plan.  Each holder of an Allowed Claim in LB 745 Class 4B is entitled to vote to accept or reject the Plan.

(b)    Distributions.  Subject to Section 6.5(b) of the Plan, each holder of an Allowed Claim in LB 745 Class 4B shall receive its Pro Rata Share of Available Cash from LB 745.

A252

5.60    <u>LB 745 Class 5 – Equity Interests in LB 745</u>.

(a)    <u>Impairment and Voting</u>.  LB 745 Class 5 is impaired by the Plan.  Each holder of an Equity Interest in LB 745 Class 5 is not entitled to vote to accept or reject the Plan and is conclusively deemed to have rejected the Plan.

(b)    <u>Distributions</u>.  Equity Interests in LB 745 shall be cancelled if and when LB 745 is dissolved in accordance with <u>Section 7.4</u> of the Plan.  Each holder of an Equity Interest in LB 745 shall neither receive nor retain any Property of the Estate or direct interest in Property of the Estate of LB 745 on account of such Equity Interests thereafter; *provided*, *however*, that in the event that all Allowed Claims against LB 745 have been satisfied in full in accordance with the Bankruptcy Code and the Plan, each holder of an Equity Interest in LB 745 may receive its Pro Rata Share of any remaining assets in LB 745.

5.61    <u>PAMI Statler Class 1 – Priority Non-Tax Claims against PAMI Statler</u>.

(a)    <u>Impairment and Voting</u>.  PAMI Statler Class 1 is impaired by the Plan. Each holder of an Allowed Claim in PAMI Statler Class 1 is entitled to vote to accept or reject the Plan.

(b)    <u>Distributions</u>.  Except to the extent that the holder of an Allowed Claim in PAMI Statler Class 1 agrees to less favorable treatment or has been paid by or on behalf of PAMI Statler on account of such Claim prior to the Effective Date, on the later of the Effective Date and the date such Claim becomes Allowed, or as soon thereafter as is practicable, each holder of an Allowed Claim in PAMI Statler Class 1 shall be paid by PAMI Statler in Cash in full.

5.62    <u>PAMI Statler Class 2 – Secured Claims against PAMI Statler</u>.

(a)    <u>Impairment and Voting</u>.  PAMI Statler Class 2 is impaired by the Plan. Each holder of an Allowed Claim in PAMI Statler Class 2 is entitled to vote to accept or reject the Plan.

(b)    <u>Distributions</u>.  Except to the extent that the holder of an Allowed Claim in PAMI Statler Class 2 agrees to less favorable treatment, each holder of an Allowed Claim in PAMI Statler Class 2 shall be satisfied by, at the option of PAMI Statler:  (i) payment in Cash by PAMI Statler in full on the later of the Effective Date and the date such Claim becomes Allowed, or as soon thereafter as is practicable; (ii) the sale or disposition proceeds of the Collateral securing such Allowed Claim to the extent of the value of the Collateral securing such Allowed Claim; (iii) surrender to the holder of such Allowed Claim of the Collateral securing such Allowed Claim; or (iv) such treatment that leaves unaltered the legal, equitable, and contractual rights to which the holder of the Allowed Claim is entitled.   In the event an Allowed Claim in PAMI Statler Class 2 is treated under clause (i) or (ii) above, the Liens securing such Claim shall be deemed released and extinguished without further order of the Bankruptcy Court.

5.63 PAMI Stadler Class 3 – General Unsecured Claims against PAMI Stadler.

(a) Impairment and Voting. PAMI Stadler Class 3 is impaired by the Plan. Each holder of an Allowed Claim in PAMI Stadler Class 3 is entitled to vote to accept or reject the Plan.

(b) Distributions. Each holder of an Allowed Claim in PAMI Stadler Class 3 shall receive its Pro Rata Share of Available Cash from PAMI Stadler.

5.64 PAMI Stadler Class 4A – Affiliate Claims of LBHI against PAMI Stadler.

(a) Impairment and Voting. PAMI Stadler Class 4A is impaired by the Plan. LBHI is entitled to vote to accept or reject the Plan.

(b) Distributions. Subject to Sections 6.5(b) and 6.5(c) of the Plan, LBHI shall receive its Pro Rata Share of Available Cash from PAMI Stadler.

5.65 PAMI Stadler Class 4B – Affiliate Claims other than those of LBHI against PAMI Stadler.

(a) Impairment and Voting. PAMI Stadler Class 4B is impaired by the Plan. Each holder of an Allowed Claim in PAMI Stadler Class 4B is entitled to vote to accept or reject the Plan.

(b) Distributions. Subject to Section 6.5(b) of the Plan, each holder of an Allowed Claim in PAMI Stadler Class 4B shall receive its Pro Rata Share of Available Cash from PAMI Stadler.

5.66 PAMI Stadler Class 5 – Equity Interests in PAMI Stadler.

(a) Impairment and Voting. PAMI Stadler Class 5 is impaired by the Plan. Each holder of an Equity Interest in PAMI Stadler Class 5 is not entitled to vote to accept or reject the Plan and is conclusively deemed to have rejected the Plan.

(b) Distributions. Equity Interests in PAMI Stadler shall be cancelled if and when PAMI Stadler is dissolved in accordance with Section 7.4 of the Plan. Each holder of an Equity Interest in PAMI Stadler shall neither receive nor retain any Property of the Estate or direct interest in Property of the Estate of PAMI Stadler on account of such Equity Interests thereafter; *provided*, *however*, that in the event that all Allowed Claims against PAMI Stadler have been satisfied in full in accordance with the Bankruptcy Code and the Plan, each holder of an Equity Interest in PAMI Stadler may receive its Pro Rata Share of any remaining assets in PAMI Stadler.

5.67 CES Class 1 – Priority Non-Tax Claims against CES.

(a) Impairment and Voting. CES Class 1 is impaired by the Plan. Each holder of an Allowed Claim in CES Class 1 is entitled to vote to accept or reject the Plan.

(b)    Distributions.   Except to the extent that the holder of an Allowed Claim in CES Class 1 agrees to less favorable treatment or has been paid by or on behalf of CES on account of such Claim prior to the Effective Date, on the later of the Effective Date and the date such Claim becomes Allowed, or as soon thereafter as is practicable, each holder of an Allowed Claim in CES Class 1 shall be paid by CES in Cash in full.

5.68    CES Class 2 – Secured Claims against CES.

(a)    Impairment and Voting.   CES Class 2 is impaired by the Plan.   Each holder of an Allowed Claim in CES Class 2 is entitled to vote to accept or reject the Plan.

(b)    Distributions.   Except to the extent that the holder of an Allowed Claim in CES Class 2 agrees to less favorable treatment, each holder of an Allowed Claim in CES Class 2 shall be satisfied by, at the option of CES:   (i) payment in Cash by CES in full on the later of the Effective Date and the date such Claim becomes Allowed, or as soon thereafter as is practicable; (ii) the sale or disposition proceeds of the Collateral securing such Allowed Claim to the extent of the value of the Collateral securing such Allowed Claim; (iii) surrender to the holder of such Allowed Claim of the Collateral securing such Allowed Claim; or (iv) such treatment that leaves unaltered the legal, equitable, and contractual rights to which the holder of the Allowed Claim is entitled.   In the event an Allowed Claim in CES Class 2 is treated under clause (i) or (ii) above, the Liens securing such Claim shall be deemed released and extinguished without further order of the Bankruptcy Court.

5.69    CES Class 3 – General Unsecured Claims against CES.

(a)    Impairment and Voting.   CES Class 3 is impaired by the Plan.   Each holder of an Allowed Claim in CES Class 3 is entitled to vote to accept or reject the Plan.

(b)    Distributions.   Each holder of an Allowed Claim in CES Class 3 shall receive its Pro Rata Share of Available Cash from CES.

5.70    CES Class 4A – Affiliate Claims of LBHI against CES.

(a)    Impairment and Voting.   CES Class 4A is impaired by the Plan.   LBHI is entitled to vote to accept or reject the Plan.

(b)    Distributions.   Subject to Sections 6.5(b) and 6.5(c) of the Plan, LBHI shall receive its Pro Rata Share of Available Cash from CES.

5.71    CES Class 4B – Affiliate Claims other than those of LBHI against CES.

(a)    Impairment and Voting.   CES Class 4B is impaired by the Plan.   Each holder of an Allowed Claim in CES Class 4B is entitled to vote to accept or reject the Plan.

(b)    Distributions.   Subject to Section 6.5(b) of the Plan, each holder of an Allowed Claim in CES Class 4B shall receive its Pro Rata Share of Available Cash from CES.

5.72  CES Class 5 – Equity Interests in CES.

(a)  _Impairment and Voting_.  CES Class 5 is impaired by the Plan.  Each holder of an Equity Interest in CES Class 5 is not entitled to vote to accept or reject the Plan and is conclusively deemed to have rejected the Plan.

(b)  _Distributions_.  Equity Interests in CES shall be cancelled if and when CES is dissolved in accordance with Section 7.4 of the Plan.  Each holder of an Equity Interest in CES shall neither receive nor retain any Property of the Estate or direct interest in Property of the Estate of CES on account of such Equity Interests thereafter; _provided_, _however_, that in the event that all Allowed Claims against CES have been satisfied in full in accordance with the Bankruptcy Code and the Plan, each holder of an Equity Interest in CES may receive its Pro Rata Share of any remaining assets in CES.

5.73  CES V Class 1 – Priority Non-Tax Claims against CES V.

(a)  _Impairment and Voting_.  CES V Class 1 is impaired by the Plan.  Each holder of an Allowed Claim in CES V Class 1 is entitled to vote to accept or reject the Plan.

(b)  _Distributions_.  Except to the extent that the holder of an Allowed Claim in CES V Class 1 agrees to less favorable treatment or has been paid by or on behalf of CES V on account of such Claim prior to the Effective Date, on the later of the Effective Date and the date such Claim becomes Allowed, or as soon thereafter as is practicable, each holder of an Allowed Claim in CES V Class 1 shall be paid by CES V in Cash in full.

5.74  CES V Class 2 – Secured Claims against CES V.

(a)  _Impairment and Voting_.  CES V Class 2 is impaired by the Plan.  Each holder of an Allowed Claim in CES V Class 2 is entitled to vote to accept or reject the Plan.

(b)  _Distributions_.  Except to the extent that the holder of an Allowed Claim in CES V Class 2 agrees to less favorable treatment, each holder of an Allowed Claim in CES V Class 2 shall be satisfied by, at the option of CES V:  (i) payment in Cash by CES V in full on the later of the Effective Date and the date such Claim becomes Allowed, or as soon thereafter as is practicable; (ii) the sale or disposition proceeds of the Collateral securing such Allowed Claim to the extent of the value of the Collateral securing such Allowed Claim; (iii) surrender to the holder of such Allowed Claim of the Collateral securing such Allowed Claim; or (iv) such treatment that leaves unaltered the legal, equitable, and contractual rights to which the holder of the Allowed Claim is entitled.   In the event an Allowed Claim in CES V Class 2 is treated under clause (i) or (ii) above, the Liens securing such Claim shall be deemed released and extinguished without further order of the Bankruptcy Court.

5.75  CES V Class 3 – General Unsecured Claims against CES V.

(a)  _Impairment and Voting_.  CES V Class 3 is impaired by the Plan.  Each holder of an Allowed Claim in CES V Class 3 is entitled to vote to accept or reject the Plan.

(b)     _Distributions_.   Each holder of an Allowed Claim in CES V Class 3 shall receive its Pro Rata Share of Available Cash from CES V.

5.76     _CES V Class 4A – Affiliate Claims of LBHI against CES V_.

(a)     _Impairment and Voting_.   CES V Class 4A is impaired by the Plan.   LBHI is entitled to vote to accept or reject the Plan.

(b)     _Distributions_.   Subject to _Sections 6.5(b)_ and _6.5(c)_ of the Plan, LBHI shall receive its Pro Rata Share of Available Cash from CES V.

5.77     _CES V Class 4B – Affiliate Claims other than those of LBHI against CES V_.

(a)     _Impairment and Voting_.   CES V Class 4B is impaired by the Plan.   Each holder of an Allowed Claim in CES V Class 4B is entitled to vote to accept or reject the Plan.

(b)     _Distributions_.   Subject to _Section 6.5(b)_ of the Plan, each holder of an Allowed Claim in CES V Class 4B shall receive its Pro Rata Share of Available Cash from CES V.

5.78     _CES V Class 5 – Equity Interests in CES V_.

(a)     _Impairment and Voting_.   CES V Class 5 is impaired by the Plan.   Each holder of an Equity Interest in CES V Class 5 is not entitled to vote to accept or reject the Plan and is conclusively deemed to have rejected the Plan.

(b)     _Distributions_.   Equity Interests in CES V shall be cancelled if and when CES V is dissolved in accordance with _Section 7.4_ of the Plan.   Each holder of an Equity Interest in CES V shall neither receive nor retain any Property of the Estate or direct interest in Property of the Estate of CES V on account of such Equity Interests thereafter; _provided_, _however_, that in the event that all Allowed Claims against CES V have been satisfied in full in accordance with the Bankruptcy Code and the Plan, each holder of an Equity Interest in CES V may receive its Pro Rata Share of any remaining assets in CES V.

5.79     _CES IX Class 1 – Priority Non-Tax Claims against CES IX_.

(a)     _Impairment and Voting_.   CES IX Class 1 is impaired by the Plan.   Each holder of an Allowed Claim in CES IX Class 1 is entitled to vote to accept or reject the Plan.

(b)     _Distributions_.   Except to the extent that the holder of an Allowed Claim in CES IX Class 1 agrees to less favorable treatment or has been paid by or on behalf of CES IX on account of such Claim prior to the Effective Date, on the later of the Effective Date and the date such Claim becomes Allowed, or as soon thereafter as is practicable, each holder of an Allowed Claim in CES IX Class 1 shall be paid by CES IX in Cash in full.

5.80    <u>CES IX Class 2 – Secured Claims against CES IX</u>.

     (a)    <u>Impairment and Voting</u>.  CES IX Class 2 is impaired by the Plan.  Each holder of an Allowed Claim in CES IX Class 2 is entitled to vote to accept or reject the Plan.

     (b)    <u>Distributions</u>.  Except to the extent that the holder of an Allowed Claim in CES IX Class 2 agrees to less favorable treatment, each holder of an Allowed Claim in CES IX Class 2 shall be satisfied by, at the option of CES IX:  (i) payment in Cash by CES IX in full on the later of the Effective Date and the date such Claim becomes Allowed, or as soon thereafter as is practicable; (ii) the sale or disposition proceeds of the Collateral securing such Allowed Claim to the extent of the value of the Collateral securing such Allowed Claim; (iii) surrender to the holder of such Allowed Claim of the Collateral securing such Allowed Claim; or (iv) such treatment that leaves unaltered the legal, equitable, and contractual rights to which the holder of the Allowed Claim is entitled.  In the event an Allowed Claim in CES IX Class 2 is treated under clause (i) or (ii) above, the Liens securing such Claim shall be deemed released and extinguished without further order of the Bankruptcy Court.

5.81    <u>CES IX Class 3 – General Unsecured Claims against CES IX</u>.

     (a)    <u>Impairment and Voting</u>.  CES IX Class 3 is impaired by the Plan.  Each holder of an Allowed Claim in CES IX Class 3 is entitled to vote to accept or reject the Plan.

     (b)    <u>Distributions</u>.  Each holder of an Allowed Claim in CES IX Class 3 shall receive its Pro Rata Share of Available Cash from CES IX.

5.82    <u>CES IX Class 4A – Affiliate Claims of LBHI against CES IX</u>.

     (a)    <u>Impairment and Voting</u>.  CES IX Class 4A is impaired by the Plan.  LBHI is entitled to vote to accept or reject the Plan.

     (b)    <u>Distributions</u>.  Subject to <u>Sections 6.5(b)</u> and <u>6.5(c)</u> of the Plan, LBHI shall receive its Pro Rata Share of Available Cash from CES IX.

5.83    <u>CES IX Class 4B – Affiliate Claims other than those of LBHI against CES IX</u>.

     (a)    <u>Impairment and Voting</u>.  CES IX Class 4B is impaired by the Plan.  Each holder of an Allowed Claim in CES IX Class 4B is entitled to vote to accept or reject the Plan.

     (b)    <u>Distributions</u>.  Subject to <u>Section 6.5(b)</u> of the Plan, each holder of an Allowed Claim in CES IX Class 4B shall receive its Pro Rata Share of Available Cash from CES IX.

5.84    <u>CES IX Class 5 – Equity Interests in CES IX</u>.

     (a)    <u>Impairment and Voting</u>.  CES IX Class 5 is impaired by the Plan.  Each holder of an Equity Interest in CES IX Class 5 is not entitled to vote to accept or reject the Plan and is conclusively deemed to have rejected the Plan.

(b)    <u>Distributions</u>.    Equity Interests in CES IX shall be cancelled if and when CES IX is dissolved in accordance with <u>Section 7.4</u> of the Plan.  Each holder of an Equity Interest in CES IX shall neither receive nor retain any Property of the Estate or direct interest in Property of the Estate of CES IX on account of such Equity Interests thereafter; *provided*, *however*, that in the event that all Allowed Claims against CES IX have been satisfied in full in accordance with the Bankruptcy Code and the Plan, each holder of an Equity Interest in CES IX may receive its Pro Rata Share of any remaining assets in CES IX.

5.85    <u>East Dover Class 1 – Priority Non-Tax Claims against East Dover</u>.

(a)    <u>Impairment and Voting</u>.    East Dover Class 1 is impaired by the Plan. Each holder of an Allowed Claim in East Dover Class 1 is entitled to vote to accept or reject the Plan.

(b)    <u>Distributions</u>.    Except to the extent that the holder of an Allowed Claim in East Dover Class 1 agrees to less favorable treatment or has been paid by or on behalf of East Dover on account of such Claim prior to the Effective Date, on the later of the Effective Date and the date such Claim becomes Allowed, or as soon thereafter as is practicable, each holder of an Allowed Claim in East Dover Class 1 shall be paid by East Dover in Cash in full.

5.86    <u>East Dover Class 2 – Secured Claims against East Dover</u>.

(a)    <u>Impairment and Voting</u>.    East Dover Class 2 is impaired by the Plan. Each holder of an Allowed Claim in East Dover Class 2 is entitled to vote to accept or reject the Plan.

(b)    <u>Distributions</u>.    Except to the extent that the holder of an Allowed Claim in East Dover Class 2 agrees to less favorable treatment, each holder of an Allowed Claim in East Dover Class 2 shall be satisfied by, at the option of East Dover:  (i) payment in Cash by East Dover in full on the later of the Effective Date and the date such Claim becomes Allowed, or as soon thereafter as is practicable; (ii) the sale or disposition proceeds of the Collateral securing such Allowed Claim to the extent of the value of the Collateral securing such Allowed Claim; (iii) surrender to the holder of such Allowed Claim of the Collateral securing such Allowed Claim; or (iv) such treatment that leaves unaltered the legal, equitable, and contractual rights to which the holder of the Allowed Claim is entitled.   In the event an Allowed Claim in East Dover Class 2 is treated under clause (i) or (ii) above, the Liens securing such Claim shall be deemed released and extinguished without further order of the Bankruptcy Court.

5.87    <u>East Dover Class 3 – General Unsecured Claims against East Dover</u>.

(a)    <u>Impairment and Voting</u>.    East Dover Class 3 is impaired by the Plan. Each holder of an Allowed Claim in East Dover Class 3 is entitled to vote to accept or reject the Plan.

(b)    <u>Distributions</u>.    Each holder of an Allowed Claim in East Dover Class 3 shall receive its Pro Rata Share of Available Cash from East Dover.

5.88    East Dover Class 4A – Affiliate Claims of LBHI against East Dover.

(a)    Impairment and Voting.  East Dover Class 4A is impaired by the Plan. LBHI is entitled to vote to accept or reject the Plan.

(b)    Distributions.  Subject to Sections 6.5(b) and 6.5(c) of the Plan, LBHI shall receive its Pro Rata Share of Available Cash from East Dover.

5.89    East Dover Class 4B – Affiliate Claims other than those of LBHI against East Dover.

(a)    Impairment and Voting.  East Dover Class 4B is impaired by the Plan. Each holder of an Allowed Claim in East Dover Class 4B is entitled to vote to accept or reject the Plan.

(b)    Distributions.  Subject to Section 6.5(b) of the Plan, each holder of an Allowed Claim in East Dover Class 4B shall receive its Pro Rata Share of Available Cash from East Dover.

5.90    East Dover Class 5 – Equity Interests in East Dover.

(a)    Impairment and Voting.  East Dover Class 5 is impaired by the Plan. Each holder of an Equity Interest in East Dover Class 5 is not entitled to vote to accept or reject the Plan and is conclusively deemed to have rejected the Plan.

(b)    Distributions.  Equity Interests in East Dover shall be cancelled if and when East Dover is dissolved in accordance with Section 7.4 of the Plan.  Each holder of an Equity Interest in East Dover shall neither receive nor retain any Property of the Estate or direct interest in Property of the Estate of East Dover on account of such Equity Interests thereafter; *provided*, *however*, that in the event that all Allowed Claims against East Dover have been satisfied in full in accordance with the Bankruptcy Code and the Plan, each holder of an Equity Interest in East Dover may receive its Pro Rata Share of any remaining assets in East Dover.

5.91    LS Finance Class 1 – Priority Non-Tax Claims against LS Finance.

(a)    Impairment and Voting.  LS Finance Class 1 is impaired by the Plan. Each holder of an Allowed Claim in LS Finance Class 1 is entitled to vote to accept or reject the Plan.

(b)    Distributions.  Except to the extent that the holder of an Allowed Claim in LS Finance Class 1 agrees to less favorable treatment or has been paid by or on behalf of LS Finance on account of such Claim prior to the Effective Date, on the later of the Effective Date and the date such Claim becomes Allowed, or as soon thereafter as is practicable, each holder of an Allowed Claim in LS Finance Class 1 shall be paid by LS Finance in Cash in full.

5.92    LS Finance Class 2 – Secured Claims against LS Finance.

(a)    Impairment and Voting.  LS Finance Class 2 is impaired by the Plan. Each holder of an Allowed Claim in LS Finance Class 2 is entitled to vote to accept or reject the Plan.

(b)    Distributions.  Except to the extent that the holder of an Allowed Claim in LS Finance Class 2 agrees to less favorable treatment, each holder of an Allowed Claim in LS Finance Class 2 shall be satisfied by, at the option of LS Finance:  (i) payment in Cash by LS Finance in full on the later of the Effective Date and the date such Claim becomes Allowed, or as soon thereafter as is practicable; (ii) the sale or disposition proceeds of the Collateral securing such Allowed Claim to the extent of the value of the Collateral securing such Allowed Claim; (iii) surrender to the holder of such Allowed Claim of the Collateral securing such Allowed Claim; or (iv) such treatment that leaves unaltered the legal, equitable, and contractual rights to which the holder of the Allowed Claim is entitled.  In the event an Allowed Claim in LS Finance Class 2 is treated under clause (i) or (ii) above, the Liens securing such Claim shall be deemed released and extinguished without further order of the Bankruptcy Court.

5.93    LS Finance Class 3 – General Unsecured Claims against LS Finance.

(a)    Impairment and Voting.  LS Finance Class 3 is impaired by the Plan. Each holder of an Allowed Claim in LS Finance Class 3 is entitled to vote to accept or reject the Plan.

(b)    Distributions.  Each holder of an Allowed Claim in LS Finance Class 3 shall receive its Pro Rata Share of Available Cash from LS Finance.

5.94    LS Finance Class 4A – Affiliate Claims of LBHI against LS Finance.

(a)    Impairment and Voting.  LS Finance Class 4A is impaired by the Plan. LBHI is entitled to vote to accept or reject the Plan.

(b)    Distributions.  Subject to Sections 6.5(b) and 6.5(c) of the Plan, LBHI shall receive its Pro Rata Share of Available Cash from LS Finance.

5.95    LS Finance Class 4B – Affiliate Claims other than those of LBHI against LS Finance.

(a)    Impairment and Voting.  LS Finance Class 4B is impaired by the Plan. Each holder of an Allowed Claim in LS Finance Class 4B is entitled to vote to accept or reject the Plan.

(b)    Distributions.  Subject to Section 6.5(b) of the Plan, each holder of an Allowed Claim in LS Finance Class 4B shall receive its Pro Rata Share of Available Cash from LS Finance.

A261

5.96   <u>LS Finance Class 5 – Equity Interests in LS Finance</u>.

(a)   <u>Impairment and Voting</u>.  LS Finance Class 5 is impaired by the Plan. Each holder of an Equity Interest in LS Finance Class 5 is not entitled to vote to accept or reject the Plan and is conclusively deemed to have rejected the Plan.

(b)   <u>Distributions</u>.  Equity Interests in LS Finance shall be cancelled if and when LS Finance is dissolved in accordance with <u>Section 7.4</u> of the Plan.  Each holder of an Equity Interest in LS Finance shall neither receive nor retain any Property of the Estate or direct interest in Property of the Estate of LS Finance on account of such Equity Interests thereafter; *provided*, *however*, that in the event that all Allowed Claims against LS Finance have been satisfied in full in accordance with the Bankruptcy Code and the Plan, each holder of an Equity Interest in LS Finance may receive its Pro Rata Share of any remaining assets in LS Finance.

5.97   <u>LUXCO Class 1 – Priority Non-Tax Claims against LUXCO</u>.

(a)   <u>Impairment and Voting</u>.  LUXCO Class 1 is impaired by the Plan.  Each holder of an Allowed Claim in LUXCO Class 1 is entitled to vote to accept or reject the Plan.

(b)   <u>Distributions</u>.  Except to the extent that the holder of an Allowed Claim in LUXCO Class 1 agrees to less favorable treatment or has been paid by or on behalf of LUXCO on account of such Claim prior to the Effective Date, on the later of the Effective Date and the date such Claim becomes Allowed, or as soon thereafter as is practicable, each holder of an Allowed Claim in LUXCO Class 1 shall be paid by LUXCO in Cash in full.

5.98   <u>LUXCO Class 2 – Secured Claims against LUXCO</u>.

(a)   <u>Impairment and Voting</u>.  LUXCO Class 2 is impaired by the Plan.  Each holder of an Allowed Claim in LUXCO Class 2 is entitled to vote to accept or reject the Plan.

(b)   <u>Distributions</u>.  Except to the extent that the holder of an Allowed Claim in LUXCO Class 2 agrees to less favorable treatment, each holder of an Allowed Claim in LUXCO Class 2 shall be satisfied by, at the option of LUXCO:  (i) payment in Cash by LUXCO in full on the later of the Effective Date and the date such Claim becomes Allowed, or as soon thereafter as is practicable; (ii) the sale or disposition proceeds of the Collateral securing such Allowed Claim to the extent of the value of the Collateral securing such Allowed Claim; (iii) surrender to the holder of such Allowed Claim of the Collateral securing such Allowed Claim; or (iv) such treatment that leaves unaltered the legal, equitable, and contractual rights to which the holder of the Allowed Claim is entitled.   In the event an Allowed Claim in LUXCO Class 2 is treated under clause (i) or (ii) above, the Liens securing such Claim shall be deemed released and extinguished without further order of the Bankruptcy Court.

5.99   <u>LUXCO Class 3 – General Unsecured Claims against LUXCO</u>.

(a)   <u>Impairment and Voting</u>.  LUXCO Class 3 is impaired by the Plan.  Each holder of an Allowed Claim in LUXCO Class 3 is entitled to vote to accept or reject the Plan.

(b)  <u>Distributions</u>.  Each holder of an Allowed Claim in LUXCO Class 3 shall receive its Pro Rata Share of Available Cash from LUXCO.

5.100  <u>LUXCO Class 4A – Affiliate Claims of LBHI against LUXCO</u>.

(a)  <u>Impairment and Voting</u>.  LUXCO Class 4A is impaired by the Plan. LBHI is entitled to vote to accept or reject the Plan.

(b)  <u>Distributions</u>.  Subject to <u>Sections 6.5(b)</u> and <u>6.5(c)</u> of the Plan, LBHI shall receive its Pro Rata Share of Available Cash from LUXCO.

5.101  <u>LUXCO Class 4B – Affiliate Claims other than those of LBHI against LUXCO</u>.

(a)  <u>Impairment and Voting</u>.  LUXCO Class 4B is impaired by the Plan. Each holder of an Allowed Claim in LUXCO Class 4B is entitled to vote to accept or reject the Plan.

(b)  <u>Distributions</u>.  Subject to <u>Section 6.5(b)</u> of the Plan, each holder of an Allowed Claim in LUXCO Class 4B shall receive its Pro Rata Share of Available Cash from. LUXCO.

5.102  <u>LUXCO Class 5 – Equity Interests in LUXCO</u>.

(a)  <u>Impairment and Voting</u>.  LUXCO Class 5 is impaired by the Plan.  Each holder of an Equity Interest in LUXCO Class 5 is not entitled to vote to accept or reject the Plan and is conclusively deemed to have rejected the Plan.

(b)  <u>Distributions</u>.  Equity Interests in LUXCO shall be cancelled if and when LUXCO is dissolved in accordance with <u>Section 7.4</u> of the Plan.  Each holder of an Equity Interest in LUXCO shall neither receive nor retain any Property of the Estate or direct interest in Property of the Estate of LUXCO on account of such Equity Interests thereafter; *provided, however*, that in the event that all Allowed Claims against LUXCO have been satisfied in full in accordance with the Bankruptcy Code and the Plan, each holder of an Equity Interest in LUXCO may receive its Pro Rata Share of any remaining assets in LUXCO.

5.103  <u>BNC Class 1 – Priority Non-Tax Claims against BNC</u>.

(a)  <u>Impairment and Voting</u>.  BNC Class 1 is impaired by the Plan.  Each holder of an Allowed Claim in BNC Class 1 is entitled to vote to accept or reject the Plan.

(b)  <u>Distributions</u>.  Except to the extent that the holder of an Allowed Claim in BNC Class 1 agrees to less favorable treatment or has been paid by or on behalf of BNC on account of such Claim prior to the Effective Date, on the later of the Effective Date and the date such Claim becomes Allowed, or as soon thereafter as is practicable, each holder of an Allowed Claim in BNC Class 1 shall be paid by BNC in Cash in full.

5.104   <u>BNC Class 2 – Secured Claims against BNC</u>.

(a)   <u>Impairment and Voting</u>.  BNC Class 2 is impaired by the Plan.  Each holder of an Allowed Claim in BNC Class 2 is entitled to vote to accept or reject the Plan.

(b)   <u>Distributions</u>.   Except to the extent that the holder of an Allowed Claim in BNC Class 2 agrees to less favorable treatment, each holder of an Allowed Claim in BNC Class 2 shall be satisfied by, at the option of BNC:   (i) payment in Cash by BNC in full on the later of the Effective Date and the date such Claim becomes Allowed, or as soon thereafter as is practicable; (ii) the sale or disposition proceeds of the Collateral securing such Allowed Claim to the extent of the value of the Collateral securing such Allowed Claim; (iii) surrender to the holder of such Allowed Claim of the Collateral securing such Allowed Claim; or (iv) such treatment that leaves unaltered the legal, equitable, and contractual rights to which the holder of the Allowed Claim is entitled.   In the event an Allowed Claim in BNC Class 2 is treated under clause (i) or (ii) above, the Liens securing such Claim shall be deemed released and extinguished without further order of the Bankruptcy Court.

5.105   <u>BNC Class 3 – General Unsecured Claims against BNC</u>.

(a)   <u>Impairment and Voting</u>.  BNC Class 3 is impaired by the Plan.  Each holder of an Allowed Claim in BNC Class 3 is entitled to vote to accept or reject the Plan.

(b)   <u>Distributions</u>.  Each holder of an Allowed Claim in BNC Class 3 shall receive its Pro Rata Share of Available Cash from BNC.

5.106   <u>BNC Class 4A – Affiliate Claims of LBHI against BNC</u>.

(a)   <u>Impairment and Voting</u>.  BNC Class 4A is impaired by the Plan.  LBHI is entitled to vote to accept or reject the Plan.

(b)   <u>Distributions</u>.  Subject to <u>Sections 6.5(b)</u> and <u>6.5(c)</u> of the Plan, LBHI shall receive its Pro Rata Share of Available Cash from BNC.

5.107   <u>BNC Class 4B – Affiliate Claims other than those of LBHI against BNC</u>.

(a)   <u>Impairment and Voting</u>.  BNC Class 4B is impaired by the Plan.  Each holder of an Allowed Claim in BNC Class 4B is entitled to vote to accept or reject the Plan.

(b)   <u>Distributions</u>.  Subject to <u>Section 6.5(b)</u> of the Plan, each holder of an Allowed Claim in BNC Class 4B shall receive its Pro Rata Share of Available Cash from BNC.

5.108   <u>BNC Class 5 – Equity Interests in BNC</u>.

(a)   <u>Impairment and Voting</u>.  BNC Class 5 is impaired by the Plan.  Each holder of an Equity Interest in BNC Class 5 is not entitled to vote to accept or reject the Plan and is conclusively deemed to have rejected the Plan.

(b)    Distributions.  Equity Interests in BNC shall be cancelled if and when BNC is dissolved in accordance with Section 7.4 of the Plan.  Each holder of an Equity Interest in BNC shall neither receive nor retain any Property of the Estate or direct interest in Property of the Estate of BNC on account of such Equity Interests thereafter; *provided*, *however*, that in the event that all Allowed Claims against BNC have been satisfied in full in accordance with the Bankruptcy Code and the Plan, each holder of an Equity Interest in BNC may receive its Pro Rata Share of any remaining assets in BNC.

5.109   LB Rose Ranch Class 1 – Priority Non-Tax Claims against LB Rose Ranch.

(a)    Impairment and Voting.  LB Rose Ranch Class 1 is impaired by the Plan. Each holder of an Allowed Claim in LB Rose Ranch Class 1 is entitled to vote to accept or reject the Plan.

(b)    Distributions.   Except to the extent that the holder of an Allowed Claim in LB Rose Ranch Class 1 agrees to less favorable treatment or has been paid by or on behalf of LB Rose Ranch on account of such Claim prior to the Effective Date, on the later of the Effective Date and the date such Claim becomes Allowed, or as soon thereafter as is practicable, each holder of an Allowed Claim in LB Rose Ranch Class 1 shall be paid by LB Rose Ranch in Cash in full.

5.110   LB Rose Ranch Class 2 – Secured Claims against LB Rose Ranch.

(a)    Impairment and Voting.  LB Rose Ranch Class 2 is impaired by the Plan. Each holder of an Allowed Claim in LB Rose Ranch Class 2 is entitled to vote to accept or reject the Plan.

(b)    Distributions.   Except to the extent that the holder of an Allowed Claim in LB Rose Ranch Class 2 agrees to less favorable treatment, each holder of an Allowed Claim in LB Rose Ranch Class 2 shall be satisfied by, at the option of LB Rose Ranch:  (i) payment in Cash by LB Rose Ranch in full on the later of the Effective Date and the date such Claim becomes Allowed, or as soon thereafter as is practicable; (ii) the sale or disposition proceeds of the Collateral securing such Allowed Claim to the extent of the value of the Collateral securing such Allowed Claim; (iii) surrender to the holder of such Allowed Claim of the Collateral securing such Allowed Claim; or (iv) such treatment that leaves unaltered the legal, equitable, and contractual rights to which the holder of the Allowed Claim is entitled.  In the event an Allowed Claim in LB Rose Ranch Class 2 is treated under clause (i) or (ii) above, the Liens securing such Claim shall be deemed released and extinguished without further order of the Bankruptcy Court.

5.111   LB Rose Ranch Class 3 – General Unsecured Claims against LB Rose Ranch.

(a)    Impairment and Voting.  LB Rose Ranch Class 3 is impaired by the Plan. Each holder of an Allowed Claim in LB Rose Ranch Class 3 is entitled to vote to accept or reject the Plan.

(b)    Distributions.   Each holder of an Allowed Claim in LB Rose Ranch Class 3 shall receive its Pro Rata Share of Available Cash from LB Rose Ranch.

A265

5.112  <u>LB Rose Ranch 4A – Affiliate Claims of LBHI against LB Rose Ranch</u>.

(a)  <u>Impairment and Voting</u>.  LB Rose Ranch Class 4A is impaired by the Plan.  LBHI is entitled to vote to accept or reject the Plan.

(b)  <u>Distributions</u>.  Subject to <u>Sections 6.5(b)</u> and <u>6.5(c)</u> of the Plan, LBHI shall receive its Pro Rata Share of Available Cash from LB Rose Ranch.

5.113  <u>LB Rose Ranch Class 4B – Affiliate Claims other than those of LBHI against LB Rose Ranch</u>.

(a)  <u>Impairment and Voting</u>.  LB Rose Ranch Class 4B is impaired by the Plan.  Each holder of an Allowed Claim in LB Rose Ranch Class 4B is entitled to vote to accept or reject the Plan.

(b)  <u>Distributions</u>.  Subject to <u>Section 6.5(b)</u> of the Plan, each holder of an Allowed Claim in LB Rose Ranch Class 4B shall receive its Pro Rata Share of Available Cash from LB Rose Ranch.

5.114  <u>LB Rose Ranch Class 5 – Equity Interests in LB Rose Ranch</u>.

(a)  <u>Impairment and Voting</u>.  LB Rose Ranch Class 5 is impaired by the Plan.  Each holder of an Equity Interest in LB Rose Ranch Class 5 is not entitled to vote to accept or reject the Plan and is conclusively deemed to have rejected the Plan.

(b)  <u>Distributions</u>.  Equity Interests in LB Rose Ranch shall be cancelled if and when LB Rose Ranch is dissolved in accordance with <u>Section 7.4</u> of the Plan.  Each holder of an Equity Interest in LB Rose Ranch shall neither receive nor retain any Property of the Estate or direct interest in Property of the Estate of LB Rose Ranch on account of such Equity Interests thereafter; *provided*, *however*, that in the event that all Allowed Claims against LB Rose Ranch have been satisfied in full in accordance with the Bankruptcy Code and the Plan, each holder of an Equity Interest in LB Rose Ranch may receive its Pro Rata Share of any remaining assets in LB Rose Ranch.

5.115  <u>SASCO Class 1 – Priority Non-Tax Claims against SASCO</u>.

(a)  <u>Impairment and Voting</u>.  SASCO Class 1 is impaired by the Plan.  Each holder of an Allowed Claim in SASCO Class 1 is entitled to vote to accept or reject the Plan.

(b)  <u>Distributions</u>.  Except to the extent that the holder of an Allowed Claim in SASCO Class 1 agrees to less favorable treatment or has been paid by or on behalf of SASCO on account of such Claim prior to the Effective Date, on the later of the Effective Date and the date such Claim becomes Allowed, or as soon thereafter as is practicable, each holder of an Allowed Claim in SASCO Class 1 shall be paid by SASCO in Cash in full.

5.116   <u>SASCO Class 2 – Secured Claims against SASCO</u>.

(a)   <u>Impairment and Voting</u>.   SASCO Class 2 is impaired by the Plan.   Each holder of an Allowed Claim in SASCO Class 2 is entitled to vote to accept or reject the Plan.

(b)   <u>Distributions</u>.   Except to the extent that the holder of an Allowed Claim in SASCO Class 2 agrees to less favorable treatment, each holder of an Allowed Claim in SASCO Class 2 shall be satisfied by, at the option of SASCO:   (i) payment in Cash by SASCO in full on the later of the Effective Date and the date such Claim becomes Allowed, or as soon thereafter as is practicable; (ii) the sale or disposition proceeds of the Collateral securing such Allowed Claim to the extent of the value of the Collateral securing such Allowed Claim; (iii) surrender to the holder of such Allowed Claim of the Collateral securing such Allowed Claim; or (iv) such treatment that leaves unaltered the legal, equitable, and contractual rights to which the holder of the Allowed Claim is entitled.   In the event an Allowed Claim in SASCO Class 2 is treated under clause (i) or (ii) above, the Liens securing such Claim shall be deemed released and extinguished without further order of the Bankruptcy Court.

5.117   <u>SASCO Class 3 – General Unsecured Claims against SASCO</u>.

(a)   <u>Impairment and Voting</u>.   SASCO Class 3 is impaired by the Plan.   Each holder of an Allowed Claim in SASCO Class 3 is entitled to vote to accept or reject the Plan.

(b)   <u>Distributions</u>.   Each holder of an Allowed Claim in SASCO Class 3 shall receive its Pro Rata Share of Available Cash from SASCO.

5.118   <u>SASCO Class 4A – Affiliate Claims of LBHI against SASCO</u>.

(a)   <u>Impairment and Voting</u>.   SASCO Class 4A is impaired by the Plan.   LBHI is entitled to vote to accept or reject the Plan.

(b)   <u>Distributions</u>.   Subject to <u>Sections 6.5(b)</u> and <u>6.5(c)</u> of the Plan, LBHI shall receive its Pro Rata Share of Available Cash from SASCO.

5.119   <u>SASCO Class 4B – Affiliate Claims other than those of LBHI against SASCO</u>.

(a)   <u>Impairment and Voting</u>.   SASCO Class 4B is impaired by the Plan.   Each holder of an Allowed Claim in SASCO Class 4B is entitled to vote to accept or reject the Plan.

(b)   <u>Distributions</u>.   Subject to <u>Section 6.5(b)</u> of the Plan, each holder of an Allowed Claim in SASCO Class 4B shall receive its Pro Rata Share of Available Cash from SASCO.

5.120   <u>SASCO Class 5 – Equity Interests in SASCO</u>.

(a)   <u>Impairment and Voting</u>.   SASCO Class 5 is impaired by the Plan.   Each holder of an Equity Interest in SASCO Class 5 is not entitled to vote to accept or reject the Plan and is conclusively deemed to have rejected the Plan.

(b)     Distributions.   Equity Interests in SASCO shall be cancelled if and when SASCO is dissolved in accordance with Section 7.4 of the Plan.  Each holder of an Equity Interest in SASCO shall neither receive nor retain any Property of the Estate or direct interest in Property of the Estate of SASCO on account of such Equity Interests thereafter; *provided*, *however*, that in the event that all Allowed Claims against SASCO have been satisfied in full in accordance with the Bankruptcy Code and the Plan, each holder of an Equity Interest in SASCO may receive its Pro Rata Share of any remaining assets in SASCO.

5.121   LB 2080 Class 1 – Priority Non-Tax Claims against LB 2080.

(a)     Impairment and Voting.  LB 2080 Class 1 is impaired by the Plan.  Each holder of an Allowed Claim in LB 2080 Class 1 is entitled to vote to accept or reject the Plan.

(b)     Distributions.   Except to the extent that the holder of an Allowed Claim in LB 2080 Class 1 agrees to less favorable treatment or has been paid by or on behalf of LB 2080 on account of such Claim prior to the Effective Date, on the later of the Effective Date and the date such Claim becomes Allowed, or as soon thereafter as is practicable, each holder of an Allowed Claim in LB 2080 Class 1 shall be paid by LB 2080 in Cash in full.

5.122   LB 2080 Class 2 – Secured Claims against LB 2080.

(a)     Impairment and Voting.  LB 2080 Class 2 is impaired by the Plan.  Each holder of an Allowed Claim in LB 2080 Class 2 is entitled to vote to accept or reject the Plan.

(b)     Distributions.   Except to the extent that the holder of an Allowed Claim in LB 2080 Class 2 agrees to less favorable treatment, each holder of an Allowed Claim in LB 2080 Class 2 shall be satisfied by, at the option of LB 2080:  (i) payment in Cash by LB 2080 in full on the later of the Effective Date and the date such Claim becomes Allowed, or as soon thereafter as is practicable; (ii) the sale or disposition proceeds of the Collateral securing such Allowed Claim to the extent of the value of the Collateral securing such Allowed Claim; (iii) surrender to the holder of such Allowed Claim of the Collateral securing such Allowed Claim; or (iv) such treatment that leaves unaltered the legal, equitable, and contractual rights to which the holder of the Allowed Claim is entitled.   In the event an Allowed Claim in LB 2080 Class 2 is treated under clause (i) or (ii) above, the Liens securing such Claim shall be deemed released and extinguished without further order of the Bankruptcy Court.

5.123   LB 2080 Class 3 – General Unsecured Claims against LB 2080.

(a)     Impairment and Voting.  LB 2080 Class 3 is impaired by the Plan.  Each holder of an Allowed Claim in LB 2080 Class 3 is entitled to vote to accept or reject the Plan.

(b)     Distributions.   Each holder of an Allowed Claim in LB 2080 Class 3 shall receive its Pro Rata Share of Available Cash from LB 2080.

5.124   LB 2080 Class 4A – Affiliate Claims of LBHI against LB 2080.

(a)     Impairment and Voting.  LB 2080 Class 4A is impaired by the Plan. LBHI is entitled to vote to accept or reject the Plan.

(b)     Distributions.   Subject to Sections 6.5(b) and 6.5(c) of the Plan, LBHI shall receive its Pro Rata Share of Available Cash from LB 2080.

5.125   LB 2080 Class 4B – Affiliate Claims other than those of LBHI against LB 2080.

(a)     Impairment and Voting.   LB 2080 Class 4B is impaired by the Plan. Each holder of an Allowed Claim in LB 2080 Class 4B is entitled to vote to accept or reject the Plan.

(b)     Distributions.   Subject to Section 6.5(b) of the Plan, each holder of an Allowed Claim in LB 2080 Class 4B shall receive its Pro Rata Share of Available Cash from LB 2080.

5.126   LB 2080 Class 5 – Equity Interests in LB 2080.

(a)     Impairment and Voting.   LB 2080 Class 5 is impaired by the Plan.   Each holder of an Equity Interest in LB 2080 Class 5 is not entitled to vote to accept or reject the Plan and is conclusively deemed to have rejected the Plan.

(b)     Distributions.   Equity Interests in LB 2080 shall be cancelled if and when LB 2080 is dissolved in accordance with Section 7.4 of the Plan.   Each holder of an Equity Interest in LB 2080 shall neither receive nor retain any Property of the Estate or direct interest in Property of the Estate of LB 2080 on account of such Equity Interests thereafter; *provided*, *however*, that in the event that all Allowed Claims against LB 2080 have been satisfied in full in accordance with the Bankruptcy Code and the Plan, each holder of an Equity Interest in LB 2080 may receive its Pro Rata Share of any remaining assets in LB 2080.

5.127   Merit Class 1 – Priority Non-Tax Claims against Merit.

(a)     Impairment and Voting.   Merit Class 1 is impaired by the Plan.   Each holder of an Allowed Claim in Merit Class 1 is entitled to vote to accept or reject the Plan.

(b)     Distributions.    Except to the extent that the holder of an Allowed Claim in Merit Class 1 agrees to less favorable treatment or has been paid by or on behalf of Merit on account of such Claim prior to the Effective Date, on the later of the Effective Date and the date such Claim becomes Allowed, or as soon thereafter as is practicable, each holder of an Allowed Claim in Merit Class 1 shall be paid by Merit in Cash in full.

5.128   Merit Class 2 – Secured Claims against Merit.

(a)     Impairment and Voting.   Merit Class 2 is impaired by the Plan.   Each holder of an Allowed Claim in Merit Class 2 is entitled to vote to accept or reject the Plan.

(b)     Distributions.    Except to the extent that the holder of an Allowed Claim in Merit Class 2 agrees to less favorable treatment, each holder of an Allowed Claim in Merit Class 2 shall be satisfied by, at the option of Merit:   (i) payment in Cash by Merit in full on the later of the Effective Date and the date such Claim becomes Allowed, or as soon thereafter as is practicable; (ii) the sale or disposition proceeds of the Collateral securing such Allowed Claim to

the extent of the value of the Collateral securing such Allowed Claim; (iii) surrender to the holder of such Allowed Claim of the Collateral securing such Allowed Claim; or (iv) such treatment that leaves unaltered the legal, equitable, and contractual rights to which the holder of the Allowed Claim is entitled.   In the event an Allowed Claim in Merit Class 2 is treated under clause (i) or (ii) above, the Liens securing such Claim shall be deemed released and extinguished without further order of the Bankruptcy Court.

5.129   Merit Class 3 – General Unsecured Claims against Merit.

(a)   Impairment and Voting.   Merit Class 3 is impaired by the Plan.   Each holder of an Allowed Claim in Merit Class 3 is entitled to vote to accept or reject the Plan.

(b)   Distributions.   Each holder of an Allowed Claim in Merit Class 3 shall receive its Pro Rata Share of Available Cash from Merit.

5.130   Merit Class 4A – Affiliate Claims of LBHI against Merit.

(a)   Impairment and Voting.   Merit Class 4A is impaired by the Plan.   LBHI is entitled to vote to accept or reject the Plan.

(b)   Distributions.   Subject to Sections 6.5(b) and 6.5(c) of the Plan, LBHI shall receive its Pro Rata Share of Available Cash from Merit.

5.131   Merit Class 4B – Affiliate Claims other than those of LBHI against Merit.

(a)   Impairment and Voting.   Merit Class 4B is impaired by the Plan.   Each holder of an Allowed Claim in Merit Class 4B is entitled to vote to accept or reject the Plan.

(b)   Distributions.   Subject to Section 6.5(b) of the Plan, each holder of an Allowed Claim in Merit Class 4B shall receive its Pro Rata Share of Available Cash from Merit.

5.132   Merit Class 5 – Equity Interests in Merit.

(a)   Impairment and Voting.   Merit Class 5 is impaired by the Plan.   Each holder of an Equity Interest in Merit Class 5 is not entitled to vote to accept or reject the Plan and is conclusively deemed to have rejected the Plan.

(b)   Distributions.   Equity Interests in Merit shall be cancelled if and when Merit is dissolved in accordance with Section 7.4 of the Plan.   Each holder of an Equity Interest in Merit shall neither receive nor retain any Property of the Estate or direct interest in Property of the Estate of Merit on account of such Equity Interests thereafter; *provided*, *however*, that in the event that all Allowed Claims against Merit have been satisfied in full in accordance with the Bankruptcy Code and the Plan, each holder of an Equity Interest in Merit may receive its Pro Rata Share of any remaining assets in Merit.

5.133    Preferred Somerset Class 1 – Priority Non-Tax Claims against Preferred Somerset.

(a)    Impairment and Voting.  Preferred Somerset Class 1 is impaired by the Plan.  Each holder of an Allowed Claim in Preferred Somerset Class 1 is entitled to vote to accept or reject the Plan.

(b)    Distributions.   Except to the extent that the holder of an Allowed Claim in Preferred Somerset Class 1 agrees to less favorable treatment or has been paid by or on behalf of Preferred Somerset on account of such Claim prior to the Effective Date, on the later of the Effective Date and the date such Claim becomes Allowed, or as soon thereafter as is practicable, each holder of an Allowed Claim in Preferred Somerset Class 1 shall be paid by Preferred Somerset in Cash in full.

5.134    Preferred Somerset Class 2 – Secured Claims against Preferred Somerset.

(a)    Impairment and Voting.  Preferred Somerset Class 2 is impaired by the Plan.  Each holder of an Allowed Claim in Preferred Somerset Class 2 is entitled to vote to accept or reject the Plan.

(b)    Distributions.   Except to the extent that the holder of an Allowed Claim in Preferred Somerset Class 2 agrees to less favorable treatment, each holder of an Allowed Claim in Preferred Somerset Class 2 shall be satisfied by, at the option of Preferred Somerset:  (i) payment in Cash by Preferred Somerset in full on the later of the Effective Date and the date such Claim becomes Allowed, or as soon thereafter as is practicable; (ii) the sale or disposition proceeds of the Collateral securing such Allowed Claim to the extent of the value of the Collateral securing such Allowed Claim; (iii) surrender to the holder of such Allowed Claim of the Collateral securing such Allowed Claim; or (iv) such treatment that leaves unaltered the legal, equitable, and contractual rights to which the holder of the Allowed Claim is entitled.   In the event an Allowed Claim in Preferred Somerset Class 2 is treated under clause (i) or (ii) above, the Liens securing such Claim shall be deemed released and extinguished without further order of the Bankruptcy Court.

5.135    Preferred Somerset Class 3 – General Unsecured Claims against Preferred Somerset.

(a)    Impairment and Voting.  Preferred Somerset Class 3 is impaired by the Plan.  Each holder of an Allowed Claim in Preferred Somerset Class 3 is entitled to vote to accept or reject the Plan.

(b)    Distributions.  Each holder of an Allowed Claim in Preferred Somerset Class 3 shall receive its Pro Rata Share of Available Cash from Preferred Somerset.

5.136    Preferred Somerset Class 4A – Affiliate Claims of LBHI against Preferred Somerset.

(a)    Impairment and Voting.  Preferred Somerset Class 4A is impaired by the Plan.   LBHI is entitled to vote to accept or reject the Plan.

(b)    Distributions.   Subject to Sections 6.5(b) and 6.5(c) of the Plan, LBHI shall receive its Pro Rata Share of Available Cash from Preferred Somerset.

5.137   Preferred Somerset Class 4B – Affiliate Claims other than those of LBHI against Preferred Somerset.

(a)    Impairment and Voting.   Preferred Somerset Class 4B is impaired by the Plan.  Each holder of an Allowed Claim in Preferred Somerset Class 4B is entitled to vote to accept or reject the Plan.

(b)    Distributions.   Subject to Section 6.5(b) of the Plan, each holder of an Allowed Claim in Preferred Somerset Class 4B shall receive its Pro Rata Share of Available Cash from Preferred Somerset.

5.138   Preferred Somerset Class 5 – Equity Interests in Preferred Somerset.

(a)    Impairment and Voting.   Preferred Somerset Class 5 is impaired by the Plan.  Each holder of an Equity Interest in Preferred Somerset Class 5 is not entitled to vote to accept or reject the Plan and is conclusively deemed to have rejected the Plan.

(b)    Distributions.   Equity Interests in Preferred Somerset shall be cancelled if and when Preferred Somerset is dissolved in accordance with Section 7.4 of the Plan.  Each holder of an Equity Interest in Preferred Somerset shall neither receive nor retain any Property of the Estate or direct interest in Property of the Estate of Preferred Somerset on account of such Equity Interests thereafter; provided, however, that in the event that all Allowed Claims against Preferred Somerset have been satisfied in full in accordance with the Bankruptcy Code and the Plan, each holder of an Equity Interest in Preferred Somerset may receive its Pro Rata Share of any remaining assets in Preferred Somerset.

5.139   Somerset Class 1 – Priority Non-Tax Claims against Somerset.

(a)    Impairment and Voting.   Somerset Class 1 is impaired by the Plan.  Each holder of an Allowed Claim in Somerset Class 1 is entitled to vote to accept or reject the Plan.

(b)    Distributions.   Except to the extent that the holder of an Allowed Claim in Somerset Class 1 agrees to less favorable treatment or has been paid by or on behalf of Somerset on account of such Claim prior to the Effective Date, on the later of the Effective Date and the date such Claim becomes Allowed, or as soon thereafter as is practicable, each holder of an Allowed Claim in Somerset Class 1 shall be paid by Somerset in Cash in full.

5.140   Somerset Class 2 – Secured Claims against Somerset.

(a)    Impairment and Voting.   Somerset Class 2 is impaired by the Plan.  Each holder of an Allowed Claim in Somerset Class 2 is entitled to vote to accept or reject the Plan.

(b)    Distributions.   Except to the extent that the holder of an Allowed Claim in Somerset Class 2 agrees to less favorable treatment, each holder of an Allowed Claim in Somerset Class 2 shall be satisfied by, at the option of Somerset:  (i) payment in Cash by

Somerset in full on the later of the Effective Date and the date such Claim becomes Allowed, or as soon thereafter as is practicable; (ii) the sale or disposition proceeds of the Collateral securing such Allowed Claim to the extent of the value of the Collateral securing such Allowed Claim; (iii) surrender to the holder of such Allowed Claim of the Collateral securing such Allowed Claim; or (iv) such treatment that leaves unaltered the legal, equitable, and contractual rights to which the holder of the Allowed Claim is entitled. In the event an Allowed Claim in Somerset Class 2 is treated under clause (i) or (ii) above, the Liens securing such Claim shall be deemed released and extinguished without further order of the Bankruptcy Court.

5.141   Somerset Class 3 – General Unsecured Claims against Somerset.

(a)   Impairment and Voting.   Somerset Class 3 is impaired by the Plan.   Each holder of an Allowed Claim in Somerset Class 3 is entitled to vote to accept or reject the Plan.

(b)   Distributions.   Each holder of an Allowed Claim in Somerset Class 3 shall receive its Pro Rata Share of Available Cash from Somerset.

5.142   Somerset Class 4A – Affiliate Claims of LBHI against Somerset.

(a)   Impairment and Voting.   Somerset Class 4A is impaired by the Plan. LBHI is entitled to vote to accept or reject the Plan.

(b)   Distributions.   Subject to Sections 6.5(b) and 6.5(c) of the Plan, LBHI shall receive its Pro Rata Share of Available Cash from Somerset.

5.143   Somerset Class 4B – Affiliate Claims other than those of LBHI against Somerset.

(a)   Impairment and Voting.   Somerset Class 4B is impaired by the Plan. Each holder of an Allowed Claim in Somerset Class 4B is entitled to vote to accept or reject the Plan.

(b)   Distributions.   Subject to Section 6.5(b) of the Plan, each holder of an Allowed Claim in Somerset Class 4B shall receive its Pro Rata Share of Available Cash from Somerset.

5.144   Somerset Class 5 – Equity Interests in Somerset.

(a)   Impairment and Voting.   Somerset Class 5 is impaired by the Plan.   Each holder of an Equity Interest in Somerset Class 5 is not entitled to vote to accept or reject the Plan and is conclusively deemed to have rejected the Plan.

(b)   Distributions.   Equity Interests in Somerset shall be cancelled if and when Somerset is dissolved in accordance with Section 7.4 of the Plan. Each holder of an Equity Interest in Somerset shall neither receive nor retain any Property of the Estate or direct interest in Property of the Estate of Somerset on account of such Equity Interests thereafter; *provided*, *however*, that in the event that all Allowed Claims against Somerset have been satisfied in full in accordance with the Bankruptcy Code and the Plan, each holder of an Equity Interest in Somerset may receive its Pro Rata Share of any remaining assets in Somerset.

## ARTICLE VI
## Implementation of the Plan

6.1    Plan Administrator.

(a)    Appointment.  LBHI shall serve as Plan Administrator for each of the Debtors.

(b)    Authority.  Subject to Section 7.2(c) of the Plan, the Plan Administrator shall have the authority and right on behalf of each of the Debtors, without the need for Bankruptcy Court approval (unless otherwise indicated), to carry out and implement all provisions of the Plan, including, without limitation, to:

(i)    except to the extent Claims have been previously Allowed, control and effectuate the Claims reconciliation process, including to object to, seek to subordinate, compromise or settle any and all Claims against the Debtors subject to Bankruptcy Court approval; *provided, however*, that where the Debtors have authorization to compromise or settle any Claims against the Debtors under a Final Order, including, without limitation, the Derivatives Procedures Order, the Plan Administrator shall be authorized to compromise or settle such Claims after the Effective Date in accordance with and subject to such Final Order;

(ii)    make Distributions to holders of Allowed Claims in accordance with the Plan;

(iii)    exercise its reasonable business judgment to direct and control the wind down, liquidation, sale and/or abandoning of the assets of the Debtors and/or Debtor-Controlled Entities under the Plan and in accordance with applicable law as necessary to maximize Distributions to holders of Allowed Claims;

(iv)    prosecute all Litigation Claims, including, without limitation, Avoidance Actions, on behalf of the Debtors, and to elect not to pursue any Litigation Claims and whether and when to compromise, settle, abandon, dismiss, or otherwise dispose of any such Litigation Claims, as the Plan Administrator may determine is in the best interests of the Debtors;

(v)    make payments to existing professionals who will continue to perform in their current capacities;

(vi)    retain professionals to assist in performing its duties under the Plan;

(vii)    maintain the books and records and accounts of the Debtors;

(viii)    invest Cash of the Debtors, including any Cash proceeds realized from the liquidation of any assets of the Debtors, including any Litigation Claims, and any income earned thereon;

(ix)     incur and pay reasonable and necessary expenses in connection with the performance of duties under the Plan, including the reasonable fees and expenses of professionals retained by the Plan Administrator;

(x)     administer each Debtor's tax obligations, including (i) filing tax returns and paying tax obligations, (ii) request, if necessary, an expedited determination of any unpaid tax liability of each Debtor or its estate under Bankruptcy Code section 505(b) for all taxable periods of such Debtor ending after the Commencement Date through the liquidation of such Debtor as determined under applicable tax laws and (iii) represent the interest and account of each Debtor or its estate before any taxing authority in all matters including, without limitation, any action, suit, proceeding or audit;

(xi)     prepare and file any and all informational returns, reports, statements, returns or disclosures relating to the Debtors that are required hereunder, by any Governmental Unit or applicable law;

(xii)     determine whether to create a Liquidating Trust for the assets of a Debtor or Debtor-Controlled Entity pursuant to Section 10.1 of the Plan and which assets to transfer to such Liquidating Trust or to issue New Securities in accordance with Section 15.2 of the Plan;

(xiii)     pay statutory fees in accordance with Section 15.7 of the Plan; and

(xiv)     perform other duties and functions that are consistent with the implementation of the Plan.

(c)     Indemnification of Plan Administrator.  Each of the Debtors shall indemnify and hold harmless LBHI solely in its capacity as the Plan Administrator for any losses incurred in such capacity, except to the extent such losses were the result of the Plan Administrator's gross negligence, willful misconduct or criminal conduct.

6.2     LAMCO.  At the discretion of the board of directors of LBHI following the Effective Date and subject to existing agreements, LAMCO may serve as asset manager for certain assets of each of the Debtors under the Plan.  Ownership and ultimate decision making authority with respect to each of the Debtor's assets after the Effective Date will be vested in the applicable Debtor.

6.3     Debtor Allocation Agreement.  The Debtor Allocation Agreement shall become effective on the Effective Date.  The Debtor Allocation Agreement shall, among other things, provide for an Allowed Administrative Expense Claim of LBSF against LBHI in the amount of $300 million as an allocation of administrative costs.  Such Claim shall be satisfied by (a) first, setoff against LBHI's Allowed Administrative Expense Claim against LBSF as of the Effective Date, (b) second, setoff against LBHI's claims arising after the Effective Date for reimbursement by LBSF for post-Effective Date administration costs after reconciliation on a quarterly basis and, if necessary, (c) third, payment of the balance in Cash up to $300 million.

6.4     Redistribution of Subordinated Claims Recoveries.   To give effect to agreements of holders of Subordinated Claims, all Distributions under the Plan made by LBHI shall be calculated as if each holder of an Allowed Claim in LBHI Class 10A, LBHI Class 10B and LBHI Class 10C were to receive its Pro Rata Share of Available Cash from LBHI, and, in the case of each holder of an Allowed Claim in LBHI Class 10A and LBHI Class 10B, its Pro Rata Share of the Subordinated Class 10C Distribution; *provided*, *however*, that:

(a)     the Subordinated Class 10A Distribution shall be automatically distributed to holders of Allowed Claims in LBHI Class 3 and LBHI Class 4A pursuant to Sections 4.3(b) and 4.4(b) of the Plan, respectively, until all such Claims are satisfied in full;

(b)     the Subordinated Class 10B Distribution shall be automatically distributed to holders of Allowed Claims in LBHI Class 3, LBHI Class 4A, LBHI Class 4B and LBHI Class 5 pursuant to Sections 4.3(b), 4.4(b), 4.5(b) and 4.6(b) of the Plan, respectively, until all such Claims are satisfied in full;

(c)     the Subordinated Class 10C Distribution shall be automatically distributed to holders of Allowed Claims in LBHI Class 3, LBHI Class 4A, LBHI Class 4B, LBHI Class 5, LBHI Class 10A and LBHI Class 10B pursuant to Sections 4.3(b), 4.4(b), 4.5(b), 4.6(b), 4.13(b) and 4.14(b) of the Plan, respectively, until all such Claims are satisfied in full; *provided*, *however*, that any portion of the Subordinated Class 10C Distribution payable to holders of Allowed Claims in LBHI Class 10A shall be automatically distributed to holders of Allowed Claims in LBHI Class 3 and LBHI Class 4A pursuant to Section 6.4(a) of the Plan until all such Claims are satisfied in full; *provided*, *further*, that any portion of the Subordinated Class 10C Distribution payable to holders of Allowed Claims in LBHI Class 10B shall be automatically distributed to holders of Allowed Claims in LBHI Class 3, LBHI Class 4A, LBHI Class 4B, and LBHI Class 5 pursuant to Section 6.4(b) of the Plan until all such Claims are satisfied in full.

6.5     Plan Settlement.   Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, the Plan incorporates a proposed compromise and settlement of numerous inter-Debtor, Debtor-Creditor and inter-Creditor issues designed to achieve an economic settlement of Claims against all of the Debtors and an efficient resolution of the Chapter 11 Cases.   The Plan constitutes a settlement of potential litigation of issues, including, without limitation, the potential substantive consolidation of the Lehman enterprise, the validity and enforceability of certain Affiliate Guarantee Claims, the allowance of certain Affiliate Claims, including Intercompany Funding Balances owed to LBHI by Subsidiary Debtors, the potential equitable, contractual or statutory subordination of certain Claims and the ownership and rights of various Debtors and their Affiliates with respect to certain assets.   The Plan settlement will be implemented as follows:

(a)     Each holder of an Allowed Claim in an LBHI Class 3 or LBHI Class 7 shall be entitled to receive its Pro Rata Share of the Plan Adjustment until such Allowed Claims are satisfied in full in accordance with Sections 4.3(b) and 4.9(b) of the Plan, as applicable.   In the event that holders of Allowed Claims in LBHI Class 3 or LBHI Class 7 are satisfied in full, Distributions (including the Plan Adjustment), if any, shall continue to be made on account of such Claims as if they had not been satisfied in full, *provided* that such Distributions shall be made to each Participating Debtor for the exclusive benefit of holders of Allowed Claims in such

Participating Debtor's Contributing Classes and, in the case of LBHI, LBHI Class 9A or, in the case of LBSF, LBSF Class 4B, in proportion to, and only to the extent of, its Plan Adjustment contribution.

> (b)  Each holder of a Senior Affiliate Claim, Senior Affiliate Guarantee Claim or Affiliate Claim against a Debtor shall have an Allowed Claim, as applicable, against that Debtor in an amount that is agreed to by the applicable Debtor and an Affiliate or otherwise determined by the Bankruptcy Court.

> (i)  The Debtors' Claims Schedule is incorporated in the Plan and shall become effective on the Effective Date.  Senior Affiliate Claims, Senior Affiliate Guarantee Claims and Affiliate Claims of a Debtor against another Debtor shall be allowed in the net amounts set forth on pages 1 and 2 of the Debtors' Claims Schedule.

> (ii)  The Bankhaus Settlement Agreement is incorporated in the Plan and shall become effective on the Effective Date.  The Bankhaus Settlement Agreement provides for the allowance of certain Claims asserted by LBB against certain of the Debtors, the exchange of releases between the Debtors and certain Debtor-Controlled Entities that are parties to the Bankhaus Settlement Agreement and LBB and other material terms and conditions, all as more fully set forth and provided for in the Bankhaus Settlement Agreement.

> (iii)  The LBT Settlement Agreement is incorporated in the Plan.   The LBT Settlement Agreement provides for the allowance of certain claims of LBT, including, without limitation, an Allowed Senior Affiliate Claim of LBT against LBHI in LBHI Class 4A in the amount of $34,548,000,000, the allowance of certain Claims asserted by certain Debtors against LBT, the exchange of mutual releases between the Debtors and LBT and other material terms and conditions, all as more fully set forth in the LBT Settlement Agreement. Additionally, pursuant to the LBT Settlement Agreement, Sections 8.10, 8.14, 8.15 and 13.8 of the Plan shall not apply to LBT or the Allowed Senior Affiliate Claim of LBT and holders of Allowed Guarantee Claims for which LBT is the Primary Obligor shall not be subject to Section 8.13(e) of the Plan.

> (iv)  LBSN shall not be subject to Sections 8.10, 8.14 and 8.15 of the Plan.

> (v)  The Hong Kong Settlement Agreement is incorporated in the Plan. The Hong Kong Settlement Agreement provides for the allowance of certain Claims asserted by certain Hong Kong Lehman Entities In Liquidation against certain of the Debtors, the allowance of certain Claims asserted by the Debtors against certain Hong Kong Lehman Entities In Liquidation, the exchange of mutual releases between the Debtors and the Hong Kong Lehman Entities In Liquidation and other material terms and conditions, all as more fully set forth and provided for in the Hong Kong Settlement Agreement.

> (vi)  The Singapore Settlement Agreement is incorporated in the Plan. The Singapore Settlement Agreement provides for the allowance of certain Claims asserted by the Lehman Singapore Entities against certain of the Debtors and certain Debtor-Controlled Entities, the allowance of certain Claims asserted by the Debtors and the Debtor-Controlled

Entities against certain Lehman Singapore Entities, the exchange of mutual releases between the Debtors and the Debtor-Controlled Entities and the Lehman Singapore Entities and other material terms and conditions, all as more fully set forth and provided for in the Singapore Settlement Agreement.

(vii)   Any settlement agreement entered into among any of the Debtors and any Non-Controlled Affiliate that is contained in the Plan Supplement is incorporated in the Plan and shall become effective in accordance with its terms.

(c)   For purposes of the calculation of the Distributions to be made to LBHI from a Subsidiary Debtor, including with respect to setoff of a Subsidiary Debtor's Allowed Claim against LBHI, only 80% of the Intercompany Funding Balance due to LBHI from a Subsidiary Debtor shall be included in such calculation, as reflected of the Debtors' Claims Schedule, and LBHI shall participate in Distributions against a Subsidiary Debtor in the amounts and to the extent set forth on page 4 of the Debtors' Claims Schedule.

(d)   Only holders of Allowed Claims in LBSF Class 4A and LBSF Class 5C shall be entitled to receive the LBSF Additional Settlement Amount in accordance with Sections 5.21(b) and 5.25(b), respectively.   Each of the other Participating Debtors and each Racers Trust acknowledges and agrees that it is not a holder in LBSF Class 4A and LBSF Class 5C and it shall not receive a Distribution in respect of the LBSF Additional Settlement Amount.

(e)   The LCPI Settlement Amount shall be automatically distributed to holders of Allowed Claims in LCPI Class 4A until such Allowed Claims are satisfied in full in accordance with Section 5.4(b) of the Plan.   In the event holders of Allowed Claims in LCPI Class 4A are satisfied in full, Distributions, if any, shall continue to be made on account of such Claims as if they had not been satisfied in full, *provided* that such Distributions shall be made to LCPI Class 5A.

(f)   The LBSF Settlement Amount shall be automatically distributed to holders of Allowed Claims in LBSF Class 4A until such Allowed Claims are satisfied in full in accordance with Section 5.21(b) of the Plan.   In the event holders of Allowed Claims in LBSF Class 4A are satisfied in full, Distributions, if any, shall continue to be made on account of such Claims as if they had not been satisfied in full, *provided* that such Distributions shall be made to LBSF Class 5A.

(g)   The Racers 2007-A Trust shall have (A) an Allowed General Unsecured Claim against LCPI in LCPI Class 4B, subject to the Plan Adjustment, in the amount $5.0 billion, (B) an Allowed General Unsecured Claim against LBSF in LBSF Class 4B, subject to the Racers Adjustment, in the amount of $1,947,735,000 and (C) an Allowed Third-Party Guarantee Claim against LBHI in LBHI Class 9B, subject to the Racers Adjustment, in the amount of $1,947,735,000.   The Racers 2007-A Trust shall not receive aggregate Distributions on account of all such Allowed Claims in excess of the Allowed amount of its General Unsecured Claim against LCPI; *provided* that, to the extent the Allowed Claims of the Racers 2007-A Trust are satisfied in full in accordance with the foregoing and Section 8.13 of the Plan, LCPI or LBHI, as applicable, shall be subrogated to the Allowed Claim of the Racers 2007-A Trust against LBSF pursuant to Section 8.14 of the Plan.   All other Claims of the Racers 2007-A

Trust and all Claims of the Racers MM Trust against the Debtors shall be disallowed and subject to Sections 13.4 and 13.5 of the Plan.

(h)     The Fenway Claim shall be Allowed against LCPI as General Unsecured Claims in LCPI Class 4B, subject to the Plan Adjustment, in the aggregate net amount of $230 million.

(i)     The Debtors shall apply the Structured Securities Valuation Methodologies to all Structured Securities Claims held by any PSA Creditor in determining the Allowed amount of such Claims.

(j)     Any settlement agreement entered into among any of the Debtors and any Creditor that is contained in the Plan Supplement is incorporated in the Plan and shall become effective in accordance with its terms.

6.6     <u>Closing of Chapter 11 Case</u>.  After the Chapter 11 Case of a Debtor has been fully administered, the Plan Administrator shall seek authority from the Bankruptcy Court to close such Debtor's Chapter 11 Case in accordance with the Bankruptcy Code and the Bankruptcy Rules.

6.7     <u>Indenture Trustee and Creditors' Committee Members Fees</u>.  Subject to entry of the Confirmation Order, the reasonable fees and expenses (including attorneys fees) of (a) the indenture trustee for the Senior Notes and the Subordinated Notes and (b) the individual members of the Creditors' Committee, in each case, incurred in their capacities as indenture trustee or members of the Creditors' Committee, respectively, shall, (i) to the extent incurred and unpaid by a Debtor prior to the Effective Date, be Allowed as Administrative Expense Claims and paid by the Debtors in accordance with the Debtor Allocation Agreement upon application to and subject to approval of the Bankruptcy Court, and (ii) to the extent incurred after the Effective Date, be Allowed as Administrative Expense Claims and paid by the Debtors on a monthly basis upon the submission of fee statements without further order of the Bankruptcy Court.

## ARTICLE VII
## Corporate Governance

7.1     <u>Corporate Form</u>.  On the Effective Date, each of the Debtors shall maintain its current corporate form.

7.2     <u>LBHI Board of Directors and Officers</u>.

(a)     Following the Effective Date, the board of directors of LBHI shall consist of seven (7) persons.  The initial board of directors of LBHI shall be selected by the Director Selection Committee.  Each of the initial directors of LBHI shall have initial and, if reelected, subsequent terms of one year.  A director of LBHI may be removed from office by the Plan Trust with cause.  Subject to death, incapacity, resignation or removal for cause and reelection by the Plan Trust in accordance with the Plan Trust Agreement, the initial directors shall serve as the board of directors of LBHI through the Closing Date.  Upon expiration of the term of a director of LBHI or his or her resignation, death or removal for cause, the election of such

A279

director or a replacement director shall be determined by action of the Plan Trust as sole shareholder of LBHI.

(b)     The Director Selection Committee shall be comprised of the following nine (9) members:

(i)     Rutger Schimmelpenninck (in his capacity as co-bankruptcy trustee (curatoren) for LBT).

(ii)     the LBB Administrator;

(iii)     the Debtors;

(iv)     each of the co-chairs of the Creditors' Committee (each of whom shall exercise his or her independent business judgment in the selection of directors and not act at the direction of the Creditors' Committee);

(v)     an individual chosen by the Opco Plan Proponents who are PSA Creditors;

(vi)     an individual chosen by the members of the group of creditors commonly referred to as the Ad Hoc Group of Lehman Brothers Creditors that are PSA Creditors; and

(vii)     two individuals chosen collectively by the following PSA Creditors:  Carval Investors UK Limited, Davidson Kempner Capital Management LLC, Elliott Management Corporation, King Street Capital Management LP, Och-Ziff Capital Management Group LLC, The Baupost Group LLC and Varde Partners LP.

(c)     Following the Effective Date, the board of directors of LBHI shall, in addition to its other duties, be responsible for (i) instructing and supervising the Debtors and the Plan Administrator with respect to their responsibilities under the Plan; (ii) reviewing and approving the prosecution of adversary and other proceedings, if any, including approving proposed settlements thereof; (iii) reviewing and approving objections to and proposed settlements of Disputed Claims; and (iv) performing such other duties that may be necessary and proper to assist the Debtors and the Plan Administrator and their retained professionals.  In its discretion, following the Effective Date, the board of directors of LBHI may also delegate any duties assigned to the Plan Administrator to any other committee, entity or individual.

7.3     Subsidiary Debtor Post-Effective Date Management.

(a)     Following the Effective Date, the board of directors of LBSF and LCPI shall each consist of three (3) individuals as follows:

(i)     an individual who is a concurrently serving member of the LBHI board of directors that is selected by the LBHI board of directors;

A280

(ii)   an individual who is a concurrently serving member of the LBHI board of directors that is selected by the LBHI board of directors and, in the case of LBSF or LCPI, acceptable to the Opco Plan Proponents who are PSA Creditors; and

(iii)   an individual who is selected by the individuals appointed pursuant to (i) and (ii) of this section and who is independent from LBHI, the members of the Director Selection Committee and, in the case of LBSF, LBSF, or in the case of LCPI, LCPI.

Each of the initial directors of LBSF and LCPI shall have initial and, if reelected, subsequent terms of one year.  A director of LBSF and LCPI may be removed from office by Lehman ALI (as directed by LBHI) only for cause.  Upon the resignation, death, incapacity or removal for cause of a director of LBSF or LCPI, the election of a replacement director shall be determined by action of Lehman ALI (as directed by LBHI); *provided* that at all times the LBSF and LCPI boards of directors must be comprised of individuals that satisfy the requirements of Section 7.3(a) hereof.

(b)   Following the Effective Date, the respective boards of directors or managers, as applicable, of the Subsidiary Debtors other than LBSF and LCPI shall consist of one (1) individual who shall be a concurrently serving member of the LBHI board of directors.  With respect to a Subsidiary Debtor incorporated or formed under the laws of a jurisdiction outside of the United States, if the laws of such foreign jurisdiction require the appointment of more than one (1) director or manager to the board of directors or managers of such Subsidiary Debtor or of a director or manager that is not an individual concurrently serving as a member of the LBHI board of directors, such additional or alternative directors or managers shall be appointed by the LBHI board of directors.  Each of the initial directors or managers of the Subsidiary Debtors other than LBSF and LCPI shall have initial and, if reelected, subsequent terms of one year.  Thereafter, LBHI or the Subsidiary Debtor or Debtor-Controlled Entity that is the sole shareholder of the relevant Subsidiary Debtor shall elect successors of the then-serving members of the boards or managers for such Subsidiary Debtor at each annual meeting or upon the removal or resignation of such individuals.  LBHI or the Subsidiary Debtor or Debtor-Controlled Entity that is the sole shareholder of the relevant Subsidiary Debtor shall also have the power to act by written consent to remove any director or manager of such Subsidiary Debtor at any time with or without cause.  Notwithstanding the foregoing, any Subsidiary Debtor that is a limited partnership shall continue to be managed by its general partner.

7.4   Plan Trust.

(a)   The Plan Trust shall be established on the Effective Date and shall continue in existence until the Closing Date.  The Plan Trustees shall be the members of the Director Selection Committee.  Each of the Plan Trustees shall continue in such capacity until he or she ceases to be a Plan Trustee in accordance with the terms and conditions set forth in the Plan Trust Agreement.  In the event of a vacancy in the office of Plan Trustee, the remaining Plan Trustees shall by majority vote of the remaining Plan Trustees fill the vacancy if in their discretion the circumstances of the Plan Trust warrant doing so.  The Plan Trust shall exercise voting rights associated with the Plan Trust Stock in furtherance of the liquidation of the Debtors and compliance with the provisions of the Plan.  The sole purpose of the Plan Trust shall be to hold the Plan Trust Stock as provided in Section 4.17(b).  The Plan Trust shall be governed, in

accordance with the Plan Trust Agreement, by the Plan Trustees. Any distribution from assets of LBHI that is made to the Plan Trust as holder of such share shall be for the benefit of the holders of Equity Interests in accordance with <u>Section 4.17(b)</u>.

(b) The Plan Trust Agreement shall provide that (i) at such time as a vacancy on the board of directors of LBHI is to be filled or there is a vote on the election of a director upon the expiration of a director's term of office, the Plan Trust shall fill such vacancy by majority vote of the Plan Trustees and (ii) at all other times, the Plan Trust may act, by majority vote of the Plan Trustees, to remove and replace directors, with cause.

7.5    <u>Corporate Existence</u>.    After the Effective Date, the Plan Administrator may decide to (a) maintain each Debtor as a corporation in good standing until such time as all aspects of the Plan pertaining to such Debtor have been completed, or (b) at such time as the Plan Administrator considers appropriate and consistent with the implementation of the Plan pertaining to such Debtor, dissolve such Debtor and complete the winding up of such Debtor without the necessity for any other or further actions to be taken by or on behalf of such dissolving Debtor or its shareholder or any payments to be made in connection therewith subject to the filing of a certificate of dissolution with the appropriate governmental authorities (including, without limitation, the transfer of all or part of the assets of such Debtor to a Liquidating Trust in accordance with <u>Article X</u> of the Plan), or (c) dissolve any Debtor-Controlled Entity and complete the winding up of such Debtor-Controlled Entity in accordance with applicable law; *provided*, *however*, that the foregoing does not limit the Plan Administrator's ability to otherwise abandon an interest in a Debtor-Controlled Entity.

7.6    <u>Wind-Down</u>.    After the Effective Date, pursuant to the Plan, the Plan Administrator shall wind-down, sell and otherwise liquidate assets of the Debtors and/or Debtor-Controlled Entities in accordance with <u>Section 6.1(b)(iii)</u> of the Plan. The wind-down, sale and liquidation of each such Debtor's assets (as determined for federal income tax purposes) shall occur over a period of three years after the Effective Date (it being understood that such liquidation may include the transfer of all or part of the assets of such Debtor to one or more Liquidating Trusts within the meaning of Treas. Reg. § 301.7701-4); *provided*, *however*, that the wind-down and liquidation may extend over a longer period of time if the Debtors receive a private letter ruling or other equivalent guidance from the IRS from which the Plan Administrator reasonably concludes that the continued wind-down and liquidation should not result in a reduction or limitation of the Debtors' tax attributes for federal income tax purposes that materially impairs the expected actual use of such tax attributes.

7.7    <u>Certificate of Incorporation and By-Laws</u>.    As of the Effective Date, the certificate of incorporation and by-laws of each Debtor shall be amended to the extent necessary to carry out the provisions of the Plan. The amended certificate and by-laws of such Debtor (if any) shall be contained in the Plan Supplement.

7.8    <u>Stock Trading Restrictions</u>.    The restrictions imposed by the Stock Trading Restrictions Order shall remain effective and binding through the closing of LBHI's Chapter 11 Case.

**ARTICLE VIII**
**Provisions Regarding Voting and Distributions Under the Plan**

8.1     Voting of Claims.   Each holder of an Allowed Claim in an impaired Class of Claims that is entitled to vote on the Plan pursuant to Article III, Article IV and Article V of the Plan shall be entitled to vote separately to accept or reject the Plan as provided in an order entered by the Bankruptcy Court establishing procedures with respect to the solicitation and tabulation of votes to accept or reject the Plan, or any other order or orders of the Bankruptcy Court.

8.2     Nonconsensual Confirmation.   If any impaired Class of Claims entitled to vote on the Plan does not accept the Plan by the requisite majority provided in section 1126(c) of the Bankruptcy Code, the Debtors reserve the right to amend the Plan in accordance with Section 15.6 of the Plan or undertake to have the Bankruptcy Court confirm the Plan under section 1129(b) of the Bankruptcy Code or both.   With respect to impaired Classes of Claims or Equity Interests that are deemed to reject the Plan, the Debtors shall request that the Bankruptcy Code confirm the Plan pursuant to section 1129(b) of the Bankruptcy Code.

8.3     Distributions of Available Cash.   On the Effective Date, or as soon thereafter as practicable, after the satisfaction in full of (or the establishment of reserves sufficient for the satisfaction in full of) Allowed Administrative Expense Claims, Allowed Priority Tax Claims, Allowed Priority Non-Tax Claims and Allowed Secured Claims (to the extent the Debtor determines to pay such Allowed Secured Claim in Cash) against a Debtor, each Debtor shall make a Distribution of its Available Cash in accordance with the provisions of the Plan to holders of Allowed Claims against such Debtor.   After the initial Distribution, each Debtor shall make Distributions of Available Cash in accordance with the Plan to holders of Allowed Claims against such Debtor semi-annually on March 30 and September 30 of each year, provided that each such Distribution in the aggregate is not less than $10,000,000 of such Debtor's Available Cash.   Notwithstanding the foregoing, the Plan Administrator may determine, in its sole discretion (a) to make a Distribution that is less than $10,000,000 in the aggregate of a Debtor's Available Cash, or (b) not to make a Distribution to the holder of an Allowed Claim (other than a Claim that has become Allowed pursuant to clauses (b), (d) and (e) of Section 1.4 of the Plan) on the basis that it has not yet determined whether to object to such Claim and such Claim shall be treated as a Disputed Claim for purposes of Distributions under the Plan until the Plan Administrator determines (i) not to object to such Claim (or the time to object to Claims expires), (ii) agrees with the holder of such Claim to allow such Claim in an agreed upon amount or (iii) objects to such Claim and such Claim is Allowed by a Final Order.   To the extent that a Liquidating Trust is established for a Debtor in accordance with Article X of the Plan, any Distributions to be made to holders of Allowed Claims thereafter shall be made by the Liquidating Trustee to such holders as holders of Liquidating Trust Interests in accordance with the provisions of the Plan.   Distributions of Cash on account of such Liquidating Trust Interests shall be made in accordance with Section 10.7 of the Plan.

8.4     Disputed Claims Holdback.   From and after the Effective Date, and until such time as all Disputed Claims have been compromised and settled or determined by Final Order, the Plan Administrator shall, consistent with and subject to section 1123(a)(4) of the Bankruptcy Code, retain from Available Cash an aggregate amount equal to the Pro Rata Share of the

A283

Distributions that would have been made to each holder of a Disputed Claim if such Disputed Claim were an Allowed Claim against such Debtor in an amount equal to the least of (a) the filed amount of such Disputed Claim, (b) the amount determined, to the extent permitted by the Bankruptcy Code and Bankruptcy Rules, by the Bankruptcy Court for purposes of fixing the amount to be retained for such Disputed Claim, and (c) such other amount as may be agreed upon by the holder of such Disputed Claim and the Plan Administrator.  On the date of the first Distribution that is at least forty-five (45) days (or such fewer days as may be agreed between the applicable Debtor and the holder of the applicable Disputed Claim) after the date on which a Disputed Claim becomes an Allowed Claim against a Debtor, such Debtor shall remit to the holder of such Allowed Claim Available Cash equal to the amount that would have been distributed from the Effective Date through and including the date of such Distribution on account of such Allowed Claim had such Claim been Allowed as of the Effective Date, together with any interest earned on the lesser of (i) such amount and (ii) the amount retained with respect to such Claim pursuant to this provision, in each case, but only to the extent that such interest is attributable to the amount of the Allowed Claim; *provided*, that (x) such amount shall be paid first out of the Available Cash retained on account of such Allowed Claim and second out of Available Cash other than Available Cash retained on account of other Disputed Claims and (y) if the amount available for Distribution pursuant to the foregoing clause (x) is insufficient to remit all Distributions required to be made to such holder pursuant to this sentence, such holder shall receive the amount of such insufficiency on the next subsequent date(s) of Distribution before the holders of any other Claims against such Debtor receive any further Distributions out of Available Cash (other than Available Cash retained on account of other Disputed Claims) from such Debtor.  To the extent that a Disputed Claim against a Debtor is disallowed by Final Order or becomes an Allowed Claim in an amount less than the amount retained with respect to such Claim pursuant to this provision, the amount that would have been distributed on account of such Disputed Claim, or the excess of the amount of Available Cash that would have been distributed on account of such Disputed Claim over the amount of Available Cash actually distributed on account of such Disputed Claim, shall become Available Cash for Distributions to the holders of Allowed Claims.  Nothing in this Section 8.4 of the Plan shall preclude any holder of a Disputed Claim from seeking, on notice to the Plan Administrator, an order of the Bankruptcy Court in respect of or relating to the amount retained with respect to such holder's Disputed Claim.  Unless otherwise ordered by the Bankruptcy Court, Available Cash retained on account of Disputed Claims shall not be used by, on behalf of or for the benefit of a Debtor for operating expenses, costs or any purpose other than as set forth in this section.  If the Plan Administrator determines, in its sole discretion, that the value of a Debtor's assets (other than such Debtor's Available Cash) exceeds the amount of Available Cash necessary to be retained pursuant to this section on account of Disputed Claims against such Debtor, the Plan Administrator may, subject to Bankruptcy Court approval, on proper notice to all holders of Disputed Claims against such Debtor, release such Available Cash for Distribution to holders of Allowed Claims and retain in, lieu thereof, such Debtor's non-Cash assets to satisfy its Disputed Claims if such Claims become Allowed Claims.

8.5    Minimum Distribution and Manner of Payment.  Other than with respect to a Convenience Claim or Convenience Guarantee Claim, no payment of Cash of less than $500 shall be made by any Debtor to any holder of an Allowed Claim against such Debtor unless a request therefor is made in writing to the Plan Administrator.  Any payment of Cash made

A284

pursuant to the Plan may be made at the option of the Plan Administrator either by check or by wire transfer.

8.6   <u>Distributions Free and Clear</u>.   Except as otherwise provided herein, any Distributions under the Plan shall be free and clear of any Liens, Claims and encumbrances, and no other entity, including the Debtors or the Plan Administrator shall have any interest, legal, beneficial or otherwise, in assets transferred pursuant to the Plan.

8.7   <u>Delivery of Distributions and Undeliverable Distributions</u>.   Distributions to holders of Allowed Claims shall be made at the address of each such holder as set forth on the Schedules filed with the Bankruptcy Court, unless superseded by a new address as set forth (a) on a proof of Claim filed by a holder of an Allowed Claim, (b) in another writing notifying the Plan Administrator (at the addresses set forth in <u>Section 15.12</u>) or the Court appointed claims agent of a change of address or (c) in the notice filed with the Bankruptcy Court in accordance with Bankruptcy Rule 3001(e) to the extent a Claim has been transferred.   If any holder's Distribution is returned as undeliverable, no further Distributions to such holder shall be made unless and until the Plan Administrator is notified of such holder's then-current address, at which time all missed Distributions shall be made to such holder at its then-current address, without interest.   All demands for undeliverable Distributions shall be made on or before six (6) months after the date such undeliverable Distribution was initially made.   Thereafter, the amount represented by such undeliverable Distribution shall irrevocably revert to the applicable Debtor as Available Cash for Distributions to the holders of Allowed Claims, and any Claim in respect of such undeliverable Distribution shall be discharged and forever barred from assertion against such Debtor or its respective property.

8.8   <u>Withholding and Reporting Requirements</u>.   In connection with the Plan and all instruments issued in connection therewith and distributed thereon, the Plan Administrator or the Liquidating Trustee (as applicable) shall comply with all applicable withholding and reporting requirements imposed by any federal, state, or local taxing authority, and all Distributions shall be subject to any such withholding or reporting requirements.   All such amounts withheld and paid to the appropriate Governmental Unit shall be treated as distributed to such holders. Notwithstanding the above, each holder of an Allowed Claim or Liquidating Trust Interest that is to receive a Distribution shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any Governmental Unit, including income, withholding and other tax obligations, on account of such Distribution.   The Plan Administrator or the Liquidating Trustee (as applicable), has the right, but not the obligation, to not make a Distribution until such holder has made arrangements satisfactory to such issuing or disbursing party for payment of any such tax obligations.   The Plan Administrator or the Liquidating Trustee (as applicable), may require, as a condition to receipt of a Distribution, that the holder of an Allowed Claim or Liquidating Trust Interest provide a completed Form W-8, W-9 and/or other tax information deemed necessary in the sole discretion of the Plan Administrator or Liquidating Trustee, as applicable to each such holder, provided that if the Plan Administrator or Liquidating Trustee (as applicable) makes such a request and the holder fails to comply before the date that is 180 days after the request is made, the amount of such Distribution shall irrevocably revert to the applicable Debtor or Liquidating Trust and any Claim in respect of such Distribution shall be discharged and forever barred from assertion against such Debtor, Liquidating Trust, or its respective property.

8.9     Time Bar to Cash Payment Rights.   Checks issued in respect of Allowed Claims shall be null and void if not negotiated within 90 days after the date of issuance thereof. Requests for reissuance of any check shall be made to the Plan Administrator by the holder of the Allowed Claim to whom such check originally was issued.   Any claim in respect of such a voided check shall be made on or before 90 days after the expiration of the 90 day period following the date of issuance of such check.   Thereafter, the amount represented by such voided check shall irrevocably revert to the Debtor and any Claim in respect of such voided check shall be discharged and forever barred from assertion against such Debtor and its property.

8.10     Setoffs and Recoupment.   Except as otherwise agreed by a Debtor, any Debtor may, but shall not be required to, setoff against or recoup from any Claim and the payments to be made pursuant to the Plan in respect of such Claim any Claims of any nature whatsoever that the Debtor may have against the claimant; *provided, however*, that the claimant shall be served with written notice of the proposed setoff or recoupment at least twenty-eight (28) days prior to exercising any asserted setoff or recoupment right, and, if such claimant serves a written objection to such asserted setoff or recoupment on or before twenty-eight (28) days of receipt of such written notice, (i) the objection shall be deemed to initiate a contested matter governed by, *inter alia*, Bankruptcy Rule 9014 and Local Rules 9014-1 and 9014-2, (ii) nothing herein shall affect the respective burden of each party in connection with such contested matter, and (iii) the Debtor shall not proceed with the asserted setoff or recoupment absent the withdrawal of such objection or the entry of a Final Order overruling such objection but the Debtor may withhold such payment pending resolution of such objection; *provided, further,* that neither the failure to setoff against or recoup from any Claim nor the allowance of any Claim hereunder shall constitute a waiver or release by such Debtor of any such Claim the Debtor may have against such claimant.

8.11     Claims Register.   The register of Claims maintained by the Debtors shall remain open after the Effective Date and the Debtors and Plan Administrator shall recognize any transfer of Claims at any time thereafter, *provided* that for purposes of each Distribution, the Debtors and the Plan Administrator will not recognize any transfer during the period commencing thirty (30) calendar days prior to a Distribution Date.   Except as otherwise provided in the Plan, any transfer of a Claim, whether occurring prior to or after the Confirmation Date, shall not affect or alter the classification and treatment of such Claim under the Plan and any such transferred Claim shall be subject to classification and treatment under the Plan as if such Claim was held by the transferor who held such Claim on the Commencement Date.

8.12     Allocation of Distributions.   Distributions to any holder of an Allowed Claim shall be allocated first to the principal portion of any such Allowed Claim (as determined for federal income tax purposes), and, only after the principal portion of any such Allowed Claim is satisfied in full, to any portion of such Allowed Claim comprising interest (but solely to the extent that interest is an allowable portion of such Allowed Claim).

8.13     Maximum Distribution.

(a)     An (i) Allowed Claim that receives Distributions (excluding Distributions contributed to the Plan Adjustment on account of such Allowed Claim) in the Allowed amount

A286

of such Claim or (ii) Allowed Guarantee Claim that receives Distributions (excluding Distributions contributed to the Plan Adjustment on account of such Allowed Guarantee Claim) that combined with Distributions or other consideration provided on the corresponding Primary Claim (excluding Distributions contributed to the Plan Adjustment on account of such Primary Claim) equal the Allowed amount of such Guarantee Claim (or such amount as may be agreed to by a holder and the Debtors) shall, in each case, be deemed satisfied in full as to such Allowed Claim or Allowed Guarantee Claim against the applicable Debtor. To the extent that an Allowed Guarantee Claim is deemed satisfied in full, LBHI shall be entitled to receive future Distributions or consideration on account of the corresponding Primary Claim as subrogee pursuant to Section 8.14(a) of the Plan to the extent of LBHI's Distribution on account of such Guarantee Claim less any amounts received by LBHI by way of disgorgement thereof. Except as specifically provided with respect to LBHI's rights of subrogation set forth above, nothing contained herein shall in any way affect the rights of the holder of a Guarantee Claim with respect to a corresponding Primary Claim against a Primary Obligor that is not a Debtor.

(b)     In no event shall (i) an Allowed Claim receive Distributions (excluding Distributions contributed to the Plan Adjustment on account of such Allowed Claim) in excess of the Allowed amount of such Claim or (ii) an Allowed Guarantee Claim receive Distributions (excluding Distributions contributed to the Plan Adjustment on account of such Allowed Guarantee Claim) that combined with Distributions or other consideration provided on the corresponding Primary Claim (excluding Distributions contributed to the Plan Adjustment on account of such Primary Claim) are in excess of the Allowed amount of the Guarantee Claim (or such amount as may be agreed to by a holder and the Debtors).

(c)     To the extent that any Debtor has Available Cash after all Allowed Claims against that Debtor have been satisfied in full in accordance with Section 8.13(a) of the Plan, each holder of each such Allowed Claim shall receive its Pro Rata Share of further Distributions, if any, to the fullest extent permissible under the Bankruptcy Code in satisfaction of postpetition interest on the Allowed amount of such Claims at the rate applicable in the contract or contracts on which such Allowed Claim is based (or, absent such contractual rate, at the statutory rate) until such time as all postpetition interest on all such Allowed Claims has been paid in full.

(d)     For purposes of determining whether an Allowed Claim has been satisfied in full in accordance with Section 8.13(a) of the Plan, all Distributions or other consideration provided by a Primary Obligor in a currency other than the U.S. Dollar shall be converted to the U.S. Dollar applying the existing exchange rate derived from Reuters existing at approximately 3:00 p.m. GMT on the Confirmation Date. Nothing contained in this provision shall affect the applicable exchange rate for determining the Allowed amount of any Claim under section 502(b) of the Bankruptcy Code.

(e)     The Plan Administrator may, in its sole discretion, request that a holder of an Allowed Guarantee Claim, except holders of Allowed Guarantee Claims for which a Subsidiary Debtor is the Primary Obligor, certify in writing and provide evidence reasonably satisfactory to the Plan Administrator to confirm whether: (i) the Primary Claim has been Allowed or disallowed against the Primary Obligor, and, if Allowed, the amount of such Allowed Primary Claim, (ii) the Primary Claim is disputed or subject to objection by a Foreign Administrator or other party, (iii) the consideration, if any, received to date on account of such

A287

Allowed Primary Claim from the Primary Obligor, (iv) such holder has been notified by or on behalf of the Primary Obligor of any future distributions or payment anticipated or estimated to be made on account of such Primary Claim from the Primary Obligor; or (v) the holder (A) has sufficient assets to satisfy an order or judgment to disgorge any Distributions received with respect to such Allowed Guarantee Claim if it is ultimately determined that such holder is required to disgorge all or a portion of such Distributions and (B) will submit to the jurisdiction of the Bankruptcy Court for purposes of such order or judgment and will not contest the enforcement of such order or judgment in any foreign jurisdiction. If the holder does not also certify, in addition to the foregoing, that the holder has sufficient assets in the United States of America to satisfy an order to disgorge any Distributions with respect to such Allowed Guarantee Claim, unless the Bankruptcy Court orders otherwise, the Plan Administrator may require that the holder post security for any obligation to disgorge Distributions made to such holder on account of such Allowed Guarantee Claim as a condition to the receipt of future Distributions on such Claim if the Plan Administrator reasonably determines that such security is necessary to ensure the recovery of any amount of Distributions made by LBHI to such holder that is ordered to be disgorged. If (i) the Plan Administrator determines, based on the foregoing, that an Allowed Guarantee Claim has been satisfied in full in accordance with Section 8.13(a) of the Plan, then unless the Bankruptcy Court orders otherwise, no Distributions shall thereafter be made on account of such Allowed Guarantee Claim, or (ii) a holder of an Allowed Guarantee Claim does not comply with this section, then unless the Bankruptcy Court orders otherwise, the Plan Administrator shall not be required to make Distributions on account of such Allowed Guarantee Claim, *provided* that nothing herein shall preclude a holder of an Allowed Guarantee Claim from challenging the determination of the Plan Administrator in the Bankruptcy Court; *provided, further*, that the Plan Administrator shall reserve Distributions with respect to such Allowed Guarantee Claim and, unless such Allowed Guarantee Claim has been satisfied in full in accordance with Section 8.13(a) of the Plan, promptly after compliance with this section the Plan Administrator shall remit to the holder of such Allowed Guarantee Claim the lesser of (x) the amount reserved pursuant to this section on account of such Allowed Guarantee Claim or (y) the amount necessary to satisfy such Allowed Guarantee Claim in full in accordance with Section 8.13(a) of the Plan.

(f) Any portion of any Distribution made by LBHI to the holder of an Allowed Guarantee Claim that is recovered pursuant to Section 8.13 or 8.14 of the Plan, whether by way of subrogation, disgorgement or otherwise, shall be treated as Available Cash of LBHI and distributed accordingly.

8.14   Rights of Reimbursement.

(a) Except as otherwise agreed by the Debtors, to the extent that a Debtor now has or becomes legally entitled to be subrogated to the rights of any Creditor, including on account of any Distributions received by holders of Allowed Guarantee Claims that are satisfied in full in accordance with Section 8.13(a) of the Plan, (i) such Creditor shall be deemed to have consented to the subrogation of its right against any third-party, including, without limitation, a Primary Obligor, that may be obligated to reimburse or indemnify the Debtor for all or a portion of such Distribution, or (ii) the Debtor shall have all rights, title and power as subrogee of the Creditor against any such third-party, including, without limitation, a Primary Obligor, to the fullest extent permitted by applicable law.

A288

(b)     Except as otherwise agreed by the Debtors, the Debtors' rights to assert or prosecute Litigation Claims for reimbursement, indemnification, recoupment or any other similar right, including, without limitation, any right to setoff with respect to any of the foregoing, against any entity, including, without limitation, a Primary Obligor, on account of Distributions made to the holders of Allowed Claims or Allowed Guarantee Claims, shall be fully preserved to the fullest extent permitted by applicable law.

8.15     <u>Distributions to Non-Controlled Affiliates</u>.  Except as otherwise agreed by the Debtors and a Non-Controlled Affiliate or with respect to LBT or LBSN, the Plan Administrator may determine, in its sole discretion, to withhold all or a portion of a Distribution to a Non-Controlled Affiliate if such Distribution would be distributed by such Non-Controlled Affiliate to satisfy a Claim of a different Non-Controlled Affiliate against which a Debtor has a Claim but the latter Non-Controlled Affiliate has refused to honor such Claim of a Debtor without subordination, reduction or offset unless (a) otherwise agreed to by the Plan Administrator or (b) the priority and amount of a Debtor's Claim against the latter Non-Controlled Affiliate has been determined by Final Order.

## ARTICLE IX
## Procedures for Treating Disputed Claims

9.1     <u>Objections</u>.  The Debtors' rights to object to, oppose and defend against all Claims on any basis are fully preserved.  Notwithstanding that a Primary Claim is Allowed against a Primary Obligor, the Debtors reserve the right to object to, oppose and defend against all Guarantee Claims.   As of the Effective Date, objections to, and requests for estimation of, all Claims against the Debtors may be interposed and prosecuted only by the Plan Administrator, which shall consult with the applicable Debtor regarding the same.   Objections to and requests for estimation of Claims shall be filed with the Court and served on the claimant on or before the later of (a) the date that is 2 years after the Effective Date and (b) such later date as may be fixed by the Bankruptcy Court for cause shown.

9.2     <u>No Distributions Pending Allowance</u>.  Notwithstanding any other provision hereof and unless otherwise agreed, if any portion of a Claim is a Disputed Claim, no Distribution shall be made on account of such Claim unless and until such Disputed Claim becomes an Allowed Claim.

9.3     <u>Estimation of Claims</u>.  The Plan Administrator may at any time request on behalf of any Debtor that the Bankruptcy Court estimate any contingent, unliquidated, or Disputed Claim, to the extent permitted by the Bankruptcy Code and Bankruptcy Rules, regardless of whether such Debtor previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain exclusive jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including, without limitation, during the pendency of any appeal relating to any such objection. In the event that the Bankruptcy Court estimates any contingent, unliquidated or Disputed Claim, the amount so estimated may constitute (i) the Allowed amount of such Claim, (ii) a maximum limitation on such Claim, (iii) the amount to be reserved in respect of Claim, or (iv) the amount of such Claim for voting purposes, all as determined by the Bankruptcy Court in accordance with the Bankruptcy Code and Bankruptcy Rules.  If the estimated amount constitutes a maximum

A289

limitation on the amount of such Claim, such Debtor may pursue supplementary proceedings to object to the allowance of such Claim. All of the aforementioned objection, estimation, and resolution procedures are intended to be cumulative and not exclusive of one another. Claims may be estimated and subsequently disallowed, reduced, compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

9.4     <u>Resolution of Disputed Claims</u>.  On and after the Effective Date, the Plan Administrator shall have the authority to compromise, settle or otherwise resolve or withdraw any objections to Claims and to compromise, settle or otherwise resolve any Disputed Claims in accordance with <u>Section 6.1(b)(i)</u> of the Plan.

## ARTICLE X
## <u>Liquidating Trust</u>

10.1     <u>Execution of Liquidating Trust Agreement</u>.  After the Effective Date, and only if the Plan Administrator determines that one or more Liquidating Trusts are in the best interests of one or more Debtors and holders of Allowed Claims against and Equity Interests in such Debtors, the Plan Administrator and a Liquidating Trustee shall execute a Liquidating Trust Agreement, and shall take all other necessary steps to establish a Liquidating Trust and Liquidating Trust Interests therein, which shall be for the benefit of Liquidating Trust Beneficiaries.  In the event of any conflict between the terms of this <u>Section 10.1</u> and the terms of a Liquidating Trust Agreement as such conflict relates to the establishment of a Liquidating Trust, the terms of this <u>Section 10.1</u> shall govern.  A Liquidating Trust Agreement may provide powers, duties and authorities in addition to those explicitly stated herein, but only to the extent that such powers, duties, and authorities do not affect the status of a Liquidating Trust as a "liquidating trust" for United States federal income tax purposes.

10.2     <u>Purpose of the Liquidating Trust</u>.  Each Liquidating Trust shall be established for the sole purpose of liquidating and distributing the assets of the Debtor contributed to such Liquidating Trust in accordance with Treas. Reg. § 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business.

10.3     <u>Liquidating Trust Assets</u>.  Each Liquidating Trust shall consist of Liquidating Trust Assets.  After the creation of a Liquidating Trust pursuant to <u>Section 10.1</u> of the Plan, the Plan Administrator shall transfer all of the Liquidating Trust Assets to a Liquidating Trust. Liquidating Trust Assets may be transferred subject to certain liabilities, as provided in a Liquidating Trust Agreement.  Such transfer shall be exempt from any stamp, real estate transfer, mortgage reporting, sales, use or other similar tax pursuant to section 1146(a) of the Bankruptcy Code.

10.4     <u>Administration of the Liquidating Trust</u>.  Each Liquidating Trust shall be administered by a Liquidating Trustee pursuant to a Liquidating Trust Agreement and the Plan. In the event of an inconsistency between the Plan and a Liquidating Trust Agreement as such conflict relates to anything other than the establishment of a Liquidating Trust, the Liquidating Trust Agreement shall control.

A290

10.5   Liquidating Trustee's Tax Power for Debtors.   A Liquidating Trustee shall have the same authority in respect of all taxes of the Debtors, and to the same extent, as if the Liquidating Trustee were the Debtor.

10.6   Cash Investments.   A Liquidating Trustee may invest Cash (including any earnings thereon or proceeds therefrom); *provided*, *however*, that such investments are investments permitted to be made by a "liquidating trust" within the meaning of Treas. Reg. § 301.7701-4(d), as reflected therein, or under applicable IRS guidelines, rulings or other controlling authorities.

10.7   Distribution of Liquidating Trust Interests.   A Liquidating Trustee is required to distribute to the holders of Allowed Claims on account of their Liquidating Trust Interests, on a semi-annual basis, all Available Cash (including any Cash received from the Debtors and treating any permissible investment as Cash for purposes of this Section 10.7), less such amounts that may be reasonably necessary to (a) meet contingent liabilities and to maintain the value of the Liquidating Trust Assets during liquidation, (b) pay reasonable incurred or anticipated expenses (including, without limitation, any taxes imposed on or payable by the Debtors or Liquidating Trust or in respect of the Liquidating Trust Assets), or (c) satisfy other liabilities incurred or anticipated by such Liquidating Trust in accordance with the Plan or Liquidating Trust Agreement; *provided*, *however*, that such Liquidating Trustee shall not be required to make a Distribution pursuant to this Section 10.7 of the Plan if such Liquidating Trustee determines that the expense associated with making the Distribution would likely utilize a substantial portion of the amount to be distributed, thus making the Distribution impracticable.

10.8   Federal Income Tax Treatment of Liquidating Trust.   Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt of an adverse determination by the IRS upon audit if not contested by such Liquidating Trustee), for all United States federal income tax purposes, all parties (including, without limitation, the Debtors, a Liquidating Trustee and Liquidating Trust Beneficiaries) shall treat the transfer of Liquidating Trust Assets to a Liquidating Trust as (1) a transfer of Liquidating Trust Assets (subject to any obligations relating to those assets) directly to Liquidating Trust Beneficiaries (other than to the extent Liquidating Trust Assets are allocable to Disputed Claims), followed by (2) the transfer by such beneficiaries to a Liquidating Trust of Liquidating Trust Assets in exchange for Liquidating Trust Interests.   Accordingly, except in the event of contrary definitive guidance, Liquidating Trust Beneficiaries shall be treated for United States federal income tax purposes as the grantors and owners of their respective share of Liquidating Trust Assets (other than such Liquidating Trust Assets as are allocable to Disputed Claims).   The foregoing treatment shall also apply, to the extent permitted by applicable law, for state and local income tax purposes.   For the purpose of this Section 10.8, the terms "party" and "Liquidating Trust Beneficiary" shall not include the United States or any agency or department thereof, or any officer or employee thereof acting in such capacity.

10.9   Tax Reporting.

(a)   A Liquidating Trustee shall file tax returns for a Liquidating Trust treating such Liquidating Trust as a grantor trust pursuant to Treas. Reg. § 1.671-4(a) and in accordance with this Section 10.9(a).   A Liquidating Trustee also shall annually send to each holder of a

A291

Liquidating Trust Interest a separate statement regarding the receipts and expenditures of the Liquidating Trust as relevant for U.S. federal income tax purposes and will instruct all such holders to use such information in preparing their U.S. federal income tax returns or to forward the appropriate information to such holders' underlying beneficial holders with instructions to utilize such information in preparing their U.S. federal income tax returns.

(b)        Allocations of Liquidating Trust taxable income among Liquidating Trust Beneficiaries (other than taxable income allocable to any assets allocable to, or retained on account of, Disputed Claims) shall be determined by reference to the manner in which an amount of Cash representing such taxable income would be distributed (were such Cash permitted to be distributed at such time) if, immediately prior to such deemed Distribution, the Liquidating Trust had distributed all its assets (valued at their tax book value, other than assets allocable Disputed Claims) to the holders of Liquidating Trust Interests, adjusted for prior taxable income and loss and taking into account all prior and concurrent Distributions from a Liquidating Trust. Similarly, taxable loss of a Liquidating Trust shall be allocated by reference to the manner in which an economic loss would be borne immediately after a hypothetical liquidating distribution of the remaining Liquidating Trust Assets.   The tax book value of Liquidating Trust Assets for purpose of this paragraph shall equal their fair market value on the date Liquidating Trust Assets are transferred to a Liquidating Trust, adjusted in accordance with tax accounting principles prescribed by the IRC, the applicable Treasury Regulations, and other applicable administrative and judicial authorities and pronouncements.

(c)        As soon as reasonably practicable after Liquidating Trust Assets are transferred to a Liquidating Trust, a Liquidating Trustee shall make a good faith valuation of Liquidating Trust Assets.   Such valuation shall be made available from time to time to all parties to the Liquidating Trust (including, without limitation, the Debtors and Liquidating Trust Beneficiaries), to the extent relevant to such parties for tax purposes, and shall be used consistently by such parties for all United States federal income tax purposes.

(d)        Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt by a Liquidating Trustee of a private letter ruling if such Liquidating Trustee so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by such Liquidating Trustee), such Liquidating Trustee (i) may timely elect to treat any Liquidating Trust Assets allocable to Disputed Claims as a "disputed ownership fund" governed by Treas. Reg. § 1.468B-9, and (ii) to the extent permitted by applicable law, shall report consistently for state and local income tax purposes.   If a "disputed ownership fund" election is made, all parties (including such Liquidating Trustee, the Debtors and Liquidating Trust Beneficiaries) shall report for United States federal, state and local income tax purposes consistently with the foregoing.

(e)        A Liquidating Trustee shall be responsible for payment, out of Liquidating Trust Assets, of any taxes imposed on a Liquidating Trust or its assets.

(f)        A Liquidating Trustee may request an expedited determination of taxes of a Liquidating Trust, including any reserve for Disputed Claims, or of the Debtor as to whom the Liquidating Trust was established, under section 505(b) of the Bankruptcy Code for all tax

returns filed for, or on behalf of, such Liquidating Trust or the Debtor for all taxable periods through the dissolution of such Liquidating Trust.

10.10  <u>Dissolution</u>.

(a)  A Liquidating Trustee and Liquidating Trust shall be discharged or dissolved, as the case may be, at such time as (i) all of the Liquidating Trust Assets have been distributed pursuant to the Plan and a Liquidating Trust Agreement, (ii) a Liquidating Trustee determines, in its sole discretion, that the administration of any remaining Liquidating Trust Assets is not likely to yield sufficient additional Liquidating Trust proceeds to justify further pursuit, or (iii) all Distributions required to be made by a Liquidating Trustee under the Plan and a Liquidating Trust Agreement have been made; *provided*, *however*, that in no event shall a Liquidating Trust be dissolved later than three (3) years from the creation of such Liquidating Trust pursuant to <u>Section 10.1</u> of the Plan unless the Bankruptcy Court, upon motion within the six-month period prior to the third (3rd) anniversary (or within the six-month period prior to the end of an extension period), determines that a fixed period extension (not to exceed three (3) years, together with any prior extensions, without a favorable private letter ruling from the IRS or an opinion of counsel satisfactory to the Liquidating Trustee that any further extension would not adversely affect the status of the trust as a liquidating trust for United States federal income tax purposes) is necessary to facilitate or complete the recovery and liquidation of the Liquidating Trust Assets.

(b)  If at any time a Liquidating Trustee determines, in reliance upon such professionals as a Liquidating Trustee may retain, that the expense of administering a Liquidating Trust so as to make a final Distribution to Liquidating Trust Beneficiaries is likely to exceed the value of the assets remaining in such Liquidating Trust, such Liquidating Trustee may apply to the Bankruptcy Court for authority to (i) reserve any amount necessary to dissolve such Liquidating Trust, (ii) donate any balance to a charitable organization (A) described in section 501(c)(3) of the IRC, (B) exempt from United States federal income tax under section 501(a) of the IRC, (C) not a "private foundation", as defined in section 509(a) of the IRC, and (D) that is unrelated to the Debtors, such Liquidating Trust, and any insider of such Liquidating Trustee, and (iii) dissolve such Liquidating Trust.

## ARTICLE XI
## Treatment of Executory Contracts and Unexpired Leases

11.1  <u>Executory Contracts and Unexpired Leases</u>.  Pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, all prepetition executory contracts and unexpired leases that exist between a Debtor and any person or entity shall be deemed rejected by such Debtor, as of the Effective Date, except for any prepetition executory contract or unexpired lease (a) that has been assumed pursuant to an order of the Bankruptcy Court entered prior to the Effective Date, (b) as to which a motion for approval of the assumption or rejection of such executory contract or unexpired lease has been filed prior to the Confirmation Date, or (c) that is specifically designated in the Plan Supplement as a contract or lease to be assumed by the Debtor; *provided*, *however*, that the Debtors reserve the right, on or prior to the Confirmation Date, to amend the Plan Supplement to remove any prepetition executory contract or unexpired lease therefrom or add any prepetition executory contract or unexpired lease thereto, in which event such executory

contract(s) or unexpired lease(s) shall, as of the Effective Date, be deemed to be, respectively, rejected or assumed. The Debtors shall provide notice of any amendments to the Plan Supplement to the parties to the executory contracts and unexpired leases affected thereby. The listing of or failure to list a document in the Plan Supplement shall not constitute an admission by the Debtors that such document is or is not an executory contract or an unexpired lease or that the Debtors have any liability thereunder.

11.2    <u>Approval of Assumption and Rejection of Executory Contracts and Unexpired Leases</u>. Entry of the Confirmation Order shall, subject to and upon the occurrence of the Effective Date, constitute (a) the approval, pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, of the assumption of the executory contracts and unexpired leases assumed or assumed and assigned pursuant to the Plan and (b) the approval, pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, of the rejection of the executory contracts and unexpired leases rejected pursuant to the Plan. To the extent any provision of an executory contract or unexpired lease to be assumed by any of the Debtors under the Plan limits such Debtor's ability to assign such executory contract or unexpired lease, the effectiveness of such provision shall be limited or nullified to the full extent provided in section 365(f) of the Bankruptcy Code.

11.3    <u>Cure of Defaults</u>. Except as may otherwise be agreed to by the parties, within thirty (30) days after the Effective Date, the Debtor shall cure any and all undisputed defaults under any executory contract or unexpired lease assumed by the Debtor pursuant to the Plan, in accordance with section 365(b) of the Bankruptcy Code. All disputed defaults that are required to be cured shall be cured either within thirty (30) days of the entry of a Final Order determining the amount, if any, of the Debtor's liability with respect thereto, or as may otherwise be agreed to by the parties.

11.4    <u>Bar Date for Filing Proofs of Claim Relating to Executory Contracts and Unexpired Leases Rejected Pursuant to the Plan</u>. Claims arising out of the rejection of an executory contract or unexpired lease pursuant to the Plan must be filed with the Bankruptcy Court and served upon the relevant Debtor no later than forty-five (45) days after the later of (a) notice of entry of an order approving the rejection of such executory contract or unexpired lease, (b) notice of entry of the Confirmation Order and occurrence of the Effective Date, and (c) notice of an amendment to the Plan Supplement relating to such executory contract or unexpired lease. **Except as set forth in the preceding sentence, all such Claims must otherwise comply with the provisions of the Bar Date Order. All such Claims not filed in accordance with the foregoing will be forever barred from assertion against the Debtors and their estates.** Any Claim arising out of the rejection of an executory contract or unexpired lease pursuant to the Plan shall be classified as a General Unsecured Claim or Convenience Claim, as applicable, against the Debtor that is a party to such executory contract or unexpired lease.

11.5    <u>Insurance Policies</u>. To the extent that any of the Debtors' insurance policies and any agreements, documents or instruments with insurers relating thereto constitute executory contracts, such  contracts shall be deemed assumed under the Plan. Nothing contained herein shall constitute or be deemed a waiver of any Litigation Claims that the Debtors may hold against any entity, including, without limitation, the insurer under any of the Debtors' policies of insurance.

11.6   Indemnification Obligations.   Subject to the occurrence of the Effective Date, the obligations of each Debtor to indemnify, defend, reimburse or limit the liability of (a) directors, officers and any other employee who is held responsible for obligations of the Debtor incurred after the Commencement Date who are directors, officers or employees of such Debtor or a Debtor-Controlled Entity on or after the Commencement Date and (b) Released Parties, respectively, against any Claims or Causes of Action as provided in the Debtor's articles of organization, certificates of incorporation, bylaws, other organizational documents or applicable law, shall survive confirmation of the Plan, shall be assumed by such Debtor and will remain in effect after the Effective Date.   Any such assumed obligations owed in connection with an event occurring after the Commencement Date shall be paid as an Administrative Expense Claim under the Plan.   Any such obligations owed in connection with an event occurring before the Commencement Date shall be treated as pre-petition Claims under the Plan.   Nothing in the Plan shall in any way limit, modify, alter or amend the Debtor's limitation of liability of the Independent Directors set forth in Section 10.1 of the Restated Certificate of Incorporation of LBHI.

## ARTICLE XII
## Effectiveness of the Plan

12.1   Conditions Precedent to the Confirmation of the Plan.   The following are conditions precedent to the confirmation of the Plan with respect to each Debtor:

(a)   The Bankruptcy Court shall have entered the Structured Securities Order in form and substance satisfactory to the Debtors and the Creditors' Committee; and

(b)   The Bankruptcy Court shall have entered a Confirmation Order with respect to the Plan for all of the Participating Debtors in form and substance satisfactory to the respective Debtor and the Creditors' Committee.

12.2   Conditions Precedent to the Effective Date of the Plan.   The following are conditions precedent to the Effective Date of the Plan with respect to each Debtor:

(a)   The Confirmation Order, in form and substance acceptable to the Debtors and the Creditors' Committee, shall have been entered;

(b)   All actions and all agreements, instruments or other documents necessary to implement the terms and provisions of the Plan are effected or executed and delivered, as applicable, in form and substance satisfactory to the Debtors;

(c)   All authorizations, consents and regulatory approvals, if any, required by the Debtors in connection with the consummation of the Plan are obtained and not revoked; and

(d)   The certificate of incorporation and by-laws of the Debtors shall have been amended to the extent necessary to effectuate the Plan.

12.3   Waiver of Conditions.   Notwithstanding the foregoing, each Debtor reserves its right, upon obtaining the consent of the Creditors' Committee, to waive the occurrence of the conditions precedent to the (a) Confirmation of its Plan set forth in Section 12.1 and (b) Effective

A295

Date set forth in <u>Section 12.2</u> of the Plan other than <u>Section 12.2(a)</u> of the Plan. Any such waiver may be effected at any time, without notice, without leave or order of the Bankruptcy Court, and without any formal action other than proceeding to consummate the Plan. Any actions required to be taken on the Effective Date shall take place and shall be deemed to have occurred simultaneously, and no such action shall be deemed to have occurred prior to the taking of any other such action. If any of the Debtors decide, with the consent of the Creditors' Committee, that one of the conditions precedent to the Effective Date of its Plan cannot be satisfied and the occurrence of such condition is not waived or cannot be waived, then the Debtor shall file a notice of the inability to satisfy such condition prior to the Effective Date with the Bankruptcy Court.

**ARTICLE XIII**
**Effects of Confirmation**

13.1 <u>Vesting of Assets</u>. Upon the Effective Date, pursuant to section 1141(b) and (c) of the Bankruptcy Code, all Property of the Estate of a Debtor shall vest in that Debtor free and clear of all Claims, Liens, encumbrances, charges and other interests, except as provided herein. From and after the Effective Date, the Debtors, acting through the Plan Administrator, may take any action, including, without limitation, the operation of their businesses, the use, acquisition, sale, lease and disposition of property, and the entry into transactions, agreements, understandings or arrangements, whether in or other than in the ordinary course of business, and execute, deliver, implement, and fully perform any and all obligations, instruments, documents and papers or otherwise in connection with any of the foregoing, free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules and in all respects as if there were no pending cases under any chapter or provision of the Bankruptcy Code, except as explicitly provided herein.

13.2 <u>Binding Effect</u>. On and after the Confirmation Date, the provisions of the Plan shall bind any holder of a Claim against, or Equity Interest in, the Debtors and their respective successors and assigns, whether or not the Claim or Equity Interest of such holder is impaired under the Plan and whether or not such holder has accepted the Plan.

13.3 **<u>Release and Exculpation</u>. On and after the Effective Date, the Debtors and all entities who have held, hold or may hold Claims against or Equity Interests in any or all of the Debtors (whether proof of such Claims or Equity Interests has been filed or not), along with their respective present or former employees, agents, officers, directors or principals, shall be deemed to have released (a) the Released Parties from, and none of the Released Parties shall have or incur any liability for, any Claim for, Cause of Action for or other assertion of liability for any act taken or omitted to be taken during the Chapter 11 Cases in connection with, or arising out of, the Chapter 11 Cases, the negotiation, formulation, dissemination, confirmation, consummation or administration of the Plan, property to be distributed under the Plan or any other act or omission in connection with the Chapter 11 Cases, the Plan, the Disclosure Statement, the Plan Support Agreements or any contract, instrument, document or other agreement related thereto and (b) the PSA Creditors from, and none of the PSA Creditors shall have or incur any liability for, any Claim for, Cause of Action for or other assertion of liability for any act taken or omitted to be taken in connection with, or arising out of, the negotiation, formulation, dissemination or confirmation, consummation or administration of the Plan, or any other act or omission**

A296

in connection with the Plan, the Disclosure Statement, the Plan Support Agreements, including the filing of any alternative chapter 11 plan and any determination to not pursue solicitation or confirmation of such alternative plan, or any contract, instrument, document or other agreement related thereto; *provided*, *however*, that (i) in no event shall any Litigation Claim, Cause of Action or other Claim or assertion of liability against any Released Party or PSA Creditor for any act taken or omitted to be taken prior to the Commencement Date be released by the Plan, (ii) nothing herein shall affect or release any obligation of the Debtors under the Plan, and (iii) nothing herein shall affect the liability of any person that otherwise would result from any such act or omission to the extent such act or omission is determined by a Final Order to have constituted willful misconduct or gross negligence; *provided*, *further*, that nothing in this Plan shall limit the liability of the professionals of the Debtors, the Creditors' Committee or the PSA Creditors to their respective clients pursuant to Rule 1.8(h)(1) of the New York Rules of Professional Conduct.

13.4  <u>Discharge</u>.  Except as expressly provided in the Plan, upon the date that all Distributions under the Plan have been made, (a) each holder (as well as any trustees and agents on behalf of each holder) of a Claim against or Equity Interest in a Debtor shall be deemed to have forever waived, released and discharged the Debtors, to the fullest extent permitted by section 1141 of the Bankruptcy Code, of and from any and all Claims, Equity Interests, rights and liabilities that arose prior to the Effective Date and (b) all such holders shall be forever precluded and enjoined, pursuant to section 524 of the Bankruptcy Code, from prosecuting or asserting any discharged Claim against or terminated Equity Interest in the Debtors.

13.5  <u>Injunction</u>.  Except as expressly provided in the Plan, the Confirmation Order, or a separate order of the Bankruptcy Court or as agreed to by a Creditor and the Plan Administrator (on behalf of a Debtor), all entities who have held, hold or may hold Claims against or Equity Interests in any or all of the Debtors (whether proof of such Claims or Equity Interests has been filed or not) and other parties in interest, along with their respective present or former employees, agents, officers, directors or principals, are permanently enjoined, on and after the Effective Date, solely with respect to any Claims and Causes of Action that will be or are extinguished or released pursuant to the Plan from (i) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including, without limitation, any proceeding in a judicial, arbitral, administrative or other forum) against or affecting the Released Parties or the property of any of the Released Parties, (ii) enforcing, levying, attaching (including, without limitation, any prejudgment attachment), collecting, or otherwise recovering by any manner or means, whether directly or indirectly, any judgment, award, decree, or order against the Released Parties or the property of any of the Released Parties, (iii) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against the Released Parties or the property of any of the Released Parties, (iv) asserting any right of setoff, directly or indirectly, against any obligation due the Released Parties or the property of any of the Released Parties, except as contemplated or allowed by the Plan; (v) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan; and (vi) taking any actions to interfere with the implementation or consummation of the Plan.

13.6 <u>United States Government</u>. As to the United States, its agencies, departments or agents, nothing in the Plan or Confirmation Order shall: (a) discharge, release or otherwise preclude (i) any liability of the Debtors arising on or after the Confirmation Date (defined for purposes of this section as the date the Confirmation Order becomes final and non-appealable), (ii) with respect to the Debtors, any liability that is not a Claim against a Debtor, (iii) any valid right of setoff or recoupment, or (iv) any liability of the Debtors arising under environmental or criminal laws as the owner or operator of property that such Debtor owns after the Confirmation Date (defined for purposes of this section as the date the Confirmation Order becomes final and non-appealable); or (b) limit or expand the scope of the discharge to which the Debtors are entitled under the Bankruptcy Code. The discharge and injunction provisions contained in the Plan and Confirmation Order are not intended and shall not be construed to bar the United States from, subsequent to the Effective Date, pursuing any police or regulatory action.

13.7 <u>Terms of Injunctions or Stays</u>. Unless otherwise provided in the Plan, the Confirmation Order, or a separate order of the Bankruptcy Court, all injunctions or stays arising under or entered during the Chapter 11 Cases under section 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the closing of all of the Chapter 11 Cases.

13.8 <u>Retention of Litigation Claims and Reservation of Rights</u>. Except as expressly provided in the Plan, nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or the relinquishment of any rights, defenses or Litigation Claims that the Debtors may have or choose to assert on behalf of their respective estates under any provision of the Bankruptcy Code or any applicable nonbankruptcy law that the Debtors had prior to the Effective Date, including, without limitation, (a) any and all Claims against any person or entity, to the extent such person or entity asserts a crossclaim, counterclaim, and/or Claim for setoff which seeks affirmative relief against the Debtors, their officers, directors, or representatives, (b) any and all Claims or rights arising under any tax sharing agreement among the Debtors and their Affiliates (including the tax sharing agreement among the Debtors and LBI based on their regular and consistent course of conduct over many years), (c) any and all Claims for reimbursement of costs incurred for the benefit of any Affiliate, including in connection with the disposition of an Affiliate's assets; (d) any and all Avoidance Actions, and (e) any right of setoff or other legal or equitable defense and remedies. The Debtors shall have, retain, reserve, and may assert all such rights, defenses or Litigation Claims after the Effective Date fully as if the Chapter 11 Cases had not been commenced.

13.9 <u>Barclays Sale Order</u>. Nothing contained in the Plan, the Disclosure Statement or the Confirmation Order constitutes or shall be construed as any modification or amendment to the Barclays Sale Order and the rights and defenses of each of the Debtors, the SIPA Trustee (on behalf of LBI), Barclays Bank PLC and Barclays Capital Inc., with respect to any litigation, adversary proceeding, contested matter, claims adjudication, appeal or other dispute against the other are fully preserved, including, without limitation, any rights, defenses, counterclaims and/or cross-claims asserted in connection with or related to the Sale Order.

13.10 <u>No Waiver of Rights and Defenses</u>. Except as otherwise agreed, the provisions of the Plan shall not enjoin, impair, prejudice, have any preclusive effect upon, or otherwise affect (A) the rights of any Creditor to (x) effectuate a recoupment pursuant to common law or

setoff pursuant to common law or otherwise in accordance with (a) section 553 and (b) sections 362(b)(6), 362(b)(7), 362(b)(17), 362(b)(27), 555, 556, 559, 560 or 561 of the Bankruptcy Code (subject to the Debtors' rights to contest the validity of such asserted right of setoff or recoupment or the applicability of any of the foregoing sections of the Bankruptcy Code) or (y) continue to assert the validity of a setoff or recoupment previously taken by such Creditor or to seek authority from the Bankruptcy Court to exercise a right of setoff or recoupment (subject in each case to the Debtors' right to contest the validity of any such setoff or recoupment), or (B) any legal or equitable defense, including any defensive right of setoff or recoupment, that has been, or may be asserted, by any entity in response to a Litigation Claim, Avoidance Action of a Debtor or objections to Claims against a Debtor.

## ARTICLE XIV
## Retention of Jurisdiction

14.1   <u>Retention of Jurisdiction</u>.   The Bankruptcy Court shall retain exclusive jurisdiction of all matters arising under, arising out of, or related to, the Chapter 11 Cases and the Plan pursuant to, and for the purposes of, sections 105(a) and 1142 of the Bankruptcy Code and for, among other things, the following purposes:

(a)   To hear and determine any motions for the assumption, assumption and assignment or rejection of executory contracts or unexpired leases and the allowance of any Claims resulting therefrom;

(b)   To determine any and all adversary proceedings, applications and contested matters relating to the Chapter 11 Cases, in each case in accordance with applicable law;

(c)   To hear and determine any objection to or motion to estimate Claims;

(d)   To enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified, or vacated;

(e)   To issue such orders in aid of execution of the Plan to the extent authorized by section 1142 of the Bankruptcy Code;

(f)   To consider any modifications of the Plan, to cure any defect or omission or reconcile any inconsistency in any order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

(g)   To hear and determine all applications for compensation and reimbursement of expenses of professionals under sections 330, 331 and 503(b) of the Bankruptcy Code;

(h)   To hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan and any agreements or documents incorporated in or contemplated by the Plan, including, without limitation, <u>Sections 6.4</u>, <u>6.5</u>, <u>13.3</u>, <u>13.4</u> and <u>13.5</u> of the Plan;

A299

(i)      To issue injunctions, enter and implement other orders, and take such other actions as may be necessary or appropriate to enforce or to restrain interference by any person with the consummation, implementation or enforcement of the Plan, the Confirmation Order, or any other order of the Bankruptcy Court;

(j)      To hear and determine any actions brought against the Plan Administrator in connection with the Plan, including, without limitation, any action relating to Distributions under the Plan;

(k)      To hear and determine any actions brought to recover all assets of the Debtors and property of the estates, wherever located or to determine or declare entitlement to such assets and property, including through actions of interpleader or in the nature of interpleader involving the same; *provided*, *however*, that this provision shall not limit the jurisdiction of a foreign court or tribunal overseeing a Foreign Proceeding;

(l)      To hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code, including any requests for expedited determinations under section 505(b) of the Bankruptcy Code filed, or to be filed, with respect to tax returns of the Debtors and of any Liquidating Trusts for any and all taxable periods ending after the Commencement Date through the Closing Date;

(m)      To hear all matters relating to <u>Article XIII</u> of the Plan, including, without limitation, all matters relating to the releases, exculpation, and injunction granted thereunder.

(n)      To hear all matters relating to the Plan Trust;

(o)      To hear any other matter consistent with the provisions of the Bankruptcy Code; and

(p)      To enter a final decree closing the Chapter 11 Cases.

## ARTICLE XV
## <u>Miscellaneous Provisions</u>

15.1    <u>Post-Effective Date Role of Creditors' Committee and Fee Committee.</u>

(a)      On the Effective Date, the Creditors' Committee shall be dissolved for all purposes other than (i) implementation of the Plan through the date of the initial Distribution in accordance with <u>Section 8.3</u> of the Plan, (ii) defending any appeals from the Confirmation Order to final disposition of such appeals, and (iii) all matters relating to professional fees and the fee committee appointed in the Chapter 11 Cases for the period prior to the Effective Date. Following the Effective Date, the litigation and derivatives subcommittees of the Creditors' Committee may continue functioning for the limited purposes of (i) resolving pending litigation and (ii) subject to approval of the post-Effective Date board of directors of LBHI, other litigation and derivatives matters as to which, currently, the subcommittees are involved, and shall be recommended by the applicable subcommittee and the Plan Administrator.  Other than with respect to the foregoing, the members of the Creditors' Committee shall be released and discharged of and from all further authority, duties, responsibilities, and obligations related to

and arising from and in connection with the Chapter 11 Cases, and the retention or employment of the Creditors' Committee's attorneys, accountants, and other agents shall terminate. The Debtors shall pay the reasonable fees and expenses of the professionals retained by and shall reimburse the members of the remaining subcommittees for reasonable disbursements incurred, including the reasonable fees of counsel, in connection with the foregoing from and after the Effective Date. If a member of a subcommittee becomes unable to serve on a subcommittee or resigns after the Effective Date, the remaining members may replace such member, continue to discharge the subcommittee's roles, or dissolve by a majority vote of the remaining members. Each of the subcommittees shall be deemed dissolved upon the earliest to occur of (i) voluntary agreement of the members of the subcommittee, (ii) the completion of the subcommittee's responsibilities, and (iv) the Closing Date.

(b)     The fee committee appointed in the Chapter 11 Cases will continue to exist after the Effective Date to perform its duties under the amended fee protocol in connection with all applications for approval of professional fees incurred prior to the Effective Date, and all related proceedings, including hearings on final fee applications. The Debtors shall pay the reasonable fees and expenses of the independent member and counsel retained by the fee committee in connection with the foregoing from and after the Effective Date.

15.2     Issuance of New Securities.  In the discretion of the Plan Administrator, each Debtor or Debtor Controlled-Entity (a) may form and transfer certain assets of the Debtors and/or Debtor Controlled Entities to new (or utilize existing) entities, including, without limitation, one or more separately managed partnerships, REITs or other investment vehicles, to hold certain real estate or other assets of the Debtors and/or Debtor-Controlled Entities and, (b) may, in connection therewith, issue New Securities for Distribution under the Plan.  In the event that the Plan Administrator determines to issue New Securities, each holder of Allowed Claims or Equity Interests against a Debtor that contributed assets to the entity issuing New Securities shall receive the relevant New Securities as Distributions in accordance with the Plan.  The New Securities shall be valued as of the date of the issuance and the holders of Allowed Claims or Equity Interests receiving such New Securities shall be deemed satisfied to the extent of the value of the New Securities.

15.3     Exemption from Securities Laws.  To the maximum extent provided by section 1145 of the Bankruptcy Code and applicable non-bankruptcy law, the issuance of any New Securities or Liquidating Trust Interests will be exempt from registration under the Securities Act of 1933, as amended, and all rules and regulations promulgated thereunder and any other applicable non-bankruptcy law or regulation.

15.4     Exemption from Transfer Taxes.  Pursuant to section 1146(a) of the Bankruptcy Code, (a) the issuance, transfer, or exchange of notes or equity securities, (b) the creation of any mortgage, deed of trust, lien, pledge, or other security interest, (c) the making or assignment of or surrender of any lease or sublease, or (d) the making of or delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with the Plan, and any merger agreements, agreements of restructuring, disposition, liquidation or dissolution, any deeds, bills of sale, transfers of tangible property, or assignments executed in connection with any disposition or acquisition of assets contemplated by the Plan (including by a Liquidating Trust),

in each case whether as a result of sale, assignment, foreclosure or deed in lieu of foreclosure, shall not be subject to any stamp, real estate transfer, mortgage recording or other similar tax.

15.5    <u>Plan Supplement</u>.  The Debtor Allocation Agreement, the amended certificate and by-laws of the Debtors (if any) in accordance with <u>Section 7.7</u>, the Plan Trust Agreement, a list of any contracts or leases to be assumed or assumed and assigned by the Debtors in accordance with <u>Section 11.1</u>, any settlement agreement among any of the Debtors and a Non-Controlled Affiliate in accordance with <u>Section 6.5(b)(vii)</u> and any settlement agreement among any of the Debtors and a Creditor in accordance with <u>Section 6.5(j)</u> shall be contained in the Plan Supplement that is filed with the Clerk of the Bankruptcy Court at least ten (10) days prior to the Voting Deadline.  Upon its filing with the Bankruptcy Court, the Plan Supplement may be obtained on the Debtors' independent website at www.lehman-docket.com or by request to the Debtors in accordance with <u>Section 15.12</u> of the Plan.

15.6    <u>Post-Effective Date Reporting</u>.  Beginning the first month-end and first quarter-end following the Effective Date and until the Closing Date, the Plan Administrator shall file with the Bankruptcy Court:

(a)    within thirty (30) days after the end of each month, a monthly operating report for such month presented in a format and containing information similar to that used by the Debtors during the Chapter 11 Cases for the "Schedule of Cash Receipts and Disbursements" and "Schedule of Professional Fee and Expense Disbursements";

(b)    within one-hundred-twenty (120) days after the end of each quarter, a quarterly report for such quarter presented in a format and containing information similar to that used by the Debtors during the Chapter 11 Cases for "Monthly Operating Report Balance Sheets" that (i) contains the following schedules in a format and containing information similar to that used by the Debtors during the Chapter 11 Cases: "Real Estate Owned and Unencumbered by Product Type" (such schedule to also include cost and unpaid principal balance information), "Commercial Real Estate Owned and Unencumbered by Property Type and Region," "Private Equity/Principal Investments Owned and Unencumbered by Legal Entity and Product Type" (such schedule to also include cost and unpaid principal information), "Derivatives Assets and Liabilities" (such schedule to also include special purpose vehicle receivable information), "Loan Portfolio Summary (Funded and Unencumbered)" (schedule to also include unpaid principal balance information), and "Unfunded Lending and Private Equity/Principal Investments Commitments"; and (ii) includes a section titled "Management's Discussion and Analysis" and supplemental data that will include:

(A)    a discussion of any known trends, events, material changes in market values or reserves, demands, commitments and uncertainties that have, or are reasonably likely to have, a material effect on the Debtors' financial condition or on the forecasted undiscounted cash flow principal amounts estimated as of a designated date;

(B)    a description (including asset name, type and material terms of) any new investments in any asset or permitted expenditures to preserve existing assets (in each case, in a single transaction or a series of related transactions on a cumulative basis after the Effective Date in excess of $25 million);

(C)     a description (including asset name, type and material terms) of any restructurings, settlements, sales (including disclosure of any gains or losses relative to the market value reported in the prior period balance sheet, and relative to forecasted undiscounted cash flow estimates as of a designated date for principal amounts), wind-downs or liquidations of the Debtors' existing assets, in each case, solely with respect to any asset that has a forecasted undiscounted cash flow principal amount estimate of greater than $50 million for derivatives, loan, or private equity or principal investments assets or $75 million for real estate assets;

(D)     an update of the claims reconciliation and resolution process, including a description of any claim settlements providing for the allowance in excess of $250 million of a Disputed Claim against the Debtors;

(E)     a description of the Debtors' affirmative litigation actions against third-parties that are pending, including the damages sought by the Debtors; and

(F)     a discussion of post-Effective Date material costs and expenses incurred by the Debtors; and

(c)     on an annual basis for two (2) years and thereafter on a semiannual basis within one-hundred twenty (120) days after the end of such period, a report reconciling cash flow estimates presented in a format and containing information similar to that used by the Debtors during the Chapter 11 Cases for "Reconciliation of Cash Flow Estimates" reports and also a description of collections by the Debtors and a comparison of performance relative to forecasted collections and estimates of future costs and expenses of administration.

Notwithstanding the foregoing, the Plan Administrator or the board of directors or manager for a Debtor may in its sole discretion modify or include less information in any of the foregoing reports than listed above if the Plan Administrator or the board of directors or manager for a Debtor determines in its reasonable discretion that disclosing any such information would be unduly burdensome, such information is or has become immaterial or no longer meaningful as the activities of the Debtor(s) evolve, such disclosure could place the Debtor(s) in a competitive or negotiation disadvantage, or such disclosure is precluded by confidentiality limitations.

15.7     Payment of Statutory Fees.     On the Effective Date and thereafter, the Plan Administrator and any Liquidating Trustee thereafter appointed, shall pay all fees incurred pursuant to Section 1930 of title 28, United States Code, together with interest, if any, pursuant to Section 3717 of title 31, United States Code for each Debtor's case, or until such time as a final decree is entered closing a particular Debtor's case, a Final Order converting such Debtor's case to a case under Chapter 7 of the Bankruptcy Code or a Final Order dismissing such Debtor's case is entered.

15.8     Amendment or Modification of Plan.     Subject to the terms and conditions of the Plan Support Agreements, the Debtors reserve the right to propose alterations, amendments, or modifications of or to the Plan in writing at any time prior to the Confirmation Date, provided that the Plan, as altered, amended or modified satisfies the conditions of section 1122 and 1123 of the Bankruptcy Code, and the Debtors shall have complied with section 1125 of the Bankruptcy Code.     Subject to the terms and conditions of the Plan Support Agreements, the Plan

may be altered, amended, or modified at any time after the Confirmation Date and before substantial consummation, provided that the Plan, as altered, amended or modified satisfies the requirements of sections 1122 and 1123 of the Bankruptcy Code and the Bankruptcy Court, after notice and a hearing, confirms the Plan, as altered, modified or amended, under section 1129 of the Bankruptcy Code and the circumstances warrant such alterations, amendments of modifications.   A holder of a Claim that has accepted the Plan shall be deemed to have accepted the Plan, as altered, amended or modified, to the extent, and subject to the conditions, set forth in Bankruptcy Rule 3019.

15.9     <u>Withdrawal or Revocation of the Plan</u>.   Subject to the terms and conditions of the Plan Support Agreements, the Debtors reserve the right to withdraw or revoke the Plan at any time prior to the Confirmation Date.  If the Debtors revoke or withdraw the Plan prior to the Confirmation Date, or if the Confirmation Date does not occur, then the Plan shall be deemed null and void.   In such event, nothing contained herein shall be deemed to constitute a waiver or release of any Claim by or against the Debtors or any other person or to prejudice in any manner the rights of the Debtors or any other person in any further proceedings involving the Debtors.

15.10    <u>Courts of Competent Jurisdiction</u>.   If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising out of the Plan, such abstention, refusal or failure of jurisdiction shall have no effect upon and shall not control, prohibit, or limit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

15.11    <u>Transactions on Business Days</u>.   If the Effective Date or any other date on which a transaction may occur under the Plan shall occur on a day that is not a Business Day, any transactions or other actions contemplated by the Plan to occur on such day shall instead occur on the next succeeding Business Day.

15.12    <u>Notices</u>.   Any notices to or requests of the Debtors by parties in interest under or in connection with the Plan shall be in writing and served either by (a) certified mail, return receipt requested, postage prepaid, (b) hand delivery, or (c) reputable overnight delivery service, all charges prepaid, and shall be deemed to have been given when received by the following parties:

If to any Debtor:

c/o Lehman Brothers Holdings Inc.
1271 Avenue of the Americas
New York, New York 10020
Attention: Bryan Marsal and John K. Suckow

with a copy to:

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153
Attention: Harvey R. Miller and Lori R. Fife

**A304**

Re:   Lehman Brothers

15.13   <u>Severability</u>.   In the event that the Bankruptcy Court determines, prior to the Confirmation Date, that any provision of the Plan is invalid, void, or unenforceable, the Bankruptcy Court shall, with the consent of the Debtors, have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.   The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

15.14   <u>Governing Law</u>.   Except to the extent the Bankruptcy Code or Bankruptcy Rules are applicable, the rights and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of New York without giving effect to the principles of conflicts of law thereof.

15.15   <u>Headings</u>.   Headings are used in the Plan for convenience and reference only, and shall not constitute a part of the Plan for any other purpose.

15.16   <u>Exhibits</u>.   All exhibits and schedules to the Plan as well as the Plan Supplement and any exhibits or schedules thereto are incorporated into and are a part of the Plan as if set forth in full herein.

15.17   <u>Successors and Assigns</u>.   All the rights, benefits, and obligations of any person named or referred to in the Plan shall be binding on, and shall inure to the benefit of, the heirs, executors, administrators, successors, and/or assigns of such person.

Dated:      New York, New York
            November 29, 2011

                        LEHMAN BROTHERS HOLDINGS INC.


                        By:   _____/s/ John Suckow_____
                              Name:   John Suckow
                              Title:   President and Chief Operating Officer


                        LB 745 LLC


                        By:   _____/s/ John Suckow_____
                              Name:   John Suckow
                              Title:   President and Chief Operating Officer

PAMI STATLER ARMS LLC

By: _____/s/ John Suckow_____
      Name:   John Suckow
      Title:   Authorized Signatory


LEHMAN BROTHERS COMMODITY SERVICES INC.

By: _____/s/ John Suckow_____
      Name:   John Suckow
      Title:   President and Chief Operating Officer


LEHMAN BROTHERS SPECIAL FINANCING INC.

By: _____/s/ John Suckow_____
      Name:   John Suckow
      Title:   President and Chief Operating Officer

LEHMAN BROTHERS OTC DERIVATIVES INC.

By: _____/s/ John Suckow_____
      Name:   John Suckow
      Title:   President and Chief Operating Officer


LEHMAN BROTHERS DERIVATIVE PRODUCTS INC.

By: _____/s/ Daniel Ehrmann_____
      Name:   Daniel Ehrmann
      Title:   Vice-President


LEHMAN COMMERCIAL PAPER INC.

By: _____/s/ John Suckow_____
      Name:   John Suckow
      Title:   President and Chief Operating Officer

LEHMAN BROTHERS COMMERCIAL CORP.


By:      /s/ John Suckow
         Name:   John Suckow
         Title:   President and Chief Operating Officer


LEHMAN BROTHERS FINANCIAL PRODUCTS INC.


By:      /s/ Daniel Ehrmann
         Name:   Daniel Ehrmann
         Title:   Vice-President


CES AVIATION LLC


By:      /s/ John Suckow
         Name:   John Suckow
         Title:   President and Chief Operating Officer


CES AVIATION V LLC


By:      /s/ John Suckow
         Name:   John Suckow
         Title:   President and Chief Operating Officer


CES AVIATION IX LLC


By:      /s/ John Suckow
         Name:   John Suckow
         Title:   President and Chief Operating Officer


EAST DOVER LIMITED


By:      /s/ Daniel Ehrmann
         Name:   Daniel Ehrmann
         Title:   Duly Authorized Officer

LEHMAN SCOTTISH FINANCE L.P., by its general
partner Property Asset Management Inc.


By:      /s/ John Suckow
    Name:    John Suckow
    Title:    President and Chief Operating Officer


LUXEMBOURG RESIDENTIAL PROPERTIES LOAN
FINANCE S.A.R.L.


By:      /s/ Daniel Ehrmann
    Name:    Daniel Ehrmann
    Title:    Manager

BNC MORTGAGE LLC


By:      /s/ John Suckow
    Name:    John Suckow
    Title:    Authorized Signatory

LB ROSE RANCH LLC


By:      /s/ John Suckow
    Name:    John Suckow
    Title:    Authorized Signatory


STRUCTURED ASSET SECURITIES CORPORATION


By:      /s/ John Suckow
    Name:    John Suckow
    Title:    President and Chief Operating Officer


LB 2080 KALAKAUA OWNERS LLC, by its managing
member PAMI LLC


By:      /s/ John Suckow
    Name:    John Suckow
    Title:    President and Chief Operating Officer

**A308**

MERIT, LLC, by its Manager
LEHMAN COMMERCIAL PAPER INC.


By:      /s/ John Suckow
       Name:    John Suckow
       Title:    President and Chief Operating Officer


LB SOMERSET LLC, by its managing member
PAMI LLC


By:      /s/ John Suckow
       Name:    John Suckow
       Title:    President and Chief Operating Officer

LB PREFERRED SOMERSET LLC, by its managing
member PAMI LLC


By:      /s/ John Suckow
       Name:    John Suckow
       Title:    President and Chief Operating Officer


Counsel:

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone:   (212) 310-8000
Facsimile:   (212) 310-8007

Attorneys for Debtors and
Debtors in Possession

A309

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------x
                                               :

In re                                     :        **Chapter 11 Case No.**
                                               :

**LEHMAN BROTHERS HOLDINGS INC.,** *et al.*,  :        **08-13555 (JMP)**
                                               :

                      **Debtors.**        :        **(Jointly Administered)**
                                               :

------------------------------------------------------------------x

 

## MODIFIED THIRD AMENDED JOINT CHAPTER 11 PLAN OF
## LEHMAN BROTHERS HOLDINGS INC. AND ITS AFFILIATED DEBTORS

 

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Tel: (212) 310-8000
Fax: (212) 310-8007

Attorneys for Debtors and
Debtors in Possession

Dated: New York, New York
       November 29, 2011

# TABLE OF CONTENTS

**Page**

ARTICLE I        DEFINITIONS AND CONSTRUCTION OF TERMS...................... 1

ARTICLE II       TREATMENT OF ADMINISTRATIVE EXPENSE CLAIMS
                 AND PRIORITY TAX CLAIMS .................................... 17

2.1      Administrative Expense Claims.................................... 17

2.2      Professional Compensation and Reimbursement Claims ........................ 17

2.3      Priority Tax Claims.................................................... 18

ARTICLE III      CLASSIFICATION OF CLAIMS AND EQUITY
                 INTERESTS ................................................ 18

3.1      LBHI................................................................ 18

3.2      LCPI................................................................ 19

3.3      LBCS................................................................ 19

3.4      LBSF................................................................ 19

3.5      LOTC................................................................ 20

3.6      LBCC................................................................ 20

3.7      LBDP................................................................ 20

3.8      LBFP................................................................ 21

3.9      LB 745.............................................................. 21

3.10     PAMI Statler........................................................ 21

3.11     CES................................................................. 21

3.12     CES V............................................................... 22

3.13     CES IX.............................................................. 22

3.14     East Dover.......................................................... 22

3.15     LS Finance.......................................................... 22

3.16     LUXCO.............................................................. 23

3.17     BNC................................................................. 23

3.18     LB Rose Ranch....................................................... 23

3.19     SASCO.............................................................. 23

3.20     LB 2080............................................................. 24

3.21     Merit............................................................... 24

3.22     Preferred Somerset.................................................. 24

# TABLE OF CONTENTS
## (continued)

| | | Page |
|---|---|---|
| 3.23 | Somerset | 24 |
| ARTICLE IV | TREATMENT OF CLAIMS AGAINST AND EQUITY INTERESTS IN LBHI | 25 |
| 4.1 | LBHI Class 1 – Priority Non-Tax Claims against LBHI | 25 |
| 4.2 | LBHI Class 2 – Secured Claims against LBHI | 25 |
| 4.3 | LBHI Class 3 – Senior Unsecured Claims against LBHI | 25 |
| 4.4 | LBHI Class 4A – Senior Affiliate Claims against LBHI | 25 |
| 4.5 | LBHI Class 4B – Senior Affiliate Guarantee Claims against LBHI | 26 |
| 4.6 | LBHI Class 5 – Senior Third-Party Guarantee Claims against LBHI | 26 |
| 4.7 | LBHI Class 6A – Convenience Claims against LBHI | 26 |
| 4.8 | LBHI Class 6B – Convenience Guarantee Claims against LBHI | 26 |
| 4.9 | LBHI Class 7 – General Unsecured Claims against LBHI | 27 |
| 4.10 | LBHI Class 8 – Affiliate Claims against LBHI | 27 |
| 4.11 | LBHI Class 9A – Third-Party Guarantee Claims against LBHI | 27 |
| 4.12 | LBHI Class 9B – Third-Party Guarantee Claims of the Racers Trusts against LBHI | 27 |
| 4.13 | LBHI Class 10A – Subordinated Class 10A Claims against LBHI | 27 |
| 4.14 | LBHI Class 10B – Subordinated Class 10B Claims against LBHI | 28 |
| 4.15 | LBHI Class 10C – Subordinated Class 10C Claims against LBHI | 28 |
| 4.16 | LBHI Class 11 – Section 510(b) Claims against LBHI | 28 |
| 4.17 | LBHI Class 12 – Equity Interests in LBHI | 28 |
| ARTICLE V | TREATMENT OF CLAIMS AGAINST AND EQUITY INTERESTS IN SUBSIDIARY DEBTORS | 29 |
| 5.1 | LCPI Class 1 – Priority Non-Tax Claims against LCPI | 29 |
| 5.2 | LCPI Class 2 – Secured Claims against LCPI | 29 |
| 5.3 | LCPI Class 3 – Convenience Claims against LCPI | 30 |
| 5.4 | LCPI Class 4A – General Unsecured Claims other than those of Designated Entities against LCPI | 30 |
| 5.5 | LCPI Class 4B – General Unsecured Claims of Designated Entities against LCPI | 30 |
| 5.6 | LCPI Class 5A – Affiliate Claims of LBHI against LCPI | 30 |

## TABLE OF CONTENTS
### (continued)

Page

5.7    LCPI Class 5B – Affiliate Claims of Participating Subsidiary Debtors against LCPI .................................................................................. 31

5.8    LCPI Class 5C – Affiliate Claims other than those of Participating Debtors against LCPI ..................................................................................... 31

5.9    LCPI Class 6 – Equity Interests in LCPI ................................................ 31

5.10   LBCS Class 1 – Priority Non-Tax Claims against LBCS ..................... 31

5.11   LBCS Class 2 – Secured Claims against LBCS ................................... 32

5.12   LBCS Class 3 – Convenience Claims against LBCS ........................... 32

5.13   LBCS Class 4 – General Unsecured Claims against LBCS ................. 32

5.14   LBCS Class 5A – Affiliate Claims of LBHI against LBCS ................... 32

5.15   LBCS Class 5B – Affiliate Claims of Participating Subsidiary Debtors against LBCS ................................................................................. 33

5.16   LBCS Class 5C – Affiliate Claims other than those of Participating Debtors against LBCS ................................................................................. 33

5.17   LBCS Class 6 – Equity Interests in LBCS ............................................ 33

5.18   LBSF Class 1 – Priority Non-Tax Claims against LBSF ...................... 33

5.19   LBSF Class 2 – Secured Claims against LBSF ................................... 34

5.20   LBSF Class 3 – Convenience Claims against LBSF ............................ 34

5.21   LBSF Class 4A – General Unsecured Claims other than those of the Racers Trusts against LBSF ................................................................. 34

5.22   LBSF Class 4B – General Unsecured Claims of the Racers Trusts against LBSF ............................................................................................. 34

5.23   LBSF Class 5A – Affiliate Claims of LBHI against LBSF .................... 35

5.24   LBSF Class 5B – Affiliate Claims of Participating Subsidiary Debtors against LBSF ................................................................................. 35

5.25   LBSF Class 5C – Affiliate Claims other than those of Participating Debtors against LBSF ................................................................................. 35

5.26   LBSF Class 6 – Equity Interests in LBSF ............................................. 35

5.27   LOTC Class 1 – Priority Non-Tax Claims against LOTC ..................... 36

5.28   LOTC Class 2 – Secured Claims against LOTC ................................... 36

5.29   LOTC Class 3 – Convenience Claims against LOTC ............................ 36

5.30   LOTC Class 4 – General Unsecured Claims against LOTC .................. 36

# TABLE OF CONTENTS
## (continued)

Page

5.31    LOTC Class 5A – Affiliate Claims of LBHI against LOTC ................... 37

5.32    LOTC Class 5B – Affiliate Claims of Participating Subsidiary Debtors against LOTC ................................................................ 37

5.33    LOTC Class 5C – Affiliate Claims other than those of Participating Debtors against LOTC ....................................................... 37

5.34    LOTC Class 6 – Equity Interests in LOTC................................ 37

5.35    LBCC Class 1 – Priority Non-Tax Claims against LBCC..................... 38

5.36    LBCC Class 2 – Secured Claims against LBCC ................................ 38

5.37    LBCC Class 3 – Convenience Claims against LBCC ........................... 38

5.38    LBCC Class 4 – General Unsecured Claims against LBCC.................... 38

5.39    LBCC Class 5A – Affiliate Claims of LBHI against LBCC ................... 39

5.40    LBCC Class 5B – Affiliate Claims of Participating Subsidiary Debtors against LBCC ................................................................ 39

5.41    LBCC Class 5C – Affiliate Claims other than those of Participating Debtors against LBCC ....................................................... 39

5.42    LBCC Class 6 – Equity Interests in LBCC................................ 39

5.43    LBDP Class 1 – Priority Non-Tax Claims against LBDP ..................... 40

5.44    LBDP Class 2 – Secured Claims against LBDP ................................ 40

5.45    LBDP Class 3 – General Unsecured Claims against LBDP ................... 40

5.46    LBDP Class 4A – Affiliate Claims of LBHI against LBDP.................... 40

5.47    LBDP Class 4B – Affiliate Claims other than those of LBHI against LBDP. ..................................................................... 41

5.48    LBDP Class 5 – Equity Interests in LBDP ................................ 41

5.49    LBFP Class 1 – Priority Non-Tax Claims against LBFP ..................... 41

5.50    LBFP Class 2 – Secured Claims against LBFP ................................ 41

5.51    LBFP Class 3 – General Unsecured Claims against LBFP ................... 42

5.52    LBFP Class 4A – Affiliate Claims of LBHI against LBFP ................... 42

5.53    LBFP Class 4B – Affiliate Claims other than those of LBHI against LBFP..................................................................... 42

5.54    LBFP Class 5 – Equity Interests in LBFP ................................ 42

5.55    LB 745 Class 1 – Priority Non-Tax Claims against LB 745 ................... 42

5.56    LB 745 Class 2 – Secured Claims against LB 745 ................................. 43

A314

# TABLE OF CONTENTS
## (continued)

| | | Page |
|---|---|---|
| 5.57 | LB 745 Class 3 – General Unsecured Claims against LB 745 | 43 |
| 5.58 | LB 745 Class 4A – Affiliate Claims of LBHI against LB 745 | 43 |
| 5.59 | LB 745 Class 4B – Affiliate Claims other than those of LBHI against LB 745 | 43 |
| 5.60 | LB 745 Class 5 – Equity Interests in LB 745 | 44 |
| 5.61 | PAMI Statler Class 1 – Priority Non-Tax Claims against PAMI Statler | 44 |
| 5.62 | PAMI Statler Class 2 – Secured Claims against PAMI Statler | 44 |
| 5.63 | PAMI Statler Class 3 – General Unsecured Claims against PAMI Statler | 45 |
| 5.64 | PAMI Statler Class 4A – Affiliate Claims of LBHI against PAMI Statler | 45 |
| 5.65 | PAMI Statler Class 4B – Affiliate Claims other than those of LBHI against PAMI Statler | 45 |
| 5.66 | PAMI Statler Class 5 – Equity Interests in PAMI Statler | 45 |
| 5.67 | CES Class 1 – Priority Non-Tax Claims against CES | 45 |
| 5.68 | CES Class 2 – Secured Claims against CES | 46 |
| 5.69 | CES Class 3 – General Unsecured Claims against CES | 46 |
| 5.70 | CES Class 4A – Affiliate Claims of LBHI against CES | 46 |
| 5.71 | CES Class 4B – Affiliate Claims other than those of LBHI against CES | 46 |
| 5.72 | CES Class 5 – Equity Interests in CES | 47 |
| 5.73 | CES V Class 1 – Priority Non-Tax Claims against CES V | 47 |
| 5.74 | CES V Class 2 – Secured Claims against CES V | 47 |
| 5.75 | CES V Class 3 – General Unsecured Claims against CES V | 47 |
| 5.76 | CES V Class 4A – Affiliate Claims of LBHI against CES V | 48 |
| 5.77 | CES V Class 4B – Affiliate Claims other than those of LBHI against CES V | 48 |
| 5.78 | CES V Class 5 – Equity Interests in CES V | 48 |
| 5.79 | CES IX Class 1 – Priority Non-Tax Claims against CES IX | 48 |
| 5.80 | CES IX Class 2 – Secured Claims against CES IX | 49 |
| 5.81 | CES IX Class 3 – General Unsecured Claims against CES IX | 49 |

**A315**

# TABLE OF CONTENTS
## (continued)

Page

5.82    CES IX Class 4A – Affiliate Claims of LBHI against CES IX .............. 49

5.83    CES IX Class 4B – Affiliate Claims other than those of LBHI against CES IX ................................................................................. 49

5.84    CES IX Class 5 – Equity Interests in CES IX ......................................... 49

5.85    East Dover Class 1 – Priority Non-Tax Claims against East Dover ........ 50

5.86    East Dover Class 2 – Secured Claims against East Dover...................... 50

5.87    East Dover Class 3 – General Unsecured Claims against East Dover................................................................................................. 50

5.88    East Dover Class 4A – Affiliate Claims of LBHI against East Dover................................................................................................. 51

5.89    East Dover Class 4B – Affiliate Claims other than those of LBHI against East Dover ............................................................................ 51

5.90    East Dover Class 5 – Equity Interests in East Dover............................... 51

5.91    LS Finance Class 1 – Priority Non-Tax Claims against LS Finance ....... 51

5.92    LS Finance Class 2 – Secured Claims against LS Finance...................... 52

5.93    LS Finance Class 3 – General Unsecured Claims against LS Finance ................................................................................................ 52

5.94    LS Finance Class 4A – Affiliate Claims of LBHI against LS Finance ................................................................................................ 52

5.95    LS Finance Class 4B – Affiliate Claims other than those of LBHI against LS Finance ............................................................................ 52

5.96    LS Finance Class 5 – Equity Interests in LS Finance ............................. 53

5.97    LUXCO Class 1 – Priority Non-Tax Claims against LUXCO ............... 53

5.98    LUXCO Class 2 – Secured Claims against LUXCO............................... 53

5.99    LUXCO Class 3 – General Unsecured Claims against LUXCO............. 53

5.100   LUXCO Class 4A – Affiliate Claims of LBHI against LUXCO............. 54

5.101   LUXCO Class 4B – Affiliate Claims other than those of LBHI against LUXCO ................................................................................. 54

5.102   LUXCO Class 5 – Equity Interests in LUXCO ...................................... 54

5.103   BNC Class 1 – Priority Non-Tax Claims against BNC ........................... 54

5.104   BNC Class 2 – Secured Claims against BNC ......................................... 55

5.105   BNC Class 3 – General Unsecured Claims against BNC ....................... 55

A316

## TABLE OF CONTENTS
### (continued)

Page

5.106  BNC Class 4A – Affiliate Claims of LBHI against BNC ...................... 55

5.107  BNC Class 4B – Affiliate Claims other than those of LBHI against BNC ...................................................................................................... 55

5.108  BNC Class 5 – Equity Interests in BNC .................................................. 55

5.109  LB Rose Ranch Class 1 – Priority Non-Tax Claims against LB Rose Ranch ............................................................................................. 56

5.110  LB Rose Ranch Class 2 – Secured Claims against LB Rose Ranch ........ 56

5.111  LB Rose Ranch Class 3 – General Unsecured Claims against LB Rose Ranch ............................................................................................. 56

5.112  LB Rose Ranch 4A – Affiliate Claims of LBHI against LB Rose Ranch ................................................................................................ 57

5.113  LB Rose Ranch Class 4B – Affiliate Claims other than those of LBHI against LB Rose Ranch.................................................................. 57

5.114  LB Rose Ranch Class 5 – Equity Interests in LB Rose Ranch ............... 57

5.115  SASCO Class 1 – Priority Non-Tax Claims against SASCO ................. 57

5.116  SASCO Class 2 – Secured Claims against SASCO................................ 58

5.117  SASCO Class 3 – General Unsecured Claims against SASCO.............. 58

5.118  SASCO Class 4A – Affiliate Claims of LBHI against SASCO ............. 58

5.119  SASCO Class 4B – Affiliate Claims other than those of LBHI against SASCO ...................................................................................... 58

5.120  SASCO Class 5 – Equity Interests in SASCO........................................ 58

5.121  LB 2080 Class 1 – Priority Non-Tax Claims against LB 2080 .............. 59

5.122  LB 2080 Class 2 – Secured Claims against LB 2080 ............................. 59

5.123  LB 2080 Class 3 – General Unsecured Claims against LB 2080 ............ 59

5.124  LB 2080 Class 4A – Affiliate Claims of LBHI against LB 2080............ 59

5.125  LB 2080 Class 4B – Affiliate Claims other than those of LBHI against LB 2080 ...................................................................................... 60

5.126  LB 2080 Class 5 – Equity Interests in LB 2080 ..................................... 60

5.127  Merit Class 1 – Priority Non-Tax Claims against Merit......................... 60

5.128  Merit Class 2 – Secured Claims against Merit........................................ 60

5.129  Merit Class 3 – General Unsecured Claims against Merit...................... 61

5.130  Merit Class 4A – Affiliate Claims of LBHI against Merit ..................... 61

## TABLE OF CONTENTS
### (continued)

Page

5.131   Merit Class 4B – Affiliate Claims other than those of LBHI against
        Merit..................................................................................................... 61

5.132   Merit Class 5 – Equity Interests in Merit.............................................. 61

5.133   Preferred Somerset Class 1 – Priority Non-Tax Claims against
        Preferred Somerset............................................................................... 62

5.134   Preferred Somerset Class 2 – Secured Claims against Preferred
        Somerset................................................................................................ 62

5.135   Preferred Somerset Class 3 – General Unsecured Claims against
        Preferred Somerset............................................................................... 62

5.136   Preferred Somerset Class 4A – Affiliate Claims of LBHI against
        Preferred Somerset............................................................................... 62

5.137   Preferred Somerset Class 4B – Affiliate Claims other than those of
        LBHI against Preferred Somerset ......................................................... 63

5.138   Preferred Somerset Class 5 – Equity Interests in Preferred
        Somerset................................................................................................ 63

5.139   Somerset Class 1 – Priority Non-Tax Claims against Somerset.............. 63

5.140   Somerset Class 2 – Secured Claims against Somerset............................ 63

5.141   Somerset Class 3 – General Unsecured Claims against Somerset........... 64

5.142   Somerset Class 4A – Affiliate Claims of LBHI against Somerset .......... 64

5.143   Somerset Class 4B – Affiliate Claims other than those of LBHI
        against Somerset ................................................................................... 64

5.144   Somerset Class 5 – Equity Interests in Somerset.................................... 64

ARTICLE VI         IMPLEMENTATION OF THE PLAN ............................................. 65

6.1     Plan Administrator ................................................................................ 65

6.2     LAMCO .................................................................................................. 66

6.3     Debtor Allocation Agreement ................................................................ 66

6.4     Redistribution of Subordinated Claims Recoveries ................................ 67

6.5     Plan Settlement ..................................................................................... 67

6.6     Closing of Chapter 11 Case ................................................................... 70

6.7     Indenture Trustee and Creditors' Committee Members Fees .................. 70

ARTICLE VII        CORPORATE GOVERNANCE ..................................................... 70

7.1     Corporate Form...................................................................................... 70

A318

# TABLE OF CONTENTS
## (continued)

**Page**

| | | |
|---|---|---|
| 7.2 | LBHI Board of Directors and Officers | 70 |
| 7.3 | Subsidiary Debtor Post-Effective Date Management | 71 |
| 7.4 | Plan Trust. | 72 |
| 7.5 | Corporate Existence | 73 |
| 7.6 | Wind-Down | 73 |
| 7.7 | Certificate of Incorporation and By-Laws | 73 |
| 7.8 | Stock Trading Restrictions | 73 |
| ARTICLE VIII | PROVISIONS REGARDING VOTING AND DISTRIBUTIONS UNDER THE PLAN | 74 |
| 8.1 | Voting of Claims | 74 |
| 8.2 | Nonconsensual Confirmation | 74 |
| 8.3 | Distributions of Available Cash | 74 |
| 8.4 | Disputed Claims Holdback. | 74 |
| 8.5 | Minimum Distribution and Manner of Payment | 75 |
| 8.6 | Distributions Free and Clear | 76 |
| 8.7 | Delivery of Distributions and Undeliverable Distributions | 76 |
| 8.8 | Withholding and Reporting Requirements | 76 |
| 8.9 | Time Bar to Cash Payment Rights | 77 |
| 8.10 | Setoffs and Recoupment | 77 |
| 8.11 | Claims Register | 77 |
| 8.12 | Allocation of Distributions | 77 |
| 8.13 | Maximum Distribution | 77 |
| 8.14 | Rights of Reimbursement | 79 |
| 8.15 | Distributions to Non-Controlled Affiliates | 80 |
| ARTICLE IX | PROCEDURES FOR TREATING DISPUTED CLAIMS | 80 |
| 9.1 | Objections | 80 |
| 9.2 | No Distributions Pending Allowance | 80 |
| 9.3 | Estimation of Claims | 80 |
| 9.4 | Resolution of Disputed Claims | 81 |

**A319**

## TABLE OF CONTENTS
### (continued)

| | | Page |
|---|---|---|

ARTICLE X — LIQUIDATING TRUST .................................................................. 81

10.1    Execution of Liquidating Trust Agreement ........................................... 81

10.2    Purpose of the Liquidating Trust ......................................................... 81

10.3    Liquidating Trust Assets ...................................................................... 81

10.4    Administration of the Liquidating Trust .............................................. 81

10.5    Liquidating Trustee's Tax Power for Debtors ...................................... 82

10.6    Cash Investments .................................................................................. 82

10.7    Distribution of Liquidating Trust Interests .......................................... 82

10.8    Federal Income Tax Treatment of Liquidating Trust .......................... 82

10.9    Tax Reporting ....................................................................................... 82

10.10   Dissolution ........................................................................................... 84

ARTICLE XI — TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES .............................................................................. 84

11.1    Executory Contracts and Unexpired Leases ........................................ 84

11.2    Approval of Assumption and Rejection of Executory Contracts and Unexpired Leases ................................................................................. 85

11.3    Cure of Defaults ................................................................................... 85

11.4    Bar Date for Filing Proofs of Claim Relating to Executory Contracts and Unexpired Leases Rejected Pursuant to the Plan .............. 85

11.5    Insurance Policies ................................................................................ 85

11.6    Indemnification Obligations ................................................................ 86

ARTICLE XII — EFFECTIVENESS OF THE PLAN ............................................ 86

12.1    Conditions Precedent to the Confirmation of the Plan ........................ 86

12.2    Conditions Precedent to the Effective Date of the Plan ...................... 86

12.3    Waiver of Conditions ........................................................................... 86

ARTICLE XIII — EFFECTS OF CONFIRMATION ............................................. 87

13.1    Vesting of Assets ................................................................................. 87

13.2    Binding Effect ...................................................................................... 87

13.3    Release and Exculpation ...................................................................... 87

13.4    Discharge .............................................................................................. 88

13.5    Injunction ............................................................................................. 88

# TABLE OF CONTENTS
## (continued)

Page

13.6 United States Government ............................................................. 89

13.7 Terms of Injunctions or Stays ....................................................... 89

13.8 Retention of Litigation Claims and Reservation of Rights ..................... 89

13.9 Barclays Sale Order. ................................................................... 89

13.10 No Waiver of Rights and Defenses. ................................................ 89

ARTICLE XIV    RETENTION OF JURISDICTION ................................... 90

14.1 Retention of Jurisdiction .............................................................. 90

ARTICLE XV    MISCELLANEOUS PROVISIONS ................................... 91

15.1 Post-Effective Date Role of Creditors' Committee and Fee
Committee ................................................................................ 91

15.2 Issuance of New Securities ........................................................... 92

15.3 Exemption from Securities Laws .................................................... 92

15.4 Exemption from Transfer Taxes ..................................................... 92

15.5 Plan Supplement ....................................................................... 93

15.6 Post-Effective Date Reporting. ...................................................... 93

15.7 Payment of Statutory Fees. .......................................................... 94

15.8 Amendment or Modification of Plan ............................................... 94

15.9 Withdrawal or Revocation of the Plan .............................................. 95

15.10 Courts of Competent Jurisdiction ................................................... 95

15.11 Transactions on Business Days ...................................................... 95

15.12 Notices .................................................................................... 95

15.13 Severability .............................................................................. 96

15.14 Governing Law ......................................................................... 96

15.15 Headings ................................................................................. 96

15.16 Exhibits .................................................................................. 96

15.17 Successors and Assigns ............................................................... 96

A321

## Schedules

Plan Adjustment Percentages.................................................................Schedule 1

Debtors' Claims Schedule..................................................................Schedule 2

Bankhaus Settlement Agreement.......................................................Schedule 3

PSA Creditors ................................................................................Schedule 4

Hong Kong Settlement Agreement....................................................Schedule 5

LBT Settlement Agreement ..............................................................Schedule 6

Singapore Settlement Agreement .....................................................Schedule 7

# ARTICLE I
## Definitions and Construction of Terms

Definitions. As used in the Plan, the following terms shall have the respective meanings specified below:

1.1 **Administrative Expense Claim** means any right to payment constituting a cost or expense of administration of any of the Chapter 11 Cases under sections 503(b) and 507(a)(2) of the Bankruptcy Code, including, without limitation, any actual and necessary expenses of preserving the estates of the Debtors, any actual and necessary expenses of operating the businesses of the Debtors, any indebtedness or obligations incurred or assumed by the Debtors in connection with the conduct of their business from and after the Commencement Date, all compensation and reimbursement of expenses to the extent Allowed by the Bankruptcy Court under sections 330 or 503 of the Bankruptcy Code.

1.2 **Affiliate** shall have the meaning assigned to such term in section 101(2) of the Bankruptcy Code, excluding a Designated Entity.

1.3 **Affiliate Claim** means (a) in the case of LBHI, any Claim asserted by an Affiliate of LBHI, other than an Administrative Expense Claim, a Priority Non-Tax Claim, a Secured Claim, a Senior Affiliate Claim or a Senior Affiliate Guarantee Claim, or (b) in the case of a Subsidiary Debtor, any Claim asserted by an Affiliate of that Subsidiary Debtor, other than an Administrative Expense Claim, a Priority Non-Tax Claim or a Secured Claim.

1.4 **Allowed** means, with reference to any Claim against the Debtors, (a) any Claim that has been listed by the Debtors in their Schedules, as such Schedules may be amended by the Debtors from time to time in accordance with Bankruptcy Rule 1009, as liquidated in amount and not disputed or contingent and for which no contrary proof of claim has been filed, (b) any Claim allowed hereunder, (c) any Claim that is not Disputed, (d) any Claim that is compromised, settled, or otherwise resolved pursuant to the authority granted to the Debtors pursuant to a Final Order of the Bankruptcy Court, including, without limitation, the Derivatives Procedures Order, or under Section 9.4 of the Plan, or (e) any Claim that, if Disputed, has been Allowed by Final Order; *provided*, *however*, that Claims allowed solely for the purpose of voting to accept or reject the Plan pursuant to an order of the Bankruptcy Court shall not be considered "Allowed Claims" hereunder. Unless otherwise specified herein or by order of the Bankruptcy Court, "Allowed Administrative Expense Claim" or "Allowed Claim" shall not, for any purpose under the Plan, include interest on such Administrative Expense Claim or Claim from and after the Commencement Date. For purposes of a Foreign Proceeding, an Allowed Claim includes a Claim that has been accepted or allowed in a Foreign Proceeding by settlement with a Foreign Administrator or Final Order of a court of competent jurisdiction.

1.5 **Available Cash** means (a) all Cash of a Debtor realized from its business operations, the sale or other disposition of its assets, the interest earned on its invested funds, recoveries from Litigation Claims or from any other source or otherwise less (b) the amount of Cash (i) necessary to pay holders of Allowed Administrative Expense Claims, Priority Tax Claims, Priority Non-Tax Claims, Secured Claims, Convenience Claims and Convenience Guarantee Claims against such Debtor in accordance with the Plan, and (ii) estimated and

reserved by such Debtor to (A) adequately fund the reasonable and necessary projected costs to carry out the provisions of the Plan with respect to such Debtor on and after the Effective Date, (B) pay all fees payable under section 1930 of chapter 123 of title 28 of the United States Code and (C) fund and maintain any postpetition reserve requirements in connection with any agreements or otherwise.  Available Cash shall include the applicable portions of (i) excess amounts retained for Disputed Claims that become available in accordance with <u>Section 8.4</u> of the Plan, (ii) amounts represented by undeliverable Distributions in accordance with <u>Section 8.7</u>, or (iii) amounts attributable to voided checks in accordance with <u>Section 8.9</u> of the Plan.

1.6    <u>Avoidance Actions</u> means any actions commenced or that may be commenced before or after the Effective Date pursuant to sections 544, 545, 547, 548, 549, 550, 551 or 553 of the Bankruptcy Code.

1.7    <u>Ballot</u> means the form distributed to each holder of an impaired Claim that is entitled to vote to accept or reject the Plan.

1.8    <u>Bankhaus Settlement Agreement</u> means that certain Amended and Restated Settlement Agreement, dated March 1, 2011, among the Debtors and certain Debtor-Controlled Entities and the LBB Administrator, as amended by that certain Amendment #1, dated March 18, 2011, to the Amended and Restated Settlement Agreement, which are annexed hereto as <u>Schedule 3</u>.

1.9    <u>Bankruptcy Code</u> means title 11 of the United States Code, as amended from time to time, as applicable to the Chapter 11 Cases.

1.10    <u>Bankruptcy Court</u> means the United States Bankruptcy Court for the Southern District of New York having jurisdiction over the Chapter 11 Cases.

1.11    <u>Bankruptcy Rules</u> means the Federal Rules of Bankruptcy Procedure, as promulgated by the United States Supreme Court under section 2072 of title 28 of the United States Code, and any Local Rules of the Bankruptcy Court.

1.12    <u>Barclays Sale Order</u> means the *Order Under 11 U.S.C. § § 105(a), 363, and 365 and Federal Rules of Bankruptcy Procedure 2002, 6004 and 6006 Authorizing and Approving (A) the Sale of Purchased Assets Free and Clear of Liens and Other Interests and (B) Assumption and Assignment of Executory Contracts and Unexpired Leases*, entered by the Bankruptcy Court on September 20, 2008 in the Chapter 11 Cases [Docket No. 258] and the concurrent order entered in the LBI Proceeding on September 19, 2008 [Case No. 08-1420; Docket No. 3].

1.13    <u>Bar Date Order</u> means the *Order Pursuant to Section 502(b)(9) of the Bankruptcy Code and Bankruptcy Rule 3003(c)(3) Establishing the Deadline for Filing Proofs of Claim, Approving the Form and Manner of Notice thereof and Approving the Proof of Claim Form* approved and entered by the Bankruptcy Court on July 2, 2009 [Docket No. 4271], as the same may be amended from time to time.

1.14    <u>BNC</u> means BNC Mortgage LLC.

1.15  <u>Business Day</u> means any day other than a Saturday, a Sunday, and any other day on which commercial banks in New York, New York are required or authorized to close by law or executive order.

1.16  <u>Cash</u> means legal tender of the United States of America.

1.17  <u>Causes of Action</u> means, without limitation, any and all actions, causes of action, controversies, liabilities, obligations, rights, suits, damages, judgments, Claims, and demands whatsoever, whether known or unknown, reduced to judgment, liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, secured or unsecured, assertable directly or derivatively, existing or hereafter arising, in law, equity, or otherwise, based in whole or in part upon any act or omission or other event occurring prior to the Effective Date.

1.18  <u>CES</u> means CES Aviation LLC.

1.19  <u>CES V</u> means CES Aviation V LLC.

1.20  <u>CES IX</u> means CES Aviation IX LLC.

1.21  <u>Chapter 11 Cases</u> means the voluntary cases commenced by the Debtors under chapter 11 of the Bankruptcy Code, which are being jointly administered and are currently pending before the Bankruptcy Court, styled *In re Lehman Brothers Holdings Inc.*, *et al.*, Chapter 11 Case No. 08-13555 (JMP).

1.22  <u>Claim</u> shall have the meaning assigned to such term in section 101(5) of the Bankruptcy Code.

1.23  <u>Class</u> means a category of holders of Claims or Equity Interests as set forth in <u>Article III</u> of the Plan.

1.24  <u>Class 10A Subordinated Notes</u> means, collectively, (a) the Floating Rate Junior Subordinated Deferrable Interest Debentures due 2035 issued pursuant to the Eighth Supplemental Indenture, dated as of August 19, 2005, between LBHI and JPMorgan Chase Bank, as trustee; (b) the Fixed/Floating Rate Subordinated Notes due 2016 Series 5065, issued pursuant to a final term sheet dated as of September 26, 2006 under the Euro Medium-Term Note Program; (c) the Floating Rate Subordinated Notes due 2037 Series EB17, issued pursuant to a final term sheet dated as of January 23, 2007 under the Euro Medium-Term Note Program; (d) the Fixed/Floating Rate Subordinated Notes due 2019 Series 6222, issued pursuant to the final term sheet dated as of February 14, 2007 under the Euro Medium-Term Note Program; and (e) the Floating Rate Subordinated Notes due 2037 Series EB 18, issued pursuant to a final term sheet, dated as of May 30, 2007, under the Euro Medium-Term Note Program.

1.25  <u>Class 10B Subordinated Notes</u> means, collectively, (a) the 6.375% Subordinated Deferrable Interest Debentures due 2052, issued pursuant to the Fourth Supplemental Indenture, dated as of March 17, 2003, between LBHI and JPMorgan Chase Bank, as trustee; (b) the 6.375% Subordinated Deferrable Interest Debentures due October 2052, issued pursuant to the Fifth Supplemental Indenture, dated as of October 31, 2003, between LBHI and JPMorgan Chase Bank, as trustee; (c) the 6.00% Subordinated Deferrable Interest Debentures due 2053, issued

A325

pursuant to the Sixth Supplemental Indenture, dated as of April 22, 2004, between LBHI and JPMorgan Chase Bank, as trustee; (d) the 6.24% Subordinated Deferrable Interest Debentures due 2054, issued pursuant to the Seventh Supplemental Indenture, dated as of January 18, 2005, between LBHI and JPMorgan Chase Bank, as trustee; (e) the 5.75% Subordinated Notes due 2017, issued pursuant to the Ninth Supplemental Indenture, dated as of October 24, 2006, between LBHI and JPMorgan Chase Bank, as trustee; (f) the Fixed and Floating Rate Subordinated Notes Due 2032, issued pursuant to the Tenth Supplemental Indenture, dated as of May 1, 2007, between LBHI and JPMorgan Chase Bank, as trustee; (g) the 6.50% Subordinated Notes Due 2017, issued pursuant to the Thirteenth Supplemental Indenture, dated as of July 19, 2007, between LBHI and The Bank of New York, as trustee; (h) the 6.875% Subordinated Notes Due 2037, issued pursuant to the Fourteenth Supplemental Indenture, dated as of July 19, 2007, between LBHI and The Bank of New York, as trustee; (i) the 6.75% Subordinated Notes Due 2017, issued pursuant to the Fifteenth Supplemental Indenture, dated as of December 21, 2007, between LBHI and The Bank of New York, as trustee; and (j) the 7.50% Subordinated Notes Due 2038, issued pursuant to the Sixteenth Supplemental Indenture, dated as of May 9, 2008, between LBHI and The Bank of New York, as trustee.

1.26   Class 10C Subordinated Notes means, collectively, (a) the 5.707% Remarketable Junior Subordinated Debentures due 2043, issued pursuant to the Eleventh Supplemental Indenture, dated as of May 17, 2007, between LBHI and U.S. Bank National Association, as trustee; and (b) the Floating Rate Remarketable Junior Subordinated Debentures due 2043, issued pursuant to the Twelfth Supplemental Indenture, dated as of May 17, 2007, between LBHI and U.S. Bank National Association, as trustee.

1.27   Closing Date means the date upon which all of the Chapter 11 Cases have been closed in accordance with Section 6.6 of the Plan.

1.28   Collateral means any property or interest in Property of the Estates of the Debtors subject to a Lien to secure the payment of a Claim, which Lien is not subject to avoidance or otherwise invalid and unenforceable under the Bankruptcy Code or applicable non-bankruptcy law.

1.29   Commencement Date means (a) September 15, 2008 with respect to LBHI, (b) September 16, 2008 with respect to LB 745, (c) September 23, 2008 with respect to PAMI Statler, (d) October 3, 2008 with respect to LBCS, LBSF and LOTC, (d) October 5, 2008 with respect to LBDP, LCPI, LBCC, LBFP, CES, CES V, CES IX, East Dover and LS Finance, (e) January 7, 2009 with respect to LUXCO, (f) January 9, 2009 with respect to BNC, (g) February 9, 2009 with respect to SASCO and LB Rose Ranch, (h) April 23, 2009 with respect to LB 2080, (i) December 14, 2009 with respect to Merit, and (j) December 22, 2009 with respect to Somerset and Preferred Somerset.

1.30   Confirmation Date means the date upon which the Bankruptcy Court enters a Confirmation Order on the docket of the Chapter 11 Cases as applicable to each Debtor.

1.31   Confirmation Hearing means the hearing held by the Bankruptcy Court, as the same may be continued from time to time, to consider confirmation of the Plan.

A326

1.32 <u>Confirmation Order</u> means an order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code as applicable to each Debtor.

1.33 <u>Contributing Class</u> means each of LBHI Class 5, LBHI Class 9A, LCPI Class 4A, LCPI Class 4B, LCPI Class 5B, LCPI Class 5C, LBCS Class 4, LBCS Class 5B, LBCS Class 5C, LBSF Class 4A, LBSF Class 5B, LBSF Class 5C, LOTC Class 4, LOTC Class 5B, LOTC Class 5C, LBCC Class 4, LBCC Class 5B and LBCC Class 5C.

1.34 <u>Convenience Claim</u> means any Senior Unsecured Claim or General Unsecured Claim other than a Claim on account of a public debt security issued by LBHI, a Claim asserted by a nominee on behalf of one or more beneficial holders of such Claim or a Claim of a Designated Entity that is (a) Allowed in an amount of fifty thousand dollars ($50,000) or less or (b) Allowed in an amount greater than fifty thousand dollars ($50,000) but which is reduced to fifty thousand dollars ($50,000) (i) by an irrevocable written election by the holder of such Allowed Claim made on a properly delivered Ballot or (ii) pursuant to a settlement agreement between the applicable Debtor and holder of such Claim entered into after the Voting Deadline; *provided, however* that (1) any Claim that was Allowed in excess of fifty thousand dollars ($50,000) may not be subdivided into multiple Claims of fifty thousand dollars ($50,000) or less for purposes of receiving treatment as a Convenience Claim, (2) Claims in the same Class held by a Creditor shall be aggregated for purposes of determining whether such Claims are eligible to be Convenience Claims, (3) Claims acquired after the Commencement Date shall not be aggregated unless such Claims are in the same Classes, are held by a Creditor and were originally held by one Creditor, and (4) Claims held by a Creditor prior to the Commencement Date shall not be aggregated with Claims acquired by such Creditor after the Commencement Date.

1.35 <u>Convenience Guarantee Claim</u> means any Senior Third-Party Guarantee Claim or Third-Party Guarantee Claim other than a Claim on account of a public debt security issued by LBHI, a Claim asserted by a nominee on behalf of one or more beneficial holders of such Claim or a Claim of a Designated Entity that is (a) Allowed in an amount of fifty thousand dollars ($50,000) or less or (b) Allowed in an amount greater than fifty thousand dollars ($50,000) but which is reduced to fifty thousand dollars ($50,000) (i) by an irrevocable written election by the holder of such Allowed Claim made on a properly delivered Ballot or (ii) pursuant to a settlement agreement between the applicable Debtor and holder of such Claim entered into after the Voting Deadline; *provided, however* that (1) any Claim that was Allowed in excess of fifty thousand dollars ($50,000) may not be subdivided into multiple Claims of fifty thousand dollars ($50,000) or less for purposes of receiving treatment as a Convenience Guarantee Claim, (2) Claims in the same Class held by a Creditor shall be aggregated for purposes of determining whether such Claims are eligible to be Convenience Guarantee Claims, (3) Claims acquired after the Commencement Date shall not be aggregated unless such Claims are in the same Classes, are held by a Creditor and were originally held by one Creditor, and (4) Claims held by a Creditor prior to the Commencement Date shall not be aggregated with Claims acquired by such Creditor after the Commencement Date.

1.36 <u>Creditor</u> shall have the meaning assigned to such term in section 101(10) of the Bankruptcy Code.

1.37    Creditors' Committee means the statutory committee of unsecured creditors appointed in the Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code.

1.38    Debtor means BNC, CES, CES V, CES IX, East Dover, LB 745, LB 2080, LB Rose Ranch, LBCC, LBCS, LBDP, LBFP, LBHI, LBSF, LCPI, LOTC, LS Finance, LUXCO, Merit, PAMI Statler, Preferred Somerset, SASCO and Somerset, each in its individual capacity as debtor and debtor in possession in its Chapter 11 Case pursuant to sections 101(13), 1107(a) and 1108 of the Bankruptcy Code.

1.39    Debtor Allocation Agreement means the agreement contained in the Plan Supplement among two or more of the Debtors that identifies, allocates and sets forth other agreed rights and obligations with respect to (a) the costs and benefits of Jointly Owned Litigation Claims, (b) commonly held tax benefits and obligations, (c) expenses of administration of the Chapter 11 Cases, and (d) certain other inter-Debtor related issues.

1.40    Debtors' Claims Schedule means the schedule attached hereto as Schedule 2 setting forth the amounts of Senior Affiliate Claims, Senior Affiliate Guarantee Claims or Affiliate Claims, as applicable, of a Debtor against another Debtor.

1.41    Debtor-Controlled Entity means a non-Debtor Affiliate of the Debtors that is managed and controlled by a Debtor as of the Effective Date.

1.42    Designated Entity means each of the Racers Trusts and the holder of the Fenway Claims.

1.43    Derivatives Procedures Order means the *Order Pursuant to Sections 105 and 365 of the Bankruptcy Code to Establish Procedures for the Settlement or Assumption or Assignment of Prepetition Derivatives Contracts*, approved and entered by the Bankruptcy Court on December 16, 2008 [Docket No. 2257], as amended or may be amended from time to time.

1.44    Director Selection Committee means the committee established pursuant to Section 7.2(b) of the Plan, the members of which are identified in the Plan Supplement.

1.45    Disclosure Statement means that certain disclosure statement relating to the Plan, including, without limitation, all exhibits and schedules thereto, as approved by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code.

1.46    Disputed means, with reference to any Claim, (a) any Claim proof of which was timely and properly filed that is (i) disputed in whole or in part under the Plan, including, without limitation, any Senior Affiliate Claim, Senior Affiliate Guarantee Claim or Affiliate Claim that is not Allowed in accordance with Section 6.5(b) of the Plan, or (ii) as to which a timely objection and/or request for estimation has been interposed, which objection and/or request for estimation has not been withdrawn or determined by a Final Order, or (b) any Claim, proof of which was required to be filed by the Bar Date Order or another Final Order of the Bankruptcy Court in a form and manner proscribed in such order, but as to which a proof of Claim was not timely or properly filed.

1.47    Distribution means any initial or subsequent payment or transfer made under the Plan.

1.48    Distribution Date means any date on which a Distribution is made upon at least thirty (30) Business Days written notice filed on the docket of the Chapter 11 Cases or otherwise communicated to holders of Allowed Claims.

1.49    East Dover means East Dover Limited.

1.50    Effective Date means the first Business Day on which the conditions to effectiveness of the Plan set forth in Article XII have been satisfied or waived and on which the Plan shall become effective with respect to a Debtor.

1.51    Equity Interest means (a) shares of common stock, preferred stock, other forms of ownership interest, or any other equity security (as defined in section 101(16) of the Bankruptcy Code) in any Debtor that was in existence immediately prior to or on the Commencement Date for such Debtor, and (b) Allowed Claims against LBHI arising out of, relating to, or in connection with any of the foregoing that are subject to section 510(b) of the Bankruptcy Code.

1.52    Excess LBSF Settlement Amount means the Distributions, if any, made in accordance with the last sentence of Section 6.5(f) of the Plan to holders of Allowed Claims in LBSF Class 5A in the event holders of Allowed Claims in LBSF Class 4A are satisfied in full.

1.53    Excess LCPI Settlement Amount means the Distributions, if any, made in accordance with the last sentence of Section 6.5(e) of the Plan to holders of Allowed Claims in LCPI Class 5A in the event holders of Allowed Claims in LCPI Class 4A are satisfied in full.

1.54    Excess Plan Adjustment means the Distributions (including the Plan Adjustment), if any, made in accordance with the last sentence of Section 6.5(a) of the Plan in the event that holders of Allowed Claims in an LBHI Class 3 or LBHI Class 7 are satisfied in full to Participating Debtors for the exclusive benefit of (i) holders of Allowed Claims in such Participating Debtors' Contributing Classes and, in addition to the foregoing, (ii) (A) in the case of LBHI, LBHI Class 9B or (B) in the case of LBSF, LBSF Class 4B.

1.55    Excess Plan Adjustment Portion means, with respect to each Contributing Class and LBHI Class 9B and LBSF Class 4B, (a) if the Excess Plan Adjustment is equal to the Plan Adjustment, the portion of the Plan Adjustment contributed by such Contributing Class, LBHI Class 9B or LBSF Class 4B and (b) if the Excess Plan Adjustment is less than the Plan Adjustment, the portion of the Excess Plan Adjustment that bears the same relationship to the Excess Plan Adjustment as the portion of the Plan Adjustment contributed by such Contributing Class, LBHI Class 9B or LBSF Class 4B bears to the Plan Adjustment, contributed by all Contributing Classes and LBHI Class 9B and LBSF Class 4B.

1.56    Fenway Claim means the Claim asserted by LBHI in connection with the Fenway transaction, which shall be Allowed in accordance with Section 6.5(h) of the Plan.

1.57    Final Order means an order of the Bankruptcy Court or any other court of competent jurisdiction as to which the time to appeal, petition for certiorari, or move for

reargument or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for reargument or rehearing shall then be pending or as to which any right to appeal, petition for certiorari, reargue, or rehear shall have been waived in writing in form and substance satisfactory to the Debtors or, in the event that an appeal, writ of certiorari, or reargument or rehearing thereof has been sought, such order of the Bankruptcy Court or other court of competent jurisdiction shall have been determined by the highest court to which such order was appealed, or certiorari, reargument, or rehearing shall have been denied and the time to take any further appeal, petition for certiorari, or move for reargument or rehearing shall have expired; *provided*, *however*, that the possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules or applicable law, may be filed with respect to such order shall not cause such order not to be a Final Order.

1.58    Foreign Administrator means each of the persons or entities that is managing the affairs and representing the insolvency estate of a Non-Controlled Affiliate that is subject to a Foreign Proceeding.

1.59    Foreign Proceeding means an insolvency, administration, liquidation, rehabilitation, receivership or like proceeding commenced by or initiated against a Non-Controlled Affiliate in a jurisdiction outside of the United States.

1.60    General Unsecured Claim means, (a) in the case of LBHI, any Claim other than an Administrative Expense Claim, a Priority Tax Claim, a Priority Non-Tax Claim, a Secured Claim, a Senior Unsecured Claim, a Senior Affiliate Claim, a Senior Affiliate Guarantee Claim, a Senior Third-Party Guarantee Claim, an Affiliate Claim, a Third-Party Guarantee Claim, a Subordinated Claim or a Section 510(b) Claim, or (b) in the case of each Subsidiary Debtor, any Claim other than an Administrative Expense Claim, a Priority Tax Claim, a Priority Non-Tax Claim, a Secured Claim or an Affiliate Claim.

1.61    Governmental Unit shall have the meaning assigned to such term in section 101(27) of the Bankruptcy Code.

1.62    Guarantee Claim means a Claim asserted against LBHI on the basis of a guarantee, promise, pledge, indemnity or similar agreement by LBHI (a) to satisfy an obligation or liability of another entity or (b) with respect to asset values, collection or net worth of another entity.

1.63    Hong Kong Lehman Entities In Liquidation shall have the meaning assigned to such term in the Hong Kong Settlement Agreement.

1.64    Hong Kong Settlement Agreement means that certain Settlement and Plan Support Agreement, dated July 31, 2011, among the Debtors and the Hong Kong Lehman Entities In Liquidation, which is annexed hereto as Schedule 5.

1.65    Independent Directors means Michael L. Ainslie, John F. Akers, Roger S. Berlind, Thomas H. Cruikshank, Marsha Johnson Evans, Sir Christopher Gent, Jerry A. Grundhofer, Roland A. Hernandez, Henry Kaufman and John D. Macomber.

1.66 <u>Intercompany Funding Balance</u> means that portion of LBHI's Claim against a Subsidiary Debtor, in the amount reflected on page 3 of the Debtors' Claims Schedule, that relates to the funding of operations of such Subsidiary Debtor but does not relate to specific transactions, such as derivative contracts or repurchase agreements.

1.67 <u>IRS</u> means the Internal Revenue Service.

1.68 <u>Jointly Owned Litigation Claims</u> means any Litigation Claims that may be, are or are asserted to be owned, either jointly or individually, by one or more of the Debtors.

1.69 <u>LAMCO</u> means LAMCO Holdings LLC and its subsidiary Affiliates.

1.70 <u>LB 745</u> means LB 745 LLC.

1.71 <u>LB 2080</u> means LB 2080 Kalakaua Owners LLC.

1.72 <u>LBB</u> means Lehman Brothers Bankhaus AG (in Insolvenz).

1.73 <u>LBB Administrator</u> means Dr. Michael C. Frege in his capacity as insolvency administrator (*Insolvenzverwalter*) of LBB.

1.74 <u>LBCC</u> means Lehman Brothers Commercial Corporation.

1.75 <u>LBCS</u> means Lehman Brothers Commodities Services Inc.

1.76 <u>LBDP</u> means Lehman Brothers Derivative Products Inc.

1.77 <u>LBFP</u> means Lehman Brothers Financial Products Inc.

1.78 <u>LBHI</u> means Lehman Brothers Holdings Inc.

1.79 <u>LBHI Stock</u> means the common or preferred stock of LBHI outstanding on the Effective Date.

1.80 <u>LBI</u> means Lehman Brothers Inc.

1.81 <u>LBI Proceeding</u> means the proceeding commenced under the Securities Investor Protection Act of 1970, as amended, with respect to LBI.

1.82 <u>LB Rose Ranch</u> means LB Rose Ranch LLC.

1.83 <u>LBSF</u> means Lehman Brothers Special Financing Inc.

1.84 <u>LBSF Additional Settlement Amount</u> means the first $70 million that is recovered by LBSF in respect of "Total Assets" in excess of $14,156,000,000, the amount of "Total Assets" of LBSF estimated in Exhibit 4 to the Disclosure Statement, dated June 29, 2011, which shall be distributed to only holders of Allowed Claims in LBSF Class 4A and LBSF Class 5C in accordance with <u>Section 6.5(d)</u> of the Plan.

A331

1.85    LBSF Settlement Amount means the first $100 million of Distributions made to LBHI on account of its Allowed Affiliate Claim against LBSF that shall be automatically redistributed in accordance with Section 6.5(f) of the Plan.

1.86    LBSN means Lehman Brothers Securities N.V.

1.87    LBT means Lehman Brothers Treasury Co. B.V.

1.88    LBT Trustees means Rutger J. Schimmelpenninck and Frédéric Verhoeven, in their capacity as bankruptcy trustees (*curatoren*) for LBT.

1.89    LBT Settlement Agreement that certain Settlement Agreement, dated August 30, 2011, among the Debtors and the LBT Trustees, which is annexed hereto as Schedule 6.

1.90    LCPI means Lehman Commercial Paper Inc.

1.91    LCPI Settlement Amount means the first $100 million of Distributions made to LBHI on account of its Allowed Affiliate Claim against LCPI that shall be automatically redistributed in accordance with Section 6.5(e) of the Plan.

1.92    Lehman means LBHI together with all of its direct and indirect Affiliates existing on or after the LBHI Commencement Date.

1.93    Lehman ALI means Lehman ALI Inc.

1.94    Lehman Singapore Entities means the Lehman Singapore Liquidation Companies and the Lehman Singapore Non-Liquidation Companies as such terms are defined in the Singapore Settlement Agreement.

1.95    Lien shall have the meaning assigned to such term in section 101(37) of the Bankruptcy Code.

1.96    Liquidating Trust means a trust that may be created after the Effective Date in accordance with the provisions of Article X of the Plan and a Liquidating Trust Agreement for the benefit of holders of Allowed Claims or Equity Interests and as determined by the Plan Administrator consistent with the purposes of any such Liquidating Trust pursuant to Section 10.2 of the Plan.

1.97    Liquidating Trust Agreement means an agreement evidencing the terms and provisions governing a Liquidating Trust that shall be entered into prior to the establishment of such Liquidating Trust and pursuant to which a Liquidating Trustee shall manage and administer Liquidating Trust Assets.

1.98    Liquidating Trust Assets means the assets of a Debtor or Debtor-Controlled Entity to be transferred to a Liquidating Trust as may be determined by the Plan Administrator, which shall be described in a Liquidating Trust Agreement.

1.99   Liquidating Trust Beneficiaries means those holders of Allowed Claims against or Equity Interests in a Debtor to the extent such holders receive Liquidating Trust Interests.

1.100   Liquidating Trustee means the person or entity appointed by the Plan Administrator prior to the creation of a Liquidating Trust to administer such Liquidating Trust in accordance with the provisions of Article X of the Plan and a Liquidating Trust Agreement; provided, however, that under no circumstance shall a Liquidating Trustee be a director or officer with respect to any entity over which the Liquidating Trust has control.

1.101   Liquidating Trust Interests means the non-certificated beneficial interests of a Liquidating Trust allocable to holders of Allowed Claims and/or Equity Interests in accordance with the terms and conditions of a Liquidating Trust Agreement, which may or may not be transferable.

1.102   Litigation Claims means any and all Causes of Action held by a Debtor.

1.103   LOTC means Lehman Brothers OTC Derivatives Inc.

1.104   LS Finance means Lehman Scottish Finance L.P.

1.105   LUXCO means Luxembourg Residential Properties Loan Finance S.a.r.l.

1.106   Merit means Merit, LLC.

1.107   New Securities means the securities that may be distributed by a Debtor or Debtor-Controlled Entity after the Effective Date to the holders of Allowed Claims against or Equity Interests in such Debtor representing an interest in an existing or newly formed entity of a Debtor or Debtor-Controlled Entity pursuant to and in a manner consistent with Section 15.2 of the Plan.

1.108   Non-Controlled Affiliate means an Affiliate of the Debtors that is not currently managed and controlled by a Debtor as of the Effective Date, including, without limitation, all Affiliates that are subject to a Foreign Proceeding and LBI.

1.109   Opco Plan Proponents means those entities that are "Non-Consolidation Plan Proponents," as identified in Schedule A to the *Joint Chapter 11 Plan For Lehman Brothers Holdings Inc. and Its Affiliated Debtors Other Than Merit, LLC, LB Somerset, LLC and LB Preferred Somerset LLC Proposed by Non-Consolidation Plan Proponents*, filed on April 25, 2011 [Docket No. 16229], that have Claims against LBSF and LCPI.

1.110   Ordinary Course Professional Order means the *Amended Order Pursuant to Sections 105(a), 327, 328, and 330 of the Bankruptcy Code Authorizing the Debtors to Employ Professionals Utilized in the Ordinary Course of Business*, approved and entered by the Bankruptcy Court on March 25, 2010 [Docket No. 7822], as the same may be amended from time to time.

1.111   PAMI Statler means PAMI Statler Arms LLC.

1.112   Participating Debtors means LBHI together with each of the Participating Subsidiary Debtors.

1.113   Participating Subsidiary Debtor means LCPI, LBSF, LOTC, LBCC or LBCS.

1.114   Plan means, collectively, the chapter 11 plans of each of the Debtors, and (where specified herein) individually, the chapter 11 plan of each Debtor, including, without limitation, the Plan Supplement and all exhibits, supplements, appendices, and schedules hereto, either in its present form or as each of the foregoing may be altered, amended or modified from time to time.

1.115   Plan Administrator means LBHI pursuant to the authority granted in Section 6.1 of the Plan.

1.116   Plan Adjustment means the sum of (a) the Racers Adjustment and (b) the sum of (i) each of the Distributions (excluding Distributions on account of the LBSF Settlement Amount, the LBSF Additional Settlement Amount and the LCPI Settlement Amount) made to holders of Allowed Claims in each Contributing Class, multiplied by (ii) the Plan Adjustment Percentage applicable to each such Contributing Class, that shall be redistributed in accordance with Section 6.5(a) of the Plan.

1.117   Plan Adjustment Percentage means the percentage applicable to a Contributing Class of a Participating Debtor as set forth on Schedule 1 hereto.

1.118   Plan Supplement means the document containing the forms of documents specified in Section 15.5 of the Plan.

1.119   Plan Support Agreement means an agreement to support the Plan that has been or will be executed by a PSA Creditor.

1.120   Plan Trust means the trust established under New York law to hold the Plan Trust Stock on and after the Effective Date.

1.121   Plan Trust Agreement means the agreement contained in the Plan Supplement creating and setting forth the terms and conditions that shall govern the Plan Trust.

1.122   Plan Trust Stock means one new share of LBHI common stock to be issued to the Plan Trust upon cancellation of the LBHI Stock in accordance with Section 4.17(b) of the Plan.

1.123   Plan Trustee means any of the persons acting as trustee of the Plan Trust pursuant to Section 7.4 of the Plan.

1.124   Preferred Somerset means LB Preferred Somerset LLC.

1.125   Primary Claim means a Claim against a Primary Obligor for which a corresponding Guarantee Claim has been asserted.

1.126   Primary Obligor means an entity other than LBHI that is purportedly obligated or liable on a Claim with respect to which a Guarantee Claim has been asserted.

1.127   <u>Priority Non-Tax Claim</u> means any Claim, other than an Administrative Expense Claim or a Priority Tax Claim, entitled to priority in payment under section 507(a) of the Bankruptcy Code or, to the extent applicable, 12 U.S.C. § 4617(b)(15).

1.128   <u>Priority Tax Claim</u> means any Claim of a Governmental Unit of the kind entitled to priority in payment as specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code.

1.129   <u>Property of the Estate</u> means all property of a Debtor pursuant to section 541 of the Bankruptcy Code.

1.130   <u>Pro Rata Share</u> means with respect to an Allowed Claim or Equity Interest (a) within the same Class, the proportion that an Allowed Claim or Equity Interest bears to the sum of all Allowed Claims and Disputed Claims or Allowed Equity Interests and Disputed Equity Interests within such Class, or (b) among all Classes, the proportion that a Class of Allowed Claims bears to the sum of all Allowed Claims and Disputed Claims; *provided*, *however*, that Administrative Expense Claims, Priority Tax Claims, Priority Non-Tax Claims, Secured Claims, Convenience Claims, Convenience Guarantee Claims and section 510(b) Claims shall not be considered for purposes of "Pro Rata Share" among all Classes; *provided*, *further*, *however*, that only the following Claims shall be considered in the determination of "Pro Rata Share" among all Classes with respect to the following Distributions:

(i)   Available Cash in the case of LBHI:  Senior Unsecured Claims, Senior Affiliate Claims, Senior Affiliate Guarantee Claims, Senior Third-Party Guarantee Claims, General Unsecured Claims, Affiliate Claims, Third-Party Guarantee Claims and Subordinated Claims.

(ii)   Available Cash in the case of a Subsidiary Debtor:  General Unsecured Claims and Affiliate Claims.

(iii)   LBSF Settlement Amount: General Unsecured Claims against LBSF other than Claims of any of the Racers Trusts.

(iv)   LBSF Additional Settlement Amount: (1) General Unsecured Claims against LBSF other than Claims of any of the Racers Trusts, and (2) Affiliate Claims against LBSF other than Claims of any of the Participating Debtors.

(v)   LCPI Settlement Amount:  General Unsecured Claims against LCPI other than Claims of any Designated Entity.

(vi)   Plan Adjustment:  Senior Unsecured Claims against LBHI and General Unsecured Claims against LBHI.

(vii)   Subordinated Class 10A Distribution:  Senior Unsecured Claims and Senior Affiliate Claims.

(viii)   Subordinated Class 10B Distribution:  Senior Unsecured Claims, Senior Affiliate Claims, Senior Affiliate Guarantee Claims and Senior Third-Party Guarantee Claims.

A335

(ix)     Subordinated Class 10C Distribution:  Senior Unsecured Claims, Senior Affiliate Claims, Senior Affiliate Guarantee Claims, Senior Third-Party Guarantee Claims, Subordinated Class 10A Claims and Subordinated Class 10B Claims.

1.131   <u>PSA Creditor</u> means any Creditor identified on <u>Schedule 4</u> (as the same may be amended from time to time) that is a party to a Plan Support Agreement with the Debtors that has not been terminated, and the Ad Hoc Group of Lehman Brothers Creditors, and each former, current and future member thereof that executes a Plan Support Agreement prior to the hearing to consider approval of the Disclosure Statement, and each of its officers, directors, managers, members, accountants, financial advisors, investment bankers, agents, restructuring advisors, attorneys, representatives or other professionals serving during the pendency of the Chapter 11 Cases (solely in their capacity as officers, directors, managers, members, accountants, financial advisors, investment bankers, agents, restructuring advisors, attorneys, representatives or other professionals serving during the pendency of the Chapter 11 Cases).

1.132   <u>Racers 2007-A Trust</u> means the Restructured Assets with Enhanced Returns Series 2007-A Trust.

1.133   <u>Racers Adjustment</u> means the Distributions made to the Racers 2007-A Trust on account of (a) in the case of LBSF, $1 billion of its Allowed Claim against LBSF or (b) in the case of LBHI, $1 billion of its Allowed Guarantee Claim against LBHI.

1.134   <u>Racers MM Trust</u> means the Restructured Assets with Enhanced Returns 2007-7-MM Trust.

1.135   <u>Racers Trusts</u> means the Racers 2007-A Trust and the Racers MM Trust.

1.136   <u>Released Parties</u> means, collectively, and in each case, solely in such capacity, the Debtors, the Independent Directors, the Plan Administrator, the Creditors' Committee, each current and former member of the Creditors' Committee and, with respect to each of the foregoing, their respective officers, directors, managers, members, accountants, financial advisors, investment bankers, agents, restructuring advisors, attorneys, representatives or other professionals serving during the pendency of the Chapter 11 Cases (solely in their capacity as officers, directors, managers, members, accountants, financial advisors, investment bankers, agents, restructuring advisors, attorneys, representatives or other professionals serving during the pendency of the Chapter 11 Cases).

1.137   <u>SASCO</u> means Structured Asset Securities Corporation.

1.138   <u>Schedules</u> means the schedules of assets and liabilities, schedules of current income and current expenditures and the statements of financial affairs filed by the Debtors as required by section 521 of the Bankruptcy Code and Bankruptcy Rule 1007, including any supplements or amendments thereto through the Confirmation Date.

1.139   <u>Secured Claim</u> means any Claim (a) to the extent reflected in the Schedules or upon a proof of Claim as a Secured Claim, which is secured by a Lien on Collateral to the extent of the value of such Collateral, as determined in accordance with section 506(a) of the

A336

Bankruptcy Code or (b) that is subject to a valid right of setoff pursuant to section 553 of the Bankruptcy Code.

1.140   Section 510(b) Claim means any Claim against LBHI that is subject to section 510(b) of the Bankruptcy Code other than any Claim arising out of, relating to, or in connection with Equity Interests in LBHI.

1.141   Senior Affiliate Claim means any Claim asserted by an Affiliate of LBHI that is entitled to a contractual right of priority in payment to all Subordinated Claims (excluding an "Other Financial Obligation" as defined in the Class 10B Subordinated Notes or Class 10C Subordinated Notes), other than a Senior Affiliate Guarantee Claim.

1.142   Senior Affiliate Guarantee Claim means any Guarantee Claim asserted by an Affiliate of LBHI that is entitled to a contractual right of priority in payment to Subordinated Class 10B Claims and Subordinated Class 10C Claims, but not Subordinated Class 10A Claims (excluding an "Other Financial Obligation" as defined in the Class 10B Subordinated Notes or Class 10C Subordinated Notes).

1.143   Senior Notes means, collectively, the various notes issued by LBHI as to which Wilmington Trust Co. serves as indenture trustee.

1.144   Senior Third-Party Guarantee Claim means any Guarantee Claim asserted by a third-party that is not an Affiliate of LBHI that is entitled to a contractual right of priority in payment to Subordinated Class 10B Claims and Subordinated Class 10C Claims, but not Subordinated Class 10A Claims (excluding an "Other Financial Obligation" as defined in the Class 10B Subordinated Notes or Class 10C Subordinated Notes).

1.145   Senior Unsecured Claim means any Claim against LBHI that is entitled to a contractual right of priority in payment to all Subordinated Claims (excluding an "Other Financial Obligation" as defined in the Class 10B Subordinated Notes or Class 10C Subordinated Notes), other than a Senior Affiliate Claim, Senior Affiliate Guarantee Claim and Senior Third-Party Guarantee Claim.

1.146   Singapore Settlement Agreement means that certain Settlement Agreement, dated August 24, 2011, among the Debtors, certain Debtor-Controlled Entities and the Lehman Singapore Entities, which is annexed hereto as Schedule 7.

1.147   SIPA Trustee means James W. Giddens as trustee appointed under the Securities Investor Protection Act of 1970 to administer LBI's estate.

1.148   Somerset means LB Somerset LLC.

1.149   Stock Trading Restrictions Order means the *Order Pursuant to Sections 105(a) and 362 of the Bankruptcy Code Approving Restrictions on Certain Transfers of Interests in the Debtors' Estates and Establishing Notification Procedures Relating Thereto* [Docket No. 1386], as the same may be amended from time to time.

1.150   Structured Securities Claims means the Claims against LBHI arising out of structured securities issued or guaranteed by LBHI, which Claims are listed in Exhibit A to the Structured Securities Motion.

1.151   Structured Securities Motion means the *Motion Pursuant to Sections 105(a) and 502(b) of the Bankruptcy Code and Bankruptcy Rule 9019 for Approval of Procedures for Determining the Allowed Amount of Claims Filed Based on Structured Securities Issued or Guaranteed by Lehman Brothers Holdings Inc.*, filed substantially contemporaneously with the Plan.

1.152   Structured Securities Order means an order of the Bankruptcy Court granting the Structured Securities Motion and approving the procedures for the allowance of Structured Securities Claims pursuant to the Structured Securities Valuation Methodologies.

1.153   Structured Securities Valuation Methodologies means the methodologies annexed as Exhibit 11 to the Disclosure Statement for the valuation of Structured Securities Claims.

1.154   Subordinated Class 10A Distribution means the total Distribution that would have been made to holders of Allowed Subordinated Class 10A Claims but for the reallocation of such Distribution pursuant to Section 6.4 of the Plan.

1.155   Subordinated Class 10B Distribution means the total Distribution that would have been made to holders of Allowed Subordinated Class 10B Claims but for the reallocation of such Distribution pursuant to Section 6.4 of the Plan.

1.156   Subordinated Class 10C Distribution means the total Distribution that would have been made to holders of Allowed Subordinated Class 10C Claims but for the reallocation of such Distribution pursuant to Section 6.4 of the Plan.

1.157   Subordinated Claim means any Subordinated Class 10A Claim, Subordinated Class 10B Claim or Subordinated Class 10C Claim.

1.158   Subordinated Class 10A Claim means any Claim against LBHI arising under the Class 10A Subordinated Notes.

1.159   Subordinated Class 10B Claim means any Claim against LBHI arising under the Class 10B Subordinated Notes.

1.160   Subordinated Class 10C Claim means any Claim against LBHI arising under the Class 10C Subordinated Notes.

1.161   Subordinated Notes means, collectively, the Class 10A Subordinated Notes, Class 10B Subordinated Notes and Class 10C Subordinated Notes.

1.162   Subsidiary Debtor means each of the Debtors other than LBHI.

1.163   Third-Party Guarantee Claim means any Guarantee Claim asserted by an entity that is not an Affiliate of LBHI other than a Senior Third-Party Guarantee Claim.

1.164   Voting Deadline means the date fixed by the Bankruptcy Court as the last date upon which holders of Claims may vote to accept or reject the Plan

Rules of Construction.   Wherever from the context it appears appropriate, each term stated in either the singular or the plural shall include both the singular and the plural and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and neuter.   Unless otherwise specified, all section, article, schedule, or exhibit references in the Plan are to the respective Section in, Article of, Schedule to, or Exhibit to, the Plan.   The words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to the Plan as a whole and not to any particular section, subsection, or clause contained in the Plan.   The rules of construction contained in section 102 of the Bankruptcy Code shall apply to the construction of the Plan.   The headings in the Plan are for convenience of reference only and shall not limit or otherwise affect the provisions of the Plan.

## ARTICLE II
## Treatment of Administrative
## Expense Claims and Priority Tax Claims

2.1   Administrative Expense Claims.   Except to the extent that a holder of an Allowed Administrative Expense Claim has been paid by a Debtor prior to the Effective Date or agrees to less favorable treatment, each holder of an Allowed Administrative Expense Claim shall receive Cash from the Debtor obligated for the payment of such Allowed Administrative Expense Claim in an amount equal to the Allowed amount of such Administrative Expense Claim on the later of the Effective Date and the date such Administrative Expense Claim becomes an Allowed Administrative Expense Claim, or as soon thereafter as is practicable; *provided*, *however*, that Allowed Administrative Expense Claims representing liabilities incurred in the ordinary course of business by a Debtor or other obligations incurred by such Debtor shall be paid in full and performed by such Debtor in the ordinary course of business in accordance with the terms and subject to the conditions of any agreements governing, instruments evidencing, or other documents relating to such transactions.

2.2   Professional Compensation and Reimbursement Claims.   Other than a professional retained by the Debtors pursuant to the Ordinary Course Professional Order, any entity seeking an award of the Bankruptcy Court of compensation for services rendered and/or reimbursement of expenses incurred on behalf of the Debtors and the Creditors' Committee through and including the Effective Date under section 105(a), 363(b), 503(b)(2), 503(b)(3), 503(b)(4) or 503(b)(5) of the Bankruptcy Code shall (a) file its final application for allowance of such compensation and/or reimbursement by no later than the date that is 120 days after the Effective Date or such other date as may be fixed by the Bankruptcy Court, and (b) be paid by or on behalf of the Debtor in full and in Cash in the amounts Allowed upon (i) the date the order granting such award becomes a Final Order, or as soon thereafter as practicable, or (ii) such other terms as may be mutually agreed upon by the claimant and the Debtor obligated for the payment of such Allowed Claim.   The Debtors are authorized to pay compensation for professional services rendered and reimburse expenses incurred on behalf of the Debtors and the Creditors' Committee after the Effective Date in the ordinary course and without Bankruptcy Court approval.

A339

2.3   <u>Priority Tax Claims</u>.   Except to the extent that a holder of an Allowed Priority Tax Claim has been paid prior to the Effective Date or agrees to less favorable treatment, each holder of an Allowed Priority Tax Claim shall receive from one or more of the Debtors obligated for the payment of such Allowed Priority Tax Claim, and at the sole option of such Debtor(s), (i) Cash in an amount equal to the Allowed amount of such Priority Tax Claim on the later of the Effective Date and the date such Priority Tax Claim becomes an Allowed Priority Tax Claim, or as soon thereafter as is practicable, or (ii) equal Cash payments to be made initially on the Effective Date or as soon thereafter as practicable and semi-annually thereafter in an aggregate amount equal to such Allowed Priority Tax Claim, together with interest at a fixed annual rate determined under applicable non-bankruptcy law, over a period from the Effective Date through the fifth (5th) anniversary after the Commencement Date; *provided*, *however*, that such election shall be without prejudice to the Debtor's right to prepay such Allowed Priority Tax Claim in full or in part without penalty.

**ARTICLE III**
**<u>Classification Of Claims And Equity Interests</u>**

Claims against the Debtors, other than Administrative Expense Claims and Priority Tax Claims, and Equity Interests are classified for all purposes (unless otherwise specified), including voting and Distribution pursuant to the Plan, as follows:

3.1   <u>LBHI</u>

| <u>Class</u> | <u>Designation</u> | <u>Impairment</u> | <u>Entitlement to Vote</u> |
|---|---|---|---|
| 1 | Priority Non-Tax Claims | Impaired | Yes |
| 2 | Secured Claims | Impaired | Yes |
| 3 | Senior Unsecured Claims | Impaired | Yes |
| 4A | Senior Affiliate Claims | Impaired | Yes |
| 4B | Senior Affiliate Guarantee Claims | Impaired | Yes |
| 5 | Senior Third-Party Guarantee Claims | Impaired | Yes |
| 6A | Convenience Claims | Impaired | Yes |
| 6B | Convenience Guarantee Claims | Impaired | Yes |
| 7 | General Unsecured Claims | Impaired | Yes |
| 8 | Affiliate Claims | Impaired | Yes |
| 9A | Third-Party Guarantee Claims other than of the Racers Trusts | Impaired | Yes |
| 9B | Third-Party Guarantee Claims of the Racers Trusts | Impaired | Yes |
| 10A | Subordinated Class 10A Claims | Impaired | No (deemed to reject) |
| 10B | Subordinated Class 10B Claims | Impaired | No (deemed to reject) |
| 10C | Subordinated Class 10C Claims | Impaired | No (deemed to reject) |
| 11 | Section 510(b) Claims | Impaired | No (deemed to reject) |
| 12 | Equity Interests | Impaired | No (deemed to reject) |

A340

### 3.2    LCPI

| Class | Designation | Impairment | Entitlement to Vote |
|-------|-------------|------------|---------------------|
| 1 | Priority Non-Tax Claims | Impaired | Yes |
| 2 | Secured Claims | Impaired | Yes |
| 3 | Convenience Claims | Impaired | Yes |
| 4A | General Unsecured Claims other than those of Designated Entities | Impaired | Yes |
| 4B | General Unsecured Claims of Designated Entities | Impaired | Yes |
| 5A | Affiliate Claims of LBHI | Impaired | Yes |
| 5B | Affiliate Claims of Participating Subsidiary Debtors | Impaired | Yes |
| 5C | Affiliate Claims other than those of Participating Debtors | Impaired | Yes |
| 6 | Equity Interests | Impaired | No (deemed to reject) |

### 3.3    LBCS

| Class | Designation | Impairment | Entitlement to Vote |
|-------|-------------|------------|---------------------|
| 1 | Priority Non-Tax Claims | Impaired | Yes |
| 2 | Secured Claims | Impaired | Yes |
| 3 | Convenience Claims | Impaired | Yes |
| 4 | General Unsecured Claims | Impaired | Yes |
| 5A | Affiliate Claims of LBHI | Impaired | Yes |
| 5B | Affiliate Claims of Participating Subsidiary Debtors | Impaired | Yes |
| 5C | Affiliate Claims other than those of Participating Debtors | Impaired | Yes |
| 6 | Equity Interests | Impaired | No (deemed to reject) |

### 3.4    LBSF

| Class | Designation | Impairment | Entitlement to Vote |
|-------|-------------|------------|---------------------|
| 1 | Priority Non-Tax Claims | Impaired | Yes |
| 2 | Secured Claims | Impaired | Yes |
| 3 | Convenience Claims | Impaired | Yes |
| 4A | General Unsecured Claims other than those of the Racers Trusts | Impaired | Yes |
| 4B | General Unsecured Claims of the Racers Trusts | Impaired | Yes |
| 5A | Affiliate Claims of LBHI | Impaired | Yes |
| 5B | Affiliate Claims of Participating Subsidiary Debtors | Impaired | Yes |
| 5C | Affiliate Claims other than those of Participating Debtors | Impaired | Yes |

A341

| Class | Designation | | Impairment | Entitlement to Vote |
|-------|-------------|--|------------|---------------------|
| 6 | Equity Interests | | Impaired | No (deemed to reject) |

### 3.5    LOTC

| Class | Designation | | Impairment | Entitlement to Vote |
|-------|-------------|--|------------|---------------------|
| 1 | Priority Non-Tax Claims | | Impaired | Yes |
| 2 | Secured Claims | | Impaired | Yes |
| 3 | Convenience Claims | | Impaired | Yes |
| 4 | General Unsecured Claims | | Impaired | Yes |
| 5A | Affiliate Claims of LBHI | | Impaired | Yes |
| 5B | Affiliate Claims of Participating Subsidiary Debtors | | Impaired | Yes |
| 5C | Affiliate Claims other than those of Participating Debtors | | Impaired | Yes |
| 6 | Equity Interests | | Impaired | No (deemed to reject) |

### 3.6    LBCC

| Class | Designation | | Impairment | Entitlement to Vote |
|-------|-------------|--|------------|---------------------|
| 1 | Priority Non-Tax Claims | | Impaired | Yes |
| 2 | Secured Claims | | Impaired | Yes |
| 3 | Convenience Claims | | Impaired | Yes |
| 4 | General Unsecured Claims | | Impaired | Yes |
| 5A | Affiliate Claims of LBHI | | Impaired | Yes |
| 5B | Affiliate Claims of Participating Subsidiary Debtors | | Impaired | Yes |
| 5C | Affiliate Claims other than those of Participating Debtors | | Impaired | Yes |
| 6 | Equity Interests | | Impaired | No (deemed to reject) |

### 3.7    LBDP

| Class | Designation | | Impairment | Entitlement to Vote |
|-------|-------------|--|------------|---------------------|
| 1 | Priority Non-Tax Claims | | Impaired | Yes |
| 2 | Secured Claims | | Impaired | Yes |
| 3 | General Unsecured Claims | | Impaired | Yes |
| 4A | Affiliate Claims of LBHI | | Impaired | Yes |
| 4B | Affiliate Claims other than those of LBHI | | Impaired | Yes |
| 5 | Equity Interests | | Impaired | No (deemed to reject) |

A342

### 3.8    LBFP

| Class | Designation | Impairment | Entitlement to Vote |
|---|---|---|---|
| 1 | Priority Non-Tax Claims | Impaired | Yes |
| 2 | Secured Claims | Impaired | Yes |
| 3 | General Unsecured Claims | Impaired | Yes |
| 4A | Affiliate Claims of LBHI | Impaired | Yes |
| 4B | Affiliate Claims other than those of LBHI | Impaired | Yes |
| 5 | Equity Interests | Impaired | No (deemed to reject) |

### 3.9    LB 745

| Class | Designation | Impairment | Entitlement to Vote |
|---|---|---|---|
| 1 | Priority Non-Tax Claims | Impaired | Yes |
| 2 | Secured Claims | Impaired | Yes |
| 3 | General Unsecured Claims | Impaired | Yes |
| 4A | Affiliate Claims of LBHI | Impaired | Yes |
| 4B | Affiliate Claims other than those of LBHI | Impaired | Yes |
| 5 | Equity Interests | Impaired | No (deemed to reject) |

### 3.10    PAMI Statler

| Class | Designation | Impairment | Entitlement to Vote |
|---|---|---|---|
| 1 | Priority Non-Tax Claims | Impaired | Yes |
| 2 | Secured Claims | Impaired | Yes |
| 3 | General Unsecured Claims | Impaired | Yes |
| 4A | Affiliate Claims of LBHI | Impaired | Yes |
| 4B | Affiliate Claims other than those of LBHI | Impaired | Yes |
| 5 | Equity Interests | Impaired | No (deemed to reject) |

### 3.11    CES

| Class | Designation | Impairment | Entitlement to Vote |
|---|---|---|---|
| 1 | Priority Non-Tax Claims | Impaired | Yes |
| 2 | Secured Claims | Impaired | Yes |
| 3 | General Unsecured Claims | Impaired | Yes |
| 4A | Affiliate Claims of LBHI | Impaired | Yes |
| 4B | Affiliate Claims other than those of LBHI | Impaired | Yes |
| 5 | Equity Interests | Impaired | No (deemed to reject) |

### 3.12    CES V

| Class | Designation | Impairment | Entitlement to Vote |
|-------|-------------|------------|---------------------|
| 1 | Priority Non-Tax Claims | Impaired | Yes |
| 2 | Secured Claims | Impaired | Yes |
| 3 | General Unsecured Claims | Impaired | Yes |
| 4A | Affiliate Claims of LBHI | Impaired | Yes |
| 4B | Affiliate Claims other than those of LBHI | Impaired | Yes |
| 5 | Equity Interests | Impaired | No (deemed to reject) |

### 3.13    CES IX

| Class | Designation | Impairment | Entitlement to Vote |
|-------|-------------|------------|---------------------|
| 1 | Priority Non-Tax Claims | Impaired | Yes |
| 2 | Secured Claims | Impaired | Yes |
| 3 | General Unsecured Claims | Impaired | Yes |
| 4A | Affiliate Claims of LBHI | Impaired | Yes |
| 4B | Affiliate Claims other than those of LBHI | Impaired | Yes |
| 5 | Equity Interests | Impaired | No (deemed to reject) |

### 3.14    East Dover

| Class | Designation | Impairment | Entitlement to Vote |
|-------|-------------|------------|---------------------|
| 1 | Priority Non-Tax Claims | Impaired | Yes |
| 2 | Secured Claims | Impaired | Yes |
| 3 | General Unsecured Claims | Impaired | Yes |
| 4A | Affiliate Claims of LBHI | Impaired | Yes |
| 4B | Affiliate Claims other than those of LBHI | Impaired | Yes |
| 5 | Equity Interests | Impaired | No (deemed to reject) |

### 3.15    LS Finance

| Class | Designation | Impairment | Entitlement to Vote |
|-------|-------------|------------|---------------------|
| 1 | Priority Non-Tax Claims | Impaired | Yes |
| 2 | Secured Claims | Impaired | Yes |
| 3 | General Unsecured Claims | Impaired | Yes |
| 4A | Affiliate Claims of LBHI | Impaired | Yes |
| 4B | Affiliate Claims other than those of LBHI | Impaired | Yes |
| 5 | Equity Interests | Impaired | No (deemed to reject) |

US_ACTIVE:\43869458\01\58399.0008

A344

### 3.16   LUXCO

| Class | Designation | Impairment | Entitlement to Vote |
|---|---|---|---|
| 1 | Priority Non-Tax Claims | Impaired | Yes |
| 2 | Secured Claims | Impaired | Yes |
| 3 | General Unsecured Claims | Impaired | Yes |
| 4A | Affiliate Claims of LBHI | Impaired | Yes |
| 4B | Affiliate Claims other than those of LBHI | Impaired | Yes |
| 5 | Equity Interests | Impaired | No (deemed to reject) |

### 3.17   BNC

| Class | Designation | Impairment | Entitlement to Vote |
|---|---|---|---|
| 1 | Priority Non-Tax Claims | Impaired | Yes |
| 2 | Secured Claims | Impaired | Yes |
| 3 | General Unsecured Claims | Impaired | Yes |
| 4A | Affiliate Claims of LBHI | Impaired | Yes |
| 4B | Affiliate Claims other than those of LBHI | Impaired | Yes |
| 5 | Equity Interests | Impaired | No (deemed to reject) |

### 3.18   LB Rose Ranch

| Class | Designation | Impairment | Entitlement to Vote |
|---|---|---|---|
| 1 | Priority Non-Tax Claims | Impaired | Yes |
| 2 | Secured Claims | Impaired | Yes |
| 3 | General Unsecured Claims | Impaired | Yes |
| 4A | Affiliate Claims of LBHI | Impaired | Yes |
| 4B | Affiliate Claims other than those of LBHI | Impaired | Yes |
| 5 | Equity Interests | Impaired | No (deemed to reject) |

### 3.19   SASCO

| Class | Designation | Impairment | Entitlement to Vote |
|---|---|---|---|
| 1 | Priority Non-Tax Claims | Impaired | Yes |
| 2 | Secured Claims | Impaired | Yes |
| 3 | General Unsecured Claims | Impaired | Yes |
| 4A | Affiliate Claims of LBHI | Impaired | Yes |
| 4B | Affiliate Claims other than those of LBHI | Impaired | Yes |
| 5 | Equity Interests | Impaired | No (deemed to reject) |

**A345**

### 3.20    LB 2080

| Class | Designation | Impairment | Entitlement to Vote |
|-------|-------------|------------|---------------------|
| 1 | Priority Non-Tax Claims | Impaired | Yes |
| 2 | Secured Claims | Impaired | Yes |
| 3 | General Unsecured Claims | Impaired | Yes |
| 4A | Affiliate Claims of LBHI | Impaired | Yes |
| 4B | Affiliate Claims other than those of LBHI | Impaired | Yes |
| 5 | Equity Interests | Impaired | No (deemed to reject) |

### 3.21    Merit

| Class | Designation | Impairment | Entitlement to Vote |
|-------|-------------|------------|---------------------|
| 1 | Priority Non-Tax Claims | Impaired | Yes |
| 2 | Secured Claims | Impaired | Yes |
| 3 | General Unsecured Claims | Impaired | Yes |
| 4A | Affiliate Claims of LBHI | Impaired | Yes |
| 4B | Affiliate Claims other than those of LBHI | Impaired | Yes |
| 5 | Equity Interests | Impaired | No (deemed to reject) |

### 3.22    Preferred Somerset

| Class | Designation | Impairment | Entitlement to Vote |
|-------|-------------|------------|---------------------|
| 1 | Priority Non-Tax Claims | Impaired | Yes |
| 2 | Secured Claims | Impaired | Yes |
| 3 | General Unsecured Claims | Impaired | Yes |
| 4A | Affiliate Claims of LBHI | Impaired | Yes |
| 4B | Affiliate Claims other than those of LBHI | Impaired | Yes |
| 5 | Equity Interests | Impaired | No (deemed to reject) |

### 3.23    Somerset

| Class | Designation | Impairment | Entitlement to Vote |
|-------|-------------|------------|---------------------|
| 1 | Priority Non-Tax Claims | Impaired | Yes |
| 2 | Secured Claims | Impaired | Yes |
| 3 | General Unsecured Claims | Impaired | Yes |
| 4A | Affiliate Claims of LBHI | Impaired | Yes |
| 4B | Affiliate Claims other than those of LBHI | Impaired | Yes |
| 5 | Equity Interests | Impaired | No (deemed to reject) |

US_ACTIVE:\43869458\01\58399.0008

## ARTICLE IV
## Treatment of Claims Against and Equity Interests in LBHI

4.1     LBHI Class 1 – Priority Non-Tax Claims against LBHI.

(a)     Impairment and Voting.   LBHI Class 1 is impaired by the Plan.   Each holder of an Allowed Claim in LBHI Class 1 is entitled to vote to accept or reject the Plan.

(b)     Distributions.   Except to the extent that the holder of an Allowed Claim in LBHI Class 1 agrees to less favorable treatment or has been paid by or on behalf of LBHI on account of such Claim prior to the Effective Date, on the later of the Effective Date and the date such Claim becomes Allowed, or as soon thereafter as is practicable, each holder of an Allowed Claim in LBHI Class 1 shall be paid by LBHI in Cash in full.

4.2     LBHI Class 2 – Secured Claims against LBHI.

(a)     Impairment and Voting.   LBHI Class 2 is impaired by the Plan.   Each holder of an Allowed Claim in LBHI Class 2 is entitled to vote to accept or reject the Plan.

(b)     Distributions.   Except to the extent that the holder of an Allowed Claim in LBHI Class 2 agrees to less favorable treatment, each holder of an Allowed Claim in LBHI Class 2 shall be satisfied by, at the option of LBHI:   (i) payment in Cash by LBHI in full on the later of the Effective Date and the date such Claim becomes Allowed, or as soon thereafter as is practicable; (ii) the sale or disposition proceeds of the Collateral securing such Allowed Claim to the extent of the value of the Collateral securing such Allowed Claim; (iii) surrender to the holder of such Allowed Claim of the Collateral securing such Allowed Claim; or (iv) such treatment that leaves unaltered the legal, equitable, and contractual rights to which the holder of the Allowed Claim is entitled.   In the event an Allowed Claim in LBHI Class 2 is treated under clause (i) or (ii) above, the Liens securing such Claim shall be deemed released and extinguished without further order of the Bankruptcy Court.

4.3     LBHI Class 3 – Senior Unsecured Claims against LBHI.

(a)     Impairment and Voting.   LBHI Class 3 is impaired by the Plan.   Each holder of an Allowed Claim in LBHI Class 3 is entitled to vote to accept or reject the Plan.

(b)     Distributions.   Each holder of an Allowed Claim in LBHI Class 3 shall receive its Pro Rata Share of (i) Available Cash from LBHI, (ii) Subordinated Class 10A Distribution, (iii) Subordinated Class 10B Distribution, (iv) Subordinated Class 10C Distribution and (v) the Plan Adjustment.

4.4     LBHI Class 4A – Senior Affiliate Claims against LBHI.

(a)     Impairment and Voting.   LBHI Class 4A is impaired by the Plan.   Each holder of an Allowed Claim in LBHI Class 4A is entitled to vote to accept or reject the Plan.

(b)     Distributions.   Subject to Section 6.5(b) of the Plan, each holder of an Allowed Claim in LBHI Class 4A shall receive its Pro Rata Share of (i) Available Cash from

A347

LBHI, (ii) Subordinated Class 10A Distribution, (iii) Subordinated Class 10B Distribution and (iv) Subordinated Class 10C Distribution.

4.5     LBHI Class 4B – Senior Affiliate Guarantee Claims against LBHI.

(a)     Impairment and Voting.  LBHI Class 4B is impaired by the Plan.  Each holder of an Allowed Claim in LBHI Class 4B is entitled to vote to accept or reject the Plan.

(b)     Distributions.  Subject to Section 6.5(b) of the Plan, each holder of an Allowed Claim in LBHI Class 4B shall receive its Pro Rata Share of (i) Available Cash from LBHI, (ii) Subordinated Class 10B Distribution and (iii) Subordinated Class 10C Distribution.

4.6     LBHI Class 5 – Senior Third-Party Guarantee Claims against LBHI.

(a)     Impairment and Voting.  LBHI Class 5 is impaired by the Plan.  Each holder of an Allowed Claim in LBHI Class 5 is entitled to vote to accept or reject the Plan.

(b)     Distributions.  Each holder of an Allowed Claim in LBHI Class 5 shall receive its Pro Rata Share of (i) (A) Available Cash from LBHI, (B) Subordinated Class 10B Distribution and (C) Subordinated Class 10C Distribution; *provided*, *however*, that the applicable Plan Adjustment Percentage of the Distributions set forth in clauses (A), (B) and (C) above shall be automatically redistributed pursuant to Section 6.5(a) of the Plan, and (ii) the Excess Plan Adjustment Portion with respect to LBHI Class 5.

4.7     LBHI Class 6A – Convenience Claims against LBHI.

(a)     Impairment and Voting.  LBHI Class 6A is impaired by the Plan.  Each holder of an Allowed Claim in LBHI Class 6A is entitled to vote to accept or reject the Plan.

(b)     Distributions.  Each holder of an Allowed Claim in LBHI Class 6A shall receive Cash from LBHI in an amount equal to .26 multiplied by the amount of such Claim, in full and complete satisfaction of such Allowed Claim, on the later of the Effective Date and the date such Claim becomes an Allowed Claim, or as soon thereafter as is practicable.

4.8     LBHI Class 6B – Convenience Guarantee Claims against LBHI.

(a)     Impairment and Voting.  LBHI Class 6B is impaired by the Plan.  Each holder of an Allowed Claim in LBHI Class 6B is entitled to vote to accept or reject the Plan.

(b)     Distributions.  Each holder of an Allowed Claim in LBHI Class 6B shall receive Cash from LBHI in an amount equal to .17 multiplied by the amount of such Claim, in full and complete satisfaction of such Allowed Claim, on the later of the Effective Date and the date such Claim becomes an Allowed Claim, or as soon thereafter as is practicable.

4.9    LBHI Class 7 – General Unsecured Claims against LBHI.

(a)    Impairment and Voting.  LBHI Class 7 is impaired by the Plan.  Each holder of an Allowed Claim in LBHI Class 7 is entitled to vote to accept or reject the Plan.

(b)    Distributions.  Each holder of an Allowed Claim in LBHI Class 7 shall receive its Pro Rata Share of (i) Available Cash from LBHI and (ii) the Plan Adjustment.

4.10    LBHI Class 8 – Affiliate Claims against LBHI.

(a)    Impairment and Voting.  LBHI Class 8 is impaired by the Plan.  Each holder of an Allowed Claim in LBHI Class 8 is entitled to vote to accept or reject the Plan.

(b)    Distributions.  Subject to Section 6.5(b) of the Plan, each holder of an Allowed Claim in LBHI Class 8 shall receive its Pro Rata Share of Available Cash from LBHI.

4.11    LBHI Class 9A – Third-Party Guarantee Claims against LBHI.

(a)    Impairment and Voting.  LBHI Class 9A is impaired by the Plan.  Each holder of an Allowed Claim in LBHI Class 9A is entitled to vote to accept or reject the Plan.

(b)    Distributions.  Each holder of an Allowed Claim in LBHI Class 9A shall receive from LBHI its Pro Rata Share of (i) Available Cash; *provided*, *however*, that the applicable Plan Adjustment Percentage of such Distribution shall be automatically redistributed pursuant to Section 6.5(a) of the Plan, and (ii) the Excess Plan Adjustment Portion with respect to LBHI Class 9A.

4.12    LBHI Class 9B – Third-Party Guarantee Claims of the Racers Trusts against LBHI.

(a)    Impairment and Voting.  LBHI Class 9B is impaired by the Plan.  Each holder of an Allowed Claim in LBHI Class 9B is entitled to vote to accept or reject the Plan.

(b)    Distributions.  Subject to Section 6.5(g) of the Plan, each holder of an Allowed Claim in LBHI Class 9B shall receive from LBHI its Pro Rata Share of (i) Available Cash; *provided, however*, that the Racers Adjustment shall be automatically redistributed pursuant to Section 6.5(a) of the Plan, and (ii) the Excess Plan Adjustment Portion with respect to LBHI Class 9B.

4.13    LBHI Class 10A – Subordinated Class 10A Claims against LBHI.

(a)    Impairment and Voting.  LBHI Class 10A is impaired by the Plan.  Each holder of an Allowed Claim in LBHI Class 10A is not entitled to vote to accept or reject the Plan and is conclusively deemed to have rejected the Plan.

(b)    Distributions.  Holders of Allowed Claims in LBHI Class 10A shall not receive any Distributions on account of such Claims unless and until all holders of Allowed Claims in LBHI Class 3 and LBHI Class 4A are satisfied in full, in which case each holder of an

Allowed Claim in LBHI Class 10A shall receive its Pro Rata Share of (i) Available Cash from LBHI and (ii) Subordinated Class 10C Distribution.

4.14     LBHI Class 10B – Subordinated Class 10B Claims against LBHI.

(a)     Impairment and Voting. LBHI Class 10B is impaired by the Plan. Each holder of an Allowed Claim in LBHI Class 10B is not entitled to vote to accept or reject the Plan and is conclusively deemed to have rejected the Plan.

(b)     Distributions. Holders of Allowed Claims in LBHI Class 10B shall not receive any Distributions on account of such Claims unless and until all holders of Allowed Claims in LBHI Class 3, LBHI Class 4A, LBHI Class 4B and LBHI Class 5 are satisfied in full, in which case each holder of an Allowed Claim in LBHI Class 10B shall receive its Pro Rata Share of (i) Available Cash from LBHI and (ii) Subordinated Class 10C Distribution.

4.15     LBHI Class 10C – Subordinated Class 10C Claims against LBHI.

(a)     Impairment and Voting. LBHI Class 10C is impaired by the Plan. Each holder of an Allowed Claim in LBHI Class 10C is not entitled to vote to accept or reject the Plan and is conclusively deemed to have rejected the Plan.

(b)     Distributions. Holders of Allowed Claims in LBHI Class 10C shall not receive any Distributions on account of such Claims unless and until all holders of Allowed Claims in LBHI Class 3, LBHI Class 4A, LBHI Class 4B, LBHI Class 5, LBHI Class 10A and LBHI Class 10B are satisfied in full, in which case each holder of an Allowed Claim in LBHI Class 10C shall receive its Pro Rata Share of Available Cash from LBHI.

4.16     LBHI Class 11 – Section 510(b) Claims against LBHI.

(a)     Impairment and Voting. LBHI Class 11 is impaired by the Plan. Each holder of an Allowed Claim in LBHI Class 11 is not entitled to vote to accept or reject the Plan and is conclusively deemed to have rejected the Plan.

(b)     Distributions. Holders of Allowed Claims in LBHI Class 11 shall not receive any Distributions on account of such Claims unless and until all holders of Allowed Claims against LBHI other than Claims in LBHI Class 11 are satisfied in full, in which case each holder of an Allowed Claim in LBHI Class 11 shall receive its Pro Rata Share of Available Cash from LBHI.

4.17     LBHI Class 12 – Equity Interests in LBHI.

(a)     Impairment and Voting. LBHI Class 12 is impaired by the Plan. Each holder of an Equity Interest in LBHI Class 12 is not entitled to vote to accept or reject the Plan and is conclusively deemed to have rejected the Plan.

(b)     Stock Exchange. On the Effective Date, all LBHI Stock shall be cancelled and the Plan Trust Stock shall be issued to the Plan Trust which will hold such share for the benefit of the holders of such former LBHI Stock consistent with their former relative

A350

priority and economic entitlements; *provided*, *however*, that the Plan Trust may not exercise any voting rights appurtenant thereto in conflict with Article VII of the Plan. On or promptly after the Effective Date, the Plan Administrator shall file with the Securities and Exchange Commission a Form 15 for the purpose of terminating the registration of any of LBHI's publicly traded securities.

(c) Distributions. Each holder of an Equity Interest in LBHI (through their interest in the new share of LBHI common stock or otherwise) shall neither receive nor retain any Property of the Estate or direct interest in Property of the Estate of LBHI on account of such Equity Interests; *provided*, *however*, that in the event that all Allowed Claims in LBHI Classes 1 through 11 have been satisfied in full in accordance with the Bankruptcy Code and the Plan, each holder of an Equity Interest in LBHI may receive its share of any remaining assets of LBHI consistent with such holder's rights of payment existing immediately prior to the Commencement Date. Unless otherwise determined by the Plan Administrator, on the date that LBHI's Chapter 11 Case is closed in accordance with Section 6.6 of the Plan, the Plan Trust Stock issued pursuant to subsection (b) above shall be deemed cancelled and of no further force and effect provided that such cancellation does not adversely impact the Debtors' estates.

(d) Non-Transferable. The continuing rights of holders of Equity Interests (including through their interest in the Plan Trust Stock or otherwise) shall be nontransferable except by operation of law.

## ARTICLE V
## Treatment of Claims Against and Equity Interests in Subsidiary Debtors

5.1     LCPI Class 1 – Priority Non-Tax Claims against LCPI.

(a) Impairment and Voting. LCPI Class 1 is impaired by the Plan. Each holder of an Allowed Claim in LCPI Class 1 is entitled to vote to accept or reject the Plan.

(b) Distributions. Except to the extent that the holder of an Allowed Claim in LCPI Class 1 agrees to less favorable treatment or has been paid by or on behalf of LCPI on account of such Claim prior to the Effective Date, on the later of the Effective Date and the date such Claim becomes Allowed, or as soon thereafter as is practicable, each holder of an Allowed Claim in LCPI Class 1 shall be paid by LCPI in Cash in full.

5.2     LCPI Class 2 – Secured Claims against LCPI.

(a) Impairment and Voting. LCPI Class 2 is impaired by the Plan. Each holder of an Allowed Claim in LCPI Class 2 is entitled to vote to accept or reject the Plan.

(b) Distributions. Except to the extent that the holder of an Allowed Claim in LCPI Class 2 agrees to less favorable treatment, each holder of an Allowed Claim in LCPI Class 2 shall be satisfied by, at the option of LCPI: (i) payment in Cash by LCPI in full on the later of the Effective Date and the date such Claim becomes Allowed, or as soon thereafter as is practicable; (ii) the sale or disposition proceeds of the Collateral securing such Allowed Claim to the extent of the value of the Collateral securing such Allowed Claim; (iii) surrender to the holder of such Allowed Claim of the Collateral securing such Allowed Claim; or (iv) such

A351

treatment that leaves unaltered the legal, equitable, and contractual rights to which the holder of the Allowed Claim is entitled.   In the event an Allowed Claim in LCPI Class 2 is treated under clause (i) or (ii) above, the Liens securing such Claim shall be deemed released and extinguished without further order of the Bankruptcy Court.

5.3    LCPI Class 3 – Convenience Claims against LCPI.

(a)    Impairment and Voting.  LCPI Class 3 is impaired by the Plan.  Each holder of an Allowed Claim in LCPI Class 3 is entitled to vote to accept or reject the Plan.

(b)    Distributions.  Each holder of an Allowed Claim in LCPI Class 3 shall receive Cash from LCPI in an amount equal to .60 multiplied by the amount of such Claim, in full and complete satisfaction of such Allowed Claim, on the later of the Effective Date and the date such Claim becomes an Allowed Claim, or as soon thereafter as is practicable.

5.4    LCPI Class 4A – General Unsecured Claims other than those of Designated Entities against LCPI.

(a)    Impairment and Voting.  LCPI Class 4A is impaired by the Plan.  Each holder of an Allowed Claim in LCPI Class 4A is entitled to vote to accept or reject the Plan.

(b)    Distributions.  Each holder of an Allowed Claim in LCPI Class 4A shall receive its Pro Rata Share (i) from LCPI of (A) Available Cash; provided, however, that the applicable Plan Adjustment Percentage of such Distribution shall be automatically redistributed pursuant to Section 6.5(a) of the Plan, and (B) the Excess Plan Adjustment Portion with respect to LCPI Class 4A, and (ii) the LCPI Settlement Amount.

5.5    LCPI Class 4B – General Unsecured Claims of Designated Entities against LCPI.

(a)    Impairment and Voting.  LCPI Class 4B is impaired by the Plan.  Each holder of an Allowed Claim in LCPI Class 4B is entitled to vote to accept or reject the Plan.

(b)    Distributions.   Subject to Sections 6.5(g) or 6.5(h), each holder of an Allowed Claim in LCPI Class 4B shall receive from LCPI its Pro Rata Share of (i) Available Cash; provided, however, that the applicable Plan Adjustment Percentage of such Distribution shall be automatically redistributed pursuant to Section 6.5(a) of the Plan, and (ii) the Excess Plan Adjustment Portion with respect to LCPI Class 4B.

5.6    LCPI Class 5A – Affiliate Claims of LBHI against LCPI.

(a)    Impairment and Voting.  LCPI Class 5A is impaired by the Plan.  LBHI is entitled to vote to accept or reject the Plan.

(b)    Distributions.   Subject to Sections 6.5(b) and 6.5(c) of the Plan, LBHI shall receive from LCPI (i) its Pro Rata Share of Available Cash; provided, however, that the LCPI Settlement Amount shall be automatically redistributed pursuant to Section 6.5(e) of the Plan, and (ii) the Excess LCPI Settlement Amount.

5.7     LCPI Class 5B – Affiliate Claims of Participating Subsidiary Debtors against LCPI.

(a)     Impairment and Voting.  LCPI Class 5B is impaired by the Plan.  Each holder of an Allowed Claim in LCPI Class 5B is entitled to vote to accept or reject the Plan.

(b)     Distributions.  Subject to Section 6.5(b) of the Plan, each holder of an Allowed Claim in LCPI Class 5B shall receive from LCPI its Pro Rata Share of (i) Available Cash; provided, however, that the applicable Plan Adjustment Percentage of such Distribution shall be automatically redistributed pursuant to Section 6.5(a) of the Plan, and (ii) the Excess Plan Adjustment Portion with respect to LCPI Class 5B.

5.8     LCPI Class 5C – Affiliate Claims other than those of Participating Debtors against LCPI.

(a)     Impairment and Voting.  LCPI Class 5C is impaired by the Plan.  Each holder of an Allowed Claim in LCPI Class 5C is entitled to vote to accept or reject the Plan.

(b)     Distributions.  Subject to Section 6.5(b) of the Plan, each holder of an Allowed Claim in LCPI Class 5C shall receive from LCPI its Pro Rata Share of (i) Available Cash; provided, however, that the applicable Plan Adjustment Percentage of such Distribution shall be automatically redistributed pursuant to Section 6.5(a) of the Plan, and (ii) the Excess Plan Adjustment Portion with respect to LCPI Class 5C.

5.9     LCPI Class 6 – Equity Interests in LCPI.

(a)     Impairment and Voting.  LCPI Class 6 is impaired by the Plan.  Each holder of an Equity Interest in LCPI Class 6 is not entitled to vote to accept or reject the Plan and is conclusively deemed to have rejected the Plan.

(b)     Distributions.  Equity Interests in LCPI shall be cancelled if and when LCPI is dissolved in accordance with Section 7.4 of the Plan.  Each holder of an Equity Interest in LCPI shall neither receive nor retain any Property of the Estate or direct interest in Property of the Estate of LCPI on account of such Equity Interests thereafter; provided, however, that in the event that all Allowed Claims against LCPI have been satisfied in full in accordance with the Bankruptcy Code and the Plan, each holder of an Equity Interest in LCPI may receive its Pro Rata Share of any remaining assets in LCPI.

5.10    LBCS Class 1 – Priority Non-Tax Claims against LBCS.

(a)     Impairment and Voting.  LBCS Class 1 is impaired by the Plan.  Each holder of an Allowed Claim in LBCS Class 1 is entitled to vote to accept or reject the Plan.

(b)     Distributions.  Except to the extent that the holder of an Allowed Claim in LBCS Class 1 agrees to less favorable treatment or has been paid by or on behalf of LBCS on account of such Claim prior to the Effective Date, on the later of the Effective Date and the date such Claim becomes Allowed, or as soon thereafter as is practicable, each holder of an Allowed Claim in LBCS Class 1 shall be paid by LBCS in Cash in full.

5.11    LBCS Class 2 – Secured Claims against LBCS.

(a)    Impairment and Voting.  LBCS Class 2 is impaired by the Plan.  Each holder of an Allowed Claim in LBCS Class 2 is entitled to vote to accept or reject the Plan.

(b)    Distributions.   Except to the extent that the holder of an Allowed Claim in LBCS Class 2 agrees to less favorable treatment, each holder of an Allowed Claim in LBCS Class 2 shall be satisfied by, at the option of LBCS:   (i) payment in Cash by LBCS in full on the later of the Effective Date and the date such Claim becomes Allowed, or as soon thereafter as is practicable; (ii) the sale or disposition proceeds of the Collateral securing such Allowed Claim to the extent of the value of the Collateral securing such Allowed Claim; (iii) surrender to the holder of such Allowed Claim of the Collateral securing such Allowed Claim; or (iv) such treatment that leaves unaltered the legal, equitable, and contractual rights to which the holder of the Allowed Claim is entitled.   In the event an Allowed Claim in LBCS Class 2 is treated under clause (i) or (ii) above, the Liens securing such Claim shall be deemed released and extinguished without further order of the Bankruptcy Court.

5.12    LBCS Class 3 – Convenience Claims against LBCS.

(a)    Impairment and Voting.  LBCS Class 3 is impaired by the Plan.  Each holder of an Allowed Claim in LBCS Class 3 is entitled to vote to accept or reject the Plan.

(b)    Distributions.  Each holder of an Allowed Claim in LBCS Class 3 shall receive Cash from LBCS in an amount equal to .55 multiplied by the amount of such Claim, in full and complete satisfaction of such Allowed Claim, on the later of the Effective Date and the date such Claim becomes an Allowed Claim, or as soon thereafter as is practicable.

5.13    LBCS Class 4 – General Unsecured Claims against LBCS.

(a)    Impairment and Voting.  LBCS Class 4 is impaired by the Plan.  Each holder of an Allowed Claim in LBCS Class 4 is entitled to vote to accept or reject the Plan.

(b)    Distributions.  Each holder of an Allowed Claim in LBCS Class 4 shall receive from LBCS its Pro Rata Share of (i) Available Cash; *provided*, *however*, that the applicable Plan Adjustment Percentage of such Distribution shall be automatically redistributed pursuant to Section 6.5(a) of the Plan, and (ii) the Excess Plan Adjustment Portion with respect to LBCS Class 4.

5.14    LBCS Class 5A – Affiliate Claims of LBHI against LBCS.

(a)    Impairment and Voting.   LBCS Class 5A is impaired by the Plan.   LBHI is entitled to vote to accept or reject the Plan.

(b)    Distributions.   Subject to Sections 6.5(b) and 6.5(c) of the Plan, LBHI shall receive its Pro Rata Share of Available Cash from LBCS.

A354

5.15    LBCS Class 5B – Affiliate Claims of Participating Subsidiary Debtors against LBCS.

(a)    Impairment and Voting.  LBCS Class 5B is impaired by the Plan.  Each holder of an Allowed Claim in LBCS Class 5B is entitled to vote to accept or reject the Plan.

(b)    Distributions.  Subject to Section 6.5(b) of the Plan, each holder of an Allowed Claim in LBCS Class 5B shall receive from LBCS its Pro Rata Share of (i) Available Cash; provided, however, that the applicable Plan Adjustment Percentage of such Distribution shall be automatically redistributed pursuant to Section 6.5(a) of the Plan, and (ii) the Excess Plan Adjustment Portion with respect to LBCS Class 5B.

5.16    LBCS Class 5C – Affiliate Claims other than those of Participating Debtors against LBCS.

(a)    Impairment and Voting.  LBCS Class 5C is impaired by the Plan.  Each holder of an Allowed Claim in LBCS Class 5C is entitled to vote to accept or reject the Plan.

(b)    Distributions.  Subject to Section 6.5(b) of the Plan, each holder of an Allowed Claim in LBCS Class 5C shall receive from LBCS its Pro Rata Share of (i) Available Cash; provided, however, that the applicable Plan Adjustment Percentage of such Distribution shall be automatically redistributed pursuant to Section 6.5(a) of the Plan, and (ii) the Excess Plan Adjustment Portion with respect to LBCS Class 5C.

5.17    LBCS Class 6 – Equity Interests in LBCS.

(a)    Impairment and Voting.  LBCS Class 6 is impaired by the Plan.  Each holder of an Equity Interest in LBCS Class 6 is not entitled to vote to accept or reject the Plan and is conclusively deemed to have rejected the Plan.

(b)    Distributions.  Equity Interests in LBCS shall be cancelled if and when LBCS is dissolved in accordance with Section 7.4 of the Plan.  Each holder of an Equity Interest in LBCS shall neither receive nor retain any Property of the Estate or direct interest in Property of the Estate of LBCS on account of such Equity Interests thereafter; provided, however, that in the event that all Allowed Claims against LBCS have been satisfied in full in accordance with the Bankruptcy Code and the Plan, each holder of an Equity Interest in LBCS may receive its Pro Rata Share of any remaining assets in LBCS.

5.18    LBSF Class 1 – Priority Non-Tax Claims against LBSF.

(a)    Impairment and Voting.  LBSF Class 1 is impaired by the Plan.  Each holder of an Allowed Claim in LBSF Class 1 is entitled to vote to accept or reject the Plan.

(b)    Distributions.  Except to the extent that the holder of an Allowed Claim in LBSF Class 1 agrees to less favorable treatment or has been paid by or on behalf of LBSF on account of such Claim prior to the Effective Date, on the later of the Effective Date and the date such Claim becomes Allowed, or as soon thereafter as is practicable, each holder of an Allowed Claim in LBSF Class 1 shall be paid by LBSF in Cash in full.

5.19    LBSF Class 2 – Secured Claims against LBSF.

(a)    Impairment and Voting.  LBSF Class 2 is impaired by the Plan.  Each holder of an Allowed Claim in LBSF Class 2 is entitled to vote to accept or reject the Plan.

(b)    Distributions.   Except to the extent that the holder of an Allowed Claim in LBSF Class 2 agrees to less favorable treatment, each holder of an Allowed Claim in LBSF Class 2 shall be satisfied by, at the option of LBSF:   (i) payment in Cash by LBSF in full on the later of the Effective Date and the date such Claim becomes Allowed, or as soon thereafter as is practicable; (ii) the sale or disposition proceeds of the Collateral securing such Allowed Claim to the extent of the value of the Collateral securing such Allowed Claim; (iii) surrender to the holder of such Allowed Claim of the Collateral securing such Allowed Claim; or (iv) such treatment that leaves unaltered the legal, equitable, and contractual rights to which the holder of the Allowed Claim is entitled.   In the event an Allowed Claim in LBSF Class 2 is treated under clause (i) or (ii) above, the Liens securing such Claim shall be deemed released and extinguished without further order of the Bankruptcy Court.

5.20    LBSF Class 3 – Convenience Claims against LBSF.

(a)    Impairment and Voting.  LBSF Class 3 is impaired by the Plan.  Each holder of an Allowed Claim in LBSF Class 3 is entitled to vote to accept or reject the Plan.

(b)    Distributions.  Each holder of an Allowed Claim in LBSF Class 3 shall receive Cash from LBSF in an amount equal to .32 multiplied by the amount of such Claim, in full and complete satisfaction of such Allowed Claim, on the later of the Effective Date and the date such Claim becomes an Allowed Claim, or as soon thereafter as is practicable.

5.21    LBSF Class 4A – General Unsecured Claims other than those of the Racers Trusts against LBSF.

(a)    Impairment and Voting.  LBSF Class 4A is impaired by the Plan.  Each holder of an Allowed Claim in LBSF Class 4A is entitled to vote to accept or reject the Plan.

(b)    Distributions.  Each holder of an Allowed Claim in LBSF Class 4A shall receive its Pro Rata Share (i) from LBSF of (A) Available Cash; *provided*, *however*, that the applicable Plan Adjustment Percentage of such Distribution shall be automatically redistributed pursuant to Section 6.5(a) of the Plan, (B) the Excess Plan Adjustment Portion with respect to LBSF Class 4A, and (C) the LBSF Additional Settlement Amount, and (ii) the LBSF Settlement Amount.

5.22    LBSF Class 4B – General Unsecured Claims of the Racers Trusts against LBSF.

(a)    Impairment and Voting.  LBSF Class 4B is impaired by the Plan.  Each holder of an Allowed Claim in LBSF Class 4B is entitled to vote to accept or reject the Plan.

(b)    Distributions.  Subject to Sections 6.5(d) and 6.5(g) of the Plan, each holder of an Allowed Claim in LBSF Class 4B shall receive from LBSF its Pro Rata Share of (i) Available Cash; *provided, however*, that the Racers Adjustment shall be automatically

A356

redistributed pursuant to Section 6.5(a) of the Plan, and (ii) the Excess Plan Adjustment Portion with respect to LBSF Class 4B.

5.23   LBSF Class 5A – Affiliate Claims of LBHI against LBSF.

(a)   *Impairment and Voting*.   LBSF Class 5A is impaired by the Plan.   LBHI is entitled to vote to accept or reject the Plan.

(b)   *Distributions*.   Subject to Sections 6.5(b), 6.5(c) and 6.5(d) of the Plan, LBHI shall receive from LBSF (i) its Pro Rata Share of Available Cash; *provided, however*, that the LBSF Settlement Amount shall be automatically redistributed pursuant to Section 6.5(f) of the Plan, and (ii) the Excess LBSF Settlement Amount.

5.24   LBSF Class 5B – Affiliate Claims of Participating Subsidiary Debtors against LBSF.

(a)   *Impairment and Voting*.   LBSF Class 5B is impaired by the Plan.   Each holder of an Allowed Claim in LBSF Class 5B is entitled to vote to accept or reject the Plan.

(b)   *Distributions*.   Subject to Sections 6.5(b) and 6.5(d) of the Plan, each holder of an Allowed Claim in LBSF Class 5B shall receive from LBSF its Pro Rata Share of (i) Available Cash; *provided*, *however*, that the applicable Plan Adjustment Percentage of such Distribution shall be automatically redistributed pursuant to Section 6.5(a) of the Plan, and (ii) the Excess Plan Adjustment Portion with respect to LBSF Class 5B.

5.25   LBSF Class 5C – Affiliate Claims other than those of Participating Debtors against LBSF.

(a)   *Impairment and Voting*.   LBSF Class 5C is impaired by the Plan.   Each holder of an Allowed Claim in LBSF Class 5C is entitled to vote to accept or reject the Plan.

(b)   *Distributions*.   Subject to Section 6.5(b) of the Plan, each holder of an Allowed Claim in LBSF Class 5C shall receive from LBSF its Pro Rata Share of (i) Available Cash; *provided*, *however*, that the applicable Plan Adjustment Percentage of such Distribution shall be automatically redistributed pursuant to Section 6.5(a) of the Plan, (ii) the Excess Plan Adjustment Portion with respect to LBSF Class 5C and (iii) the LBSF Additional Settlement Amount.

5.26   LBSF Class 6 – Equity Interests in LBSF.

(a)   *Impairment and Voting*.   LBSF Class 6 is impaired by the Plan.   Each holder of an Equity Interest in LBSF Class 6 is not entitled to vote to accept or reject the Plan and is conclusively deemed to have rejected the Plan.

(b)   *Distributions*.   Equity Interests in LBSF shall be cancelled if and when LBSF is dissolved in accordance with Section 7.4 of the Plan.   Each holder of an Equity Interest in LBSF shall neither receive nor retain any Property of the Estate or direct interest in Property of the Estate of LBSF on account of such Equity Interests thereafter; *provided*, *however*, that in

A357

the event that all Allowed Claims against LBSF have been satisfied in full in accordance with the Bankruptcy Code and the Plan, each holder of an Equity Interest in LBSF may receive its Pro Rata Share of any remaining assets in LBSF.

### 5.27    LOTC Class 1 – Priority Non-Tax Claims against LOTC.

(a)    <u>Impairment and Voting</u>.  LOTC Class 1 is impaired by the Plan.  Each holder of an Allowed Claim in LOTC Class 1 is entitled to vote to accept or reject the Plan.

(b)    <u>Distributions</u>.  Except to the extent that the holder of an Allowed Claim in LOTC Class 1 agrees to less favorable treatment or has been paid by or on behalf of LOTC on account of such Claim prior to the Effective Date, on the later of the Effective Date and the date such Claim becomes Allowed, or as soon thereafter as is practicable, each holder of an Allowed Claim in LOTC Class 1 shall be paid by LOTC in Cash in full.

### 5.28    LOTC Class 2 – Secured Claims against LOTC.

(a)    <u>Impairment and Voting</u>.  LOTC Class 2 is impaired by the Plan.  Each holder of an Allowed Claim in LOTC Class 2 is entitled to vote to accept or reject the Plan.

(b)    <u>Distributions</u>.  Except to the extent that the holder of an Allowed Claim in LOTC Class 2 agrees to less favorable treatment, each holder of an Allowed Claim in LOTC Class 2 shall be satisfied by, at the option of LOTC:  (i) payment in Cash by LOTC in full on the later of the Effective Date and the date such Claim becomes Allowed, or as soon thereafter as is practicable; (ii) the sale or disposition proceeds of the Collateral securing such Allowed Claim to the extent of the value of the Collateral securing such Allowed Claim; (iii) surrender to the holder of such Allowed Claim of the Collateral securing such Allowed Claim; or (iv) such treatment that leaves unaltered the legal, equitable, and contractual rights to which the holder of the Allowed Claim is entitled.   In the event an Allowed Claim in LOTC Class 2 is treated under clause (i) or (ii) above, the Liens securing such Claim shall be deemed released and extinguished without further order of the Bankruptcy Court.

### 5.29    LOTC Class 3 – Convenience Claims against LOTC.

(a)    <u>Impairment and Voting</u>.  LOTC Class 3 is impaired by the Plan.  Each holder of an Allowed Claim in LOTC Class 3 is entitled to vote to accept or reject the Plan.

(b)    <u>Distributions</u>.  Each holder of an Allowed Claim in LOTC Class 3 shall receive Cash from LOTC in an amount equal to .34 multiplied by the amount of such Claim, in full and complete satisfaction of such Allowed Claim, on the later of the Effective Date and the date such Claim becomes an Allowed Claim, or as soon thereafter as is practicable.

### 5.30    LOTC Class 4 – General Unsecured Claims against LOTC.

(a)    <u>Impairment and Voting</u>.  LOTC Class 4 is impaired by the Plan.  Each holder of an Allowed Claim in LOTC Class 4 is entitled to vote to accept or reject the Plan.

(b)  Distributions.  Each holder of an Allowed Claim in LOTC Class 4 shall receive from LOTC its Pro Rata Share of (i) Available Cash; *provided*, *however*, that the applicable Plan Adjustment Percentage of such Distribution shall be automatically redistributed pursuant to Section 6.5(a) of the Plan, and (ii) the Excess Plan Adjustment Portion with respect to LOTC Class 4.

5.31  LOTC Class 5A – Affiliate Claims of LBHI against LOTC.

(a)  Impairment and Voting.  LOTC Class 5A is impaired by the Plan.  LBHI is entitled to vote to accept or reject the Plan.

(b)  Distributions.  Subject to Sections 6.5(b) and 6.5(c) of the Plan, LBHI shall receive its Pro Rata Share of Available Cash from LOTC.

5.32  LOTC Class 5B – Affiliate Claims of Participating Subsidiary Debtors against LOTC.

(a)  Impairment and Voting.  LOTC Class 5B is impaired by the Plan.  Each holder of an Allowed Claim in LOTC Class 5B is entitled to vote to accept or reject the Plan.

(b)  Distributions.  Subject to Section 6.5(b) of the Plan, each holder of an Allowed Claim in LOTC Class 5B shall receive from LOTC its Pro Rata Share of (i) Available Cash; *provided*, *however*, that the applicable Plan Adjustment Percentage of such Distribution shall be automatically redistributed pursuant to Section 6.5(a) of the Plan, and (ii) the Excess Plan Adjustment Portion with respect to LOTC Class 5B.

5.33  LOTC Class 5C – Affiliate Claims other than those of Participating Debtors against LOTC.

(a)  Impairment and Voting.  LOTC Class 5C is impaired by the Plan.  Each holder of an Allowed Claim in LOTC Class 5C is entitled to vote to accept or reject the Plan.

(b)  Distributions.  Subject to Section 6.5(b) of the Plan, each holder of an Allowed Claim in LOTC Class 5C shall receive from LOTC its Pro Rata Share of (i) Available Cash; *provided*, *however*, that the applicable Plan Adjustment Percentage of such Distribution shall be automatically redistributed pursuant to Section 6.5(a) of the Plan, and (ii) the Excess Plan Adjustment Portion with respect to LOTC Class 5C.

5.34  LOTC Class 6 – Equity Interests in LOTC.

(a)  Impairment and Voting.  LOTC Class 6 is impaired by the Plan.  Each holder of an Equity Interest in LOTC Class 6 is not entitled to vote to accept or reject the Plan and is conclusively deemed to have rejected the Plan.

(b)  Distributions.  Equity Interests in LOTC shall be cancelled if and when LOTC is dissolved in accordance with Section 7.4 of the Plan.  Each holder of an Equity Interest in LOTC shall neither receive nor retain any Property of the Estate or direct interest in Property of the Estate of LOTC on account of such Equity Interests thereafter; *provided*, *however*, that in

the event that all Allowed Claims against LOTC have been satisfied in full in accordance with the Bankruptcy Code and the Plan, each holder of an Equity Interest in LOTC may receive its Pro Rata Share of any remaining assets in LOTC.

5.35    LBCC Class 1 – Priority Non-Tax Claims against LBCC.

(a)    Impairment and Voting.  LBCC Class 1 is impaired by the Plan.  Each holder of an Allowed Claim in LBCC Class 1 is entitled to vote to accept or reject the Plan.

(b)    Distributions.  Except to the extent that the holder of an Allowed Claim in LBCC Class 1 agrees to less favorable treatment or has been paid by or on behalf of LBCC on account of such Claim prior to the Effective Date, on the later of the Effective Date and the date such Claim becomes Allowed, or as soon thereafter as is practicable, each holder of an Allowed Claim in LBCC Class 1 shall be paid by LBCC in Cash in full.

5.36    LBCC Class 2 – Secured Claims against LBCC.

(a)    Impairment and Voting.  LBCC Class 2 is impaired by the Plan.  Each holder of an Allowed Claim in LBCC Class 2 is entitled to vote to accept or reject the Plan.

(b)    Distributions.  Except to the extent that the holder of an Allowed Claim in LBCC Class 2 agrees to less favorable treatment, each holder of an Allowed Claim in LBCC Class 2 shall be satisfied by, at the option of LBCC:  (i) payment in Cash by LBCC in full on the later of the Effective Date and the date such Claim becomes Allowed, or as soon thereafter as is practicable; (ii) the sale or disposition proceeds of the Collateral securing such Allowed Claim to the extent of the value of the Collateral securing such Allowed Claim; (iii) surrender to the holder of such Allowed Claim of the Collateral securing such Allowed Claim; or (iv) such treatment that leaves unaltered the legal, equitable, and contractual rights to which the holder of the Allowed Claim is entitled.  In the event an Allowed Claim in LBCC Class 2 is treated under clause (i) or (ii) above, the Liens securing such Claim shall be deemed released and extinguished without further order of the Bankruptcy Court.

5.37    LBCC Class 3 – Convenience Claims against LBCC.

(a)    Impairment and Voting.  LBCC Class 3 is impaired by the Plan.  Each holder of an Allowed Claim in LBCC Class 3 is entitled to vote to accept or reject the Plan.

(b)    Distributions.  Each holder of an Allowed Claim in LBCC Class 3 shall receive Cash from LBCC in an amount equal to .49 multiplied by the amount of such Claim, in full and complete satisfaction of such Allowed Claim, on the later of the Effective Date and the date such Claim becomes an Allowed Claim, or as soon thereafter as is practicable.

5.38    LBCC Class 4 – General Unsecured Claims against LBCC.

(a)    Impairment and Voting.  LBCC Class 4 is impaired by the Plan.  Each holder of an Allowed Claim in LBCC Class 4 is entitled to vote to accept or reject the Plan.

(b)    Distributions.  Each holder of an Allowed Claim in LBCC Class 4 shall receive from LBCC its Pro Rata Share of (i) Available Cash; *provided*, *however*, that the applicable Plan Adjustment Percentage of such Distribution shall be automatically redistributed pursuant to Section 6.5(a) of the Plan, and (ii) the Excess Plan Adjustment Portion with respect to LBCC Class 4.

5.39    LBCC Class 5A – Affiliate Claims of LBHI against LBCC.

(a)    Impairment and Voting.  LBCC Class 5A is impaired by the Plan.  LBHI is entitled to vote to accept or reject the Plan.

(b)    Distributions.  Subject to Sections 6.5(b) and 6.5(c) of the Plan, LBHI shall receive its Pro Rata Share of Available Cash from LBCC.

5.40    LBCC Class 5B – Affiliate Claims of Participating Subsidiary Debtors against LBCC.

(a)    Impairment and Voting.  LBCC Class 5B is impaired by the Plan.  Each holder of an Allowed Claim in LBCC Class 5B is entitled to vote to accept or reject the Plan.

(b)    Distributions.  Subject to Section 6.5(b) of the Plan, each holder of an Allowed Claim in LBCC Class 5B shall receive from LBCC its Pro Rata Share of (i) Available Cash; *provided*, *however*, that the applicable Plan Adjustment Percentage of such Distribution shall be automatically redistributed pursuant to Section 6.5(a) of the Plan, and (ii) the Excess Plan Adjustment Portion with respect to LBCC Class 5B.

5.41    LBCC Class 5C – Affiliate Claims other than those of Participating Debtors against LBCC.

(a)    Impairment and Voting.  LBCC Class 5C is impaired by the Plan.  Each holder of an Allowed Claim in LBCC Class 5C is entitled to vote to accept or reject the Plan.

(b)    Distributions.  Subject to Section 6.5(b) of the Plan, each holder of an Allowed Claim in LBCC Class 5C shall receive from LBCC its Pro Rata Share of (i) Available Cash; *provided*, *however*, that the applicable Plan Adjustment Percentage of such Distribution shall be automatically redistributed pursuant to Section 6.5(a) of the Plan, and (ii) the Excess Plan Adjustment Portion with respect to LBCC Class 5C.

5.42    LBCC Class 6 – Equity Interests in LBCC.

(a)    Impairment and Voting.  LBCC Class 6 is impaired by the Plan.  Each holder of an Equity Interest in LBCC Class 6 is not entitled to vote to accept or reject the Plan and is conclusively deemed to have rejected the Plan.

(b)    Distributions.  Equity Interests in LBCC shall be cancelled if and when LBCC is dissolved in accordance with Section 7.4 of the Plan.  Each holder of an Equity Interest in LBCC shall neither receive nor retain any Property of the Estate or direct interest in Property of the Estate of LBCC on account of such Equity Interests thereafter; *provided*, *however*, that in

A361

the event that all Allowed Claims against LBCC have been satisfied in full in accordance with the Bankruptcy Code and the Plan, each holder of an Equity Interest in LBCC may receive its Pro Rata Share of any remaining assets in LBCC.

5.43     LBDP Class 1 – Priority Non-Tax Claims against LBDP.

(a)     Impairment and Voting.  LBDP Class 1 is impaired by the Plan.  Each holder of an Allowed Claim in LBDP Class 1 is entitled to vote to accept or reject the Plan.

(b)     Distributions.   Except to the extent that the holder of an Allowed Claim in LBDP Class 1 agrees to less favorable treatment or has been paid by or on behalf of LBDP on account of such Claim prior to the Effective Date, on the later of the Effective Date and the date such Claim becomes Allowed, or as soon thereafter as is practicable, each holder of an Allowed Claim in LBDP Class 1 shall be paid by LBDP in Cash in full.

5.44     LBDP Class 2 – Secured Claims against LBDP.

(a)     Impairment and Voting.  LBDP Class 2 is impaired by the Plan.  Each holder of an Allowed Claim in LBDP Class 2 is entitled to vote to accept or reject the Plan.

(b)     Distributions.   Except to the extent that the holder of an Allowed Claim in LBDP Class 2 agrees to less favorable treatment, each holder of an Allowed Claim in LBDP Class 2 shall be satisfied by, at the option of LBDP:   (i) payment in Cash by LBDP in full on the later of the Effective Date and the date such Claim becomes Allowed, or as soon thereafter as is practicable; (ii) the sale or disposition proceeds of the Collateral securing such Allowed Claim to the extent of the value of the Collateral securing such Allowed Claim; (iii) surrender to the holder of such Allowed Claim of the Collateral securing such Allowed Claim; or (iv) such treatment that leaves unaltered the legal, equitable, and contractual rights to which the holder of the Allowed Claim is entitled.   In the event an Allowed Claim in LBDP Class 2 is treated under clause (i) or (ii) above, the Liens securing such Claim shall be deemed released and extinguished without further order of the Bankruptcy Court.

5.45     LBDP Class 3 – General Unsecured Claims against LBDP.

(a)     Impairment and Voting.  LBDP Class 3 is impaired by the Plan.  Each holder of an Allowed Claim in LBDP Class 3 is entitled to vote to accept or reject the Plan.

(b)     Distributions.  Each holder of an Allowed Claim in LBDP Class 3 shall receive its Pro Rata Share of Available Cash from LBDP.

5.46     LBDP Class 4A – Affiliate Claims of LBHI against LBDP.

(a)     Impairment and Voting.  LBHI is entitled to vote to accept or reject the Plan.

(b)     Distributions.  Subject to Sections 6.5(b) and 6.5(c) of the Plan, LBHI shall receive its Pro Rata Share of Available Cash from LBDP.

5.47    LBDP Class 4B – Affiliate Claims other than those of LBHI against LBDP.

(a)    Impairment and Voting.  LBDP Class 4B is impaired by the Plan.  Each holder of an Allowed Claim in LBDP Class 4B is entitled to vote to accept or reject the Plan.

(b)    Distributions.  Subject to Section 6.5(b) of the Plan, each holder of an Allowed Claim in LBDP Class 4B shall receive its Pro Rata Share of Available Cash from LBDP.

5.48    LBDP Class 5 – Equity Interests in LBDP.

(a)    Impairment and Voting.  LBDP Class 5 is impaired by the Plan.  Each holder of an Equity Interest in LBDP Class 5 is not entitled to vote to accept or reject the Plan and is conclusively deemed to have rejected the Plan.

(b)    Distributions.  Equity Interests in LBDP shall be cancelled if and when LBDP is dissolved in accordance with Section 7.4 of the Plan.   Each holder of an Equity Interest in LBDP shall neither receive nor retain any Property of the Estate or direct interest in Property of the Estate of LBDP on account of such Equity Interests thereafter; *provided*, *however*, that in the event that all Allowed Claims against LBDP have been satisfied in full in accordance with the Bankruptcy Code and the Plan, each holder of an Equity Interest in LBDP may receive its Pro Rata Share of any remaining assets in LBDP.

5.49    LBFP Class 1 – Priority Non-Tax Claims against LBFP.

(a)    Impairment and Voting.  LBFP Class 1 is impaired by the Plan.  Each holder of an Allowed Claim in LBFP Class 1 is entitled to vote to accept or reject the Plan.

(b)    Distributions.   Except to the extent that the holder of an Allowed Claim in LBFP Class 1 agrees to less favorable treatment or has been paid by or on behalf of LBFP on account of such Claim prior to the Effective Date, on the later of the Effective Date and the date such Claim becomes Allowed, or as soon thereafter as is practicable, each holder of an Allowed Claim in LBFP Class 1 shall be paid by LBFP in Cash in full.

5.50    LBFP Class 2 – Secured Claims against LBFP.

(a)    Impairment and Voting.  LBFP Class 2 is impaired by the Plan.  Each holder of an Allowed Claim in LBFP Class 2 is entitled to vote to accept or reject the Plan.

(b)    Distributions.   Except to the extent that the holder of an Allowed Claim in LBFP Class 2 agrees to less favorable treatment, each holder of an Allowed Claim in LBFP Class 2 shall be satisfied by, at the option of LBFP:   (i) payment in Cash by LBFP in full on the later of the Effective Date and the date such Claim becomes Allowed, or as soon thereafter as is practicable; (ii) the sale or disposition proceeds of the Collateral securing such Allowed Claim to the extent of the value of the Collateral securing such Allowed Claim; (iii) surrender to the holder of such Allowed Claim of the Collateral securing such Allowed Claim; or (iv) such treatment that leaves unaltered the legal, equitable, and contractual rights to which the holder of the Allowed Claim is entitled.   In the event an Allowed Claim in LBFP Class 2 is treated under

A363

clause (i) or (ii) above, the Liens securing such Claim shall be deemed released and extinguished without further order of the Bankruptcy Court.

5.51    LBFP Class 3 – General Unsecured Claims against LBFP.

(a)    Impairment and Voting.  LBFP Class 3 is impaired by the Plan.  Each holder of an Allowed Claim in LBFP Class 3 is entitled to vote to accept or reject the Plan.

(b)    Distributions.  Each holder of an Allowed Claim in LBFP Class 3 shall receive its Pro Rata Share of Available Cash from LBFP.

5.52    LBFP Class 4A – Affiliate Claims of LBHI against LBFP.

(a)    Impairment and Voting.  LBFP Class 4A is impaired by the Plan.  LBHI is entitled to vote to accept or reject the Plan.

(b)    Distributions.  Subject to Sections 6.5(b) and 6.5(c) of the Plan, LBHI shall receive its Pro Rata Share of Available Cash from LBFP.

5.53    LBFP Class 4B – Affiliate Claims other than those of LBHI against LBFP.

(a)    Impairment and Voting.  LBFP Class 4B is impaired by the Plan.  Each holder of an Allowed Claim in LBFP Class 4B is entitled to vote to accept or reject the Plan.

(b)    Distributions.  Subject to Section 6.5(b) of the Plan, each holder of an Allowed Claim in LBFP Class 4B shall receive its Pro Rata Share of Available Cash from LBFP.

5.54    LBFP Class 5 – Equity Interests in LBFP.

(a)    Impairment and Voting.  LBFP Class 5 is impaired by the Plan.  Each holder of an Equity Interest in LBFP Class 5 is not entitled to vote to accept or reject the Plan and is conclusively deemed to have rejected the Plan.

(b)    Distributions.  Equity Interests in LBFP shall be cancelled if and when LBFP is dissolved in accordance with Section 7.4 of the Plan.  Each holder of an Equity Interest in LBFP shall neither receive nor retain any Property of the Estate or direct interest in Property of the Estate of LBFP on account of such Equity Interests thereafter; *provided*, *however*, that in the event that all Allowed Claims against LBFP have been satisfied in full in accordance with the Bankruptcy Code and the Plan, each holder of an Equity Interest in LBFP may receive its Pro Rata Share of any remaining assets in LBFP.

5.55    LB 745 Class 1 – Priority Non-Tax Claims against LB 745.

(a)    Impairment and Voting.  LB 745 Class 1 is impaired by the Plan.  Each holder of an Allowed Claim in LB 745 Class 1 is entitled to vote to accept or reject the Plan.

(b)    Distributions.  Except to the extent that the holder of an Allowed Claim in LB 745 Class 1 agrees to less favorable treatment or has been paid by or on behalf of LB 745 on

A364

account of such Claim prior to the Effective Date, on the later of the Effective Date and the date such Claim becomes Allowed, or as soon thereafter as is practicable, each holder of an Allowed Claim in LB 745 Class 1 shall be paid by LB 745 in Cash in full.

5.56    <u>LB 745 Class 2 – Secured Claims against LB 745</u>.

(a)    <u>Impairment and Voting</u>.  LB 745 Class 2 is impaired by the Plan.  Each holder of an Allowed Claim in LB 745 Class 2 is entitled to vote to accept or reject the Plan.

(b)    <u>Distributions</u>.  Except to the extent that the holder of an Allowed Claim in LB 745 Class 2 agrees to less favorable treatment, each holder of an Allowed Claim in LB 745 Class 2 shall be satisfied by, at the option of LB 745:  (i) payment in Cash by LB 745 in full on the later of the Effective Date and the date such Claim becomes Allowed, or as soon thereafter as is practicable; (ii) the sale or disposition proceeds of the Collateral securing such Allowed Claim to the extent of the value of the Collateral securing such Allowed Claim; (iii) surrender to the holder of such Allowed Claim of the Collateral securing such Allowed Claim; or (iv) such treatment that leaves unaltered the legal, equitable, and contractual rights to which the holder of the Allowed Claim is entitled.  In the event an Allowed Claim in LB 745 Class 2 is treated under clause (i) or (ii) above, the Liens securing such Claim shall be deemed released and extinguished without further order of the Bankruptcy Court.

5.57    <u>LB 745 Class 3 – General Unsecured Claims against LB 745</u>.

(a)    <u>Impairment and Voting</u>.  LB 745 Class 3 is impaired by the Plan.  Each holder of an Allowed Claim in LB 745 Class 3 is entitled to vote to accept or reject the Plan.

(b)    <u>Distributions</u>.  Each holder of an Allowed Claim in LB 745 Class 3 shall receive its Pro Rata Share of Available Cash from LB 745.

5.58    <u>LB 745 Class 4A – Affiliate Claims of LBHI against LB 745</u>.

(a)    <u>Impairment and Voting</u>.  LB 745 Class 4A is impaired by the Plan.  LBHI is entitled to vote to accept or reject the Plan.

(b)    <u>Distributions</u>.  Subject to <u>Sections 6.5(b)</u> and <u>6.5(c)</u> of the Plan, LBHI shall receive its Pro Rata Share of Available Cash from LB 745.

5.59    <u>LB 745 Class 4B – Affiliate Claims other than those of LBHI against LB 745</u>.

(a)    <u>Impairment and Voting</u>.  LB 745 Class 4B is impaired by the Plan.  Each holder of an Allowed Claim in LB 745 Class 4B is entitled to vote to accept or reject the Plan.

(b)    <u>Distributions</u>.  Subject to <u>Section 6.5(b)</u> of the Plan, each holder of an Allowed Claim in LB 745 Class 4B shall receive its Pro Rata Share of Available Cash from LB 745.

5.60    LB 745 Class 5 – Equity Interests in LB 745.

(a)    Impairment and Voting.  LB 745 Class 5 is impaired by the Plan.  Each holder of an Equity Interest in LB 745 Class 5 is not entitled to vote to accept or reject the Plan and is conclusively deemed to have rejected the Plan.

(b)    Distributions.  Equity Interests in LB 745 shall be cancelled if and when LB 745 is dissolved in accordance with Section 7.4 of the Plan.  Each holder of an Equity Interest in LB 745 shall neither receive nor retain any Property of the Estate or direct interest in Property of the Estate of LB 745 on account of such Equity Interests thereafter; *provided*, *however*, that in the event that all Allowed Claims against LB 745 have been satisfied in full in accordance with the Bankruptcy Code and the Plan, each holder of an Equity Interest in LB 745 may receive its Pro Rata Share of any remaining assets in LB 745.

5.61    PAMI Statler Class 1 – Priority Non-Tax Claims against PAMI Statler.

(a)    Impairment and Voting.  PAMI Statler Class 1 is impaired by the Plan. Each holder of an Allowed Claim in PAMI Statler Class 1 is entitled to vote to accept or reject the Plan.

(b)    Distributions.  Except to the extent that the holder of an Allowed Claim in PAMI Statler Class 1 agrees to less favorable treatment or has been paid by or on behalf of PAMI Statler on account of such Claim prior to the Effective Date, on the later of the Effective Date and the date such Claim becomes Allowed, or as soon thereafter as is practicable, each holder of an Allowed Claim in PAMI Statler Class 1 shall be paid by PAMI Statler in Cash in full.

5.62    PAMI Statler Class 2 – Secured Claims against PAMI Statler.

(a)    Impairment and Voting.  PAMI Statler Class 2 is impaired by the Plan. Each holder of an Allowed Claim in PAMI Statler Class 2 is entitled to vote to accept or reject the Plan.

(b)    Distributions.  Except to the extent that the holder of an Allowed Claim in PAMI Statler Class 2 agrees to less favorable treatment, each holder of an Allowed Claim in PAMI Statler Class 2 shall be satisfied by, at the option of PAMI Statler:  (i) payment in Cash by PAMI Statler in full on the later of the Effective Date and the date such Claim becomes Allowed, or as soon thereafter as is practicable; (ii) the sale or disposition proceeds of the Collateral securing such Allowed Claim to the extent of the value of the Collateral securing such Allowed Claim; (iii) surrender to the holder of such Allowed Claim of the Collateral securing such Allowed Claim; or (iv) such treatment that leaves unaltered the legal, equitable, and contractual rights to which the holder of the Allowed Claim is entitled.   In the event an Allowed Claim in PAMI Statler Class 2 is treated under clause (i) or (ii) above, the Liens securing such Claim shall be deemed released and extinguished without further order of the Bankruptcy Court.

A366

5.63     PAMI Statler Class 3 – General Unsecured Claims against PAMI Statler.

          (a)     Impairment and Voting.  PAMI Statler Class 3 is impaired by the Plan. Each holder of an Allowed Claim in PAMI Statler Class 3 is entitled to vote to accept or reject the Plan.

          (b)     Distributions.  Each holder of an Allowed Claim in PAMI Statler Class 3 shall receive its Pro Rata Share of Available Cash from PAMI Statler.

5.64     PAMI Statler Class 4A – Affiliate Claims of LBHI against PAMI Statler.

          (a)     Impairment and Voting.  PAMI Statler Class 4A is impaired by the Plan. LBHI is entitled to vote to accept or reject the Plan.

          (b)     Distributions.  Subject to Sections 6.5(b) and 6.5(c) of the Plan, LBHI shall receive its Pro Rata Share of Available Cash from PAMI Statler.

5.65     PAMI Statler Class 4B – Affiliate Claims other than those of LBHI against PAMI Statler.

          (a)     Impairment and Voting.  PAMI Statler Class 4B is impaired by the Plan. Each holder of an Allowed Claim in PAMI Statler Class 4B is entitled to vote to accept or reject the Plan.

          (b)     Distributions.  Subject to Section 6.5(b) of the Plan, each holder of an Allowed Claim in PAMI Statler Class 4B shall receive its Pro Rata Share of Available Cash from PAMI Statler.

5.66     PAMI Statler Class 5 – Equity Interests in PAMI Statler.

          (a)     Impairment and Voting.  PAMI Statler Class 5 is impaired by the Plan. Each holder of an Equity Interest in PAMI Statler Class 5 is not entitled to vote to accept or reject the Plan and is conclusively deemed to have rejected the Plan.

          (b)     Distributions.  Equity Interests in PAMI Statler shall be cancelled if and when PAMI Statler is dissolved in accordance with Section 7.4 of the Plan.  Each holder of an Equity Interest in PAMI Statler shall neither receive nor retain any Property of the Estate or direct interest in Property of the Estate of PAMI Statler on account of such Equity Interests thereafter; *provided*, *however*, that in the event that all Allowed Claims against PAMI Statler have been satisfied in full in accordance with the Bankruptcy Code and the Plan, each holder of an Equity Interest in PAMI Statler may receive its Pro Rata Share of any remaining assets in PAMI Statler.

5.67     CES Class 1 – Priority Non-Tax Claims against CES.

          (a)     Impairment and Voting.  CES Class 1 is impaired by the Plan.  Each holder of an Allowed Claim in CES Class 1 is entitled to vote to accept or reject the Plan.

(b)    Distributions.   Except to the extent that the holder of an Allowed Claim in CES Class 1 agrees to less favorable treatment or has been paid by or on behalf of CES on account of such Claim prior to the Effective Date, on the later of the Effective Date and the date such Claim becomes Allowed, or as soon thereafter as is practicable, each holder of an Allowed Claim in CES Class 1 shall be paid by CES in Cash in full.

5.68    CES Class 2 – Secured Claims against CES.

(a)    Impairment and Voting.   CES Class 2 is impaired by the Plan.   Each holder of an Allowed Claim in CES Class 2 is entitled to vote to accept or reject the Plan.

(b)    Distributions.   Except to the extent that the holder of an Allowed Claim in CES Class 2 agrees to less favorable treatment, each holder of an Allowed Claim in CES Class 2 shall be satisfied by, at the option of CES:   (i) payment in Cash by CES in full on the later of the Effective Date and the date such Claim becomes Allowed, or as soon thereafter as is practicable; (ii) the sale or disposition proceeds of the Collateral securing such Allowed Claim to the extent of the value of the Collateral securing such Allowed Claim; (iii) surrender to the holder of such Allowed Claim of the Collateral securing such Allowed Claim; or (iv) such treatment that leaves unaltered the legal, equitable, and contractual rights to which the holder of the Allowed Claim is entitled.   In the event an Allowed Claim in CES Class 2 is treated under clause (i) or (ii) above, the Liens securing such Claim shall be deemed released and extinguished without further order of the Bankruptcy Court.

5.69    CES Class 3 – General Unsecured Claims against CES.

(a)    Impairment and Voting.   CES Class 3 is impaired by the Plan.   Each holder of an Allowed Claim in CES Class 3 is entitled to vote to accept or reject the Plan.

(b)    Distributions.   Each holder of an Allowed Claim in CES Class 3 shall receive its Pro Rata Share of Available Cash from CES.

5.70    CES Class 4A – Affiliate Claims of LBHI against CES.

(a)    Impairment and Voting.   CES Class 4A is impaired by the Plan.   LBHI is entitled to vote to accept or reject the Plan.

(b)    Distributions.   Subject to Sections 6.5(b) and 6.5(c) of the Plan, LBHI shall receive its Pro Rata Share of Available Cash from CES.

5.71    CES Class 4B – Affiliate Claims other than those of LBHI against CES.

(a)    Impairment and Voting.   CES Class 4B is impaired by the Plan.   Each holder of an Allowed Claim in CES Class 4B is entitled to vote to accept or reject the Plan.

(b)    Distributions.   Subject to Section 6.5(b) of the Plan, each holder of an Allowed Claim in CES Class 4B shall receive its Pro Rata Share of Available Cash from CES.

A368

5.72   <u>CES Class 5 – Equity Interests in CES</u>.

(a)   <u>Impairment and Voting</u>.  CES Class 5 is impaired by the Plan.  Each holder of an Equity Interest in CES Class 5 is not entitled to vote to accept or reject the Plan and is conclusively deemed to have rejected the Plan.

(b)   <u>Distributions</u>.  Equity Interests in CES shall be cancelled if and when CES is dissolved in accordance with <u>Section 7.4</u> of the Plan.  Each holder of an Equity Interest in CES shall neither receive nor retain any Property of the Estate or direct interest in Property of the Estate of CES on account of such Equity Interests thereafter; *provided*, *however*, that in the event that all Allowed Claims against CES have been satisfied in full in accordance with the Bankruptcy Code and the Plan, each holder of an Equity Interest in CES may receive its Pro Rata Share of any remaining assets in CES.

5.73   <u>CES V Class 1 – Priority Non-Tax Claims against CES V</u>.

(a)   <u>Impairment and Voting</u>.  CES V Class 1 is impaired by the Plan.  Each holder of an Allowed Claim in CES V Class 1 is entitled to vote to accept or reject the Plan.

(b)   <u>Distributions</u>.  Except to the extent that the holder of an Allowed Claim in CES V Class 1 agrees to less favorable treatment or has been paid by or on behalf of CES V on account of such Claim prior to the Effective Date, on the later of the Effective Date and the date such Claim becomes Allowed, or as soon thereafter as is practicable, each holder of an Allowed Claim in CES V Class 1 shall be paid by CES V in Cash in full.

5.74   <u>CES V Class 2 – Secured Claims against CES V</u>.

(a)   <u>Impairment and Voting</u>.  CES V Class 2 is impaired by the Plan.  Each holder of an Allowed Claim in CES V Class 2 is entitled to vote to accept or reject the Plan.

(b)   <u>Distributions</u>.  Except to the extent that the holder of an Allowed Claim in CES V Class 2 agrees to less favorable treatment, each holder of an Allowed Claim in CES V Class 2 shall be satisfied by, at the option of CES V:  (i) payment in Cash by CES V in full on the later of the Effective Date and the date such Claim becomes Allowed, or as soon thereafter as is practicable; (ii) the sale or disposition proceeds of the Collateral securing such Allowed Claim to the extent of the value of the Collateral securing such Allowed Claim; (iii) surrender to the holder of such Allowed Claim of the Collateral securing such Allowed Claim; or (iv) such treatment that leaves unaltered the legal, equitable, and contractual rights to which the holder of the Allowed Claim is entitled.   In the event an Allowed Claim in CES V Class 2 is treated under clause (i) or (ii) above, the Liens securing such Claim shall be deemed released and extinguished without further order of the Bankruptcy Court.

5.75   <u>CES V Class 3 – General Unsecured Claims against CES V</u>.

(a)   <u>Impairment and Voting</u>.  CES V Class 3 is impaired by the Plan.  Each holder of an Allowed Claim in CES V Class 3 is entitled to vote to accept or reject the Plan.

(b)    _Distributions_.  Each holder of an Allowed Claim in CES V Class 3 shall receive its Pro Rata Share of Available Cash from CES V.

5.76    _CES V Class 4A – Affiliate Claims of LBHI against CES V._

(a)    _Impairment and Voting_.  CES V Class 4A is impaired by the Plan.  LBHI is entitled to vote to accept or reject the Plan.

(b)    _Distributions_.  Subject to _Sections 6.5(b)_ and _6.5(c)_ of the Plan, LBHI shall receive its Pro Rata Share of Available Cash from CES V.

5.77    _CES V Class 4B – Affiliate Claims other than those of LBHI against CES V._

(a)    _Impairment and Voting_.  CES V Class 4B is impaired by the Plan.  Each holder of an Allowed Claim in CES V Class 4B is entitled to vote to accept or reject the Plan.

(b)    _Distributions_.  Subject to _Section 6.5(b)_ of the Plan, each holder of an Allowed Claim in CES V Class 4B shall receive its Pro Rata Share of Available Cash from CES V.

5.78    _CES V Class 5 – Equity Interests in CES V._

(a)    _Impairment and Voting_.  CES V Class 5 is impaired by the Plan.  Each holder of an Equity Interest in CES V Class 5 is not entitled to vote to accept or reject the Plan and is conclusively deemed to have rejected the Plan.

(b)    _Distributions_.  Equity Interests in CES V shall be cancelled if and when CES V is dissolved in accordance with _Section 7.4_ of the Plan.  Each holder of an Equity Interest in CES V shall neither receive nor retain any Property of the Estate or direct interest in Property of the Estate of CES V on account of such Equity Interests thereafter; _provided_, _however_, that in the event that all Allowed Claims against CES V have been satisfied in full in accordance with the Bankruptcy Code and the Plan, each holder of an Equity Interest in CES V may receive its Pro Rata Share of any remaining assets in CES V.

5.79    _CES IX Class 1 – Priority Non-Tax Claims against CES IX._

(a)    _Impairment and Voting_.  CES IX Class 1 is impaired by the Plan.  Each holder of an Allowed Claim in CES IX Class 1 is entitled to vote to accept or reject the Plan.

(b)    _Distributions_.  Except to the extent that the holder of an Allowed Claim in CES IX Class 1 agrees to less favorable treatment or has been paid by or on behalf of CES IX on account of such Claim prior to the Effective Date, on the later of the Effective Date and the date such Claim becomes Allowed, or as soon thereafter as is practicable, each holder of an Allowed Claim in CES IX Class 1 shall be paid by CES IX in Cash in full.

5.80    CES IX Class 2 – Secured Claims against CES IX.

(a)    Impairment and Voting.  CES IX Class 2 is impaired by the Plan.  Each holder of an Allowed Claim in CES IX Class 2 is entitled to vote to accept or reject the Plan.

(b)    Distributions.  Except to the extent that the holder of an Allowed Claim in CES IX Class 2 agrees to less favorable treatment, each holder of an Allowed Claim in CES IX Class 2 shall be satisfied by, at the option of CES IX:   (i) payment in Cash by CES IX in full on the later of the Effective Date and the date such Claim becomes Allowed, or as soon thereafter as is practicable; (ii) the sale or disposition proceeds of the Collateral securing such Allowed Claim to the extent of the value of the Collateral securing such Allowed Claim; (iii) surrender to the holder of such Allowed Claim of the Collateral securing such Allowed Claim; or (iv) such treatment that leaves unaltered the legal, equitable, and contractual rights to which the holder of the Allowed Claim is entitled.  In the event an Allowed Claim in CES IX Class 2 is treated under clause (i) or (ii) above, the Liens securing such Claim shall be deemed released and extinguished without further order of the Bankruptcy Court.

5.81    CES IX Class 3 – General Unsecured Claims against CES IX.

(a)    Impairment and Voting.  CES IX Class 3 is impaired by the Plan.  Each holder of an Allowed Claim in CES IX Class 3 is entitled to vote to accept or reject the Plan.

(b)    Distributions.  Each holder of an Allowed Claim in CES IX Class 3 shall receive its Pro Rata Share of Available Cash from CES IX.

5.82    CES IX Class 4A – Affiliate Claims of LBHI against CES IX.

(a)    Impairment and Voting.  CES IX Class 4A is impaired by the Plan.  LBHI is entitled to vote to accept or reject the Plan.

(b)    Distributions.  Subject to Sections 6.5(b) and 6.5(c) of the Plan, LBHI shall receive its Pro Rata Share of Available Cash from CES IX.

5.83    CES IX Class 4B – Affiliate Claims other than those of LBHI against CES IX.

(a)    Impairment and Voting.  CES IX Class 4B is impaired by the Plan.  Each holder of an Allowed Claim in CES IX Class 4B is entitled to vote to accept or reject the Plan.

(b)    Distributions.  Subject to Section 6.5(b) of the Plan, each holder of an Allowed Claim in CES IX Class 4B shall receive its Pro Rata Share of Available Cash from CES IX

5.84    CES IX Class 5 – Equity Interests in CES IX.

(a)    Impairment and Voting.  CES IX Class 5 is impaired by the Plan.  Each holder of an Equity Interest in CES IX Class 5 is not entitled to vote to accept or reject the Plan and is conclusively deemed to have rejected the Plan.

A371

(b)     Distributions.   Equity Interests in CES IX shall be cancelled if and when CES IX is dissolved in accordance with Section 7.4 of the Plan.  Each holder of an Equity Interest in CES IX shall neither receive nor retain any Property of the Estate or direct interest in Property of the Estate of CES IX on account of such Equity Interests thereafter; *provided, however*, that in the event that all Allowed Claims against CES IX have been satisfied in full in accordance with the Bankruptcy Code and the Plan, each holder of an Equity Interest in CES IX may receive its Pro Rata Share of any remaining assets in CES IX.

5.85    East Dover Class 1 – Priority Non-Tax Claims against East Dover.

(a)     Impairment and Voting.   East Dover Class 1 is impaired by the Plan. Each holder of an Allowed Claim in East Dover Class 1 is entitled to vote to accept or reject the Plan.

(b)     Distributions.   Except to the extent that the holder of an Allowed Claim in East Dover Class 1 agrees to less favorable treatment or has been paid by or on behalf of East Dover on account of such Claim prior to the Effective Date, on the later of the Effective Date and the date such Claim becomes Allowed, or as soon thereafter as is practicable, each holder of an Allowed Claim in East Dover Class 1 shall be paid by East Dover in Cash in full.

5.86    East Dover Class 2 – Secured Claims against East Dover.

(a)     Impairment and Voting.   East Dover Class 2 is impaired by the Plan. Each holder of an Allowed Claim in East Dover Class 2 is entitled to vote to accept or reject the Plan.

(b)     Distributions.   Except to the extent that the holder of an Allowed Claim in East Dover Class 2 agrees to less favorable treatment, each holder of an Allowed Claim in East Dover Class 2 shall be satisfied by, at the option of East Dover:  (i) payment in Cash by East Dover in full on the later of the Effective Date and the date such Claim becomes Allowed, or as soon thereafter as is practicable; (ii) the sale or disposition proceeds of the Collateral securing such Allowed Claim to the extent of the value of the Collateral securing such Allowed Claim; (iii) surrender to the holder of such Allowed Claim of the Collateral securing such Allowed Claim; or (iv) such treatment that leaves unaltered the legal, equitable, and contractual rights to which the holder of the Allowed Claim is entitled.   In the event an Allowed Claim in East Dover Class 2 is treated under clause (i) or (ii) above, the Liens securing such Claim shall be deemed released and extinguished without further order of the Bankruptcy Court.

5.87    East Dover Class 3 – General Unsecured Claims against East Dover.

(a)     Impairment and Voting.   East Dover Class 3 is impaired by the Plan. Each holder of an Allowed Claim in East Dover Class 3 is entitled to vote to accept or reject the Plan.

(b)     Distributions.   Each holder of an Allowed Claim in East Dover Class 3 shall receive its Pro Rata Share of Available Cash from East Dover.

A372

5.88    East Dover Class 4A – Affiliate Claims of LBHI against East Dover.

(a)    Impairment and Voting.  East Dover Class 4A is impaired by the Plan. LBHI is entitled to vote to accept or reject the Plan.

(b)    Distributions.  Subject to Sections 6.5(b) and 6.5(c) of the Plan, LBHI shall receive its Pro Rata Share of Available Cash from East Dover.

5.89    East Dover Class 4B – Affiliate Claims other than those of LBHI against East Dover.

(a)    Impairment and Voting.  East Dover Class 4B is impaired by the Plan. Each holder of an Allowed Claim in East Dover Class 4B is entitled to vote to accept or reject the Plan.

(b)    Distributions.  Subject to Section 6.5(b) of the Plan, each holder of an Allowed Claim in East Dover Class 4B shall receive its Pro Rata Share of Available Cash from East Dover.

5.90    East Dover Class 5 – Equity Interests in East Dover.

(a)    Impairment and Voting.  East Dover Class 5 is impaired by the Plan. Each holder of an Equity Interest in East Dover Class 5 is not entitled to vote to accept or reject the Plan and is conclusively deemed to have rejected the Plan.

(b)    Distributions.  Equity Interests in East Dover shall be cancelled if and when East Dover is dissolved in accordance with Section 7.4 of the Plan.  Each holder of an Equity Interest in East Dover shall neither receive nor retain any Property of the Estate or direct interest in Property of the Estate of East Dover on account of such Equity Interests thereafter; *provided*, *however*, that in the event that all Allowed Claims against East Dover have been satisfied in full in accordance with the Bankruptcy Code and the Plan, each holder of an Equity Interest in East Dover may receive its Pro Rata Share of any remaining assets in East Dover.

5.91    LS Finance Class 1 – Priority Non-Tax Claims against LS Finance.

(a)    Impairment and Voting.  LS Finance Class 1 is impaired by the Plan. Each holder of an Allowed Claim in LS Finance Class 1 is entitled to vote to accept or reject the Plan.

(b)    Distributions.  Except to the extent that the holder of an Allowed Claim in LS Finance Class 1 agrees to less favorable treatment or has been paid by or on behalf of LS Finance on account of such Claim prior to the Effective Date, on the later of the Effective Date and the date such Claim becomes Allowed, or as soon thereafter as is practicable, each holder of an Allowed Claim in LS Finance Class 1 shall be paid by LS Finance in Cash in full.

5.92    LS Finance Class 2 – Secured Claims against LS Finance.

(a)    Impairment and Voting.  LS Finance Class 2 is impaired by the Plan. Each holder of an Allowed Claim in LS Finance Class 2 is entitled to vote to accept or reject the Plan.

(b)    Distributions.  Except to the extent that the holder of an Allowed Claim in LS Finance Class 2 agrees to less favorable treatment, each holder of an Allowed Claim in LS Finance Class 2 shall be satisfied by, at the option of LS Finance:  (i) payment in Cash by LS Finance in full on the later of the Effective Date and the date such Claim becomes Allowed, or as soon thereafter as is practicable; (ii) the sale or disposition proceeds of the Collateral securing such Allowed Claim to the extent of the value of the Collateral securing such Allowed Claim; (iii) surrender to the holder of such Allowed Claim of the Collateral securing such Allowed Claim; or (iv) such treatment that leaves unaltered the legal, equitable, and contractual rights to which the holder of the Allowed Claim is entitled.  In the event an Allowed Claim in LS Finance Class 2 is treated under clause (i) or (ii) above, the Liens securing such Claim shall be deemed released and extinguished without further order of the Bankruptcy Court.

5.93    LS Finance Class 3 – General Unsecured Claims against LS Finance.

(a)    Impairment and Voting.  LS Finance Class 3 is impaired by the Plan. Each holder of an Allowed Claim in LS Finance Class 3 is entitled to vote to accept or reject the Plan.

(b)    Distributions.  Each holder of an Allowed Claim in LS Finance Class 3 shall receive its Pro Rata Share of Available Cash from LS Finance.

5.94    LS Finance Class 4A – Affiliate Claims of LBHI against LS Finance.

(a)    Impairment and Voting.  LS Finance Class 4A is impaired by the Plan. LBHI is entitled to vote to accept or reject the Plan.

(b)    Distributions.  Subject to Sections 6.5(b) and 6.5(c) of the Plan, LBHI shall receive its Pro Rata Share of Available Cash from LS Finance.

5.95    LS Finance Class 4B – Affiliate Claims other than those of LBHI against LS Finance.

(a)    Impairment and Voting.  LS Finance Class 4B is impaired by the Plan. Each holder of an Allowed Claim in LS Finance Class 4B is entitled to vote to accept or reject the Plan.

(b)    Distributions.  Subject to Section 6.5(b) of the Plan, each holder of an Allowed Claim in LS Finance Class 4B shall receive its Pro Rata Share of Available Cash from LS Finance.

A374

5.96   LS Finance Class 5 – Equity Interests in LS Finance.

(a)   Impairment and Voting.   LS Finance Class 5 is impaired by the Plan. Each holder of an Equity Interest in LS Finance Class 5 is not entitled to vote to accept or reject the Plan and is conclusively deemed to have rejected the Plan.

(b)   Distributions.   Equity Interests in LS Finance shall be cancelled if and when LS Finance is dissolved in accordance with Section 7.4 of the Plan.   Each holder of an Equity Interest in LS Finance shall neither receive nor retain any Property of the Estate or direct interest in Property of the Estate of LS Finance on account of such Equity Interests thereafter; provided, however, that in the event that all Allowed Claims against LS Finance have been satisfied in full in accordance with the Bankruptcy Code and the Plan, each holder of an Equity Interest in LS Finance may receive its Pro Rata Share of any remaining assets in LS Finance.

5.97   LUXCO Class 1 – Priority Non-Tax Claims against LUXCO.

(a)   Impairment and Voting.   LUXCO Class 1 is impaired by the Plan.   Each holder of an Allowed Claim in LUXCO Class 1 is entitled to vote to accept or reject the Plan.

(b)   Distributions.   Except to the extent that the holder of an Allowed Claim in LUXCO Class 1 agrees to less favorable treatment or has been paid by or on behalf of LUXCO on account of such Claim prior to the Effective Date, on the later of the Effective Date and the date such Claim becomes Allowed, or as soon thereafter as is practicable, each holder of an Allowed Claim in LUXCO Class 1 shall be paid by LUXCO in Cash in full.

5.98   LUXCO Class 2 – Secured Claims against LUXCO.

(a)   Impairment and Voting.   LUXCO Class 2 is impaired by the Plan.   Each holder of an Allowed Claim in LUXCO Class 2 is entitled to vote to accept or reject the Plan.

(b)   Distributions.   Except to the extent that the holder of an Allowed Claim in LUXCO Class 2 agrees to less favorable treatment, each holder of an Allowed Claim in LUXCO Class 2 shall be satisfied by, at the option of LUXCO:   (i) payment in Cash by LUXCO in full on the later of the Effective Date and the date such Claim becomes Allowed, or as soon thereafter as is practicable; (ii) the sale or disposition proceeds of the Collateral securing such Allowed Claim to the extent of the value of the Collateral securing such Allowed Claim; (iii) surrender to the holder of such Allowed Claim of the Collateral securing such Allowed Claim; or (iv) such treatment that leaves unaltered the legal, equitable, and contractual rights to which the holder of the Allowed Claim is entitled.   In the event an Allowed Claim in LUXCO Class 2 is treated under clause (i) or (ii) above, the Liens securing such Claim shall be deemed released and extinguished without further order of the Bankruptcy Court.

5.99   LUXCO Class 3 – General Unsecured Claims against LUXCO.

(a)   Impairment and Voting.   LUXCO Class 3 is impaired by the Plan.   Each holder of an Allowed Claim in LUXCO Class 3 is entitled to vote to accept or reject the Plan.

(b)    _Distributions_.   Each holder of an Allowed Claim in LUXCO Class 3 shall receive its Pro Rata Share of Available Cash from LUXCO.

5.100   _LUXCO Class 4A – Affiliate Claims of LBHI against LUXCO_.

(a)    _Impairment and Voting_.   LUXCO Class 4A is impaired by the Plan. LBHI is entitled to vote to accept or reject the Plan.

(b)    _Distributions_.   Subject to _Sections 6.5(b)_ and _6.5(c)_ of the Plan, LBHI shall receive its Pro Rata Share of Available Cash from LUXCO.

5.101   _LUXCO Class 4B – Affiliate Claims other than those of LBHI against LUXCO_.

(a)    _Impairment and Voting_.   LUXCO Class 4B is impaired by the Plan. Each holder of an Allowed Claim in LUXCO Class 4B is entitled to vote to accept or reject the Plan.

(b)    _Distributions_.   Subject to _Section 6.5(b)_ of the Plan, each holder of an Allowed Claim in LUXCO Class 4B shall receive its Pro Rata Share of Available Cash from. LUXCO.

5.102   _LUXCO Class 5 – Equity Interests in LUXCO_.

(a)    _Impairment and Voting_.   LUXCO Class 5 is impaired by the Plan.   Each holder of an Equity Interest in LUXCO Class 5 is not entitled to vote to accept or reject the Plan and is conclusively deemed to have rejected the Plan.

(b)    _Distributions_.   Equity Interests in LUXCO shall be cancelled if and when LUXCO is dissolved in accordance with _Section 7.4_ of the Plan.   Each holder of an Equity Interest in LUXCO shall neither receive nor retain any Property of the Estate or direct interest in Property of the Estate of LUXCO on account of such Equity Interests thereafter; _provided, however_, that in the event that all Allowed Claims against LUXCO have been satisfied in full in accordance with the Bankruptcy Code and the Plan, each holder of an Equity Interest in LUXCO may receive its Pro Rata Share of any remaining assets in LUXCO.

5.103   _BNC Class 1 – Priority Non-Tax Claims against BNC_.

(a)    _Impairment and Voting_.   BNC Class 1 is impaired by the Plan.   Each holder of an Allowed Claim in BNC Class 1 is entitled to vote to accept or reject the Plan.

(b)    _Distributions_.   Except to the extent that the holder of an Allowed Claim in BNC Class 1 agrees to less favorable treatment or has been paid by or on behalf of BNC on account of such Claim prior to the Effective Date, on the later of the Effective Date and the date such Claim becomes Allowed, or as soon thereafter as is practicable, each holder of an Allowed Claim in BNC Class 1 shall be paid by BNC in Cash in full.

5.104   BNC Class 2 – Secured Claims against BNC.

(a)   Impairment and Voting.  BNC Class 2 is impaired by the Plan.  Each holder of an Allowed Claim in BNC Class 2 is entitled to vote to accept or reject the Plan.

(b)   Distributions.   Except to the extent that the holder of an Allowed Claim in BNC Class 2 agrees to less favorable treatment, each holder of an Allowed Claim in BNC Class 2 shall be satisfied by, at the option of BNC:   (i) payment in Cash by BNC in full on the later of the Effective Date and the date such Claim becomes Allowed, or as soon thereafter as is practicable; (ii) the sale or disposition proceeds of the Collateral securing such Allowed Claim to the extent of the value of the Collateral securing such Allowed Claim; (iii) surrender to the holder of such Allowed Claim of the Collateral securing such Allowed Claim; or (iv) such treatment that leaves unaltered the legal, equitable, and contractual rights to which the holder of the Allowed Claim is entitled.   In the event an Allowed Claim in BNC Class 2 is treated under clause (i) or (ii) above, the Liens securing such Claim shall be deemed released and extinguished without further order of the Bankruptcy Court.

5.105   BNC Class 3 – General Unsecured Claims against BNC.

(a)   Impairment and Voting.  BNC Class 3 is impaired by the Plan.  Each holder of an Allowed Claim in BNC Class 3 is entitled to vote to accept or reject the Plan.

(b)   Distributions.  Each holder of an Allowed Claim in BNC Class 3 shall receive its Pro Rata Share of Available Cash from BNC.

5.106   BNC Class 4A – Affiliate Claims of LBHI against BNC.

(a)   Impairment and Voting.  BNC Class 4A is impaired by the Plan.  LBHI is entitled to vote to accept or reject the Plan.

(b)   Distributions.  Subject to Sections 6.5(b) and 6.5(c) of the Plan, LBHI shall receive its Pro Rata Share of Available Cash from BNC.

5.107   BNC Class 4B – Affiliate Claims other than those of LBHI against BNC.

(a)   Impairment and Voting.  BNC Class 4B is impaired by the Plan.  Each holder of an Allowed Claim in BNC Class 4B is entitled to vote to accept or reject the Plan.

(b)   Distributions.  Subject to Section 6.5(b) of the Plan, each holder of an Allowed Claim in BNC Class 4B shall receive its Pro Rata Share of Available Cash from BNC.

5.108   BNC Class 5 – Equity Interests in BNC.

(a)   Impairment and Voting.  BNC Class 5 is impaired by the Plan.  Each holder of an Equity Interest in BNC Class 5 is not entitled to vote to accept or reject the Plan and is conclusively deemed to have rejected the Plan.

(b)    Distributions.   Equity Interests in BNC shall be cancelled if and when BNC is dissolved in accordance with Section 7.4 of the Plan.   Each holder of an Equity Interest in BNC shall neither receive nor retain any Property of the Estate or direct interest in Property of the Estate of BNC on account of such Equity Interests thereafter; *provided*, *however*, that in the event that all Allowed Claims against BNC have been satisfied in full in accordance with the Bankruptcy Code and the Plan, each holder of an Equity Interest in BNC may receive its Pro Rata Share of any remaining assets in BNC.

5.109   LB Rose Ranch Class 1 – Priority Non-Tax Claims against LB Rose Ranch.

(a)    Impairment and Voting.   LB Rose Ranch Class 1 is impaired by the Plan. Each holder of an Allowed Claim in LB Rose Ranch Class 1 is entitled to vote to accept or reject the Plan.

(b)    Distributions.   Except to the extent that the holder of an Allowed Claim in LB Rose Ranch Class 1 agrees to less favorable treatment or has been paid by or on behalf of LB Rose Ranch on account of such Claim prior to the Effective Date, on the later of the Effective Date and the date such Claim becomes Allowed, or as soon thereafter as is practicable, each holder of an Allowed Claim in LB Rose Ranch Class 1 shall be paid by LB Rose Ranch in Cash in full.

5.110   LB Rose Ranch Class 2 – Secured Claims against LB Rose Ranch.

(a)    Impairment and Voting.   LB Rose Ranch Class 2 is impaired by the Plan. Each holder of an Allowed Claim in LB Rose Ranch Class 2 is entitled to vote to accept or reject the Plan.

(b)    Distributions.   Except to the extent that the holder of an Allowed Claim in LB Rose Ranch Class 2 agrees to less favorable treatment, each holder of an Allowed Claim in LB Rose Ranch Class 2 shall be satisfied by, at the option of LB Rose Ranch:  (i) payment in Cash by LB Rose Ranch in full on the later of the Effective Date and the date such Claim becomes Allowed, or as soon thereafter as is practicable; (ii) the sale or disposition proceeds of the Collateral securing such Allowed Claim to the extent of the value of the Collateral securing such Allowed Claim; (iii) surrender to the holder of such Allowed Claim of the Collateral securing such Allowed Claim; or (iv) such treatment that leaves unaltered the legal, equitable, and contractual rights to which the holder of the Allowed Claim is entitled.  In the event an Allowed Claim in LB Rose Ranch Class 2 is treated under clause (i) or (ii) above, the Liens securing such Claim shall be deemed released and extinguished without further order of the Bankruptcy Court.

5.111   LB Rose Ranch Class 3 – General Unsecured Claims against LB Rose Ranch.

(a)    Impairment and Voting.   LB Rose Ranch Class 3 is impaired by the Plan. Each holder of an Allowed Claim in LB Rose Ranch Class 3 is entitled to vote to accept or reject the Plan.

(b)    Distributions.   Each holder of an Allowed Claim in LB Rose Ranch Class 3 shall receive its Pro Rata Share of Available Cash from LB Rose Ranch.

5.112 <u>LB Rose Ranch 4A – Affiliate Claims of LBHI against LB Rose Ranch</u>.

(a) <u>Impairment and Voting</u>. LB Rose Ranch Class 4A is impaired by the Plan. LBHI is entitled to vote to accept or reject the Plan.

(b) <u>Distributions</u>. Subject to <u>Sections 6.5(b)</u> and <u>6.5(c)</u> of the Plan, LBHI shall receive its Pro Rata Share of Available Cash from LB Rose Ranch.

5.113 <u>LB Rose Ranch Class 4B – Affiliate Claims other than those of LBHI against LB Rose Ranch</u>.

(a) <u>Impairment and Voting</u>. LB Rose Ranch Class 4B is impaired by the Plan. Each holder of an Allowed Claim in LB Rose Ranch Class 4B is entitled to vote to accept or reject the Plan.

(b) <u>Distributions</u>. Subject to <u>Section 6.5(b)</u> of the Plan, each holder of an Allowed Claim in LB Rose Ranch Class 4B shall receive its Pro Rata Share of Available Cash from LB Rose Ranch.

5.114 <u>LB Rose Ranch Class 5 – Equity Interests in LB Rose Ranch</u>.

(a) <u>Impairment and Voting</u>. LB Rose Ranch Class 5 is impaired by the Plan. Each holder of an Equity Interest in LB Rose Ranch Class 5 is not entitled to vote to accept or reject the Plan and is conclusively deemed to have rejected the Plan.

(b) <u>Distributions</u>. Equity Interests in LB Rose Ranch shall be cancelled if and when LB Rose Ranch is dissolved in accordance with <u>Section 7.4</u> of the Plan. Each holder of an Equity Interest in LB Rose Ranch shall neither receive nor retain any Property of the Estate or direct interest in Property of the Estate of LB Rose Ranch on account of such Equity Interests thereafter; *provided*, *however*, that in the event that all Allowed Claims against LB Rose Ranch have been satisfied in full in accordance with the Bankruptcy Code and the Plan, each holder of an Equity Interest in LB Rose Ranch may receive its Pro Rata Share of any remaining assets in LB Rose Ranch.

5.115 <u>SASCO Class 1 – Priority Non-Tax Claims against SASCO</u>.

(a) <u>Impairment and Voting</u>. SASCO Class 1 is impaired by the Plan. Each holder of an Allowed Claim in SASCO Class 1 is entitled to vote to accept or reject the Plan.

(b) <u>Distributions</u>. Except to the extent that the holder of an Allowed Claim in SASCO Class 1 agrees to less favorable treatment or has been paid by or on behalf of SASCO on account of such Claim prior to the Effective Date, on the later of the Effective Date and the date such Claim becomes Allowed, or as soon thereafter as is practicable, each holder of an Allowed Claim in SASCO Class 1 shall be paid by SASCO in Cash in full.

5.116   <u>SASCO Class 2 – Secured Claims against SASCO</u>.

(a)   <u>Impairment and Voting</u>.  SASCO Class 2 is impaired by the Plan.  Each holder of an Allowed Claim in SASCO Class 2 is entitled to vote to accept or reject the Plan.

(b)   <u>Distributions</u>.  Except to the extent that the holder of an Allowed Claim in SASCO Class 2 agrees to less favorable treatment, each holder of an Allowed Claim in SASCO Class 2 shall be satisfied by, at the option of SASCO:  (i) payment in Cash by SASCO in full on the later of the Effective Date and the date such Claim becomes Allowed, or as soon thereafter as is practicable; (ii) the sale or disposition proceeds of the Collateral securing such Allowed Claim to the extent of the value of the Collateral securing such Allowed Claim; (iii) surrender to the holder of such Allowed Claim of the Collateral securing such Allowed Claim; or (iv) such treatment that leaves unaltered the legal, equitable, and contractual rights to which the holder of the Allowed Claim is entitled.  In the event an Allowed Claim in SASCO Class 2 is treated under clause (i) or (ii) above, the Liens securing such Claim shall be deemed released and extinguished without further order of the Bankruptcy Court.

5.117   <u>SASCO Class 3 – General Unsecured Claims against SASCO</u>.

(a)   <u>Impairment and Voting</u>.  SASCO Class 3 is impaired by the Plan.  Each holder of an Allowed Claim in SASCO Class 3 is entitled to vote to accept or reject the Plan.

(b)   <u>Distributions</u>.  Each holder of an Allowed Claim in SASCO Class 3 shall receive its Pro Rata Share of Available Cash from SASCO.

5.118   <u>SASCO Class 4A – Affiliate Claims of LBHI against SASCO</u>.

(a)   <u>Impairment and Voting</u>.  SASCO Class 4A is impaired by the Plan.  LBHI is entitled to vote to accept or reject the Plan.

(b)   <u>Distributions</u>.  Subject to <u>Sections 6.5(b)</u> and <u>6.5(c)</u> of the Plan, LBHI shall receive its Pro Rata Share of Available Cash from SASCO.

5.119   <u>SASCO Class 4B – Affiliate Claims other than those of LBHI against SASCO</u>.

(a)   <u>Impairment and Voting</u>.  SASCO Class 4B is impaired by the Plan.  Each holder of an Allowed Claim in SASCO Class 4B is entitled to vote to accept or reject the Plan.

(b)   <u>Distributions</u>.  Subject to <u>Section 6.5(b)</u> of the Plan, each holder of an Allowed Claim in SASCO Class 4B shall receive its Pro Rata Share of Available Cash from SASCO.

5.120   <u>SASCO Class 5 – Equity Interests in SASCO</u>.

(a)   <u>Impairment and Voting</u>.  SASCO Class 5 is impaired by the Plan.  Each holder of an Equity Interest in SASCO Class 5 is not entitled to vote to accept or reject the Plan and is conclusively deemed to have rejected the Plan.

58

(b)  Distributions.  Equity Interests in SASCO shall be cancelled if and when SASCO is dissolved in accordance with Section 7.4 of the Plan.  Each holder of an Equity Interest in SASCO shall neither receive nor retain any Property of the Estate or direct interest in Property of the Estate of SASCO on account of such Equity Interests thereafter; *provided*, *however*, that in the event that all Allowed Claims against SASCO have been satisfied in full in accordance with the Bankruptcy Code and the Plan, each holder of an Equity Interest in SASCO may receive its Pro Rata Share of any remaining assets in SASCO.

5.121   LB 2080 Class 1 – Priority Non-Tax Claims against LB 2080.

(a)  Impairment and Voting.  LB 2080 Class 1 is impaired by the Plan.  Each holder of an Allowed Claim in LB 2080 Class 1 is entitled to vote to accept or reject the Plan.

(b)  Distributions.  Except to the extent that the holder of an Allowed Claim in LB 2080 Class 1 agrees to less favorable treatment or has been paid by or on behalf of LB 2080 on account of such Claim prior to the Effective Date, on the later of the Effective Date and the date such Claim becomes Allowed, or as soon thereafter as is practicable, each holder of an Allowed Claim in LB 2080 Class 1 shall be paid by LB 2080 in Cash in full.

5.122   LB 2080 Class 2 – Secured Claims against LB 2080.

(a)  Impairment and Voting.  LB 2080 Class 2 is impaired by the Plan.  Each holder of an Allowed Claim in LB 2080 Class 2 is entitled to vote to accept or reject the Plan.

(b)  Distributions.  Except to the extent that the holder of an Allowed Claim in LB 2080 Class 2 agrees to less favorable treatment, each holder of an Allowed Claim in LB 2080 Class 2 shall be satisfied by, at the option of LB 2080:  (i) payment in Cash by LB 2080 in full on the later of the Effective Date and the date such Claim becomes Allowed, or as soon thereafter as is practicable; (ii) the sale or disposition proceeds of the Collateral securing such Allowed Claim to the extent of the value of the Collateral securing such Allowed Claim; (iii) surrender to the holder of such Allowed Claim of the Collateral securing such Allowed Claim; or (iv) such treatment that leaves unaltered the legal, equitable, and contractual rights to which the holder of the Allowed Claim is entitled.   In the event an Allowed Claim in LB 2080 Class 2 is treated under clause (i) or (ii) above, the Liens securing such Claim shall be deemed released and extinguished without further order of the Bankruptcy Court.

5.123   LB 2080 Class 3 – General Unsecured Claims against LB 2080.

(a)  Impairment and Voting.  LB 2080 Class 3 is impaired by the Plan.  Each holder of an Allowed Claim in LB 2080 Class 3 is entitled to vote to accept or reject the Plan.

(b)  Distributions.  Each holder of an Allowed Claim in LB 2080 Class 3 shall receive its Pro Rata Share of Available Cash from LB 2080.

5.124   LB 2080 Class 4A – Affiliate Claims of LBHI against LB 2080.

(a)  Impairment and Voting.  LB 2080 Class 4A is impaired by the Plan.  LBHI is entitled to vote to accept or reject the Plan.

(b)     Distributions.  Subject to Sections 6.5(b) and 6.5(c) of the Plan, LBHI shall receive its Pro Rata Share of Available Cash from LB 2080.

5.125   LB 2080 Class 4B – Affiliate Claims other than those of LBHI against LB 2080.

(a)     Impairment and Voting.  LB 2080 Class 4B is impaired by the Plan. Each holder of an Allowed Claim in LB 2080 Class 4B is entitled to vote to accept or reject the Plan.

(b)     Distributions.  Subject to Section 6.5(b) of the Plan, each holder of an Allowed Claim in LB 2080 Class 4B shall receive its Pro Rata Share of Available Cash from LB 2080.

5.126   LB 2080 Class 5 – Equity Interests in LB 2080.

(a)     Impairment and Voting.  LB 2080 Class 5 is impaired by the Plan.  Each holder of an Equity Interest in LB 2080 Class 5 is not entitled to vote to accept or reject the Plan and is conclusively deemed to have rejected the Plan.

(b)     Distributions.  Equity Interests in LB 2080 shall be cancelled if and when LB 2080 is dissolved in accordance with Section 7.4 of the Plan.  Each holder of an Equity Interest in LB 2080 shall neither receive nor retain any Property of the Estate or direct interest in Property of the Estate of LB 2080 on account of such Equity Interests thereafter; *provided*, *however*, that in the event that all Allowed Claims against LB 2080 have been satisfied in full in accordance with the Bankruptcy Code and the Plan, each holder of an Equity Interest in LB 2080 may receive its Pro Rata Share of any remaining assets in LB 2080.

5.127   Merit Class 1 – Priority Non-Tax Claims against Merit.

(a)     Impairment and Voting.  Merit Class 1 is impaired by the Plan.  Each holder of an Allowed Claim in Merit Class 1 is entitled to vote to accept or reject the Plan.

(b)     Distributions.   Except to the extent that the holder of an Allowed Claim in Merit Class 1 agrees to less favorable treatment or has been paid by or on behalf of Merit on account of such Claim prior to the Effective Date, on the later of the Effective Date and the date such Claim becomes Allowed, or as soon thereafter as is practicable, each holder of an Allowed Claim in Merit Class 1 shall be paid by Merit in Cash in full.

5.128   Merit Class 2 – Secured Claims against Merit.

(a)     Impairment and Voting.  Merit Class 2 is impaired by the Plan.  Each holder of an Allowed Claim in Merit Class 2 is entitled to vote to accept or reject the Plan.

(b)     Distributions.   Except to the extent that the holder of an Allowed Claim in Merit Class 2 agrees to less favorable treatment, each holder of an Allowed Claim in Merit Class 2 shall be satisfied by, at the option of Merit:   (i) payment in Cash by Merit in full on the later of the Effective Date and the date such Claim becomes Allowed, or as soon thereafter as is practicable; (ii) the sale or disposition proceeds of the Collateral securing such Allowed Claim to

the extent of the value of the Collateral securing such Allowed Claim; (iii) surrender to the holder of such Allowed Claim of the Collateral securing such Allowed Claim; or (iv) such treatment that leaves unaltered the legal, equitable, and contractual rights to which the holder of the Allowed Claim is entitled.   In the event an Allowed Claim in Merit Class 2 is treated under clause (i) or (ii) above, the Liens securing such Claim shall be deemed released and extinguished without further order of the Bankruptcy Court.

    5.129   Merit Class 3 – General Unsecured Claims against Merit.

       (a)    Impairment and Voting.  Merit Class 3 is impaired by the Plan.   Each holder of an Allowed Claim in Merit Class 3 is entitled to vote to accept or reject the Plan.

       (b)    Distributions.  Each holder of an Allowed Claim in Merit Class 3 shall receive its Pro Rata Share of Available Cash from Merit.

    5.130   Merit Class 4A – Affiliate Claims of LBHI against Merit.

       (a)    Impairment and Voting.  Merit Class 4A is impaired by the Plan.   LBHI is entitled to vote to accept or reject the Plan.

       (b)    Distributions.  Subject to Sections 6.5(b) and 6.5(c) of the Plan, LBHI shall receive its Pro Rata Share of Available Cash from Merit.

    5.131   Merit Class 4B – Affiliate Claims other than those of LBHI against Merit.

       (a)    Impairment and Voting.  Merit Class 4B is impaired by the Plan.   Each holder of an Allowed Claim in Merit Class 4B is entitled to vote to accept or reject the Plan.

       (b)    Distributions.  Subject to Section 6.5(b) of the Plan, each holder of an Allowed Claim in Merit Class 4B shall receive its Pro Rata Share of Available Cash from Merit.

    5.132   Merit Class 5 – Equity Interests in Merit.

       (a)    Impairment and Voting.  Merit Class 5 is impaired by the Plan.   Each holder of an Equity Interest in Merit Class 5 is not entitled to vote to accept or reject the Plan and is conclusively deemed to have rejected the Plan.

       (b)    Distributions.  Equity Interests in Merit shall be cancelled if and when Merit is dissolved in accordance with Section 7.4 of the Plan.   Each holder of an Equity Interest in Merit shall neither receive nor retain any Property of the Estate or direct interest in Property of the Estate of Merit on account of such Equity Interests thereafter; *provided*, *however*, that in the event that all Allowed Claims against Merit have been satisfied in full in accordance with the Bankruptcy Code and the Plan, each holder of an Equity Interest in Merit may receive its Pro Rata Share of any remaining assets in Merit.

5.133    Preferred Somerset Class 1 – Priority Non-Tax Claims against Preferred Somerset.

(a)    Impairment and Voting.   Preferred Somerset Class 1 is impaired by the Plan.  Each holder of an Allowed Claim in Preferred Somerset Class 1 is entitled to vote to accept or reject the Plan.

(b)    Distributions.   Except to the extent that the holder of an Allowed Claim in Preferred Somerset Class 1 agrees to less favorable treatment or has been paid by or on behalf of Preferred Somerset on account of such Claim prior to the Effective Date, on the later of the Effective Date and the date such Claim becomes Allowed, or as soon thereafter as is practicable, each holder of an Allowed Claim in Preferred Somerset Class 1 shall be paid by Preferred Somerset in Cash in full.

5.134    Preferred Somerset Class 2 – Secured Claims against Preferred Somerset.

(a)    Impairment and Voting.   Preferred Somerset Class 2 is impaired by the Plan.  Each holder of an Allowed Claim in Preferred Somerset Class 2 is entitled to vote to accept or reject the Plan.

(b)    Distributions.   Except to the extent that the holder of an Allowed Claim in Preferred Somerset Class 2 agrees to less favorable treatment, each holder of an Allowed Claim in Preferred Somerset Class 2 shall be satisfied by, at the option of Preferred Somerset:  (i) payment in Cash by Preferred Somerset in full on the later of the Effective Date and the date such Claim becomes Allowed, or as soon thereafter as is practicable; (ii) the sale or disposition proceeds of the Collateral securing such Allowed Claim to the extent of the value of the Collateral securing such Allowed Claim; (iii) surrender to the holder of such Allowed Claim of the Collateral securing such Allowed Claim; or (iv) such treatment that leaves unaltered the legal, equitable, and contractual rights to which the holder of the Allowed Claim is entitled.   In the event an Allowed Claim in Preferred Somerset Class 2 is treated under clause (i) or (ii) above, the Liens securing such Claim shall be deemed released and extinguished without further order of the Bankruptcy Court.

5.135    Preferred Somerset Class 3 – General Unsecured Claims against Preferred Somerset.

(a)    Impairment and Voting.   Preferred Somerset Class 3 is impaired by the Plan.  Each holder of an Allowed Claim in Preferred Somerset Class 3 is entitled to vote to accept or reject the Plan.

(b)    Distributions.   Each holder of an Allowed Claim in Preferred Somerset Class 3 shall receive its Pro Rata Share of Available Cash from Preferred Somerset.

5.136    Preferred Somerset Class 4A – Affiliate Claims of LBHI against Preferred Somerset.

(a)    Impairment and Voting.   Preferred Somerset Class 4A is impaired by the Plan.   LBHI is entitled to vote to accept or reject the Plan.

(b)    Distributions.    Subject to Sections 6.5(b) and 6.5(c) of the Plan, LBHI shall receive its Pro Rata Share of Available Cash from Preferred Somerset.

5.137    Preferred Somerset Class 4B – Affiliate Claims other than those of LBHI against Preferred Somerset.

(a)    Impairment and Voting.    Preferred Somerset Class 4B is impaired by the Plan.  Each holder of an Allowed Claim in Preferred Somerset Class 4B is entitled to vote to accept or reject the Plan.

(b)    Distributions.    Subject to Section 6.5(b) of the Plan, each holder of an Allowed Claim in Preferred Somerset Class 4B shall receive its Pro Rata Share of Available Cash from Preferred Somerset.

5.138    Preferred Somerset Class 5 – Equity Interests in Preferred Somerset.

(a)    Impairment and Voting.    Preferred Somerset Class 5 is impaired by the Plan.  Each holder of an Equity Interest in Preferred Somerset Class 5 is not entitled to vote to accept or reject the Plan and is conclusively deemed to have rejected the Plan.

(b)    Distributions.    Equity Interests in Preferred Somerset shall be cancelled if and when Preferred Somerset is dissolved in accordance with Section 7.4 of the Plan.  Each holder of an Equity Interest in Preferred Somerset shall neither receive nor retain any Property of the Estate or direct interest in Property of the Estate of Preferred Somerset on account of such Equity Interests thereafter; provided, however, that in the event that all Allowed Claims against Preferred Somerset have been satisfied in full in accordance with the Bankruptcy Code and the Plan, each holder of an Equity Interest in Preferred Somerset may receive its Pro Rata Share of any remaining assets in Preferred Somerset.

5.139    Somerset Class 1 – Priority Non-Tax Claims against Somerset.

(a)    Impairment and Voting.    Somerset Class 1 is impaired by the Plan.  Each holder of an Allowed Claim in Somerset Class 1 is entitled to vote to accept or reject the Plan.

(b)    Distributions.    Except to the extent that the holder of an Allowed Claim in Somerset Class 1 agrees to less favorable treatment or has been paid by or on behalf of Somerset on account of such Claim prior to the Effective Date, on the later of the Effective Date and the date such Claim becomes Allowed, or as soon thereafter as is practicable, each holder of an Allowed Claim in Somerset Class 1 shall be paid by Somerset in Cash in full.

5.140    Somerset Class 2 – Secured Claims against Somerset.

(a)    Impairment and Voting.    Somerset Class 2 is impaired by the Plan.  Each holder of an Allowed Claim in Somerset Class 2 is entitled to vote to accept or reject the Plan.

(b)    Distributions.    Except to the extent that the holder of an Allowed Claim in Somerset Class 2 agrees to less favorable treatment, each holder of an Allowed Claim in Somerset Class 2 shall be satisfied by, at the option of Somerset:  (i) payment in Cash by

Somerset in full on the later of the Effective Date and the date such Claim becomes Allowed, or as soon thereafter as is practicable; (ii) the sale or disposition proceeds of the Collateral securing such Allowed Claim to the extent of the value of the Collateral securing such Allowed Claim; (iii) surrender to the holder of such Allowed Claim of the Collateral securing such Allowed Claim; or (iv) such treatment that leaves unaltered the legal, equitable, and contractual rights to which the holder of the Allowed Claim is entitled.  In the event an Allowed Claim in Somerset Class 2 is treated under clause (i) or (ii) above, the Liens securing such Claim shall be deemed released and extinguished without further order of the Bankruptcy Court.

5.141   <u>Somerset Class 3 – General Unsecured Claims against Somerset</u>.

(a)   <u>Impairment and Voting</u>.  Somerset Class 3 is impaired by the Plan.  Each holder of an Allowed Claim in Somerset Class 3 is entitled to vote to accept or reject the Plan.

(b)   <u>Distributions</u>.  Each holder of an Allowed Claim in Somerset Class 3 shall receive its Pro Rata Share of Available Cash from Somerset.

5.142   <u>Somerset Class 4A – Affiliate Claims of LBHI against Somerset</u>.

(a)   <u>Impairment and Voting</u>.  Somerset Class 4A is impaired by the Plan.  LBHI is entitled to vote to accept or reject the Plan.

(b)   <u>Distributions</u>.  Subject to <u>Sections 6.5(b)</u> and <u>6.5(c)</u> of the Plan, LBHI shall receive its Pro Rata Share of Available Cash from Somerset.

5.143   <u>Somerset Class 4B – Affiliate Claims other than those of LBHI against Somerset</u>.

(a)   <u>Impairment and Voting</u>.  Somerset Class 4B is impaired by the Plan.  Each holder of an Allowed Claim in Somerset Class 4B is entitled to vote to accept or reject the Plan.

(b)   <u>Distributions</u>.  Subject to <u>Section 6.5(b)</u> of the Plan, each holder of an Allowed Claim in Somerset Class 4B shall receive its Pro Rata Share of Available Cash from Somerset.

5.144   <u>Somerset Class 5 – Equity Interests in Somerset</u>.

(a)   <u>Impairment and Voting</u>.  Somerset Class 5 is impaired by the Plan.  Each holder of an Equity Interest in Somerset Class 5 is not entitled to vote to accept or reject the Plan and is conclusively deemed to have rejected the Plan.

(b)   <u>Distributions</u>.  Equity Interests in Somerset shall be cancelled if and when Somerset is dissolved in accordance with <u>Section 7.4</u> of the Plan.  Each holder of an Equity Interest in Somerset shall neither receive nor retain any Property of the Estate or direct interest in Property of the Estate of Somerset on account of such Equity Interests thereafter; *provided*, *however*, that in the event that all Allowed Claims against Somerset have been satisfied in full in accordance with the Bankruptcy Code and the Plan, each holder of an Equity Interest in Somerset may receive its Pro Rata Share of any remaining assets in Somerset.

# ARTICLE VI
## Implementation of the Plan

6.1     Plan Administrator.

(a)     Appointment.   LBHI shall serve as Plan Administrator for each of the Debtors.

(b)     Authority.   Subject to Section 7.2(c) of the Plan, the Plan Administrator shall have the authority and right on behalf of each of the Debtors, without the need for Bankruptcy Court approval (unless otherwise indicated), to carry out and implement all provisions of the Plan, including, without limitation, to:

(i)     except to the extent Claims have been previously Allowed, control and effectuate the Claims reconciliation process, including to object to, seek to subordinate, compromise or settle any and all Claims against the Debtors subject to Bankruptcy Court approval; provided, however, that where the Debtors have authorization to compromise or settle any Claims against the Debtors under a Final Order, including, without limitation, the Derivatives Procedures Order, the Plan Administrator shall be authorized to compromise or settle such Claims after the Effective Date in accordance with and subject to such Final Order;

(ii)     make Distributions to holders of Allowed Claims in accordance with the Plan;

(iii)     exercise its reasonable business judgment to direct and control the wind down, liquidation, sale and/or abandoning of the assets of the Debtors and/or Debtor-Controlled Entities under the Plan and in accordance with applicable law as necessary to maximize Distributions to holders of Allowed Claims;

(iv)     prosecute all Litigation Claims, including, without limitation, Avoidance Actions, on behalf of the Debtors, and to elect not to pursue any Litigation Claims and whether and when to compromise, settle, abandon, dismiss, or otherwise dispose of any such Litigation Claims, as the Plan Administrator may determine is in the best interests of the Debtors;

(v)     make payments to existing professionals who will continue to perform in their current capacities;

(vi)     retain professionals to assist in performing its duties under the Plan;

(vii)     maintain the books and records and accounts of the Debtors;

(viii)     invest Cash of the Debtors, including any Cash proceeds realized from the liquidation of any assets of the Debtors, including any Litigation Claims, and any income earned thereon;

(ix)    incur and pay reasonable and necessary expenses in connection with the performance of duties under the Plan, including the reasonable fees and expenses of professionals retained by the Plan Administrator;

(x)    administer each Debtor's tax obligations, including (i) filing tax returns and paying tax obligations, (ii) request, if necessary, an expedited determination of any unpaid tax liability of each Debtor or its estate under Bankruptcy Code section 505(b) for all taxable periods of such Debtor ending after the Commencement Date through the liquidation of such Debtor as determined under applicable tax laws and (iii) represent the interest and account of each Debtor or its estate before any taxing authority in all matters including, without limitation, any action, suit, proceeding or audit;

(xi)    prepare and file any and all informational returns, reports, statements, returns or disclosures relating to the Debtors that are required hereunder, by any Governmental Unit or applicable law;

(xii)    determine whether to create a Liquidating Trust for the assets of a Debtor or Debtor-Controlled Entity pursuant to Section 10.1 of the Plan and which assets to transfer to such Liquidating Trust or to issue New Securities in accordance with Section 15.2 of the Plan;

(xiii)    pay statutory fees in accordance with Section 15.7 of the Plan; and

(xiv)    perform other duties and functions that are consistent with the implementation of the Plan.

(c)    Indemnification of Plan Administrator.    Each of the Debtors shall indemnify and hold harmless LBHI solely in its capacity as the Plan Administrator for any losses incurred in such capacity, except to the extent such losses were the result of the Plan Administrator's gross negligence, willful misconduct or criminal conduct.

6.2    LAMCO.    At the discretion of the board of directors of LBHI following the Effective Date and subject to existing agreements, LAMCO may serve as asset manager for certain assets of each of the Debtors under the Plan.    Ownership and ultimate decision making authority with respect to each of the Debtor's assets after the Effective Date will be vested in the applicable Debtor.

6.3    Debtor Allocation Agreement.    The Debtor Allocation Agreement shall become effective on the Effective Date.    The Debtor Allocation Agreement shall, among other things, provide for an Allowed Administrative Expense Claim of LBSF against LBHI in the amount of $300 million as an allocation of administrative costs.    Such Claim shall be satisfied by (a) first, setoff against LBHI's Allowed Administrative Expense Claim against LBSF as of the Effective Date, (b) second, setoff against LBHI's claims arising after the Effective Date for reimbursement by LBSF for post-Effective Date administration costs after reconciliation on a quarterly basis and, if necessary, (c) third, payment of the balance in Cash up to $300 million.

6.4   <u>Redistribution of Subordinated Claims Recoveries</u>.   To give effect to agreements of holders of Subordinated Claims, all Distributions under the Plan made by LBHI shall be calculated as if each holder of an Allowed Claim in LBHI Class 10A, LBHI Class 10B and LBHI Class 10C were to receive its Pro Rata Share of Available Cash from LBHI, and, in the case of each holder of an Allowed Claim in LBHI Class 10A and LBHI Class 10B, its Pro Rata Share of the Subordinated Class 10C Distribution; *provided*, *however*, that:

(a)   the Subordinated Class 10A Distribution shall be automatically distributed to holders of Allowed Claims in LBHI Class 3 and LBHI Class 4A pursuant to <u>Sections 4.3(b)</u> and <u>4.4(b)</u> of the Plan, respectively, until all such Claims are satisfied in full;

(b)   the Subordinated Class 10B Distribution shall be automatically distributed to holders of Allowed Claims in LBHI Class 3, LBHI Class 4A, LBHI Class 4B and LBHI Class 5 pursuant to <u>Sections 4.3(b)</u>, <u>4.4(b)</u>, <u>4.5(b)</u> and <u>4.6(b)</u> of the Plan, respectively, until all such Claims are satisfied in full;

(c)   the Subordinated Class 10C Distribution shall be automatically distributed to holders of Allowed Claims in LBHI Class 3, LBHI Class 4A, LBHI Class 4B, LBHI Class 5, LBHI Class 10A and LBHI Class 10B pursuant to <u>Sections 4.3(b)</u>, <u>4.4(b)</u>, <u>4.5(b)</u>, <u>4.6(b)</u>, <u>4.13(b)</u> and <u>4.14(b)</u> of the Plan, respectively, until all such Claims are satisfied in full; *provided*, *however*, that any portion of the Subordinated Class 10C Distribution payable to holders of Allowed Claims in LBHI Class 10A shall be automatically distributed to holders of Allowed Claims in LBHI Class 3 and LBHI Class 4A pursuant to <u>Section 6.4(a)</u> of the Plan until all such Claims are satisfied in full; *provided*, *further*, that any portion of the Subordinated Class 10C Distribution payable to holders of Allowed Claims in LBHI Class 10B shall be automatically distributed to holders of Allowed Claims in LBHI Class 3, LBHI Class 4A, LBHI Class 4B, and LBHI Class 5 pursuant to <u>Section 6.4(b)</u> of the Plan until all such Claims are satisfied in full.

6.5   <u>Plan Settlement</u>.   Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, the Plan incorporates a proposed compromise and settlement of numerous inter-Debtor, Debtor-Creditor and inter-Creditor issues designed to achieve an economic settlement of Claims against all of the Debtors and an efficient resolution of the Chapter 11 Cases.   The Plan constitutes a settlement of potential litigation of issues, including, without limitation, the potential substantive consolidation of the Lehman enterprise, the validity and enforceability of certain Affiliate Guarantee Claims, the allowance of certain Affiliate Claims, including Intercompany Funding Balances owed to LBHI by Subsidiary Debtors, the potential equitable, contractual or statutory subordination of certain Claims and the ownership and rights of various Debtors and their Affiliates with respect to certain assets.   The Plan settlement will be implemented as follows:

(a)   Each holder of an Allowed Claim in an LBHI Class 3 or LBHI Class 7 shall be entitled to receive its Pro Rata Share of the Plan Adjustment until such Allowed Claims are satisfied in full in accordance with <u>Sections 4.3(b)</u> and <u>4.9(b)</u> of the Plan, as applicable.   In the event that holders of Allowed Claims in LBHI Class 3 or LBHI Class 7 are satisfied in full, Distributions (including the Plan Adjustment), if any, shall continue to be made on account of such Claims as if they had not been satisfied in full, *provided* that such Distributions shall be made to each Participating Debtor for the exclusive benefit of holders of Allowed Claims in such

Participating Debtor's Contributing Classes and, in the case of LBHI, LBHI Class 9A or, in the case of LBSF, LBSF Class 4B, in proportion to, and only to the extent of, its Plan Adjustment contribution.

(b)     Each holder of a Senior Affiliate Claim, Senior Affiliate Guarantee Claim or Affiliate Claim against a Debtor shall have an Allowed Claim, as applicable, against that Debtor in an amount that is agreed to by the applicable Debtor and an Affiliate or otherwise determined by the Bankruptcy Court.

(i)     The Debtors' Claims Schedule is incorporated in the Plan and shall become effective on the Effective Date.   Senior Affiliate Claims, Senior Affiliate Guarantee Claims and Affiliate Claims of a Debtor against another Debtor shall be allowed in the net amounts set forth on pages 1 and 2 of the Debtors' Claims Schedule.

(ii)     The Bankhaus Settlement Agreement is incorporated in the Plan and shall become effective on the Effective Date.   The Bankhaus Settlement Agreement provides for the allowance of certain Claims asserted by LBB against certain of the Debtors, the exchange of releases between the Debtors and certain Debtor-Controlled Entities that are parties to the Bankhaus Settlement Agreement and LBB and other material terms and conditions, all as more fully set forth and provided for in the Bankhaus Settlement Agreement.

(iii)     The LBT Settlement Agreement is incorporated in the Plan.   The LBT Settlement Agreement provides for the allowance of certain claims of LBT, including, without limitation, an Allowed Senior Affiliate Claim of LBT against LBHI in LBHI Class 4A in the amount of $34,548,000,000, the allowance of certain Claims asserted by certain Debtors against LBT, the exchange of mutual releases between the Debtors and LBT and other material terms and conditions, all as more fully set forth in the LBT Settlement Agreement. Additionally, pursuant to the LBT Settlement Agreement, Sections 8.10, 8.14, 8.15 and 13.8 of the Plan shall not apply to LBT or the Allowed Senior Affiliate Claim of LBT and holders of Allowed Guarantee Claims for which LBT is the Primary Obligor shall not be subject to Section 8.13(e) of the Plan.

(iv)     LBSN shall not be subject to Sections 8.10, 8.14 and 8.15 of the Plan.

(v)     The Hong Kong Settlement Agreement is incorporated in the Plan. The Hong Kong Settlement Agreement provides for the allowance of certain Claims asserted by certain Hong Kong Lehman Entities In Liquidation against certain of the Debtors, the allowance of certain Claims asserted by the Debtors against certain Hong Kong Lehman Entities In Liquidation, the exchange of mutual releases between the Debtors and the Hong Kong Lehman Entities In Liquidation and other material terms and conditions, all as more fully set forth and provided for in the Hong Kong Settlement Agreement.

(vi)     The Singapore Settlement Agreement is incorporated in the Plan. The Singapore Settlement Agreement provides for the allowance of certain Claims asserted by the Lehman Singapore Entities against certain of the Debtors and certain Debtor-Controlled Entities, the allowance of certain Claims asserted by the Debtors and the Debtor-Controlled

A390

Entities against certain Lehman Singapore Entities, the exchange of mutual releases between the Debtors and the Debtor-Controlled Entities and the Lehman Singapore Entities and other material terms and conditions, all as more fully set forth and provided for in the Singapore Settlement Agreement.

(vii)    Any settlement agreement entered into among any of the Debtors and any Non-Controlled Affiliate that is contained in the Plan Supplement is incorporated in the Plan and shall become effective in accordance with its terms.

(c)    For purposes of the calculation of the Distributions to be made to LBHI from a Subsidiary Debtor, including with respect to setoff of a Subsidiary Debtor's Allowed Claim against LBHI, only 80% of the Intercompany Funding Balance due to LBHI from a Subsidiary Debtor shall be included in such calculation, as reflected of the Debtors' Claims Schedule, and LBHI shall participate in Distributions against a Subsidiary Debtor in the amounts and to the extent set forth on page 4 of the Debtors' Claims Schedule.

(d)    Only holders of Allowed Claims in LBSF Class 4A and LBSF Class 5C shall be entitled to receive the LBSF Additional Settlement Amount in accordance with Sections 5.21(b) and 5.25(b), respectively.   Each of the other Participating Debtors and each Racers Trust acknowledges and agrees that it is not a holder in LBSF Class 4A and LBSF Class 5C and it shall not receive a Distribution in respect of the LBSF Additional Settlement Amount.

(e)    The LCPI Settlement Amount shall be automatically distributed to holders of Allowed Claims in LCPI Class 4A until such Allowed Claims are satisfied in full in accordance with Section 5.4(b) of the Plan.   In the event holders of Allowed Claims in LCPI Class 4A are satisfied in full, Distributions, if any, shall continue to be made on account of such Claims as if they had not been satisfied in full, *provided* that such Distributions shall be made to LCPI Class 5A.

(f)    The LBSF Settlement Amount shall be automatically distributed to holders of Allowed Claims in LBSF Class 4A until such Allowed Claims are satisfied in full in accordance with Section 5.21(b) of the Plan.   In the event holders of Allowed Claims in LBSF Class 4A are satisfied in full, Distributions, if any, shall continue to be made on account of such Claims as if they had not been satisfied in full, *provided* that such Distributions shall be made to LBSF Class 5A.

(g)    The Racers 2007-A Trust shall have (A) an Allowed General Unsecured Claim against LCPI in LCPI Class 4B, subject to the Plan Adjustment, in the amount $5.0 billion, (B) an Allowed General Unsecured Claim against LBSF in LBSF Class 4B, subject to the Racers Adjustment, in the amount of $1,947,735,000 and (C) an Allowed Third-Party Guarantee Claim against LBHI in LBHI Class 9B, subject to the Racers Adjustment, in the amount of $1,947,735,000.  The Racers 2007-A Trust shall not receive aggregate Distributions on account of all such Allowed Claims in excess of the Allowed amount of its General Unsecured Claim against LCPI; *provided* that, to the extent the Allowed Claims of the Racers 2007-A Trust are satisfied in full in accordance with the foregoing and Section 8.13 of the Plan, LCPI or LBHI, as applicable, shall be subrogated to the Allowed Claim of the Racers 2007-A Trust against LBSF pursuant to Section 8.14 of the Plan.   All other Claims of the Racers 2007-A

A391

Trust and all Claims of the Racers MM Trust against the Debtors shall be disallowed and subject to <u>Sections 13.4</u> and <u>13.5</u> of the Plan.

(h)     The Fenway Claim shall be Allowed against LCPI as General Unsecured Claims in LCPI Class 4B, subject to the Plan Adjustment, in the aggregate net amount of $230 million.

(i)     The Debtors shall apply the Structured Securities Valuation Methodologies to all Structured Securities Claims held by any PSA Creditor in determining the Allowed amount of such Claims.

(j)     Any settlement agreement entered into among any of the Debtors and any Creditor that is contained in the Plan Supplement is incorporated in the Plan and shall become effective in accordance with its terms.

6.6     <u>Closing of Chapter 11 Case</u>.  After the Chapter 11 Case of a Debtor has been fully administered, the Plan Administrator shall seek authority from the Bankruptcy Court to close such Debtor's Chapter 11 Case in accordance with the Bankruptcy Code and the Bankruptcy Rules.

6.7     <u>Indenture Trustee and Creditors' Committee Members Fees</u>.  Subject to entry of the Confirmation Order, the reasonable fees and expenses (including attorneys fees) of (a) the indenture trustee for the Senior Notes and the Subordinated Notes and (b) the individual members of the Creditors' Committee, in each case, incurred in their capacities as indenture trustee or members of the Creditors' Committee, respectively, shall, (i) to the extent incurred and unpaid by a Debtor prior to the Effective Date, be Allowed as Administrative Expense Claims and paid by the Debtors in accordance with the Debtor Allocation Agreement upon application to and subject to approval of the Bankruptcy Court, and (ii) to the extent incurred after the Effective Date, be Allowed as Administrative Expense Claims and paid by the Debtors on a monthly basis upon the submission of fee statements without further order of the Bankruptcy Court.

## ARTICLE VII
## Corporate Governance

7.1     <u>Corporate Form</u>.  On the Effective Date, each of the Debtors shall maintain its current corporate form.

7.2     <u>LBHI Board of Directors and Officers</u>.

(a)     Following the Effective Date, the board of directors of LBHI shall consist of seven (7) persons.  The initial board of directors of LBHI shall be selected by the Director Selection Committee.  Each of the initial directors of LBHI shall have initial and, if reelected, subsequent terms of one year.  A director of LBHI may be removed from office by the Plan Trust with cause.  Subject to death, incapacity, resignation or removal for cause and reelection by the Plan Trust in accordance with the Plan Trust Agreement, the initial directors shall serve as the board of directors of LBHI through the Closing Date.  Upon expiration of the term of a director of LBHI or his or her resignation, death or removal for cause, the election of such

A392

director or a replacement director shall be determined by action of the Plan Trust as sole shareholder of LBHI.

(b)     The Director Selection Committee shall be comprised of the following nine (9) members:

(i)     Rutger Schimmelpenninck (in his capacity as co-bankruptcy trustee (curatoren) for LBT).

(ii)     the LBB Administrator;

(iii)     the Debtors;

(iv)     each of the co-chairs of the Creditors' Committee (each of whom shall exercise his or her independent business judgment in the selection of directors and not act at the direction of the Creditors' Committee);

(v)     an individual chosen by the Opco Plan Proponents who are PSA Creditors;

(vi)     an individual chosen by the members of the group of creditors commonly referred to as the Ad Hoc Group of Lehman Brothers Creditors that are PSA Creditors; and

(vii)     two individuals chosen collectively by the following PSA Creditors:  Carval Investors UK Limited, Davidson Kempner Capital Management LLC, Elliott Management Corporation, King Street Capital Management LP, Och-Ziff Capital Management Group LLC, The Baupost Group LLC and Varde Partners LP.

(c)     Following the Effective Date, the board of directors of LBHI shall, in addition to its other duties, be responsible for (i) instructing and supervising the Debtors and the Plan Administrator with respect to their responsibilities under the Plan; (ii) reviewing and approving the prosecution of adversary and other proceedings, if any, including approving proposed settlements thereof; (iii) reviewing and approving objections to and proposed settlements of Disputed Claims; and (iv) performing such other duties that may be necessary and proper to assist the Debtors and the Plan Administrator and their retained professionals.  In its discretion, following the Effective Date, the board of directors of LBHI may also delegate any duties assigned to the Plan Administrator to any other committee, entity or individual.

7.3     Subsidiary Debtor Post-Effective Date Management.

(a)     Following the Effective Date, the board of directors of LBSF and LCPI shall each consist of three (3) individuals as follows:

(i)     an individual who is a concurrently serving member of the LBHI board of directors that is selected by the LBHI board of directors;

(ii)  an individual who is a concurrently serving member of the LBHI board of directors that is selected by the LBHI board of directors and, in the case of LBSF or LCPI, acceptable to the Opco Plan Proponents who are PSA Creditors; and

(iii)  an individual who is selected by the individuals appointed pursuant to (i) and (ii) of this section and who is independent from LBHI, the members of the Director Selection Committee and, in the case of LBSF, LBSF, or in the case of LCPI, LCPI.

Each of the initial directors of LBSF and LCPI shall have initial and, if reelected, subsequent terms of one year.  A director of LBSF and LCPI may be removed from office by Lehman ALI (as directed by LBHI) only for cause.  Upon the resignation, death, incapacity or removal for cause of a director of LBSF or LCPI, the election of a replacement director shall be determined by action of Lehman ALI (as directed by LBHI); *provided* that at all times the LBSF and LCPI boards of directors must be comprised of individuals that satisfy the requirements of Section 7.3(a) hereof.

(b)  Following the Effective Date, the respective boards of directors or managers, as applicable, of the Subsidiary Debtors other than LBSF and LCPI shall consist of one (1) individual who shall be a concurrently serving member of the LBHI board of directors.  With respect to a Subsidiary Debtor incorporated or formed under the laws of a jurisdiction outside of the United States, if the laws of such foreign jurisdiction require the appointment of more than one (1) director or manager to the board of directors or managers of such Subsidiary Debtor or of a director or manager that is not an individual concurrently serving as a member of the LBHI board of directors, such additional or alternative directors or managers shall be appointed by the LBHI board of directors.  Each of the initial directors or managers of the Subsidiary Debtors other than LBSF and LCPI shall have initial and, if reelected, subsequent terms of one year.  Thereafter, LBHI or the Subsidiary Debtor or Debtor-Controlled Entity that is the sole shareholder of the relevant Subsidiary Debtor shall elect successors of the then-serving members of the boards or managers for such Subsidiary Debtor at each annual meeting or upon the removal or resignation of such individuals. LBHI or the Subsidiary Debtor or Debtor-Controlled Entity that is the sole shareholder of the relevant Subsidiary Debtor shall also have the power to act by written consent to remove any director or manager of such Subsidiary Debtor at any time with or without cause. Notwithstanding the foregoing, any Subsidiary Debtor that is a limited partnership shall continue to be managed by its general partner.

7.4  Plan Trust.

(a)  The Plan Trust shall be established on the Effective Date and shall continue in existence until the Closing Date.  The Plan Trustees shall be the members of the Director Selection Committee.  Each of the Plan Trustees shall continue in such capacity until he or she ceases to be a Plan Trustee in accordance with the terms and conditions set forth in the Plan Trust Agreement.  In the event of a vacancy in the office of Plan Trustee, the remaining Plan Trustees shall by majority vote of the remaining Plan Trustees fill the vacancy if in their discretion the circumstances of the Plan Trust warrant doing so.  The Plan Trust shall exercise voting rights associated with the Plan Trust Stock in furtherance of the liquidation of the Debtors and compliance with the provisions of the Plan.  The sole purpose of the Plan Trust shall be to hold the Plan Trust Stock as provided in Section 4.17(b).  The Plan Trust shall be governed, in

A394

accordance with the Plan Trust Agreement, by the Plan Trustees. Any distribution from assets of LBHI that is made to the Plan Trust as holder of such share shall be for the benefit of the holders of Equity Interests in accordance with <u>Section 4.17(b)</u>.

(b) The Plan Trust Agreement shall provide that (i) at such time as a vacancy on the board of directors of LBHI is to be filled or there is a vote on the election of a director upon the expiration of a director's term of office, the Plan Trust shall fill such vacancy by majority vote of the Plan Trustees and (ii) at all other times, the Plan Trust may act, by majority vote of the Plan Trustees, to remove and replace directors, with cause.

7.5 <u>Corporate Existence</u>. After the Effective Date, the Plan Administrator may decide to (a) maintain each Debtor as a corporation in good standing until such time as all aspects of the Plan pertaining to such Debtor have been completed, or (b) at such time as the Plan Administrator considers appropriate and consistent with the implementation of the Plan pertaining to such Debtor, dissolve such Debtor and complete the winding up of such Debtor without the necessity for any other or further actions to be taken by or on behalf of such dissolving Debtor or its shareholder or any payments to be made in connection therewith subject to the filing of a certificate of dissolution with the appropriate governmental authorities (including, without limitation, the transfer of all or part of the assets of such Debtor to a Liquidating Trust in accordance with <u>Article X</u> of the Plan), or (c) dissolve any Debtor-Controlled Entity and complete the winding up of such Debtor-Controlled Entity in accordance with applicable law; *provided*, *however*, that the foregoing does not limit the Plan Administrator's ability to otherwise abandon an interest in a Debtor-Controlled Entity.

7.6 <u>Wind-Down</u>. After the Effective Date, pursuant to the Plan, the Plan Administrator shall wind-down, sell and otherwise liquidate assets of the Debtors and/or Debtor-Controlled Entities in accordance with <u>Section 6.1(b)(iii)</u> of the Plan. The wind-down, sale and liquidation of each such Debtor's assets (as determined for federal income tax purposes) shall occur over a period of three years after the Effective Date (it being understood that such liquidation may include the transfer of all or part of the assets of such Debtor to one or more Liquidating Trusts within the meaning of Treas. Reg. § 301.7701-4); *provided*, *however*, that the wind-down and liquidation may extend over a longer period of time if the Debtors receive a private letter ruling or other equivalent guidance from the IRS from which the Plan Administrator reasonably concludes that the continued wind-down and liquidation should not result in a reduction or limitation of the Debtors' tax attributes for federal income tax purposes that materially impairs the expected actual use of such tax attributes.

7.7 <u>Certificate of Incorporation and By-Laws</u>. As of the Effective Date, the certificate of incorporation and by-laws of each Debtor shall be amended to the extent necessary to carry out the provisions of the Plan. The amended certificate and by-laws of such Debtor (if any) shall be contained in the Plan Supplement.

7.8 <u>Stock Trading Restrictions</u>. The restrictions imposed by the Stock Trading Restrictions Order shall remain effective and binding through the closing of LBHI's Chapter 11 Case.

## ARTICLE VIII
### Provisions Regarding Voting and Distributions Under the Plan

8.1   Voting of Claims.   Each holder of an Allowed Claim in an impaired Class of Claims that is entitled to vote on the Plan pursuant to Article III, Article IV and Article V of the Plan shall be entitled to vote separately to accept or reject the Plan as provided in an order entered by the Bankruptcy Court establishing procedures with respect to the solicitation and tabulation of votes to accept or reject the Plan, or any other order or orders of the Bankruptcy Court.

8.2   Nonconsensual Confirmation.   If any impaired Class of Claims entitled to vote on the Plan does not accept the Plan by the requisite majority provided in section 1126(c) of the Bankruptcy Code, the Debtors reserve the right to amend the Plan in accordance with Section 15.6 of the Plan or undertake to have the Bankruptcy Court confirm the Plan under section 1129(b) of the Bankruptcy Code or both.   With respect to impaired Classes of Claims or Equity Interests that are deemed to reject the Plan, the Debtors shall request that the Bankruptcy Code confirm the Plan pursuant to section 1129(b) of the Bankruptcy Code.

8.3   Distributions of Available Cash.   On the Effective Date, or as soon thereafter as practicable, after the satisfaction in full of (or the establishment of reserves sufficient for the satisfaction in full of) Allowed Administrative Expense Claims, Allowed Priority Tax Claims, Allowed Priority Non-Tax Claims and Allowed Secured Claims (to the extent the Debtor determines to pay such Allowed Secured Claim in Cash) against a Debtor, each Debtor shall make a Distribution of its Available Cash in accordance with the provisions of the Plan to holders of Allowed Claims against such Debtor.   After the initial Distribution, each Debtor shall make Distributions of Available Cash in accordance with the Plan to holders of Allowed Claims against such Debtor semi-annually on March 30 and September 30 of each year, provided that each such Distribution in the aggregate is not less than $10,000,000 of such Debtor's Available Cash.   Notwithstanding the foregoing, the Plan Administrator may determine, in its sole discretion (a) to make a Distribution that is less than $10,000,000 in the aggregate of a Debtor's Available Cash, or (b) not to make a Distribution to the holder of an Allowed Claim (other than a Claim that has become Allowed pursuant to clauses (b), (d) and (e) of Section 1.4 of the Plan) on the basis that it has not yet determined whether to object to such Claim and such Claim shall be treated as a Disputed Claim for purposes of Distributions under the Plan until the Plan Administrator determines (i) not to object to such Claim (or the time to object to Claims expires), (ii) agrees with the holder of such Claim to allow such Claim in an agreed upon amount or (iii) objects to such Claim and such Claim is Allowed by a Final Order.   To the extent that a Liquidating Trust is established for a Debtor in accordance with Article X of the Plan, any Distributions to be made to holders of Allowed Claims thereafter shall be made by the Liquidating Trustee to such holders as holders of Liquidating Trust Interests in accordance with the provisions of the Plan.   Distributions of Cash on account of such Liquidating Trust Interests shall be made in accordance with Section 10.7 of the Plan.

8.4   Disputed Claims Holdback.   From and after the Effective Date, and until such time as all Disputed Claims have been compromised and settled or determined by Final Order, the Plan Administrator shall, consistent with and subject to section 1123(a)(4) of the Bankruptcy Code, retain from Available Cash an aggregate amount equal to the Pro Rata Share of the

Distributions that would have been made to each holder of a Disputed Claim if such Disputed
Claim were an Allowed Claim against such Debtor in an amount equal to the least of (a) the filed
amount of such Disputed Claim, (b) the amount determined, to the extent permitted by the
Bankruptcy Code and Bankruptcy Rules, by the Bankruptcy Court for purposes of fixing the
amount to be retained for such Disputed Claim, and (c) such other amount as may be agreed
upon by the holder of such Disputed Claim and the Plan Administrator.  On the date of the first
Distribution that is at least forty-five (45) days (or such fewer days as may be agreed between the
applicable Debtor and the holder of the applicable Disputed Claim) after the date on which a
Disputed Claim becomes an Allowed Claim against a Debtor, such Debtor shall remit to the
holder of such Allowed Claim Available Cash equal to the amount that would have been
distributed from the Effective Date through and including the date of such Distribution on
account of such Allowed Claim had such Claim been Allowed as of the Effective Date, together
with any interest earned on the lesser of (i) such amount and (ii) the amount retained with respect
to such Claim pursuant to this provision, in each case, but only to the extent that such interest is
attributable to the amount of the Allowed Claim; *provided*, that (x) such amount shall be paid
first out of the Available Cash retained on account of such Allowed Claim and second out of
Available Cash other than Available Cash retained on account of other Disputed Claims and (y)
if the amount available for Distribution pursuant to the foregoing clause (x) is insufficient to
remit all Distributions required to be made to such holder pursuant to this sentence, such holder
shall receive the amount of such insufficiency on the next subsequent date(s) of Distribution
before the holders of any other Claims against such Debtor receive any further Distributions out
of Available Cash (other than Available Cash retained on account of other Disputed Claims)
from such Debtor.  To the extent that a Disputed Claim against a Debtor is disallowed by Final
Order or becomes an Allowed Claim in an amount less than the amount retained with respect to
such Claim pursuant to this provision, the amount that would have been distributed on account of
such Disputed Claim, or the excess of the amount of Available Cash that would have been
distributed on account of such Disputed Claim over the amount of Available Cash actually
distributed on account of such Disputed Claim, shall become Available Cash for Distributions to
the holders of Allowed Claims.   Nothing in this <u>Section 8.4</u> of the Plan shall preclude any holder
of a Disputed Claim from seeking, on notice to the Plan Administrator, an order of the
Bankruptcy Court in respect of or relating to the amount retained with respect to such holder's
Disputed Claim.  Unless otherwise ordered by the Bankruptcy Court, Available Cash retained
on account of Disputed Claims shall not be used by, on behalf of or for the benefit of a Debtor
for operating expenses, costs or any purpose other than as set forth in this section.  If the Plan
Administrator determines, in its sole discretion, that the value of a Debtor's assets (other than
such Debtor's Available Cash) exceeds the amount of Available Cash necessary to be retained
pursuant to this section on account of Disputed Claims against such Debtor, the Plan
Administrator may, subject to Bankruptcy Court approval, on proper notice to all holders of
Disputed Claims against such Debtor, release such Available Cash for Distribution to holders of
Allowed Claims and retain in, lieu thereof, such Debtor's non-Cash assets to satisfy its Disputed
Claims if such Claims become Allowed Claims.

8.5     <u>Minimum Distribution and Manner of Payment</u>.  Other than with respect to a
Convenience Claim or Convenience Guarantee Claim, no payment of Cash of less than $500
shall be made by any Debtor to any holder of an Allowed Claim against such Debtor unless a
request therefor is made in writing to the Plan Administrator.  Any payment of Cash made

A397

pursuant to the Plan may be made at the option of the Plan Administrator either by check or by wire transfer.

8.6    <u>Distributions Free and Clear</u>.    Except as otherwise provided herein, any Distributions under the Plan shall be free and clear of any Liens, Claims and encumbrances, and no other entity, including the Debtors or the Plan Administrator shall have any interest, legal, beneficial or otherwise, in assets transferred pursuant to the Plan.

8.7    <u>Delivery of Distributions and Undeliverable Distributions</u>.    Distributions to holders of Allowed Claims shall be made at the address of each such holder as set forth on the Schedules filed with the Bankruptcy Court, unless superseded by a new address as set forth (a) on a proof of Claim filed by a holder of an Allowed Claim, (b) in another writing notifying the Plan Administrator (at the addresses set forth in <u>Section 15.12</u>) or the Court appointed claims agent of a change of address or (c) in the notice filed with the Bankruptcy Court in accordance with Bankruptcy Rule 3001(e) to the extent a Claim has been transferred.  If any holder's Distribution is returned as undeliverable, no further Distributions to such holder shall be made unless and until the Plan Administrator is notified of such holder's then-current address, at which time all missed Distributions shall be made to such holder at its then-current address, without interest.  All demands for undeliverable Distributions shall be made on or before six (6) months after the date such undeliverable Distribution was initially made.  Thereafter, the amount represented by such undeliverable Distribution shall irrevocably revert to the applicable Debtor as Available Cash for Distributions to the holders of Allowed Claims, and any Claim in respect of such undeliverable Distribution shall be discharged and forever barred from assertion against such Debtor or its respective property.

8.8    <u>Withholding and Reporting Requirements</u>.    In connection with the Plan and all instruments issued in connection therewith and distributed thereon, the Plan Administrator or the Liquidating Trustee (as applicable) shall comply with all applicable withholding and reporting requirements imposed by any federal, state, or local taxing authority, and all Distributions shall be subject to any such withholding or reporting requirements.  All such amounts withheld and paid to the appropriate Governmental Unit shall be treated as distributed to such holders.  Notwithstanding the above, each holder of an Allowed Claim or Liquidating Trust Interest that is to receive a Distribution shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any Governmental Unit, including income, withholding and other tax obligations, on account of such Distribution.  The Plan Administrator or the Liquidating Trustee (as applicable), has the right, but not the obligation, to not make a Distribution until such holder has made arrangements satisfactory to such issuing or disbursing party for payment of any such tax obligations.  The Plan Administrator or the Liquidating Trustee (as applicable), may require, as a condition to receipt of a Distribution, that the holder of an Allowed Claim or Liquidating Trust Interest provide a completed Form W-8, W-9 and/or other tax information deemed necessary in the sole discretion of the Plan Administrator or Liquidating Trustee, as applicable to each such holder, provided that if the Plan Administrator or Liquidating Trustee (as applicable) makes such a request and the holder fails to comply before the date that is 180 days after the request is made, the amount of such Distribution shall irrevocably revert to the applicable Debtor or Liquidating Trust and any Claim in respect of such Distribution shall be discharged and forever barred from assertion against such Debtor, Liquidating Trust, or its respective property.

8.9     Time Bar to Cash Payment Rights.   Checks issued in respect of Allowed Claims shall be null and void if not negotiated within 90 days after the date of issuance thereof. Requests for reissuance of any check shall be made to the Plan Administrator by the holder of the Allowed Claim to whom such check originally was issued.   Any claim in respect of such a voided check shall be made on or before 90 days after the expiration of the 90 day period following the date of issuance of such check.   Thereafter, the amount represented by such voided check shall irrevocably revert to the Debtor and any Claim in respect of such voided check shall be discharged and forever barred from assertion against such Debtor and its property.

8.10     Setoffs and Recoupment.   Except as otherwise agreed by a Debtor, any Debtor may, but shall not be required to, setoff against or recoup from any Claim and the payments to be made pursuant to the Plan in respect of such Claim any Claims of any nature whatsoever that the Debtor may have against the claimant; *provided, however*, that the claimant shall be served with written notice of the proposed setoff or recoupment at least twenty-eight (28) days prior to exercising any asserted setoff or recoupment right, and, if such claimant serves a written objection to such asserted setoff or recoupment on or before twenty-eight (28) days of receipt of such written notice, (i) the objection shall be deemed to initiate a contested matter governed by, *inter alia*, Bankruptcy Rule 9014 and Local Rules 9014-1 and 9014-2, (ii) nothing herein shall affect the respective burden of each party in connection with such contested matter, and (iii) the Debtor shall not proceed with the asserted setoff or recoupment absent the withdrawal of such objection or the entry of a Final Order overruling such objection but the Debtor may withhold such payment pending resolution of such objection; *provided, further,* that neither the failure to setoff against or recoup from any Claim nor the allowance of any Claim hereunder shall constitute a waiver or release by such Debtor of any such Claim the Debtor may have against such claimant.

8.11     Claims Register.   The register of Claims maintained by the Debtors shall remain open after the Effective Date and the Debtors and Plan Administrator shall recognize any transfer of Claims at any time thereafter, *provided* that for purposes of each Distribution, the Debtors and the Plan Administrator will not recognize any transfer during the period commencing thirty (30) calendar days prior to a Distribution Date.   Except as otherwise provided in the Plan, any transfer of a Claim, whether occurring prior to or after the Confirmation Date, shall not affect or alter the classification and treatment of such Claim under the Plan and any such transferred Claim shall be subject to classification and treatment under the Plan as if such Claim was held by the transferor who held such Claim on the Commencement Date.

8.12     Allocation of Distributions.   Distributions to any holder of an Allowed Claim shall be allocated first to the principal portion of any such Allowed Claim (as determined for federal income tax purposes), and, only after the principal portion of any such Allowed Claim is satisfied in full, to any portion of such Allowed Claim comprising interest (but solely to the extent that interest is an allowable portion of such Allowed Claim).

8.13     Maximum Distribution.

(a)     An (i) Allowed Claim that receives Distributions (excluding Distributions contributed to the Plan Adjustment on account of such Allowed Claim) in the Allowed amount

A399

of such Claim or (ii) Allowed Guarantee Claim that receives Distributions (excluding Distributions contributed to the Plan Adjustment on account of such Allowed Guarantee Claim) that combined with Distributions or other consideration provided on the corresponding Primary Claim (excluding Distributions contributed to the Plan Adjustment on account of such Primary Claim) equal the Allowed amount of such Guarantee Claim (or such amount as may be agreed to by a holder and the Debtors) shall, in each case, be deemed satisfied in full as to such Allowed Claim or Allowed Guarantee Claim against the applicable Debtor. To the extent that an Allowed Guarantee Claim is deemed satisfied in full, LBHI shall be entitled to receive future Distributions or consideration on account of the corresponding Primary Claim as subrogee pursuant to Section 8.14(a) of the Plan to the extent of LBHI's Distribution on account of such Guarantee Claim less any amounts received by LBHI by way of disgorgement thereof. Except as specifically provided with respect to LBHI's rights of subrogation set forth above, nothing contained herein shall in any way affect the rights of the holder of a Guarantee Claim with respect to a corresponding Primary Claim against a Primary Obligor that is not a Debtor.

(b) In no event shall (i) an Allowed Claim receive Distributions (excluding Distributions contributed to the Plan Adjustment on account of such Allowed Claim) in excess of the Allowed amount of such Claim or (ii) an Allowed Guarantee Claim receive Distributions (excluding Distributions contributed to the Plan Adjustment on account of such Allowed Guarantee Claim) that combined with Distributions or other consideration provided on the corresponding Primary Claim (excluding Distributions contributed to the Plan Adjustment on account of such Primary Claim) are in excess of the Allowed amount of the Guarantee Claim (or such amount as may be agreed to by a holder and the Debtors).

(c) To the extent that any Debtor has Available Cash after all Allowed Claims against that Debtor have been satisfied in full in accordance with Section 8.13(a) of the Plan, each holder of each such Allowed Claim shall receive its Pro Rata Share of further Distributions, if any, to the fullest extent permissible under the Bankruptcy Code in satisfaction of postpetition interest on the Allowed amount of such Claims at the rate applicable in the contract or contracts on which such Allowed Claim is based (or, absent such contractual rate, at the statutory rate) until such time as all postpetition interest on all such Allowed Claims has been paid in full.

(d) For purposes of determining whether an Allowed Claim has been satisfied in full in accordance with Section 8.13(a) of the Plan, all Distributions or other consideration provided by a Primary Obligor in a currency other than the U.S. Dollar shall be converted to the U.S. Dollar applying the existing exchange rate derived from Reuters existing at approximately 3:00 p.m. GMT on the Confirmation Date. Nothing contained in this provision shall affect the applicable exchange rate for determining the Allowed amount of any Claim under section 502(b) of the Bankruptcy Code.

(e) The Plan Administrator may, in its sole discretion, request that a holder of an Allowed Guarantee Claim, except holders of Allowed Guarantee Claims for which a Subsidiary Debtor is the Primary Obligor, certify in writing and provide evidence reasonably satisfactory to the Plan Administrator to confirm whether: (i) the Primary Claim has been Allowed or disallowed against the Primary Obligor, and, if Allowed, the amount of such Allowed Primary Claim, (ii) the Primary Claim is disputed or subject to objection by a Foreign Administrator or other party, (iii) the consideration, if any, received to date on account of such

Allowed Primary Claim from the Primary Obligor, (iv) such holder has been notified by or on behalf of the Primary Obligor of any future distributions or payment anticipated or estimated to be made on account of such Primary Claim from the Primary Obligor; or (v) the holder (A) has sufficient assets to satisfy an order or judgment to disgorge any Distributions received with respect to such Allowed Guarantee Claim if it is ultimately determined that such holder is required to disgorge all or a portion of such Distributions and (B) will submit to the jurisdiction of the Bankruptcy Court for purposes of such order or judgment and will not contest the enforcement of such order or judgment in any foreign jurisdiction. If the holder does not also certify, in addition to the foregoing, that the holder has sufficient assets in the United States of America to satisfy an order to disgorge any Distributions with respect to such Allowed Guarantee Claim, unless the Bankruptcy Court orders otherwise, the Plan Administrator may require that the holder post security for any obligation to disgorge Distributions made to such holder on account of such Allowed Guarantee Claim as a condition to the receipt of future Distributions on such Claim if the Plan Administrator reasonably determines that such security is necessary to ensure the recovery of any amount of Distributions made by LBHI to such holder that is ordered to be disgorged. If (i) the Plan Administrator determines, based on the foregoing, that an Allowed Guarantee Claim has been satisfied in full in accordance with Section 8.13(a) of the Plan, then unless the Bankruptcy Court orders otherwise, no Distributions shall thereafter be made on account of such Allowed Guarantee Claim, or (ii) a holder of an Allowed Guarantee Claim does not comply with this section, then unless the Bankruptcy Court orders otherwise, the Plan Administrator shall not be required to make Distributions on account of such Allowed Guarantee Claim, *provided* that nothing herein shall preclude a holder of an Allowed Guarantee Claim from challenging the determination of the Plan Administrator in the Bankruptcy Court; *provided, further*, that the Plan Administrator shall reserve Distributions with respect to such Allowed Guarantee Claim and, unless such Allowed Guarantee Claim has been satisfied in full in accordance with Section 8.13(a) of the Plan, promptly after compliance with this section the Plan Administrator shall remit to the holder of such Allowed Guarantee Claim the lesser of (x) the amount reserved pursuant to this section on account of such Allowed Guarantee Claim or (y) the amount necessary to satisfy such Allowed Guarantee Claim in full in accordance with Section 8.13(a) of the Plan.

(f) Any portion of any Distribution made by LBHI to the holder of an Allowed Guarantee Claim that is recovered pursuant to Section 8.13 or 8.14 of the Plan, whether by way of subrogation, disgorgement or otherwise, shall be treated as Available Cash of LBHI and distributed accordingly.

8.14 Rights of Reimbursement.

(a) Except as otherwise agreed by the Debtors, to the extent that a Debtor now has or becomes legally entitled to be subrogated to the rights of any Creditor, including on account of any Distributions received by holders of Allowed Guarantee Claims that are satisfied in full in accordance with Section 8.13(a) of the Plan, (i) such Creditor shall be deemed to have consented to the subrogation of its right against any third-party, including, without limitation, a Primary Obligor, that may be obligated to reimburse or indemnify the Debtor for all or a portion of such Distribution, or (ii) the Debtor shall have all rights, title and power as subrogee of the Creditor against any such third-party, including, without limitation, a Primary Obligor, to the fullest extent permitted by applicable law.

(b)   Except as otherwise agreed by the Debtors, the Debtors' rights to assert or prosecute Litigation Claims for reimbursement, indemnification, recoupment or any other similar right, including, without limitation, any right to setoff with respect to any of the foregoing, against any entity, including, without limitation, a Primary Obligor, on account of Distributions made to the holders of Allowed Claims or Allowed Guarantee Claims, shall be fully preserved to the fullest extent permitted by applicable law.

8.15   <u>Distributions to Non-Controlled Affiliates</u>.   Except as otherwise agreed by the Debtors and a Non-Controlled Affiliate or with respect to LBT or LBSN, the Plan Administrator may determine, in its sole discretion, to withhold all or a portion of a Distribution to a Non-Controlled Affiliate if such Distribution would be distributed by such Non-Controlled Affiliate to satisfy a Claim of a different Non-Controlled Affiliate against which a Debtor has a Claim but the latter Non-Controlled Affiliate has refused to honor such Claim of a Debtor without subordination, reduction or offset unless (a) otherwise agreed to by the Plan Administrator or (b) the priority and amount of a Debtor's Claim against the latter Non-Controlled Affiliate has been determined by Final Order.

## ARTICLE IX
## Procedures for Treating Disputed Claims

9.1   <u>Objections</u>.   The Debtors' rights to object to, oppose and defend against all Claims on any basis are fully preserved.   Notwithstanding that a Primary Claim is Allowed against a Primary Obligor, the Debtors reserve the right to object to, oppose and defend against all Guarantee Claims.   As of the Effective Date, objections to, and requests for estimation of, all Claims against the Debtors may be interposed and prosecuted only by the Plan Administrator, which shall consult with the applicable Debtor regarding the same.   Objections to and requests for estimation of Claims shall be filed with the Court and served on the claimant on or before the later of (a) the date that is 2 years after the Effective Date and (b) such later date as may be fixed by the Bankruptcy Court for cause shown.

9.2   <u>No Distributions Pending Allowance</u>.   Notwithstanding any other provision hereof and unless otherwise agreed, if any portion of a Claim is a Disputed Claim, no Distribution shall be made on account of such Claim unless and until such Disputed Claim becomes an Allowed Claim.

9.3   <u>Estimation of Claims</u>.   The Plan Administrator may at any time request on behalf of any Debtor that the Bankruptcy Court estimate any contingent, unliquidated, or Disputed Claim, to the extent permitted by the Bankruptcy Code and Bankruptcy Rules, regardless of whether such Debtor previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain exclusive jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including, without limitation, during the pendency of any appeal relating to any such objection. In the event that the Bankruptcy Court estimates any contingent, unliquidated or Disputed Claim, the amount so estimated may constitute (i) the Allowed amount of such Claim, (ii) a maximum limitation on such Claim, (iii) the amount to be reserved in respect of Claim, or (iv) the amount of such Claim for voting purposes, all as determined by the Bankruptcy Court in accordance with the Bankruptcy Code and Bankruptcy Rules.   If the estimated amount constitutes a maximum

limitation on the amount of such Claim, such Debtor may pursue supplementary proceedings to object to the allowance of such Claim. All of the aforementioned objection, estimation, and resolution procedures are intended to be cumulative and not exclusive of one another. Claims may be estimated and subsequently disallowed, reduced, compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

9.4     <u>Resolution of Disputed Claims</u>.  On and after the Effective Date, the Plan Administrator shall have the authority to compromise, settle or otherwise resolve or withdraw any objections to Claims and to compromise, settle or otherwise resolve any Disputed Claims in accordance with <u>Section 6.1(b)(i)</u> of the Plan.

**ARTICLE X**
**<u>Liquidating Trust</u>**

10.1     <u>Execution of Liquidating Trust Agreement</u>.  After the Effective Date, and only if the Plan Administrator determines that one or more Liquidating Trusts are in the best interests of one or more Debtors and holders of Allowed Claims against and Equity Interests in such Debtors, the Plan Administrator and a Liquidating Trustee shall execute a Liquidating Trust Agreement, and shall take all other necessary steps to establish a Liquidating Trust and Liquidating Trust Interests therein, which shall be for the benefit of Liquidating Trust Beneficiaries.  In the event of any conflict between the terms of this <u>Section 10.1</u> and the terms of a Liquidating Trust Agreement as such conflict relates to the establishment of a Liquidating Trust, the terms of this <u>Section 10.1</u> shall govern.  A Liquidating Trust Agreement may provide powers, duties and authorities in addition to those explicitly stated herein, but only to the extent that such powers, duties, and authorities do not affect the status of a Liquidating Trust as a "liquidating trust" for United States federal income tax purposes.

10.2     <u>Purpose of the Liquidating Trust</u>.  Each Liquidating Trust shall be established for the sole purpose of liquidating and distributing the assets of the Debtor contributed to such Liquidating Trust in accordance with Treas. Reg. § 301.7701-4(d), with no objective to continue or engage in the conduct of a trade or business.

10.3     <u>Liquidating Trust Assets</u>.  Each Liquidating Trust shall consist of Liquidating Trust Assets.  After the creation of a Liquidating Trust pursuant to <u>Section 10.1</u> of the Plan, the Plan Administrator shall transfer all of the Liquidating Trust Assets to a Liquidating Trust. Liquidating Trust Assets may be transferred subject to certain liabilities, as provided in a Liquidating Trust Agreement.  Such transfer shall be exempt from any stamp, real estate transfer, mortgage reporting, sales, use or other similar tax pursuant to section 1146(a) of the Bankruptcy Code.

10.4     <u>Administration of the Liquidating Trust</u>.  Each Liquidating Trust shall be administered by a Liquidating Trustee pursuant to a Liquidating Trust Agreement and the Plan. In the event of an inconsistency between the Plan and a Liquidating Trust Agreement as such conflict relates to anything other than the establishment of a Liquidating Trust, the Liquidating Trust Agreement shall control.

10.5    Liquidating Trustee's Tax Power for Debtors.  A Liquidating Trustee shall have the same authority in respect of all taxes of the Debtors, and to the same extent, as if the Liquidating Trustee were the Debtor.

10.6    Cash Investments.  A Liquidating Trustee may invest Cash (including any earnings thereon or proceeds therefrom); provided, however, that such investments are investments permitted to be made by a "liquidating trust" within the meaning of Treas. Reg. § 301.7701-4(d), as reflected therein, or under applicable IRS guidelines, rulings or other controlling authorities.

10.7    Distribution of Liquidating Trust Interests.  A Liquidating Trustee is required to distribute to the holders of Allowed Claims on account of their Liquidating Trust Interests, on a semi-annual basis, all Available Cash (including any Cash received from the Debtors and treating any permissible investment as Cash for purposes of this Section 10.7), less such amounts that may be reasonably necessary to (a) meet contingent liabilities and to maintain the value of the Liquidating Trust Assets during liquidation, (b) pay reasonable incurred or anticipated expenses (including, without limitation, any taxes imposed on or payable by the Debtors or Liquidating Trust or in respect of the Liquidating Trust Assets), or (c) satisfy other liabilities incurred or anticipated by such Liquidating Trust in accordance with the Plan or Liquidating Trust Agreement; provided, however, that such Liquidating Trustee shall not be required to make a Distribution pursuant to this Section 10.7 of the Plan if such Liquidating Trustee determines that the expense associated with making the Distribution would likely utilize a substantial portion of the amount to be distributed, thus making the Distribution impracticable.

10.8    Federal Income Tax Treatment of Liquidating Trust.  Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt of an adverse determination by the IRS upon audit if not contested by such Liquidating Trustee), for all United States federal income tax purposes, all parties (including, without limitation, the Debtors, a Liquidating Trustee and Liquidating Trust Beneficiaries) shall treat the transfer of Liquidating Trust Assets to a Liquidating Trust as (1) a transfer of Liquidating Trust Assets (subject to any obligations relating to those assets) directly to Liquidating Trust Beneficiaries (other than to the extent Liquidating Trust Assets are allocable to Disputed Claims), followed by (2) the transfer by such beneficiaries to a Liquidating Trust of Liquidating Trust Assets in exchange for Liquidating Trust Interests.  Accordingly, except in the event of contrary definitive guidance, Liquidating Trust Beneficiaries shall be treated for United States federal income tax purposes as the grantors and owners of their respective share of Liquidating Trust Assets (other than such Liquidating Trust Assets as are allocable to Disputed Claims).  The foregoing treatment shall also apply, to the extent permitted by applicable law, for state and local income tax purposes.  For the purpose of this Section 10.8, the terms "party" and "Liquidating Trust Beneficiary" shall not include the United States or any agency or department thereof, or any officer or employee thereof acting in such capacity.

10.9    Tax Reporting.

(a)    A Liquidating Trustee shall file tax returns for a Liquidating Trust treating such Liquidating Trust as a grantor trust pursuant to Treas. Reg. § 1.671-4(a) and in accordance with this Section 10.9(a).  A Liquidating Trustee also shall annually send to each holder of a

Liquidating Trust Interest a separate statement regarding the receipts and expenditures of the Liquidating Trust as relevant for U.S. federal income tax purposes and will instruct all such holders to use such information in preparing their U.S. federal income tax returns or to forward the appropriate information to such holders' underlying beneficial holders with instructions to utilize such information in preparing their U.S. federal income tax returns.

(b)        Allocations of Liquidating Trust taxable income among Liquidating Trust Beneficiaries (other than taxable income allocable to any assets allocable to, or retained on account of, Disputed Claims) shall be determined by reference to the manner in which an amount of Cash representing such taxable income would be distributed (were such Cash permitted to be distributed at such time) if, immediately prior to such deemed Distribution, the Liquidating Trust had distributed all its assets (valued at their tax book value, other than assets allocable Disputed Claims) to the holders of Liquidating Trust Interests, adjusted for prior taxable income and loss and taking into account all prior and concurrent Distributions from a Liquidating Trust. Similarly, taxable loss of a Liquidating Trust shall be allocated by reference to the manner in which an economic loss would be borne immediately after a hypothetical liquidating distribution of the remaining Liquidating Trust Assets.   The tax book value of Liquidating Trust Assets for purpose of this paragraph shall equal their fair market value on the date Liquidating Trust Assets are transferred to a Liquidating Trust, adjusted in accordance with tax accounting principles prescribed by the IRC, the applicable Treasury Regulations, and other applicable administrative and judicial authorities and pronouncements.

(c)        As soon as reasonably practicable after Liquidating Trust Assets are transferred to a Liquidating Trust, a Liquidating Trustee shall make a good faith valuation of Liquidating Trust Assets.   Such valuation shall be made available from time to time to all parties to the Liquidating Trust (including, without limitation, the Debtors and Liquidating Trust Beneficiaries), to the extent relevant to such parties for tax purposes, and shall be used consistently by such parties for all United States federal income tax purposes.

(d)        Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary (including the receipt by a Liquidating Trustee of a private letter ruling if such Liquidating Trustee so requests one, or the receipt of an adverse determination by the IRS upon audit if not contested by such Liquidating Trustee), such Liquidating Trustee (i) may timely elect to treat any Liquidating Trust Assets allocable to Disputed Claims as a "disputed ownership fund" governed by Treas. Reg. § 1.468B-9, and (ii) to the extent permitted by applicable law, shall report consistently for state and local income tax purposes.   If a "disputed ownership fund" election is made, all parties (including such Liquidating Trustee, the Debtors and Liquidating Trust Beneficiaries) shall report for United States federal, state and local income tax purposes consistently with the foregoing.

(e)        A Liquidating Trustee shall be responsible for payment, out of Liquidating Trust Assets, of any taxes imposed on a Liquidating Trust or its assets.

(f)        A Liquidating Trustee may request an expedited determination of taxes of a Liquidating Trust, including any reserve for Disputed Claims, or of the Debtor as to whom the Liquidating Trust was established, under section 505(b) of the Bankruptcy Code for all tax

returns filed for, or on behalf of, such Liquidating Trust or the Debtor for all taxable periods through the dissolution of such Liquidating Trust.

10.10 <u>Dissolution</u>.

(a) A Liquidating Trustee and Liquidating Trust shall be discharged or dissolved, as the case may be, at such time as (i) all of the Liquidating Trust Assets have been distributed pursuant to the Plan and a Liquidating Trust Agreement, (ii) a Liquidating Trustee determines, in its sole discretion, that the administration of any remaining Liquidating Trust Assets is not likely to yield sufficient additional Liquidating Trust proceeds to justify further pursuit, or (iii) all Distributions required to be made by a Liquidating Trustee under the Plan and a Liquidating Trust Agreement have been made; *provided*, *however*, that in no event shall a Liquidating Trust be dissolved later than three (3) years from the creation of such Liquidating Trust pursuant to <u>Section 10.1</u> of the Plan unless the Bankruptcy Court, upon motion within the six-month period prior to the third (3rd) anniversary (or within the six-month period prior to the end of an extension period), determines that a fixed period extension (not to exceed three (3) years, together with any prior extensions, without a favorable private letter ruling from the IRS or an opinion of counsel satisfactory to the Liquidating Trustee that any further extension would not adversely affect the status of the trust as a liquidating trust for United States federal income tax purposes) is necessary to facilitate or complete the recovery and liquidation of the Liquidating Trust Assets.

(b) If at any time a Liquidating Trustee determines, in reliance upon such professionals as a Liquidating Trustee may retain, that the expense of administering a Liquidating Trust so as to make a final Distribution to Liquidating Trust Beneficiaries is likely to exceed the value of the assets remaining in such Liquidating Trust, such Liquidating Trustee may apply to the Bankruptcy Court for authority to (i) reserve any amount necessary to dissolve such Liquidating Trust, (ii) donate any balance to a charitable organization (A) described in section 501(c)(3) of the IRC, (B) exempt from United States federal income tax under section 501(a) of the IRC, (C) not a "private foundation", as defined in section 509(a) of the IRC, and (D) that is unrelated to the Debtors, such Liquidating Trust, and any insider of such Liquidating Trustee, and (iii) dissolve such Liquidating Trust.

## ARTICLE XI
## Treatment of Executory Contracts and Unexpired Leases

11.1 <u>Executory Contracts and Unexpired Leases</u>. Pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, all prepetition executory contracts and unexpired leases that exist between a Debtor and any person or entity shall be deemed rejected by such Debtor, as of the Effective Date, except for any prepetition executory contract or unexpired lease (a) that has been assumed pursuant to an order of the Bankruptcy Court entered prior to the Effective Date, (b) as to which a motion for approval of the assumption or rejection of such executory contract or unexpired lease has been filed prior to the Confirmation Date, or (c) that is specifically designated in the Plan Supplement as a contract or lease to be assumed by the Debtor; *provided*, *however*, that the Debtors reserve the right, on or prior to the Confirmation Date, to amend the Plan Supplement to remove any prepetition executory contract or unexpired lease therefrom or add any prepetition executory contract or unexpired lease thereto, in which event such executory

contract(s) or unexpired lease(s) shall, as of the Effective Date, be deemed to be, respectively, rejected or assumed. The Debtors shall provide notice of any amendments to the Plan Supplement to the parties to the executory contracts and unexpired leases affected thereby. The listing of or failure to list a document in the Plan Supplement shall not constitute an admission by the Debtors that such document is or is not an executory contract or an unexpired lease or that the Debtors have any liability thereunder.

11.2    Approval of Assumption and Rejection of Executory Contracts and Unexpired Leases. Entry of the Confirmation Order shall, subject to and upon the occurrence of the Effective Date, constitute (a) the approval, pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, of the assumption of the executory contracts and unexpired leases assumed or assumed and assigned pursuant to the Plan and (b) the approval, pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, of the rejection of the executory contracts and unexpired leases rejected pursuant to the Plan. To the extent any provision of an executory contract or unexpired lease to be assumed by any of the Debtors under the Plan limits such Debtor's ability to assign such executory contract or unexpired lease, the effectiveness of such provision shall be limited or nullified to the full extent provided in section 365(f) of the Bankruptcy Code.

11.3    Cure of Defaults. Except as may otherwise be agreed to by the parties, within thirty (30) days after the Effective Date, the Debtor shall cure any and all undisputed defaults under any executory contract or unexpired lease assumed by the Debtor pursuant to the Plan, in accordance with section 365(b) of the Bankruptcy Code. All disputed defaults that are required to be cured shall be cured either within thirty (30) days of the entry of a Final Order determining the amount, if any, of the Debtor's liability with respect thereto, or as may otherwise be agreed to by the parties.

11.4    Bar Date for Filing Proofs of Claim Relating to Executory Contracts and Unexpired Leases Rejected Pursuant to the Plan. Claims arising out of the rejection of an executory contract or unexpired lease pursuant to the Plan must be filed with the Bankruptcy Court and served upon the relevant Debtor no later than forty-five (45) days after the later of (a) notice of entry of an order approving the rejection of such executory contract or unexpired lease, (b) notice of entry of the Confirmation Order and occurrence of the Effective Date, and (c) notice of an amendment to the Plan Supplement relating to such executory contract or unexpired lease. **Except as set forth in the preceding sentence, all such Claims must otherwise comply with the provisions of the Bar Date Order. All such Claims not filed in accordance with the foregoing will be forever barred from assertion against the Debtors and their estates.** Any Claim arising out of the rejection of an executory contract or unexpired lease pursuant to the Plan shall be classified as a General Unsecured Claim or Convenience Claim, as applicable, against the Debtor that is a party to such executory contract or unexpired lease.

11.5    Insurance Policies. To the extent that any of the Debtors' insurance policies and any agreements, documents or instruments with insurers relating thereto constitute executory contracts, such  contracts shall be deemed assumed under the Plan. Nothing contained herein shall constitute or be deemed a waiver of any Litigation Claims that the Debtors may hold against any entity, including, without limitation, the insurer under any of the Debtors' policies of insurance.

11.6    Indemnification Obligations.    Subject to the occurrence of the Effective Date, the obligations of each Debtor to indemnify, defend, reimburse or limit the liability of (a) directors, officers and any other employee who is held responsible for obligations of the Debtor incurred after the Commencement Date who are directors, officers or employees of such Debtor or a Debtor-Controlled Entity on or after the Commencement Date and (b) Released Parties, respectively, against any Claims or Causes of Action as provided in the Debtor's articles of organization, certificates of incorporation, bylaws, other organizational documents or applicable law, shall survive confirmation of the Plan, shall be assumed by such Debtor and will remain in effect after the Effective Date.    Any such assumed obligations owed in connection with an event occurring after the Commencement Date shall be paid as an Administrative Expense Claim under the Plan.    Any such obligations owed in connection with an event occurring before the Commencement Date shall be treated as pre-petition Claims under the Plan.    Nothing in the Plan shall in any way limit, modify, alter or amend the Debtor's limitation of liability of the Independent Directors set forth in Section 10.1 of the Restated Certificate of Incorporation of LBHI.

## ARTICLE XII
## Effectiveness of the Plan

12.1    Conditions Precedent to the Confirmation of the Plan.    The following are conditions precedent to the confirmation of the Plan with respect to each Debtor:

(a)    The Bankruptcy Court shall have entered the Structured Securities Order in form and substance satisfactory to the Debtors and the Creditors' Committee; and

(b)    The Bankruptcy Court shall have entered a Confirmation Order with respect to the Plan for all of the Participating Debtors in form and substance satisfactory to the respective Debtor and the Creditors' Committee.

12.2    Conditions Precedent to the Effective Date of the Plan.    The following are conditions precedent to the Effective Date of the Plan with respect to each Debtor:

(a)    The Confirmation Order, in form and substance acceptable to the Debtors and the Creditors' Committee, shall have been entered;

(b)    All actions and all agreements, instruments or other documents necessary to implement the terms and provisions of the Plan are effected or executed and delivered, as applicable, in form and substance satisfactory to the Debtors;

(c)    All authorizations, consents and regulatory approvals, if any, required by the Debtors in connection with the consummation of the Plan are obtained and not revoked; and

(d)    The certificate of incorporation and by-laws of the Debtors shall have been amended to the extent necessary to effectuate the Plan.

12.3    Waiver of Conditions.    Notwithstanding the foregoing, each Debtor reserves its right, upon obtaining the consent of the Creditors' Committee, to waive the occurrence of the conditions precedent to the (a) Confirmation of its Plan set forth in Section 12.1 and (b) Effective

A408

Date set forth in <u>Section 12.2</u> of the Plan other than <u>Section 12.2(a)</u> of the Plan. Any such waiver may be effected at any time, without notice, without leave or order of the Bankruptcy Court, and without any formal action other than proceeding to consummate the Plan. Any actions required to be taken on the Effective Date shall take place and shall be deemed to have occurred simultaneously, and no such action shall be deemed to have occurred prior to the taking of any other such action. If any of the Debtors decide, with the consent of the Creditors' Committee, that one of the conditions precedent to the Effective Date of its Plan cannot be satisfied and the occurrence of such condition is not waived or cannot be waived, then the Debtor shall file a notice of the inability to satisfy such condition prior to the Effective Date with the Bankruptcy Court.

## ARTICLE XIII
## Effects of Confirmation

13.1 <u>Vesting of Assets</u>. Upon the Effective Date, pursuant to section 1141(b) and (c) of the Bankruptcy Code, all Property of the Estate of a Debtor shall vest in that Debtor free and clear of all Claims, Liens, encumbrances, charges and other interests, except as provided herein. From and after the Effective Date, the Debtors, acting through the Plan Administrator, may take any action, including, without limitation, the operation of their businesses, the use, acquisition, sale, lease and disposition of property, and the entry into transactions, agreements, understandings or arrangements, whether in or other than in the ordinary course of business, and execute, deliver, implement, and fully perform any and all obligations, instruments, documents and papers or otherwise in connection with any of the foregoing, free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules and in all respects as if there were no pending cases under any chapter or provision of the Bankruptcy Code, except as explicitly provided herein.

13.2 <u>Binding Effect</u>. On and after the Confirmation Date, the provisions of the Plan shall bind any holder of a Claim against, or Equity Interest in, the Debtors and their respective successors and assigns, whether or not the Claim or Equity Interest of such holder is impaired under the Plan and whether or not such holder has accepted the Plan.

13.3 **<u>Release and Exculpation</u>. On and after the Effective Date, the Debtors and all entities who have held, hold or may hold Claims against or Equity Interests in any or all of the Debtors (whether proof of such Claims or Equity Interests has been filed or not), along with their respective present or former employees, agents, officers, directors or principals, shall be deemed to have released (a) the Released Parties from, and none of the Released Parties shall have or incur any liability for, any Claim for, Cause of Action for or other assertion of liability for any act taken or omitted to be taken during the Chapter 11 Cases in connection with, or arising out of, the Chapter 11 Cases, the negotiation, formulation, dissemination, confirmation, consummation or administration of the Plan, property to be distributed under the Plan or any other act or omission in connection with the Chapter 11 Cases, the Plan, the Disclosure Statement, the Plan Support Agreements or any contract, instrument, document or other agreement related thereto and (b) the PSA Creditors from, and none of the PSA Creditors shall have or incur any liability for, any Claim for, Cause of Action for or other assertion of liability for any act taken or omitted to be taken in connection with, or arising out of, the negotiation, formulation, dissemination or confirmation, consummation or administration of the Plan, or any other act or omission**

A409

in connection with the Plan, the Disclosure Statement, the Plan Support Agreements, including the filing of any alternative chapter 11 plan and any determination to not pursue solicitation or confirmation of such alternative plan, or any contract, instrument, document or other agreement related thereto; *provided*, *however*, that (i) in no event shall any Litigation Claim, Cause of Action or other Claim or assertion of liability against any Released Party or PSA Creditor for any act taken or omitted to be taken prior to the Commencement Date be released by the Plan, (ii) nothing herein shall affect or release any obligation of the Debtors under the Plan, and (iii) nothing herein shall affect the liability of any person that otherwise would result from any such act or omission to the extent such act or omission is determined by a Final Order to have constituted willful misconduct or gross negligence; *provided*, *further*, that nothing in this Plan shall limit the liability of the professionals of the Debtors, the Creditors' Committee or the PSA Creditors to their respective clients pursuant to Rule 1.8(h)(1) of the New York Rules of Professional Conduct.

13.4   <u>Discharge</u>.  Except as expressly provided in the Plan, upon the date that all Distributions under the Plan have been made, (a) each holder (as well as any trustees and agents on behalf of each holder) of a Claim against or Equity Interest in a Debtor shall be deemed to have forever waived, released and discharged the Debtors, to the fullest extent permitted by section 1141 of the Bankruptcy Code, of and from any and all Claims, Equity Interests, rights and liabilities that arose prior to the Effective Date and (b) all such holders shall be forever precluded and enjoined, pursuant to section 524 of the Bankruptcy Code, from prosecuting or asserting any discharged Claim against or terminated Equity Interest in the Debtors.

13.5   <u>Injunction</u>.  Except as expressly provided in the Plan, the Confirmation Order, or a separate order of the Bankruptcy Court or as agreed to by a Creditor and the Plan Administrator (on behalf of a Debtor), all entities who have held, hold or may hold Claims against or Equity Interests in any or all of the Debtors (whether proof of such Claims or Equity Interests has been filed or not) and other parties in interest, along with their respective present or former employees, agents, officers, directors or principals, are permanently enjoined, on and after the Effective Date, solely with respect to any Claims and Causes of Action that will be or are extinguished or released pursuant to the Plan from (i) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including, without limitation, any proceeding in a judicial, arbitral, administrative or other forum) against or affecting the Released Parties or the property of any of the Released Parties, (ii) enforcing, levying, attaching (including, without limitation, any prejudgment attachment), collecting, or otherwise recovering by any manner or means, whether directly or indirectly, any judgment, award, decree, or order against the Released Parties or the property of any of the Released Parties, (iii) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind against the Released Parties or the property of any of the Released Parties, (iv) asserting any right of setoff, directly or indirectly, against any obligation due the Released Parties or the property of any of the Released Parties, except as contemplated or allowed by the Plan; (v) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan; and (vi) taking any actions to interfere with the implementation or consummation of the Plan.

13.6    United States Government.  As to the United States, its agencies, departments or agents, nothing in the Plan or Confirmation Order shall: (a) discharge, release or otherwise preclude (i) any liability of the Debtors arising on or after the Confirmation Date (defined for purposes of this section as the date the Confirmation Order becomes final and non-appealable), (ii) with respect to the Debtors, any liability that is not a Claim against a Debtor, (iii) any valid right of setoff or recoupment, or (iv) any liability of the Debtors arising under environmental or criminal laws as the owner or operator of property that such Debtor owns after the Confirmation Date (defined for purposes of this section as the date the Confirmation Order becomes final and non-appealable); or (b) limit or expand the scope of the discharge to which the Debtors are entitled under the Bankruptcy Code.  The discharge and injunction provisions contained in the Plan and Confirmation Order are not intended and shall not be construed to bar the United States from, subsequent to the Effective Date, pursuing any police or regulatory action.

13.7    Terms of Injunctions or Stays.  Unless otherwise provided in the Plan, the Confirmation Order, or a separate order of the Bankruptcy Court, all injunctions or stays arising under or entered during the Chapter 11 Cases under section 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the closing of all of the Chapter 11 Cases.

13.8    Retention of Litigation Claims and Reservation of Rights.  Except as expressly provided in the Plan, nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or the relinquishment of any rights, defenses or Litigation Claims that the Debtors may have or choose to assert on behalf of their respective estates under any provision of the Bankruptcy Code or any applicable nonbankruptcy law that the Debtors had prior to the Effective Date, including, without limitation, (a) any and all Claims against any person or entity, to the extent such person or entity asserts a crossclaim, counterclaim, and/or Claim for setoff which seeks affirmative relief against the Debtors, their officers, directors, or representatives, (b) any and all Claims or rights arising under any tax sharing agreement among the Debtors and their Affiliates (including the tax sharing agreement among the Debtors and LBI based on their regular and consistent course of conduct over many years), (c) any and all Claims for reimbursement of costs incurred for the benefit of any Affiliate, including in connection with the disposition of an Affiliate's assets; (d) any and all Avoidance Actions, and (e) any right of setoff or other legal or equitable defense and remedies.  The Debtors shall have, retain, reserve, and may assert all such rights, defenses or Litigation Claims after the Effective Date fully as if the Chapter 11 Cases had not been commenced.

13.9    Barclays Sale Order.  Nothing contained in the Plan, the Disclosure Statement or the Confirmation Order constitutes or shall be construed as any modification or amendment to the Barclays Sale Order and the rights and defenses of each of the Debtors, the SIPA Trustee (on behalf of LBI), Barclays Bank PLC and Barclays Capital Inc., with respect to any litigation, adversary proceeding, contested matter, claims adjudication, appeal or other dispute against the other are fully preserved, including, without limitation, any rights, defenses, counterclaims and/or cross-claims asserted in connection with or related to the Sale Order.

13.10    No Waiver of Rights and Defenses.  Except as otherwise agreed, the provisions of the Plan shall not enjoin, impair, prejudice, have any preclusive effect upon, or otherwise affect (A) the rights of any Creditor to (x) effectuate a recoupment pursuant to common law or

setoff pursuant to common law or otherwise in accordance with (a) section 553 and (b) sections 362(b)(6), 362(b)(7), 362(b)(17), 362(b)(27), 555, 556, 559, 560 or 561 of the Bankruptcy Code (subject to the Debtors' rights to contest the validity of such asserted right of setoff or recoupment or the applicability of any of the foregoing sections of the Bankruptcy Code) or (y) continue to assert the validity of a setoff or recoupment previously taken by such Creditor or to seek authority from the Bankruptcy Court to exercise a right of setoff or recoupment (subject in each case to the Debtors' right to contest the validity of any such setoff or recoupment), or (B) any legal or equitable defense, including any defensive right of setoff or recoupment, that has been, or may be asserted, by any entity in response to a Litigation Claim, Avoidance Action of a Debtor or objections to Claims against a Debtor.

## ARTICLE XIV
## Retention of Jurisdiction

14.1    Retention of Jurisdiction.    The Bankruptcy Court shall retain exclusive jurisdiction of all matters arising under, arising out of, or related to, the Chapter 11 Cases and the Plan pursuant to, and for the purposes of, sections 105(a) and 1142 of the Bankruptcy Code and for, among other things, the following purposes:

(a)    To hear and determine any motions for the assumption, assumption and assignment or rejection of executory contracts or unexpired leases and the allowance of any Claims resulting therefrom;

(b)    To determine any and all adversary proceedings, applications and contested matters relating to the Chapter 11 Cases, in each case in accordance with applicable law;

(c)    To hear and determine any objection to or motion to estimate Claims;

(d)    To enter and implement such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified, or vacated;

(e)    To issue such orders in aid of execution of the Plan to the extent authorized by section 1142 of the Bankruptcy Code;

(f)    To consider any modifications of the Plan, to cure any defect or omission or reconcile any inconsistency in any order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

(g)    To hear and determine all applications for compensation and reimbursement of expenses of professionals under sections 330, 331 and 503(b) of the Bankruptcy Code;

(h)    To hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan and any agreements or documents incorporated in or contemplated by the Plan, including, without limitation, Sections 6.4, 6.5, 13.3, 13.4 and 13.5 of the Plan;

(i)      To issue injunctions, enter and implement other orders, and take such other actions as may be necessary or appropriate to enforce or to restrain interference by any person with the consummation, implementation or enforcement of the Plan, the Confirmation Order, or any other order of the Bankruptcy Court;

(j)      To hear and determine any actions brought against the Plan Administrator in connection with the Plan, including, without limitation, any action relating to Distributions under the Plan;

(k)      To hear and determine any actions brought to recover all assets of the Debtors and property of the estates, wherever located or to determine or declare entitlement to such assets and property, including through actions of interpleader or in the nature of interpleader involving the same; *provided*, *however*, that this provision shall not limit the jurisdiction of a foreign court or tribunal overseeing a Foreign Proceeding;

(l)      To hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code, including any requests for expedited determinations under section 505(b) of the Bankruptcy Code filed, or to be filed, with respect to tax returns of the Debtors and of any Liquidating Trusts for any and all taxable periods ending after the Commencement Date through the Closing Date;

(m)      To hear all matters relating to Article XIII of the Plan, including, without limitation, all matters relating to the releases, exculpation, and injunction granted thereunder.

(n)      To hear all matters relating to the Plan Trust;

(o)      To hear any other matter consistent with the provisions of the Bankruptcy Code; and

(p)      To enter a final decree closing the Chapter 11 Cases.

## ARTICLE XV
## Miscellaneous Provisions

15.1    Post-Effective Date Role of Creditors' Committee and Fee Committee.

(a)      On the Effective Date, the Creditors' Committee shall be dissolved for all purposes other than (i) implementation of the Plan through the date of the initial Distribution in accordance with Section 8.3 of the Plan, (ii) defending any appeals from the Confirmation Order to final disposition of such appeals, and (iii) all matters relating to professional fees and the fee committee appointed in the Chapter 11 Cases for the period prior to the Effective Date. Following the Effective Date, the litigation and derivatives subcommittees of the Creditors' Committee may continue functioning for the limited purposes of (i) resolving pending litigation and (ii) subject to approval of the post-Effective Date board of directors of LBHI, other litigation and derivatives matters as to which, currently, the subcommittees are involved, and shall be recommended by the applicable subcommittee and the Plan Administrator.  Other than with respect to the foregoing, the members of the Creditors' Committee shall be released and discharged of and from all further authority, duties, responsibilities, and obligations related to

and arising from and in connection with the Chapter 11 Cases, and the retention or employment of the Creditors' Committee's attorneys, accountants, and other agents shall terminate. The Debtors shall pay the reasonable fees and expenses of the professionals retained by and shall reimburse the members of the remaining subcommittees for reasonable disbursements incurred, including the reasonable fees of counsel, in connection with the foregoing from and after the Effective Date. If a member of a subcommittee becomes unable to serve on a subcommittee or resigns after the Effective Date, the remaining members may replace such member, continue to discharge the subcommittee's roles, or dissolve by a majority vote of the remaining members. Each of the subcommittees shall be deemed dissolved upon the earliest to occur of (i) voluntary agreement of the members of the subcommittee, (ii) the completion of the subcommittee's responsibilities, and (iv) the Closing Date.

(b)     The fee committee appointed in the Chapter 11 Cases will continue to exist after the Effective Date to perform its duties under the amended fee protocol in connection with all applications for approval of professional fees incurred prior to the Effective Date, and all related proceedings, including hearings on final fee applications. The Debtors shall pay the reasonable fees and expenses of the independent member and counsel retained by the fee committee in connection with the foregoing from and after the Effective Date.

15.2     <u>Issuance of New Securities</u>.  In the discretion of the Plan Administrator, each Debtor or Debtor Controlled-Entity (a) may form and transfer certain assets of the Debtors and/or Debtor Controlled Entities to new (or utilize existing) entities, including, without limitation, one or more separately managed partnerships, REITs or other investment vehicles, to hold certain real estate or other assets of the Debtors and/or Debtor-Controlled Entities and, (b) may, in connection therewith, issue New Securities for Distribution under the Plan.  In the event that the Plan Administrator determines to issue New Securities, each holder of Allowed Claims or Equity Interests against a Debtor that contributed assets to the entity issuing New Securities shall receive the relevant New Securities as Distributions in accordance with the Plan.  The New Securities shall be valued as of the date of the issuance and the holders of Allowed Claims or Equity Interests receiving such New Securities shall be deemed satisfied to the extent of the value of the New Securities.

15.3     <u>Exemption from Securities Laws</u>.  To the maximum extent provided by section 1145 of the Bankruptcy Code and applicable non-bankruptcy law, the issuance of any New Securities or Liquidating Trust Interests will be exempt from registration under the Securities Act of 1933, as amended, and all rules and regulations promulgated thereunder and any other applicable non-bankruptcy law or regulation.

15.4     <u>Exemption from Transfer Taxes</u>.  Pursuant to section 1146(a) of the Bankruptcy Code, (a) the issuance, transfer, or exchange of notes or equity securities, (b) the creation of any mortgage, deed of trust, lien, pledge, or other security interest, (c) the making or assignment of or surrender of any lease or sublease, or (d) the making of or delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with the Plan, and any merger agreements, agreements of restructuring, disposition, liquidation or dissolution, any deeds, bills of sale, transfers of tangible property, or assignments executed in connection with any disposition or acquisition of assets contemplated by the Plan (including by a Liquidating Trust),

in each case whether as a result of sale, assignment, foreclosure or deed in lieu of foreclosure, shall not be subject to any stamp, real estate transfer, mortgage recording or other similar tax.

15.5    Plan Supplement.   The Debtor Allocation Agreement, the amended certificate and by-laws of the Debtors (if any) in accordance with Section 7.7, the Plan Trust Agreement, a list of any contracts or leases to be assumed or assumed and assigned by the Debtors in accordance with Section 11.1, any settlement agreement among any of the Debtors and a Non-Controlled Affiliate in accordance with Section 6.5(b)(vii) and any settlement agreement among any of the Debtors and a Creditor in accordance with Section 6.5(j) shall be contained in the Plan Supplement that is filed with the Clerk of the Bankruptcy Court at least ten (10) days prior to the Voting Deadline.   Upon its filing with the Bankruptcy Court, the Plan Supplement may be obtained on the Debtors' independent website at www.lehman-docket.com or by request to the Debtors in accordance with Section 15.12 of the Plan.

15.6    Post-Effective Date Reporting.   Beginning the first month-end and first quarter-end following the Effective Date and until the Closing Date, the Plan Administrator shall file with the Bankruptcy Court:

(a)     within thirty (30) days after the end of each month, a monthly operating report for such month presented in a format and containing information similar to that used by the Debtors during the Chapter 11 Cases for the "Schedule of Cash Receipts and Disbursements" and "Schedule of Professional Fee and Expense Disbursements";

(b)     within one-hundred-twenty (120) days after the end of each quarter, a quarterly report for such quarter presented in a format and containing information similar to that used by the Debtors during the Chapter 11 Cases for "Monthly Operating Report Balance Sheets" that (i) contains the following schedules in a format and containing information similar to that used by the Debtors during the Chapter 11 Cases: "Real Estate Owned and Unencumbered by Product Type" (such schedule to also include cost and unpaid principal balance information), "Commercial Real Estate Owned and Unencumbered by Property Type and Region," "Private Equity/Principal Investments Owned and Unencumbered by Legal Entity and Product Type" (such schedule to also include cost and unpaid principal information), "Derivatives Assets and Liabilities" (such schedule to also include special purpose vehicle receivable information), "Loan Portfolio Summary (Funded and Unencumbered)" (schedule to also include unpaid principal balance information), and "Unfunded Lending and Private Equity/Principal Investments Commitments"; and (ii) includes a section titled "Management's Discussion and Analysis" and supplemental data that will include:

(A)     a discussion of any known trends, events, material changes in market values or reserves, demands, commitments and uncertainties that have, or are reasonably likely to have, a material effect on the Debtors' financial condition or on the forecasted undiscounted cash flow principal amounts estimated as of a designated date;

(B)     a description (including asset name, type and material terms) of any new investments in any asset or permitted expenditures to preserve existing assets (in each case, in a single transaction or a series of related transactions on a cumulative basis after the Effective Date in excess of $25 million);

(C)     a description (including asset name, type and material terms) of any restructurings, settlements, sales (including disclosure of any gains or losses relative to the market value reported in the prior period balance sheet, and relative to forecasted undiscounted cash flow estimates as of a designated date for principal amounts), wind-downs or liquidations of the Debtors' existing assets, in each case, solely with respect to any asset that has a forecasted undiscounted cash flow principal amount estimate of greater than $50 million for derivatives, loan, or private equity or principal investments assets or $75 million for real estate assets;

(D)     an update of the claims reconciliation and resolution process, including a description of any claim settlements providing for the allowance in excess of $250 million of a Disputed Claim against the Debtors;

(E)     a description of the Debtors' affirmative litigation actions against third-parties that are pending, including the damages sought by the Debtors; and

(F)     a discussion of post-Effective Date material costs and expenses incurred by the Debtors; and

(c)     on an annual basis for two (2) years and thereafter on a semiannual basis within one-hundred twenty (120) days after the end of such period, a report reconciling cash flow estimates presented in a format and containing information similar to that used by the Debtors during the Chapter 11 Cases for "Reconciliation of Cash Flow Estimates" reports and also a description of collections by the Debtors and a comparison of performance relative to forecasted collections and estimates of future costs and expenses of administration.

Notwithstanding the foregoing, the Plan Administrator or the board of directors or manager for a Debtor may in its sole discretion modify or include less information in any of the foregoing reports than listed above if the Plan Administrator or the board of directors or manager for a Debtor determines in its reasonable discretion that disclosing any such information would be unduly burdensome, such information is or has become immaterial or no longer meaningful as the activities of the Debtor(s) evolve, such disclosure could place the Debtor(s) in a competitive or negotiation disadvantage, or such disclosure is precluded by confidentiality limitations.

15.7     <u>Payment of Statutory Fees</u>.     On the Effective Date and thereafter, the Plan Administrator and any Liquidating Trustee thereafter appointed, shall pay all fees incurred pursuant to Section 1930 of title 28, United States Code, together with interest, if any, pursuant to Section 3717 of title 31, United States Code for each Debtor's case, or until such time as a final decree is entered closing a particular Debtor's case, a Final Order converting such Debtor's case to a case under Chapter 7 of the Bankruptcy Code or a Final Order dismissing such Debtor's case is entered.

15.8     <u>Amendment or Modification of Plan</u>.     Subject to the terms and conditions of the Plan Support Agreements, the Debtors reserve the right to propose alterations, amendments, or modifications of or to the Plan in writing at any time prior to the Confirmation Date, provided that the Plan, as altered, amended or modified satisfies the conditions of section 1122 and 1123 of the Bankruptcy Code, and the Debtors shall have complied with section 1125 of the Bankruptcy Code.     Subject to the terms and conditions of the Plan Support Agreements, the Plan

A416

may be altered, amended, or modified at any time after the Confirmation Date and before substantial consummation, provided that the Plan, as altered, amended or modified satisfies the requirements of sections 1122 and 1123 of the Bankruptcy Code and the Bankruptcy Court, after notice and a hearing, confirms the Plan, as altered, modified or amended, under section 1129 of the Bankruptcy Code and the circumstances warrant such alterations, amendments of modifications. A holder of a Claim that has accepted the Plan shall be deemed to have accepted the Plan, as altered, amended or modified, to the extent, and subject to the conditions, set forth in Bankruptcy Rule 3019.

15.9    <u>Withdrawal or Revocation of the Plan</u>.   Subject to the terms and conditions of the Plan Support Agreements, the Debtors reserve the right to withdraw or revoke the Plan at any time prior to the Confirmation Date.  If the Debtors revoke or withdraw the Plan prior to the Confirmation Date, or if the Confirmation Date does not occur, then the Plan shall be deemed null and void.  In such event, nothing contained herein shall be deemed to constitute a waiver or release of any Claim by or against the Debtors or any other person or to prejudice in any manner the rights of the Debtors or any other person in any further proceedings involving the Debtors.

15.10    <u>Courts of Competent Jurisdiction</u>.   If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising out of the Plan, such abstention, refusal or failure of jurisdiction shall have no effect upon and shall not control, prohibit, or limit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

15.11    <u>Transactions on Business Days</u>.   If the Effective Date or any other date on which a transaction may occur under the Plan shall occur on a day that is not a Business Day, any transactions or other actions contemplated by the Plan to occur on such day shall instead occur on the next succeeding Business Day.

15.12    <u>Notices</u>.   Any notices to or requests of the Debtors by parties in interest under or in connection with the Plan shall be in writing and served either by (a) certified mail, return receipt requested, postage prepaid, (b) hand delivery, or (c) reputable overnight delivery service, all charges prepaid, and shall be deemed to have been given when received by the following parties:

If to any Debtor:

c/o Lehman Brothers Holdings Inc.
1271 Avenue of the Americas
New York, New York 10020
Attention: Bryan Marsal and John K. Suckow

with a copy to:

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153
Attention: Harvey R. Miller and Lori R. Fife

Re:   Lehman Brothers

15.13   <u>Severability</u>.  In the event that the Bankruptcy Court determines, prior to the Confirmation Date, that any provision of the Plan is invalid, void, or unenforceable, the Bankruptcy Court shall, with the consent of the Debtors, have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan shall remain in full force and effect and shall in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation.  The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

15.14   <u>Governing Law</u>.  Except to the extent the Bankruptcy Code or Bankruptcy Rules are applicable, the rights and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of New York without giving effect to the principles of conflicts of law thereof.

15.15   <u>Headings</u>.  Headings are used in the Plan for convenience and reference only, and shall not constitute a part of the Plan for any other purpose.

15.16   <u>Exhibits</u>.  All exhibits and schedules to the Plan as well as the Plan Supplement and any exhibits or schedules thereto are incorporated into and are a part of the Plan as if set forth in full herein.

15.17   <u>Successors and Assigns</u>.  All the rights, benefits, and obligations of any person named or referred to in the Plan shall be binding on, and shall inure to the benefit of, the heirs, executors, administrators, successors, and/or assigns of such person.

Dated:   New York, New York
         November 29, 2011

LEHMAN BROTHERS HOLDINGS INC.


By:   _____/s/ John Suckow_____
      Name:   John Suckow
      Title:   President and Chief Operating Officer


LB 745 LLC


By:   _____/s/ John Suckow_____
      Name:   John Suckow
      Title:   President and Chief Operating Officer

PAMI STATLER ARMS LLC

By: _____/s/ John Suckow_____
      Name:   John Suckow
      Title:   Authorized Signatory

LEHMAN BROTHERS COMMODITY SERVICES INC.

By: _____/s/ John Suckow_____
      Name:   John Suckow
      Title:   President and Chief Operating Officer

LEHMAN BROTHERS SPECIAL FINANCING INC.

By: _____/s/ John Suckow_____
      Name:   John Suckow
      Title:   President and Chief Operating Officer

LEHMAN BROTHERS OTC DERIVATIVES INC.

By: _____/s/ John Suckow_____
      Name:   John Suckow
      Title:   President and Chief Operating Officer

LEHMAN BROTHERS DERIVATIVE PRODUCTS INC.

By: _____/s/ Daniel Ehrmann_____
      Name:   Daniel Ehrmann
      Title:   Vice-President

LEHMAN COMMERCIAL PAPER INC.

By: _____/s/ John Suckow_____
      Name:   John Suckow
      Title:   President and Chief Operating Officer

LEHMAN BROTHERS COMMERCIAL CORP.

By: _____/s/ John Suckow_____
     Name:   John Suckow
     Title:   President and Chief Operating Officer

LEHMAN BROTHERS FINANCIAL PRODUCTS INC.

By: _____/s/ Daniel Ehrmann_____
     Name:   Daniel Ehrmann
     Title:   Vice-President

CES AVIATION LLC

By: _____/s/ John Suckow_____
     Name:   John Suckow
     Title:   President and Chief Operating Officer

CES AVIATION V LLC

By: _____/s/ John Suckow_____
     Name:   John Suckow
     Title:   President and Chief Operating Officer

CES AVIATION IX LLC

By: _____/s/ John Suckow_____
     Name:   John Suckow
     Title:   President and Chief Operating Officer

EAST DOVER LIMITED

By: _____/s/ Daniel Ehrmann_____
     Name:   Daniel Ehrmann
     Title:   Duly Authorized Officer

LEHMAN SCOTTISH FINANCE L.P., by its general
    partner Property Asset Management Inc.


By: _____/s/ John Suckow_____
    Name:   John Suckow
    Title:   President and Chief Operating Officer


LUXEMBOURG RESIDENTIAL PROPERTIES LOAN FINANCE S.A.R.L.


By: _____/s/ Daniel Ehrmann_____
    Name:   Daniel Ehrmann
    Title:   Manager

BNC MORTGAGE LLC


By: _____/s/ John Suckow_____
    Name:   John Suckow
    Title:   Authorized Signatory

LB ROSE RANCH LLC


By: _____/s/ John Suckow_____
    Name:   John Suckow
    Title:   Authorized Signatory


STRUCTURED ASSET SECURITIES CORPORATION


By: _____/s/ John Suckow_____
    Name:   John Suckow
    Title:   President and Chief Operating Officer


LB 2080 KALAKAUA OWNERS LLC, by its managing member PAMI LLC


By: _____/s/ John Suckow_____
    Name:   John Suckow
    Title:   President and Chief Operating Officer

MERIT, LLC, by its Manager
LEHMAN COMMERCIAL PAPER INC.


By:       /s/ John Suckow
     Name:   John Suckow
     Title:   President and Chief Operating Officer


LB SOMERSET LLC, by its managing member
PAMI LLC


By:       /s/ John Suckow
     Name:   John Suckow
     Title:   President and Chief Operating Officer

LB PREFERRED SOMERSET LLC, by its managing
member PAMI LLC


By:       /s/ John Suckow
     Name:   John Suckow
     Title:   President and Chief Operating Officer


Counsel:

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone:   (212) 310-8000
Facsimile:   (212) 310-8007

Attorneys for Debtors and
Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x
                                              :

| | |
|---|---|
| **In re** | :    **Chapter 11 Case No.** |
| | : |
| **LEHMAN BROTHERS HOLDINGS INC.,** *et al.*, | :    **08-13555 (JMP)** |
| | : |
| **Debtors.** | :    **(Jointly Administered)** |
| | : |

---------------------------------------------------------------x

**ORDER CONFIRMING MODIFIED THIRD AMENDED JOINT CHAPTER 11**
**PLAN OF LEHMAN BROTHERS HOLDINGS INC. AND ITS AFFILIATED DEBTORS**

Lehman Brothers Holdings Inc. and its affiliated debtors,[1] (collectively, the "Debtors"), each having proposed and filed the Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and its Affiliated Debtors, dated August 31, 2011 (as subsequently supplemented, amended or modified, including by the Plan Supplement, the "Plan")[2] and the Disclosure Statement for the Plan, dated August 31, 2011 (as amended, the "Disclosure Statement"); and the Court having entered the *Amended Order (I) Approving the Proposed Disclosure Statement and the Form and Manner of Notice of the Disclosure Statement Hearing, (II) Establishing Solicitation and Voting Procedures, (III) Scheduling a Confirmation Hearing, and (IV) Establishing Notice and Objection Procedures for Confirmation of the Debtors' Joint Chapter 11 Plan*, dated September 1, 2011 [ECF No. 19631] (the "Disclosure Statement Order");

---

[1] The Debtors are: Lehman Brothers Holdings Inc., LB 745 LLC, PAMI Statler Arms LLC, Lehman Brothers Commodity Services Inc., Lehman Brothers Special Financing Inc., Lehman Brothers OTC Derivatives Inc., Lehman Brothers Derivatives Products Inc., Lehman Commercial Paper Inc., Lehman Brothers Commercial Corporation, Lehman Brothers Financial Products, Inc., Lehman Scottish Finance L.P., CES Aviation LLC, CES Aviation V LLC, CES Aviation IX LLC, East Dover Limited, Luxembourg Residential Properties Loan Finance S.a.r.l., BNC Mortgage LLC, Structured Asset Securities Corporation, LB Rose Ranch LLC, LB 2080 Kalakaua Owners LLC, Merit LLC, LB Somerset LLC, and LB Preferred Somerset LLC.

[2] Unless otherwise defined herein, capitalized terms used herein shall have the meanings ascribed to such terms in the Plan, a copy of which is annexed hereto as Exhibit A. Any term used in the Plan or this Confirmation Order that is not defined in the Plan or this Confirmation Order, but that is defined in title 11 of the United States Code (the "Bankruptcy Code") or the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") shall have the meaning ascribed to that term in the Bankruptcy Code or the Bankruptcy Rules, as applicable.

and the Disclosure Statement, the Plan and the Solicitation Packages (as defined below) having

been distributed to holders of Claims entitled to vote on the Plan as provided in the Disclosure

Statement Order; and due notice of (i) entry of the Disclosure Statement Order, (ii) the hearing

on confirmation of the Plan (the "Confirmation Hearing"), and (iii) the deadline for voting on,

and/or objecting to, the Plan having been provided to holders of Claims against and Equity

Interests in the Debtors and other parties in interest in accordance with the Disclosure Statement

Order, the Bankruptcy Code and the Bankruptcy Rules, as established by the affidavits of

service, mailing, and/or publication filed with the Court; and the following documents having

been filed in support of or in connection with the confirmation of the Plan:

(i)     Affidavit of Solicitation Mailing [ECF No. 20882] (the "Notice Affidavit");

(ii)     Affidavits of Publication of Notice of (a) Approval of the Disclosure Statement, (b) Establishing the Record Date, (c) Hearing on Confirmation of the Plan and Procedures for Objecting to Confirmation of the Plan and (d) Procedures and Deadline for Voting on Plan [ECF No. 21695] (the "Publication Affidavits");

(iii)     Declaration of Jane Sullivan on Behalf of Epiq Bankruptcy Solutions, LLC Regarding Voting and Tabulation of Ballots Cast on Debtors' Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and its Affiliated Debtors, dated as of November 29, 2011 [ECF No. 22743] (as supplemented on December 5, 2011 [ECF No. 22972], the "Voting Certification");

(iv)     the Plan Supplement, dated October 25, 2011 and amendments thereto (the "Plan Supplement") [ECF Nos. 21254, 21665, 22156, 22590, 22742, 22876, 22975 and 22980];

(v)     the Debtors' Memorandum of Law Pursuant to Section 1123(b)(3)(A) of the Bankruptcy Code and Rule 9019 of the Federal Rules of Bankruptcy Procedure, In Support

of Plan Settlements, dated November 29, 2011 (the "Debtors' Memorandum of Law In Support of the Global Settlement") [ECF No. 22749];

        (vi)    the Debtors' Memorandum of Law in Support of Confirmation of Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and its Affiliated Debtors, dated November 29, 2011 (the "Debtors' Memorandum of Law In Support of Confirmation") [ECF No. 22747];

        (vii)    the Declaration of John K. Suckow in Support of Confirmation of Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and its Affiliated Debtors, dated November 29, 2011 [ECF No. 22759] (the "Suckow Declaration");

        (vii)    the Declaration of Daniel J. Ehrmann in Support of Confirmation of Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and its Affiliated Debtors, dated November 29, 2011 [ECF No. 22760] (the "Ehrmann Declaration");

        (ix)    the Declaration of Steven J. Cohn in Support of Confirmation of Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and its Affiliated Debtors, dated November 29, 2011 [ECF No. 22761] (the "Cohn Declaration");

        (x)    the Debtors' Response to Objections to Confirmation, dated November 29, 2011 (the "Debtors' Response") [ECF No. 22751];

        (xi)    the Statement of Official Committee of Unsecured Creditors (I) In Support of Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and its Affiliated Debtors and (II) In Response to Objections to Such Plan, dated as of November 29, 2011 [ECF No. 22773];

        (xii)    the statements of numerous other Creditors in support of confirmation of the Plan; and

        (xiii)    objections to confirmation of the Plan by certain parties;

A425

and each of the objections having been resolved, overruled, or withdrawn at or prior to the

Confirmation Hearing; and the Court having held the Confirmation Hearing commencing on

December 6, 2011; and after full consideration of the record of the Chapter 11 Cases, including,

without limitation, motions, applications and orders in the Chapter 11 Cases, the foregoing

documents, and the evidence admitted and arguments of counsel made at the Confirmation

Hearing; and after due deliberation and good and sufficient cause appearing therefor, it is hereby

DETERMINED, FOUND, ADJUDGED, AND DECREED:

## **FINDINGS OF FACT**

A.    <u>Findings of Fact</u>.  The findings set forth herein and in the record of the

Confirmation Hearing constitute the Court's findings of fact pursuant to Rule 52 of the Federal

Rules of Civil Procedure, as made applicable herein by Bankruptcy Rules 7052 and 9014.  To the

extent any of the following findings of fact constitute conclusions of law, they are adopted as

such.

B.    <u>Separate Chapter 11 Plans for Each Debtor</u>.  Unless otherwise expressly

contemplated herein, any statement regarding the Plan or the satisfaction of any requirements by

the Plan or the Debtors, or approval of Plan, shall be deemed to apply separately to the chapter

11 plan of each of the Debtors.  Unless otherwise expressly contemplated herein, any statements

included herein referring to actions taken by the Debtors shall be deemed to mean actions taken

by each Debtor in connection with its Plan.

C.    <u>Exclusive Jurisdiction; Venue; Core Proceeding (28 U.S.C. §§ 157(b)(2), 1334(a))</u>.  This Court has jurisdiction over the Chapter 11 Cases pursuant to 28 U.S.C. §§ 157

and 1334.  Venue is proper under 28 U.S.C. §§ 1408 and 1409.  Confirmation of the Plan is a

core proceeding pursuant to 28 U.S.C. § 157(b)(2)(L), and this Court has exclusive jurisdiction

A426

to determine whether the Plan complies with the applicable provisions of the Bankruptcy Code
and should be confirmed.

D.  <u>Commencement of Chapter 11 Cases</u>.  Commencing on September 15,
2008 and periodically thereafter (as applicable, the "<u>Commencement Date</u>"), LBHI and certain
of its Affiliates commenced with this Court voluntary cases under chapter 11 of the Bankruptcy
Code.  The Debtors' Chapter 11 Cases have been consolidated for procedural purposes only and
are being jointly administered pursuant to Rule 1015(b) of the Bankruptcy Rules.  The Debtors
are authorized to operate their businesses and manage their properties as debtors in possession
pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

E.  <u>Judicial Notice</u>.  The Court takes judicial notice of the docket of the
Chapter 11 Cases maintained by the Clerk of the Court and/or its duly-appointed agent,
including, without limitation, all pleadings and other documents filed, all orders entered, and the
evidence and arguments made, proffered, or adduced at the hearings held before the Court during
the pendency of the Chapter 11 Cases, including, but not limited to, the hearing to consider the
adequacy of the Disclosure Statement.

F.  <u>Burden of Proof</u>.  The Debtors have met their burden of proving the
elements of section 1129(a) and (b) of the Bankruptcy Code by a preponderance of the evidence.

G.  <u>Transmittal and Mailing of Materials; Notice</u>.  On, September 1, 2011, the
Court entered the Disclosure Statement Order, which, among others things, approved the
Disclosure Statement, finding the Disclosure Statement contained "adequate information" under
section 1125 of the Bankruptcy Code, established the procedures for the solicitation, voting, and
tabulation of votes on the Plan, and approved the form of ballots and master ballots (the
"<u>Ballots</u>").  The Disclosure Statement, the Plan, the Ballots, the Disclosure Statement Order, the
notice of the scheduling of the Confirmation Hearing (the "<u>Confirmation Hearing Notice</u>"), and a

letter from the Creditors' Committee in support of the Plan (translated into five languages) (such documents, collectively, the "Solicitation Package"), were transmitted and served in compliance with the Disclosure Statement Order, the Bankruptcy Rules, and the Local Bankruptcy Rules for the Southern District of New York (the "Local Rules"), and such transmittal and service, as evidenced by the Notice Affidavit was adequate and sufficient. The Debtors' publication of the Confirmation Hearing Notice in *The New York Times, The Wall Street Journal, the Financial Times, The Times of London, the Sydney Morning Herald, the Tribune De Geneve, the DE Telegraaf, the Apple Daily, the Tages Anzeiger, the Luxemburger Wort, the Corriere Del Ticino, the Frankfurter Allgemeine Zeitung,* and *Yomiuri Shimbun*, as set forth in the Publication Affidavits (i) complied with the Disclosure Statement Order, (ii) was adequate and sufficient under the circumstances of these Chapter 11 Cases, (iii) provided adequate notice of the deadline for objecting to confirmation of the Plan, and the date, time and location of the Confirmation Hearing, and (iv) provided due process to all parties in interest in these Chapter 11 Cases. No other or further notice is required.

H. <u>Voting</u>. Votes on the Plan were solicited after disclosure of "adequate information" as defined in section 1125 of the Bankruptcy Code. As described in the Voting Certification, votes to accept or reject the Plan have been solicited and tabulated fairly, in good faith, and in a manner consistent with the Bankruptcy Code, the Bankruptcy Rules and the Disclosure Statement Order.

I. <u>Plan Supplement</u>. On October 25, 2011, the Debtors filed the Plan Supplement, which included certain documents and agreements contemplated by the Plan, including the forms of revised certificates of incorporation and by-laws, or similar documents, for each Debtor other than Lehman Scottish Finance L.P. and East Dover Limited; the schedules of executory contracts and unexpired leases to be assumed pursuant to the Plan; the Plan Trust

A428

Agreement; the form of Debtor Allocation Agreement; copies of settlement agreements that are incorporated into the Plan pursuant to sections 6.5(b)(viii) and (j) of the Plan; an amendment to the Plan; an updated recovery and liquidation analysis for SASCO and LBCC; a schedule of Claims by Debtor-Controlled Entities against the Debtors; a reconciliation of the ownership of certain assets as between certain Debtors; and a list of Debtor-Controlled Entities that may be dissolved or merged in accordance with the Plan. The Plan Supplement was amended on October 25, 2011, November 4, 2011, November 15, 2011, November 22, 2011, November 29, 2011, December 2, 2011 and December 5, 2011. The Plan Supplement complies with the provisions of section 15.5 of the Plan.

J.      Modifications to the Plan.  The Plan, and documents, amendments or supplements to the Plan included in the Plan Supplement and any amendments thereto, as modified by the Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and its Affiliated Debtors, filed on November 29, 2011 and December 5, 2011 (the "Plan Modifications"), shall constitute the Plan.

K.      Compliance with Bankruptcy Code (11 U.S.C. § 1129(a)(1)).  The Plan complies with the applicable provisions of the Bankruptcy Code, thereby satisfying section 1129(a)(1) of the Bankruptcy Code.

L.      Compliance with Bankruptcy Rule 3016(a).  The Plan is dated and identifies the entities submitting the Plan as proponents, thereby satisfying Bankruptcy Rule 3016(a).

M.      Proper Classification (11 U.S.C. §§ 1122, 1123(a)(1)).  In addition to Administrative Expense Claims and Priority Tax Claims which need not be designated, the Plan designates 16 Classes of Claims against LBHI, 8 Classes of Claims against each of LCPI and LBSF, 7 Classes of Claims against each of LBCS, LBCC and LOTC and 5 Classes of Claims

against each of the other Debtors, and one Class of Equity Interests for each Debtor.  As required

by section 1122(a) of the Bankruptcy Code, the Claims and Equity Interests placed in each Class

are substantially similar to other Claims and Equity Interests, as the case may be, in each such

Class.

           (i)     <u>Justification for Separate Classification</u>.  Valid business, factual, and legal

reasons exist for separately classifying the various Classes of Claims and Equity Interests created

under the Plan.  The classification takes into account the nature of Claims and the differing legal

rights of the holders of such Claims.  The nature of Claims and legal rights of the holders differ

for (i) Claims asserted by Affiliates and third-party Creditors, (ii) direct Claims against a Debtor

and Guarantee Claims, (iii) Claims subject to contractual or statutory subordination, and (iv)

Claims entitled to be treated as senior obligations.  In addition, the classification of Claims

pursuant to the Plan takes into account the nature and risks of certain Claims in respect of the

Plan Issues.  These issues include: whether the equitable doctrine of substantive consolidation

may be applied to the Debtors and their Affiliates; the characterization of the intercompany

balances owed to LBHI by Subsidiary Debtors; the Allowed amounts of Affiliate Claims; the

ownership and rights of various Debtors and their Affiliates with respect to certain assets; the

allocation of costs and expenses of administration among the Debtors; and the post-effective date

governance of the Debtors (collectively, the "<u>Plan Issues</u>"). The relative risks and benefits of

potential litigation of the Plan Issues is a reasonable basis for the Plan to provide for separate

classification of such Claims.  If the Debtors and their Affiliates were substantively consolidated,

generally, all Claims based on LBHI's guarantees of the obligations of its Affiliates and all

Claims of Affiliates would be disregarded.  The different nature of Claims, the legal rights of the

holders of Claims and the recovery entitlements of Claims in the separate Classes, are a

reasonable basis for separately classifying Claims.

A430

(ii)    Contractual Subordination Agreements.  The contractual terms of the indentures pursuant to which LBHI issued Subordinated Notes provide that upon the bankruptcy of LBHI, no payments will be made to holders of the Subordinated Notes until all obligations of LBHI designated as "senior" in the indentures have been satisfied in full.  The Plan gives effect to these provisions by separately classifying Claims based on their respective priority in relation to the Subordinated Notes and the entitlement to receive amounts that would otherwise have been distributed to holders of Claims based on the Subordinated Notes.

(iii)    Convenience Claims and Convenience Guarantee Claims (11 U.S.C. § 1122(b)).  The definition and classification of Convenience Claims and Convenience Guarantee Claims are reasonable and necessary for administrative convenience.  The inclusion of convenience Classes in the Plans of LBHI, LBCS, LBCC, LBSF, LCPI and LOTC will permit those Debtors to make a single Distribution on account of Convenience Claims and Convenience Guarantee Claims against such Debtors and avoid the administrative burden of tracking the transfers of these Claims, repeating the calculations of the Distributions to holders of such Claims, providing notices to holders of such Claims and preparing and mailing or wiring Distributions to holders of such Claims on each Distribution Date.  The definitions of Convenience Claims and Convenience Guarantee Claims, including the exclusions of Claims based on public debt securities issued or guaranteed by LBHI or a Claim filed by a nominee on behalf of one or more beneficial holders of Claims, is reasonable and necessary for administrative convenience.

N.    Specified Unimpaired Classes (11 U.S.C. § 1123(a)(2)).  The Plan does not include any Classes of Claims that are unimpaired under the Plan.  The Plan satisfies section 1123(a)(2) of the Bankruptcy Code.

O.      <u>Specified Treatment of Impaired Classes (11 U.S.C. § 1123(a)(3))</u>.  All

Classes of Claims are impaired under the Plan.  Articles III, IV and V of the Plan specify the

treatment for each Class of Claims, thereby satisfying section 1123(a)(3) of the Bankruptcy

Code.

P.      <u>No Discrimination (11 U.S.C. § 1123(a)(4))</u>.  The Plan provides for the

same treatment by the Debtors for each Claim or Equity Interest in each respective Class unless

the holder of a particular Claim or Equity Interest has agreed to a less favorable treatment of

such Claim or Equity Interest, thereby satisfying section 1123(a)(4) of the Bankruptcy Code.

Q.      <u>Implementation of Plan (11 U.S.C. § 1123(a)(5))</u>.  The Plan, including the

various documents and agreements set forth in the Exhibits to the Plan and the Plan Supplement,

provide adequate and proper means for the Plan's implementation, including (i) the appointment

of a Plan Administrator with the duties and responsibilities set forth in Section 6.1(b) of the Plan

to administer and maximize the value of the Debtors' estates; (ii) the Global Settlement and

Bilateral Settlements incorporated into the Plan; (iii) the provisions governing Distributions

under the Plan; (iv) the procedures governing the allowance of Claims under the Plan; (v) the

dissolution or wind down of a Debtor or Debtor-Controlled Entity in accordance with applicable

law and consistent with the implementation of the Plan; and (vi) the liquidating trust vehicles

that may be created under the Plan, thereby satisfying section 1123(a)(5) of the Bankruptcy

Code. *See* Plan, Arts. VI-X.

R.      <u>Nonvoting Equity Securities (11 U.S.C. § 1123(a)(6))</u>.  To the extent

applicable, each Debtor's certificate of incorporation, bylaws or limited liability company

agreement, as applicable, shall be amended as of the Effective Date to contain a provision that

prohibits the issuance of nonvoting equity securities prohibited by section 1123(a)(6), thereby

satisfying section 1123(a)(6) of the Bankruptcy Code.

A432

S.     Selection of Officers, Directors, or Trustees (11 U.S.C. § 1123(a)(7)).

Sections 7.2, 7.3 and 7.4 of the Plan provide for the manner in which the boards of directors of

each of the Debtors will be appointed following the Effective Date.  Such provisions are

consistent with the interests of Creditors, equity security holders, and public policy, thereby

satisfying section 1123(a)(7) of the Bankruptcy Code.  Prior to the Confirmation Hearing, the

Debtors have filed with the Court a list of the persons selected to serve on the board of directors

of LBHI following the Effective Date [ECF No. 22931].

T.     Additional Plan Provisions (11 U.S.C. § 1123(b)).  The provisions of the

Plan are appropriate and not inconsistent with the applicable provisions of the Bankruptcy Code,

thereby satisfying section 1123(b) of the Bankruptcy Code.  The failure to specifically address a

provision of the Bankruptcy Code in this Confirmation Order shall not diminish or impair the

effectiveness of this Confirmation Order.

U.     Assumption and Rejection (11 U.S.C. § 1123(b)(2)).  Article XI of the

Plan and the Plan Supplement (as amended) provide for the rejection of executory contracts and

unexpired leases of the Debtors as of the Effective Date, except for any executory contract or

unexpired lease (i) that has been assumed pursuant to an order of the Bankruptcy Court prior to

the Effective Date, (ii) as to which a motion for approval of the assumption of such executory

contract or unexpired lease has been filed and served prior to the Confirmation Date or (iii) that

is specifically designated as an executory contract or unexpired lease to be assumed in the Plan

Supplement, and any amendment thereto.  Pursuant to the notices sent out by the Debtors to each

party to a contract proposed to be assumed by the Debtors (each, a "Cure Notice"), the Debtors

provided notice of any defaults to be cured with respect to each contract to be assumed by the

Debtors.  Numerous parties filed objections to the assumption of their contracts; a hearing before

the Court on the assumption of such contracts has been scheduled for February 14, 2012 at 10:00

11

**A433**

a.m.  In addition, the Debtors have agreed with certain other parties to defer without date

disputes regarding whether a particular contract is executory and, if executory, whether (i) the

obligations thereunder are severable and (ii) whether the contract will be assumed or rejected.

The Plan is consistent with section 1123(b)(2) of the Bankruptcy Code.

              V.      <u>Settlement/Retention of Claims or Interests (11 U.S.C. § 1123(b)(3))</u>.  The

Plan includes a settlement and compromise of the Plan Issues that is designed to achieve a fair

and efficient resolution of the Chapter 11 Cases.  Pursuant to Section 1123(b)(3) of the

Bankruptcy Code and Bankruptcy Rule 9019, the Plan constitutes a settlement of potential

litigation of the Plan Issues.  The terms of the Plan reflect an integrated and comprehensive

settlement that resolves the various Plan Issues through (i) the Plan Adjustment; (ii) Distributions

to LBHI on only 80% of the portion of its Claims against the Subsidiary Debtors relating to

intercompany funding; (iii) the reallocation of the first $100 million distributed to LBHI on

account of its Claims against LBSF and LCPI to holders of General Unsecured Claims in LBSF

Class 4A and LCPI Class 4A; (iv) the Distribution to holders of General Unsecured Claims in

LBSF Class 4A and Affiliate Claims in LBSF Class 5C of the first $70 million recovered by

LBSF on account of its assets in excess of $14.156 billion; (v) the Allowed amount of Claims

asserted by Designated Entities; (vi) the allowance of LBT's intercompany Claim against LBHI

in the amount of $34.548 billion; (vii) the allocation of costs and expenses incurred in the

administration of the estates pursuant to the Debtor Allocation Agreement; and (viii) the

principles included in the Structured Securities Valuation Methodologies (the "<u>Global</u>

<u>Settlement</u>").  Each component of the Global Settlement is an integral part thereof.  The Plan was

accepted by Creditors holding 95.00% of voting Claims in the aggregate amount of

approximately $400 billion.  The Creditors supporting the Global Settlement include the

A434

Creditors' Committee, the Ad Hoc Group,[3] certain of the Non-Con Plan Proponents[4] and certain

Foreign Affiliates (as defined below), each of which is a sophisticated party and represented by

counsel that is recognized as being knowledgeable and experienced in the field of complex

chapter 11 cases. The Global Settlement is a result of good faith arms'-length negotiations. The

Global Settlement is consistent with section 1123(b)(3) of the Bankruptcy Code.

(i)    Substantive Consolidation.

a.    The Debtors and the Creditors' Committee have conducted

a thorough factual and legal analysis to determine whether the substantive consolidation of the

Debtors and their Affiliates is appropriate. The facts and analysis set forth in the Disclosure

Statement, the Debtors' Memorandum of Law In Support of the Global Settlement, and the

Suckow Declaration, reflect that there are facts that support and facts that militate against the

substantive consolidation of the Debtors and their Affiliates based upon the law in this

jurisdiction. There is a possibility that if litigated to final judgment, a court may find that the

substantive consolidation of the Debtors and their affiliates, including their Foreign Affiliates, is

appropriate.

b.    The Global Settlement gives due consideration to the

strengths and weaknesses of potential arguments that have been made for and against substantive

---

[3] The Ad Hoc Group consists of California Public Employees' Retirement System, Canyon Capital Advisors LLC, City of Costa Mesa, City of Fremont, County of San Mateo, Fiduciary Counselors Inc., Fir Tree, Inc., Gruss Asset Management, L.P., Owl Creek Asset Management, L.P., on behalf of the funds it manages or advises, Paulson & Co. Inc., Perry Capital LLC, on behalf of one or more investment funds for which it or an affiliate acts as investment advisor or general partner, Taconic Capital Advisors L.P. and Vallejo Sanitation and Flood Control District.

[4] The Non-Con Plan Proponents are Angelo, Gordon & Co., L.P., Contrarian Capital Management, LLC, Credit Agricole CIB, Credit Suisse International, Cyrus Capital Partners, LP, D. E. Shaw Composite Portfolios, L.L.C., D. E. Shaw Oculus Portfolios, L.L.C., Deutsche Bank AG, Goldentree Asset Management, LP, Goldman Sachs Bank USA (successor by merger to Goldman Sachs Capital Markets, L.P.), Goldman Sachs International, Hayman Capital Management, LP, Knighthead Capital Management, LLC, Mason Capital Management LLC, Morgan Stanley & Co. International plc., Morgan Stanley Capital Services Inc., Mount Kellett Capital Management, Oaktree Capital Management, L.P., The Royal Bank of Scotland plc, Serengeti Asset Management LP, Silver Point Capital, L.P., State Street Bank and Trust Company, and York Capital Management Global Advisors, LLC.

A435

consolidation. Litigation regarding substantive consolidation of the Debtors would require vast amounts of discovery and investigation into the operations of Lehman prior to the Commencement Date, would be extraordinarily complex and costly for all parties involved, and would significantly delay Distributions to all Creditors.

        c.     The Plan Adjustment, which is a key element of the Global Settlement, ensures that recoveries to all Creditors are within the range of possible litigated outcomes and fall between the estimated Distributions to each Class if the Participating Debtors and their affiliates were substantively consolidated or if the Participating Debtors had strict non-consolidation plans.

        (ii)    <u>Characterization of Intercompany Claims</u>.

        a.     Prior to the Commencement Date, the Debtors and their Affiliates entered into tens of thousands of transactions daily involving billions of dollars. The transactions were recorded on Lehman's general ledger. The Debtors reviewed a sampling of the transactions between Debtors and considered the relevant legal standards for the recharacterization of indebtedness as equity interests. Based on the facts and analysis set forth in the Disclosure Statement, the Debtors' Memorandum of Law In Support of the Global Settlement, and the Cohn Declaration, there is a risk that certain portions of the intercompany balances owed to LBHI by the Subsidiary Debtors could be recharacterized as equity contributions if such matter were litigated to final judgment.

        b.     The Global Settlement gives due consideration to the strengths and weaknesses of potential arguments for and against the recharacterization of intercompany balances. Litigation regarding characterization of a vast number of intercompany balances would be extremely time consuming and expensive, and would delay Distributions to all Creditors.

14

A436

c.     By providing that the Distribution that LBHI will receive is based only on a portion of its Claims against the Subsidiary Debtors, the Plan provides recoveries to all Creditors that are within the range of possible litigated outcomes.

(iii)     <u>Amount of Intercompany Claims/ Ownership of Assets</u>**.**

a.     As a result of the large number of intercompany transactions among the Debtors and their Affiliates prior to the Commencement Date, there are many intercompany receivables and payables between Debtors.  The Debtors and their advisors have reviewed some of the transactions and the transfer of assets among the Debtors and determined that it is in the best interests of all Debtors and their Creditors to agree to the intercompany Claims among the parties in the amounts set forth on the books and records, subject to certain adjustments, and not to pursue any avoidance actions.

b.     The Plan establishes the Allowed amount of Claims among the Debtors and Claims of the Debtor-Controlled Entities against the Debtors and provides that all other Claims or causes of action are irrevocably released and waived.  The terms of the Global Settlement give due consideration to the strengths and weaknesses of potential arguments regarding the Claims among such entities and the ownership of assets.  Litigation regarding the amount or validity of thousands of intercompany balances and ownership of the Debtors' assets would be extremely time consuming and expensive, and would delay Distributions to all Creditors.

c.     The settlement of all Claims among the Debtors in the amounts set forth on the books and records, subject to certain adjustments, is within the range of possible litigated outcomes.

A437

    (iv) <u>Settlements with Foreign Affiliates and Certain Third-Party Creditors</u>
<u>Incorporated in the Plan</u>.

      a.  Lehman was a worldwide enterprise prior to the

Commencement Date which included affiliates organized and doing business in many

international jurisdictions.  Following the Commencement Date, insolvency or liquidation

proceedings were commenced with respect to 80 of the Foreign Affiliates of the Debtors in 16

jurisdictions.  Due to the manner in which Lehman operated prior to the Commencement Date,

upon the fracturing of the Lehman enterprise, the Foreign Affiliates and the Debtors had

significant Claims against each other.

      b.  The Debtors have entered into settlement agreements with

Lehman Brothers Bankhaus AG, Lehman Brothers Treasury Co. B.V., Lehman Brothers

Securities N.V., Lehman Brothers International (Europe) and the Lehman UK Entities, Lehman

Brothers (Luxembourg) Equity Finance S.A. (*en faillite*), Lehman Brothers (Luxembourg)

Equity Finance S.A. (in liquidation), the Hong Kong Lehman Entities In Liquidation, the

Lehman Singapore Entities, the Lehman Japan Entities (collectively, the "<u>Foreign Affiliates</u>"),

Deutsche Bundesbank ("<u>Bundesbank</u>"), Bundesverband deutscher Banken E.V. ("<u>BdB</u>"),

Entschädigungseinrichtung deutscher Banken GmbH ("<u>EdB</u>"), and Deutsche Bank and certain

holders of participations in Claim Nos. 59006 and 58233 (collectively, the "<u>Bilateral</u>

<u>Settlements</u>").  Each of the Bilateral Settlements with the Foreign Affiliates, BdB, EdB and

Bundesbank takes into account the various Plan Issues, specifically substantive consolidation,

and the validity and enforceability of asserted Guarantee Claims.  Many of the Foreign Affiliates

asserted Guarantee Claims against LBHI based upon certain corporate resolutions, pursuant to

which LBHI purportedly guaranteed the obligations of certain of its Affiliates.  LBHI has

reviewed such Claims and has challenged the enforceability of such Claims.

A438

c.       The Bilateral Settlements, other than the agreement with
Deutsche Bank, take into account the fact that Claims of the affiliates and Guarantee Claims
would be disregarded if the Debtors and its affiliates were substantively consolidated and the risk
that certain Guarantee Claims may be unenforceable against LBHI, and, therefore, allow the
Claims of the Foreign Affiliates in amounts substantially less than the asserted amounts.

d.       The Bilateral Settlement with Deutsche Bank takes into
account the relative strengths of the arguments regarding the classification of certain Claims and
the interpretation of the applicable agreements in which such Claims were settled and Allowed.

e.       The Bilateral Settlements resulted in a reduction of Claims
asserted against the Debtors by more than $295 billion.

f.       Each of the Bilateral Settlements was negotiated in good
faith and at arm's length.

W.       Debtors' Compliance with Bankruptcy Code (11 U.S.C. § 1129(a)(2)).
The Debtors have complied with the applicable provisions of the Bankruptcy Code, except as
otherwise provided or permitted by orders of the Court.  The Debtors have complied with the
applicable provisions of the Bankruptcy Code, including sections 1125 and 1126, the Bankruptcy
Rules, and the Disclosure Statement Order in transmitting the Solicitation Packages and related
documents and notices and in soliciting and tabulating votes on the Plan.

X.       Plan Proposed in Good Faith (11 U.S.C. § 1129(a)(3)).  The Debtors have
proposed the Plan in good faith and not by any means forbidden by law, thereby satisfying
section 1129(a)(3) of the Bankruptcy Code.  The Debtors' good faith is evident from the facts
and record of these Chapter 11 Cases, the Disclosure Statement and the hearing thereon, and the
record of the Confirmation Hearing and other proceedings held in these Chapter 11 Cases.  The
Plan was proposed with the legitimate and honest purpose of maximizing the value of the

17

Debtors' estates and effectuating an orderly liquidation of the Debtors. The Plan was negotiated at arm's length among representatives of the Debtors, the Creditors' Committee, the Ad Hoc Group, certain of the Non-Con Plan Proponents, certain holders of notes issued by LBT and guaranteed by LBHI, various Foreign Affiliates and other Creditors. More than 150 parties that asserted approximately $450 billion in Claims have entered into Plan Support Agreements in connection with the Plan.

        Y.        <u>Payments for Services or Costs and Expenses (11 U.S.C. § 1129(a)(4))</u>. All payments made or to be made by any of the Debtors for services or for costs and expenses in connection with the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, have been approved by, or are subject to the approval of, the Court, thereby satisfying section 1129(a)(4) of the Bankruptcy Code.

        Z.        <u>Directors, Officers, and Insiders (11 U.S.C. § 1129(a)(5))</u>. The Debtors have complied with section 1129(a)(5) of the Bankruptcy Code. Sections 7.2 and 7.3 of the Plan provide for the manner in which the board of directors of each of the Debtors will be selected. The Debtors have filed with the Court a list of the directors selected by the Director Selection Committee to serve on the board of directors of LBHI following the Effective Date. The appointment to such offices of such persons is consistent with the interests of holders of Claims against and Equity Interests in the Debtors and with public policy. The Plan, therefore, complies with section 1129(a)(5) of the Bankruptcy Code.

        AA.     <u>No Rate Changes (11 U.S.C. § 1129(a)(6))</u>. The Plan does not provide for any rate changes by the Debtors, and, therefore, section 1129(a)(6) of the Bankruptcy Code is inapplicable in these Chapter 11 Cases.

        BB.     <u>Best Interests of Creditors (11 U.S.C. § 1129(a)(7))</u>. The Plan satisfies section 1129(a)(7) of the Bankruptcy Code. The Disclosure Statement, the Plan Supplement, the

A440

Cohn Declaration and the other evidence proffered or adduced at the Confirmation Hearing (i) are persuasive and credible, (ii) have not been controverted by other evidence, and (iii) establish that each holder of an impaired Claim or Equity Interest in each Debtor will receive or retain under the Plan, on account of such Claim or Equity Interest, property of a value, as of the Effective Date, that is not less than the amount such holder would receive or retain if the applicable Debtor were hypothetically liquidated under chapter 7 of the Bankruptcy Code on such date.  The assumptions and estimates in the liquidation analysis that are set forth in Exhibit 5 to the Disclosure Statement are reasonable in the context of these Chapter 11 Cases, including the assumption that the compromises and settlements incorporated in the Plan would also be consummated in a hypothetical chapter 7 liquidation.  Conversion of the Chapter 11 Cases to chapter 7 would result in substantial additional delay and expense, as well as diminished asset value.

        CC.     <u>Acceptance by Certain Classes (11 U.S.C. § 1129(a)(8))</u>.  Other than classes of Claims identified in the Voting Certification for which no votes were cast (the "<u>Non-Voting Classes</u>"), at each Debtor, all Classes in which Creditors were entitled to vote have voted to accept the Plan in accordance with section 1126(c) of the Bankruptcy Code.  Under these circumstances and in light of the overwhelming support for the Plan, the Non-Voting Classes are deemed to have accepted the Plan.  Claims in LBHI Class 10A, 10B, 10C and 11 (the "<u>Deemed Rejecting Classes of Claims</u>"), and Equity Interests in each of the Debtors are not entitled to receive or retain any property under the Plan and, therefore, are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Although section 1129(a)(8) of the Bankruptcy Code has not been satisfied with respect to the Deemed Rejecting Classes of Claims and the Classes of Equity Interests in each Debtor, each Debtor's Plan is confirmable because each Plan satisfies section 1129(b) of the Bankruptcy Code with respect to such Classes.

19

DD.     Treatment of Administrative Expenses, Priority Non-Tax Claims, and

Priority Tax Claims (11 U.S.C. § 1129(a)(9)).  The treatment of Administrative Expense Claims

and Priority Non-Tax Claims pursuant to Sections 2.1 of the Plan satisfies the requirements of

sections 1129(a)(9)(A) and (B) of the Bankruptcy Code, and the treatment of Priority Tax Claims

pursuant to Section 2.3 of the Plan satisfies the requirements of section 1129(a)(9)(C) of the

Bankruptcy Code.  Each Debtor has sufficient Cash to pay Allowed Administrative Expense

Claims, Allowed Priority Non-Tax Claims, and Allowed Priority Tax Claims.

EE.     Acceptance by Impaired Classes (11 U.S.C. § 1129(a)(10)).  At least one

Class of Claims against each Debtor that is impaired under the Plan has accepted the Plan,

determined without including any acceptance of the Plan by any insider, thus satisfying the

requirements of section 1129(a)(10) of the Bankruptcy Code.

FF.     Feasibility (11 U.S.C. § 1129(a)(11)).  The Debtors' Memorandum of Law

in Support of Confirmation, the Disclosure Statement and the Suckow Declaration are persuasive

and credible evidence that each Debtor will have sufficient funds to continue to manage its assets

and make all payments required under the Plan.  Accordingly, the Plan satisfies the requirements

of section 1129(a)(11) of the Bankruptcy Code.

GG.     Payment of Fees (11 U.S.C. § 1129(a)(12)).  All fees payable under

section 1930 of title 28, United States Code, as determined by the Court, have been paid or will

be paid pursuant to Section 15.7 of the Plan.  Thus, the Plan satisfies the requirements of section

1129(a)(12) of the Bankruptcy Code.

HH.     Benefit Plans (11 U.S.C. § 1129(a)(13)).  Section 1123(a)(13) is

inapplicable to the Debtors.

A442

II.    <u>Inapplicable Sections of Section 1129 of the Bankruptcy Code</u>.  Sections 1129(a)(14), 1129(a)(15), 1129(a)(16) and 1129(e) are inapplicable in the Debtors' Chapter 11 Cases.

JJ.    <u>Fair and Equitable; No Unfair Discrimination (11 U.S.C. § 1129(b))</u>. Based on the Disclosure Statement, the Debtors' Memorandum of Law In Support of the Global Settlement, the Debtors' Memorandum of Law In Support of Confirmation of the Plan, the Suckow Declaration, and the Debtors' Response, the Plan (i) does not discriminate unfairly, and (ii) is fair and equitable as to LBHI Classes 10A, 10B, 10C and 11 and the Equity Interests in each Debtor, which Classes were deemed to reject the Plan, as required by section 1129(b)(1) of the Bankruptcy Code.

KK.    <u>Only One Plan (11 U.S.C. § 1129(c))</u>.  The Plan is the only plan being prosecuted in these Chapter 11 Cases, thereby satisfying section 1129(c) of the Bankruptcy Code.  The Ad Hoc Group and certain of the Non-Con Plan Proponents that signed plan support agreements have agreed to support the Plan and hold their plans in abeyance and not prosecute or seek confirmation of the Plan subject to certain termination rights set forth in the Stipulation and Order, dated June 30, 2011 [ECF Nos. 18306 and 18686].  Neither the Ad Hoc Group nor the Non-Con Plan Proponents have terminated the Stipulation and Order and both are supporting the confirmation of the Plan.

LL.    <u>Principal Purpose of the Plan (11 U.S.C. § 1129(d))</u>.  The principal purpose of the Plan is not the avoidance of taxes or the avoidance of the application of Section 5 of the Securities Act of 1933, thereby satisfying section 1129(d) of the Bankruptcy Code.

MM.    <u>Good Faith Solicitation (11 U.S.C. § 1125(e))</u>.  Based on the record before the Court in these Chapter 11 Cases, the Debtors and their directors, officers, employees, members, agents, advisors, attorneys and professionals, the Released Parties and the PSA

A443

Creditors have acted in "good faith" within the meaning of section 1125(e) of the Bankruptcy

Code in compliance with the applicable provisions of the Bankruptcy Code and Bankruptcy

Rules in connection with all their respective activities relating to the solicitation of acceptance or

rejection of the Plan and their participation in the activities described in section 1125 of the

Bankruptcy Code, and are entitled to the protections afforded by section 1125(e) of the

Bankruptcy Code and the exculpation provisions set forth in Section 13.3 of the Plan.

NN.    <u>Assumption and Rejection</u>.  Article XI of the Plan governing the

assumption and rejection of executory contracts and unexpired leases satisfies the requirements

of section 365(b) of the Bankruptcy Code.

OO.    <u>Releases, Injunction and Exculpation</u>.  In the context of these unique

Chapter 11 Cases, each of the releases, and the injunction and exculpation provisions set forth in

the Plan: (a) is within the jurisdiction of the Bankruptcy Court under 28 U.S.C. §§ 1334(a),

1334(b), and 1334(d); (b) is an essential means of implementing the Plan pursuant to section

1123(a)(6) of the Bankruptcy Code; (c) is an integral element of the transactions incorporated

into the Plan; (d) confers material benefits on, and is in the best interests of, the Debtors, their

estates, and their Creditors; (e) is important to the overall objectives of the Plan; and (f) is

consistent with sections 105, 1123, and 1129 of the Bankruptcy Code, other provisions of the

Bankruptcy Code, and other applicable law.

PP.    <u>Satisfaction of Confirmation Requirements</u>.  The Plan satisfies the

requirements for confirmation set forth in section 1129 of the Bankruptcy Code.

QQ.    <u>Objections</u>.  All parties have had a full and fair opportunity to litigate all

issues raised in the objections (excluding any timely filed objections that relate solely to

assumption of any executory contract), or which might have been raised, and the objections

A444

(excluding any timely filed objections that relate solely to assumption of any executory contract)
have been fully and fairly litigated.

RR.     Retention of Jurisdiction.  The Court is authorized to retain jurisdiction
over the matters set forth in Article XIV of the Plan and section 1142 of the Bankruptcy Code, as
well as any motions filed prior to the Effective Date requesting authorization to use, sell, or lease
assets outside the ordinary course of business pursuant to section 363 of the Bankruptcy Code.

## CONCLUSIONS OF LAW

NOW THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND
DECREED THAT:

1.      Confirmation.  The Plan is approved and confirmed under section 1129 of
the Bankruptcy Code.  The documents contained in the Plan Supplement are authorized and
approved.  The terms of the Plan, all Exhibits thereto, and the Plan Supplement are incorporated
by reference into and are an integral part of the Plan and this Confirmation Order and are all
approved.

2.      Objections.  All objections (excluding any timely filed objections that
relate solely to assumption of any executory contract) that have not been withdrawn, waived, or
settled, and all reservations of rights pertaining to confirmation of the Plan included therein, are
overruled on the merits for the reasons set forth in the Response, the Debtors' Memorandum of
Law In Support of Confirmation and the Debtors' Memorandum of Law In Support of the Global
Settlement.

3.      Conclusions of Law.  The conclusions of law set forth herein and in the
record of the Confirmation Hearing constitute the Court's conclusions of law pursuant to Rule 52
of the Federal Rules of Civil Procedure, as made applicable herein by Bankruptcy Rules 7052

A445

and 9014.  To the extent any of the following conclusions of law constitute findings of fact, they

are adopted as such.

4.      <u>Modifications to the Plan</u>.  The Plan Modifications meet the requirements

of sections 1127(a) and (c) of the Bankruptcy Code and do not adversely change the treatment of

the Claim of any Creditor or the Equity Interest of any equity security holder within the meaning

of Bankruptcy Rule 3019, and, therefore, all holders of Claims against the Debtors who voted to

accept the Plan are hereby deemed to have accepted the Plan as amended by the Plan

Modifications, and no further solicitation or voting is required.  No holder of a Claim against the

Debtors who has voted to accept the Plan shall be permitted to change its acceptance or rejection

as a consequence of the Plan Modifications.

5.      <u>Solicitation and Notice</u>.  Notice of the Confirmation Hearing complied

with the terms of the Disclosure Statement Order, was appropriate and satisfactory based upon

the circumstances of the Debtors' Chapter 11 Cases, and was in compliance with the provisions

of the Bankruptcy Code, the Bankruptcy Rules and the Local Rules.  The solicitation of votes on

the Plan complied with the solicitation procedures in the Disclosure Statement Order, was

appropriate and satisfactory under the circumstances of the Debtors' Chapter 11 Cases, and was

in compliance with the provisions of the Bankruptcy Code, the Bankruptcy Rules and the Local

Rules.  Notice of the Plan Supplement and all related documents, was appropriate and

satisfactory under the circumstances of the Debtors' Chapter 11 Cases, and was in compliance

with the provisions of the Bankruptcy Code, the Bankruptcy Rules and the Local Rules.

6.      <u>Implementation</u>.  On and after the Effective Date, the Debtors, and the

Plan Administrator are authorized to (i) execute, deliver, file, or record such documents,

contracts, instruments, releases, and other agreements, including, without limitation, those

contained in the Plan Supplement, (ii) make any and all Distributions and transfers contemplated

A446

pursuant to, and as provided for in, the Plan, and (iii) take such other actions as may be necessary to effectuate, implement, and further evidence the terms and conditions of the Plan.

       7.      <u>Plan Classification Controlling</u>.  The classification of Claims and Equity Interests for purposes of the Distributions to be made under the Plan shall be governed solely by the terms of the Plan.  The classifications set forth on the Ballots tendered to or returned by the Debtors' Creditors in connection with voting on the Plan (a) were set forth on the Ballots for purposes of voting to accept or reject the Plan, (b) do not necessarily represent, and in no way affect, the actual classification of such Claims and Equity Interests under the Plan for Distribution purposes, and (c) shall not be binding on the Debtors.

       8.      <u>Binding Effect</u>.  The Plan and its provisions shall be binding on the Debtors, any entity acquiring or receiving property or a Distribution under the Plan, and any holder of a Claim against or Equity Interest in the Debtors, including all governmental entities, whether or not the Claim or Equity Interest of such holder (a) is impaired under the Plan or (b) has accepted the Plan.

**<u>The Global Settlement</u>**

       9.      <u>Global Settlement Provisions</u>.  Based on the Debtors' Memorandum of Law In Support of the Global Settlement, the Ehrmann Declaration, the Suckow Declaration, and the Disclosure Statement, the Global Settlement set forth in section 6.5 of the Plan, and each component of the Global Settlement, are hereby approved pursuant to Bankruptcy Rule 9019 as fair and reasonable and in the best interests of each of the Debtors, their estates and Creditors. The settlement is within the range of reasonable results if the issues were litigated and falls above the lowest point in the range of reasonableness.

A447

**The Bilateral Settlements**

   10. The Plan constitutes a motion for approval of each of the Bilateral Settlements pursuant to Bankruptcy Rule 9019. The settlement agreements were included in the Plan or the Plan Supplement, which provided adequate and sufficient notice to all Creditors.

   11. <u>Approval of Bankhaus Settlement.</u> Based on the Debtors' Memorandum of Law In Support of the Global Settlement, the Ehrmann Declaration, the Suckow Declaration, and the Disclosure Statement, the settlement between the Debtors and Lehman Brothers Bankhaus AG ("<u>Bankhaus</u>") described in the Disclosure Statement and incorporated into the Plan pursuant to Section 6.5(b)(ii) of the Plan (the "<u>Bankhaus Settlement Agreement</u>") is fair and reasonable and is in the best interests of the Debtors and their Creditors and is hereby approved pursuant to Bankruptcy Rule 9019. The Debtors are duly authorized to execute, deliver, implement and fully perform any and all obligations, instruments, documents, and papers and to take any and all actions reasonably necessary or appropriate to consummate the Bankhaus Settlement Agreement, including waiving any conditions precedent to its effectiveness, and to perform any and all obligations contemplated therein. Pursuant to section 502 of the Bankruptcy Code, Bankhaus shall have Allowed Claims against the Debtors in the amounts set forth in the Bankhaus Settlement Agreement.

   12. <u>Approval of LBT Settlement.</u> Based on the Debtors' Memorandum of Law In Support of the Global Settlement, the Ehrmann Declaration, the Suckow Declaration, and the Disclosure Statement, the settlement between the Debtors and Lehman Brothers Treasury Co. B.V. ("<u>LBT</u>") described in the Disclosure Statement and incorporated into the Plan pursuant to Section 6.5(b)(iii) of the Plan (the "<u>LBT Settlement Agreement</u>") is fair and reasonable and is in the best interests of the Debtors and their Creditors and is hereby approved pursuant to Bankruptcy Rule 9019. The Debtors are duly authorized to execute, deliver, implement and fully

A448

perform any and all obligations, instruments, documents, and papers and to take any and all actions reasonably necessary or appropriate to consummate the LBT Settlement Agreement, including waiving any conditions precedent to its effectiveness, and to perform any and all obligations contemplated therein. Pursuant to section 502 of the Bankruptcy Code, LBT shall have Allowed Claims against the Debtors in the amounts set forth in the LBT Settlement Agreement.

13.     Approval of Hong Kong Settlement.  Based on the Debtors' Memorandum of Law In Support of the Global Settlement, the Ehrmann Declaration, the Suckow Declaration, and the Disclosure Statement, the settlement between the Debtors and the Hong Kong Lehman Entities In Liquidation described in the Disclosure Statement and incorporated into the Plan pursuant to Section 6.5(b)(v) of the Plan (the "Hong Kong Settlement Agreement") is fair and reasonable and is in the best interests of the Debtors and their Creditors and is hereby approved pursuant to Bankruptcy Rule 9019.  The Debtors are duly authorized to execute, deliver, implement and fully perform any and all obligations, instruments, documents, and papers and to take any and all actions reasonably necessary or appropriate to consummate the Hong Kong Settlement Agreement, including waiving any conditions precedent to its effectiveness, and to perform any and all obligations contemplated therein.  Pursuant to section 502 of the Bankruptcy Code, the Hong Kong Lehman Entities shall have Allowed Claims against the Debtors in the amounts set forth in the Hong Kong Settlement Agreement

14.     Approval of Singapore Settlement.  Based on the Debtors' Memorandum of Law In Support of the Global Settlement, the Ehrmann Declaration, the Suckow Declaration, and the Disclosure Statement, the settlement between the Debtors and the Lehman Singapore Entities described in the Disclosure Statement and incorporated into the Plan pursuant to 6.5(b)(vi) of the Plan (the "Singapore Settlement Agreement") is fair and reasonable and is in the

A449

best interests of the Debtors and their Creditors and is hereby approved pursuant to Bankruptcy Rule 9019.  The Debtors are duly authorized to execute, deliver, implement and fully perform any and all obligations, instruments, documents, and papers and to take any and all actions reasonably necessary or appropriate to consummate the Singapore Settlement Agreement, including waiving any conditions precedent to its effectiveness, and to perform any and all obligations contemplated therein.  Pursuant to section 502 of the Bankruptcy Code, Lehman Singapore shall have Allowed Claims against the Debtors in the amounts set forth in the Singapore Settlement Agreement.

15.     Approval of Lehman UK Entities Settlement.  Based on the Debtors' Memorandum of Law In Support of the Global Settlement, the Ehrmann Declaration, the Suckow Declaration, and the Disclosure Statement, the settlement between the Debtors and the Lehman UK Entities set forth in the agreement, dated October 24, 2011 included in the Plan Supplement (the "Lehman UK Entities Settlement Agreement") and incorporated into the Plan pursuant to Section 6.5(b)(vii), is fair and reasonable and is in the best interests of the Debtors and their Creditors and is hereby approved pursuant to Bankruptcy Rule 9019. The Debtors are duly authorized to execute, deliver, implement and fully perform any and all obligations, instruments, documents, and papers and to take any and all actions reasonably necessary or appropriate to consummate the Lehman UK Entities Settlement Agreement, including waiving any conditions precedent to its effectiveness, and to perform any and all obligations contemplated therein.  Pursuant to section 502 of the Bankruptcy Code, the Lehman UK Entities shall have Allowed Claims against the Debtors in the amounts set forth in the Lehman UK Entities Settlement Agreement.

16.     Approval of LBJ Settlement.  Based on the Debtors' Memorandum of Law In Support of the Global Settlement, the Ehrmann Declaration, the Suckow Declaration, and the

A450

Disclosure Statement, the settlement between the Debtors and the Lehman Japan Entities set

forth in the agreement, dated as of October 24, 2011, included in the Plan Supplement (the "LBJ

Settlement Agreement") and incorporated into the Plan pursuant to Section 6.5(b)(vii), is fair and

reasonable and is in the best interests of the Debtors and their Creditors and is hereby approved

pursuant to Bankruptcy Rule 9019.  The Debtors are duly authorized to execute, deliver,

implement and fully perform any and all obligations, instruments, documents, and papers and to

take any and all actions reasonably necessary or appropriate to consummate the LBJ Settlement

Agreement, including waiving any conditions precedent to its effectiveness, and to perform any

and all obligations contemplated therein.  Pursuant to section 502 of the Bankruptcy Code, the

Lehman Japan Entities shall have Allowed Claims against the Debtors in the amounts set forth in

the LBJ Settlement Agreement.

    17. <u>Approval of LBSN Settlement.</u>  Based on the Debtors' Memorandum of

Law In Support of the Global Settlement, the Ehrmann Declaration, the Suckow Declaration, and

the Disclosure Statement, the settlement between the Debtors and the Lehman Brothers

Securities N.V. ("LBSN") set forth in the agreement, dated as of October 19, 2011, included in

the Plan Supplement (the "LBSN Settlement Agreement") and incorporated into the Plan

pursuant to Section 6.5(b)(vii), is fair and reasonable and is in the best interests of the Debtors

and their Creditors and is hereby approved pursuant to Bankruptcy Rule 9019.  The Debtors are

duly authorized to execute, deliver, implement and fully perform any and all obligations,

instruments, documents, and papers and to take any and all actions reasonably necessary or

appropriate to consummate the LBSN Settlement Agreement, including waiving any conditions

precedent to its effectiveness, and to perform any and all obligations contemplated therein.

Pursuant to section 502 of the Bankruptcy Code, LBSN shall have Allowed Claims against the

Debtors in the amounts set forth in the LBSN Settlement Agreement.

A451

18.  <u>Approval of LB Lux Settlement.</u>  Based on the Debtors' Memorandum of
Law In Support of the Global Settlement, the Ehrmann Declaration, the Suckow Declaration, and
the Disclosure Statement, the settlement between the Debtors and Lehman Brothers
(Luxembourg) Equity Finance S.A. (*en faillite*) ("<u>LB Lux</u>") set forth in the agreement, dated as
of October 25, 2011, included in the Plan Supplement (the "<u>LB Lux Settlement Agreement</u>") and
incorporated into the Plan pursuant to Section 6.5(b)(vii), is fair and reasonable and is in the best
interests of the Debtors and their Creditors and is hereby approved pursuant to Bankruptcy Rule
9019.  The Debtors are duly authorized to execute, deliver, implement and fully perform any and
all obligations, instruments, documents, and papers and to take any and all actions reasonably
necessary or appropriate to consummate the LB Lux Settlement Agreement, including waiving
any conditions precedent to its effectiveness, and to perform any and all obligations
contemplated therein.  Pursuant to section 502 of the Bankruptcy Code, LB Lux shall have
Allowed Claims against the Debtors in the amounts set forth in the LB Lux Settlement
Agreement.

19.  <u>Approval of BdB Settlement.</u>  Based on the Debtors' Memorandum of
Law In Support of the Global Settlement, the Ehrmann Declaration, the Suckow Declaration, and
the Disclosure Statement, the settlement between the Debtors and BdB set forth in the
agreement, dated as of September 30, 2011, included in the Plan Supplement (the "<u>BdB
Settlement Agreement</u>") and incorporated into the Plan pursuant to Section 6.5(j), is fair and
reasonable and is in the best interests of the Debtors and their Creditors and is hereby approved
pursuant to Bankruptcy Rule 9019.  The Debtors are duly authorized to execute, deliver,
implement and fully perform any and all obligations, instruments, documents, and papers and to
take any and all actions reasonably necessary or appropriate to consummate the BdB Settlement
Agreement, including waiving any conditions precedent to its effectiveness, and to perform any

A452

and all obligations contemplated therein.  Pursuant to section 502 of the Bankruptcy Code, BdB shall have Allowed Claims against the Debtors in the amounts set forth in the BdB Settlement Agreement.

20.    <u>Approval of EdB Settlement.</u>  Based on the Debtors' Memorandum of Law In Support of the Global Settlement, the Ehrmann Declaration, the Suckow Declaration, and the Disclosure Statement, the settlement between the Debtors and EdB set forth in the agreement, dated as of September 30, 2011, included in the Plan Supplement (the "<u>EdB Settlement Agreement</u>") and incorporated into the Plan pursuant to Section 6.5(j), is fair and reasonable and is in the best interests of the Debtors and their Creditors and is hereby approved pursuant to Bankruptcy Rule 9019.  The Debtors are duly authorized to execute, deliver, implement and fully perform any and all obligations, instruments, documents, and papers and to take any and all actions reasonably necessary or appropriate to consummate the EdB Settlement Agreement, including waiving any conditions precedent to its effectiveness, and to perform any and all obligations contemplated therein.  Pursuant to section 502 of the Bankruptcy Code, EdB shall have Allowed Claims against the Debtors in the amounts set forth in the EdB Settlement Agreement.

21.    <u>Approval of Bundesbank Settlement.</u>  Based on the Debtors' Memorandum of Law In Support of the Global Settlement, the Ehrmann Declaration, the Suckow Declaration, and the Disclosure Statement, the settlement between the Debtors and Bundesbank set forth in the agreement, dated as of October 11, 2011, included in the Plan Supplement (the "<u>Bundesbank Settlement Agreement</u>") and incorporated into the Plan pursuant to Section 6.5(j), is fair and reasonable and is in the best interests of the Debtors and their Creditors and is hereby approved pursuant to Bankruptcy Rule 9019.  The Debtors are duly authorized to execute, deliver, implement and fully perform any and all obligations, instruments,

A453

documents, and papers and to take any and all actions reasonably necessary or appropriate to

consummate the Bundesbank Settlement Agreement, including waiving any conditions precedent

to its effectiveness, and to perform any and all obligations contemplated therein.  Pursuant to

section 502 of the Bankruptcy Code, Bundesbank shall have Allowed Claims against the Debtors

in the amounts set forth in the Bundesbank Settlement Agreement.

22.     Approval of Deutsche Bank Settlement.  Based on the Debtors'

Memorandum of Law In Support of the Global Settlement, the Ehrmann Declaration, the

Suckow Declaration, and the Disclosure Statement, the settlement between the LBHI, LCPI,

Deutsche Bank AG, Monarch Alternative Capital LP, Stone Lion Portfolio L.P., Permal Stone

Lion Fund Ltd., Centerbridge Credit Advisors LLC, and Anchorage Capital Group, L.L.C. set

forth in the agreement, dated as of November 23, 2011, included in the Plan Supplement (the

"DB Claims Settlement Agreement") and incorporated into the Plan pursuant to Section 6.5(j), is

fair and reasonable and is in the best interests of the Debtors and their Creditors and is hereby

approved pursuant to Bankruptcy Rule 9019.  The Debtors are duly authorized to execute,

deliver, implement and fully perform any and all obligations, instruments, documents, and papers

and to take any and all actions reasonably necessary or appropriate to consummate the DB

Claims Settlement Agreement, including waiving any conditions precedent to its effectiveness,

and to perform any and all obligations contemplated therein.

23.     Implementation of the Bilateral Settlements.  The Debtors are authorized

to take all actions to implement the terms of each of the Bilateral Settlements.  The Debtors are

authorized to direct Epiq Bankruptcy Solutions, LLC, the court-appointed claims agent (the

"Claims Agent") to modify the official claims register (the "Claims Register") to reflect the

terms of the Bilateral Settlements.

A454

24.     <u>Debtors' Claims Schedule</u>.  Pursuant to the Bar Date Order, the Debtors were not required to file Claims against each other.  Pursuant to Section 6.5(b)(i) of the Plan, Senior Affiliate Claims, Senior Affiliate Guarantee Claims and Affiliate Claims of a Debtor against another Debtor are Allowed in the applicable Classes in the net amounts set forth on pages 1 and 2 of the Debtors' Claims Schedule.  Other than any Claims that arise out of the Debtor Allocation Agreement, the amounts included on the Debtors' Claims Schedule shall be the only prepetition Claims of the Debtors against each other that are Allowed.  The Claims Agent is authorized to take all actions to reflect the Claims set forth in the Debtor Claims Schedule on the Claims Register.

25.     <u>Schedule of Claims of Debtor-Controlled Entities</u>.  Pursuant to the Bar Date Order, the Debtor-Controlled Entities were not required to file proofs of Claim against the Debtors prior to the Bar Date.  The Schedule of Claims of Debtor-Controlled Entities included in the Plan Supplement sets forth the prepetition Claims of the Debtor-Controlled Entities against each of the Debtors that will be Allowed pursuant to the Plan upon the occurrence of the Effective Date.  The Claims will be Allowed as Senior Affiliate Claims (LBHI Class 4A), Senior Affiliate Guarantee Claims (LBHI Class 4B) and Affiliate Claims (LBHI Class 8) against LBHI as set forth in the Schedule of Claims of Debtor-Controlled Entities and against each of the Subsidiary Debtors in the Class of Claims of Affiliates Other Than Participating Debtors.  Except for Claims that may arise between the Debtors and the Debtor-Controlled Entities in accordance with the Debtor Allocation Agreement or Claims for which a proof of Claim was timely filed, (i) the amounts included on the Schedule of Claims of Debtor-Controlled Entities shall be the only prepetition Claims of the Debtor-Controlled Entities that are Allowed against the Debtors and (ii) to the extent any Debtor-Controlled Entity is not included on the Schedule of Claims of Debtor-Controlled Entities, such Debtor-Controlled Entity shall not have any Allowed

A455

prepetition Claims against the Debtors.  Notwithstanding the foregoing, the Schedule of Claims

of Debtor-Controlled Entities provides that LB Re Financing No. 2 Limited shall have an

Allowed Claim against LBHI in LBHI Class 4A in the amount of $6,761,074,231, which amount

shall supersede in all respects the Claim filed by LB Re Financing No. 2 Limited against LBHI

(Claim No. 23568), which proof of Claim shall be disregarded for all purposes.  In addition, the

Debtor-Controlled Entities Claims Schedule provides that LB Offshore Partners Ltd. shall have

an Allowed Claim against LBSF in LBSF Class 5C in the amount of $144,992.  The Allowed

Claims set forth on this schedule shall supersede in all respects the claim filed by LB Offshore

Partners Ltd (Claim No. 27448).  However, this shall not have any effect on Claim Nos. 24609

and 24611, which LB Offshore Partners Ltd. acquired from a third party.  The Claims Agent is

authorized to take all actions to reflect the Claims set forth in the Debtor-Controlled Entities

Claims Schedule on the Claims Register.

26.    Debtor Allocation Agreement.  The Debtor Allocation Agreement, which

provides for the manner in which (a) expenses of the administration of the assets and liabilities of

the Debtors and certain of their affiliates, (b) the costs and benefits of Jointly Owned Litigation

Claims, (c) tax liabilities, refunds or readjustments for periods prior to, during and after the

Effective Date, will be allocated among the Debtors, is approved.  Pursuant to the Debtor

Allocation Agreement, LBSF shall have an Allowed Administrative Expense Claim against

LBHI in the amount of $300 million to be satisfied in accordance with Section 6.3 of the Plan.

The Debtors and the Plan Administrator are authorized to take all actions necessary to allocate

such costs and expenses in accordance with the Debtor Allocation Agreement.

27.    Resolution of Inter-Debtor Issues.  In order to "close" the various inter-

company repurchase transactions, remove encumbrances, and to simplify the accounting for the

estates, the Debtors are authorized to make the transfers set forth in the Exhibit 10 of the Plan

Supplement.  Except as set forth in the preceding sentence, all Claims and disputes among the

Debtors or a Debtor and any Debtor-Controlled Entity regarding the title or beneficial ownership

of assets are hereby resolved in favor of the Debtor or Debtor-Controlled Entity whom the

Debtors have determined have beneficial ownership of these assets.  All Avoidance Actions of

any Debtor against another Debtor or Debtor-Controlled Entity are fully and irrevocably

released.  All reservations of rights of any of the Debtors or affiliates of the Debtors or their

respective Creditors, to assert any arguments or challenge any transaction entered into by any

other Debtors contained in any order entered by this Court prior the date hereof or agreement

entered into by any Debtor or affiliate of any Debtor are fully and finally extinguished.

        28.      <u>Plan Trust Agreement</u>.  The Plan Trust Agreement, which provides that

the Plan Trust will hold the Plan Trust Stock, is approved.  The members of the Director

Selection Committee who are serving in such capacity as of the Effective Date, or their

replacements designated in accordance with the Court's Order Pursuant to Sections 105(a),

363(b), and 1142(b) of the Bankruptcy Code, Appointing the Director Selection Committee,

Approving Retention of Korn/Ferry International, and Authorizing Certain Related Relief [ECF

No. 22871], shall serve as the Plan Trustees and shall have the rights and obligations set forth in

section 7.4 of the Plan and the Plan Trust Agreement.

**<u>Executory Contracts and Unexpired Leases</u>**

        29.      Pursuant to Section 11.1 of the Plan, all prepetition executory contracts

and unexpired leases to which any of the Debtors are parties shall be deemed to be rejected

pursuant to section 365 of the Bankruptcy Code, except for any executory contract or unexpired

lease (a) that has been assumed pursuant to an order of the Court entered prior to the Effective

Date, (b) as to which a motion for approval of the assumption or rejection of such executory

contract or unexpired lease has been filed prior to the Confirmation Date, or (c) that is

A457

specifically designated in the Plan Supplement as a contract or lease to be assumed by the Debtor.

30.     Pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, the assumption of each executory contract and unexpired lease designated in the Plan Supplement other than any executory contracts set forth on Schedules 1 and 2 hereto, or that are the subject of the objections listed on Schedules 1 and 2 hereto, is approved.  To the extent any provision of an executory contract or unexpired lease to be assumed by any of the Debtors under the Plan limits such Debtor's ability to assign such executory contract or unexpired lease, the effectiveness of such provision is hereby limited or unenforceable to the full extent provided in section 365(f) of the Bankruptcy Code.  The hearing regarding the Debtors' ability to assume, or assume and assign, any executory contract or unexpired lease set forth on Schedule 1 hereto or that is the subject of the objections listed on Schedule 1 hereto (the "February 14 Contracts") shall be held by the Court **on February 14, 2011 at 10:00 a.m.**  The inclusion on the Plan Supplement of the executory contracts set forth on Schedule 2 hereto (the "Deferred Contracts") constitutes a motion for assumption of the executory contract or unexpired lease, which has been adjourned without date and shall be scheduled by the Debtors, with leave from the Court, on a date to be determined with at least 30 days notice to the counterparty, or as otherwise agreed. All of the Debtors' rights with respect to the February 14 Contracts and the Deferred Contracts are reserved.

31.     If the Court determines either before or after the Effective Date that the cure amount or requirements for adequate assurance for any Deferred Contract is in excess of the amount asserted by the Debtors, or if the Debtors determine not to proceed to assume any Deferred Contract, the Debtors' rights are fully preserved to amend Exhibit 2 to the Plan Supplement to remove the applicable contract(s), and upon such removal the applicable

A458

contract(s) shall be deemed rejected as of the Effective Date in accordance with Section 11.1 of the Plan.

32.     The filing and service of the Plan and the Plan Supplement, the service of a notice of the cure amount, and the publication of the Confirmation Order is adequate notice of the assumption of executory contracts and unexpired leases that are assumed pursuant to this Order and the Plan (the "Assumed Contracts").

33.     Except as may otherwise be agreed to by the parties to a particular contract, within thirty (30) days after the Effective Date, the applicable Debtor shall cure any and all payment defaults under its respective Assumed Contracts in accordance with section 365(b) of the Bankruptcy Code, by payment of the amount specified by the applicable Debtor in the Cure Notice sent by the Debtor with respect to such Assumed Contract.  With respect to February 14 Contracts and Deferred Contracts, disputed defaults that are required to be cured shall be cured either within thirty (30) days of the entry of a Final Order determining the amount, if any, of the Debtor's liability with respect thereto, or as may otherwise be agreed to by the parties.  Notwithstanding any requirement in the Bankruptcy Code that executory contracts be assumed or rejected on or prior to the Confirmation Date, the Debtors shall (i) be entitled to assume any executory contract that the Court determines the Debtors are entitled to assume, or (ii) reject any executory contract that either the Court determines the Debtors are not entitled to assume, or that the Debtors elect to reject at any time prior to the hearing on February 14, 2011, in which case, such assumption or rejection shall be effective as of the Effective Date.

34.     All counterparties to Assumed Contracts have been provided with adequate assurance of future performance pursuant to section 365(f) of the Bankruptcy Code.

35.     The assumption of a prepetition executory contract shall not enhance any contractual rights of a counterparty that were otherwise unenforceable under the Bankruptcy

A459

Code immediately prior to the assumption or rejection of such contract; *provided, however,* that the rights of all counterparties to assert that a contractual right was enforceable under the Bankruptcy Code immediately prior to assumption or rejection and the Debtors' rights to dispute any such assertions are fully preserved.

36.     With respect to the Assumed Contracts, any defaults on the part of the Debtors that may arise because of a condition of the kind specified in section 365(b)(2) of the Bankruptcy Code ("Ipso Facto Defaults") are not subject to the requirements under section 365(b)(1) of the Bankruptcy Code and no party shall be permitted to declare a default, terminate, cease payment, delivery or any other performance under any executory contract, or any agreement relating thereto, or otherwise modify any such executory contract, assert any Claim or right to termination payment, or impose any penalty or otherwise take action against a Debtor as a result of an Ipso Facto Default.

37.     Bar Date for Rejection Damage Claims.  Pursuant to Section 11.4 of the Plan, if the rejection of an executory contract or unexpired lease by any of the Debtors pursuant to Section 11.1 of the Plan results in damages to the other party or parties to such contract or lease, if not evidenced by a previously filed proof of Claim, a Claim for such damages shall be forever barred and shall not be enforceable against the Debtors, or any property to be distributed under the Plan, unless a proof of Claim is filed with the Court and served upon the Debtors, on or before the date that is forty-five (45) days after the later of (a) notice of entry of an order approving the rejection of such executory contract or unexpired lease, (b) notice of entry of the Confirmation Order and occurrence of the Effective Date, and (c) notice of an amendment to the Plan Supplement relating to such executory contract or unexpired lease.  All Claims filed against the Debtors as a result of the rejection of an executory contract or unexpired lease must be filed in accordance with the procedures for the filing of Claims set forth in the Bar Date Order,

38

including the requirements to complete the Derivatives Questionnaire and/or the Guarantee

Questionnaire, as applicable.  Service of the Confirmation Notice shall be sufficient notice to the

applicable counterparties to executory contracts and unexpired leases of the rejection of their

executory contracts and unexpired leases pursuant to the Plan and the deadlines and procedures

for filing and Claims against the Debtors resulting from such rejection.

        38.    <u>Insurance Contracts</u>.  To the extent that any of the Debtors' insurance

policies and any agreements, documents or instruments with insurers relating thereto constitute

executory contracts, such contracts shall be deemed assumed under the Plan.

**Title to Assets**

        39.    <u>Vesting of Assets</u>.  Pursuant to Section 13.1 of the Plan, except as

otherwise provided in the Plan, all property of each of the Debtor's estates shall vest in that

Debtor free and clear of all Claims, liens, encumbrances, charges and other interests.  From and

after the Effective Date, the Debtors, acting through the Plan Administrator, may take any action,

including, without limitation, the operation of their businesses, the use, acquisition, sale, lease

and disposition of property, and the entry into transactions, agreements, understandings or

arrangements, whether or not in the ordinary course of business, and execute, deliver, implement,

and fully perform any and all obligations, instruments, documents and papers or otherwise in

connection with any of the foregoing, free of any restrictions of the Bankruptcy Code or the

Bankruptcy Rules and in all respects as if there were no pending cases under any chapter or

provision of the Bankruptcy Code, except as explicitly provided in the Plan.

A461

**Distributions and Reserves**

40.    <u>Initial Distributions</u>.  If the Debtors make the initial Distribution after January 31 but before March 30, 2012, then notwithstanding the provisions of Section 8.3 of the Plan, the Debtors shall not be required to make a Distribution on March 30, 2012 and the second Distribution will be made on September 30, 2012.  All subsequent Distributions shall be made on the semi-annual dates set forth in Section 8.3 of the Plan.

41.    <u>Effective Date Payments and Transfers by the Debtors</u>.  Pursuant to Section 2.1 of the Plan, and subject to Sections 8.3 and 8.4 of the Plan, on the Effective Date, or as soon thereafter as is practicable, the Debtors shall remit to holders of Allowed Administrative Expense Claims, Allowed Priority Tax Claims, Allowed Priority Non-Tax Claims, and, if applicable, Allowed Secured Claims Cash in an amount equal to the Allowed amount of such Claims.

42.    <u>Reserve Requirements</u>.  Pursuant to Section 8.4 of the Plan, the Debtors shall reserve an aggregate amount equal to the Pro Rata Share of the Distributions that would have been made to each holder of a Disputed Claim if such Disputed Claim were an Allowed Claim against such Debtor in an amount equal to the least of (a) the filed amount of such Disputed Claim as set forth on the Claims Register maintained by the Claims Agent, (b) the amount determined, to the extent permitted by the Bankruptcy Code and Bankruptcy Rules, by the Court for purposes of fixing the amount to be retained for such Disputed Claim, and (c) such other amount as may have been agreed upon by the holder of such Disputed Claim and the Debtors or may be agreed upon by the holder of such Disputed Claim and the Plan Administrator.

43.    <u>No Reserve for Disallowed or Expunged Claims</u>.  None of the Debtors shall be required to establish reserves for Claims that have been disallowed or expunged by order

40

of the Court in the absence of an order of the Court expressly directing the Debtor to establish a reserve.

44.     <u>Distributions to Holders of Allowed Convenience Claims and Allowed Convenience Guarantee Claims</u>.  A single Distribution to holders of Convenience Claims and Convenience Guarantee Claims in the amounts set forth in the Plan shall satisfy such Claims in full.  Such Creditors shall not have any further right to a Distribution from any Debtor in respect of their Convenience Claims or Convenience Guarantee Claims.  Holders of Convenience Claims subject to the *Order Pursuant to Sections 105(a) and 502(b) of the Bankruptcy Code and Bankruptcy Rule 9019 Approving Procedures for the Determination of the Allowed Amount of Claims Filed Based on Structured Securities Issued or Guaranteed by Lehman Brothers Holdings Inc.* [ECF No. 19120] (the "<u>Structured Securities Procedures Order</u>") shall be bound by this paragraph even if the Debtors determine subsequent to the date hereof that the value of a structured security is greater than the amount previously proposed by the Debtors pursuant to the Structured Securities Valuation Methodologies and Structured Securities Procedures Order.

45.     <u>Setoffs and Recoupment</u>.  Except as otherwise agreed by a Debtor, including in the Plan, any Debtor may, but shall not be required to, setoff against or recoup from any Claim and the payments to be made pursuant to the Plan in respect of such Claim any Claims of any nature whatsoever that the Debtor may have against the claimant; *provided, however*, that the claimant shall be served with written notice of the proposed setoff or recoupment at least twenty-eight (28) days prior to exercising any asserted setoff or recoupment right, and, if such claimant serves a written objection to such asserted setoff or recoupment on or before twenty-eight (28) days of receipt of such written notice, (i) the objection shall be deemed to initiate a contested matter governed by, *inter alia*, Bankruptcy Rule 9014 and Local Rules 9014-1 and 9014-2, (ii) nothing herein shall affect the respective burden of each party in connection with

A463

such contested matter, and (iii) the Debtor shall not proceed with the asserted setoff or recoupment absent the withdrawal of such objection or the entry of a Final Order overruling such objection but the Debtor may withhold such payment pending resolution of such objection; *provided, further*, that neither the failure to setoff against or recoup from any Claim nor the allowance of any Claim hereunder shall constitute a waiver or release by such Debtor of any such Claim the Debtor may have against such claimant.

**Post-Effective Date Management of the Debtors**

46.     Boards of Directors.  Following the Effective Date, the board of directors of LBHI shall be: Frederick Arnold, Robert S. Gifford, Thomas A. Knott, Sean O. Mahoney, David Pauker, Ronald K. Tanemura and Owen D. Thomas.

47.     Following the Effective Date, the board of directors of LBSF and LCPI shall each consist of three (3) individuals as follows: (i) an individual who is a concurrently serving member of the LBHI board of directors who is selected by the LBHI board of directors; (ii) an individual who is a concurrently serving member of the LBHI board of directors who is selected by the LBHI board of directors and acceptable to the Opco Plan Proponents who are PSA Creditors; and (iii) an individual who is selected by the individuals appointed pursuant to (i) and (ii) of this section and who is independent from LBHI, the members of the Director Selection Committee and, in the case of LBSF, LBSF, or in the case of LCPI, LCPI.  Pursuant to the Plan, the boards of directors of each of the Subsidiary Debtors, other than LBSF and LCPI, shall consist of one (1) director which shall be a member of the LBHI board of directors.  With respect to a Subsidiary Debtor incorporated or formed under the laws of a jurisdiction outside of the United States, if the laws of such foreign jurisdiction require the appointment of more than one (1) director or manager to the board of directors or managers of such Subsidiary Debtor or of a director or manager that is not an individual concurrently serving as a member of the LBHI

A464

board of directors, such additional or alternative directors or managers shall be appointed by the LBHI board of directors

48.   <u>Post Effective Date Role of Creditors' Committee</u>.   On the Effective Date, the Creditors' Committee shall be dissolved for all purposes other than (i) implementation of the Plan through the date of the initial Distribution in accordance with Section 8.3 of the Plan; (ii) defending any appeals from this Confirmation Order until final disposition of such appeals; and (iii) all matters relating to professional fees and the fee committee appointed in the Chapter 11 Cases for the period prior to the Effective Date.   Following the Effective Date, the litigation and derivatives subcommittees of the Creditors' Committee may continue functioning for the limited purposes of (i) resolving pending litigation and (ii) subject to approval of the post-Effective Date board of directors of LBHI, other litigation and derivatives matters as to which, currently, the subcommittees are involved, and which shall be recommended by the applicable subcommittee and the Plan Administrator.   Other than with respect to the foregoing, the members of the Creditors' Committee shall be released and discharged of and from all further authority, duties, responsibilities, and obligations related to and arising from and in connection with the Chapter 11 Cases, and the retention or employment of the Creditors' Committee's attorneys, accountants, and other agents shall terminate.   The Debtors shall pay the reasonable fees and expenses of the professionals retained by and shall reimburse the members of the remaining subcommittees for reasonable disbursements incurred, including the reasonable fees of counsel, in connection with the foregoing from and after the Effective Date.   If a member of a subcommittee becomes unable to serve on a subcommittee or resigns after the Effective Date, the remaining members may replace such member, continue to discharge the subcommittee's roles, or dissolve by a majority vote of the remaining members.   Each of the subcommittees shall be deemed dissolved upon the

43

A465

earliest to occur of (i) voluntary agreement of the members of the subcommittee, (ii) the completion of the subcommittee's responsibilities, and (iii) the Closing Date.

49.   Post-Effective Date Role of Fee Committee.  The fee committee appointed in the Chapter 11 Cases shall continue to exist after the Effective Date to perform its duties under the Amended Fee Protocol approved by the Court [ECF No. 15998] in connection with all applications for approval of professional fees incurred prior to the Effective Date, and all related proceedings, including hearings on final fee applications.  The Debtors shall pay the reasonable fees and expenses of the independent member and counsel retained by the fee committee in connection with the foregoing from and after the Effective Date.

50.   Post Effective Date Reporting.  Beginning the first month-end and first quarter-end following the Effective Date and until the Closing Date, the Plan Administrator shall file with the Court reports consistent with the obligations set forth in section 15.6 of the Plan.

51.   General Authorizations.  The Plan Administrator on behalf of the Debtors is authorized to execute, deliver, file, or record such contracts, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and provisions of the Plan and any securities issued pursuant to the Plan.  The  Debtors and their directors, officers, members, agents, and attorneys are authorized and empowered to issue, execute, deliver, file, or record any agreement, document, or security, including, without limitation, the documents contained in the Plan Supplement and the Exhibits to the Plan, as modified, amended, and supplemented, in substantially the form included therein, and to take any action necessary or appropriate to implement, effectuate, and consummate the Plan in accordance with its terms, or take any or all corporate actions authorized to be taken pursuant to the Plan, including merger of any of the Debtors and the dissolution of each of the Debtors, and any release, amendment, or restatement

44

A466

of any bylaws, certificates of incorporation, or other organizational documents of the Debtors,

whether or not specifically referred to in the Plan or the Plan Supplement, without further order

of the Court, and any or all such documents shall be accepted by each of the respective state

filing offices and recorded in accordance with applicable state law and shall become effective in

accordance with their terms and the provisions of state law.

**Releases, Discharge and Injunction**

   52. <u>Releases, Exculpations, and Injunctions</u>.  The release, exculpation, and

injunction provisions contained in the Plan are fair and equitable, are given for valuable

consideration, and are in the best interests of the Debtors and their estates, and such provisions

shall be effective and binding on all persons and entities.

   53. <u>Release and Exculpation</u>.  On and after the Effective Date, the Debtors and

all entities who have held, hold or may hold Claims against or Equity Interests in any or all of the

Debtors (whether proof of such Claims or Equity Interests has been filed or not), along with their

respective present or former employees, agents, officers, directors or principals, shall be deemed

to have released (a) the Released Parties from, and none of the Released Parties shall have or

incur any liability for, any Claim for, Cause of Action for or other assertion of liability for any

act taken or omitted to be taken during the Chapter 11 Cases in connection with, or arising out

of, the Chapter 11 Cases, the negotiation, formulation, dissemination, confirmation,

consummation or administration of the Plan, property to be distributed under the Plan or any

other act or omission in connection with the Chapter 11 Cases, the Plan, the Disclosure

Statement, the Plan Support Agreements or any contract, instrument, document or other

agreement related thereto and (b) the PSA Creditors from, and none of the PSA Creditors shall

have or incur any liability for, any Claim for, Cause of Action for or other assertion of liability

for any act taken or omitted to be taken in connection with, or arising out of, the negotiation,

A467

formulation, dissemination or confirmation, consummation or administration of the Plan, or any

other act or omission in connection with the Plan, the Disclosure Statement, the Plan Support

Agreements, including the filing of any alternative chapter 11 plan and any determination to not

pursue solicitation or confirmation of such alternative plan, or any contract, instrument,

document or other agreement related thereto; *provided, however*, that (i) other than as may be

otherwise provided in any releases included in settlement agreements between the Debtors and

the Foreign Affiliates, BdB, EdB and Bundesbank that are incorporated into the Plan, in no event

shall any Litigation Claim, Cause of Action or other Claim or assertion of liability against any

Released Party or PSA Creditor for any act taken or omitted to be taken prior to the

Commencement Date be released by the Plan, (ii) nothing herein or in the Plan shall affect or

release any obligation of the Debtors under the Plan, and (iii) nothing herein shall affect the

liability of any person that otherwise would result from any such act or omission to the extent

such act or omission is determined by a Final Order to have constituted willful misconduct or

gross negligence; *provided, further*, that nothing in this Plan shall limit the liability of the

professionals of the Debtors, the Creditors' Committee or the PSA Creditors to their respective

clients pursuant to Rule 1.8(h)(1) of the New York Rules of Professional Conduct.

54.     Term of Injunctions and Automatic Stay.  Pursuant to Section 13.7 of the

Plan, unless otherwise expressly provided herein or in the Plan or in a Final Order of the Court,

all injunctions or stays arising under or entered during the Chapter 11 Cases under sections 105

or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall

remain in full force and effect until the Closing Date.

55.     Injunction.  Pursuant to Section 13.5 of the Plan, except as expressly

provided in the Plan, herein, or a separate order of the Court or as agreed to by a Creditor and the

Plan Administrator (on behalf of a Debtor), all entities who have held, hold or may hold Claims

46

A468

against or Equity Interests in any or all of the Debtors (whether proof of such Claims or Equity

Interests has been filed or not) and other parties in interest, along with their respective present or

former employees, agents, officers, directors or principals, are permanently enjoined, on and

after the Effective Date, solely with respect to any Claims and Causes of Action that will be or

are extinguished or released pursuant to the Plan from (i) commencing, conducting, or

continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind

(including, without limitation, any proceeding in a judicial, arbitral, administrative or other

forum) against or affecting the Released Parties or the property of any of the Released Parties;

(ii) enforcing, levying, attaching (including, without limitation, any prejudgment attachment),

collecting, or otherwise recovering by any manner or means, whether directly or indirectly, any

judgment, award, decree, or order against the Released Parties or the property of any of the

Released Parties; (iii) creating, perfecting, or otherwise enforcing in any manner, directly or

indirectly, any encumbrance of any kind against the Released Parties or the property of any of

the Released Parties; (iv) asserting any right of setoff, directly or indirectly, against any

obligation due the Released Parties or the property of any of the Released Parties, except as

contemplated or Allowed by the Plan; (v) acting or proceeding in any manner, in any place

whatsoever, that does not conform to or comply with the provisions of the Plan; and (vi) taking

any actions to interfere with the implementation or consummation of the Plan

      56.    <u>Discharge</u>.  Pursuant to Section 13.4 of the Plan, except as expressly

provided therein, upon the date that all Distributions under the Plan have been made, (a) each

holder (as well as any trustees and agents on behalf of each holder) of a Claim against or Equity

Interest in a Debtor shall be deemed to have forever waived, released and discharged the

Debtors, to the fullest extent permitted by section 1141 of the Bankruptcy Code, of and from any

and all Claims, Equity Interests, rights and liabilities that arose prior to the Effective Date and (b)

A469

all such holders shall be forever precluded and enjoined, pursuant to section 524 of the

Bankruptcy Code, from prosecuting or asserting any discharged Claim against or terminated

Equity Interest in the Debtors.

57.     No Waiver of Rights and Defenses. Except as otherwise agreed, the

provisions of the Plan and this Confirmation Order shall not enjoin, impair, prejudice, have any

preclusive effect upon, or otherwise affect (A) the rights of any Creditor to (x) effectuate a

recoupment pursuant to common law or setoff pursuant to common law or otherwise in

accordance with (a) section 553 and (b) sections 362(b)(6), 362(b)(7), 362(b)(17), 362(b)(27),

555, 556, 559, 560 or 561 of the Bankruptcy Code (subject to the Debtors' rights to contest the

validity of such asserted right of setoff or recoupment or the applicability of any of the foregoing

sections of the Bankruptcy Code) or (y) continue to assert the validity of a setoff previously

taken by such Creditor or to seek authority from the Bankruptcy Court to exercise a right of

setoff or recoupment (subject in each case to the Debtors' right to contest the validity of any such

setoff or recoupment), or (B) any legal or equitable defense, including any defensive right of

setoff or recoupment, that has been, or may be, asserted by any entity in response to a Litigation

Claim, Avoidance Action of a Debtor or objections to Claims against a Debtor.

58.     Indemnification Obligations.  The obligations of each Debtor to

indemnify, defend, reimburse or limit the liability of (a) directors, officers and any other

employee who is held responsible for obligations of the Debtor incurred after the

Commencement Date who are directors, officers or employees of such Debtor or a Debtor-

Controlled Entity on or after the Commencement Date and (b) Released Parties, respectively,

against any Claims or Causes of Action as provided in the Debtor's articles of organization,

certificates of incorporation, bylaws, other organizational documents or applicable law, shall be

assumed by such Debtor and will remain in effect after the Effective Date.  Any such assumed

A470

obligations owed in connection with an event occurring after the Commencement Date shall be paid as an Administrative Expense Claim under the Plan. Any such obligations owed in connection with an event occurring before the Commencement Date shall be treated as pre-petition Claims under the Plan. Nothing in the Plan shall in any way limit, modify, alter or amend the Debtor's limitation of liability of the Independent Directors set forth in Section 10.1 of the Restated Certificate of Incorporation of LBHI.

59.     Special Provisions for United States Government.

a.      As to the United States, its agencies, departments or agents, nothing in the Plan or Confirmation Order shall: (i) discharge, release or otherwise preclude (A) any liability of the Debtors arising on or after the Confirmation Date (defined for purposes of this section as the date the Confirmation Order becomes final and non appealable), (B) with respect to the Debtors, any liability that is not a Claim against a Debtor, (C) any valid right of setoff or recoupment, or (D) any liability of the Debtors arising under environmental or criminal laws as the owner or operator of property that such Debtor owns or operates after the Confirmation Date (defined for purposes of this section as the date the Confirmation Order becomes final and non-appealable); or (ii) limit or expand the scope of the discharge to which the Debtors are entitled under the Bankruptcy Code. The discharge and injunction provisions contained in the Plan and Confirmation Order are not intended and shall not be construed to bar the United States from, subsequent to the Effective Date, pursuing any police or regulatory action.

b.      Nothing in the Plan, Plan Trust Agreement, or this Confirmation Order shall provide to any person or entity (other than a Debtor) any exculpation, release, discharge, preclusion of, or injunction against (i) any liability or other obligation owed by such person or entity to the United States, its agencies or departments, or (ii) or any Claim, Cause of Action, or other right held by the United States, its agencies or departments.

49

c.    Nothing contained in the Plan or this Confirmation Order shall be deemed to have determined, or to bind the United States with respect to the determination of, the federal tax treatment of any item, distribution, person or entity, or the tax liability of any person or entity, including but not limited to the Debtors and the Liquidating Trust; *provided, however*, that the foregoing shall not affect the rights, claims, defenses and obligations of the United States or the Debtors under the Plan or otherwise with respect to the allowance, disallowance or treatment of Claims of the United States (including, without limitation, under the Bar Date Order and any stipulations between the Internal Revenue Service or United States and the Debtors), nor shall it affect any right of any Debtor or successor to a Debtor to request a determination of tax liability pursuant to section 505(b) of the Bankruptcy Code, or any defenses or objections of the United States with respect to a request for a determination of taxes by any person or entity pursuant to section 505(b) of the Bankruptcy Code.

**Miscellaneous**

60.    <u>Resolution of Potential Plan Objections</u>.  Each of the (i) Stipulation Among Debtors and Fidelity National Title Insurance Company Resolving Disputes in Connection with the Plan; and (ii) Stipulation and Agreement By and Among Fannie Mae, Freddie Mac and the Debtors Regarding the Debtors' Third Amended Plan, are approved.

61.    <u>Agreement with LBF With Respect to Section 8.15</u>.  The Debtors and the Plan Administrator shall not withhold pursuant to Section 8.15 of the Plan any Distribution to any Non-Controlled Affiliate on the basis that the Non-Controlled Affiliate may use such Distribution to satisfy a Claim of LBF against such Non-Controlled Affiliate.  The Debtors or the Plan Administrator also shall not withhold pursuant to Section 8.15 of the Plan any Distributions

A472

to LBF on account of any Allowed Claims of LBF on the basis that LBF may use such

Distribution to satisfy a claim of another Non-Controlled Affiliate against LBF.

62.    Certain Pending Securities Litigations.

a.    Nothing in the Plan or this Confirmation Order shall affect

the rights and obligations of the Debtors and of any party in interest as set forth in the Order

Discharging Examiner And Granting Related Relief [ECF No. 10169].

b.    Nothing in the Plan or in this Confirmation Order shall

preclude any of (i) the Alameda County Employees' Retirement Association, Government of

Guam Retirement Fund, Northern Ireland Local Government Officers' Superannuation

Committee, City of Edinburgh Council as Administering Authority of the Lothian Pension Fund

and Operating Engineers Local 3 Trust Fund, the court-appointed lead plaintiffs (collectively, the

"Securities Action Lead Plaintiffs") or (ii) The Local 302 and 612 of the International Union of

Operating Engineers–Employers Construction Industry Retirement Trust (the "MBS Action Lead

Plaintiffs," and together with the Securities Action Lead Plaintiffs, the "Lead Plaintiffs"), lead

plaintiffs in *In re Lehman Brothers Equity/Debt Securities Litigation*, Case No. 08-05523 (LAK),

and *In re Lehman Brothers Mortgage Backed Securities Litigation*, Case No. 08-6762 (LAK)

(the "Securities Litigation"), respectively, from seeking relief from the Court to pursue their

Claims against the Debtors solely to collect from any available insurance proceeds.  All rights of

the Debtors to object or respond to requests for such relief or assert any defenses are fully

preserved.

c.    In the event that the pending settlements involving the Lead

Plaintiffs in the Securities Litigation are not approved by final order or judgment of the United

States District Court, Southern District of New York and do not become effective by their terms,

nothing in the Plan or this Confirmation Order shall preclude the Lead Plaintiffs from seeking

A473

discovery from any of the Debtors, the Plan Administrator or the Liquidating Trustee in accordance with the Federal Rules of Civil Procedure following the Effective Date. All rights of the Debtors, the Plan Administrator or the Liquidating Trustee under the Federal Rules of Civil Procedure to object or respond to requests or assert any defenses are fully preserved.

63.   <u>Alternative Dispute Resolution Procedures</u>.  The following Court Orders shall continue to apply and be binding on all parties following the Effective Date through the Closing Date: (a) *Order Pursuant to Section 105 of the Bankruptcy Code, Bankruptcy Rule 9014, and General Order M-390 Authorizing the Debtors to Implement Claims Hearing Procedures and Alternative Dispute Resolution Procedures for Claims Against Debtors* [ECF No. 8474]; (b) *Alternative Dispute Resolution Procedures Order for Affirmative Claims of Debtors Under Derivatives Contracts* [ECF No. 5207]; (c) *Tier 2 Alternative Dispute Resolution Procedures Order for Affirmative Claims of Debtors Under Derivatives Contracts for Amounts Not More than $1 Million* [ECF No. 11649]; and (d) *Alternative Dispute Resolution Procedures Order for Affirmative Claims of the Debtors Under Derivatives Transactions with Special Purpose Vehicle Counterparties* [ECF No. 14789].

64.   <u>Claims Settlement Procedures</u>.  The following Court orders permitting the Debtors to compromise and settle Claims against the Debtors shall continue to apply and be binding on all parties following the Effective Date through the Closing Date:  (a) *Order Pursuant to Sections 105 and 365 of the Bankruptcy Code to Establish Procedures for the Settlement or Assumption and Assignment of Prepetition Derivative Contracts* [ECF No. 2257], and all supplements to such order and (b) *Order Pursuant to Section 105(a) of the Bankruptcy Code and Bankruptcy Rules 3007 and 9019(b) Approving Settlement Procedures* [ECF No. 7936].

65.   <u>Debtors' Right Under Bankruptcy Rule 2004</u>.  The Debtors' shall retain following the Effective Date the same rights they had prior to the Effective Date under

A474

Bankruptcy Rule 2004 and this Court's *Order Granting the Debtors Authority to Issue Subpoenas for the Production of Documents and Authorizing the Examination of Persons and Entities* [ECF No. 5910], shall remain in full force and effect following the Effective Date until the Closing Date.

66.    <u>Issuance of New Securities</u>.  The Plan Administrator, each Debtor or Debtor Controlled-Entity is authorized to (a) form and transfer certain assets of the Debtors and/or Debtor Controlled Entities to new (or utilize existing) entities, including, without limitation, one or more separately managed partnerships, REITs or other investment vehicles, to hold certain real estate or other assets of the Debtors and/or Debtor-Controlled Entities and, (b) issue New Securities for Distribution under the Plan.  In the event that the Plan Administrator issues New Securities, each holder of Allowed Claims or Equity Interests against a Debtor that contributed assets to the entity issuing New Securities shall receive the relevant New Securities as Distributions in accordance with the Plan.

67.    <u>Exemption from Securities Laws</u>.  The offering, issuance, or distribution of the New Securities in accordance with the Plan is exempt from the provisions of Section 5 of the Securities Act of 1933, as amended, and any state or local law requiring registration for the offer, issuance, or distribution of a security by reason of section 1145(a) of the Bankruptcy Code.

68.    <u>Exemption from Transfer Taxes</u>.  Pursuant to section 1146(a) of the Bankruptcy Code, (a) the issuance, transfer, or exchange of notes or equity securities, (b) the creation of any mortgage, deed of trust, lien, pledge, or other security interest, (c) the making or assignment of or surrender of any lease or sublease, or (d) the making of or delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with the Plan, and any merger agreements, agreements of restructuring, disposition or acquisition, liquidation or dissolution, any deeds, bills of sale, transfers of tangible property, or assignments executed in

A475

connection with any disposition or acquisition of assets contemplated by the Plan (including by a Liquidating Trust) in each case whether as a result of sale, assignment, foreclosure or deed-in-lieu of foreclosure, shall not be subject to any stamp, real estate transfer, mortgage recording, or other similar tax to which the exemption under section 1146 of the Bankruptcy Code applies.

69.    Governmental Approvals Not Required.  Except as otherwise expressly provided in this Confirmation Order, this Confirmation Order shall constitute all approvals and consents required, if any, by the laws, rules, or regulations of any state or any other governmental authority with respect to the implementation or consummation of the Plan and any documents, instruments, or agreements, and any amendments or modifications thereto, and any other acts referred to in or contemplated by the Plan, the Disclosure Statement, and any documents, instruments, or agreements, and any amendments or modifications thereto.

70.    Each federal, state, commonwealth, local, foreign, or other governmental agency is directed and authorized to accept the validity of (a) any and all documents, trust agreements, mortgages, and instruments and (b) all actions of the Plan Administrator and those acting on its behalf, that are necessary or appropriate to effectuate, implement, or consummate the transactions contemplated by the Plan, this Confirmation Order, and the agreements created or contemplated by the Plan, without payment of any recording tax, stamp tax, transfer tax, or similar tax imposed by state or local law.

71.    Structured Securities.  As provided in the Structured Securities Procedures Order, the Debtors are determining the Allowed amount of each Claim based on a Structured Security in accordance with the Structured Securities Valuation Methodologies.  In accordance with the Structured Securities Procedures Order, the Debtors sent notices of a proposed Allowed Claim amount ("Structured Securities Notices") to each holder of a Claim based on a Structured Security.  To the extent that holders of such Claims agreed with the proposed amount or did not

A476

respond by the established deadline (as such may have been extended by the Debtors), such Claim will be Allowed in the amount set forth on the Structured Securities Notice, subject to the Debtors' right to object to Claims based on Structured Securities on the grounds that such claims do not include a blocking number or include an invalid blocking number, are duplicative of other claims, have been amended and superseded, or otherwise do not comply with the provisions of the Bar Date Order is fully preserved; *provided* that, the Allowed amount of such Claims may be increased to the extent that in connection with the resolution of a disputed Structured Securities Notice, the Debtors determine that the value of a structured security is greater than the amount previously proposed by the Debtors. As indicated in paragraph 44 hereof, holders of Convenience Claims or Convenience Guarantee Claims shall not be entitled to any increase in the Allowed amount of their Claims.

72.    <u>Final Fee Applications</u>.  Pursuant to Section 2.2 of the Plan, all entities seeking an award by the Court of compensation for services rendered or reimbursement of expenses incurred through and including the Effective Date under sections 327, 328, 330, 331, 503(b)(2), 503(b)(3), 503(b)(4), or 503(b)(5) of the Bankruptcy Code (i) shall file their respective final applications for allowance of compensation for services rendered and reimbursement of expenses incurred by the date that is one hundred twenty (120) days after the Effective Date, and (ii) shall be paid in full in such amounts as are Allowed by the Court (A) on the date on which the order relating to any such application is entered, or as soon thereafter as practicable, or (B) upon such other terms as may be mutually agreed upon between the claimant and the Debtors.

73.    The Debtors are authorized to pay, in the ordinary course of business and without the need for Court approval, the reasonable fees and expenses, incurred after the

A477

Effective Date, of the professional persons employed by the Debtors and the Creditors'
Committee.

74. <u>Fees and Expenses of Indenture Trustees and Creditors' Committee</u>
<u>Members</u>.  The reasonable fees and expenses, including attorneys' fees, of (i) the indenture
trustees for the Senior Notes and the Subordinated Notes issued by LBHI and the (ii) individual
members of the Creditors' Committee shall be paid in accordance with Section 6.7 of the Plan
upon application to, and subject to approval of, the Bankruptcy Court, after reasonable notice to
and with opportunity to object for the United States Trustee and all parties in interest; *provided,*
that nothing in the Plan or this Confirmation Order shall affect any party in interest's right to
object to or defend any such application.  All objections to any such application are expressly
reserved, including, without limitation, any objections regarding the appropriate legal standard
for such applications, and any objections that payment of such fees is unauthorized under the
Bankruptcy Code and Bankruptcy Rules.

75. <u>Definition of Equity Interests</u>.  The definition of Equity Interest included
in the Plan is without prejudice to the Debtors' rights to object to, or seek to subordinate, any
Claim, and any Creditor's rights to defend against such action.

76. <u>Retention of Litigation Claims</u>.  Except as expressly provided in the Plan,
nothing contained in the Plan or herein shall be deemed to be a waiver or the relinquishment of
any rights, defenses or Litigation Claims that the Debtors may have or choose to assert on behalf
of their respective estates under any provision of the Bankruptcy Code or any applicable
nonbankruptcy law that the Debtors had prior to the Effective Date, including, without limitation,
(a) any and all Claims against any person or entity, to the extent such person or entity asserts a
crossclaim, counterclaim, and/or Claim for setoff which seeks affirmative relief against the
Debtors, their officers, directors, or representatives, (b) any and all Claims or rights arising under

A478

any tax sharing agreement among the Debtors and their Affiliates, (c) any and all Claims for reimbursement of costs incurred for the benefit of any Affiliate, including in connection with the disposition of an Affiliate's assets; (d) any and all Avoidance Actions, and (e) any right of setoff or other legal or equitable defense and remedies.  The Debtors shall have, retain, reserve, and may assert all such rights, defenses or Litigation Claims after the Effective Date fully as if the Chapter 11 Cases had not been commenced.

       77.   <u>Retention of Jurisdiction</u>. This Court may properly and, upon the Effective Date shall, consistent with Article XIV of the Plan, retain exclusive jurisdiction over all matters arising under or related to, the Chapter 11 Cases, including, without limitation, the matters set forth in Article XIV of the Plan.

       78.   <u>Debtors' Rights of Subrogation</u>.

       a.   Except as otherwise agreed by the Debtors, to the extent that a Debtor now has or becomes legally entitled to be subrogated to the rights of any Creditor, including on account of any Distributions received by holders of Allowed Guarantee Claims that are satisfied in full in accordance with Section 8.13(a) of the Plan, (i) such Creditor shall be deemed to have consented to the subrogation of its right against any third-party, including, without limitation, a Primary Obligor, that may be obligated to reimburse or indemnify the Debtor for all or a portion of such Distribution, or (ii) the Debtor shall have all rights, title and power as subrogee of the Creditor against any such third-party, including, without limitation, a Primary Obligor, to the fullest extent permitted by applicable law.

       b.   Except as otherwise agreed by the Debtors, the Debtors' rights to assert or prosecute Litigation Claims for reimbursement, indemnification, recoupment or any similar right, including, without limitation, any right to setoff with respect to any of the foregoing, against any entity, including, without limitation, a Primary Obligor, on account of

A479

Distribution made to the holders of Allowed Claims or Allowed Guarantee Claims, shall be fully preserved to the fullest extent permitted by applicable law.

79.     The Debtors' rights to assert or prosecute Litigation Claims for reimbursement, indemnification, recoupment or any other similar right, including, without limitation, any right to setoff with respect to any of the foregoing, against any entity, including, without limitation, a Primary Obligor, on account of Distributions made to the holders of Allowed Claims or Allowed Guarantee Claims, shall be fully preserved to the fullest extent permitted by applicable law.

80.     <u>Trading Restrictions</u>.  The restrictions imposed by the *Order Pursuant to Sections 105(a) and 362 of the Bankruptcy Code Approving Restrictions on Certain Transfers of Interests in the Debtors' Estates and Establishing Notification Procedures Relating Thereto* [ECF No. 1386], as the same may be amended from time to time, shall remain effective and binding through the closing of LBHI's Chapter 11 Case.

81.     <u>Equity Interests in LBHI</u>.  On the Effective Date, the LBHI Stock shall be canceled and one new share of LBHI common stock shall be issued to the Plan Trust which will hold such share for the benefit of the holders of such former LBHI Stock consistent with their former relative priority and economic entitlements; *provided, however*, that the Plan Trust may not exercise any voting rights appurtenant thereto in conflict with Article VII of the Plan.

82.     <u>Equity Interests in Subsidiary Debtors</u>.  On the Effective Date, the Equity Interests in each of the Subsidiary Debtors shall be unaffected by the Plan, in which case the Debtor holding such Equity Interests shall continue to hold such Equity Interests.

83.     <u>Nonoccurrence of Effective Date</u>.  In the event that the Effective Date does not occur, then (a) the Plan, (b) the assumption or rejection of executory contracts or unexpired leases pursuant to the Plan, (c) any document or agreement executed pursuant to the

58

A480

Plan, and (d) any actions, releases, waivers, or injunctions authorized by this Confirmation Order

or any order in aid of consummation of the Plan shall be deemed null and void; *provided* that this

paragraph shall not have any affect on any provisions of the Bilateral Settlement agreements, if

any, that survive the termination of such agreements.  In such event, nothing contained in this

Confirmation Order, any order relating to consummation of the Plan, or the Plan, and no acts

taken in preparation for consummation of the Plan shall be (i) deemed to constitute a waiver or

release of any Claims or Equity Interests by or against the Debtors or any other person or

entities, to prejudice in any manner the rights of the Debtors or any person or entity in any

further proceedings involving the Debtors or otherwise, or to constitute an admission of any sort

by the Debtors or any other persons or entities as to any issue, or (ii) construed as a finding of

fact or conclusion of law in respect thereof.

   84. <u>Notice of Entry of Confirmation Order</u>.  On or before the thirtieth (30th)

Business Day following the date of entry of this Confirmation Order, the Debtors shall serve

notice of entry of this Confirmation Order (which, in the Debtors' discretion, may be combined

with the Notice of the Effective Date) pursuant to Bankruptcy Rules 2002(f)(7), 2002(k), and

3020(c) on all Creditors and interest holders, the United States Trustee, and other parties in

interest, by causing notice of entry of the Confirmation Order (the "<u>Notice of Confirmation</u>"), to

be delivered to such parties by first-class mail, postage prepaid.  The notice described herein is

adequate under the particular circumstances, and no other or further notice is necessary.  The

Debtors also shall cause the Notice of Confirmation to be published as promptly as practicable

after the entry of this Confirmation Order once in each of *the Financial Times*, *The Wall Street

Journal* (Global Edition – North America, Europe, and Asia), and *The New York Times*

(National).

A481

85.   <u>Notice of Effective Date</u>.  Within five (5) Business Days following the occurrence of the Effective Date, the Plan Administrator shall file the notice of the occurrence of the Effective Date and shall serve a copy of same on the Master Service List, as defined in the *Second Amended Order Pursuant to Section 105(a) of the Bankruptcy Code and Bankruptcy Rules 1015(c) and 9007 Implementing Certain Notice and Case Management Procedures* [ECF No. 9635].

86.   <u>No Amendments to Proofs of Claim</u>.  After the Effective Date, other than a proof of Claim relating to an executory contract or unexpired lease that is rejected pursuant to the Plan, a proof of Claim relating to a prepetition Claim may not be filed or amended without the authority of the Court.

87.   <u>Barclays Sale Order</u>.  Nothing contained in the Plan, the Disclosure Statement or the Confirmation Order constitutes or shall be construed as any modification or amendment to the Barclays Sale Order and the rights and defenses of each of the Debtors, the SIPA Trustee (on behalf of LBI), Barclays Bank PLC and Barclays Capital Inc., with respect to any litigation, adversary proceeding, contested matter, claims adjudication, appeal or other dispute against the other are fully preserved, including, without limitation, any rights, defenses, counterclaims and/or cross-claims asserted in connection with or related to the Sale Order.

88.   <u>Payment of Statutory Fees</u>.  On the Effective Date and thereafter, the Plan Administrator and any Liquidating Trustee thereafter appointed, shall pay all fees incurred pursuant to Section 1930 of title 28, United States Code, together with interest, if any, pursuant to Section 3717 of title 31, United States Code for each Debtor's case, or until such time as a final decree is entered closing a particular Debtor's case, a Final Order converting such Debtor's case to a case under Chapter 7 of the Bankruptcy Code or a Final Order dismissing such Debtor's case is entered.

A482

89. <u>Effectiveness of Plan Provisions</u>.  Each term and provision of the Plan, as it may have been altered or interpreted by the Bankruptcy Code in accordance with section 15.13, is valid and enforceable pursuant to its terms.

90. <u>Immediate Effectiveness</u>.  Any stay of this Order provided by any Bankruptcy Rule, including Bankruptcy Rule 3020(e) is hereby waived, and the terms and provisions of this Order shall be immediately effective and enforceable upon its entry.

91. <u>Conflicts Between Order and Plan</u>.  To the extent of any inconsistency between the provisions of the Plan and this Confirmation Order, the terms and provisions contained in this Confirmation Order shall govern.  The provisions of this Confirmation Order are integrated with each other and are nonseverable and mutually dependent unless expressly stated by further order of the Court.

Dated: New York, New York
      December 6, 2011

                  *s/ James M. Peck*
                  HONORABLE JAMES M. PECK
                  UNITED STATES BANKRUPTCY JUDGE

A483

Rex Wu
6315 N Campbell
Chicago, IL 60659
312-785-0348
REX-WU@LIVE.COM

**RECEIVED**

APR - 8 2019

**U.S. BANKRUPTCY COURT, SDNY**

UNITED STATES BANKRUPTCY COURT SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Rex Wu, | ) **Case No.: 08-13555 (SCC)** |
| vs. | ) **(Jointly Administered)** |
| Lehman Brothers Holdings INC., | ) |
| et al, | ) |
| Debtors. | ) |

---

**NOTICE OF MOTION FOR AN ORDER ENFORCING THE MODIFIED THIRD AMENDED JOINT CHAPTER 11 PLAN OF LEHMAN BROTHERS HOLDINGS INC. AND ITS AFFILIATED DEBTORS FOR PURPOSES OF DISTRIBUTIONS**

Rex Wu (Pro Se) hereby file this motion for an order enforcing the Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and Its Affiliated Debtors [Docket#23023-1] (the "Plan") and the order confirming the Plan [Docket# 23023] (the "Confirmation Order") with respect to claims held by Lehman Brothers Holdings Capital Trust III ("LEHKQ"), Lehman Brothers Holdings Capital Trust IV ("LEHLQ"), Lehman Brothers Holdings Capital Trust V ("LHHMQ") and Lehman Brothers Holdings Capital Trust VI ("LEHNQ")for purposes of receiving distributions under the Plan. *Rex Wu (Pro Se) respectfully state as follows:*

**A484**

## Preliminary Statement

1. Rex Wu purchased his Lehman Brothers Holdings Capital Trust preferred shares (LEHKQ, LEHLQ, LMMHQ, LEHNQ) from the open market.

2. The Lehman Brothers Holdings Capital Trusts Preferred Shares previously traded on the NASDAQ stock exchange and currently still trading on the OTC (Over the Counter) Pinksheets exchange.

3. Rex Wu researched each of the Prospectus of LEHKQ, LEHLQ, LHHMQ, LEHNQ and "The Plan" [Docket# 23023-1]. LEHKQ, LEHLQ, LHHMQ AND LEHNQ currently have an unsecured subordinate debt claim in Class 10B of "The Plan" with their distributions reallocated to higher classes and are stated as unlikely to receive any distributions under "The Plan."

4. LEHKQ, LEHLQ, LHHMQ AND LEHNQ also are entitled to file a claim to enforce the "GUARANTEE" as stated in the Prospectus of LEHKQ, LEHLQ, LHHMQ AND LEHNQ. The holders of LEHKQ, LEHLQ, LHHMQ AND LEHNQ are entitled to file a claim to enforce the "GUARANTEE" which the Guarantee Trustee failed to file. **(EXHIBIT A). "If the guarantee trustee fails to enforce the guarantee trustee's rights under the guarantee, any holder of related preferred securities may directly sue Lehman Brothers Holdings to enforce the guarantee trustee's rights under the guarantee without first suing the trust, the guarantee trustee or any other person."**

5. Rex Wu who is the owner of shares of LEHKQ, LEHLQ, LHHMQ AND LEHNQ is exercising his right under the Prospectus of LEHKQ, LEHLQ, LHHMQ AND LEHNQ and the "THE PLAN" [Docket# 23023-1] to enforce the "GUARANTEE."

6. LEHKQ, LEHLQ LHHMQ AND LEHNQ are:

   - "On a parity with the most senior preferreds or preference stock now or hereafter issued by Lehman Brothers Holdings and with any guarantee now or hereafter entered into by Lehman Brothers Holdings in respect of any preferred securities of any affiliate of Lehman Brothers Holdings, and
   - Senior to Lehman Brothers Holdings common stock……"

7. LBHI's Capital Trusts III, IV, V, and VI Global Guarantee/Resolution claims are in parity with or rank higher than LBHI's, LBSF's or LBCC's corresponding guaranteed debt claims that were paid in 2014. (Docket#46304)

8. LBHI and JPMCB/JPMSI are codebtors and thus affiliates in this bankruptcy via common control. JPMCB/JPMSI guaranteed the claims of all its affiliates with LBHI's September 9, 2008 Guarantee and Security Agreement. Therefore, my CTs guaranteed claims are parity with the CTs held by JPMSI or JPMCB affiliates per the CTs relevant prospectus. (Docket #59555)

9. Rex Wu seeks just payment from LBHI for any payments made to parity senior preferred or preference stock now or hereafter issued by Lehman Brothers Holdings and with any guarantee now or hereafter entered into by Lehman Brothers Holdings in respect of any preferred securities of any affiliate of Lehman Brothers Holdings.

2 of 41

10. Rex Wu seeks approval and granting of the Proof of Claim.  (Exhibit D)

## Jurisdiction and Venue

11. The United States Bankruptcy Court for the Southern District of New York (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, and Article XIV, Section 14.1(h) of the Plan.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This is a core proceeding under 28 U.S.C. §§ 157(b).  The statutory bases for the relief requested in this motion are sections 105(a) and 1141 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code").

## Background

A. **Enforce Lehman Brothers Capital Trust III ("LEHKQ"), Lehman Brothers Capital Trust IV ("LEHLQ"), Lehman Brothers Capital Trust V ("LHHMQ") and Lehman Brothers Capital Trust VI's ("LEHNQ") Prospectus.**
   "If the guarantee trustee fails to enforce the guarantee trustee's rights under the guarantee, any holder of related preferred securities may directly sue Lehman Brothers Holdings to enforce the guarantee trustee's rights under the guarantee without first suing the trust, the guarantee trustee or any other person."

B. **The Chapter 11 Filing and Bar Date Order.**

12. On September 15, 2008, LBHI and, shortly thereafter, several of its subsidiaries (collectively, the "Debtors") commenced these chapter 11 cases, 2008 (the "Petition Date").  The Debtors' chapter 11 cases were consolidated for administrative purposes.

13. On July 2, 2009, the Court entered an order [Docket# 4271] (the "Bar Date Order"), which set September 22, 2009, as the general deadline by which to file proofs of claim (the "Bar Date"), with one exception pertinent here:  entities appearing on the "Exempt Entities List," **(Exhibit B)**, "are not required to file a Proof of Claim on or before the Bar Date."  The Four Capital Trusts at issue here, "Lehman Brothers Holdings Capital Trust III" (i.e., LEHKQ), "Lehman Brothers Holdings Capital Trust IV" (i.e. LEHLQ), Lehman Brothers Holdings Capital Trust V" (i.e. LHHMQ) and "Lehman Brothers Holdings Capital Trust VI" (i.e. LEHNQ), are identified on the Exempt Entities List.

14. Rex Wu's LEHKQ, LEHLQ, LHHMQ and LEHNQ are EXEMPTED from the Bar Date Order. **(Exhibit B)**

15. Based on each individual Prospectus, the Redemption Value is $25.  **(Exhibit C)**

16. Pursuant to Article 11.1 of the Plan, Class 10B or LEHKQ, LEHLQ, LHHMQ, AND LEHNQ were deemed rejected on the Effective Date, except as otherwise set forth in Article 11.1.  The Bar Date Exemptions exempts LEHKQ, LEHLQ, LHHMQ, and LEHNQ from the deadline to file a claim.  The LEHKQ, LEHLQ, LHHMQ AND LEHNQ PROSPECTUS entitles the holders of the exempted Capital Trusts to bring action to enforce the "Guarantee" and file the Guarantee Claim.

A486

### The Plan and Confirmation Order

17. The Plan and the Confirmation Order entered on December 6, 2011, make no specific reference to the "Guarantee". The Guarantee Trustee have not enforced the Guarantee of the "Exempt Entities" LEHKQ, LEHLQ, LHHMQ AND LEHNQ. The Bar Date does not apply to "Exempt Entities." (Docket #59409)

### Argument

Rex Wu who is the owner of shares of LEHKQ, LEHLQ, LHHMQ AND LEHNQ is exercising his right under the Prospectus of LEHKQ, LEHLQ, LHHMQ AND LEHNQ and the "THE PLAN" [Docket# 23023-1] to enforce the "GUARANTEE" and Guarantee Claims.

Lehman Brothers Holdings Capital Trust III, Lehman Brothers Holdings Capital Trusts IV, Lehman Brothers Holdings Capital Trusts V and Lehman Brothers Holdings Capital Trusts VI are "Exempted Entities" on the "Exempted Entities" List and are not bound to the Bar Date Order.

With Respect to the Confirmation Order and the Bar Date Order. For all of the following reasons, I respectfully request that the Court grant this motion.

I. THE COURT SHOULD ENFORCE THE CONFIRMATION ORDER AND PLAN TO REQUIRE THE PLAN ADMINISTRATOR TO ACCEPT THE GUARANTEE CLAIMs AS CLASS 4B OR THE BEST CLASS DETERMINED.

#### A. The Court Has Jurisdiction To Enforce The Plan.

18. Pursuant to the Confirmation Order, this Court retained exclusive jurisdiction to enforce the Confirmation Order and the Plan, and over all matters arising under or related to these chapter 11 cases. (See Confirmation Order, ¶ 77; Plan, Art. 14.1.) The Plan and the Confirmation Order contain mechanisms for the claims allowance process, including allowance, liquidation, reserves, and distribution procedures. (See Plan, Art. VIII ("Provisions Regarding … Distributions Under the Plan"), Art. IX ("Procedures for Treating Disputed Claims"); Confirmation Order, ¶¶ 40-45 ("Distributions and Reserves")). Moreover, any dispute over what claims needed to be filed (or did not need to be filed, as the case may be) pursuant to the Bar Date Order arises under the Bankruptcy Code because "it is a proceeding that, by its nature, could arise only in the context of a bankruptcy case." In re Leco Enters., 144 B.R. 244, 248-49 (S.D.N.Y. 1992). Moreover, the Court retains jurisdiction to enforce its own orders, including the Confirmation Order and the Bar Date Order. Travelers Indem. Co. v. Bailey, 557 U.S. 137, 151 (2009) ("[T]he Bankruptcy Court plainly had jurisdiction to interpret and enforce its own prior orders."). (Docket #59409)

#### B. Applicable Law

19. Enforcing the Plan is appropriate because "a confirmed plan holds the status of a binding contract as between the debtor and its creditors." In re Victory Markets, Inc., 221 B.R. 298, 303 (B.A.P. 2d Cir. 1998) (citing McFarland v. Leyh (In re Texas Gen. Petroleum Corp.), 52 F.3d 1330, 1335 (5th Cir. 1995); In re Sugarhouse Realty, Inc., 192 B.R. 355, 362 (E.D. Pa. 1996)); see also 11 U.S.C. § 1141(a) ("[T]he provisions of a confirmed plan bind the debtor, any entity issuing securities under the plan, any entity

acquiring property under the plan, and any creditor, equity security holder, or
general partner in the debtor."). (Docket #59409)

**C. LEHKQ, LEHLQ, LHHMQ AND LEHNQ Were Not Required To File Proofs Of Claim To Preserve The Guarantee and Guarantee Claims**

20. The Plan contains various mechanisms and procedures regarding claims
against any of the Debtors, including allowance, liquidation, reserve, and
distribution provisions. (See Plan, Art. VIII ("Provisions Regarding …
Distributions Under the Plan"), Art. IX ("Procedures for Treating Disputed
Claims"); Confirmation Order, ¶¶ 40-45 ("Distributions and Reserves").) LBHI
is required to maintain appropriate reserves for disputed claims and make
distributions on account of allowed claims. (See Plan, Art. 8.4.) (Docket
#59409)

21. LEHKQ, LEHLQ, LHHMQ and LEHNQ were not required to file proofs of claim
against the Debtors under the Bar Date Order. The Bar Date Order includes a
carve-out from the proof of claim filing requirements for entities listed on
the Exempt Entities List, on which LEHKQ, LEHLQ, LHHMQ and LEHNQ appear. (See
Bar Date Order ("[T]he following persons or entities are not required to file
a Proof of Claim on or before the Bar Date: [. . . ] any entity included on the
Exempt Entities List[.]"). The Confirmation Order and the Plan do not
specifically alter the carve-out included in the Bar Date Order with respect to
the Guarantee and the Guarantee Claims.

22. In fact, the Plan and the Confirmation Order preserve the Guarantee Claims.
A "Claim" under the Plan is as defined under the section 101(5) of the
Bankruptcy Code, which does not require that a proof of claim be filed. (Plan,
Art. 1.22.) The Plan's allowance and dispute provisions then address the
treatment of various claims. (See Plan, Art. 1.4, Art. 1.46.) These
provisions do not specifically state whether the claims of "Exempt Entities"
are "allowed" or "disputed," where such claims were listed in the Schedules and
where the Bar Date Order did not require the filing of a proof of claim. But
certainly nothing in the Plan explicitly eliminates the Guarantee and the
Guarantee Claims. (Docket #59409)

23. The Debtors' actions during the confirmation process illustrate that, when
the Debtors wanted to, they knew how to require certain originally-denominated
Exempt Entities to have to file a proof of claim after the Bar Date, but they
did not impose that requirement on the "GUARANTEE" and Guarantee Claims of
LEHKQ, LEHLQ, LHHMQ AND LEHNQ.

24. Because LEHKQ, LEHLQ, LHHMQ AND LEHNQ'S "GUARANTEE" and Guarantee claims
were not expressly disallowed or extinguished by virtue of the Confirmation
Order and the Plan, the Bar Date Order carve-out still controls with respect to
the Guarantee Claims. Because LEHKQ, LEHLQ, LHHMQ AND LEHNQ are exempt from
having to file a proof of claim under the Bar Date Order, their Guarantee
Claims are preserved without having to file a proof of claim at any time,
before or after the Bar Date. (See Plan, Art. 1.4. (a "Claim" is "Allowed"
under the Plan if it "is not Disputed").) The Court should accordingly
enforce the Confirmation Order and the Plan with respect to the Guarantee
Claims, which contain allowance, reserve, and distribution procedures regarding
unresolved claims.

**D. The Plan Administrator Must Apply the Plan's Claim Provisions to Lehman Brothers Holding's Guarantee Claims.**

25. I believe that on a going-forward basis the Plan Administrator

must apply the Plan's claim provisions (including the dispute mechanism and reserve provisions) to LEHKQ, LEHLQ, LHHMQ, LEHNQ'S GUARANTEE Claims as timely filed claims, until such time as the parties can attempt to reach a consensual resolution of the Claims under the Guarantee or absent such resolution, seek adjudication of LEHKQ, LEHLQ, LHHMQ, and LEHNQ'S GUARANTEE Claims by the Court. Notably, I am not seeking that the Plan Administrator claw back any previous distribution to create a reserve for the Guarantee Claims, and instead are seeking solely to have the Guarantee Claims addressed (and, if necessary, appropriately reserved for) on a going-forward basis. (Docket #59409)

26. For example, the Confirmation Order provides that "pursuant to Section 8.4 of the Plan, the Debtors shall reserve an aggregate amount equal to the Pro Rata Share of the Distributions that would have been made to each holder of a Disputed claim if such Disputed claim were an Allowed Claim against such Debtor[.]" (Confirmation Order ¶ 42; see also Plan, Art. 8.4.) A "Claim" under the Plan is as defined under the section 101(5) of the Bankruptcy Code. A Claim is "Allowed" under the Plan if it "is not Disputed." (Plan, Art. 1.4.) A Claim is "Disputed" if "any Claim proof of which was timely and properly filed . . . as to which a timely objection . . . has been interposed, which objection . . . has not been withdrawn or determined by a Final Order." (Plan, Art. 1.46.) Here, no objection has been filed with respect to LEHKQ, LEHLQ, LHHMQ AND LEHNQ's Guarantee Claims, and no provision of the Plan or the Confirmation Order otherwise explicitly disallows them, notwithstanding the Bar Date Order. (Docket #59409)

**E. ENFORCING THE PLAN WILL NOT PREJUDICE THE PLAN ADMINISTRATOR'S ADMINISTRATION OF THE LBSF OR LBHI ESTATE.**

27. Although I request for relief is supported—and should be governed entirely—by the Bar Date Order, the Plan, and the Confirmation Order, I separately note that enforcement of the Plan's express provisions will not result in any prejudice to the Plan Administrators' administration of the LBHI estate. The relief sought by me would only affect prospective distributions under the Plan. (Docket #59409)

28. Moreover, the failure of the Debtors to alter the 2009 Bar Date Order carve-out with respect to the claims of LP IV and LP V was entirely one of LBHI's own making. After the Petition Date, the Partnerships (at that time ultimately controlled by LBHI) never commenced their own separate insolvency proceedings, unlike many of LBHI's other foreign affiliates and subsidiaries. (See Debtors' Disclosure Statement for Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and Its Affiliated Debtors Pursuant to Section 1125 of the Bankruptcy Code, Art. VI.F.4 ("Cross-Border Insolvency Protocol / Negotiations With Foreign Debtors"). (Docket #59409)

29. As a result, I file this motion to seek direction and certainty from this Court as to the status of the Guarantee and the Guarantee Claims arising from LEHKQ, LEHLQ, LHHMQ AND LEHNQ.

6 of 41

A489

WHEREFORE, subject to the conditions set forth herein, Rex Wu respectfully request that the Court enforce the provisions of the Confirmation Order and the Plan with respect to the Guarantee and the Guarantee Claims being requested in relations to LEHKQ, LEHLQ, LHHMQ AND LEHNQ against LBHI.

.

Dated this 5th day of July, 2019

_____

Rex Wu
6315 N Campbell
Chicago, IL 60659

**Exhibits Intentionally Omitted Due to File Size**

Rickey M. Gregory
7090 FM 141
Dime Box, Texas 77853
Telephone: (512) 417-6312
Email: rickeygregory4477@gmail.com
Pro-se

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

In re                                          Chapter 11

LEHMAN BROTHERS HOLDINGS INC., et al.,   Case No. 08-13555 (SCC)

Debtors.                                       Jointly Administered


**JOINDER of Rickey M. Gregory to  Motion of Rex Wu to Approve Motion for an Order
Enforcing the Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings
Inc. and its Affiliated Debtors for Purposes of Distributions filed by Rex Wu on April 08,
2019 [Docket # 59614].**


Rickey M. Gregory, hereby joins in the motion filed on April 08, 2019 [Doc. No. 59614] (the
"Motion") by  Rex Wu to Approve Motion for an Order Enforcing the Modified Third Amended Joint
Chapter 11 Plan of Lehman Brothers Holdings Inc. and its Affiliated Debtors for Purposes of
Distributions filed by Rex Wu on April 08, 2019 [Docket # 59614],
 and respectfully represents as follows:

1. Like Rex Wu, Rickey M. Gregory holds LBHI's Preferred Securities: LEHKQ, LEHLQ, LEHNQ
and LHHMQ issued by Lehman Brothers Holdings Capital Trust 3, 4, 5 and 6.

2. Rickey M. Gregory hereby adopts and incorporates all of the arguments raised in the Motion
as if such arguments were set forth herein and asserted by Rickey M. Gregory. As Rex Wu
correctly argues in the Motion, the relief requested in the Motion is supported by, among other
things, the plain language of the confirmed Plan and applicable bankruptcy law.

3. Rickey M. Gregory reserves all rights to be heard before the Court; via CourtCall at the hearing
scheduled for May 30, 2019 at 11:00am; with regard to the issues
raised in the Motion and this Joinder. Rickey M. Gregory reserves all of his rights and remedies,
and nothing contained in this Joinder shall constitute an admission by Rickey M. Gregory for any
other purpose or a waiver of any rights or remedies available to Rickey M. Gregory.
WHEREFORE, Rickey M. Gregory joins in Rex Wu's Motion and respectfully
requests that this Court approve the Motion in its entirety.

Dated: April 24, 2019

Respectfully submitted,
Rickey M. Gregory
By: /s/ Rickey M. Gregory

Rickey M. Gregory
7090 FM 141
Dime Box, Texas 77853

APR 25 2019

1/3

**A492**

**Exhibits Intentionally Omitted Due to File Size**

Dan Ianello
PO Box 796
Granger, IN 46530
Telephone: (574)514-7614
Email: dnello@yahoo.com
Pro-se



UNITED STATES BANKRUPTCY COURT
SOUTHERN DISCTRICT OF NEW YORK

In Regards: <u>Chapter 11 - LEHMAN BROTHERS HOLDINGS INC., et al., Case No. 08-13555 (SCC)</u>

Debtors.      Jointly Administered

**JOINDER of Dan Ianello to Motion of Rex Wu to Approve Motion for an Order Enforcing the Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and its Affiliated Debtors for Purposes of Distributions filed by Rex Wu on April 08, 2019 (Docket# 59614)**

Dan Ianello, hereby joins in the motion filed on April 08, 2019 (Docket# 59614, the "Motion") by Rex Wu to Approve Motion for an Order Enforcing the Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and its Affiliated Debtors for Purposes of Distributions filed by Rex Wu on April 08, 2019 (Docket# 59614) and respectfully represents as follows:

1. Like Rex Wu and Rickey M. Gregory, Dan Ianello holds LBHI's Preferred Securities: LEHKQ, LEHLQ, LEHNQ and LEHHMQ issued by Lehman Brothers Holdings Capital Trust 3,4,5 and 6.

2. Just as Rickey M. Gregory, Dan Ianello hereby adopts and incorporates all of the arguments raised in the Motion as if such arguments were set forth herein and asserted by Dan Ianello. As Rex Wu correctly argues in the Motion, the relief requested in the Motion is supported by, among other things, the plain language of the confirmed Plan and applicable bankruptcy law.

3. Dan Ianello reserves all rights to be heard before the Court; via CourtCall at the hearing scheduled for May 30, 2019 at 11:00am; with regard to the issues raised in the Motion and this Joinder. Dan Ianello reserves all of his rights and remedies, and nothing contained in this Joinder shall constitute an admission by Dan Ianello for any other purpose or a waiver of any rights or remedies available to Dan Ianello. WHEREFORE, Dan Ianello joins in Rex Wu's Motion and Rickey M. Gregory's Joinder and respectfully requests that this Court approve this Motion in its entirety.

Dated May 16, 2019

Respectfully submitted,
Dan Ianello
By:/s/Dan Ianello

Dan Ianello
PO Box 796
Granger, IN 46530
Telephone: (574)514-7614
*Email:* dnello@yahoo.com
Pro-se

1 OF 2

A494

**Exhibits Intentionally Omitted Due to File Size**

Julie Ianello
PO Box 796
Granger, IN 46530
Telephone: (574)360-9056
Email: jnello23566@gmail.com
Pro-se



UNITED STATES BANKRUPTCY COURT
SOUTHERN DISCTRICT OF NEW YORK

In Regards:  Chapter 11 - LEHMAN BROTHERS HOLDINGS INC., et al., Case No. 08-13555 (SCC)

Debtors.       Jointly Administered

**JOINDER of Julie Ianello to Motion of Rex Wu to Approve Motion for an Order Enforcing the Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and its Affiliated Debtors for Purposes of Distributions filed by Rex Wu on April 08, 2019 (Docket# 59614)**

Julie Ianello, hereby joins in the motion filed on April 08, 2019 (Docket# 59614, the "Motion") by Rex Wu to Approve Motion for an Order Enforcing the Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and its Affiliated Debtors for Purposes of Distributions filed by Rex Wu on April 08, 2019 (Docket# 59614) and respectfully represents as follows:

1.  Like Rex Wu and Rickey M. Gregory, Julie Ianello holds LBHI's Preferred Securities: LEHKQ, LEHLQ, LEHNQ and LEHHMQ issued by Lehman Brothers Holdings Capital Trust 3,4,5 and 6.

2.  Just as Rickey M. Gregory, Julie Ianello hereby adopts and incorporates all of the arguments raised in the Motion as if such arguments were set forth herein and asserted by Julie Ianello. As Rex Wu correctly argues in the Motion, the relief requested in the Motion is supported by, among other things, the plain language of the confirmed Plan and applicable bankruptcy law.

3.  Julie Ianello reserves all rights to be heard before the Court; via CourtCall at the hearing scheduled for May 30, 2019 at 11:00am; with regard to the issues raised in the Motion and this Joinder. Julie Ianello reserves all of her rights and remedies, and nothing contained in this Joinder shall constitute an admission by Julie Ianello for any other purpose or a waiver of any rights or remedies available to Julie Ianello. WHEREFORE, Julie Ianello joins in Rex Wu's Motion and Rickey M. Gregory's Joinder and respectfully requests that this Court approve this Motion in its entirety.

Dated May 16, 2019

Respectfully submitted,
Julie Ianello
By:/s/Julie Ianello

Julie Ianello
PO Box 796
Granger, IN 46530
Telephone: (574)360-9056
Email: jnello23566@gmail.com
Pro-se

1 oF 2

A496

**Exhibits Intentionally Omitted Due to File Size**

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Garrett A. Fail

Attorneys for Lehman Brothers Holdings Inc.
and Certain of Its Affiliates

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------x
In re                                                :        Chapter 11 Case No.
                                                     :
LEHMAN BROTHERS HOLDINGS INC., et al.,               :        08-13555 (SCC)
                                                     :
                        Debtors.                     :        (Jointly Administered)
-----------------------------------------------------------------x

## PLAN ADMINISTRATOR'S OBJECTION TO MOTION TO ALLOW LATE CLAIM

TO THE HONORABLE SHELLEY C. CHAPMAN,
UNITED STATES BANKRUPTCY JUDGE:

Lehman Brothers Holdings Inc. ("LBHI"), as Plan Administrator, files this objection to the *Motion for an Order Enforcing the Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and Its Affiliated Debtors for Purposes of Distributions* filed last month by Rex Wu ("Wu") (ECF No. 59614) (the "Motion") and respectfully represents:

### OBJECTION

1.      Wu seeks "approval and granting of [his] Proof of Claim" [Mot. ¶10] – a claim alleged for the first time in April 2019 as an attachment to his Motion.  Specifically, Wu seeks recovery on a claim of $662,780.77 based on guarantees issued by LBHI (each a "Subordinated Guarantee") in connection with securities issued by four separate trusts that owned subordinated debt issued by LBHI.  [*Id.* at Ex. D.]

2.      As set forth below, even if Wu was permitted to file his claim, and even if the claim was allowed, any liability for the claim would be subordinated in accordance with section 510(a) of the Bankruptcy Code to the level of preferred equity in LBHI; Wu would recover nothing from LBHI in these cases.[1]

3.      Nonetheless, Wu should not be permitted to file his claim.   Upon information and belief, Wu acquired his securities after entry of the confirmation order in 2011 and after consummation of the plan in these chapter 11 cases (the "Plan") in 2012.[2]  By that time, additional claims against LBHI based on the Subordinated Guarantees (held by the then-holder of Wu's securities) were subject to (not exempt from) a bar date.  Wu has not plead, and cannot establish, cause to permit the filing of a claim years after the bar date and possibly six years or more after Wu acquired the trust securities and his purported claim.  The Motion can be denied on this basis alone.

4.      Moreover, even if Wu could file a claim, the claim could not be allowed. As this Court held in 2011, LBHI has no liability for guarantee claims based on a Subordinated Guarantee.[3]  The Court has also recognized that claims like Wu's would be duplicative of allowed claims filed by the indenture trustees for the subordinated debt issued by LBHI linked to the securities issued by the four trusts in which Wu invested.  Indeed, the Court disallowed over 1,725 proofs of claim on that basis.  The Court would find the same is true for Wu's claim.  The Motion can be denied on these bases alone.

---

[1]  *Accord* ECF No. 27630 (order classifying guarantee claim based on Subordinated Guarantee for purposes of Distributions under the Plan as an LBHI Class 12 Equity Interest with consent of Debtors).

[2] Capitalized terms used but not defined herein have the meanings ascribed to such terms in the Plan.  [ECF No. 22737.]  Wu failed to disclose the date on which he acquired his claims and improperly redacted the attachments to the Motion.  Wu should disclose this information to the Court and parties in interest.

[3] *See e.g.*, ECF No. 23049 (order dated granting LBHI's 218th omnibus objection [ECF No. 20107] and disallowing and expunging claims based on a Subordinated Guarantee).

5.      Accordingly, the Motion should be denied with prejudice.

**The Trusts and the Subordinated Guarantees**

6.      The Court approved the disclosure statement for solicitation of votes on the Plan by order, dated September 1, 2011 [ECF No. 19631]. As described in the disclosure statement, as of August 31, 2008, the Debtors' long-term borrowing included billions of dollars of subordinated debt. [ECF No. 19629.]

7.      Claims against LBHI on account of LBHI's subordinated debt are classified in LBHI Class 10A, LBHI Class 10B, or LBHI Class 10C of the Plan. *See Id.* Holders of claims in LBHI Class 10A, LBHI Class 10B, or LBHI Class 10C "are not expected to receive any Distributions on account of such Claims." *Id.* "Any Distributions that would have been paid to such Claims are automatically redistributed to holders of [allowed senior unsecured claims against LBHI]." *Id.*

8.      Prior to the Commencement Date, certain issuances of LBHI's subordinated debt (the "Subordinated Debt") were acquired by certain trusts, which, in turn, issued securities (the "Trust Preferred Securities") to third parties. LBHI issued Subordinated Guarantees in connection with the issuance of the Trust Preferred Securities.

9.      Wu purports to have acquired Trust Preferred Securities in four trusts: Lehman Brothers Holdings Capital Trust III ("Capital Trust III"), Lehman Brothers Holdings Capital Trust IV ("Capital Trust IV"), Lehman Brothers Holdings Capital Trust V ("Capital Trust V"), and Lehman Brothers Holdings Capital Trust VI ("Capital Trust VI") (collectively, the "Trusts"). Each Trust held a separate issuance of Subordinated Debt.

10.     Wu alleges he reviewed the relevant prospectuses for the Trust Preferred Securities.[4]  *See* Mot. ¶3.  These prospectuses made clear with repeated references that:

a.  the Trusts' assets consisted exclusively of Subordinated Debt[5];

b.  the Trusts could only make payments on the Trust Preferred Securities if LBHI first makes payments on the Subordinated Debt[6];

c.  the Subordinated Guarantee does not cover payments when the Trust does not have sufficient funds to make payments on the Trust Preferred Securities.  In other words, if LBHI does not make a payment on the Subordinated Debt, the Trust will not have sufficient funds to make payments on the Trust Preferred Securities, and the Subordinated Guarantee will not obligate LBHI to make those payments on the Trust's behalf.[7]

d.  LBHI's obligations under the guarantee are subordinate to its obligations under all of its other liabilities.[8]

11.     The Subordinated Guarantees themselves likewise provide that:

[LBHI's] [g]uarantee will constitute unsecured obligations of [LBHI] and will rank (i) subordinate and junior in right of payment to all other liabilities of [LBHI], (ii) on a parity with the most senior preferred or preference stock… and (iii) senior to [LBHI's] common stock.[9]

---

[4] Copies of the prospectuses are available on the Court's docket.  [*See* ECF No. 20107.]  The Debtors will provide the Court with courtesy copies in advance of the hearing on the Motion.

[5] *See, e.g.,* LBH Capital Trust III prospectus supplement for 6.375% Preferred Securities, Series K, dated March 12, 2003 ("Prospectus III") at s-1 ("The trust that is issuing the preferred securities will have no assets other than subordinated debentures issued by Lehman Brothers Holdings."), *Id.* at s-7 ("The only assets of the trust will be the subordinated debentures."); LBH Capital Trust IV prospectus supplement for 6.375% Preferred Securities, Series L, dated October 9, 2003 ("Prospectus IV") at s-1, *Id.* at s-7; LBH Capital Trust Lehman Brothers Holdings Capital Trust V prospectus supplement for 6.00% Preferred Securities, Series M, dated April 1, 2003 ("Prospectus V") at s-1, *Id.* at s-7; LBH Capital Trust VI prospectus supplement for 6.24% Preferred Securities, Series N, dated January 5, 2005 ("Prospectus VI") at s-1, *Id.* at s-8.

[6] Prospectus III at s-1, s-5 ("[P]ayments under the subordinated debentures will be the sole source of income to the trust."); Prospectus IV at s-1 (same), s-5 (same); Prospectus V s-1 (same), s-5 (same); Prospectus VI s-1 (same), s-6 (same).

[7] *See* Description of the Guarantee, Prospectus III at page 20, Prospectus IV at page 21, Prospectus V at page 21, Prospectus VI at page 21.

[8] *See* Description of the Guarantee, Prospectus III at page 20, Prospectus IV at page 21, Prospectus V at page 21, Prospectus VI at page 21.

[9] *See e.g., id.*

## Bar Dates and Relevant Claims

12.    As set forth in the Motion, on July 2, 2009, this Court entered an order (the "Bar Date Order") [ECF No. 4271] setting forth the procedures and establishing September 22, 2009 (the "Bar Date") as the general deadline for filing proofs of claim in the Chapter 11 Cases.

13.    The indenture trustees for the Subordinated Debt linked to the Trust Preferred Securities filed proofs of claim on behalf of the holders of such securities prior to the Bar Date. These claims, identified in the chart below, were subsequently Allowed against LBHI:

| Claim No. | Allowed Amount | Plan Class | Applicable Trust |
|-----------|----------------|------------|------------------|
| 21805 | $314,207,499.10 | LBHI Class 10B | Capital Trust III |
| 22122 | $311,742,937.05 | LBHI Class 10B | Capital Trust IV |
| 22123 | $416,013,746.69 | LBHI Class 10B | Capital Trust V |
| 67753 | $234,250,517.60 | LBHI Class 10B | Capital Trust VI |

14.    Thus, as was intended, in this case, the indenture trustees for securities listed on the Bar Date Order's "Master List of Securities" filed a global proof of claim on behalf of all holders of such securities. It is therefore of no import that the Trusts appeared on the Bar Date Order's "Exempt Entities List" but did not file proofs of claim. The beneficial interests of the Trusts and the individual holders of Trust Preferred Securities were represented by more than $1 billion in Allowed claims against LBHI. [*See* Bar Date Order at 3, 5.]

15.    Wu didn't file a proof of claim prior to the Bar Date – because he did not hold any claim against LBHI prior to the Bar Date. But more than 1,725 proofs of claim were filed by other parties who purported to hold the Subordinated Debt and/or Trust Preferred Securities. The Court disallowed and expunged each of these claims as duplicative of the Allowed claims filed by the indenture trustee referenced above or, in several instances, as late claims.[10]  It

---

[10] *See, e.g.,* ECF Nos. 12671 (duplicative), 12893 (duplicative), 12835 (duplicative), 12676 (duplicative), 12527 (late), 12413 (late), 18427 (late), 19528 (late). Each of these Court orders and the corresponding motions was filed publicly on the Court's docket. In addition, as disclosed in its financial reports, from time to time LBHI publishes responses to questions received from creditors and other parties. A non-exhaustive review revealed that LBHI published

is possible that Wu acquired his Trust Preferred Securities from one of the parties whose claims against LBHI had been expunged.

16.     On December 6, 2011, the Court entered an order confirming the Plan (the "<u>Confirmation Order</u>").  [ECF No. 23023.]  The Confirmation Order provided: "After the Effective Date, … a proof of Claim relating to a prepetition Claim may not be filed … without the authority of the Court."  [Confirmation Order ¶ 86.]  This order applies whether or not the purported creditor was subject to the Bar Date, was a party listed on the Exempt Entities List, or was the holder of a security listed on the Master List of Securities.

## The Court Should Not Permit the Filing of A New Claim

17.     Styled as a motion to enforce the Plan, the Motion points to no provision of the Plan that mandates LBHI's consideration of a new claim.  Simply stated: no such provision exists.  The Confirmation Order directly contradicts the notion that parties may freely file new claims.  The Court may deny the Motion "to enforce the Plan" on this basis alone.

18.     Wu has not carried his burden to establish cause to allow him to file a claim. In exercising its discretion during the course of these cases to disallow hundreds of late-filed claims and to refuse new claims to be filed and existing claims to be amended, the Court has properly focused on (a) whether any delay in filing was in the creditors' control, (b) the impact on the administration of these mega cases, and (c) the impact on other creditors, notwithstanding the potential validity of the late or new claims.  *See e.g., In re Lehman Bros. Holdings Inc.*, 433 B.R. 113, 120 (Bankr. S.D.N.Y. 2010), aff'd sub nom. *CVI GVF (Lux) Master S.a.r.l. v. Lehman Bros.*

---

responses to questions regarding the Trusts and Trust Preferred Securities in February and October of 2014.  *See* https://dm.epiq11.com/case/LBH/documents.   LBHI disclosed then that, based on projected future cash flow estimates, holders of Trust Preferred Securities would not receive any recovery.

*Holdings Inc.*, 445 B.R. 137 (S.D.N.Y. 2011). Here, application of each of these factors militates

denial of Claimant's claims against the Debtors.

19.    <u>Control</u>:  Any delay in filing a claim was clearly within Wu's control.  Wu

does not and cannot argue otherwise.[11]

20.    <u>Impact on administration</u>:    The Court has repeatedly recognized the

deleterious impact of new claims on the administration of these mega cases.    The Plan

Administrator need not repeat all of the arguments it has made in the past in detail here.   "The

prejudice to the Debtors is not traceable to the filing of any single additional claim but to the impact

of permitting exceptions that will encourage others to seek similar leniency." *In re Lehman Bros.*

*Holdings Inc.*, 433 B.R. 113, 126 (Bankr. S.D.N.Y. 2010), aff'd sub nom. *CVI GVF (Lux) Master*

*S.a.r.l. v. Lehman Bros. Holdings Inc.*, 445 B.R. 137 (S.D.N.Y. 2011).[12] Granting the Motion will

open the floodgates for the thousands of similarly-situated, individual holders of Subordinated

Guarantees to file motions to allow claims and motions for reconsideration of the disallowance of

their prior claims.   Two parties have already filed a joinder to the Motion.[13]   Wu ignores the

incremental administrative expense required for analysis and any objection to each newly-asserted

claim.    As remaining amounts available for distribution continue to decrease over time, the

proportion of expense to creditor recovery continues to increase exponentially.   Wu's incredible

---

[11] As noted above, it is possible that Wu acquired his Trust Preferred Securities from a party who had, in fact, filed a proof of claim that was subsequently disallowed by the Court.  Without a blocking number, there is no way that LBHI would be able to determine legitimate ownership and eliminate the possibility of more than one party filing claims for the same interest.

[12] "Creditors act at their peril where they fail to adequately investigate and pursue their rights." *Id. Cf. In re Hooker Invs., Inc.*, 937 F.2d 833, 840 (2d Cir. 1991) (stating a deadline for asserting claims is more than a "procedural gauntlet" and functions as "an integral part of the reorganization process."); *In re Keene Corp.*, 188 B.R. 903, 907 (Bankr. S.D.N.Y. 1995) (same).

[13] Indeed, Wu's filing of the Motion and the parties' filings of their joinders, support the argument that LBHI made to deny another motion to allow new proofs of claim to be filed late in these cases. [*See* ECF No. 59549.] Wu appears to have been inspired by (and in fact copy blocks of text from) the filing of that other motion. [*Cf.* Mot. at ¶ 28 (referring to "the Partnerships" and "LP IV and LP V") with ECF No. 59409 at ¶ 36.]

assertion that there will not be "*any* prejudice to the … administration of the LBHI estate" is pure *ipse dixit* and should not alter the Court's established view.

21.   <u>Impact on creditors</u>:   Wu is wrong to conclude that because his request would "only affect prospective distributions under the Plan," there would be no negative effect on other creditors.  Mot. ¶ 27.  Admission and allowance of new claims clearly would dilute remaining recoveries for current creditors.  "Creditors must be able to learn what they will receive under a Plan . . . [f]ailure to [identify the creditor body] prejudices the entire community of interest . . ." *See In re Waterman S.S. Corp.*, 59 B.R. 724, 728 (Bankr. S.D.N.Y. 1986).  Here, the prejudice would be extraordinary given (a) the potential magnitude of additional claims that could be asserted (discussed above), and (b) LBHI has no liability for these claims, and even if it did, any liability would be subordinated to all other creditors of LBHI (discussed below).

**<u>Wu's Claim Cannot Be Allowed</u>**

22.   The Court has disallowed and expunged timely-filed claims similar to the claim asserted now by Wu on the basis that LBHI has no liability to Wu under the Subordinated Guarantee.  [*See* ECF Nos. 23049, 27630.]  The Court would find the same if Wu's claim were filed.  For this reason, the Motion should be denied.

23.   Section 502(b)(1) of the Bankruptcy Code provides, in relevant part, that a claim may not be allowed to the extent that "such claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law."  11 U.S.C. § 502(b)(1).  A proof of claim is "deemed allowed, unless a party in interest objects."  11 U.S.C. § 502(a).  If an objection refuting at least one of the claim's essential allegations is asserted, the claimant has the burden to demonstrate the validity of the claim.  *See In re Oneida, Ltd.*, 400 B.R. 384, 389 (Bankr. S.D.N.Y. 2009); *In re Adelphia Commc'ns Corp.*, No. 02-41729 (REG), 2007 Bankr. LEXIS 660 at *15

(Bankr. S.D.N.Y. Feb. 20, 2007); *In re Rockefeller Ctr. Props.*, 272 B.R. 524, 539 (Bankr. S.D.N.Y. 2000).

24.     Wu seeks recovery on an allowed claim in the amount of $662,780.77. There is no basis for an allowed claim in this amount. It is undisputed that each Trust's only asset is Subordinated Debt and that holders of Subordinated Debt will not recover from LBHI pursuant the Plan. The Trusts "only make payments on the [Trust Preferred Securities] if [LBHI] first makes payment on the Subordinated Debt." [*See e.g.*, Prospectus IV at 1.] The Subordinated Guarantee "does not cover payments when the [Trust] does not have sufficient funds to make payments on the [Trust Preferred Securities]." [*Id.* at s-4.] Thus, by the express terms of the Subordinated Guarantee, LBHI has no liability under the Subordinated Guarantee. [*See id.* at 21 (describing the terms of the Subordinated Guarantee).] Therefore, claims based on Subordinated Guarantee should be disallowed and expunged in their entirety. Indeed, claims based on Subordinated Guarantees have been disallowed by the Court for this reason. [*See* 23049, 27630.] Further, allowing an individual claim by Wu would lead to Wu potentially receiving a duplicative recovery, as his beneficial interest was represented by the allowed claims filed by the indenture trustees.

**Wu's Claim Would Be Subordinated**

25.     Section 510(a) of the Bankruptcy Code provides that "[a] subordination agreement is enforceable … to the same extent that such agreement is enforceable under applicable nonbankruptcy law." 11 U.S.C. § 510(a).

26.     Courts have routinely held that the "enforcement of lawful subordination agreements by Bankruptcy Courts does not offend the policy of equal distribution of the bankrupt's estate." *In re Leasing Consultants, Inc.*, 2 B.R. 165, 168 (Bankr. N.Y. 1980), citing *In re Credit Industrial Corp.*, 366 F.2d 402, 407 (2d Cir. 1966). Under general contract law principles, when

a subordination agreement is unambiguous, the parties' rights are governed exclusively by that agreement. *In re Leasing Consultants, Inc.*, 2 B.R. at 169. This Court has enforced subordination provisions consistently in these cases, including through the classification and treatment of Subordinated Debt pursuant to the Plan.

27. The prospectuses upon which Wu purports to have relied clearly provides that any liability that LBHI would have on the Subordinated Guarantee is subordinated to the level of preferred equity interests in LBHI:

> [LBHI's] [g]uarantee will constitute unsecured obligations of [LBHI] and will rank (i) subordinate and junior in right of payment to all other liabilities of [LBHI], (ii) on a parity with the most senior preferred or preference stock… and (iii) senior to [LBHI's] common stock.

[Prospectus IV at 21.]. Thus, if LBHI had any liability on account of the Subordinated Guarantee, such liability would be subordinate and junior in right of payment to all other liabilities of LBHI and *pari passu* with LBHI's preferred equity, which is not expected to recover from LBHI. Wu acknowledges this. [Mot. ¶6.]

28. Wu's cites two letters filed on the docket by Mr. Rickey Gregory. [Mot. ¶¶ 7, 8, citing ECF Nos. 46304, 59555.] Neither Wu nor either of Mr. Gregory's letters is clear, but neither alters the clear fact that any liability under the Subordinated Guarantees is not entitled to recover as a claim against LBHI.

## JOINDERS

29. Mr. Gregory filed a joinder to the Motion. [ECF No. 59659.] The joinder contains no substantive argument and alleges no new fact pertinent to the Motion. Wu subsequently filed a letter on the docket expressing his support for Mr. Gregory. [ECF No. 59715.] Subsequently, Dan Lanello and Julie Lanello each filed separate (but identical) joinders to the Motion. [ECF Nos. 59735, 59736.] Like Mr. Gregory's joinder, the Lanello joinders contain no

new substantive argument and allege no new fact pertinent to the Motion.  The Court should not

grant any relief based on the joinders.

## **RESERVATION OF RIGHTS**

30.     LBHI reserves all rights to object to any claim that may be permitted to be

asserted against any of the Debtors.

Dated: May 29, 2019
       New York, New York

/s/ Garrett A. Fail
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Garrett A. Fail

Attorneys for Lehman Brothers Holdings Inc.
and Certain of Its Affiliates

Alex Olivo
16452 Harold Street
Oak Forest, IL 60452
Telephone: (630) 697-9464
Email: olivo_alex@yahoo.com
Pro Se

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

In re                                    Chapter 11

LEHMAN BROTHERS HOLDINGS INC, et al., Case No. 08-13555 (SCC)

Debtors                        Jointly Administered

Joinder of Alex Olivo to Motion of Rex Wu to Approve Motion for an Order Enforcing the Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and its Affiliated Debtors for Purposes of Distributions filed by Rex Wu on April 08, 2019 [Docket #59614].

Alex Olivo, hereby joins in the motion filed on April 08, 2019 [Doc. No. 59614] (the "Motion") by Rex Wu to Approve Motion for an Order Enforcing the Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and its Affiliated Debtors for Purposes of Distributions filed by Rex Wu on April 08, 2019 [Docket # 59614], and respectfully represents as follows:

1. Like Rex Wu and Rickey M. Gregory, Alex Olivo holds LBHI's Preferred Securities: LEHKQ, LEHLQ, LEHNQ and LHHMQ issued by Lehman Brothers Holdings Capital Trust 3,4,5, and 6.

2.Just as Rickey M. Gregory, Alex Olivo hereby adopts and incorporates all of the arguments raised in the Motion as if such arguments were set forth herein and asserted by Alex Olivo. As Rex Wu correctly argues in the Motion, the relief requested in the Motion is supported by, among other things, the plain language of the confirmed Plan and applicable bankruptcy law.

3. Alex Olivo reserves all rights to be heard before the Court; via CourtCall at the hearing scheduled for June 19, 2019 at 11:00 am; with regard to the issues raised in the Motion and this Joinder. Alex Olivo reserves all of his rights and remedies, and nothing contained in this Joinder shall constitute an admission by Alex Olivo for any other purpose or a waiver of any rights or remedies available to Alex Olivo. WHEREFORE, Alex Olivo joins in Rex Wu's Motion and Rickey M. Gregory's Joinder and respectfully requests that this Court approve the Motion in its entirety.

Dated: May 28, 2019
Respectfully Submitted,
Alex Olivo
By: /s/ Alex Olivo

Alex Olivo
16452 Harold
Oak Forest, IL 60452

MAY 31 2019
U.S. BANKRUPTCY COURT
SO DIST OF NEW YORK

**A509**

**Exhibits Intentionally Omitted Due to File Size**

Glenn A. Blaze
748 Port Monmouth Road
Port Monmouth, NJ, 07758
Telephone: 732-769-2398
Email: Glennblaze2@gmail.com
Pro-Se



JUN -3 2019

United State Bankruptcy Court
Southern District of New York

In regards : Chapter 11 Lehman Brothers Holding Inc., et al., Case No. 08-13555(SCC)

Debtors. Jointly Administered

Joinder of Glenn Blaze to Motion of Rex Wu to Approve Motion for an Order Enforcing the Modified Third Amended Joint Chapter 11 Plan of Lehman Brother Holdings Inc., and its Affiliated Debtors for Purposes of Distribution filed by Rex Wu on April 08, 2019(Docket #59614)

Glenn Blaze, hereby joins in the motion filed on April 08,2019 (Docket 59614, the "motion") by Rex Wu to Approve Motion for an Order Enforcing the Modified Third Amended Joint Chapter 11 Plan of Lehman Brother Holdings Inc., and its Affiliated Debtors for Purposes of Distributions filed by Rex Wu on April 08, 2019 (Docket # 59614) and respectfully represents as follows:

1.   Like Rex Wu and Rickey Gregory, Glenn Blaze holds LBHI's Preferred Securities: LEHKQ, LEHLQ, LEHNQ, and LEHHMQ issued by Lehman Brothers Holdings Capital Trust 3,4,5 and 6

2.  Just as Rickey Gregory, Glenn Blaze hereby adopts and incorporates all of the arguments raised in the Motion as if such arguments were set forth herein and asserted by Glenn Blaze.  As Rex Wu correctly argues in the Motion, the relief requested in the Motion is supported by, among other things, the plain language of the confirmed Plan and applicable bankruptcy law.

3.  Glenn Blaze reserves all rights to be heard before the Court: via CourtCall at the hearing scheduled for June 19, 2019 at 11:00 AM; with regard to the issues raised in the Motion and this Joinder. Glenn Blaze reserves all of his rights and remedies, and nothing contained in this joinder shall constitute an admission by Glenn Blaze for any other purpose or a waiver of any rights or remedies available to Glenn Blaze.  WHEREFORE, Glenn Blaze join in Rex Wu's Motion and Rickey M. Gregory's Joinder and respectfully requests that this Court approve this motion in its entirety.

Dated May 28, 2019

Respectfully submitted,

Glenn A. Blaze
By:/s/Glenn Blaze

Glenn Blaze
748 Port Monmouth Road
Port Monmouth, NJ, 07758
Telephone: 732-769-2398
Email: Glennblaze2@gmail.com
Pro-Se                                    Page 1 of 2

**Exhibits Intentionally Omitted Due to File Size**

Elizabeth Harrison
1413 N. Vermont Street
Arlington, VA. 22201
Telephone: (571)480-2520
Email: Eharrison165@gmail.com
Pro Se

JUN – 4 2019

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

In Regards: Chapter 11 LEHMAN BROTHERS HOLDINGS INC., et al., Case No. 08-13555 (SCC)

Debtors.          Jointly Administered

**Joinder of Elizabeth Harrison to Motion of Rex Wu to Approve Motion for an Order Enforcing the Modified Third Amendment Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and its Affiliated Debtors for Purposes of Distributions filed by Rex Wu on April 08, 2019 (Docket # 59614)**

Elizabeth Harrison, hereby joins in the motion filed April 08, 2019 (Docket # 59614, the "Motion") by Rex Wu to Approve Motion for an Order Enforcing the Modified Third Amended Joint Chapter 11 Plan of Lehman Brothers Holdings Inc. and its Affiliated Debtors for Purposes of Distributions filed by Rex Wu on April 08, 2019 (Docket # 59614) and respectfully represents as follows:

1. Like Rex Wu and and Rickey M. Gregory, Elizabeth Harrison holds LBHI's Preferred Securities: LEHNQ, LEHKQ and LHHMQ issued by Lehman Brothers Holdings Capital Trust 3, 4 and 6.
2. Just as Rickey M. Gregory, Elizabeth Harrison hereby adopts and incorporates all of the arguments raised in the Motion as if such arguments were set forth herein and asserted by Elizabeth Harrison. As Rex Wu correctly argues in the Motion, the relief requested in the Motion is supported by, among other things, the plain language of the confirmed Plan and applicable bankruptcy law.
3. Elizabeth Harrison reserves all rights to be heard before the Court; via Courtcall at the hearing scheduled for June 19, 2019 at 11:00 am; with regard to the issues raised in the Motion and this Joinder. Elizabeth Harrison reserves all of her rights and remedies, and nothing contained in this Joinder shall constitute an admission by Elizabeth Harrison for any other purpose or a waiver of any rights or remedies available to Elizabeth Harrison. WHEREFORE, Elizabeth Harrison joins in Rex Wu's Motion and Rickey M. Gregory's Joinder and respectfully requests that this Court approve this Motion in its entirety.

Dated June 01, 2019

Respectfully Submitted,
Elizabeth Harrison
By:/s/Elizabeth Harrison
*Elizabeth Harrison*
1413 N. Vermont Street
Arlington, VA. 22201
Telephone: (571)480-2520
Email: Eharrison165@gmail.com
Pro Se                                    Page 1 of 2

A513

**Exhibits Intentionally Omitted Due to File Size**

**Joseph J. Waske**
**22862 Via Genoa**
**Dana Point, CA 92629**
**949-517-8330**
**jwaske3@yahoo.com**

JAN - 2 2020

### UNITED STATES BANKRUPTCY COURT SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **Joseph J. Waske,** ) | **Case No.: 08-13555 (SCC)** |
| ) | |
| vs. ) | **(Jointly Administered)** |
| ) | |
| **Lehman Brothers Holdings INC.,** ) | |
| ) | |
| **et al,** ) | |
| ) | |
| **Debtors.** ) | |

---

### MOTION TO RECLASSIFY

**TO THE HONORABLE SHELLEY C CHAPMAN**
**UNITED STATES BANKRUPTCY JUDGE:**

Joseph J. Waske, as Pro Se, states and requests the honorable
court to reclassify his shares of Lehman Brothers Holding Inc
Capital Trusts III, IV, V and VI based on new information that
the guarantee is enforceable.

#### Background

The Lehman Brothers Holdings Inc. Capital Trusts III, IV, V and
VI each have a guarantee that has not been enforced by the
Trustee. Within each Prospectus (Exhibit A pgs. 10-25) of
Lehman Brothers Holdings Capital Trusts III, IV, V and VI,

A515

Joseph J. Waske has the rights and standing to enforce the
guarantee as if he were the Trustee, if the Trustee fails to
enforce the guarantee.  The guarantee was never filed and
thereby the trustee failed its obligations to place the Lehman
Brothers Holdings Inc. Capital Trusts III, IV, V and VI in its
proper class as entitled under the Prospectus. Joseph J. Waske
argues that the Lehman Brothers Holdings Capital Trusts III, IV,
V and VI should be in the same class as LBIE's Senior Preferred
Shares A or B, whichever class has the higher priority based on
the parity rights of the Guarantee listed in each of the issued
Prospectus. There are other potential securities that were
issued by Lehman Brothers Holdings Inc. that the Lehman Brothers
Holding Inc. Capital Trusts III, IV, V and VI may be in parity
with. Only the debtor will have knowledge of this information.

## Jurisdiction

The United States Bankruptcy Court for the Southern District of
New York (the "Court") has jurisdiction over this matter
pursuant to 28 U.S.C. §§ 157 and 1334, and Article XIV, Section
14.1(h) of the Plan.  Venue is proper pursuant to 28 U.S.C. §§
1408 and 1409. This is a core proceeding under 28 U.S.C. §§
157(b). The statutory basis for the relief requested in this
motion are sections 105(a) and 1141 of title 11 of the United
States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code").

2

A516

<u>Argument</u>

1. Joseph J. Waske has the standing and rights afforded to him
   by the securities Prospectus to file the reclassify motion
   as if he were the trustee based on the Trustees failure to
   file the GUARANTEE (Exhibit A pgs. 10-25).

   a. "If the guarantee trustee fails to enforce the
      guarantee, any holder of preferred securities may
      directly sue Lehman Brothers Holdings to enforce the
      Guarantee Trustee's rights under the guarantee"

2. Lehman Brothers Holdings Inc. Capital Trusts III, IV, V and
   VI (Exhibit A pgs. 10-25) are:

   a. "On a parity with the most senior preferred or
      preference stock now or hereafter issued by Lehman
      Brothers Holdings and with any guarantee now or
      hereafter entered into by Lehman Brothers Holdings in
      respect of any preferred securities of any affiliate
      of Lehman Brothers Holdings, and

   b. Senior to Lehman Brothers Holdings common stock……"

3. Lehman Brothers Holdings Inc. Capital Trust III, IV, V and
   VI are in parity with LBIE's redeemable Class A or B
   preference Shares.

   a. "LBIE was incorporated on 10 September 1990 under the
      Companies Act 1985 as a company limited by shares. On
      21 December 1992, it was re-registered as an unlimited
      company. It appears that this step was taken for US

3

A517

tax reasons. Re-registration of LBIE as an unlimited company enabled it to be treated as a branch of its then parent company for US tax purposes, thereby enabling losses in LBIE to be set off against profits in the parent."

b. "The share capital of LBIE comprises 6,273,113,999 ordinary shares of $1 each, 2 million 5% redeemable Class A preference shares of $1000 each, and 5.1 million 5% redeemable Class B shares of £1000 each. All these shares, except for 1 ordinary share, are held by LBHI2. ***The two classes of preference shares result from capital restructurings of LBIE in 2006 and 2007***,...The remaining ordinary share is held by LBL."

c. LBIE Contributed Equity to a Joint Venture to Facilitate LBIE claims. Shares of LBIE Preference Shares A and B were issued to the Joint Venture (Exhibit B pgs. 27-28).

d. LBIE Preference Shares are believed to be in class 4. Joseph J. Waske requests his interest to be reclassified to class 4 or into the highest class LBIE preference shares A or B are placed.

e. Lehman Brothers Holdings Inc. Capital Trusts III, IV, V and VI prospectus are all dated June 2001 (Exhibit C pgs. 30-33).

4

A518

4. Joseph J. Waske relied on the SRM Ruling on the purchase of
   his most recent shares. Per the Honorable Court (Docket
   #59614 Hearing Transcripts)

   a. "So, what you're referring to is the
   22 law that's clear and that I set forth in the recent SRM
   23 decision, which I wouldn't charge Mr. Gregory or Mr. Wu with
   24 being aware of. But the law is that when there is a general
   guarantee, its necessary to show
    2 that one acted in reliance - with knowledge of and in
    3 reliance on the general guarantee. So, by definition,
    4 that's not the case here""

5. The holders of the Lehman Brothers Holdings Inc. Capital
   Trusts III, IV, V and VI do not need to rely on the SRM
   Ruling to have standing because the holders have the rights
   and standing of the Trustee which is afforded to them by
   the prospectus if the trustee fails to enforce the
   GUARANTEE which is the case here. This right to enforce
   the GUARANTEE allows the holder to file a motion for a
   reclassification to the proper class under the POR which is
   at minimum to be in the same class as LBIE's senior
   preference A or B shares. Whichever is more senior.

6. "The Guarantee will not be discharged except by payment of
   the Guarantee payments in full to the extent not paid by
   the trust or upon distribution of the junior subordinate
   debt securities to the holders of the preferred securities
   in exchange for all such preferred securities." (Exhibit A
   pgs. 10-25)

A519

7. If there is an objection to this motion, it must be filed
   by the end of day January 25st, 2020. This motion shall be
   deemed granted and a decision to be entered in favor of
   Joseph J. Waske if an objection is not filed by end of day
   January 21st, 2020.

8. If the LBIE Senior Preference Shares are not in class 4,
   then the debtor should provide the corrected class the LBIE
   Senior Preference Shares A and B are in. The debtor should
   disclose what securities were issued by LBHI or its
   affiliates since June 2001. The most senior of those
   securities is where the Lehman Brothers Holdings Inc.
   Capital Trusts III, IV, V and VI should be reclassified.

9. The Reclassification of the Lehman Brothers Holdings Inc.
   Capital Trusts III, IV, V and VI to be in parity with
   LBIE's Senior Preference Shares A and/or B shall be treated
   as if the Capital Trust were in that class from the
   inception of the bankruptcy. Joseph J. Waske shall be
   entitled to all the rights and benefits as if his Lehman
   Brothers Holdings Inc. Capital Trusts III, IV, V and VI
   interests were in that class from day 1.

A520

## Conclusion

10.     Joseph J. Waske is afforded the rights and standing of the trustee based on the trustee's failure to file the GUARANTEE under the "Effects of Obligations Under the Junior Subordinated Debt Securities and the GUARANTEE"(Exhibit A pgs. 10-25) agreement within the Lehman Brothers Holdings Inc. Capital Trust III, IV, V and VI prospectus to file this motion to reclassify his interest to be treated in parity with LBIE's Senior Preference Shares A and B. The Lehman Brothers Holdings Inc. Capital Trusts III, IV, V and VI preferred shares are in parity with the LBIE Senior Preference Shares A and B issued in 2006 and 2007 based on the Prospectus of the Lehman Brothers Holdings Inc. Capital Trust III, IV, V and VI. The GUARANTEE is effective based on the Global Guarantee, Board of Director's Guarantee and SRM Ruling.

## Reservations of Rights

11.     Joseph J. Waske reserves all his rights that he is entitled to.

WHEREFORE, subject to the conditions set forth herein, Joseph J. Waske respectfully requests that the Court enforce the Lehman Brothers Holding Inc. Capital Trusts III, IV, V and VI prospectus, recognize the rights and standing of Joseph J. Waske

A521

as if it were the rights of the Trustee to enforce the GUARANTEE

for a reclassification of Joseph J. Waske's interests to be in

parity with LBIE's Senior Preference Shares A or B, whichever is

more senior.

Respectfully Submitted,

Dated this 30th day of December, 2019

Joseph J. Waske
22862 Via Genoa
Dana Point, CA 92629

A522

**Exhibits Intentionally Omitted Due to File Size**

Rex Wu
6315 N. Campbell
Chicago, IL 60659
Tel: (312)785-0348
Email: rex_wu@live.com
Pro-Se

**RECEIVED**

JAN - 7 2020

**U.S. BANKRUPTCY COURT, SDNY**

### UNITED STATES BANKRUPTCY COURT
### SOUTHERN DISTRICT OF NEW YORK

In Regards: Chapter 11 LEHMAN BROTHERS HOLDINGS INC., et al., Case # 08-13555 (SCC)
Motion to Reclassify (Docket# 60337) JOINDER

**Joinder of Rex Wu to Motion to Reclassify (Docket # 60337) filed by Joseph Waske on January 3 , 2020.**

Rex Wu, hereby joins in the Motion to Reclassify filed by Joseph Waske on January 3rd , 2020 (Docket # 60337) and respectfully represents as follows:

1. Like Joseph Waske, Rex Wu holds LBHI's Preferred Securities: LEHKQ, LEHLQ, LEHNQ and LHHMQ issued by Lehman Brothers Holdings Capital Trust 3, 4, 5 and 6.

2. As a result of Motion #59614 filed by Rex Wu, there was new information discovered during the hearing regarding the SRM decision that effects all holders of the Lehman Brothers Holdings Inc. Capital Trusts III, IV, V and VI. This also effects Rex Wu's most current legal holdings.

3. Rex Wu have similar arguments to the Motion to Reclassify. The Motion to Reclassify pertains to many facts that Rex Wu would present if he were to file on his own in particularly relating to the SRM decision and the arguments for and if it applies with certain other rights afforded in the Prospectuses. Would the SRM decision apply if the holders can pursue their rights as if it were the rights of the Trustee? What are the rights of the holders if they purchased their shares after the Hearing of Motion #59614? The answers to the questions should be, they are protected under the GUARANTEE and their shares are in parity with the most senior preference shares of Lehman Brothers Holdings Inc. and/or their affiliates issued on or thereafter as stated on the prospectuses. These are some of the points that Rex Wu shares between myself and Mr. Waske and thereby request to join the motion. (EXHIBIT A)

4. Rex Wu hereby adopts and incorporates all the arguments and statements raised in the Motion to Reclassify as if such arguments and statements raised were in set forth herein and asserted by Rex Wu.

1 of 3

5.  Rex Wu reserves all of his rights and remedies, and nothing contained in this Joinder shall constitute an admission by Rex Wu for any other purpose or a waiver of any rights or remedies available to Rex Wu.


WHEREFORE, Rex Wu joins in Joseph Waske's Motion to Reclassify and respectfully requests that this court carefully review the documents submitted and grant the Motion to Reclass in its entirety.


Respectfully Submitted,

January 3 , 2020

**Rex Wu**
**6315 N Campbell**
**Chicago, IL 60659**
**312-785-0348**
**rex_wu@live.com**
**Pro-Se**

**EXHIBIT A**

**Transcript pg. 81 and 82 from the June 19th 2019 Docket #59614 Ruling**

```
21          THE COURT:  So, what you're referring to is the

22     law that's clear and that I set forth in the recent SRM

23     decision, which I wouldn't charge Mr. Gregory or Mr. Wu with

24     being aware of.  But the law is that when there is a general

25     guarantee, as opposed to a specific guarantee, and corporate
```

```
                                                     Page 82

1     resolution is a general guarantee, it's necessary to show

2     that one acted in reliance -- with knowledge of and in

3     reliance on the general guarantee.  So, by definition,

4     that's not the case here.
```

3 of 3

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Garrett A. Fail

Attorneys for Lehman Brothers Holdings Inc.
and Certain of Its Affiliates

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
In re                                                  :          Chapter 11 Case No.
                                                       :
LEHMAN BROTHERS HOLDINGS INC., et al.,                 :          08-13555 (SCC)
                                                       :
                                  Debtors.             :          (Jointly Administered)
-----------------------------------------------------------------x

### PLAN ADMINISTRATOR'S OBJECTION TO MOTION TO RECLASSIFY

TO THE HONORABLE SHELLEY C. CHAPMAN,
UNITED STATES BANKRUPTCY JUDGE:

Lehman Brothers Holdings Inc. ("LBHI"), as Plan Administrator, files this

objection to the *Motion to Reclassify* filed by Joseph J. Waske ("Waske") (ECF No. 60337)

(the "Motion"), the *Joinder to Motion to Reclassify* (ECF No. 60348) (the "Wu Joinder") filed by

Rex Wu ("Wu"), and the *Joinder to Motion of Joseph J. Waske* (ECF No. 60354) (together, with

the Wu Joinder, the "Joinders") filed by Alex Olivo ("Olivo") and respectfully represents:

### OBJECTION

1.      Waske requests that the Court "reclassify his shares of [LBHI] Capital

Trusts III, IV, V and VI based on new information" that the guarantees issued by LBHI (each

a "Subordinated Guarantee") in connection such trusts are now "enforceable." (Mot. ¶1.) Wu

and Olivo seek the same relief in the Joinders. (*See* Joinders ¶¶3-4.) Although stylized as a motion

to "reclassify," neither Waske nor the joinder parties timely submitted proofs of claim against

LBHI or obtained permission from the Court to file a late proof of claim.[1]  Accordingly, there is nothing for the Court to reclassify.  The Motion can be denied on this basis alone.  Notwithstanding the foregoing, the Motion purports to "deem [itself] granted" if an objection is not filed by January 21, 2020.  The Plan Administrator hereby objects to the Motion and Joinders in all respects.

       2.      The Plan Administrator presumes, construing the Motion in the best possible light, that the relief Waske ultimately seeks is a claim against LBHI based on Subordinated Guarantee.  As set forth below, even if Waske was permitted to file his claim, and even if the claim was allowed, any liability for the claim would be subordinated in accordance with section 510(a) of the Bankruptcy Code to the level of preferred equity in LBHI; Waske would recover nothing from LBHI in these cases.

       3.      Nonetheless, Waske should not be permitted to file his claim.  Waske states that he "relied on the SRM Ruling on the purchase of his most recent shares" (Mot. 4.)[2]  This Court's *Memorandum Decision and Order Sustaining Plan Administrator's Objection to Claim Number 29606 Filed by SRM Global Master Fund Limited Partnership* (ECF No. 59744) was issued on June 3, 2019, which is well after entry of the confirmation order in 2011 and after consummation of the plan in these chapter 11 cases (the "Plan") in 2012.[3]  By that time, additional

---

[1] On July 2, 2019, Wu was denied permission by the Court to file a late claim based shares in the same capital trusts that Wu now seeks to have reclassified in the Wu Joinder.  (*See* ECF No. 59801.)  The Court's order denying Wu permission to file a late was appealed by a third-party, Dan Ianello, which remains pending before the District Court. *See Dan Ianello v. Lehman Brothers Holdings Inc.*, Case No. 1:19-cv-06397 (PAE).  To the extent that Wu seeks reconsideration of the Court's prior ruling, it should be denied without a hearing.  *See In re AMR Corp.*, 2016 WL 675543 *1 (Bankr. S.D.N.Y. 2016) ("Motions for reconsideration and to amend or alter judgment serve a limited function - to correct manifest errors of law or fact or to present newly discovered evidence.  But a motion for reconsideration is neither an occasion for repeating old arguments previously rejected nor an opportunity for making new arguments that could have been previously advanced.  Reconsideration is an extraordinary remedy to be employed sparingly in the interests of finality and conservation of scarce judicial resources.").

[2] Waske failed to disclose the date on which he acquired the other shares (if any) he is seeking a claim in respect of.  Waske should disclose this information to the Court and parties in interest.

[3] Capitalized terms used but not defined herein have the meanings ascribed to such terms in the Plan.  (ECF No. 22737.)

claims against LBHI based on the Subordinated Guarantees (held by the then-holder of Waske's securities) were subject to (not exempt from) a bar date. Accordingly, even if Waske were to seek permission to file a late claim, based on the facts set forth in the Motion, he cannot establish cause to permit the filing of a claim years after the bar date.

4.      Moreover, any such claim could not be allowed. As this Court held in 2011 and as recently as 2019, LBHI has no liability for guarantee claims based on a Subordinated Guarantee.[4]   The Court has also recognized that claims like Waske's would be duplicative of allowed claims filed by the indenture trustees for the subordinated debt issued by LBHI linked to the securities issued by the four trusts in which Waske, Wu, and Olivo invested. Indeed, the Court disallowed over 1,725 proofs of claim on that basis. The Court would find the same is true for any claim to be filed by Waske.

5.      Accordingly, the Motion should be denied with prejudice, including with prejudice to any future motion Waske might file seeking to obtain permission to file a late claim based on the Subordinated Guarantee.

**The Trusts and the Subordinated Guarantees**

6.      The Court approved the disclosure statement for solicitation of votes on the Plan by order, dated September 1, 2011. (ECF No. 19631.) As described in the disclosure statement, as of August 31, 2008, the Debtors' long-term borrowing included billions of dollars of subordinated debt. (ECF No. 19629.)

7.      Claims against LBHI on account of LBHI's subordinated debt are classified in LBHI Class 10A, LBHI Class 10B, or LBHI Class 10C of the Plan. *See Id.* Holders of claims

---

[4] *See e.g.*, ECF No. 23049 (order dated granting LBHI's 218th omnibus objection (ECF No. 20107) and disallowing and expunging claims based on a Subordinated Guarantee); ECF No. 59813 (order denying Wu permission to file late claim based on Subordinated Guarantee).

in LBHI Class 10A, LBHI Class 10B, or LBHI Class 10C "are not expected to receive any Distributions on account of such Claims." *Id.* "Any Distributions that would have been paid to such Claims are automatically redistributed to holders of [allowed senior unsecured claims against LBHI]." *Id.*

8.      Prior to the Commencement Date, certain issuances of LBHI's subordinated debt (the "<u>Subordinated Debt</u>") were acquired by certain trusts, which, in turn, issued securities (the "<u>Trust Preferred Securities</u>") to third parties. LBHI issued Subordinated Guarantees in connection with the issuance of the Trust Preferred Securities.

9.      Waske purports to have acquired Trust Preferred Securities in four trusts: Lehman Brothers Holdings Capital Trust III ("<u>Capital Trust III</u>"), Lehman Brothers Holdings Capital Trust IV ("<u>Capital Trust IV</u>"), Lehman Brothers Holdings Capital Trust V ("<u>Capital Trust V</u>"), and Lehman Brothers Holdings Capital Trust VI ("<u>Capital Trust VI</u>") (collectively, the "<u>Trusts</u>"). Each Trust held a separate issuance of Subordinated Debt.

10.      The relevant prospectuses for the Trust Preferred Securities[5] referred to by Waske throughout the Motion made clear with repeated references that:

a.      the Trusts' assets consisted exclusively of Subordinated Debt;[6]

b.      the Trusts could only make payments on the Trust Preferred Securities if LBHI first makes payments on the Subordinated Debt;[7]

---

[5] Copies of the prospectuses are available on the Court's docket. (*See* ECF No. 20107.) The Debtors will provide the Court with courtesy copies in advance of the hearing on the Motion.

[6] *See, e.g.,* LBH Capital Trust III prospectus supplement for 6.375% Preferred Securities, Series K, dated March 12, 2003 ("<u>Prospectus III</u>") at s-1 ("The trust that is issuing the preferred securities will have no assets other than subordinated debentures issued by Lehman Brothers Holdings."), *Id.* at s-7 ("The only assets of the trust will be the subordinated debentures."); LBH Capital Trust IV prospectus supplement for 6.375% Preferred Securities, Series L, dated October 9, 2003 ("<u>Prospectus IV</u>") at s-1, *Id.* at s-7; LBH Capital Trust Lehman Brothers Holdings Capital Trust V prospectus supplement for 6.00% Preferred Securities, Series M, dated April 1, 2003 ("<u>Prospectus V</u>") at s-1, *Id.* at s-7; LBH Capital Trust VI prospectus supplement for 6.24% Preferred Securities, Series N, dated January 5, 2005 ("<u>Prospectus VI</u>") at s-1, *Id.* at s-8.

[7] Prospectus III at s-1, s-5 ("[P]ayments under the subordinated debentures will be the sole source of income to the trust."); Prospectus IV at s-1 (same), s-5 (same); Prospectus V s-1 (same), s-5 (same); Prospectus VI s-1 (same), s-6

    c.    the Subordinated Guarantee does not cover payments when the Trust does not have sufficient funds to make payments on the Trust Preferred Securities.  In other words, if LBHI does not make a payment on the Subordinated Debt, the Trust will not have sufficient funds to make payments on the Trust Preferred Securities, and the Subordinated Guarantee will not obligate LBHI to make those payments on the Trust's behalf;[8] and

    d.    LBHI's obligations under the guarantee are subordinate to its obligations under all of its other liabilities.[9]

11.    The Subordinated Guarantees themselves likewise provide that:

[LBHI's] [g]uarantee will constitute unsecured obligations of [LBHI] and will rank (i) subordinate and junior in right of payment to all other liabilities of [LBHI], (ii) on a parity with the most senior preferred or preference stock… and (iii) senior to [LBHI's] common stock.[10]

## Bar Dates and Relevant Claims

12.    As set forth in the Motion, on July 2, 2009, this Court entered an order (ECF No. 4271) setting forth the procedures and establishing September 22, 2009 (the "Bar Date") as the general deadline for filing proofs of claim in the Chapter 11 Cases.

13.    The indenture trustees for the Subordinated Debt linked to the Trust Preferred Securities filed proofs of claim on behalf of the holders of such securities prior to the Bar Date.  These claims, identified in the chart below, were subsequently Allowed against LBHI:

| Claim No. | Allowed Amount | Plan Class | Applicable Trust |
|---|---|---|---|
| 21805 | $314,207,499.10 | LBHI Class 10B | Capital Trust III |
| 22122 | $311,742,937.05 | LBHI Class 10B | Capital Trust IV |
| 22123 | $416,013,746.69 | LBHI Class 10B | Capital Trust V |
| 67753 | $234,250,517.60 | LBHI Class 10B | Capital Trust VI |

---

(same).

[8] *See* Description of the Guarantee, Prospectus III at page 20, Prospectus IV at page 21, Prospectus V at page 21, Prospectus VI at page 21.

[9] *See* Description of the Guarantee, Prospectus III at page 20, Prospectus IV at page 21, Prospectus V at page 21, Prospectus VI at page 21.

[10] *See e.g.*, *id.*

14.     Thus, as was intended, the indenture trustees for securities issued by the Trusts each filed a global proof of claim on behalf of all holders of such securities. The beneficial interests of the Trusts and the individual holders of Trust Preferred Securities are represented by more than $1 billion in Allowed claims against LBHI.

15.     Waske didn't file a proof of claim prior to the Bar Date – because, as he states, he purchased his shares over ten years after the Bar Date. But more than 1,725 proofs of claim were filed by other parties who purported to hold the Subordinated Debt and/or Trust Preferred Securities. The Court disallowed and expunged each of these claims as duplicative of the Allowed claims filed by the indenture trustee referenced above or, in several instances, as late claims.[11] It is possible that Waske acquired his Trust Preferred Securities from one of the parties whose claims against LBHI had been expunged.

16.     On December 6, 2011, the Court entered an order confirming the Plan (the "Confirmation Order"). (ECF No. 23023.) The Confirmation Order provided: "After the Effective Date, … a proof of Claim relating to a prepetition Claim may not be filed … without the authority of the Court." (Confirmation Order ¶ 86.) This order applies whether or not the purported creditor was subject to the Bar Date.

**The Court Motion Should Be Denied for A Host of Reasons**

17.     Styled as a motion to reclassify, the Motion points to no claim against LBHI to be reclassified. The Court may deny the Motion on this basis alone.

---

[11] *See, e.g.,* ECF Nos. 12671 (duplicative), 12893 (duplicative), 12835 (duplicative), 12676 (duplicative), 12527 (late), 12413 (late), 18427 (late), 19528 (late). Each of these Court orders and the corresponding motions was filed publicly on the Court's docket. In addition, as disclosed in its financial reports, from time to time LBHI publishes responses to questions received from creditors and other parties. A non-exhaustive review revealed that LBHI published responses to questions regarding the Trusts and Trust Preferred Securities in February and October of 2014. *See* https://dm.epiq11.com/case/LBH/documents. LBHI disclosed then that, based on projected future cash flow estimates, holders of Trust Preferred Securities would not receive any recovery.

18.     Even if what Waske ultimately seeks is to assert a late claim, he cannot carry his burden to establish cause to allow him to file such a claim.  In exercising its discretion during the course of these cases to disallow hundreds of late-filed claims and to refuse new claims to be filed and existing claims to be amended, the Court has properly focused on (a) whether any delay in filing was in the creditors' control, (b) the impact on the administration of these mega cases, and (c) the impact on other creditors, notwithstanding the potential validity of the late or new claims.  *See e.g., In re Lehman Bros. Holdings Inc.*, 433 B.R. 113, 120 (Bankr. S.D.N.Y. 2010), aff'd sub nom. *CVI GVF (Lux) Master S.a.r.l. v. Lehman Bros. Holdings Inc.*, 445 B.R. 137 (S.D.N.Y. 2011); ECF No. 59801 (order denying Wu permission to file a late claim).  Here, application of each of these factors would require denial of any attempt by Waske to assert a claim at this stage of LBHI's chapter 11 case:

19.     <u>Control</u>:  Waske purchased his Trust Preferred Securities with actual knowledge that this Court had previously denied Wu permission to file a late claim based on the same Trust Preferred Securities.   (*See* Mot.  ¶ 4 (stating reliance on the Court's statements at the hearing denying Wu permission to file a late claim based on the same Trust Preferred Securities)).[12]

20.     <u>Impact on administration</u>:  The Court has repeatedly recognized the deleterious impact of new claims on the administration of these mega cases.   The Plan Administrator need not repeat all of the arguments it has made in the past in detail here.  "The prejudice to the Debtors is not traceable to the filing of any single additional claim but to the impact of permitting exceptions that will encourage others to seek similar leniency."  *In re Lehman Bros. Holdings Inc.*, 433 B.R. 113, 126 (Bankr. S.D.N.Y. 2010), aff'd sub nom.  *CVI GVF (Lux) Master*

---

[12] As noted above, it is possible that Waske acquired his Trust Preferred Securities from a party who had, in fact, filed a proof of claim that was subsequently disallowed by the Court.  Without a blocking number, there is no way that LBHI would be able to determine legitimate ownership and eliminate the possibility of more than one party filing claims for the same interest.

*S.a.r.l. v. Lehman Bros. Holdings Inc.*, 445 B.R. 137 (S.D.N.Y. 2011).[13]  Allowing Waske to assert

a claim now will open the floodgates for the thousands of similarly-situated, individual holders of

Subordinated Guarantees to file motions to allow claims and motions for reconsideration of the

disallowance of their prior claims.  A number of parties have recently filed pleadings seeking to

assert such relief, including Wu and Olivo.  *See Joinder of Rickey M. Gregory* (ECF No. 59659);

*Joinder of Dan Ianello* (ECF No. 59735); *Joinder of Julie Ianello* (ECF No. 59736); *Joinder of*

*Alex Olivo* (ECF No. 59741); *Joinder of Glen A. Blaze* (ECF No. 59753); *Joinder of Elizabeth*

*Harrison* (ECF No. 59755).

   21. <u>Impact on creditors</u>:  Admission and allowance of new claims clearly would

dilute remaining recoveries for current creditors.  As the Court stated at the June 19, 2019 hearing

in connection with Wu's previous motion, "[t]his exercise has cost creditors money."  *See* June

19, 2019 Hr'g Tr. At 88:4-10; *In re Waterman S.S. Corp.*, 59 B.R. 724, 728 (Bankr. S.D.N.Y.

1986) ("Creditors must be able to learn what they will receive under a Plan . . . [f]ailure to [identify

the creditor body] prejudices the entire community of interest . . .").  Here, the prejudice would be

extraordinary given (a) the potential magnitude of additional claims that could be asserted

(discussed above), and (b) LBHI has no liability for these claims, and even if it did, any liability

would be subordinated to all other creditors of LBHI (discussed below).

<u>**Waske's Purported Claims Cannot Be Allowed**</u>

   22. The Court has disallowed and expunged timely-filed claims similar to those

that Waske purports to hold on the basis that LBHI has no liability under the Subordinated

---

[13] "Creditors act at their peril where they fail to adequately investigate and pursue their rights." *Id. Cf. In re Hooker Invs., Inc.*, 937 F.2d 833, 840 (2d Cir. 1991) (stating a deadline for asserting claims is more than a "procedural gauntlet" and functions as "an integral part of the reorganization process."); *In re Keene Corp.*, 188 B.R. 903, 907 (Bankr. S.D.N.Y. 1995) (same).

Guarantee. (*See* ECF Nos. 23049, 27630.) The Court would find the same if Waske's claims were filed. For this reason, the Motion should be denied.

23. Section 502(b)(1) of the Bankruptcy Code provides, in relevant part, that a claim may not be allowed to the extent that "such claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law." 11 U.S.C. § 502(b)(1). A proof of claim is "deemed allowed, unless a party in interest objects." 11 U.S.C. § 502(a). If an objection refuting at least one of the claim's essential allegations is asserted, the claimant has the burden to demonstrate the validity of the claim. *See In re Oneida, Ltd.*, 400 B.R. 384, 389 (Bankr. S.D.N.Y. 2009); *In re Adelphia Commc'ns Corp.*, No. 02-41729 (REG), 2007 Bankr. LEXIS 660 at *15 (Bankr. S.D.N.Y. Feb. 20, 2007); *In re Rockefeller Ctr. Props.*, 272 B.R. 524, 539 (Bankr. S.D.N.Y. 2000).

24. It is undisputed that each Trust's only asset is Subordinated Debt and that holders of Subordinated Debt will not recover from LBHI pursuant the Plan. The Trusts "only make payments on the [Trust Preferred Securities] if [LBHI] first makes payment on the Subordinated Debt." (*See e.g.*, Prospectus IV at 1.) The Subordinated Guarantee "does not cover payments when the [Trust] does not have sufficient funds to make payments on the [Trust Preferred Securities]." (*Id.* at s-4.) Thus, by the express terms of the Subordinated Guarantee, LBHI has no liability under the Subordinated Guarantee. (*See id.* at 21 (describing the terms of the Subordinated Guarantee).) Therefore, claims based on Subordinated Guarantee should be disallowed and expunged in their entirety. Indeed, claims based on Subordinated Guarantees have been disallowed by the Court for this reason. (*See* ECF Nos. 23049, 27630.) Further, allowing an individual claim by Waske, Wu, or Olivo would lead to a potential for duplicative recovery, as their beneficial interests are represented by the allowed claims filed by the indenture trustees.

**Waske's Claim Would Be Subordinated**

25. Section 510(a) of the Bankruptcy Code provides that "[a] subordination agreement is enforceable … to the same extent that such agreement is enforceable under applicable nonbankruptcy law." 11 U.S.C. § 510(a).

26. Courts have routinely held that the "enforcement of lawful subordination agreements by Bankruptcy Courts does not offend the policy of equal distribution of the bankrupt's estate." *In re Leasing Consultants, Inc.*, 2 B.R. 165, 168 (Bankr. N.Y. 1980), citing *In re Credit Industrial Corp.*, 366 F.2d 402, 407 (2d Cir. 1966). Under general contract law principles, when a subordination agreement is unambiguous, the parties' rights are governed exclusively by that agreement. *In re Leasing Consultants, Inc.*, 2 B.R. at 169. This Court has enforced subordination provisions consistently in these cases, including through the classification and treatment of Subordinated Debt pursuant to the Plan.

27. The prospectuses upon which Waske purports to have relied clearly provides that any liability that LBHI would have on the Subordinated Guarantee is subordinated to the level of preferred equity interests in LBHI:

> [LBHI's] [g]uarantee will constitute unsecured obligations of [LBHI] and will rank (i) subordinate and junior in right of payment to all other liabilities of [LBHI], (ii) on a parity with the most senior preferred or preference stock… and (iii) senior to [LBHI's] common stock.

(Prospectus IV at 21.) Thus, if LBHI had any liability on account of the Subordinated Guarantee, such liability would be subordinate and junior in right of payment to all other liabilities of LBHI and *pari passu* with LBHI's preferred equity, which is not expected to recover from LBHI.

## RESERVATION OF RIGHTS

      28.    LBHI reserves all rights to object to any claim that may be permitted to be

asserted against any of the Debtors.

Dated: January 21, 2020
      New York, New York

              /s/ Garrett A. Fail
              WEIL, GOTSHAL & MANGES LLP
              767 Fifth Avenue
              New York, New York 10153
              Telephone: (212) 310-8000
              Facsimile: (212) 310-8007
              Garrett A. Fail

              Attorneys for Lehman Brothers Holdings Inc.
              and Certain of Its Affiliates

Rex Wu
6315 N Campbell
Chicago, IL. 60659
312-785-0348
rex_wu@live.com



JAN 3 0 2020

January 26th, 2020

The Honorable Shelley C. Chapman
United States Bankruptcy Judge Bankruptcy Court for the Southern District of New York
One Bowling Green
New York, NY 10004-1408

Re: Lehman Brothers Holding, Inc. , Docket No. 08-13555-SCC (Bankr. S.D.N.Y.) - WASKE
Motion Docket # 60337

Dear Honorable Judge Chapman:

I am respectfully writing you this letter to reiterate to the honorable court that the LBIE Senior
Preference Shares A and/or B are not subordinated debt. They are equity and equity is not debt.
Therefore, they are not subordinate. The Lehman Brothers Holdings Inc. Capital Trusts III, IV,
V and VI are in parity with at least the LBIE Senior Preference Equity A and B securities.

The Guarantee in each of Lehman Brothers Holdings Inc's Capital Trusts III, IV, V and VI was
written to reflect that the Capital Trust preferred securities are subordinate to all relevant debts of
LBHI but are not subordinate to and are to be in parity with the most senior preference stock of
LBHI or any of its Affiliates. The word Affiliates is key. Therefore, if LBIE's senior preference
A and /or B shares or any other senior preference stock of LBHI's affiliates (foreign or domestic)
received a payout or consideration from this Bankruptcy, the LBHI Capital Trusts III, IV, V and
XI are entitled to parity treatment. That would mean the Capital Trusts will have to be reclassed
to a higher class to match the affiliate(s)' parity because 10B is a subordinate class and would no
longer be an appropriate class as the Lehman Brothers Holdings Inc Capital Trusts III, IV, V and
VI are in parity with at least the LBIE senior preference shares A and/or B. As which the Waske
motion identifies a reclassification is the only remedy.

I am currently a joinder in the Waske Motion to Reclassify. What is unique about the Waske
Motion is that there are new important and vital facts that were discovered during the hearing on
docket #59614 held on June 19th, 2019 in which it was ruled on the SRM Decision a few weeks
earlier by this honorable court that in order to enforce the general guarantee a person had to have
knowledge and had to rely on the general guarantee when purchasing their position. At the time,
I did have knowledge of the general guarantee and did rely on it when purchasing my position or
else I would not have brought on motion docket #59614. I also mentioned the general
guarantee/global guarantee/BOD guarantees in my motion. The honorable court ruled on docket
#59614 that I did not meet that knowledge and reliance criterias. Therefore, its the opinion of
this honorable court that I did not have the information that I had to have knowledge and rely on
the guarantee for it to be effective. To this date, I am not sure how the honorable court came to
that decision when its brought up on the motion but I respect and disagree with its ruled opinion

1 of 2

A538

and decided to join in its appeal to the district court. The honorable court somehow came to the ruling that I did not have the information of knowing that I had to have knowledge and rely on the general guarantee.

With my current position, I decided to again fulfill the requirements as the honorable court claim I did not have knowledge of the content of the general guarantee based on the timing of the ruling on the SRM Decision. I disagree with the honorable court's ruling on docket #59614. It is the official opinion of the honorable bankruptcy court and as stated on the results of the Docket #59614 ruling that I did not have knowledge that a person had to have knowledge and rely on the general guarantee for it to be enforceable.

Therefore, I declare since the June 19th ruling, I purchased a *new* position understanding the substance of the recent SRM Decision dated June 2019 and relied on the general guarantee, the prospectuses, contract law and bankruptcy laws and confidently made my recent purchases. I relied on the general guarantee based on the SRM decision discovered during the June 19th, 2019 Docket #59614 ruling.   Therefore, a joinder is necessary to join the Waske "Motion to Recalssify" based on the *new* findings found with the SRM Decision. Anyone from June 19th, 2019 onward who have knowledge of the general guarantee and relied on it while understanding the terms of the prospectuses have a valid argument to establish against LBHI since now the Plan Administrator is aware of the parity obligations it has of at least LBIE's Senior Preference Shares A and/or B or any parity obligations LBHI have with any other LBHI's affiliates which their senior preference equity position received a benefit from this bankruptcy. The Debtor LBHI is now aware of their parity obligations filed on the Waske "Motion to Reclassify".


Thank you for your valuable time.


Respectfully Submitted,


Rex Wu
Pro Se

Joseph J. Waske
22862 Via Genoa
Dana Point, CA 92629
949-517-8330
jwaske3@yahoo.com

## UNITED STATES BANKRUPTCY COURT SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| Joseph J. Waske, | ) **Case No.: 08-13555 (SCC)** |
|  | ) |
| vs. | ) **(Jointly Administered)** |
|  | ) |
| Lehman Brothers Holdings INC., | ) |
|  | ) |
| et al, | ) |
|  | ) |
| Debtors. | ) JAN 3 1 2020 |

## RESPONSE TO PLAN ADMINISTRATOR'S OBJECTION TO MOTION TO

### RECLASSIFY

**TO THE HONORABLE SHELLEY C CHAPMAN**
**UNITED STATES BANKRUPTCY JUDGE:**

Joseph J. Waske, as Pro Se, files this response to the *Plan Administrator's Objection to Motion to Reclassify* filed by Council for Lehman Brothers Holdings Inc ("LBHI") (ECF No. 60378)(the "Objection).

### Jurisdiction

The United States Bankruptcy Court for the Southern District of New York (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, and Article XIV, Section 14.1(h) of the Plan. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This is a core proceeding under 28 U.S.C. §§

1

157(b). The statutory basis for the relief requested in this motion are sections 105(a) and 1141 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code").

### RESPONSE TO OBJECTION

1. The original Motion to Reclassify (ECF No. 60337) requests the court to reclassify Joseph Waske's share of claims held in The Lehman Brothers Holdings Inc. Capital Trusts III, IV, V and VI. The allowed claim numbers are 21805, 22122, 22123, and 67753. The Motion to Reclassify (ECF No. 60337) does not request a new claim. If a new claim is filed it would be expunged and deemed to be duplicate by the plan administrator because currently the Lehman Brother's Capital Trusts III, IV, V and VI are currently in 10B, which is a subordinated debt class. The LBIE senior preference A and B shares are not currently in class 10B. Therefore, to show parity with LBIE Senior Preferences shares A and B the Lehman Brothers Holdings Inc. Capital Trust III, IV, V and VI must be reclassified to the same class as these LBIE senior preference stock. Each LBHI Capital Trust Preferred share represents fractional ownership of the existing claims. All the preferred shares of the Lehman Brothers Holdings Inc. Capital Trusts III, IV, V and VI have a claim and the rights to those claims are transferred to the rightful current and existing holder of the shares as dictated by securities and contract law (*Ritchie vs. Rupe*).

2

2. Joseph Waske does not dispute subordination in
accordance with section 510(a) of the Bankruptcy Code and the
Motion to Reclassify (ECF No. 60337) does not request a new
claim. The reclassification relief requested seeks to place the
Capital Trusts III, IV, V and VI preferred shares in parity with
LBIE's Senior Preferred A and B class. Joseph Waske does not
dispute Section 510(a) which states:

"A subordination agreement is enforceable in a case under
this title to the same extent that such agreement is enforceable
under applicable non-bankruptcy law."

A. Joseph Waske does not dispute 510(a) because the LBHI
Capital Trusts III, IV, V and VI preferred shares are not
subordinate to the LBIE senior preference shares A and B.
The Capital Trusts III, IV, V and VI preferred shares are in
parity with any affiliates most senior preference shares of
stock. Lehman Brothers Holdings Inc., as the plan
administrator mentioned on objection, that the subordinate
guarantee of the Lehman Brothers Holdings Inc. Capital Trusts
are subordinate to all qualified liabilities of LBHI but, the
plan administrator fails to point out that the Capital Trust
Preferred securities are Equity and although equity is a
liability, they are in parity with the most senior equity of
LBHI and any of its affiliates. The question posed to the

3

honorable court - are the Lehman Brothers Holdings Inc.
Capital Trusts III, IV, V and VI in parity with LBHI affiliate
LBIE's senior preference shares A and B? The answer is YES as
written in the prospectus according to contract law which
should have been respected, but has been neglected during the
bankruptcy process. This neglect led to the error of placing
the Lehman Brothers Holdings Inc. Capital Trusts III, IV, V
and VI in class 10B. The Lehman Brothers Holdings Inc Capital
Trusts III, IV, V and VI preferred shares are:

    a. **"On a parity with the most senior preferred or**
       **preference stock now or hereafter issued by Lehman**
       **Brothers Holdings and with any guarantee now or**
       **hereafter entered into by Lehman Brothers Holdings in**
       **respect of any preferred securities of any affiliate**
       **of Lehman Brothers Holdings,** and

    b. Senior to Lehman Brothers Holdings common stock……"

    To further explain:

"The guarantee will constitute an unsecured obligation of Lehman
Brothers Holdings and will rank:

A) "subordinate and junior in right of payment to all other
   liabilities of Lehman Brothers Holdings,"
    a. The LBHI CT III, IV, V and VI are subordinate to all
       other LBHI liabilities. But not equity of its
       affiliates. The LBHI CT III, IV, V and VI are in
       parity with them.
    b. LBHI CT III, IV, V and VI preferred shares are not
       subordinated to LBIE's senior preference equity
       shares.

B) "on a parity with the most senior preferred or preference
   stock now or hereafter issued by Lehman Brothers Holdings
   and with any guarantee now or hereafter entered into by
   Lehman Brothers Holdings in respect of any preferred

A543

securities of <u>any affiliate of Lehman Brothers Holdings</u>, and"

    a. The LBHI CT III, IV, V and VI preference shares are in parity with the LBHI's affiliate LBIE's senior preference equity shares A and B.

    b. The LBIE senior equity preference shares A and B received a payout.

c) "Senior to Lehman Brothers Holding's common stock. "

    a. Joseph Waske wants to bring to the attention of the court that if there is a future entity (investment trust) that uses (contributes) assets of LBHI, the reclassification and enforcement of the guarantee should grant the CT III, IV, V and VI a contribution percentage because the CT III, IV, V and VI preferred shares are senior to equity and in parity with at least LBIE's senior preference A and B shares.

3. Joseph Waske is relying on the SRM ruling issued on June 3rd 2019 and became aware of the ruling after reading the court transcripts of docket #59614. Joseph Waske had knowledge of the General Corporate guarantee and relied on the information to purchase preferred shares. This knowledge and reliance will continue if there should be future preferred shares being purchased.[1]

---

[1] A guarantee is a contractual promise by one party, the guarantor, to fulfill the debts or obligations of another party, the primary obligor, in the event of a default by such primary obligor. See Lakhaney v. Anzelone, 788 F. Supp. 160, 163 (S.D.N.Y. 1992); 38 AM. JUR. 2D Guaranty § 1 (2019). Under New York law, guarantees are governed by contract law and, like any other contract, a guarantee can only be made by mutual assent of the parties. See Cavendish Traders, Ltd. v. Nice Skate Shoes, Ltd., 117 F. Supp. 2d 394, 400 (S.D.N.Y. 2000); Davis Sewing-Mach. Co. v. Richards, 115 U.S. 524, 525 (1885)."Guaranties are distinguished in the law as being either general or special." Evansville Nat. Bank v. Kaufmann, 93 N.Y. 273, 276 (1883). A "special" or "specific" guarantee identifies the benefiting creditor or underlying agreement being guaranteed, whereas a "general" guarantee is addressed to persons generally and may be enforced by anyone to whom it is presented. Seeid.; 38 AM. JUR. 2D Guaranty § 14. To enforce a general guarantee, a creditor must demonstrate that it had definite knowledge of the existence of the guarantee and that it acted in reliance on it when entering

4. The Motion to Reclassify (ECF No. 60337) does not
request a new claim and seeks parity relief to reclassify Joseph
Waske's Capital Trusts III, VI, V, IV preferred shares within
the same class as other Senior Preferred equity, including any
Affiliates. LBHI has failed to show how the motion to reclassify
would be "duplicative" as the motion to reclassify is not
requesting a new claim and each preferred share represents
fractional ownership of the existing allowed claims (21805,
22122, 22123, and 67753). To be in parity with the LBIE Senior
Preference A and B Shares, there has to be a reclassification.
This is the only option to show parity and the reclassification
should be to the class where the LBIE Senior Preference Stock A
and B are placed.

5. Accordingly, the Motion to Reclassify (ECF No. 60337)
should be granted as it does not seek to file a new claim based
on the Subordinate Guarantee. There is an error in the
classification of the Lehman Brothers Holdings Inc. Capital
Trusts III, IV, V and VI. The error is neglecting word
"affiliates" during the vetting. The word "affiliates" was not
taken into consideration. The motion is timely based on the
knowledge of the General Corporate guarantee and that the

---

into the transaction with the primary obligor. See Fed. Deposit Ins. Corp.
v.Schuhmacher, 660 F. Supp. 6, 8 (E.D.N.Y. 1984) ("It is, of course,
elementary that a creditor's right to enforce a contract of guaranty must be
based upon knowledge of the existence of the guaranty and that the credit
must be extended in reliance thereof.") (citation omitted); 38 AM.JUR. 2D
Guaranty § 14." (Docket #59739)

Capital Trusts III, IV, V and VI are exempt entities with

enforceable Senior Preferred equity parity rights. The request

to reclassify is not subject to a bar date. Joseph Waske seeks

to reclassify his share of the Lehman Brothers Holdings Inc

Capital Trusts III, IV, V and VI out of class 10B. Any new

claim filed would be considered duplicate to the four current

10B claims. The subordination of the Capital Trusts does not

apply to LBIE's Senior preference equity A and B shares because

those are senior preference shares of one of LBHI's affiliates.

The Capital Trusts III, IV, V and VI preferred are in parity

with LBHI's Affiliate LBIE senior preferred equity A and B class

shares.


**The Trusts enforcement and parity rights**

6. The Lehman Brothers Holdings Inc. Capital Trusts III,

IV, V and VI preferred shares have preferred rights that have

not been enforced by the Trustee. Within each Prospectus of

Lehman Brothers Holdings Capital Trusts III, IV, V and VI

preferred, Joseph J. Waske, as a holder, has the rights and

standing to enforce "any guarantee now or hereafter" as if he

were the Trustee, if the Trustee fails to enforce the

guarantee." The guarantee was never filed and thereby the

trustee failed its obligations to place the Lehman Brothers

Holdings Inc. Capital Trusts III, IV, V and VI in its proper

A546

class as entitled under the Prospectus. Joseph J. Waske argues that the Lehman Brothers Holdings Capital Trusts III, IV, V and VI preferred should be in the same class as LBIE's Senior Preferred Shares A or B, whichever class has the higher priority based on the preferred parity rights of the Guarantee listed in each of the issued Prospectus. There are other potential preference securities that were issued by Lehman Brothers Holdings Inc. that the Lehman Brothers Holding Inc. Capital Trusts III, IV, V and VI preferred may be in parity with. Only the debtor will have knowledge of this information.

7. Claims against LBHI on account of LBHI's Capital Trust III, IV, V and VI Preferred shares are incorrectly subordinated to Affiliate Senior preferred equity. LBIE's senior preferred equity was issued years after the issuance of the LBHI's Capital Trust III, IV, V and VI Preferred shares.[2]

    a. "The share capital of LBIE comprises 6,273,113,999 ordinary shares of $1 each, 2 million 5% redeemable Class A preference shares of $1000 each, and 5.1 million 5% redeemable Class B shares of £1000 each. All these shares, except for 1 ordinary share, are held by LBHI2. ***The two classes of preference shares result from capital restructurings of LBIE in 2006 and 2007***,...The remaining ordinary share is held by LBL."

8. The LBHI's Capital Trust III, IV, V and VI Preferred shares rank, "**On a parity with the most senior preferred or**

---

[2] LBH Capital Trust III prospectus, series K dated March 12, 2003. LBH Capital Trust IV, series L, dated October 9, 2003. LBH Capital Trust V prospectus, series M dated April 1, 2003. LBH Capital Trust VI, series N, dated January 5, 2005.

A547

**preference stock now or hereafter issued by Lehman Brothers Holdings and with any guarantee now or hereafter entered into by Lehman Brothers Holdings in respect of any preferred securities of any affiliate of Lehman Brothers Holdings."[3]**

9. Joseph Waske has acquired preferred securities of the four LBHI Capital Trusts III, IV, V, and VI. LBHI issued Senior preferred parity guarantees in connection with the issuance of the Trust Preferred Securities.

10. The relevant prospectuses for the Trust Preferred Securities referred to in the motion to reclassify (ECF No. 60337) made clear with reference that the guarantee will rank "on a parity with the most senior preferred or preference stock now or hereafter entered into by Lehman Brothers Holdings in respect of any preferred securities of any affiliate of Lehman Brothers Holdings, and senior to Lehman Brothers Holding's common stock."

11. The contractual preferred parity rank provides that the LBHI's Capital Trust III, IV, V and VI Preferred shares are not subordinate to LBIE's A and B class preferred shares.

12. If reclassification of the LBHI Capital Trusts III, IV, V and VI to be in parity with at least LBIE's senior preference equity shares A and B class is the right and legal

---

3 LBH Capital Trust III prospectus, series K dated March 12, 2003. LBH Capital Trust IV, series L, dated October 9, 2003. LBH Capital Trust V prospectus, series M dated April 1, 2003. LBH Capital Trust VI, series N, dated January 5, 2005.

A548

thing to do, then it should be done regardless of "opening flood
gates." It should be allowed to show fairness to <u>all the
creditors</u> involved regardless of how many others will follow
suit.  Fairness in any bankruptcy including this one is crucial
and key.


**Bar dates and Relevant Claims**

13. The Motion to Reclassify (ECF No. 60337) does not
request a new claim. Each LBHI Capital Trust Preferred share
represents fractional ownership of the existing allowed claims.

14. The indentured trustee failed to file a guarantee claim
for the senior preferred parity rights provided in each of
LBHI's Capital Trust III, IV, V and VI preferred securities
prospectuses. Each preferred share represents a fractional
portion of the allowed claims (21805, 22122, 22123, 67753) and
are therefore not duplicative.

15. As a holder of the LBHI's Capital Trust III, IV, V and
VI preferred securities, Joseph Waske is seeking to enforce the
senior preferred parity rank and the guarantee trustee's rights
provided in each securities prospectus.

16. The Motion to Reclassify (ECF No. 60337) does not
request a new claim. Each LBHI Capital Trust Preferred share
represents fractional ownership of the existing allowed claims
(21805, 22122, 22123, 67753) and therefore are not duplicative.

**The motion to reclassify (ECF No. 60337) should be allowed**

17. The Motion to Reclassify (ECF No. 60337) does not request a new claim. Each LBHI Capital Trust Preferred share represents fractional ownership of the existing allowed claims (21805, 22122, 22123, 67753) and therefore are not duplicative.

18. The relief requested should have been filed by the Guarantee Trustee and the Plan Administrator should have disclosed the specific class where affiliate preferred equity was placed to the Guarantee Trustee. These facts were only found by Joseph Waske in recent court and affiliate filings. Additionally, when affiliate preferred security recoveries were documented. LBIE's senior preference shares A and B did receive a benefit and will continue receiving benefits from this bankruptcy. The Lehman Brothers Holdings Capital Trusts III, IV, V and VI shares are in parity and should be classed alongside affiliate LBIE Senior preference shares A and B shares.

19. A late claim is not being requested, therefore the need to establish cause is unnecessary. The motion to reclassify (ECF No. 60337) seeks to reclassify the fractional ownership of the existing allowed claims (21805, 22122, 22123, 67753) out of 10B

and to the class where the parity exists with LBIE's Senior preference A and B shares.

20. <u>Control</u>: Joseph Waske has purchased shares over time and purchased recent shares based on knowledge of the General Corporate guarantee and relied on the information to purchase those preferred shares.

21. <u>Impact on administration</u>: New claims are not being requested. If the relief being requested is granted, then the other LBHI Capital Trust III, IV, V and VI preferred security holders should be granted the same relief under the fact that the plan administrator now has the knowledge of the classing error of 10B.

22. <u>Impact on creditors</u>: New claims are not being requested. If the relief being requested is granted, then the other LBHI Capital Trust III, IV, V and VI preferred security holders should be granted the same relief. The Capital Trust III, IV, V, VI, preferred securities are not subordinate to LBIE preferred class A and B. The impact to creditors would have been caused by the errors of the plan administrator and the Debtor.

## The Capital Trust Preferred shares are not subordinate to Sr. Preferred in LBHI or any Affiliate

23. The court should allow the reclassification of the existing claims. The Lehman Brothers Capital Trusts III, IV, V, VI are intact entities with Senior Preferred parity rights that are a liability to LBHI. LBHI drafted each preferred security prospectus and the specific rights that are enforceable by holders of the trusts preferred securities. The Lehman Brothers Capital Trusts III, IV, V, VI preferred securities are not subordinate to LBIE preferred class A and B.

24. The Plan Administrator's objection is based on a late claim filing and that the motion to reclassify is entirely based on the subordinate guarantee. These objections do not address the Capital Trust preferred securities parity and each holder's trustee enforcement rights. The plan administrators objections fail to refute any of the original motion to reclassify allegations. The reclassification should be deemed allowed.

25. Each Capital Trust is an intact entity and the holders of each Trusts preferred securities have specific Senior preferred parity rights that the Plan Administrator fails to address. The holders of the preferred securities also have the rights to act on these senior preferred parity rights when the Guarantee Trustee has failed to act. There is no potential for duplicative recovery because the preferred securities represent fractional ownership of allowed existing claims (21805, 22122, 22123, 67753).

A552

26. Keeping the existing claims in LBHI Class 10b and enforcement of a subordinate guarantee violates Lehman Brothers Capital Trusts III, IV, V, VI preferred securities rights and offends the policy of equal distribution of the bankrupt's estate. The Capital Trusts preferred securities contract is unambiguous in the Senior preferred parity rights and the allowed Trustee enforcement rights provided to each security holder.

27. The prospectus upon which Joseph Waske relied clearly provides a Senior preferred parity to each trusts preferred security holders. The LBHI's Capital Trust III, IV, V and VI Preferred shares rank, **"On a parity with the most senior preferred or preference stock now or hereafter issued by Lehman Brothers Holdings and with any guarantee now or hereafter entered into by Lehman Brothers Holdings in respect of any preferred securities of any affiliate of Lehman Brothers Holdings."[4]**

28. Recent court dockets have now shown that similarly situated senior preferred have received funds from LBHI or have been placed in a higher class with expected recovery in a joint venture. The following are specifics from court documents and

---

[4] LBH Capital Trust III prospectus, series K dated March 12, 2003. LBH Capital Trust IV, series L, dated October 9, 2003. LBH Capital Trust V prospectus, series M dated April 1, 2003. LBH Capital Trust VI, series N, dated January 5, 2005.

A553

plan administrator filings. Capital Trusts are intact with specific rights detailed within each prospectus. Capital trust preferred stocks are designed to be hybrid securities that possess characteristics of both debt and equity.

29. ECAPS recovery (Docket 57493, page 4)-
"The Partnerships, the GP and the ECAPS

23. On information and belief, LBHI has always been the sole member of the GP. Ex. A, § 3.1.

24. Each of the Partnerships issued ECAPS. Ex. A, § 3.7. LB UK I, LB UK II and LB UK III used the proceeds to purchase subordinated notes issued by LBH (the "LBH Sub Notes"). ld., § 3.10. LB UK IV and LB UK V used the proceeds to purchase subordinated notes

25. The Liquidators have reported that **in October 2017**, after eight months of the Liquidators' efforts, **the Plan Administrator finally released the last of the Investment Proceeds...**
to the GP, while purporting to reserve its rights and obtaining the Liquidators' agreement not to distribute the Investment Proceeds until all competing claims to them have been resolved, **in the amounts of €12.8 million, €10.8 million and $26.7 million, on behalf of LB UK III, LB UK IV and LB UK V, respectively.** Ex. B, §§ 4.8-4.11."

(Docket 57493, page 6).  The holders of these Capital Trusts saw benefits from this bankruptcy.  The Lehman Brothers Holdings Inc Capital Trusts III, IV, V and VI are in parity with these affiliate preference stock holders as well.

30. The plan administrator should provide the court and parties in interest detail of any Senior Preferred equity placed into a higher class and having parity with the LBHI Capital Trusts III, IV, V and VI preferred shares.

31.Lehman Capital Trusts III, IV, V, VI should be placed in the same class as the LBIE preferred A and B shares additionally ECaps recoveries violate the Sr. Preferred parity rights of the Capital Trust Preferred shares if a reclassification is not granted.

## **RESERVATION OF RIGHTS**

32. Joseph J. Waske reserves all his rights that he is entitled to.

WHEREFORE, subject to the conditions set forth herein, Joseph J. Waske respectfully requests that the Court enforce the Lehman Brothers Holding Inc. Capital Trusts III, IV, V and VI securities prospectus, recognize the rights and standing of Joseph J. Waske as if it were the rights of the Trustee to enforce the GUARANTEE and preferred parity rights for a reclassification of Joseph J. Waske's interests to be in parity

A555

with LBIE's Senior Preference Shares A or B, whichever is more senior.

Respectfully Submitted,

Dated this 28th day of January 28, 2020

Joseph J. Waske
22862 Via Genoa
Dana Point, CA 92629

Joseph Waske
22862 Via Genoa
Dana Point, CA 92629
949-517-8330
jwaske3@yahoo.com

## UNITED STATES BANKRUPTCY COURT SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Joseph Waske, ) | **Case No.: 08-13555 (SCC)** |
| ) | |
| vs. ) | **(Jointly Administered)** |
| ) | |
| Lehman Brothers Holdings INC., ) | **Docket #60337** |
| ) | |
| et al, ) | |
| ) | |
| Debtors. ) | FEB 25 2020 |

### MOTION TO RESERVE FOR MOTION TO RECLASSIFY

**TO THE HONORABLE SHELLEY C CHAPMAN**
**UNITED STATES BANKRUPTCY JUDGE:**

Joseph Waske, as Pro Se, requests the honorable court to set up
a reserve for the "Motion to Reclassify" (Docket #60337)
pursuant to section 13.10 of the Modified Third Amended Plan of
Lehman Brothers Holdings Inc. and its Affiliated Debtors "The
Plan" and sections 105(a), 502(c) and 1142(b) of title 11 of the
United States Code (the "Bankruptcy Code"). Joseph Waske
respectfully states as follows:

### Preliminary Statement

1. Joseph Waske is requesting the honorable court to grant a
   reserve because of the character of the arguments being

A557

made. Joseph Waske and the Joinders reserve all their rights under section 13.10 of the "The Plan".

2. There is a classification error that provides legal grounds for Joseph Waske to establish a reserve. The error has been unintentionally or intentionally disregarded and omitted in texts by the Plan Administrator and the Debtor. This omission has led to incorrectly classifying the Lehman Brothers Holdings Inc. Capital Trusts III, IV, V and VI into a subordinated 10B class.

3. Joseph Waske filed the motion Docket #60337 to seek the courts help in order to correct the error and reclassify the Lehman Brother Holdings Inc. Capital Trusts III, IV, V and VI into the appropriate proper class.

4. "The Plan" does not provide protection for errors nor does bankruptcy or contract law. "The Plan" was not compiled to knowingly disregard or ignore unintentional errors by the Plan Administrator or the Debtor. The Debtor and the Plan Administrator have an obligation to fix all errors once they have been documented and presented.

5. The Definition of the Trust Securities offered by the Lehman Brothers Inc Capital Trust III, IV, V and VI through the disclosure statements is shown on Exhibit A. LBHI equity (preferred and common shares) are not the same as the Lehman Brothers Holdings Inc. Capital Trust Securities offered by Lehman Brothers Holdings Inc. Capital Trust III, IV, V and VI. The Lehman Brothers Holdings Inc. Capital Trusts III, IV, V and VI are separate entities that LBHI established. The trusts preferred securities had specific senior preferred parity rights to LBHI and its affiliates most senior preference shares. The LBHI Capital Trust Securities are not subordinate to equity securities of any LBHI's affiliates. The subordinate guarantee only applies to liabilities of LBHI and not its affiliate's equity as stated within each prospectus.

6. After further analysis, the relief sought in the "Motion to Reclassify" from both the legal prospectus contractual language and the financial recoveries provided by LBHI or affiliates to other senior preferred equity or senior preferred trust shares, Joseph Waske and the Joinders submit that such relief is reasonable and appropriate under the circumstances. We ask that the relief be granted by the Court.

A559

## Jurisdiction

7. The United States Bankruptcy Court for the Southern District of New York (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334, and Article XIV, Section 14.1(h) of the Plan. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This is a core proceeding under 28 U.S.C. §§ 157(b). The statutory bases for the relief requested in this motion are sections 105(a) and 1141 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code").

## Statement

8. Joseph Waske relied on knowledge of June 19, 2019 transcripts (Docket #59614) regarding the general guarantee/BOD Resolution/Global Guarantee. Joseph Waske is also aware of the terms of the subordinated guarantee offered by the Lehman Brother Holdings Inc. Capital Trusts III, IV, V and VI. Joseph Waske filed the "Motion to Reclassify." (ECF No. 60337) as a holder of Capital Trust Preferred shares and as allowed within the prospectus rights since the guarantee trustees failure to act. Additionally, with knowledge the senior preferred parity

rights and that the prospectus covenants have not been
honored or acknowledged.

9. There is a need to reclassify the Lehman Brothers Holdings
Inc. Capital Trusts III, IV, V and VI, because the current
class 10B is incorrect. The Lehman Brothers Holdings Inc.
Capital Trusts III, IV, V and VI are in parity with the
most senior preference shares of LBHI and its AFFILIATES as
argued on the "Motion to Reclassify" (ECF No. 60337) and the
Joinder's letters addressed to the court.

10.    The current classification of the Lehman Brothers
Holding Inc. Capital Trusts III, IV, V and VI in class 10B
is for subordinated debt. The description of Class 10B can
be found on Exhibit B from the disclosure statements. The
disclosure statements pertaining to Lehman Brothers
Holdings Inc and its 12 classes under the LBHI bankruptcy.
"The Company" refers to LBHI only and is clearly stated on
the title. The Lehman Brothers Holdings Inc Capital Trusts
III, IV, V and VI are not subordinated debt based on the
general guarantee and the prospectus guarantee's parity
rights to LBHI and its Affiliates. Lehman Brothers Holdings
Inc. Capital Trusts III, IV, V and VI are in parity at
least with the LBIE's Senior Preference Shares, Neuberger

A561

Berman's equity shares during the bankruptcy process, the
ECAPS preference shares, or LBMB's affiliate equity –
whichever equity has been classed higher. All of these
preferred securities are a part of the Lehman Brothers
Bankruptcy globally and domestically as an affiliate or
subsidiary. The Lehman Brothers Holdings Inc. Capital
Trusts III, VI, V and VI preferred shares are not
subordinated to LBHI's Equity or the Equity of LBHI's
affiliates.  This Senior Preferred parity and the error of
placing the Lehman Brothers Holdings Inc. Capital Trust
III, IV, V and VI in class 10B. Further, the set-off
provisions provided for within each prospectus, a reserve
should be allowed to be established. The Neuberger Berman
preferred security transaction was completed after the
bankruptcy was filed.  The LBMB preferred security
transactions were also completed after the bankruptcy was
filed. The ECAPs settlement in which the trust preferred
equity saw benefits occurred recently during the
bankruptcy.  The Neuberger Berman, LBMB as well as other
transactions completed before the POR was approved and
before the disclosure statement was ratified.  The Debtor
and the Plan Administrator knew the Lehman Brothers
Holdings Inc. Capital Trusts III, IV, V and VI were in
parity with affiliates' and subsidiaries' senior preference

equity or equity prior to placing the LBHI's Capital Trust
III, IV, V and VI into class 10B which is a subordinated
debt class. That is an error the Debtor and the Plan
Administrator must now correct and reclassify the LBHI's CT
III, IV, V and VI to its proper class.

11.     It is unclear to why the words "affiliate" and
"parity" have been and continue to be omitted by the Plan
Administrator when clearly it is an obligation to them. It
is disturbing to this date the words "Affiliate" and
"parity" are routinely ignored by the Plan Administrator
even though its clearly stated in each Capital Trust
Securities Prospectus. If the error is unintentional, a
reserve should be granted and the Debtor should correct the
error.

12.     The Plan Administrator and management of the Debtor
has changed since the Plan of Reorganization and the
creation of the disclosure statements. The prior plan
administrator and LBHI estate management is believed to be
relieved off all liabilities before resigning and the
current Plan Administrator or Debtor will not be held
accountable for the past work. Lehman Brothers Holding Inc
(The Debtor) as an entity can be held responsible for

intentional or unintentional misdeeds through enforcement by the courts and review of the bankruptcy. Joseph Waske is seeking the court to look into the matter and grant this reserve request to protect involved Capital Trust preferred shareholders of the Lehman Brothers Holdings Inc. Capital Trusts III, IV, V and VI from further harm. The trustee has also been contacted in the past. An error has been brought to the attention of the Debtor and Plan Administrator through this honorable court.

13.     The Affiliate Senior Preferred parity combined with the dividend and payment stopper language within each Lehman Brothers Capital Trust III, IV, V,  IV preferred security prospectus "Important Covenants" should define where the Lehman Brothers Capital Trust III, IV, V, IV preferred securities rank. The dividend and payment stopper covenant language clearly states:

**"Important Covenants Of Lehman Brothers Holdings**

**In the guarantee, Lehman Brothers Holdings will covenant that,**

**so long as any trust securities remain outstanding, if:**

- there shall have occurred any event of default under the indenture,

- Lehman Brothers Holdings shall be in default with respect to its payment of any obligations under the guarantee, or

• Lehman Brothers Holdings shall have given notice of its election to defer interest payments and shall not have rescinded such notice, and while such interest is deferred, then **Lehman Brothers Holdings** will not, and **will not permit any subsidiary** to:

• **declare or pay any dividends or distributions on, or redeem, purchase, acquire or make a liquidation payment with respect to, any of Lehman Brothers Holdings' capital stock**, or

• make any payment of principal, interest or premium, if any, on or repay, repurchase or redeem any debt securities of Lehman Brothers Holdings that rank on a parity with or junior in interest to the junior subordinated debt securities **or make any guarantee payments with respect to any guarantee by Lehman Brothers Holdings of the debt securities of any subsidiary of Lehman Brothers Holdings if such guarantee ranks on a parity with or junior in interest to such junior subordinated debt securities, other than**

 • **dividends or distributions in common stock of Lehman Brothers Holdings,**

 • **payments under the guarantee made by Lehman Brothers Holdings in respect of the trust securities of the trust,**

 • **any declaration of a dividend in connection with the implementation of a shareholders' rights plan, or the issuance of stock under any such plan in the future, or the**

A565

**redemption or repurchase of any such rights pursuant thereto, and**

• purchases of common stock related to the issuance of common stock or rights under any of Lehman Brothers Holdings' benefit plans." (Exhibit D)

14.     The amount Joseph Waske and the Joinders seek to reserve is $71,698,276. Please see Exhibit C.

## RESERVATION OF RIGHTS

Joseph Waske and the joinder group reserve all rights under the law and do not waive any rights including being able to purchase additional Capital Trust III, IV, V, IV preferred shares in the open market.

## CONCLUSION

For all the reasons set forth herein and in the Motion, Joseph Waske respectfully requests that the Court grant a reserve to be established for the amount requested and grant such other relief as is just.

Respectfully Submitted,
Dated this 14th day of February, 2020

Joseph Waske
22862 Via Genoa
Dana Point, CA 92629

**Exhibits Intentionally Omitted Due to File Size**