Positive
As of: May 27, 2022 5:15 PM Z

# *Aneja v. M.A. Angeliades, Inc.*

United States District Court for the Southern District of New York

January 12, 2010, Decided; January 12, 2010, Filed

05 Civ. 9678 (LAP)

**Reporter**
2010 U.S. Dist. LEXIS 3035 *; 2010 WL 199681

MUKAND L. ANEJA, Plaintiff, -against- M.A. ANGELIADES, INC., Defendant.

**Prior History:** *Aneja v. M.A. Angeliades, Inc., 2008 U.S. Dist. LEXIS 30602 (S.D.N.Y., Mar. 31, 2008)*

## Core Terms

motions, reasons, misrepresentations, summary judgment, circumstances

## Case Summary

### Procedural Posture

Plaintiff employee, acting pro se, sued defendant employer, alleging unlawful discrimination on the basis of age and national origin under both federal and state law. Earlier, the court granted summary judgment for the employer on all claims. The employee then moved for relief from judgment and reconsideration pursuant to *Fed. R. Civ. P. 60(b)(2)*, **60(b)(3)**, *60(b)(6)*, *60(d)*.

### Overview

The employee's motions were filed less than a year after judgment was entered. The court found that the motions were timely. The employee was proceeding with an appeal during the one-year period, and stated that he was unaware that the appellate court would not consider the material presented by his motions until it had been submitted to the trial court. However, because the employee was already in possession of the evidence that he claimed supported his position, he had no right to relief under *Rule 60(b)(2)*, which applied only to "newly discovered evidence." The employee did not allege any action sufficient to set aside the judgment under **Rule 60(b)(3)**. He demonstrated no misrepresentations by his adversary, let alone any **fraud**. The employee acknowledged in his affidavit that

during the summary judgment proceedings he was already in possession of the "evidence" he presented. Given that acknowledgement, the employee could not have claimed that he was prevented from fully presenting his case" by his adversary's misrepresentations. The employee did not set forth any facts that suggested a **fraud** upon the court and thus was not entitled to relief under *Rule 60(d)*.

### Outcome

The motions were denied.

## LexisNexis® Headnotes

Civil Procedure > Judgments > Relief From Judgments > General Overview

*HN1*[ ] **Judgments, Relief From Judgments**

A motion under *Fed. R. Civ. P. 59(e)* must be filed within ten days of the entry of judgment.

Civil Procedure > Judgments > Relief From Judgments > General Overview

Civil Procedure > Pleading & Practice > Motion Practice > Time Limitations

*HN2*[ ] **Judgments, Relief From Judgments**

All motions under *Fed. R. Civ. P. 60(b)* must be made within a reasonable time-and for reasons *Fed. R. Civ. P. 60(b)(1)*, *(2)*, *(3)*, no more than a year after the entry of the judgment. The determination of a "reasonable time" is fact-specific, requiring the court to look at the particular circumstance of each case and balance the

ᗄ

interest in finality with the reasons for delay.

Civil Procedure > Judgments > Relief From Judgments > Newly Discovered Evidence

_HN3_[⬇] **Relief From Judgments, Newly Discovered Evidence**

_Fed. R. Civ. P. 60(b)(2)_ allows relief from judgment on the basis of newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under _Fed. R. Civ. P. 59(b)_.

Civil Procedure > Judgments > Relief From Judgments > **_Fraud_**, Misconduct & Misrepresentation

Evidence > Burdens of Proof > Clear & Convincing Proof

_HN4_[⬇] **Relief From Judgments, Fraud, Misconduct & Misrepresentation**

_Fed. R. Civ. P. 60(b)(3)_ allows relief from judgment on the basis of **_fraud_**, misrepresentation, or misconduct by an opposing party. _Fed. R. Civ. P. 60(b)(3)_. To prevail on a _Fed. R. Civ. P. 60(b)(3)_ motion, a movant must show that the conduct complained of prevented the moving party from fully and fairly presenting his case. A _Fed. R. Civ. P. 60(b)(3)_ motion cannot be granted absent clear and convincing evidence of material misrepresentations and cannot serve as an attempt to relitigate the merits. This burden exists because although the rule provides courts with authority to enable them to vacate judgments whenever such action is appropriate to accomplish justice, such authority should only be applied in extraordinary circumstances.

Civil Procedure > Judgments > Relief From Judgments > General Overview

Governments > Legislation > Effect & Operation > Retrospective Operation

_HN5_[⬇] **Judgments, Relief From Judgments**

_Fed. R. Civ. P. 60_ provides a catch-all provision for relief from a judgment for any other reason that justifies relief. _Fed. R. Civ. P. 60(b)(6)_. If the reasons offered for relief

from judgment can be considered in one of the more specific clauses of _Fed. R. Civ. P. 60(b)_, such reasons will not justify relief under _Fed. R. Civ. P. 60(b)(6)_. A change in law with retrospective application may justify the application of _Fed. R. Civ. P. 60(b)(6)_ to set aside a judgment if special circumstances are present.

Civil Procedure > Judgments > Relief From Judgments > **_Fraud_**, Misconduct & Misrepresentation

_HN6_[⬇] **Relief From Judgments, Fraud, Misconduct & Misrepresentation**

See _Fed. R. Civ. P. 60(d)(3)_.

Civil Procedure > Judgments > Relief From Judgments > **_Fraud_**, Misconduct & Misrepresentation

Evidence > Burdens of Proof > General Overview

Civil Procedure > Parties > Pro Se Litigants > General Overview

_HN7_[⬇] **Relief From Judgments, Fraud, Misconduct & Misrepresentation**

The standard to prove **_"fraud_** on the court" is extremely high, and relief under _Fed. R. Civ. P. 60(d)_ is narrower in scope than that which is sufficient for relief by timely motion under _Fed. R. Civ. P. 60(b)(3)_. Unlike **_fraud_** under _Fed. R. Civ. P. 60(b)(3)_, **_"fraud_** on the court" is limited to **_fraud_** that seriously affects the integrity of the normal process of adjudication. A plaintiff's status as a pro se litigant does not excuse him from the high burden of producing "highly convincing evidence" in support of his claim of **_fraud_** on the court.

Civil Procedure > Judgments > Relief From Judgments > General Overview

Civil Procedure > Pleading & Practice > Motion Practice > Time Limitations

_HN8_[⬇] **Judgments, Relief From Judgments**

The pendency of an appeal does not toll the time for filing a _Fed. R. Civ. P. 60(b)_ motion.

2010 U.S. Dist. LEXIS 3035, *3035

Civil Procedure > Judgments > Relief From
Judgments > Newly Discovered Evidence

*HN9*[⬇] **Relief From Judgments, Newly Discovered
Evidence**

*Fed. R. Civ. P. 60(b)(2)* applies only to "newly
discovered evidence.

Labor & Employment
Law > Discrimination > General Overview

*HN10*[⬇] **Labor & Employment Law, Discrimination**

An employee's disagreement with his employer's
evaluation of his performance in insufficient to establish
discriminatory intent.

Civil Procedure > Judgments > Relief From
Judgments > Newly Discovered Evidence

*HN11*[⬇] **Relief From Judgments, Newly Discovered
Evidence**

*Fed. R. Civ. P. 60(b)(3)* does not authorize a court to
vacate judgment when evidence that could have been
obtained at an earlier time is obtained after judgment
has been entered.

Constitutional Law > The Judiciary > Congressional
Limits

Governments > Legislation > Effect &
Operation > Retrospective Operation

Constitutional Law > Congressional Duties &
Powers > General Overview

Constitutional Law > The Judiciary > General
Overview

*HN12*[⬇] **The Judiciary, Congressional Limits**

Congress is without authority to mandate that U.S.
Const. art. III courts reopen previously adjudicated
cases.

Constitutional Law > The Judiciary > Congressional
Limits

Governments > Legislation > Effect &
Operation > Retrospective Operation

Constitutional Law > Congressional Duties &
Powers > General Overview

Constitutional Law > The Judiciary > General
Overview

*HN13*[⬇] **The Judiciary, Congressional Limits**

Congress cannot legislatively overrule decisions made
by the courts. Having achieved finality, a judicial
decision becomes the last word of the judicial
department with regard to a particular case or
controversy, and Congress may not declare by
retroactive legislation that the law applicable to that very
case was something other than what the courts said it
was.

Civil Procedure > Judgments > Relief From
Judgments > General Overview

Labor & Employment
Law > Discrimination > General Overview

*HN14*[⬇] **Judgments, Relief From Judgments**

Discrimination suits do conform to conventional notions
of finality.

**Counsel:** [*1] For Mukand L. Aneja, Plaintiff: Jonathan
Ian Nirenberg, LEAD ATTORNEY, Denovo Legal, LLC,
New York, NY.

For M.A. Angeliades, Inc., Defendant: Emily Lynn
Cozart, Michael McDermott, LEAD ATTORNEYS,
Georgoulis and Associates, New York, NY; Jennifer A.
Redmond, LEAD ATTORNEY, Daniel Jon Borriello,
Georgoulis & Associates PLLC, New York, NY.

**Judges:** LORETTA A. PRESKA, Chief United States
District Judge.

**Opinion by:** LORETTA A. PRESKA

# Opinion

٢٦

2010 U.S. Dist. LEXIS 3035, *1

## MEMORANDUM AND ORDER

LORETTA A. PRESKA, Chief United States District Judge:

By motions dated March 27, 2009 and March 28, 2009, (dkt. nos. 51, 52) *pro se* Plaintiff Mukand Aneja moves for relief from the order of summary judgment entered against him on August 25, 2003. For the reasons set forth below, the motions are denied.

## BACKGROUND

Plaintiff brought this action against his former employer, Defendant M.A. Angeliades, alleging unlawful discrimination on the basis of age and national origin under both federal and state law. On March 31, 2008, the Court granted summary judgment for Defendant on all claims. *See* Memorandum and Order dated March 31, 2008 ("Order"). Plaintiff's March 27, 2009 motion ("First Motion") seeks relief from that judgment pursuant to *Rule 60(b)(3)*, claiming that in his **[*2]** adversary committed *fraud* by making material misrepresentations in its summary judgment papers. In his reference to *Rule 60(b)(3)*, Plaintiff requests reconsideration of the Order. (*See* First Motion at I.) [1] Plaintiff's March 28, 2009 motion ("Second Motion") additionally requests relief pursuant to Rules "*60(b)(2), 60(b)(6)* &/or *60(d)* &/or any other Rule that may apply." (*See* Second Motion at 1.) The Second Motion includes excerpts from the Order as well as the text of the Lilly Ledbetter Fair Pay Act ("LLFPA"), enacted on January 23, 2009. Plaintiff further states in the Second Motion that "U.S. Congress did not intend what Supreme Court ruled Ledbetter vs. Goodyear Tire & Rubber Co. See New Act. Sec. 1 thru Section 6." (Second Motion at 2.) Plaintiff's reply paper clarified his position, citing to the LLFPA's retroactivity provision as evidence that his discriminatory wage claim should not be time-barred. (*See* Plaintiff's Response dated April 8, 2009 ("Pl's Resp.") at 3.) *See generally* Lilly Ledbetter Fair Pay Act of 2009 § 6, Pub. L. No. 111-2, 123 Stat. 5.

---

[1] While the request for "reconsideration" would ordinarily implicate *Rule 59(e)*, **HN1**[⬆] a motion under that Rule must be filed within **[*3]** ten days of the entry of judgment. *See Fed. R. Civ. P. 59(e)*. Because judgment was entered in this matter on March 31, 2008, a motion for reconsideration is untimely and will not be considered.

## LEGAL STANDARD

**HN2**[⬆] All motions under *Rule 60(b)* must be made "within a reasonable time-and for reasons [60(b)](1), (2), and (3) no more than a year after the entry of the judgment." *See Fed. R. Civ. P. 60(c)(1)*. The determination of a "reasonable time" is fact-specific, requiring the Court "to look at the particular circumstance of each case and balance the interest in finality with the reasons for delay." *Grace v. Bank Leumi Trust Co., 443 F.3d 180, 190 (2d Cir. 2006)* (addressing a motion under *Rule 60(b)(6)*).

### Rule 60(b)(2)

**HN3**[⬆] *Rule 60(b)(2)* allows relief from judgment on the basis of "newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under *Rule 59(b)*." *Fed. R. Civ. P. 60(b)(2)*.

### Rule 60(b)(3)

**HN4**[⬆] *Rule 60(b)(3)* allows relief from judgment on the basis of "*fraud* . . . misrepresentation, or misconduct by an opposing party." *Fed. R. Civ. P. 60(b)(3)*. "To prevail on a *Rule 60(b)(3)* motion, a movant must show that the conduct complained of prevented **[*4]** the moving party from fully and fairly presenting his case." *State St. Bank & Trust Co. v. Inversiones Errazuriz Limitada, 374 F.3d 158, 176 (2d Cir. 2004)*. "[A] *Rule 60(b)(3)* motion cannot be granted absent clear and convincing evidence of material misrepresentations and cannot serve as an attempt to relitigate the merits." *Fleming v. New York Univ., 865 F.2d 478, 484 (2d Cir. 1989)*. This burden exists because although the Rule "provides courts with authority to enable them to vacate judgments whenever such action is appropriate to accomplish justice," such authority "should only be applied in extraordinary circumstances." *Liljeberg v. Health Svcs. Acquisition Corp., 486 U.S. 847, 863, 108 S. Ct. 2194, 100 L. Ed. 2d 855 (1988)*.

### Rule 60(b)(6)

**HN5**[⬆] *Rule 60* also provides a catch-all provision for relief from a judgment for "any other reason that justifies relief." *Fed. R. Civ. P. 60(b)(6)*. "If the reasons offered for relief from judgment can be considered in one of the more specific clauses of *Rule 60(b)*, such reasons will

not justify relief under *Rule 60(b)(6)*." *United States v. Int'l Bhd. of Teamsters, 247 F.3d 370, 391-92 (2d Cir. 2001)*. A change in law with retrospective application may justify the application of *Rule 60(b)(6)* [*5] to set aside a judgment if special circumstances are present. *See Matarese v. Le Fevre, 801 F.2d 98, 106 (2d Cir. 1986)*.

#### Rule 60(d)

*Rule 60(d)* provides in relevant part that HN6[⬆] "[*Rule 60*] does not limit a court's power to . . . set aside a judgment for **fraud** on the court." *Fed. R. Civ. P. 60(d)(3)*. HN7[⬆] The standard to prove "**fraud** on the court" is extremely high, and relief under *Rule 60(d)* is "narrower in scope than that which is sufficient for relief by timely motion [under **60(b)(3)**]." *Gleason v. Jandrucko, 860 F.2d 556, 558 (2d Cir. 1988)*. Unlike **fraud** under *Rule 60(b)(3)*, "**fraud** on the court" is limited to "**fraud** that seriously affects the integrity of the normal process of adjudication." *Id. at 559*. Plaintiff's status as a *pro se* litigant does not excuse him from the high burden of producing "highly convincing evidence" in support of his claim of **fraud** on the court. *See Gil v. Vogilano, 131 F. Supp. 2d 486, 494 (S.D.N.Y. 2001)*.

### DISCUSSION

#### Timeliness

Although the one-year bar set for *Rule 60(b)(1)-(3)* is a limit, rather than a target, Plaintiff's motions are nonetheless timely. The Order was issued on March 31, 2008. Plaintiff made the two motions at issue on March 27 and March 28, 2009. [*6] He points out that he was proceeding with an appeal during the one-year time period. (*See* Pl.'s Resp. at 3.) The Court of Appeals denied Plaintiff's motion for rehearing on November 20, 2008. (*See* Exhibit 3 to the Affirmation in Opposition of Michael McDermott dated April 1, 2009.) While HN8[⬆] "[t]he pendency of an appeal does not toll the time for filing a *Rule 60(b)* motion," see *Aczel v. Labonia, 584 F.3d 52, 69 (2d Cir. 2009)*, Plaintiff notes that he was unaware that the Court of Appeals would not consider the material presented by his motions until it had been submitted to this Court. (Pl.'s Resp. at 2.) Plaintiff's delay, though certainly not an example of alacrity, is not an unreasonable amount of time, especially given his *pro se* status. Plaintiff's motions are therefore timely.

#### 60(b)(2)

Plaintiff's request for relief pursuant to *Rule 60(b)(2)* lacks merit. Plaintiff acknowledges in his affidavit in support of the First Motion that he had previously noted "inaccuracies and misstatements in the Affidavit of Dimitri Malakidis and the Affirmation of Jennifer Redmond, many of which [he] did not reference in this Affidavit or in [his] Brief in Opposition to Defendant's Motion for Summary [*7] Judgment . . ." (Plaintiff's Affidavit dated March 27, 2009 ("Pl's Aff.") P 4.) He elaborates in his reply brief, stating that his attorney prevented him from fully responding to what he considered misstatements. (Pl's Resp. at 1-2.) Because Plaintiff was already in possession of the evidence that he claims supports his position, he has no right to relief under *Rule 60(b)(2)*, HN9[⬆] which applies only to "newly discovered evidence." *Fed. R. Civ. P. 60(b)(2)*.

#### 60(b)(3)

Plaintiff does not allege any action sufficient to set aside the judgment under *Rule 60(b)(3)*. Even when Plaintiff's motions are construed liberally, he demonstrates no misrepresentations by his adversary, let alone a misrepresentation that rises to the level of **fraud**. Instead, Plaintiff simply offers his take on a variety of disputed facts. Many of these relate to Plaintiff's perception of his performance versus Defendant's views on the topic, a subject which was addressed at summary judgment. *See* Order at 20-22:

> [Defendant] . . . provided evidence of several legitimate, non-discriminatory reasons for terminating Plaintiff: (1) he did not have the skills to perform the work he was hired to do; (2) the NYCTA complained about his [*8] performance; (3) as a result of the previously articulated reasons, there was an absence of appropriate projects for the Plaintiff. . . . Mr. Aneja disputes the truth of these justifications.

As noted in the Order, HN10[⬆] "an employee's disagreement with [his] employer's evaluation of [his] performance in insufficient to establish discriminatory intent." *Ricks v. Conde Nast Publ'ns, Inc., 6 F. App'x 74, 78 (2d Cir. 2001)*.

The case cited by Plaintiff does not support his position. (*See* Pl.'s Resp. at 1-2 (citing *Salas v. Raemisch, 238 F.R.D. 235, 240 (W.D. Wisc. 2006)*).) The *Salas* court stated that HN11[⬆] Rule "60(b)(3) do[es] not authorize a court to vacate judgment when evidence that could have been obtained at an earlier time is obtained after

judgment has been entered." As noted *supra*, Plaintiff acknowledges in his affidavit in support of the First Motion that during summary judgment proceedings he was already in possession of the "evidence" he now presents. (Pl's Aff. P 4.) Given that acknowledgement, Plaintiff "cannot claim that [he] was prevented from fully presenting [his] case" by his adversary's misrepresentations. See *State St.*, 374 F.3d at 176. He therefore cannot prevail on a *Rule 60(b)(3)* **[*9]** motion as a matter of law. See *id.*

*Rule 60(b)(6)*

Plaintiff's claim of "*fraud*" is ineligible for relief pursuant to *Rule 60(b)(6)*. "*Fraud*" is addressed explicitly by *Rule 60(b)(3)*; to the extent Plaintiff argues that *Rule 60(b)(6)* applies to his assertion of *fraud*, his argument is without merit. *Rule 60(b)(6)* is confined to bases for relief that do not fall under one of the other provisions of *Rule 60*. See *Teamsters, 247 F.3d at 391-92*.

Plaintiff additionally presents the LLFPA as a change in statutory law that provides a basis for relief. (*See* Second Motion at 2; Pl's Resp. at 3.) To the extent Plaintiff is asserting that in passing the LLFPA Congress instructed courts to set aside *final judgments*, as opposed to cases that remain under review, that argument fails, *HN12*[⬆] Congress is without authority to mandate that Article III courts reopen previously adjudicated cases. [2] See *Plaut v. Spendthrift Farm, Inc., 514 U.S. 211, 219, 115 S. Ct. 1447, 131 L. Ed. 2d 328 (1995)* (holding statute "unconstitutional to the extent that it requires federal courts to reopen final judgments entered before its enactment").

The Court of Appeals has stated that "[a] postjudgment change in the law having retroactive application may, in special circumstances, constitute an extraordinary circumstance warranting vacation of a judgment." See

---

[2] The President noted upon signing the LLFPA that the law would not affect Lilly Ledbetter individually. *See* White House Press **[*10]** Release, Office of the Press Secretary, Remarks by the President upon Signing the Lilly Ledbetter Bill (Jan. 29, 2009). *HN13*[⬆] Congress cannot legislatively overrule decisions made by the courts. *Plaut, 514 U.S. at 227* ("Having achieved finality, however, a judicial decision becomes the last word of the judicial department with regard to a particular case or controversy, and Congress may not declare by retroactive legislation that the law applicable *to that very case* was something other than what the courts said it was.")(emphasis in original).

*Matarese, 801 F.2d at 106*. The *Matarese* court was addressing a habeas petition and noted that in such proceedings "conventional notions of finality of litigation have no place,' which it considered "special circumstances." See *id.* (internal citations omitted). The vitality of that statement is questionable; Congress clearly expressed its intent to impose "notions of finality" on habeas petitions with the enactment of the Antiterrorism and **[*11]** Effective Death Penalty Act of 1996, which greatly constricted the availability of habeas petitions. See *104 Pub. L. 132, 110 Stat. 1214*.

In any case, *HN14*[⬆] discrimination suits do conform to conventional notions of finality, and assuming *arguendo* that a postjudgment change in the law may serve as a reason to set aside a judgment, there are no special circumstances present here sufficient to warrant such relief. The Court has already noted that Plaintiff "adduced no evidence, direct or indirect, of age or national origin discrimination whatsoever." Order at 24. Even if Plaintiff's wage claims were timely, he presented no evidence to suggest that he was a victim of discrimination.

*Rule 60(d)*

Plaintiff does not set forth any facts that suggest a *fraud* upon the court and thus cannot win relief under *Rule 60(d)*. His allegations are insufficient even to show cause for relief for *fraud* on a litigant under *Rule 60(b)(2)*; it follows that they cannot support a finding of *fraud* on the court under *Rule 60(d)*. See, e.g., *Gleason, 860 F.2d at 559-60* (*fraud* involving a single litigant does not rise to the level of "*fraud*" on the court").

*CONCLUSION*

Plaintiff's motions [dkt. nos. 51, 52] are denied.

SO **[*12]** ORDERED.

Dated: New York, New York

January 12, 2010

/s/ Loretta A. Preska

LORETTA A. PRESKA,

CHIEF U.S.D.J.

---

⚠ Caution
As of: May 27, 2022 5:56 PM Z

# *Mission Prod. Holdings v. Tempnology, LLC*

Supreme Court of the United States

February 20, 2019, Argued; May 20, 2019, Decided

No. 17-1657.

**Reporter**

139 S. Ct. 1652 *; 203 L. Ed. 2d 876 **; 2019 U.S. LEXIS 3544 ***; 67 Bankr. Ct. Dec. 51; Bankr. L. Rep. (CCH) P83,378; 27 Fla. L. Weekly Fed. S 813; 2019 WL 2166392

MISSION PRODUCT HOLDINGS, INC., Petitioner v. TEMPNOLOGY, LLC, nka OLD COLD LLC

**Notice:** The LEXIS pagination of this document is subject to change pending release of the final published version.

**Prior History:** [***1] ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT

*Mission Prod. Holdings, Inc. v. Tempnology, LLC (In re Tempnology, LLC), 879 F.3d 389, 2018 U.S. App. LEXIS 870 (1st Cir., Jan. 12, 2018)*

**Disposition:** *879 F. 3d 389*, reversed and remanded.

## Core Terms

trademark, rights, licensee, license, counterparty, provisions, terminate, license agreement, damages, intellectual property, executory contract, bankruptcy court, marks, licensor's, contracts, survive, dealer, claim for damages, copier, lease, contractual right, law firm, constitutes, moot, general rule, obligations, patent, breach of contract, right to use, reorganizations

## Case Summary

**Overview**
HOLDINGS: [1]-The case was not moot because the licensee presented a claim for money damages arising from its inability to use the trademarks between the time the debtor rejected the licensing agreement and its scheduled expiration date, and none of the debtor's arguments so clearly precluded recovery as to make the case moot; [2]-The debtor's rejection of the trademark licensing agreement could not revoke the license and

did not deprive the licensee of its rights to use the trademark because, under *11 U.S.C.S. § 365*, a debtor's rejection of an executory contract in bankruptcy had the same effect as a breach outside bankruptcy. Such an act could not rescind rights that the contract previously granted.

**Outcome**
Judgment reversed and case remanded. 8-1 Decision; 1 concurrence; 1 dissent.

## LexisNexis® Headnotes

Bankruptcy Law > ... > Executory Contracts & Unexpired Leases > Powers to Assume & Reject > Executory Contracts

Bankruptcy Law > Administrative Powers > Executory Contracts & Unexpired Leases > Rejections

*HN1*[⬇] **Powers to Assume & Reject, Executory Contracts**

*Section 365 of the Bankruptcy Code* enables a debtor to reject any executory contract—meaning a contract that neither party has finished performing. *11 U.S.C.S. § 365(a)*. The section further provides that a debtor's rejection of a contract under that authority constitutes a breach of such contract. *§ 365(g)*.

Bankruptcy Law > ... > Bankruptcy > Estate Property > Contents of Estate

Bankruptcy Law > ... > Examiners, Officers &

∂1

139 S. Ct. 1652, *1652; 203 L. Ed. 2d 876, **876; 2019 U.S. LEXIS 3544, ***1

Trustees > Duties & Functions > Reorganizations

### HN2[⬇] Estate Property, Contents of Estate

Chapter 11 of the Bankruptcy Code sets out a framework for reorganizing a bankrupt business. *11 U.S.C.S. §§ 1101-1174*. The filing of a petition creates a bankruptcy estate consisting of all the debtor's assets and rights. *11 U.S.C.S. § 541*. The estate is the pot out of which creditors' claims are paid. It is administered by either a trustee or the debtor itself. *11 U.S.C.S. §§ 1101, 1107*.

Bankruptcy Law > ... > Executory Contracts & Unexpired Leases > Powers to Assume & Reject > Executory Contracts

### HN3[⬇] Powers to Assume & Reject, Executory Contracts

*Section 365(a) of the Bankruptcy Code* provides that a trustee or debtor, subject to the court's approval, may assume or reject any executory contract. *11 U.S.C.S. § 365(a)*. A contract is executory if performance remains due to some extent on both sides. Such an agreement represents both an asset (the debtor's right to the counterparty's future performance) and a liability (the debtor's own obligations to perform). *Section 365(a)* enables the debtor (or its trustee), upon entering bankruptcy, to decide whether the contract is a good deal for the estate going forward. If so, the debtor will want to assume the contract, fulfilling its obligations while benefiting from the counterparty's performance. But if not, the debtor will want to reject the contract, repudiating any further performance of its duties. The bankruptcy court will generally approve that choice, under the deferential business judgment rule.

Bankruptcy Law > Administrative Powers > Executory Contracts & Unexpired Leases > Rejections

### HN4[⬇] Executory Contracts & Unexpired Leases, Rejections

According to *11 U.S.C.S. § 365(g)*, the rejection of an executory contract constitutes a breach of such contract. The counterparty thus has a claim against the estate for damages resulting from the debtor's nonperformance. But such a claim is unlikely to ever be

paid in full. That is because the debtor's breach is deemed to occur immediately before the date of the filing of the bankruptcy petition, rather than on the actual post-petition rejection date. *§ 365(g)(1)*. By thus giving the counterparty a pre-petition claim, *§ 365(g)* places that party in the same boat as the debtor's unsecured creditors, who in a typical bankruptcy may receive only cents on the dollar.

Bankruptcy Law > Administrative Powers > Executory Contracts & Unexpired Leases > Rejections

### HN5[⬇] Executory Contracts & Unexpired Leases, Rejections

Several provisions in *11 U.S.C.S. § 365* state that a counterparty to specific kinds of agreements may keep exercising contractual rights after a debtor's rejection. For example, *§ 365(h)* provides that if a bankrupt landlord rejects a lease, the tenant need not move out; instead, she may stay and pay rent (just as she did before) until the lease term expires. *Section 365(n)* sets out a similar rule for some types of intellectual property licenses: If the debtor-licensor rejects the agreement, the licensee can continue to use the property (typically, a patent), so long as it makes whatever payments the contract demands.

Civil Procedure > Preliminary Considerations > Justiciability > Mootness

### HN6[⬇] Justiciability, Mootness

A court may dismiss a case for being moot only if it is impossible for a court to grant any effectual relief whatever to the plaintiff assuming it prevails.

Civil Procedure > Remedies > Damages > Monetary Damages

Civil Procedure > Preliminary Considerations > Justiciability > Mootness

### HN7[⬇] Damages, Monetary Damages

Claims for money damages, if at all plausible, ensure a live controversy. For better or worse, nothing so shows a continuing stake in a dispute's outcome as a demand

for dollars and cents. A case is not moot so long as a claim for monetary relief survives. Ultimate recovery on that demand may be uncertain or even unlikely for any number of reasons. But that is of no moment. If there is any chance of money changing hands, the plaintiff's suit remains live.

Civil Procedure > Preliminary
Considerations > Justiciability > Mootness

## HN8[⤓] Justiciability, Mootness

Compliance with a judicial decision does not moot a case if it remains possible to undo the effects of compliance, as through compensation.

Bankruptcy Law > Administrative
Powers > Executory Contracts & Unexpired
Leases > Rejections

## HN9[⤓] Executory Contracts & Unexpired Leases, Rejections

What is the effect of a debtor's (or trustee's) rejection of a contract under *Section 365 of the Bankruptcy Code*? The courts of appeals have offered two starkly different answers. According to one view, a rejection has the same consequence as a contract breach outside bankruptcy: It gives the counterparty a claim for damages, while leaving intact the rights the counterparty has received under the contract. According to the other view, a rejection (except in a few spheres) has more the effect of a contract rescission in the non-bankruptcy world: Though also allowing a damages claim, the rejection terminates the whole agreement along with all rights it conferred. The U.S. Supreme Court holds that both *11 U.S.C.S. § 365*'s text and fundamental principles of bankruptcy law command the first, rejection-as-breach approach. The Supreme Court rejects the competing claim that by specifically enabling the counterparties in some contracts to retain rights after rejection, Congress showed that it wanted the counterparties in all other contracts to lose their rights. Rejection of a contract—any contract—in bankruptcy operates not as a rescission but as a breach.

Bankruptcy Law > ... > Executory Contracts &
Unexpired Leases > Powers to Assume &
Reject > Executory Contracts

Business & Corporate
Compliance > ... > Breach > Contracts
Law > Breach

Bankruptcy Law > Administrative
Powers > Executory Contracts & Unexpired
Leases > Rejections

## HN10[⤓] Powers to Assume & Reject, Executory Contracts

*11 U.S.C.S. § 365(a)* gives a debtor the option, subject to court approval, to assume or reject any executory contract. And *§ 365(g)* describes what rejection means. Rejection constitutes a breach of an executory contract, deemed to occur immediately before the date of the filing of the petition. Or said more pithily, a rejection is a breach. And breach is neither a defined nor a specialized bankruptcy term. It means in the Bankruptcy Code what it means in contract law outside bankruptcy. Congress generally meant for the Bankruptcy Code to incorporate the established meaning of terms that have accumulated settled meaning.

Bankruptcy Law > ... > Executory Contracts &
Unexpired Leases > Powers to Assume &
Reject > Executory Contracts

Business & Corporate
Compliance > ... > Trademark
Law > Conveyances > Licenses

Bankruptcy Law > Administrative
Powers > Executory Contracts & Unexpired
Leases > Rejections

## HN11[⤓] Powers to Assume & Reject, Executory Contracts

*11 U.S.C.S. § 365(a)* and *(g)* speak broadly, to any executory contracts. Many licensing agreements involving trademarks or other property are of that kind. The licensor not only grants a license, but provides associated goods or services during its term; the licensee pays continuing royalties or fees. If the licensor breaches the agreement outside bankruptcy (barring any special contract term or state law), the breach does not revoke the license or stop the licensee from doing what it allows. And because rejection constitutes a breach, *§ 365(g)*, the same consequences follow in bankruptcy. The debtor can stop performing its remaining obligations under the agreement. But the

139 S. Ct. 1652, *1652; 203 L. Ed. 2d 876, **876; 2019 U.S. LEXIS 3544, ***1

debtor cannot rescind the license already conveyed. So the licensee can continue to do whatever the license authorizes.

Bankruptcy Law > ... > Bankruptcy > Estate
Property > Contents of Estate

Bankruptcy Law > Administrative
Powers > Executory Contracts & Unexpired
Leases > Rejections

### *HN12*[🔻]  Estate Property, Contents of Estate

*11 U.S.C.S. § 365* reflects a general bankruptcy rule: The estate cannot possess anything more than the debtor itself did outside bankruptcy. *11 U.S.C.S. § 541(a)(1)*, which defines the estate to include the interests of the debtor in property. Whatever limitations on the debtor's property apply outside of bankruptcy apply inside of bankruptcy as well. A debtor's property does not shrink by happenstance of bankruptcy, but it does not expand, either. So if the not-yet debtor was subject to a counterparty's contractual right (say, to retain a copier or use a trademark), so too is the trustee or debtor once the bankruptcy petition has been filed. The rejection-as-breach rule (but not the rejection-as-rescission rule) ensures that result. By insisting that the same counterparty rights survive rejection as survive breach, the rule prevents a debtor in bankruptcy from recapturing interests it had given up.

Bankruptcy Law > ... > Examiners, Officers &
Trustees > Duties & Functions > Capacities & Roles

Bankruptcy Law > Administrative
Powers > Executory Contracts & Unexpired
Leases > Rejections

### *HN13*[🔻]  Duties & Functions, Capacities & Roles

The Bankruptcy Code aims to make reorganizations possible. But it does not permit anything and everything that might advance that goal. *11 U.S.C.S. § 365* provides a debtor with a powerful tool: Through rejection, the debtor can escape all of its future contract obligations, without having to pay much of anything in return. But in allowing rejection of those contractual duties, *§ 365* does not grant the debtor an exemption from all the burdens that generally applicable law—whether involving contracts or trademarks—imposes on

property owners. *28 U.S.C.S. § 959(b)*, which requires a trustee to manage the estate in accordance with applicable law. Nor does *§ 365* relieve the debtor of the need, against the backdrop of that law, to make economic decisions about preserving the estate's value—such as whether to invest the resources needed to maintain a trademark. In thus delineating the burdens that a debtor may and may not escape, Congress also weighed (among other things) the legitimate interests and expectations of the debtor's counterparties.

Bankruptcy Law > ... > Executory Contracts &
Unexpired Leases > Powers to Assume &
Reject > Executory Contracts

Bankruptcy Law > Administrative
Powers > Executory Contracts & Unexpired
Leases > Rejections

### *HN14*[🔻]  Powers to Assume & Reject, Executory Contracts

Under *11 U.S.C.S. § 365*, a debtor's rejection of an executory contract in bankruptcy has the same effect as a breach outside bankruptcy. Such an act cannot rescind rights that the contract previously granted.

## Lawyers' Edition Display

### Decision

Debtor's rejection of executory contract under *§ 365 of Bankruptcy Code (11 U.S.C.S. § 365)* (1) had same effect as breach of contract outside bankruptcy, and (2) thus, could not rescind rights that contract granted.

### Summary

**Overview:** HOLDINGS: [1]-The case was not moot because the licensee presented a claim for money damages arising from its inability to use the trademarks between the time the debtor rejected the licensing agreement and its scheduled expiration date, and none of the debtor's arguments so clearly precluded recovery as to make the case moot; [2]-The debtor's rejection of the trademark licensing agreement could not revoke the license and did not deprive the licensee of its rights to use the trademark because, under *11 U.S.C.S. § 365*, a debtor's rejection of an executory contract in bankruptcy had the same effect as a breach outside bankruptcy. Such an act could not rescind rights that the contract

139 S. Ct. 1652, *1652; 203 L. Ed. 2d 876, **876; 2019 U.S. LEXIS 3544, ***1

previously granted.

**Outcome:** Judgment reversed and case remanded. 8-1 Decision; 1 concurrence; 1 dissent.

# Headnotes

Bankruptcy § 165 > EXECUTORY CONTRACTS -- BREACH > Headnote:
*LEdHN1*[⬇] 1

*Section 365 of the Bankruptcy Code (11 U.S.C.S. § 365)* enables a debtor to reject any executory contract-- meaning a contract that neither party has finished performing. *11 U.S.C.S. § 365(a)*. The section further provides that a debtor's rejection of a contract under that authority constitutes a breach of such contract. *§ 365(g)*. (Kagan, J., joined by Rob-erts, Ch. J., and Thomas, Ginsburg, Breyer, Alito, Sotomayor, and Kavanaugh, JJ.)

Bankruptcy § 322 > REORGANIZATION -- ESTATE > Headnote:
*LEdHN2*[⬇] 2

Chapter 11 of the Bankruptcy Code (*11 U.S.C.S. § 1101 et seq.*) sets out a framework for reorganizing a bankrupt business. *11 U.S.C.S. §§1101-1174*. The filing of a petition creates a bankruptcy estate consisting of all the debtor's assets and rights. *11 U.S.C.S. § 541*. The estate is the pot out of which creditors' claims are paid. It is administered by either a trustee or the debtor itself. *11 U.S.C.S. §§1101, 1107*. (Kagan, J., joined by Roberts, Ch. J., and Thomas, Ginsburg, Breyer, Alito, Sotomayor, and Kavanaugh, JJ.)

Bankruptcy § 165 > EXECUTORY CONTRACT -- ASSUMPTION -- REJECTION > Headnote:
*LEdHN3*[⬇] 3

*Section 365(a) of the Bankruptcy Code (11 U.S.C.S. § 365(a))* provides that a trustee or debtor, subject to the court's approval, may assume or reject any executory contract. *11 U.S.C.S. § 365(a)*. A contract is executory if

performance remains due to some extent on both sides. Such an agreement represents both an asset (the debtor's right to the counterparty's future performance) and a liability (the debtor's own obligations to perform). *Section 365(a)* enables the debtor (or its trustee), upon entering bankruptcy, to decide whether the contract is a good deal for the estate going forward. If so, the debtor will want to assume the contract, fulfilling its obligations while benefiting from the counterparty's performance. But if not, the debtor will want to reject the contract, repudiating any further performance of its duties. The bankruptcy court will generally approve that choice, under the deferential business judgment rule. (Kagan, J., joined by Roberts, Ch. J., and Thomas, Ginsburg, Breyer, Alito, Sotomayor, and Kavanaugh, JJ.)

Bankruptcy § 322 > EXECUTORY CONTRACT -- REJECTION -- BREACH > Headnote:
*LEdHN4*[⬇] 4

According to *11 U.S.C.S. § 365(g)*, the rejection of an executory contract constitutes a breach of such contract. The counterparty thus has a claim against the estate for damages resulting from the debtor's nonperformance. But such a claim is unlikely to ever be paid in full. That is because the debtor's breach is deemed to occur immediately before the date of the filing of the bankruptcy petition, rather than on the actual post-petition rejection date. *§ 365(g)(1)*. By thus giving the counterparty a pre-petition claim, *§ 365(g)* places that party in the same boat as the debtor's unsecured creditors, who in a typical bankruptcy may receive only cents on the dollar. (Kagan, J., joined by Roberts, Ch. J., and Thomas, Ginsburg, Breyer, Alito, Sotomayor, and Kavanaugh, JJ.)

Bankruptcy § 322 > REJECTION OF CONTRACT -- CONTRACTUAL RIGHTS > Headnote:
*LEdHN5*[⬇] 5

Several provisions in *11 U.S.C.S. § 365* state that a counterparty to specific kinds of agreements may keep exercising contractual rights after a debtor's rejection. For example, *§ 365(h)* provides that if a bankrupt landlord rejects a lease, the tenant need not move out; instead, she may stay and pay rent (just as she did before) until the lease term expires. *Section 365(n)* sets

25

139 S. Ct. 1652, *1652; 203 L. Ed. 2d 876, **876; 2019 U.S. LEXIS 3544, ***1

out a similar rule for some types of intellectual property licenses: If the debtor-licensor rejects the agreement, the licensee can continue to use the property (typically, a patent), so long as it makes whatever payments the contract demands. (Kagan, J., joined by Roberts, Ch. J., and Thomas, Ginsburg, Breyer, Alito, Sotomayor, and Kavanaugh, JJ.)

Courts § 762 > MOOTNESS -- IMPOSSIBILITY OF RELIEF > Headnote:
*LEdHN6[⬇]* 6

A court may dismiss a case for being moot only if it is impossible for a court to grant any effectual relief whatever to the plaintiff assuming it prevails. (Kagan, J., joined by Roberts, Ch. J., and Thomas, Ginsburg, Breyer, Alito, Sotomayor, and Kavanaugh, JJ.)

Courts § 762 > LIVE CONTROVERSY -- MONEY DAMAGES > Headnote:
*LEdHN7[⬇]* 7

Claims for money damages, if at all plausible, insure a live controversy. For better or worse, nothing so shows a continuing stake in a dispute's outcome as a demand for dollars and cents. A case is not moot so long as a claim for monetary relief survives. Ultimate recovery on that demand may be uncertain or even unlikely for any number of reasons. But that is of no moment. If there is any chance of money changing hands, the plaintiff's suit remains. (Kagan, J., joined by Roberts, Ch. J., and Thomas, Ginsburg, Breyer, Alito, Sotomayor, and Kavanaugh, JJ.)

Courts § 762 > MOOTNESS -- COMPLIANCE WITH JUDICIAL DECISION > Headnote:
*LEdHN8[⬇]* 8

Compliance with a judicial decision does not moot a case if it remains possible to undo the effects of compliance, as through compensation. (Kagan, J., joined by Roberts, Ch. J., and Thomas, Ginsburg, Breyer, Alito, Sotomayor, and Kavanaugh, JJ.)

Bankruptcy § 322 > REJECTION OF CONTRACT -- BREACH > Headnote:
*LEdHN9[⬇]* 9

What is the effect of a debtor's (or trustee's) rejection of a contract under *Section 365 of the Bankruptcy Code (11 U.S.C.S. § 365)*? The Courts of Appeals have offered two starkly different answers. According to one view, a rejection has the same consequence as a contract breach outside bankruptcy: It gives the counterparty a claim for damages, while leaving intact the rights the counterparty has received under the contract. According to the other view, a rejection (except in a few spheres) has more the effect of a contract rescission in the non-bankruptcy world: Though also allowing a damages claim, the rejection terminates the whole agreement along with all rights it conferred. The U.S. Supreme Court holds that both *11 U.S.C.S. § 365*'s text and fundamental principles of bankruptcy law command the first, rejection-as-breach approach. The Supreme Court rejects the competing claim that by specifically enabling the counterparties in some contracts to retain rights after rejection, Congress showed that it wanted the counterparties in all other contracts to lose their rights. Rejection of a contract—any contract—in bankruptcy operates not as a rescission but as a breach. (Kagan, J., joined by Roberts, Ch. J., and Thomas, Ginsburg, Breyer, Alito, Sotomayor, and Kavanaugh, JJ.)

Bankruptcy § 322; Statutes § 125 > EXECUTORY CONTRACT -- MEANING OF BREACH > Headnote:
*LEdHN10[⬇]* 10

*11 U.S.C.S. § 365(a)* gives a debtor the option, subject to court approval, to assume or reject any executory contract. And *§ 365(g)* describes what rejection means. Rejection constitutes a breach of an executory contract, deemed to occur immediately before the date of the filing of the petition. Or said more pithily, a rejection is a breach. And breach is neither a defined nor a specialized bankruptcy term. It means in the Bankruptcy Code (*11 U.S.C.S. § 101 et seq.*) what it means in contract law outside bankruptcy. Congress generally meant for the Bankruptcy Code to incorporate the established meaning of terms that have accumulated settled meaning. (Kagan, J., joined by Roberts, Ch. J.,

139 S. Ct. 1652, *1652; 203 L. Ed. 2d 876, **876; 2019 U.S. LEXIS 3544, ***1

and Thomas, Ginsburg, Breyer, Alito, Sotomayor, and Kavanaugh, JJ.)

by Roberts, Ch. J., and Thomas, Ginsburg, Breyer, Alito, Sotomayor, and Kavanaugh, JJ.)

Bankruptcy § 130 > LICENSING AGREEMENT − BREACH − LICENSEE'S RIGHTS > Headnote:
*LEdHN11*[⬇] 11

11 U.S.C.S. §§365(a) and (g) speak broadly, to any executory contracts. Many licensing agreements involving trademarks or other property are of that kind. The licensor not only grants a license, but provides associated goods or services during its term; the licensee pays continuing royalties or fees. If the licensor breaches the agreement outside bankruptcy (barring any special contract term or state law), the breach does not revoke the license or stop the licensee from doing what it allows. And because rejection constitutes a breach, § 365(g), the same consequences follow in bankruptcy. The debtor can stop performing its remaining obligations under the agreement. But the debtor cannot rescind the license already conveyed. So the licensee can continue to do whatever the license authorizes. (Kagan, J., joined by Roberts, Ch. J., and Thomas, Ginsburg, Breyer, Alito, Sotomayor, and Kavanaugh, JJ.)

Bankruptcy § 130 > REJECTION OF CONTRACT − RETENTION OF RIGHTS > Headnote:
*LEdHN12*[⬇] 12

11 U.S.C.S. § 365 reflects a general bankruptcy rule: The estate cannot possess anything more than the debtor itself did outside bankruptcy. *11 U.S.C.S. § 541(a)(1)*, which defines the estate to include the interests of the debtor in property. Whatever limitations on the debtor's property apply outside of bankruptcy apply inside of bankruptcy as well. A debtor's property does not shrink by happenstance of bankruptcy, but it does not expand, either. So if the not-yet debtor was subject to a counterparty's contractual right (say, to retain a copier or use a trademark), so too is the trustee or debtor once the bankruptcy petition has been filed. The rejection-as-breach rule (but not the rejection-as-rescission rule) ensures that result. By insisting that the same counterparty rights survive rejection as survive breach, the rule prevents a debtor in bankruptcy from recapturing interests it had given up. (Kagan, J., joined

Bankruptcy § 322 > REJECTION OF CONTRACT − RETENTION OF OBLIGATIONS > Headnote:
*LEdHN13*[⬇] 13

The Bankruptcy Code (*11 U.S.C.S. § 101 et seq.*) aims to make reorganizations possible. But it does not permit anything and everything that might advance that goal. 11 U.S.C.S. § 365 provides a debtor with a powerful tool: Through rejection, the debtor can escape all of its future contract obligations, without having to pay much of anything in return. But in allowing rejection of those contractual duties, § 365 does not grant the debtor an exemption from all the burdens that generally applicable law—whether involving contracts or trademarks— imposes on property owners. See *28 U.S.C.S. § 959(b)*, which requires a trustee to manage the estate in accordance with applicable law. Nor does § 365 relieve the debtor of the need, against the backdrop of that law, to make economic decisions about preserving the estate's value--such as whether to invest the resources needed to maintain a trademark. In thus delineating the burdens that a debtor may and may not escape, Congress also weighed (among other things) the legitimate interests and expectations of the debtor's counterparties. (Kagan, J., joined by Roberts, Ch. J., and Thomas, Ginsburg, Breyer, Alito, Sotomayor, and Kavanaugh, JJ.)

Bankruptcy § 322 > EXECUTORY CONTRACT − BREACH > Headnote:
*LEdHN14*[⬇] 14

Under 11 U.S.C.S. § 365, a debtor's rejection of an executory contract in bankruptcy has the same effect as a breach outside bankruptcy. Such an act cannot rescind rights that the contract previously granted. (Kagan, J., joined by Roberts, Ch. J., and Thomas, Ginsburg, Breyer, Alito, Sotomayor, and Kavanaugh, JJ.)

## Syllabus

139 S. Ct. 1652, *1652; 203 L. Ed. 2d 876, **876; 2019 U.S. LEXIS 3544, ***1

**[\*1656]** Petitioner Mission Product Holdings, Inc., entered into a contract with Respondent Tempnology, LLC, which gave Mission a license to use Tempnology's trademarks in connection with the distribution of certain clothing and accessories. Tempnology filed for Chapter 11 bankruptcy and sought to reject its agreement with Mission. *Section 365 of the Bankruptcy Code* enables a debtor to "reject any executory contract"--meaning a contract that neither party has finished performing. *11 U. S. C. §365(a)*. It further provides that rejection "constitutes a breach of such contract." *§365(g)*. The Bankruptcy Court approved Tempnology's rejection and further held that the rejection terminated Mission's rights to use Tempnology's trademarks. The Bankruptcy Appellate Panel reversed, relying on *Section 365(g)*s statement that rejection "constitutes a breach" to hold that rejection does not terminate rights that would survive a breach of contract outside bankruptcy. The First Circuit rejected the Panel's judgment and reinstated the Bankruptcy Court's decision.

*Held:*

1. This case is not moot. Mission presents a plausible claim for money damages arising from its inability to use Tempnology's **[\*\*\*2]** trademarks, which is sufficient to preserve a live controversy. See *Chafin v. Chafin, 568 U.S. 165, 172, 133 S. Ct. 1017, 185 L. Ed. 2d 1*. Tempnology's various arguments that Mission is not entitled to damages do not so clearly preclude recovery as to render this case moot. *Pp.    -    , 203 L. Ed. 2d 876*.

2. A debtor's rejection of an executory contract under *Section 365 of the Bankruptcy Code* has the same effect as a breach of that contract outside bankruptcy. Such an act cannot rescind rights that the contract previously granted. *Pp.    -    , 203 L. Ed. 2d, at 886-891*.

(a) *Section 365(g)* provides that rejection "constitutes a breach." And "breach" is neither a defined nor a specialized bankruptcy term--it means in the Code what it means in contract law outside bankruptcy. See *Field v. Mans, 516 U.S. 59, 69, 116 S. Ct. 437, 133 L. Ed. 2d 351*. Outside bankruptcy, a licensor's breach cannot revoke continuing rights given to a counterparty under a contract (assuming no special contract term or state law). And because rejection "constitutes a breach," the same result must follow from rejection in bankruptcy. In preserving a counterparty's rights, *Section 365* reflects

the general bankruptcy rule that the estate cannot possess anything more than the debtor did outside bankruptcy. See *Board of Trade of Chicago v. Johnson, 264 U.S. 1, 15, 44 S. Ct. 232, 68 L. Ed. 533*. And conversely, allowing rejection to rescind a counterparty's rights would circumvent the Code's stringent limits on "avoidance" actions--the exceptional **[\*\*\*3]** cases in which debtors may unwind pre-bankruptcy transfers that undermine the bankruptcy process. See, e.g., *§548(a)*. *Pp.    -    . 203 L. Ed. 2d, at 886-889*.

(b) Tempnology's principal counterargument rests on a negative inference drawn from provisions of *Section 365* identifying categories of contracts under which a counterparty may retain specified rights after rejection. **[\*\*882]** See *§§365(h), (i), (n)*. Tempnology argues that these provisions indicate that the ordinary consequence of rejection must be something different--i.e., **[\*1657]** the termination of contractual rights previously granted. But that argument offers no account of how to read *Section 365(g)* (rejection "constitutes a breach") to say essentially its opposite. And the provisions Tempnology treats as a reticulated scheme of exceptions each emerged at a different time and responded to a discrete problem--as often as not, correcting a judicial ruling of just the kind Tempnology urges.

Tempnology's remaining argument turns on how the special features of trademark law may affect the fulfillment of the Code's goals. Unless rejection terminates a licensee's right to use a trademark, Tempnology argues, a debtor must choose between monitoring the goods sold under a license or risking the loss of its trademark, either of **[\*\*\*4]** which would impede a debtor's ability to reorganize. But the distinctive features of trademarks do not persuade this Court to adopt a construction of *Section 365* that will govern much more than trademark licenses. And Tempnology's plea to facilitate reorganizations cannot overcome what *Section 365(a)* and (g) direct. In delineating the burdens a debtor may and may not escape, *Section 365*s edict that rejection is breach expresses a more complex set of aims than Tempnology acknowledges. *Pp.    -    , 203 L. Ed. 2d, at 889-891*.

*879 F. 3d 389*, reversed and remanded.

**Counsel: Danielle Spinelli** argued the cause for petitioner.

**Zachary D. Tripp** argued the cause for the United

2b

139 S. Ct. 1652, *1657; 203 L. Ed. 2d 876, **882; 2019 U.S. LEXIS 3544, ***4

States, as amicus curiae.

**Douglas Hallward-Driemeier** argued the cause for respondent.

**Judges:** Kagan, J., delivered the opinion of the Court, in which Roberts, C. J., and Thomas, Ginsburg, Breyer, Alito, Sotomayor, and Kavanaugh, JJ., joined. Sotomayor, J., filed a concurring opinion. Gorsuch, J., filed a dissenting opinion.

**Opinion by:** KAGAN

# Opinion

Justice **Kagan** delivered the opinion of the Court.

*HN1*[⬆] *LEdHN[1]*[⬆] [1] *Section 365 of the Bankruptcy Code* enables a debtor to "reject any executory contract"—meaning a contract that neither party has finished performing. *11 U. S. C. §365(a).* The section further provides that a debtor's rejection of a contract under that authority "constitutes a breach of such contract." *§365(g).*

Today we consider the meaning of those provisions in the context of a trademark licensing agreement. The question is whether the debtor-licensor's rejection of that contract deprives [***5] the licensee of its rights to use the trademark. We hold it does not. A rejection breaches a contract [*1658] but does not rescind it. And that means all the rights that would ordinarily survive a contract breach, including those conveyed here, remain in place.

I

This case arises from a licensing agreement gone wrong. Respondent Tempnology, LLC, manufactured clothing and accessories designed to stay cool when used in exercise. It marketed those products under the brand name "Coolcore," using trademarks (*e.g.*, logos and labels) to distinguish the gear from other athletic apparel. In 2012, Tempnology entered into a contract with petitioner Mission Product Holdings, Inc. See App. 203-255. The agreement gave Mission [**883] an exclusive license to distribute certain Coolcore products in the United States. And more important here, it granted Mission a non-exclusive license to use the Coolcore trademarks, both in the United States and around the world. The agreement was set to expire in July 2016. But in September 2015, Tempnology filed a petition for Chapter 11 bankruptcy. And it soon afterward asked the Bankruptcy Court to allow it to "reject" the licensing agreement. *§365(a).*

*HN2*[⬆] *LEdHN[2]*[⬆] [2] Chapter 11 of the Bankruptcy Code [***6] sets out a framework for reorganizing a bankrupt business. See *§§1101-1174.* The filing of a petition creates a bankruptcy estate consisting of all the debtor's assets and rights. See *§541.* The estate is the pot out of which creditors' claims are paid. It is administered by either a trustee or, as in this case, the debtor itself. See *§§1101, 1107.*

*HN3*[⬆] *LEdHN[3]*[⬆] [3] Section 365(a) of the Code provides that a "trustee [or debtor], subject to the court's approval, may assume or reject any executory contract." *§365(a).* A contract is executory if "performance remains due to some extent on both sides." *NLRB v. Bildisco & Bildisco, 465 U.S. 513, 522, n. 6, 104 S. Ct. 1188, 79 L. Ed. 2d 482 (1984)* (internal quotation marks omitted). Such an agreement represents both an asset (the debtor's right to the counterparty's future performance) and a liability (the debtor's own obligations to perform). *Section 365(a)* enables the debtor (or its trustee), upon entering bankruptcy, to decide whether the contract is a good deal for the estate going forward. If so, the debtor will want to assume the contract, fulfilling its obligations while benefiting from the counterparty's performance. But if not, the debtor will want to reject the contract, repudiating any further performance of its duties. The bankruptcy court will generally approve that choice, under the deferential "business [***7] judgment" rule. *Id., at 523, 104 S. Ct. 1188, 79 L. Ed. 2d 482.*

*HN4*[⬆] *LEdHN[4]*[⬆] [4] According to *Section 365(g)*, "the rejection of an executory contract[ ] constitutes a breach of such contract." As both parties here agree, the counterparty thus has a claim against the estate for damages resulting from the debtor's nonperformance. See Brief for Petitioner 17, 19; Brief for Respondent 30-31. But such a claim is unlikely to ever be paid in full. That is because the debtor's breach is deemed to occur "immediately before the date of the filing of the [bankruptcy] petition," rather than on the actual post-petition rejection date. *§365(g)(1).* By thus giving the counterparty a pre-petition claim, *Section 365(g)* places that party in the same boat as the debtor's unsecured creditors, who in a typical bankruptcy may receive only cents on the dollar. See *Bildisco, 465 U.S., at 531-532, 104 S. Ct. 1188, 79 L. Ed. 2d 482* (noting the higher priority of post-petition claims).

In this case, the Bankruptcy Court (per usual) approved Tempnology's proposed rejection of its executory licensing agreement with Mission. See App. to Pet. for [*1659] Cert. 83-84. That meant, as laid out above, two things on which the parties agree. First, Tempnology could stop performing under the contract. And second, Mission could assert (for whatever it might be worth) a pre-petition claim in the [***8] bankruptcy proceeding for damages resulting from Tempnology's nonperformance.

But Tempnology thought still another consequence ensued, and it returned [**884] to the Bankruptcy Court for a declaratory judgment confirming its view. According to Tempnology, its rejection of the contract also terminated the rights it had granted Mission to use the Coolcore trademarks. Tempnology based its argument on a negative inference. See Motion in No. 15-11400 (Bkrtcy. Ct. NH), pp. 9-14. *HN5*[↑] *LEdHN[5]*[↑] [5] Several provisions in *Section 365* state that a counterparty to specific kinds of agreements may keep exercising contractual rights after a debtor's rejection. For example, *Section 365(h)* provides that if a bankrupt landlord rejects a lease, the tenant need not move out; instead, she may stay and pay rent (just as she did before) until the lease term expires. And still closer to home, *Section 365(n)* sets out a similar rule for some types of intellectual property licenses: If the debtor-licensor rejects the agreement, the licensee can continue to use the property (typically, a patent), so long as it makes whatever payments the contract demands. But Tempnology pointed out that neither *Section 365(n)* nor any similar provision covers trademark licenses. So, it reasoned, in that [***9] sort of contract a different rule must apply: The debtor's rejection must extinguish the rights that the agreement had conferred on the trademark licensee. The Bankruptcy Court agreed. See *In re Tempnology, LLC, 541 B. R. 1 (Bkrtcy. Ct. NH 2015)*. It held, relying on the same "negative inference," that Tempnology's rejection of the licensing agreement revoked Mission's right to use the Coolcore marks. *Id., at 7*.

The Bankruptcy Appellate Panel reversed, relying heavily on a decision of the Court of Appeals for the Seventh Circuit about the effects of rejection on trademark licensing agreements. See *In re Tempnology, LLC, 559 B. R. 809, 820-823 (Bkrtcy. App. Panel CA1 2016)*; *Sunbeam Products, Inc. v. Chicago Am. Mfg., LLC, 686 F. 3d 372, 376-377 (CA7 2012)*. Rather than reason backward from *Section 365(n)* or similar provisions, the Panel focused on *Section 365(g)*'s statement that rejection of a contract "constitutes a

breach." Outside bankruptcy, the court explained, the breach of an agreement does not eliminate rights the contract had already conferred on the non-breaching party. See *559 B. R., at 820*. So neither could a rejection of an agreement in bankruptcy have that effect. A rejection "convert[s]" a "debtor's unfulfilled obligations" to a pre-petition damages claim. *Id., at 822* (quoting *Sunbeam, 686 F. 3d, at 377*). But it does not "terminate the contract" or "vaporize[ ]" the counterparty's rights. *559 B. R., at 820, 822* (quoting *Sunbeam, 686 F. 3d, at 377*). Mission could thus continue to use the Coolcore trademarks.

But the [***10] Court of Appeals for the First Circuit rejected the Panel's and Seventh Circuit's view, and reinstated the Bankruptcy Court decision terminating Mission's license. See *In re Tempnology, LLC, 879 F. 3d 389 (2018)*. The majority first endorsed that court's inference from *Section 365(n)* and similar provisions. It next reasoned that special features of trademark law counsel against allowing a licensee to retain rights to a mark after the licensing agreement's rejection. Under that body of law, the majority stated, the trademark owner's "[f]ailure to monitor and exercise [quality] control" over goods associated with a trademark "jeopardiz[es] [*1660] the continued validity of [its] own trademark rights." *Id., at 402*. So if (the majority continued) a licensee [**885] can keep using a mark after an agreement's rejection, the licensor will need to carry on its monitoring activities. And according to the majority, that would frustrate "Congress's principal aim in providing for rejection": to "release the debtor's estate from burdensome obligations." *Ibid.* (internal quotation marks omitted). Judge Torruella dissented, mainly for the Seventh Circuit's reasons. See *id., at 405-407*.

We granted certiorari to resolve the division between the First and Seventh Circuits. *586 U.S. ___, 139 S. Ct. 397, 202 L. Ed. 2d 309 (2018)*. We now affirm the Seventh's reasoning and reverse the [***11] decision below. [1]

II

_____

[1] In its briefing before this Court, Mission contends that its exclusive distribution rights survived the licensing agreement's rejection for the same reason as its trademark rights did. See Brief for Petitioner 40-44; *supra, at ___, 203 L. Ed. 2d, at 883*. But the First Circuit held that Mission had waived that argument, see *879 F. 3d, at 401*, and we have no reason to doubt that conclusion. Our decision thus affects only Mission's trademark rights.

139 S. Ct. 1652, *1660; 203 L. Ed. 2d 876, **885; 2019 U.S. LEXIS 3544, ***11

Before reaching the merits, we pause to consider Tempnology's claim that this case is moot. Under settled law, *HN6*[⬆] *LEdHN[6]*[⬆] [6] we may dismiss the case for that reason only if "it is impossible for a court to grant any effectual relief whatever" to Mission assuming it prevails. *Chafin v. Chafin, 568 U.S. 165, 172, 133 S. Ct. 1017, 185 L. Ed. 2d 1 (2013)* (internal quotation marks omitted). That demanding standard is not met here.

Mission has presented a claim for money damages—essentially lost profits—arising from its inability to use the Coolcore trademarks between the time Tempnology rejected the licensing agreement and its scheduled expiration date. See Reply Brief 22, and n. 8. *HN7*[⬆] *LEdHN[7]*[⬆] [7] Such claims, if at all plausible, ensure a live controversy. See *Memphis Light, Gas & Water Div. v. Craft, 436 U.S. 1, 8-9, 98 S. Ct. 1554, 56 L. Ed. 2d 30 (1978).* For better or worse, nothing so shows a continuing stake in a dispute's outcome as a demand for dollars and cents. See 13C C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure §3533.3, p. 2 (3d ed. 2008) (Wright & Miller) ("[A] case is not moot so long as a claim for monetary relief survives"). Ultimate recovery on that demand may be uncertain or even unlikely for any number of reasons, in this case as in others. But that is of no moment. If there is any chance of money changing hands, Mission's suit remains [***12] live. See *Chafin, 568 U.S., at 172, 133 S. Ct. 1017, 185 L. Ed. 2d 1.*

Tempnology makes a flurry of arguments about why Mission is not entitled to damages, but none so clearly precludes recovery as to make this case moot. First, Tempnology contends that Mission suffered no injury because it "never used the trademark[s]" during [the post-rejection] period." Brief for Respondent 24; see Tr. of Oral Arg. 33. But that gets things backward. Mission's non-use of the marks during that time is precisely what gives rise to its damages claim; had it employed the marks, it would not have lost any profits. So next, Tempnology argues that Mission's non-use was its own "choice," for which damages cannot lie. See *id.,* at 26. But recall that the Bankruptcy Court held that Mission *could not* use the marks after rejection (and its decision remained in effect through the [**886] agreement's expiration). See *supra, at ___, 203 L. Ed. 2d, at 884.* And although (as Tempnology counters) the court issued "no injunction," Brief for Respondent 26, that difference does not matter: Mission need not have flouted a crystal-clear ruling and [*1661] courted yet more legal trouble to preserve its claim. Cf. 13B Wright & Miller §3533.2.2, at 852 (*HN8*[⬆]) *LEdHN[8]*[⬆] [8]

"[C]ompliance [with a judicial decision] does not moot [a case] if it remains possible to undo the effects [***13] of compliance," as through compensation). So last, Tempnology claims that it bears no blame (and thus should not have to pay) for Mission's injury because all it did was "ask[ ] the court to make a ruling." Tr. of Oral Arg. 34-35. But whether Tempnology did anything to Mission amounting to a legal wrong is a prototypical merits question, which no court has addressed and which has no obvious answer. That means it is no reason to find this case moot.

And so too for Tempnology's further argument that Mission will be unable to convert any judgment in its favor to hard cash. Here, Tempnology notes that the bankruptcy estate has recently distributed all of its assets, leaving nothing to satisfy Mission's judgment. See Brief for Respondent 27. But courts often adjudicate disputes whose "practical impact" is unsure at best, as when "a defendant is insolvent." *Chafin, 568 U.S., at 175, 133 S. Ct. 1017, 185 L. Ed. 2d 1.* And Mission notes that if it prevails, it can seek the unwinding of prior distributions to get its fair share of the estate. See Reply Brief 23. So although this suit "may not make [Mission] rich," or even better off, it remains a live controversy—allowing us to proceed. *Chafin, 568 U.S., at 176, 133 S. Ct. 1017, 185 L. Ed. 2d 1.*

III

*HN9*[⬆] *LEdHN[9]*[⬆] [9] What is the effect of a debtor's (or trustee's) rejection of [***14] a contract under *Section 365 of the Bankruptcy Code*? The parties and courts of appeals have offered us two starkly different answers. According to one view, a rejection has the same consequence as a contract breach outside bankruptcy: It gives the counterparty a claim for damages, while leaving intact the rights the counterparty has received under the contract. According to the other view, a rejection (except in a few spheres) has more the effect of a contract rescission in the non-bankruptcy world: Though also allowing a damages claim, the rejection terminates the whole agreement along with all rights it conferred. Today, we hold that both *Section 365's* text and fundamental principles of bankruptcy law command the first, rejection-as-breach approach. We reject the competing claim that by specifically enabling the counterparties in some contracts to retain rights after rejection, Congress showed that it wanted the counterparties in all other contracts to lose their rights. And we reject an argument for the rescission approach turning on the distinctive features of trademark licenses. Rejection of a contract—any contract—in bankruptcy

31

139 S. Ct. 1652, *1661; 203 L. Ed. 2d 876, **886; 2019 U.S. LEXIS 3544, ***14

operates not as a rescission but as a breach.

A

We start with the text of the Code's principal [***15] provisions on rejection—and find that it does much of the work. As noted earlier, *HN10*[🔼] *LEdHN[10]*[🔼] [10] *Section 365(a)* gives a debtor an option, subject to court approval, to "assume or reject any executory contract." See *supra, at ___, 203 L. Ed. 2d, at 883.* And *Section 365(g)* describes what rejection [**887] means. Rejection "constitutes a breach of [an executory] contract," deemed to occur "immediately before the date of the filing of the petition." See *supra, at ___, 203 L. Ed. 2d, at 883.* Or said more pithily for current purposes, a rejection is a breach. And "breach" is neither a defined nor a specialized bankruptcy term. It means in the Code what it means in contract law outside bankruptcy. See *Field v. Mans, 516 U.S. 59, 69, 116 S. Ct. 437, 133 L. Ed. 2d 351 (1995)* (Congress generally meant for the Bankruptcy Code to "incorporate the established meaning" of "terms that have accumulated settled meaning" (internal quotation marks omitted)). So the [*1662] first place to go in divining the effects of rejection is to non-bankruptcy contract law, which can tell us the effects of breach.

Consider a made-up executory contract to see how the law of breach works outside bankruptcy. A dealer leases a photocopier to a law firm, while agreeing to service it every month; in exchange, the firm commits to pay a monthly fee. During the lease term, the dealer decides to stop servicing the machine, [***16] thus breaching the agreement in a material way. The law firm now has a choice (assuming no special contract term or state law). The firm can keep up its side of the bargain, continuing to pay for use of the copier, while suing the dealer for damages from the service breach. Or the firm can call the whole deal off, halting its own payments and returning the copier, while suing for any damages incurred. See 13 R. Lord, Williston on Contracts §39:32, pp. 701-702 (4th ed. 2013) ("[W]hen a contract is breached in the course of performance, the injured party may elect to continue the contract or refuse to perform further"). But to repeat: The choice to terminate the agreement and send back the copier is for the *law firm.* By contrast, the *dealer* has no ability, based on its own breach, to terminate the agreement. Or otherwise said, the dealer cannot get back the copier just by refusing to show up for a service appointment. The contract gave the law firm continuing rights in the copier, which the dealer cannot unilaterally revoke.

And now to return to bankruptcy: If the rejection of the

photocopier contract "constitutes a breach," as the Code says, then the same results should follow (save for one [***17] twist as to timing). Assume here that the dealer files a Chapter 11 petition and decides to reject its agreement with the law firm. That means, as above, that the dealer will stop servicing the copier. It means, too, that the law firm has an option about how to respond—continue the contract or walk away, while suing for whatever damages go with its choice. (Here is where the twist comes in: Because the rejection is deemed to occur "immediately before" bankruptcy, the firm's damages suit will be treated as a pre-petition claim on the estate, which will likely receive only cents on the dollar. See *supra, at ___ - ___, 203 L. Ed. 2d, at 883.*) And most important, it means that assuming the law firm wants to keep using the copier, the dealer cannot take it back. A rejection does not terminate the contract. When it occurs, the debtor and counterparty do not go back to their pre-contract positions. Instead, the counterparty retains the rights it has received under the agreement. As after a breach, so too after a rejection, those rights survive.

All of this, it will hardly surprise you to learn, is not just about photocopier [**888] leases. *HN11*[🔼] *LEdHN[11]*[🔼] [11] *Sections 365(a)* and *(g)* speak broadly, to "any executory contract[s]." Many licensing agreements involving trademarks or other [***18] property are of that kind (including, all agree, the Tempnology-Mission contract). The licensor not only grants a license, but provides associated goods or services during its term; the licensee pays continuing royalties or fees. If the licensor breaches the agreement outside bankruptcy (again, barring any special contract term or state law), everything said above goes. In particular, the breach does not revoke the license or stop the licensee from doing what it allows. See, *e.g., Sunbeam, 686 F. 3d, at 376* ("Outside of bankruptcy, a licensor's breach does not terminate a licensee's right to use [the licensed] intellectual property"). And because rejection "constitutes a breach," *§365(g),* the same consequences follow in bankruptcy. The debtor can stop performing its remaining obligations under the agreement. But the debtor cannot rescind the license already conveyed. So the licensee [*1663] can continue to do whatever the license authorizes.

In preserving those rights, *HN12*[🔼] *LEdHN[12]*[🔼] [12] *Section 365* reflects a general bankruptcy rule: The estate cannot possess anything more than the debtor itself did outside bankruptcy. See *Board of Trade of Chicago v. Johnson, 264 U.S. 1, 15, 44 S. Ct. 232, 68 L. Ed. 533 (1924)* (establishing that principle); *§541(a)(1)*

139 S. Ct. 1652, *1663; 203 L. Ed. 2d 876, **888; 2019 U.S. LEXIS 3544, ***18

(defining the estate to include the "interests *of the debtor in property*" (emphasis added)). As one [***19] bankruptcy scholar has put the point: Whatever "limitation[s] on the debtor's property [apply] outside of bankruptcy[ ] appl[y] inside of bankruptcy as well. A debtor's property does not shrink by happenstance of bankruptcy, but it does not expand, either." D. Baird, Elements of Bankruptcy 97 (6th ed. 2014). So if the not-yet debtor was subject to a counterparty's contractual right (say, to retain a copier or use a trademark), so too is the trustee or debtor once the bankruptcy petition has been filed. The rejection-as-breach rule (but *not* the rejection-as-rescission rule) ensures that result. By insisting that the same counterparty rights survive rejection as survive breach, the rule prevents a debtor in bankruptcy from recapturing interests it had given up.

And conversely, the rejection-as-rescission approach would circumvent the Code's stringent limits on "avoidance" actions—the exceptional cases in which trustees (or debtors) may indeed unwind pre-bankruptcy transfers that undermine the bankruptcy process. The most notable example is for fraudulent conveyances—usually, something-for-nothing transfers that deplete the estate (and so cheat creditors) on the eve of bankruptcy. See [***20] §548(a). A trustee's avoidance powers are laid out in a discrete set of sections in the Code, see §§544-553, far away from *Section 365*. And they can be invoked in only narrow circumstances—unlike the power of rejection, which may be exercised for any plausible economic reason. See, *e.g.*, §548(a) (describing the requirements for avoiding fraudulent transfers); *supra, at      -      , 203 L. Ed. 2d, at 883*. If trustees (or debtors) could use rejection to rescind previously granted interests, then rejection would become functionally equivalent to avoidance. Both, that is, would roll back a prior transfer. And that result would subvert everything the Code does to keep avoidances cabined—so they do not threaten the rule that the **[**889]** estate can take only what the debtor possessed before filing. Again, then, core tenets of bankruptcy law push in the same direction as *Section 365*'s text: Rejection is breach, and has only its consequences.

B

Tempnology's main argument to the contrary, here as in the courts below, rests on a negative inference. See Brief for Respondent 33-41; *supra, at      -      , 203 L. Ed. 2d, at 883-884*. Several provisions of *Section 365*, Tempnology notes, "identif[y] categories of contracts under which a counterparty" may retain specified contract rights "notwithstanding rejection." Brief for

Respondent 34. *Sections 365(h)* and *(i)* make clear [***21] that certain purchasers and lessees of real property and timeshare interests can continue to exercise rights after a debtor has rejected the lease or sales contract. See *§365(h)(1)* (real-property leases); *§365(i)* (real-property sales contracts); *§§365(h)(2), (i)* (timeshare interests). And *Section 365(n)* similarly provides that licensees of some intellectual property—but not trademarks—retain contractual rights after rejection. See *§365(n)*; *§101(35A)*; *supra, at      , 203 L. Ed. 2d, at 884*. Tempnology argues from those provisions that the ordinary consequence of rejection must be something different—*i.e.*, the termination, rather than survival, of contractual rights previously granted. Otherwise, Tempnology concludes, **[*1664]** the statute's "general rule" would "swallow the exceptions." Brief for Respondent 19.

But that argument pays too little heed to the main provisions governing rejection and too much to subsidiary ones. On the one hand, it offers no account of how to read *Section 365(g)* (recall, rejection "constitutes a breach") to say essentially its opposite (*i.e.*, that rejection and breach have divergent consequences). On the other hand, it treats as a neat, reticulated scheme of "narrowly tailored exception[s]," *id.*, at 36 (emphasis deleted), what history reveals to be anything but. Each of the provisions [***22] Tempnology highlights emerged at a different time, over a span of half a century. See, *e.g.*, 52 Stat. 881 (1938) (real-property leases); *§1(b), 102 Stat. 2538 (1988)* (intellectual property). And each responded to a discrete problem—as often as not, correcting a judicial ruling of just the kind Tempnology urges. See Andrew, Executory Contracts in Bankruptcy, 59 U. Colo. L. Rev. 845, 911-912, 916-919 (1988) (identifying judicial decisions that the provisions overturned); compare, *e.g.*, *In re Sombrero Reef Club, Inc., 18 B. R. 612, 618-619 (Bkrtcy. Ct. SD Fla. 1982)*, with, *e.g.*, *§§365(h)(2), (i)*. Read as generously as possible to Tempnology, this mash-up of legislative interventions says nothing much of anything about the content of *Section 365(g)*'s general rule. Read less generously, it affirmatively refutes Tempnology's rendition. As one bankruptcy scholar noted after an exhaustive review of the history: "What the legislative record [reflects] is that whenever Congress has been confronted with the consequences of the [view that rejection terminates all contractual rights], it has expressed its disapproval." Andrew, 59 U. Colo. L. Rev., at 928. On that account, Congress enacted the provisions, as and **[**890]** when needed, to reinforce or clarify the general rule that contractual

33

rights survive rejection. [2]

Consider more closely, for example, Congress's enactment of *Section 365(n)*, which addresses certain intellectual [***23] property licensing agreements. No one disputes how that provision came about. In *Lubrizol Enterprises* v. *Richmond Metal Finishers*, the Fourth Circuit held that a debtor's rejection of an executory contract worked to revoke its grant of a patent license. See *756 F. 2d 1043, 1045-1048 (1985)*. In other words, *Lubrizol* adopted the same rule for patent licenses that the First Circuit announced for trademark licenses here. Congress sprang into action, drafting *Section 365(n)* to reverse *Lubrizol* and ensure the continuation of patent (and some other intellectual property) licensees' rights. See *102 Stat. 2538 (1988)*; S. Rep. No. 100-505, pp. 2-4 (1988) (explaining that *Section 365(n)* "corrects [*Lubrizol's*] perception" that "*Section 365* was ever intended to be a mechanism for stripping innocent licensee[s] of rights"). As Tempnology highlights, that provision does not cover trademark licensing agreements, which continue to fall, along with most other contracts, within *Section 365(g)'s* general rule. See Brief for Respondent 38. But what of that? Even put aside the claim that *Section 365(n)* is part of a pattern— that Congress whacked Tempnology's view [*1665] of rejection wherever it raised its head. See *supra, at___, 203 L. Ed. 2d, at 889.*. Still, Congress's repudiation of *Lubrizol* for patent contracts does not show any intent to *ratify* that decision's [***24] approach for almost all others. Which is to say that no negative inference arises. Congress did nothing in adding *Section 365(n)* to alter the natural reading of *Section 365(g)*—that rejection and breach have the same results.

Tempnology's remaining argument turns on the way special features of trademark law may affect the fulfillment of the Code's goals. Like the First Circuit below, Tempnology here focuses on a trademark licensor's duty to monitor and "exercise quality control

over the goods and services sold" under a license. Brief for Respondent 20; see *supra, at___-___, 203 L. Ed. 2d, at 884*. Absent those efforts to keep up quality, the mark will naturally decline in value and may eventually become altogether invalid. See 3 J. McCarthy, Trademarks and Unfair Competition §18:48, pp. 18-129, 18-133 (5th ed. 2018). So (Tempnology argues) unless rejection of a trademark licensing agreement terminates the licensee's rights to use the mark, the debtor will have to choose between expending scarce resources on quality control and risking the loss of a valuable asset. See Brief for Respondent 59. "Either choice," Tempnology concludes, "would impede a [debtor's] ability to reorganize," thus "undermining a fundamental purpose of the Code." *Id.,* at 59-60.

[**891] To begin with, that [***25] argument is a mismatch with Tempnology's reading of *Section 365*. The argument is trademark-specific. But Tempnology's reading of *Section 365* is not. Remember, Tempnology construes that section to mean that a debtor's rejection of a contract terminates the counterparty's rights "unless the contract falls within an express statutory exception." *Id.,* at 27-28; see *supra, at___-___, 203 L. Ed. 2d, at 889*. That construction treats trademark agreements identically to most other contracts; the only agreements getting different treatment are those falling within the discrete provisions just discussed. And indeed, Tempnology could not have discovered, however hard it looked, any trademark-specific rule in *Section 365*. That section's special provisions, as all agree, do not mention trademarks; and the general provisions speak, well, generally. So Tempnology is essentially arguing that distinctive features of trademarks should persuade us to adopt a construction of *Section 365* that will govern not just trademark agreements, but pretty nearly every executory contract. However serious Tempnology's trademark-related concerns, that would allow the tail to wag the Doberman.

And even putting aside that incongruity, Tempnology's plea to facilitate trademark licensors' reorganizations cannot overcome [***26] what *Sections 365(a)* and *(g)* direct. *HN13*[⬆] *LEdHN[13]*[⬆] [13] The Code of course aims to make reorganizations possible. But it does not permit anything and everything that might advance that goal. See, e.g., *Florida Dept. of Revenue v. Piccadilly Cafeterias, Inc., 554 U.S. 33, 51, 128 S. Ct. 2326, 171 L. Ed. 2d 203 (2008)* (observing that in enacting Chapter 11, Congress did not have "a single purpose," but "str[uck] a balance" among multiple competing interests (internal quotation marks omitted)). Here, *Section 365* provides a debtor like Tempnology

---

[2] At the same time, Congress took the opportunity when drafting those provisions to fill in certain details, generally left to state law, about the post-rejection relationship between the debtor and counterparty. See, e.g., Andrew, Executory Contracts in Bankruptcy, 59 U. Colo. L. Rev. 845, 903, n. 200 (1988) (describing Congress's addition of subsidiary rules for real property leases in *Section 365(h)*); Brief for United States as *Amicus Curiae* 29 (noting that Congress similarly set out detailed rules for patent licenses in *Section 365(n)*). The provisions are therefore not redundant of *Section 365(g)*: Each sets out a remedial scheme embellishing on or tweaking the general rejection-as-breach rule.

139 S. Ct. 1652, *1665; 203 L. Ed. 2d 876, **891; 2019 U.S. LEXIS 3544, ***26

with a powerful tool: Through rejection, the debtor can escape all of its future contract obligations, without having to pay much of anything in return. See *supra, at ___ - ___, 203 L. Ed. 2d, at 883*. But in allowing rejection of those contractual duties, *Section 365* does not grant the debtor an exemption from all the burdens that generally applicable law—whether involving contracts or trademarks—imposes [*1666] on property owners. See *28 U. S. C. §959(b)* (requiring a trustee to manage the estate in accordance with applicable law). Nor does *Section 365* relieve the debtor of the need, against the backdrop of that law, to make economic decisions about preserving the estate's value—such as whether to invest the resources needed to maintain a trademark. In thus delineating the burdens that a debtor may and may not escape, Congress also weighed (among other things) the legitimate interests and expectations [***27] of the debtor's counterparties. The resulting balance may indeed impede some reorganizations, of trademark licensors and others. But that is only to say that *Section 365*'s edict that rejection is breach expresses a more complex set of aims than Tempnology acknowledges.

IV

For the reasons stated above, we hold that *HN14*[⬆] *LEdHN[14]*[⬆] [14] under *Section 365*, a debtor's rejection of an executory contract in bankruptcy has the same effect as a breach outside bankruptcy. Such an act cannot rescind rights that the contract previously granted. Here, that construction of *Section 365* [**892] means that the debtor-licensor's rejection cannot revoke the trademark license.

We accordingly reverse the judgment of the Court of Appeals and remand the case for further proceedings consistent with this opinion.

It is so ordered.

**Concur by: SOTOMAYOR**

# Concur

Justice **Sotomayor**, concurring.

I agree with the Court that a debtor's choice to reject an executory contact under *11 U. S. C. §365(a)* functions as a breach of the contract rather than unwinding the rejected contract as if it never existed. *Ante, at ___ - ___, 203 L. Ed. 2d, at 886-888*. This result follows from traditional bankruptcy principles and from the general rule set out in *§365(g) of the Bankruptcy Code*. I also

agree that no specific aspects of trademark law compel a contrary rule that equates rejection with [***28] rescission. I therefore join the Court's opinion in full. I write separately to highlight two potentially significant features of today's holding.

First, the Court does not decide that every trademark licensee has the unfettered right to continue using licensed marks postrejection. The Court granted certiorari to decide whether rejection "terminates rights of the licensee that would survive the licensor's breach under applicable nonbankruptcy law." Pet. for Cert. i. The answer is no, for the reasons the Court explains. But the baseline inquiry remains whether the licensee's rights would survive a breach under applicable nonbankruptcy law. Special terms in a licensing contract or state law could bear on that question in individual cases. See *ante, at ___ - ___, 203 L. Ed. 2d, at 887-888*; Brief for American Intellectual Property Law Association as *Amicus Curiae* 20-25 (discussing examples of contract terms that could potentially lead a bankruptcy court to limit licensee rights postrejection).

Second, the Court's holding confirms that trademark licensees' postrejection rights and remedies are more expansive in some respects than those possessed by licensees of other types of intellectual property. Those variances stem [***29] from *§365(n)*, one of several subject-specific provisions in the Bankruptcy Code that "embellis[h] on or twea[k]" the general rejection rule. *Ante, at ___, n. 2, 203 L. Ed. 2d, at 890. Section 365(n)*—which applies to patents, copyrights, and four other types of intellectual property, but not to trademarks, *§101(35A)*—alters the general rejection rule in several respects. For example, a covered licensee that chooses to retain its rights postrejection must make all of its royalty payments; the licensee has no right to deduct damages from its payments even [*1667] if it otherwise could have done so under nonbankruptcy law. *§365(n)(2)(C)(i)*. This provision and others in *§365(n)* mean that the covered intellectual property types are governed by different rules than trademark licenses.

Although these differences may prove significant for individual licensors and licensees, they do not alter the outcome here. The Court rightly rejects Tempnology's argument that the presence of *§365(n)* changes what *§365(g)* says. As the Senate Report accompanying *§365(n)* explained, the bill did not "address or intend any [**893] inference to be drawn concerning the treatment of executory contracts" under *§365*'s general rule. S. Rep. No. 100-505, p. 5 (1988); see *ante, at ___ - ___, 203 L. Ed. 2d, at 890*. To the extent trademark licensees

are treated differently **[\*\*\*30]** from licensees of other forms of intellectual property, that outcome leaves Congress with the option to tailor a provision for trademark licenses, as it has repeatedly in other contexts. See *ante, at ___ - ___, 203 L. Ed. 2d at 889-890*.

With these observations, I join the Court's opinion.

**Dissent by: GORSUCH**

# Dissent

Justice **Gorsuch**, dissenting.

This Court is not in the business of deciding abstract questions, no matter how interesting. Under the Constitution, our power extends only to deciding "Cases" and "Controversies" where the outcome matters to real parties in the real world. *Art. III, §2*. Because it's unclear whether we have anything like that here, I would dismiss the petition as improvidently granted.

This case began when Mission licensed the right to use certain of Tempnology's trademarks. After Tempnology entered bankruptcy, it sought and won from a bankruptcy court an order declaring that Mission could no longer use those trademarks. On appeal and now in this Court, Mission seeks a ruling that the bankruptcy court's declaration was wrong. But whoever is right about that, it isn't clear how it would make a difference: After the bankruptcy court ruled, the license agreement expired by its own terms, so nothing we might say here could restore **[\*\*\*31]** Mission's ability to use Tempnology's trademarks.

Recognizing that its original case seems to have become moot, Mission attempts an alternative theory in briefing before us. Now Mission says that if it prevails here it will, on remand, seek money damages from Tempnology's estate for the profits it lost when, out of respect for the bankruptcy court's order, it refrained from using the trademarks while its license still existed.

But it's far from clear whether even this theory can keep the case alive. A damages claim "suffices to avoid mootness only if viable," which means damages must at least be "legally available for [the alleged] wrong." 13C C. Wright, A. Miller, & E. Cooper, Federal Practice and Procedure §3533.3, p. 22 (3d ed. 2008). Yet, as far as Mission has told us, Tempnology did nothing that could lawfully give rise to a damages claim. After all, when

Tempnology asked the bankruptcy court to issue a declaratory ruling on a question of law, it was exercising its protected "*First Amendment* right to petition the Government for redress of grievances." *Bill Johnson's Restaurants, Inc. v. NLRB, 461 U.S. 731, 741, 103 S. Ct. 2161, 76 L. Ed. 2d 277 (1983)*. And petitioning a court normally isn't an actionable wrong that can give rise to a claim for damages. Absent a claim of malice (which **[\*\*\*32]** Mission hasn't suggested would have any basis here), the ordinary rule is that "'no action lies against a party for resort to civil courts'" or for "the assertion of a legal argument." *Lucsik v. Board of Ed. of Brunswick City School Dist., 621 F. 2d 841, 842 (CA6 1980)* (per curiam); see, e.g., **[\*1668]** *W. R. Grace & Co. v. Rubber Workers, 461 U.S. 757, 770, n. 14, 103 S. Ct. 2177, 76 L. Ed. 2d 298 (1983)*; *Russell v. Farley, 105 U.S. 433, 437-438, 26 L. Ed. 1060 (1882)*.

**[\*\*894]** Maybe Mission's able lawyers will conjure something better on remand. But, so far at least, the company hasn't come close to articulating a viable legal theory on which a claim for damages could succeed. And where our jurisdiction is so much in doubt, I decline to proceed to the merits. If the legal questions here are of sufficient importance, a live case presenting them will come along soon enough; there is no need to press the bounds of our constitutional authority to reach them today.

# References

11 U.S.C.S. § 365

3 Collier on Bankruptcy ¶ 365.10 (Matthew Bender 16th ed.)

L Ed Digest, Bankruptcy *§ 322*

L Ed Index, Bankruptcy; Reorganization

What circumstances render civil case, or issues arising therein, moot so as to preclude Supreme Court's consideration of their merits. *44 L. Ed. 2d 745*.

The Supreme Court and the post-Erie federal common law. *31 L. Ed. 2d 1006*.

---

**End of Document**