Positive
As of: May 27, 2022 6:02 PM Z

# ANZ Sec., Inc. v. Giddens (In re Lehman Bros.)

United States Court of Appeals for the Second Circuit

August 26, 2015, Argued; December 14, 2015, Decided

Docket No. 14-3686

**Reporter**
808 F.3d 942 *; 2015 U.S. App. LEXIS 21606 **; 74 Collier Bankr. Cas. 2d (MB) 1480; Bankr. L. Rep. (CCH) P82,883; 61 Bankr. Ct. Dec. 249

IN RE: LEHMAN BROTHERS INC. ANZ SECURITIES, INC.; BMO CAPITAL MARKETS CORP., f/k/a HARRIS NESBITT CORP.; BNY MELLON CAPITAL MARKETS, LLC; CABRERA CAPITAL MARKETS, LLC; BNP PARIBAS FS, LLC, as successor in interest to FORTIS SECURITIES, LLC, f/k/a FORTIS INVESTMENT SERVICES, LLC; NATIONAL AUSTRALIA BANK, LTD.; SUNTRUST ROBINSON HUMPHREY, INC.; THE WILLIAMS CAPITAL GROUP, L.P.; DNB MARKETS, INC., f/k/a DNB NOR MARKETS, INC.; NABSECURITIES, LLC, Appellants, - v.- JAMES W. GIDDENS, as Trustee for the SIPA Liquidation of Lehman Brothers Inc., Trustee-Appellee.

**Prior History:** This appeal concerns the proper application of *Section 510(b) of the Bankruptcy Code* to claims seeking contribution or reimbursement for losses incurred in the course of defending and settling securities fraud lawsuits brought by investors in securities issued by a debtor's affiliate. Appellants challenge a judgment of the United States District Court for the Southern District of New York (Scheindlin, J.) affirming a bankruptcy court order (Peck, J.) subordinating Appellants' contribution claims pursuant to *§ 510(b)* to the claims of the Debtor's general unsecured creditors. For the following reasons, we AFFIRM the judgment and adopt the district court's construction of *§ 510(b)* **[**1]** .

*In re Lehman Bros. Inc., 519 B.R. 434, 2014 U.S. Dist. LEXIS 124590 (S.D.N.Y., 2014)*

## Core Terms

affiliate, subordination, Underwriters, bankruptcy court, claim for contribution, bankruptcy proceedings, district court, senior

## Case Summary

### Overview

HOLDINGS: [1]-Claims of junior underwriters of notes for contribution or reimbursement were properly subordinated to claims of general unsecured creditors of the lead underwriter of the notes in liquidation under *11 U.S.C.S. § 510(b)*, since the notes were non-equity securities issued by the lead underwriter's affiliated parent corporation which represented unsecured claims.

### Outcome

Judgment affirmed.

## LexisNexis® Headnotes

Bankruptcy Law > ... > Types of Claims > Unsecured Priority Claims > Subordination

*HN1*[] **Unsecured Priority Claims, Subordination**

In order to ensure that claims which are in essence claims corresponding to ownership of securities (debt or equity) are confined to their proper tier of the waterfall, *§ 510(b) of the Bankruptcy Code* provides generally that a claim arising from rescission of a purchase or sale of a security of the debtor or for damages arising from the purchase or sale of such a security shall be subordinated to all claims or interests that are senior to or equal the claim or interest represented by such security. *11 U.S.C.S. § 510(b)*. The provision treats the security of an affiliate as a security of the bankruptcy debtor for this purpose. The provision encompasses

31

claims for contribution for such damages.

Bankruptcy Law > ... > Judicial Review > Standards of Review > Clear Error Review

Bankruptcy Law > ... > Judicial Review > Standards of Review > De Novo Standard of Review

**HN2[] Standards of Review, Clear Error Review**

An appellate court exercises plenary review over a district court's affirmance of a bankruptcy court's decision, reviewing de novo the bankruptcy court's conclusions of law, and reviewing its findings of fact for clear error.

Bankruptcy Law > ... > Types of Claims > Unsecured Priority Claims > Subordination

**HN3[] Unsecured Priority Claims, Subordination**

See *11 U.S.C.S. § 510(b)*.

Bankruptcy Law > ... > Types of Claims > Unsecured Priority Claims > Subordination

**HN4[] Unsecured Priority Claims, Subordination**

In the affiliate securities context, the claim or interest represented by such security means a claim or interest of the same type as the affiliate security. Claims arising from securities of a bankruptcy debtor's affiliate should be subordinated in the debtor's bankruptcy proceeding to all claims or interests senior or equal to claims in the bankruptcy proceeding that are of the same type as the underlying securities (generally, secured debt, unsecured debt, common stock, etc.; and in some circumstances potentially a narrower sub-category).

Governments > Legislation > Interpretation

**HN5[] Legislation, Interpretation**

Statutory analysis necessarily begins with the plain meaning of a law's text and, absent ambiguity, will generally end there.

Governments > Legislation > Interpretation

**HN6[] Legislation, Interpretation**

A court reviews statutory text, considering the ordinary or natural meaning of the words chosen by Congress.

Bankruptcy Law > ... > Types of Claims > Unsecured Priority Claims > Subordination

**HN7[] Unsecured Priority Claims, Subordination**

Claims arising from securities of a bankruptcy debtor's affiliate are to be subordinated to all claims or interests senior or equal to claims in the bankruptcy proceeding that are of the same type as the underlying securities (generally, secured debt, unsecured debt, common stock, etc.).

**Counsel:** LUKE A. BAREFOOT, Cleary Gottlieb Steen & Hamilton LLP, New York, New York (Mitchell A. Lowenthal, Peter Fox, on the brief), for Appellants.

JAMES C. FITZPATRICK, Hughes Hubbard & Reed LLP, New York, New York (James B. Kobak, Jr., Robert B. Funkhouser, Jordan E. Pace, Jason E. Zakai, on the brief), for Trustee-Appellee.

**Judges:** Before: WALKER, JACOBS, and LIVINGSTON, Circuit Judges.

**Opinion by:** DENNIS JACOBS

## Opinion

**[*944]** DENNIS JACOBS, Circuit Judge:

HN1[] In order to ensure that claims which are in essence claims corresponding to ownership of securities (debt or equity) are confined to their proper tier **[**2]** of the waterfall, *Section 510(b) of the Bankruptcy Code* provides generally that "a claim arising from rescission of a purchase or sale of a security of the debtor or . . . for damages arising from the purchase or sale of such a security . . . shall be subordinated to all claims or interests that are senior to or equal the claim or interest represented by such security . . . ." *11 U.S.C. § 510(b)*. The provision treats the security of an "affiliate" as a security of the debtor for this purpose. The provision was amended in 1984 to encompass claims for contribution for such damages.

This appeal concerns the proper application of that provision in the Lehman bankruptcies. The Debtor here, Lehman Brothers Inc. ("LBI"), was lead underwriter for unsecured notes issued by Lehman Brothers Holdings Inc. ("Lehman Holdings"), its affiliate and parent. Following the bankruptcy of both the Lehman entity that issued the notes (Lehman Holdings) and the Lehman entity that was lead underwriter on the issuances (LBI), the "Junior Underwriters"[1] were held to account for the noteholders' losses, and incurred loss for defense and settlements. They now assert claims for contribution or reimbursement against the liquidation estate of Debtor LBI as lead underwriter **[**3]** of those notes.

The Bankruptcy Court of the Southern District of New York (Peck, J.) construed the statute to require subordination of the Junior Underwriters' contribution claims. The district court (Scheindlin, J.) affirmed the bankruptcy court's order, adopting a different analysis. We adopt the district court's construction of *§ 510(b)*, reject the various challenges to that construction, and affirm the judgment.

**BACKGROUND**

On September 15, 2008, Lehman Holdings filed for Chapter 11 bankruptcy protection--the largest bankruptcy filing in U.S. history. Four days later, Lehman Holdings's broker-dealer and wholly-owned subsidiary, LBI, was placed into liquidation pursuant to the *Securities Investor Protection Act of 1970*, as amended ("*SIPA*"), *15 U.S.C. §§ 78aaa, et seq.*[2] **[**4]** James W. Giddens was appointed as *SIPA* **[*945]** Trustee. An automatic stay applied to both proceedings. See *11 U.S.C. § 362*.

Between 2004 and 2008, before the Lehman collapse, LBI (as lead underwriter) and the Junior Underwriters launched 22 offerings of Lehman Holdings securities, totaling $32.4 billion. Beginning in December 2005, a Master Agreement Among Underwriters (the "Agreement") governed the relationship between LBI and the Junior Underwriters. One provision of the Agreement created **[**5]** a right of contribution among co-underwriters (based on percentage participation) for losses or liabilities resulting from securities fraud claims arising out of the offerings.

After commencement of LBI's *SIPA* proceeding (and of its parent's Chapter 11 proceeding), investors in Lehman Holdings notes filed securities fraud lawsuits against the Junior Underwriters, alleging material misstatements and omissions in the offering documents. LBI was not a defendant due to the automatic stay. The Junior Underwriters allege that they collectively incurred almost $78 million in the defense and settlement of those claims.

The Junior Underwriters filed general creditor proofs of claim against LBI in its *SIPA* proceeding, asserting rights to contribution for their losses pursuant to the Agreement and *Section 11(f) of the Securities Act of 1933*, *15 U.S.C. § 77k(f)*. The *SIPA* Trustee objected on the ground, inter alia, that the claims were subject to mandatory subordination pursuant to *11 U.S.C. § 510(b)*.

The Junior Underwriters argued that *§ 510(b)* could not be used to subordinate the claims in LBI's *SIPA* proceeding because the securities were issued by LBI's *parent*, rather than LBI. The Junior Underwriters acknowledge (as they must) that the section expressly **[**6]** applies to securities issued by "affiliate[s]," and that it requires that such claims "be subordinated to all claims or interests that are senior to or equal the claim[s] or interest[s] represented by such securit[ies] . . . ." But they argued (and argue) that: "a

[1] Appellants Junior Underwriters are ANZ Securities, Inc.; BMO Capital Markets Corp., f/k/a Harris Nesbitt Corp.; BNY Mellon Capital Markets, LLC; Cabrera Capital Markets, LLC; BNP Paribas FS, LLC, as successor in interest to Fortis Securities, LLC, f/k/a Fortis Investment Services, LLC; National Australia Bank, Ltd.; SunTrust Robinson Humphrey, Inc.; The Williams Capital Group, L.P.; DNB Markets, Inc., f/k/a DnB Nor Markets, Inc.; and nabSecurities, LLC.

[2] *SIPA* was enacted following the failure of broker-dealers in 1969 and 1970. *In re Adler Coleman Clearing Corp., 195 B.R. 266, 269 (Bankr. S.D.N.Y. 1996)*. It "protect[s] investors against financial losses arising from the insolvency of their brokers" and "protect[s] capital markets by instilling confidence in securities traders." *In re Bernard L. Madoff Inv. Sec. LLC, 654 F.3d 229, 239 (2d Cir. 2011)* (first quoting *In re New Times Sec. Servs., Inc., 463 F.3d 125, 127 (2d Cir. 2006)*; and then quoting *SIPC v. Morgan, Kennedy & Co., 533 F.2d 1314, 1317 (2d Cir. 1976)*). It "establishes procedures for liquidating failed broker-dealers and provides their customers with special protections. . . . [A] fund of 'customer property,' separate from the general estate of the failed broker-dealer, is established for priority distribution exclusively among customers." *Id. at 233* (quoting *15 U.S.C. § 78lll(4)*). "Notwithstanding the special protection afforded customers under *SIPA*, a *SIPA* liquidation is essentially a bankruptcy liquidation . . . ." *In re Adler Coleman Clearing Corp., 195 B.R. at 269*; see *15 U.S.C. § 78fff(b)*.

'claim or interest represented by such security' means . . . an assertion of the rights to payment concomitant to ownership of a given security," Br. of Appellants at 26-27; claims arising from the purchase or sale of securities of a debtor's affiliate (and claims for contribution on account of such a claim) therefore can be subordinated in the debtor's bankruptcy or SIPA proceeding only when claims also could be made in that proceeding based on ownership of the affiliate's securities; and, since the LBI estate did not independently contain securities issued by its parent, there were no "claim[s] or interest[s] represented by" the Lehman Holdings-issued securities to which the Junior Underwriters' contribution claims could be subordinated. See id. at 5-6, 13, 26, 35-38. In other words, they argued that because the Lehman Holdings-issued securities were not otherwise part of LBI's waterfall, § 510(b) did not apply to the Junior Underwriters' claims.

Bankruptcy Judge Peck rejected the Junior Underwriters' arguments and **[**7]** ordered their claims subordinated to the claims of general unsecured creditors. *In re Lehman Bros. Inc., 503 B.R. 778 (Bankr. S.D.N.Y. 2014)*. The bankruptcy judge reasoned that, when considering affiliate securities, the "claim[s] . . . represented by" the parent securities were the claims for contribution themselves: general unsecured claims, connected in subject matter to the underlying securities. *Id. at 784-85, 787*.

District Judge Scheindlin affirmed the bankruptcy court's order, but on another ground. To determine the level of subordination, the district judge focused on the type of security rather than on the type of claim. See *In re Lehman Bros. Inc., 519 B.R. 434, 450 & n.94, 451 & n.99* **[*946]** *(S.D.N.Y. 2014)*. Her opinion reasoned that "any ambiguity in the statute lies not in *whether* claims based on securities of an affiliate are to be subordinated but *how* that subordination is to occur," and that, in this instance, "[a] straightforward and practical application of *section 510(b)* recognizes that unsecured, non-equity securities"—like the notes at issue—"represent unsecured claims, meaning that claims involving such securities must be subordinated to general unsecured claims." *Id. at 449-51*; see also *id. at 452* ("In cases involving affiliate securities, the type of security dictates the level of subordination whether or not that security represents **[**8]** an actual claim in the debtor's case."). This appeal followed.[3]

[3] The decisions below also subordinated claims by two entities that are not parties to this appeal, Claren Road Credit Master Fund Ltd. and UBS Financial Services, Inc.

**DISCUSSION**

HN2[] "We exercise plenary review over a district court's affirmance of a bankruptcy court's decision," reviewing de novo the bankruptcy court's conclusions of law, and reviewing its findings of fact for clear error. *In re AppliedTheory Corp., 493 F.3d 82, 85 (2d Cir. 2007)* (per curiam). The facts material to the appeal are undisputed, so our review is de novo. For the following reasons, we adopt the district court's construction of *§ 510(b)*, and affirm the judgment subordinating the Junior Underwriters' claims.

**I**

*Section 510(b) of the Bankruptcy Code*, which applies to this SIPA proceeding (see *15 U.S.C. § 78fff(b)*), provides:

> HN3[] For the purpose of distribution under this title, a claim arising from rescission of a purchase or sale of a security of the debtor *or of an affiliate of the debtor*, for damages arising from the purchase or sale of such a security, or for reimbursement or contribution allowed under *section 502* on account of such a claim, shall be subordinated to *all claims or interests that are senior to or equal the claim or interest represented by such security*, except that if such **[**9]** security is common stock, such claim has the same priority as common stock.

*11 U.S.C. § 510(b)* (emphases added).

The Code thus requires that the Junior Underwriters' claims for contribution be subordinated—so long as there is a reasonable reading of *§ 510(b)* that locates their claims on a proper tier of the Debtor's waterfall. The Junior Underwriters contend that no such reading is possible. We disagree.

We adopt the district court's analysis. HN4[] We hold that in the affiliate securities context, "the claim or interest represented by such security" means a claim or interest of the same type as the affiliate security. Claims arising from securities of a debtor's affiliate should be subordinated in the debtor's bankruptcy proceeding to all claims or interests senior or equal to claims in the bankruptcy proceeding that are of the same type as the underlying securities (generally, secured debt, unsecured debt, common stock, etc.; and in some circumstances potentially a narrower sub-category).

40

II

Textual principles lead us to this result. See *Bustamante v. Napolitano, 582 F.3d 403, 406 (2d Cir. 2009)* (HN5[] "Statutory analysis necessarily begins with the plain meaning of a law's text and, absent ambiguity, will generally end there." (alteration omitted) (quoting *Puello v. BCIS, 511 F.3d 324, 327 [*947] (2d Cir. 2007)*)). The phrase "represented **[**10]** by" is not self-reading and is largely unhelpful. At the same time, our construction is consistent with an ordinary meaning of the word "represent". See *Mary Jo. C. v. N.Y.S. & Local Ret. Sys., 707 F.3d 144, 155 (2d Cir. 2013)* (HN6[] "[W]e 'review the statutory text, considering the ordinary or natural meaning of the words chosen by Congress . . . .'" (quoting *United States v. Aguilar, 585 F.3d 652, 657 (2d Cir. 2009)*)); 4 *Collier on Bankruptcy 510.04[1]* (16th ed. 2009) ("If the security is an unsecured debt instrument, the claim that is represented by that security is a general, unsecured claim.");[4] Webster's Third New International Dictionary of the English Language Unabridged 1926 (1986) (defining "represent" as, inter alia, "to correspond to in kind").

Moreover, our reading gives meaning to the entire provision, allowing the statute to operate on claims relating to affiliate securities--which are expressly included. See *Samantar v. Yousuf, 560 U.S. 305, 319, 130 S. Ct. 2278, 176 L. Ed. 2d 1047 (2010)* ("We do not construe statutory phrases in isolation; we read statutes as a whole." (alterations omitted) (quoting *United States v. Morton, 467 U.S. 822, 828, 104 S. Ct. 2769, 81 L. Ed. 2d 680 (1984)*)); *Tablie v. Gonzales, 471 F.3d 60, 64 (2d Cir. 2006)* ("We are obliged 'to give effect, if possible, to every clause and word of a statute,' and to render none superfluous." (alteration omitted) (quoting *Collazos v. United States, 368 F.3d 190, 199 (2d Cir. 2004)*)).

The Junior Underwriters **[**11]** have proposed no convincing rationale for their alternative construction, under which the affiliate securities provision would operate only in two (hypothetical) instances: when a debtor's and its affiliate's estates are substantively consolidated in bankruptcy, and when the debtor had guaranteed payment on the securities of its affiliate. As a preliminary matter, nothing in the text of *§ 510(b)* suggests the affiliate provision is so limited, and in the absence of any textual hook we hesitate to adopt a narrow construction of a section that our precedent suggests should be read "broadly." *In re Med Diversified, Inc., 461 F.3d 251, 259 (2d Cir. 2006)*. Additionally, as the district court explained in rejecting the significance of the first hypothetical, it is "unlikely that Congress . . . relied on [substantive consolidation] to provide meaning to the 'affiliate' language," given that such consolidation is not provided for explicitly in the Bankruptcy Code. *In re Lehman Bros. Inc., 519 B.R. at 451-52* (citing *In re Augie/Restivo Baking Co., 860 F.2d 515, 518 (2d Cir. 1988)*).

The Junior Underwriters' textual argument is flawed on its own terms. They contend that the district court "effectively amend[ed]" the statute. Reply Br. at 13; see also Br. of Appellants at 19. But the Junior Underwriters' construction is no more a plain language reading than the one the district **[**12]** court expressed and we adopt. They would read the phrase "claim or interest represented by such security" to mean a claim or interest *based on ownership of* such security in this proceeding. Such language does not appear in *§ 510(b)*.[5]

**[*948] III**

The available legislative history supports a construction that reaches affiliate securities in the ordinary case. *Section 510(b)* emerged from two distinct bills, neither of

---

[4] Collier was not referencing claims arising out of affiliate securities, and the observation would be non-controversial in the non-affiliate context.

[5] Various constructions have been advanced to give effect to the "affiliate" language. Our construction is preferable to the competing constructions advanced in this litigation. The bankruptcy court's approach is less plausible as a textual matter: *Section 510(b)* directs subordination to "claims or interests that are senior to or equal the claim or interest represented by such *security*," not to the claim or interest represented by such *claim*. The Trustee's alternative approach--to which he devotes a single paragraph of his appellate brief--asks the bankruptcy court to assume that LBI was liable on its parent's securities and to subordinate the contribution claims below those phantom liabilities (disregarding their separate corporate forms). Furthermore, the Trustee appears to imagine that such phantom claims (based on ownership of the parent's securities) would be situated at the very bottom of LBI's waterfall--below even the claims based on ownership of LBI common stock. Such **[**13]** a super-subordination seems inconsistent with the directive that no claims are to be subordinated below the level of the debtor's common stock. See *11 U.S.C. § 510(b)*.

which included claims arising out of transactions in affiliate securities; they subordinated only claims arising from the purchase or sale of securities issued by the debtor.[6] In the drafting process, Congress expressly included claims based on affiliate securities. See *11 U.S.C. § 510(b) (1982)*; *Bankruptcy Reform Act of 1978, Pub. L. No. 95-598, § 510(b), 92 Stat. 2549, 2586 (1978)*. Congress further expanded *§ 510(b)*'s reach in 1984, with the addition of claims for reimbursement and contribution. See *Bankruptcy Amendments and Federal Judgeship Act of 1984, Pub. L. No. 98-353, tit. III, sec. 451, 98 Stat. 333, 375 (1984)*; *In re Mid-Am. Waste Sys. Inc., 228 B.R. 816, 824 (Bankr. D. Del. 1999)* (describing 1984 amendment).

Congressional reports disclose no substantive discussion of either change. See *In re Lehman Bros. Inc., 519 B.R. at 442 n.47* ("[T]he legislative history of *section 510(b)* does not discuss the inclusion of affiliates in the statute."); *In re Mid-Am. Waste Sys. Inc., 228 B.R. at 824* ("Congress's 1984 amendment to *§ 510(b)* was not accompanied by any legislative history."). But they were both broadening measures. And *§ 510(b)* case law--our own and that of other courts--endorses a "broad" interpretation of the section (at least to the extent that such an interpretation is plausibly supported by the text). See, e.g., *In re Med Diversified, Inc., 461 F.3d at 255, 259*; *In re Telegroup, Inc., 281 F.3d 133, 135-36 (3d Cir. 2002)*; *In re Betacom of Phoenix, Inc., 240 F.3d 823, 827, 830-31 (9th Cir. 2001)*; *In re Enron Corp., 341 B.R. 141, 151, 153-54, 158-59, 163 (Bankr. S.D.N.Y. 2006)*.[7]

## IV

Just as the available legislative history supports our construction, so too does analysis of the rationales that motivated Congress to enact the section in the first place. The original enactment of *§ 510(b)* was motivated by an influential law review article by Professors John J. Slain and Homer Kripke. *In re Med Diversified, Inc., 461 F.3d at 255*; see Slain & Kripke, The Interface Between Securities Regulation and Bankruptcy--Allocating the Risk of Illegal Securities Issuance Between Securityholders and the Issuer's Creditors, 48 N.Y.U. L. Rev. 261 (1973). Slain and Kripke called for reinforcement **[**15]** of the absolute priority rule, by which creditors recover **[*949]** in full before equity holders recover any of their investment. Slain & Kripke, supra, at 261. They proposed mandatory subordination in a debtor's bankruptcy proceeding of claims alleging fraud and similar violations in the issuance of the debtor's securities, "because the bankruptcy courts' favorable treatment of shareholder fraud claims provided 'investors a windfall by giving them an opportunity to reap the benefits of a profitable entity and by allowing them to share with creditors in the event the enterprise was forced to reorganize or liquidate.'" *In re Med Diversified, Inc., 461 F.3d at 256* (quoting *In re PT-1 Communs., Inc., 304 B.R. 601, 609 (Bankr. E.D.N.Y. 2004))*.

Slain and Kripke's article gave two related policy rationales for subordination: "(1) the dissimilar risk and return expectation of shareholders and creditors," referred to as the "risk-allocation rationale"; and "(2) the reliance of creditors on the equity cushion provided by shareholder investment," referred to as the "equity cushion rationale." *Id. at 256, 259*; see Slain & Kripke, supra, at 286-91. Congress generally adopted the Slain and Kripke rationales when enacting *§ 510(b)*, which incorporated much (though not all) of the proposal advanced in their article. See *In re Med Diversified, Inc., 461 F.3d at 255-56*; *In re Telegroup, Inc., 281 F.3d at 139*; H. Rep. No. 95-595, at 194 (1977) ("The argument for mandatory subordination **[**16]** is best described by Professors Slain and Kripke."); *id. at 194-96* (summarizing and adopting their argument).[8]

The risk-allocation rationale is "'more integral to any policy analysis of *section 510(b)*'" than is "the equity cushion concept," the latter being "'only one part of the broader judgment concerning risk allocation.'" *In re Med Diversified, Inc., 461 F.3d at 258-59* (quoting *In re Enron Corp., 341 B.R. at 166*); see also *In re Telegroup, Inc.,*

---

[6] As relevant here, both proposed bills subordinated "any claim for rescission of the purchase of securities issued by the debtor corporation or for damages resulting from the purchase or sale of such securities." See *Bankruptcy Act* Revision, Hearings on H.R. 31 and H.R. 32 Before the Subcommittee on Civil & Constitutional Rights of the H. Comm. on the Judiciary, 94th Cong. 27, App'x 1 at 1, 142, App'x 2 at 355 (1976) (proposed **[**14]** 1975 bankruptcy acts).

[7] These cases concerned the types of claims eligible for subordination by virtue of falling within the first half of *§ 510(b)* (referred to as "arising-from" claims).

[8] Slain and Kripke did not propose subordinating claims arising from the purchase or sale of securities of the debtor's *affiliate*, and therefore had no occasion to consider how or whether the rationales they offered might bear upon the subordination of such securities. See generally Slain & Kripke, supra.

281 F.3d at 139 (noting that Slain and Kripke "conceptualiz[ed] the issue as one of risk allocation"); Slain & Kripke, *supra*, at 263; id. at 267 ("We are only incidentally concerned with the precise predicate of a disaffected stockholder's efforts to recapture his investment from the corporation."). Risk allocation serves as an effective rationalization for subordination in those circumstances when an affiliate's securities provide the basis for the claim, because the purchasers of the securities issued by the affiliate have taken on the risk-return expectations of investors while the debtor's creditors have not.[9] See **[*950]** *In re Med Diversified, Inc., 461 F.3d at 258-59*. Moreover, we need not determine whether **[**17]** this rationale is strong enough to warrant subordination of claims arising out of transactions in affiliate securities--Congress has already determined that it is. See *11 U.S.C. § 510(b)*.

"Congress enacted *§ 510(b)* to prevent disappointed shareholders from recovering their investment loss by using fraud and other securities claims to bootstrap their way to parity with general unsecured creditors in a bankruptcy proceeding." *In re Enron Corp., 341 B.R. at 158*. In order to prevent such bootstrapping from being effected indirectly, the statute likewise subordinates claims for contribution and reimbursement based on payments made to disappointed investors. **[**19]**

## V

Every other court that has applied *§ 510(b)* to claims based on affiliate securities--when the debtor was a corporate entity--has required subordination.[10] However, a survey of these cases provides little guidance in determining the appropriate level of subordination. They come out diverse ways; many do not discuss the issue explicitly; some that do give no reasons; and none involves a claimant making the same type of textual argument that the Junior Underwriters present here. But they nevertheless provide ballast for an interpretation of the statutory text that reaches affiliate claims in the ordinary case.[11]

---

[9] Several courts have concluded that the reimbursement and contribution amendment was a "logical extension" of the original risk-allocation rationale, and that Congress intended to ensure that the "risks associated with the issuance of stock [and securities]" were placed on the "underwriter, who is in a better position to evaluate such risks," and were not shifted to general unsecured creditors. *In re Mid-Am. Waste Sys., Inc., 228 B.R. at 825-26, 828*; see also, e.g., *In re Jacom Comput. Servs., Inc., 280 B.R. 570, 572 (Bankr. S.D.N.Y. 2002)*; *In re Walnut Equip. Leasing Co., No. 97-19699 (DWS), 1999 Bankr. LEXIS 1626, 1999 WL 1271762, at *9-10 (Bankr. E.D. Pa. Dec. 28, 1999)*.

In the bankruptcy court, the Junior Underwriters acknowledged that a "debtor's underwriters are better positioned to manage [the risk of the debtor's failure] than its creditors." J.A. 182 P 34 (Resp. Of Underwriter Claimants to the Trustee's One Hundred Fourth Omnibus Objection to General Creditor Claims). They now argue, however, that the rationale of these cases is "dubious," and that "in any event, it only holds for the *issuer's* creditors since it focuses solely on which parties--the issuer's underwriters or the issuer's creditors--were better positioned to protect themselves from the *issuer's* wrongful conduct." Br. **[**18]** of Appellants at 32-33. If a policy judgment on this point were required to resolve this case, we might find that, as between the Junior Underwriters and LBI's general creditors--which had no involvement in the issuance of securities of LBI's parent--the Junior Underwriters were likely better situated to anticipate and manage the risk of material misstatements or omissions in the Lehman Holdings offering materials. See *Chris-Craft Indus. Inc. v. Piper Aircraft Corp., 480 F.2d 341, 370 (2d Cir. 1973)* (noting underwriters' "expertise in appraising the securities issue and the issuer" and their "special motive thoroughly to investigate the issuer's strengths and weaknesses"). But we need not make such a finding; Congress explicitly included claims for contribution on account of damages claims arising from the securities of a debtor's affiliate in *§ 510(b)*.

[10] See, e.g., *In re Am. Hous. Found., 785 F.3d 143 (5th Cir. 2015)*; *In re VF Brands, Inc., 275 B.R. 725 (Bankr. D. Del. 2002)*; *In re Lernout & Hauspie Speech Prods., N.V., 264 B.R. 336 (Bankr. D. Del. 2001)*; *In re Basin Res. Corp., 190 B.R. 824 (Bankr. N.D. Tex. 1996)*; *In re Wis. Barge Line, 76 B.R. 142 (Bankr. E.D. Mo. 1987)*; see also *In re Del Biaggio, No. 12-CV-6447 (YGR), 2013 U.S. Dist. LEXIS 163953, 2013 WL 6073367 (N.D. Cal. Nov. 18, 2013)* (same result in individual debtor case).

[11] The one case on which the Junior Underwriters rely, *In re Khan, 523 B.R. 175 (9th Cir. B.A.P. 2014)* (declining to apply the statute to claims relating to affiliate securities in the bankruptcy proceeding of two individual debtors), is easily distinguishable. The rationale of the court (which did not parse the meaning of "represented by") was focused entirely on whether the statute applies to an individual (non-corporate) debtor. See *id. at 182-83*. It found the text to be ambiguous on this question, and ultimately determined that *§ 510(b)* does not apply **[**20]** to an individual debtor, because the policy rationales behind it are inapt: An individual debtor's creditors do not rely on any equity cushion when determining whether to extend credit, and the two different levels of risk-return expectations do not exist. *Id. at 183*.

## VI

When a bankruptcy court subordinates claims arising out of securities that were issued by the debtor's affiliate, it may become somewhat messy to superimpose the capital structure of the affiliate onto that of the debtor (although this case may not **[*951]** require the bankruptcy court to confront these issues[12]). Nevertheless, our approach works in broad strokes, and preserves flexibility needed by the bankruptcy court.

The bankruptcy court will be guided by the instruction that *HN7*[] claims arising from securities of a debtor's affiliate are to be subordinated to all claims or interests senior or equal to claims in the bankruptcy proceeding that are of the same type as the underlying securities (generally, secured debt, unsecured debt, common **[**21]** stock, etc.). The bankruptcy court is well-suited to engage in that kind of classification and discrimination. A court of equity may also determine whether it makes sense to group claims for subordination into narrower subcategories. When granular distinctions of priority among the affiliate's securities are not mirrored in the debtor's estate, a bankruptcy court may have to add tiers to the waterfall or, in a different case, may have to group multiple levels of priority. Similar choices are made in Chapter 11 reorganizations, in which bankruptcy judges determine whether securities are "substantially similar" to other securities such that they should be classified together. See *11 U.S.C. § 1122* (providing that a debtor's reorganization plan "may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class").

Bankruptcy judges regularly make these types of determinations, and they are better situated to do so than we are.

## CONCLUSION

For the foregoing reasons, we **AFFIRM** the judgment of the district court.

---

[12] LBI's *SIPA* liquidation has a single class of general unsecured creditor claims; and it appears that these claims are expected to consume the LBI estate. See Br. for Appellee at 30-31; cf. Reply Br. at 10.

End of Document

44

 Positive
As of: May 27, 2022 6:02 PM Z

# *In re Lehman Bros. Inc.*

United States District Court for the Southern District of New York

September 5, 2014, Decided; September 5, 2014, Filed

14-cv-1742(SAS); 14-cv-1987(SAS); 14-cv-2305(SAS)

**Reporter**
519 B.R. 434 *; 2014 U.S. Dist. LEXIS 124590 **

In re LEHMAN BROTHERS INC., Debtor.

**Subsequent History:** Affirmed by *ANZ Sec., Inc. v. Giddens (In re Lehman Bros.), 2015 U.S. App. LEXIS 21606 (2d Cir., Dec. 14, 2015)*

**Prior History:** **[**1]** Appeals arising from SIP A Liquidation Proceeding, Case No. 08-1420.

*In re Lehman Bros., 503 B.R. 778, 2014 Bankr. LEXIS 337 (Bankr. S.D.N.Y., 2014)*

## Core Terms

subordination, bonds, affiliate, bankruptcy court, stock, ambiguous, unsecured creditor, co-underwriters, argues, underwriter, sale of securities, unsecured claim, shareholder, common stock, risk-allocation, damages, holder, rescission, issuance, causal, nexus, plain language, no claim, broker-dealer, offering, register, Orders, capital structure, investors, courts

## Case Summary

### Overview

HOLDINGS: [1]-*11 U.S.C.S. § 510(b)* mandated the subordination of arising-from and contribution claims, provided such claims were based on securities of a debtor or an affiliate of the debtor; [2]-The level of subordination could be determined by reference to the type of claim or interest represented by such security, e.g., secured, unsecured, common stock, or equity; [3]-In cases involving affiliate securities, the type of security dictated the level of subordination whether or not that security represented an actual claim in the debtor's case; [4]-The bankruptcy court did not err in subordinating a putative securities seller's claim where, inter alia, it assumed the risk of the loss of investment; [5]-Subordinating the co-underwriters' claims to the claims of general unsecured creditors was proper as nothing in *§ 510(b)* forced unsecured creditors to subsidize their litigation costs.

### Outcome

Orders affirmed.

## LexisNexis® Headnotes

Bankruptcy Law > ... > Judicial Review > Standards of Review > Clear Error Review

Bankruptcy Law > ... > Judicial Review > Standards of Review > De Novo Standard of Review

*HN1*[] **Standards of Review, Clear Error Review**

A district court functions as an appellate court in reviewing orders entered by bankruptcy courts. Findings of fact are reviewed for clear error, *Fed. R. Bankr. P. 8013*, whereas findings that involve questions of law, or mixed questions of fact and law, are reviewed de novo. A district court may affirm, modify, or reverse a bankruptcy judge's judgment, order, or decree or remand with instructions for further proceedings.

Bankruptcy Law > ... > Types of Claims > Unsecured Priority Claims > Subordination

*HN2*[] **Unsecured Priority Claims, Subordination**

See *11 U.S.C.S. 510(b)*.

Bankruptcy Law > ... > Types of

Claims > Unsecured Priority Claims > Subordination

**HN3[] Unsecured Priority Claims, Subordination**

11 U.S.C.S. § 510(b) describes three categories of claims that are subject to mandatory subordination and then addresses how subordination is to occur.

Bankruptcy Law > ... > Types of Claims > Unsecured Priority Claims > Subordination

**HN4[] Unsecured Priority Claims, Subordination**

A shareholder claimant who seeks to rescind an equity interest and to obtain a debt claim will have the debt claim subordinated. Rescission will lead to subordination below the interest held before rescission. However, if the security is common stock, the claim has the same priority as common stock. If the security is an unsecured debt instrument, the claim that is represented by that security is a general, unsecured claim. Since the claim represented by the instrument is a general, unsecured claim, any claim for rescission will be subordinated until the claims of the general unsecured creditors have been satisfied.

Bankruptcy Law > ... > Types of Claims > Unsecured Priority Claims > Subordination

**HN5[] Unsecured Priority Claims, Subordination**

11 U.S.C.S. § 510(b) is not limited to claims based on fraud in the issuance.

Bankruptcy Law > ... > Types of Claims > Unsecured Priority Claims > Subordination

**HN6[] Unsecured Priority Claims, Subordination**

11 U.S.C.S. § 510(b) is not limited to shareholder claims. Section 510(b) uses the term security, which is defined in 11 U.S.C.S. § 101(49) of the Bankruptcy Code as including stocks, bonds, and notes, among other instruments. Accordingly, § 510(b) is applied broadly to subordinate claims arising in a variety of contexts, such as claims based on fraudulent retention, as well as other torts or breach of contract claims involving the failure to deliver, exchange, or register securities. Courts also subordinate claims for contribution, indemnification, and reimbursement asserted by underwriters and others, and claims based on securities of an affiliate of the debtor. Courts also recognize that the claimant need not be an actual security holder, and the debtor need not be the issuer of the security for § 510(b) to apply.

Bankruptcy Law > ... > Types of Claims > Unsecured Priority Claims > Subordination

**HN7[] Unsecured Priority Claims, Subordination**

It is now well-settled that 11 U.S.C.S. § 510(b) applies in the absence of an actual purchase or sale.

Bankruptcy Law > ... > Types of Claims > Unsecured Priority Claims > Subordination

**HN8[] Unsecured Priority Claims, Subordination**

Given the weight of precedent favoring subordination under 11 U.S.C.S. § 510(b) even where no purchase or sale has occurred, and the absence of persuasive precedent upholding the contrary position, the ambiguity vel non of the statutory text is beside the point.

Bankruptcy Law > ... > Types of Claims > Unsecured Priority Claims > Subordination

**HN9[] Unsecured Priority Claims, Subordination**

Regardless of the type of claim, precedent requires subordination of claims by security holders that seek to recover for the loss in value of a security issued by the debtor or an affiliate. Neither 11 U.S.C.S. § 510(b) nor the Securities Investor Protection Act (SIPA) suggests an exception for transactions involving broker-dealer debtors either purchasing or selling affiliate bonds. SIPA provides that § 510(b) applies in liquidation proceedings, 15 U.S.C.S. § 78fff(b); bonds, in keeping with their common meaning, are included in the definition of security, 11 U.S.C.S. § 101(49)(A); and § 510(b) explicitly references both debtor and debtor-affiliate securities.

Bankruptcy Law > ... > Types of Claims > Unsecured Priority Claims > Subordination

**HN10[] Unsecured Priority Claims, Subordination**

Courts applying *11 U.S.C.S. § 510(b)* where the debtor is a broker-dealer must differentiate between those claims arising from the purchase or sale of affiliated securities and those that arise from the purchase or sale of securities issued by unaffiliated third parties.

Bankruptcy Law > ... > Types of Claims > Unsecured Priority Claims > Subordination

**HN11[] Unsecured Priority Claims, Subordination**

*11 U.S.C.S. § 510(b)* separately refers to the claim subject to subordination, the underlying debtor or affiliate security, and the claim or interest represented by that security.

Bankruptcy Law > ... > Types of Claims > Unsecured Priority Claims > Subordination

**HN12[] Unsecured Priority Claims, Subordination**

Nothing in *11 U.S.C.S. § 510(b)* ties subordination to a security within the capital structure of the debtor.

Bankruptcy Law > ... > Types of Claims > Unsecured Priority Claims > Subordination

**HN13[] Unsecured Priority Claims, Subordination**

It is true that generally shareholders of a subsidiary have no claim against the parent and thus are not part of any priority scheme of claims against the parent. However, *11 U.S.C.S. § 510(b)* unambiguously states that rescission, arising-from, and contribution claims involving securities of an affiliate of the debtor are subject to subordination. Thus, any ambiguity in the statute lies not in whether claims based on securities of an affiliate are to be subordinated but how that subordination is to occur.

Bankruptcy Law > ... > Types of Claims > Unsecured Priority Claims > Subordination

**HN14[] Unsecured Priority Claims, Subordination**

The United States Bankruptcy Court for the District of Delaware rejected the argument that because there is no general principle which states that claims of general unsecured creditors of a parent are senior to the claims of shareholders of its subsidiary, *11 U.S.C.S. § 510(b)* does not require subordination of claims based on affiliate securities to claims held by the debtor's creditors. The court looked to the type of claim asserted by the claimant and determined that because the claim was an unsecured claim, *§ 510(b)* required that it be subordinated to the claims of general unsecured creditors.

Bankruptcy Law > ... > Types of Claims > Unsecured Priority Claims > Subordination

**HN15[] Unsecured Priority Claims, Subordination**

Regardless of the approach, the United States District Court for the Southern District of New York agrees with the United States Bankruptcy Court for the Southern District of New York and other courts that arising-from claims in the affiliate context must at the very least be subordinated to general unsecured claims to effectuate the purpose of *11 U.S.C.S. § 510(b)*.

Bankruptcy Law > ... > Types of Claims > Unsecured Priority Claims > Subordination

**HN16[] Unsecured Priority Claims, Subordination**

It is not reasonable to read *11 U.S.C.S. § 510(b)* as applying only when there is a close nexus between the affiliate security and the asserted claim. *Section 510(b)* states that a claim arising from the purchase or sale of a security of a debtor or an affiliate of the debtor shall be subordinated to all claims or interests that are senior to or equal the claim or interest represented by such security. The statute's application to securities of an affiliate is therefore unambiguous. Furthermore, the phrase arising from, which implies a causal connection, modifies the types of claims that are subject to mandatory subordination, not how those claims are to be subordinated. Neither the phrase represented by nor its placement in *§ 510(b)* implies a causal connection requiring a close nexus between the security and the asserted claim.

Bankruptcy Law > ... > Types of

Claims > Unsecured Priority Claims > Subordination

**HN17[] Unsecured Priority Claims, Subordination**

A straightforward and practical application of 11 U.S.C.S. § 510(b) recognizes that unsecured, non-equity securities represent unsecured claims, meaning that claims involving such securities must be subordinated to general unsecured claims, and when the relevant security is common stock the underlying claim is subordinated to the level of common stock.

Bankruptcy Law > ... > Types of Claims > Unsecured Priority Claims > Subordination

**HN18[] Unsecured Priority Claims, Subordination**

Claims for contribution arising from transactions based on securities of an affiliate of the debtor are plainly subject to subordination under 11 U.S.C.S. § 510(b).

Bankruptcy Law > ... > Types of Claims > Unsecured Priority Claims > Subordination

**HN19[] Unsecured Priority Claims, Subordination**

By including securities of affiliates in 11 U.S.C.S. § 510(b), Congress has already made the judgment that claims for contribution based on such securities must be subordinated. This is because underwriters are in a better position to allocate risks associated with the issuance of securities and it is inconsistent with the policies articulated in the legislative history of § 510(b) to force unsecured creditors to subsidize the underwriters' litigation costs.

Bankruptcy Law > ... > Types of Claims > Unsecured Priority Claims > Subordination

**HN20[] Unsecured Priority Claims, Subordination**

11 U.S.C.S. § 510(b) mandates the subordination of arising-from and contribution claims, provided such claims are based on securities of a debtor or an affiliate of the debtor. The level of subordination can be determined by reference to the type of claim or interest represented by such security, e.g., secured, unsecured, common stock, or equity. In cases involving affiliate securities, the type of security dictates the level of subordination whether or not that security represents an actual claim in the debtor's case.

**Counsel:** For Claren Road Credit Master Fund Ltd., Appellant: Marshall R. King, Esq., Matthew J. Williams, Esq., Joshua Weisser, Esq., Gibson, Dunn, & Crutcher LLP, New York, NY.

For UBS Financial Services Inc., Appellant: Joshua Dorchak, Esq., Bingham McCutchen LLP, New York, NY.

For ANZ Securities, Inc., BMO Capital Markets Corp., BNY Mellon Capital Markets, LLC, Cabrera Capital Markets, LLC, DNB Markets, Inc., BNP Paribas FS, LLC, nabSecurities, LLC, National Australia Bank Ltd., SunTrust Robinson Humphrey, Inc. and The Williams Capital Group, L.P., Appellants: Mitchell A. Lowenthal, Esq., Luke A. Barefoot, Esq., Cleary Gottlieb Steen & Hamilton LLP, New York, NY.

For James W. Giddens, as Trustee for the SIPA Liquidation of Lehman Brothers, Inc., Appellee: James B. Kobak, Jr., Esq., Michael E. Salzman, Esq., Ramsey Chamie, Esq., Dina R. Hoffer, Esq., Hughes Hubbard & Reed LLP, New York, NY.

**Judges:** Shira A. Scheindlin, United States District Judge.

**Opinion by:** Shira A. Scheindlin

## Opinion

**[*436] OPINION AND ORDER**

**SHIRA A. SCHEINDLIN, U.S.D.J.:**

I. INTRODUCTION

On September 19, 2008, Lehman Brothers Inc. ("LBI"), a registered broker-dealer and wholly-owned subsidiary of **[**2]** Lehman Brothers Holdings Inc. ("LBHI"), was placed into liquidation pursuant to the Securities Investor Protection Act of 1970 ("SIPA"), and James W. Giddens was appointed as SIPA trustee (the "Trustee"). Before the Court are three related appeals from two orders entered by Bankruptcy Judge James M. Peck in LBI's SIPA proceeding (the "Orders").[1] In relevant part,

[1] *See In re Lehman Brothers Inc.*, No. 08-1420 (JMP) (SIPA), Dkt. Nos. 8176 and 8177; In re Lehman Brothers, Inc., 503

the Orders grant a motion and sustain an objection filed by the Trustee seeking to subordinate certain claims pursuant to section 510(b) of the Bankruptcy Code. The Bankruptcy Court found that subordination of the claims to the claims of general unsecured creditors was mandated under the plain language of section 510(b).

Appellant Claren Road Credit Master Fund Ltd. ("Claren Road") argues that its claim for damages against LBI, based on LBI's failure to purchase bonds issued by LBHI from Claren Road pursuant to a prime brokerage account agreement, should not be subordinated because it does not "aris[e] from the purchase or sale" of the LBHI bonds within the meaning of section 510(b).[2] In addition, Claren Road and the remaining appellants, co-underwriters[3] with LBI in the issuance of LBHI securities, [**3] argue that section 510(b) is inapplicable because there are no claims or interests "represented by" LBHI securities in LBI's SIPA proceeding.[4] For the reasons set forth below, the Orders are AFFIRMED.

## II. BACKGROUND [**4]

### A. Claren Road

#### 1. Claren Road's Claim

In December 2005, Claren Road and LBI entered into a prime brokerage agreement.[5] The PBA deems LBHI and [*437] certain LBHI affiliates as parties and is signed by LBI "as signatory for itself and as agent for the affiliates named herein."[6] As prime broker, LBI agreed to "'settl[e] trades executed on [Claren Road's] behalf by [its] executing broker(s).'"[7] On September 12, 2008, LBI and Claren Road entered into two separate trades in which LBI agreed to purchase LBHI bonds from Claren Road at a discount to par. LBI breached its agreement to purchase the LBHI bonds on September 17, 2008, when it failed to settle the trades. Claren Road filed a claim against LBI in the SIPA liquidation for over $8.5 million, representing the difference between the amount that LBI had agreed to pay for the LBHI bonds and their market price on September 19, 2008.[8]

#### 2. The Trustee's Motion and the Bankruptcy Court's Order [**5]

On October 25, 2013, the Trustee filed a motion seeking to confirm the non-customer status[9] of Claren Road's claim under SIPA and to subordinate it to the claims of general unsecured creditors pursuant to section

---

B.R. 778 (Bankr. S.D.N.Y. 2014) ("Decision Below").

[2] *See* Opening Brief of Appellant Claren Road Credit Master Fund Ltd. ("Claren Road Mem."), Case No. 14-cv-1742, at 8-10 (quoting 11 U.S.C. § 510(b)); Reply Brief of Appellant Claren Road Credit Master Fund Ltd. ("Claren Road Reply"), Case No. 14-cv-1742, at 3-5.

[3] A joint appeal was filed by underwriters ANZ Securities, Inc. ("ANZ"), BMO Capital Markets Corp., BNY Mellon Capital Markets, LLC, Cabrera Capital Markets, LLC, DNB Markets, Inc., BNP Paribas FS, LLC, nabSecurities, LLC, National Australia Bank Ltd., SunTrust Robinson Humphrey, Inc. and The Williams Capital Group, L.P. I will refer to these underwriters collectively as "ANZ." Underwriter UBS Financial Services Inc. ("UBSFS") is represented by separate counsel and has filed a separate appeal. I will refer to UBSFS and ANZ collectively as the "co-underwriters."

[4] Opening Brief of Appellant UBS Financial Services Inc. ("UBSFS Mem."), Case No. 14-cv-2305, at 1 (quoting 11 U.S.C. § 510(b)); Opening Brief of Junior Underwriter Appellants ("ANZ Mem."), Case No. 14-cv-1987, at 3 (same).

[5] *See* Claren Road Mem. at 4; Customer Account Agreement Prime Brokerage ("PBA"), Ex. 2 to 3/26/14 Declaration of Joshua Weisser, counsel to Claren Road, in Support of Opening Brief of Appellant Claren Road Credit Master Fund Ltd.

[6] PBA at 1, 11.

[7] Claren Road Mem. at 5 (quoting PBA ¶ 21(b)).

[8] *See id.*

[9] Congress enacted SIPA in response to customer losses that resulted from stockbroker failures in 1969 and 1970. The purpose of SIPA is "to protect individual investors from financial hardship; to insulate the economy from the disruption which can follow the failure of major financial institutions; and to achieve a general upgrading of financial responsibility requirements of brokers and dealers to eliminate, to the maximum extent possible, the risks which lead to customer loss." S. Rep. No. 1218, 91st Cong., 2d Sess., at 4 (1970). To effectuate this purpose, "a fund of 'customer property' is established [] consisting of cash and securities held by the broker-dealer . . . for priority distribution exclusively among customers," and "[t]he Trustee allocates the customer property so that customers 'share ratably in such customer property . . . to the extent of their respective net equities.'" *In re Bernard L. Madoff Inv. Sec. LLC*, 740 F.3d 81, 85 (2d Cir. 2014) (quoting 15 U.S.C. § 78fff-2(c)(1)(B)). [**8]

510(b).[10] Claren Road argued that on a literal reading of section 510(b), its claim does not arise from a purchase or sale of a security because LBI did not complete the purchase of the LBHI bonds.[11] It further argued that under Second Circuit case law, section 510(b) is ambiguous when applied to its claim and that subordination of its claim would not further the policy objectives underlying the statute.[12] The Bankruptcy Court held **[*438]** that under the plain language of the statute, Claren Road's claim was subject to subordination as a claim arising from the purchase or sale of a security of a debtor affiliate.[13] The Bankruptcy Court also rejected Claren Road's argument that because section 510(b) states that an arising from claim "shall be subordinated to all claims or interests that are senior to or equal *the claim or interest represented by such security*," claims based on LBHI bonds may not be subordinated in LBI's SIPA proceeding where holders of LBHI bonds have *no claims* against LBI's estate.[14] The Bankruptcy Court explained that

> Claren Road's **[**6]** approach is too narrow and fails to recognize the common meaning of the words used in the statute. A more reasonable interpretation of the statutory language is that the "claim . . . represented by [the LBHI Bonds]" is not directed to a recovery from LBI on account of the LBHI Bonds but extends to the breach of contract claim asserted by Claren Road against LBI with respect to these bonds. Such a claim is a general unsecured claim that is connected to the subject matter of the securities in question. The essence of the claim is the failure to purchase the LBHI Bonds. This reading of the plain language of the statute leads to the conclusion that the Claren Road Claim "shall be subordinated to all claims . . . that are senior to or equal" the general unsecured claims against LBI.
>
> Interpreting the phrase "claim or interest *represented by such security*" in this fashion is a common sense interpretation of section 510(b) that infuses the words of section 510(b) with meaning. If a claim "represented by such security" were to be restricted to a recovery from the issuer for amounts outstanding under the security, then no claim arising from the purchase or sale of *affiliate* securities would ever fit within the regime for **[**7]** subordination. Such a result would contradict express provisions of the statute which direct that such claims shall be subordinated.[15]

The Bankruptcy Court entered an order allowing Claren Road's claim as a non-customer claim in its asserted amount, and subordinated that claim to the claims of general unsecured creditors.

### B. The Co-underwriters

#### 1. ANZ

In the course of its business as a broker-dealer, LBI

---

[10] *See* Decision Below, 503 B.R. at 781.

[11] *See* Claren Road Mem. at 8 ("Although section 510(b), by its terms, is limited to claims "arising from the purchase or sale" of a security of the debtor or an affiliate of the debtor, no such 'purchase or sale' occurred in connection with the Claren Road Claim. The Claim arises out of the *absence* of a purchase or sale, caused by LBI's *failure* to consummate the purchase to which it had agreed, thereby breaching its contract with Claren Road.") (emphasis in original).

[12] *See* Decision Below, 503 B.R. at 781. A number of facts relevant to consideration of these policy rationales are not included in the record, such as what business Claren Road is engaged in, when and for what purpose it purchased the LBHI bonds, whether the LBHI bonds were freely tradeable, etc. In this regard, it is unclear why these appeals come to this Court on the Trustee's motion/objection and not in the context of an adversary proceeding in which the factual record could have been more fully developed. *See* Fed. R. Bankr. P. 7001(8) (stating than an adversary proceeding must be brought "to subordinate any allowed claim or interest, except when a chapter 9, chapter 11, chapter 12, or chapter 13 plan provides for subordination); *but see* Lernout & Hauspie Speech Prods., N.V. v. Baker (In re Lernout & Hauspie Speech Prods. N.V.), 264 B.R. 336, 339-40 (Bankr. D. Del. 2001) (explaining that Rule 7001(8) "appears to limit subordination **[**9]** complaints to allowed claims," and, in any event declining to elevate form over substance where there had been due process). While the parties have not challenged the Bankruptcy Court's decision on procedural grounds, the Trustee raises a number of fact-based arguments. *See, e.g.*, Brief for the Appellee Trustee, Case No. 14-cv-1742, at 2, 19. Ultimately, however, the absence of factual findings by the Bankruptcy Court does not impact this Court's holdings.

[13] *See* Decision Below, 503 B.R. at 783-84.

[14] 11 U.S.C. § 510(b) (emphasis added); *see* Decision Below, 503 B.R. at 784.

[15] Decision Below, 503 B.R. at 784 (alterations and emphasis in original).

served as lead underwriter in connection with offerings of registered securities issued by LBHI.[16] LBI and ANZ entered into a Master Agreement Among Underwriters dated December 1, 2005, which governed the relationship among the underwriters.[17] "The agreement required each underwriter to contribute, based on **[*439]** its agreed percentage participation in an offering, toward losses or liabilities incurred by another underwriter arising from allegations that the offering materials contained untrue statements or omissions."[18]

After LBHI's collapse, a number of purchasers of LBHI securities filed lawsuits, including class actions, against ANZ.[19] LBI was not named as a defendant because of the bar created by the automatic stay under *section 362*. These actions alleged that LBHI's offering documents contained material misstatements and omissions and sought to hold ANZ liable for damages under federal securities laws.[20] ANZ's legal fees and settlement payments came to nearly seventy-eight million dollars and ANZ filed claims in LBI's SIPA proceeding based on asserted contractual and statutory rights to contribution.

**2. UBSFS**

Pursuant to a purchase agreement entered into by UBSFS and LBI in 2007, "[i]n 2007 and 2008, UBSFS purchased from LBI, in LBI's capacity as underwriter, certain notes, including certain Medium Term Notes, Series I, U.S. Structured Notes issued by LBI [ ], expressly earmarked for sale to UBSFS clients."[21] There were approximately eighty-four issuances of the **[**11]** LBHI notes pursuant to the parties' agreements. UBSFS did not purchase or hold any of the notes for its own account.[22] Following the commencement of LBI's SIPA case, a number of UBSFS clients filed class action lawsuits or initiated arbitration proceedings against UBSFS, asserting securities fraud and related claims based on alleged material misstatements and omissions in the offering materials concerning the LBHI notes.[23] UBSFS filed a claim for over two hundred and fifty million dollars based on its statutory right to contribution.[24]

**3. The Trustee's Objection and the Bankruptcy Court's Order**

On July 12, 2013, the SIPA Trustee filed an objection to the underwriter claims arguing that such claims should be subordinated under *section 510(b)*. The co-underwriters argued that their claims could not be subordinated "because the LBHI securities do not represent a claim that can be made in the LBI case."[25] The Bankruptcy Court rejected the co-underwriters' "hyper-technical" focus "on what it means for claims to be represented by securities of an affiliate of the debtor," disagreeing that "the claims must be based on securities **[**12]** within the capital structure of an enterprise that includes a debtor and affiliated entities."[26] The Bankruptcy Court explained that this rested on "the false premise [ ] that the claims represented by the securities of an affiliate of the debtor must be the same kinds of claims that could be made by a holder of those securities against that affiliate" and concluded that the co-underwriters' claims "are simply claims for reimbursement and contribution based on the sale of **[*440]** securities of LBHI, an affiliate of the debtor, and such claims do not rank equally with other unsecured claims against LBI.[27] In reaching this conclusion, the Bankruptcy Court relied on the plain language of the statute and therefore did not consider legislative history or any other external material.

---

[16] *See* ANZ Mem. at 5 (noting that between 2006 and 2008, LBI was the largest underwriter **[**10]** of offerings of registered securities issued by LBHI).

[17] *See id.*

[18] Decision Below, *503 B.R. at 781*.

[19] ANZ Mem. at 5. These suits were consolidated in a securities class action in this district captioned *In re Lehman Brother Equity/Debt Securities Litigation*, No. 08-cv-5523 (the "Class Action").

[20] *See id.* at 5-6.

[21] UBSFS Mem. at 3.

[22] *See id.*

[23] *See id.* at 4. Some of these actions were consolidated in the Class Action.

[24] *See id.* at 5.

[25] Decision Below, *503 B.R. at 786-87*.

[26] *Id. at 787*.

[27] *Id.*

51

### III. LEGAL STANDARD

HN1[] A district court functions as an appellate court in reviewing orders entered by bankruptcy courts.[28] Findings of fact are reviewed for clear error,[29] whereas findings that involve questions of law, or mixed questions of fact and law, are reviewed de novo.[30] A district court "may affirm, modify, or reverse a bankruptcy judge's judgment, order, or decree or remand with instructions for further proceedings." **[**13]** [31]

### IV. APPLICABLE LAW[32]

Section 510(b), as amended in 1984, provides that

> HN2[] For the purpose of distribution under this title, a claim arising from rescission of a purchase or sale of a security of the debtor or of an affiliate of the debtor, for damages arising from the purchase or sale of such a security, or for reimbursement or contribution allowed under section 502 on account of such a claim, shall be subordinated to all claims or interests that are senior to or equal the claim or interest represented by such security, except that if such security is common stock, such claim has the same priority as common stock.[33]

HN3[] Section 510(b) thus describes three categories of claims that are subject to mandatory subordination and then addresses how subordination is to occur.[34] The two categories relevant here are claims (i) "for damages arising from the purchase **[**14]** or sale of [a security of the debtor or of an affiliate of the debtor]" and (ii) "for reimbursement or contribution . . . on account of such a claim[.]"[35] With regard to the level **[*441]** of subordination, a leading treatise describes the operation of section 510(b) as follows:

> HN4[] A shareholder claimant who seeks to rescind an equity interest and to obtain a debt claim will have the debt claim subordinated. Rescission will lead to subordination below the interest held before rescission. However, if the security is common stock, the claim has the same priority as common stock. If the security is an unsecured debt instrument, the claim that is represented by that security is a general, unsecured claim. Since the claim represented by the instrument is a general, unsecured claim, any claim for rescission will be subordinated until the claims of the general unsecured creditors have been satisfied.[36]

A report of the United States House of Representatives sheds light on the purpose of section 510(b):

> A difficult policy question to be resolved in a business bankruptcy concerns the relative status of a security holder who seeks to rescind his purchase of securities or to sue for damages based on such a

---

28 *See In re Sanshoe Worldwide Corp., 993 F.2d 300, 305 (2d Cir. 1993).*

29 *See Fed. R. Bankr. P. 8013.*

30 *See In re Adelphia Commc'ns Corp., 298 B.R. 49, 52 (S.D.N.Y. 2003)* (citing ***In re United States Lines, Inc., 197 F.3d 631, 640-41 (2d Cir. 1999)***).

31 *Fed. R. Bankr. P. 8013.*

32 SIPA incorporates section 510(b). *See 15 U.S.C. § 78fff(b); Securities Investor Protection Corp. v. Stratton Oakmont, Inc., 229 B.R. 273, 279 (Bankr. S.D.N.Y. 1999)* (citations omitted) (stating that "[a] SIPA Proceeding is essentially a bankruptcy liquidation" and noting that "SIPA incorporates chapters 1, 3, and 5 of title 11 (all of which are also applicable in a [bankruptcy liquidation]"). SIPA proceedings are initiated in the district court and then transferred to the bankruptcy court. *See 15 U.S.C. § 78eee(a)(3), (b)(4).*

33 The 1978 version of section 510(b) provided:

> Any claim for recission [sic] of a purchase or sale of a security of the debtor or of an affiliate or for damages arising from the purchase or sale of such a security shall be subordinated for purposes of distribution to all claims and interests that are senior or equal to the claim or interest represented by such security.

Apart from correcting a typographical error, the 1984 amendment added claims based on contribution or indemnification and states that when the underlying security is common stock, the claim is subordinated to the level of common stock.

34 *See KIT digital, Inc. v. Invigor Grp. Ltd. (In re KIT digital, Inc.), 497 B.R. 170, 178 (Bankr. S.D.N.Y. 2013)* ("*KIT digital*") ("[B]y reason of the 'shall' in the second to last clause, subordination of any claims subject to section 510(b) is mandatory.").

35 *11 U.S.C. § 510(b).*

36 16 Alan N. Resnick & Henry J. Sommer, Collier on Bankruptcy ¶ 510.04[1] (16th ed. 2013) ("Collier").

purchase: Should he be treated as **[**15]** a general unsecured creditor based on his tort claim for rescission, or should his claim be subordinated? . . . [Professors Slain and Kripke] conclude that allocation of assets in a bankruptcy case is a zero-sum situation, and that rules of allocation in bankruptcy should be predicated on allocation of risk. The two risks to be considered are the risk of insolvency of the debtor and the risk of an unlawful issuance of securities. While both security holders and general creditors assume the risk of involvency[,] Slain and Kripke conclude that the risk of illegality in securities issuance should be borne by those investing in securities and not by general creditors.[37]

As explained by the Second Circuit in *Med Diversified*, "Congress . . . adopted Slain and Kripke's policy rationales for mandatory subordination: '1) the dissimilar risk and return expectations of shareholders and creditors; and 2) the reliance of creditors on the equity cushion provided by shareholder investment.'"[38] Either rationale can justify subordination under section 510(b), but courts have focused mainly on the risk-allocation rationale.[39] The risk-allocation rationale "represents a Congressional judgment that, as between shareholders **[**16]** and general unsecured creditors, it is shareholders who should bear the risk of illegality in the issuance of **[*442]** stock in the event the issuer enters bankruptcy."[40]

Notably, this statement concerning the risk-allocation rationale is incomplete for two reasons. *First*, as recognized in *Med Diversified*, HN5[↑] section 510(b) is not limited to claims based on fraud in the issuance.[41] Indeed, Slain and Kripke were "only incidentally concerned with the precise predicate of a disaffected shareholder's efforts to recapture his investment from the corporation."[42] *Second*, HN6[↑] section 510(b) is not limited to shareholder claims.[43] Section 510(b) uses the term **[**18]** "security," which is defined in section 101(49) of the Bankruptcy Code as including stocks, bonds, and notes, among other instruments. Accordingly, section 510(b) has been applied broadly to subordinate claims arising in a variety of contexts, such as claims based on fraudulent retention,[44] as well as other torts or breach of contract claims involving the failure to deliver, exchange, or register securities.[45]

---

[37] H. Rep. No. 595, 95th Cong., 1st Sess. (1977) at 194-95 (citing John J. Slain and Homer Kripke, *The Interface Between Securities Regulation and Bankruptcy — Allocating the Risk of Illegal Securities [**17] Issuance Between Securityholders and the Issuer's Creditors*, 48 N.Y.U. L.Rev. 261 (1973) ("Slain and Kripke")). Congress was greatly influenced by Slain and Kripke. *See id.* at 196 (stating that "[t]he bill generally adopts the Slain/Kripke position"), 195 ("The argument for mandatory subordination is best described by Professors Slain and Kripke.").

[38] Rombro v. Dufrayne (In re Med Diversified, Inc.), 461 F.3d 251, 256 (2d Cir. 2006) ("*Med Diversified*") (citations omitted).

[39] *See* id. at 259 (relying on the risk-allocation rationale and stating that of the two rationales it is "'more integral to any policy analysis of section 510(b)'") (quoting In re Enron Corp., 341 B.R. 141, 166 (Bankr. S.D.N.Y. 2006) ("*Enron*")). As explained in *Enron*, it is "unclear which rationale Slain and Kripke regarded as superior, if these concepts can even be neatly severed," but "Congress and the courts have clearly elevated the issue of risk [rather than creditor reliance] to the fore." *Id.* at 166 n.21.

[40] Med Diversified, 461 F.3d at 256.

[41] *See* id. at 257 (recognizing that "the holdings of most prominent decisions of local bankruptcy courts also support the broad interpretation of section 510(b)"); Enron, 341 B.R. at 163 (stating that "the broad applicability of section 510(b) is now quite settled"); KIT digital, 497 B.R. at 181 ("While I certainly agree that other Circuits have construed section 510(b) broadly, so has the Second Circuit, along with bankruptcy and district court judges in the Second Circuit.").

[42] Slain and Kripke, 48 N.Y.U. L. Rev. at 267.

[43] *See id.* at 268 ("Hereafter, the discussion is focused upon the rescinding stockholder. Mutatis mutandis, the **[**19]** discussion is equally applicable to holders of subordinated debentures and to other creditors whose debt securities are contractually subordinated."); Levine v. Resolution Trust Corp. (In re Coronet Capital Co.), No. 94 Civ. 1187, 1995 U.S. Dist. LEXIS 10175, 1995 WL 429494, at *8 (S.D.N.Y. July 12, 1995) (finding that promissory notes are within the meaning of section 510(b) and explicitly rejecting the argument that section 510(b) should be restricted to equity securities); Allen v. Geneva Steel Co. (In re Geneva Steel Co.), 281 F.3d 1173, 1177, 1182-83 (10th Cir. 2002) ("*Geneva Steel*") (upholding subordination of claims related to bonds).

[44] *See* Geneva Steel, 281 F.3d at 1182-83; In re Granite Partners, L.P., 208 B.R. 332, 339 (Bankr. S.D.N.Y. 1997) ("*Granite Partners*").

[45] *See* Med Diversified, 461 F.3d at 255 (failure to exchange); Baroda Hill Invs., Ltd. v. Telegroup, Inc. (In re Telegroup, Inc.), 281 F.3d 133, 138-42 (3d Cir. 2002) ("*Telegroup*") (failure to register); American Broadcasting Sys., Inc. v. Nugent (In re

Courts have also subordinated claims for contribution, indemnification, and reimbursement asserted by underwriters and others,[46] and claims based on securities of an affiliate of the debtor.[47] Courts **[*443]** also recognize that the claimant need not be an actual security holder,[48] and the debtor need not be the issuer of the security for section 510(b) to apply.[49]

In a number of differing contexts, courts have found the phrase "arising from the purchase or sale of a security" to be ambiguous. The source of this ambiguity is typically the terms "arising from," which imply a causal connection.[50] For example, in *Telegroup*, parties to a stock purchase agreement that required the seller to use its best efforts to register the stock brought a claim based on the theory that had the seller registered the stock, they would have sold their shares and avoided their losses.[51] The Third Circuit deemed section 510(b) ambiguous in this context, and explained that

> [f]or a claim to "aris[e] from the purchase or sale of . . . a security," there must obviously be some nexus or causal relationship between the claim and the sale of the security, but § 510(b)'s language alone provides little guidance in delineating the precise scope of the **[**22]** required nexus. On the one hand, it is reasonable, as a textual matter, to hold that the claims in this case do not "arise from" the purchase or sale of Telegroup's stock, since the claims are predicated on conduct that occurred

---

Betacom of Phoenix, Inc.), 240 F.3d 823 (9th Cir. 2001) ("*Betacom*") (failure to deliver); In re PT-1 Commc'ns, Inc., 304 B.R. 601, 608 (Bankr. E.D.N.Y. 2004) (tortious interference); Frankum v. International Wireless Commc'ns Holdings, Inc. (In re International Wireless Commc'ns Holdings, Inc.), 257 B.R. 739 (Bankr. D. Del. 2001) (breach of stock purchase agreement), *aff'd*, 279 B.R. 463 (D. Del. 2002), *aff'd*, 68 Fed. App'x 275 (3d Cir. Apr. 16, 2003); In re NAL Fin. Grp., Inc., 237 B.R. 225, 231 (Bankr. S.D. Fla. 1999) (failure to register debentures).

46 *See* In re Jacom Computer Servs., Inc., 280 B.R. 570, 572 (Bankr. S.D.N.Y. 2002) ("*Jacom*") ("[U]nderwriters are in a better position to allocate risks associated with the issuance of securities and [ ] it is inconsistent with the policies articulated in the legislative history of section 510(b) to force unsecured creditors to subsidize the underwriters' litigation costs."); In re Touch America Holdings, 381 B.R. 95, 104-06 (Bankr. D. Del. 2008) (subordinating statutory indemnification claim asserted by directors and officers); In re Mid-American Waste Sys., Inc., 228 B.R. 816, 824-26 (Bankr. D. Del. 1999); Official Comm. of Creditors Holding Unsecured Claims v. PaineWebber Inc. (In re De Laurentiis Entm't Grp., Inc.), 124 B.R. 305, 308 (C.D. Cal. 1991).

47 *See* In re VF Brands, Inc., 275 B.R. 725, 728 (Bankr. D. Del. 2002) (concluding that "[a]pplying section 510(b) requires that the [claimant's claim] (which is based on damages from the purchase of stock of an affiliate of the [debtors]) must be subordinated to the claims of the general unsecured creditors **[**20]** of the [debtors] which in the absence of that section would be equal in priority to its claim."); Liquidating Trust Comm. of the Del Biaggio Liquidating Trust v. Freeman (In re Del Biaggio), No. 12 Civ. 6447, 2013 U.S. Dist. LEXIS 163953, 2013 WL 6073367, at *7-8 (N.D. Cal. Nov. 18, 2013) ("*Del Biaggio*") (rejecting argument that affiliate and debtor securities "are not senior or junior to each other because they simply do not compete for the same assets and distributions" and subordinating fraud claim to those of debtor's unsecured creditors), *appeal docketed*, No. 13-17500 (9th Cir. Dec. 9, 2013). *Accord Collier* ¶ 510.04[4] ("Section 510(b) applies whether the securities were issued by the debtor or by an affiliate of the debtor."). However, the legislative history of section 510(b) does not discuss the inclusion of affiliates in the statute.

48 *See* Med Diversified, 461 F.3d at 258 ("[A] claimant need not be an actual shareholder for his claim to be covered by the statute."); In re Walnut Equip. Leasing Co., No. 97-19699, 1999 Bankr. LEXIS 1626, 1999 WL 1271762, at *6 (Bankr. E.D. Pa. Dec. 28, 1999) ("[T]he language of § 510(b) does not limit its application to any particular type of claimant . . . but, rather, focuses on the type of claim possessed (*e.g.*, claim for reimbursement or contribution)."). By the same token, "[n]othing . . . would require the subordination of a claim simply because the identity of the claimant happened to be a shareholder . . . ." Telegroup, 281 F.3d at 144 n.2. "A typical example of such an excluded claim is a personal injury tort claim asserted by a shareholder. In such a case, **[**21]** although there was a purchase of the debtor's security, the tort claim does not 'arise from' that purchase . . . ." Enron, 341 B.R. at 156 n.12.

49 *See, e.g.*, In re Lehman Bros. Holdings Inc., 513 B.R. 624, 2014 WL 3726123, at *6 (Bankr. S.D.N.Y. 2014) ("The plain language of section 510(b) does not include the term 'issuer,' nor does it refer to securities 'issued by' or 'sold by' the debtor or an affiliate of the debtor; the Court is unwilling to read such terms, or any ambiguity, into the statute.").

50 *See* Granite Partners, 208 B.R. at 339 (explaining that "[s]omething 'arises' from a source when it originates from that source. Webster's New International Dictionary 117 (unabridged ed. 1976); Black's Law Dictionary 108 (6th ed. 1990). The phrase 'arising from' signifies some causal connection. Cf. Black's Law Dictionary 108 (defining 'arises out of')."),

51 *See* Telegroup, 281 F.3d at 136.



after the stock was purchased. On the other hand, it is, in our view, more natural, as a textual matter, to read "arising from" as requiring some nexus or causal relationship between the claims and the purchase of the securities, but not as limiting **[*444]** the nexus to claims alleging illegality in the purchase itself.[52]

In the Third Circuit's view, section 510(b) "is reasonably read to encompass" claims based on the failure to register securities, as they "would not have arisen *but for* the purchase of Telegroup's stock and allege a breach of a provision of the stock purchase agreement."[53]

The Second Circuit considered the ambiguity of the phrase "arising **[**23]** from" in *Med Diversified*.[54] In that case, a departing employee, David Rombro, entered into a severance agreement whereby Med Diversified agreed to issue shares of its common stock to Rombro in exchange for Rombro's shares in PrimeRX, an unaffiliated company.[55] After Med Diversified filed for bankruptcy protection, Rombro asserted a claim based on its failure to consummate the exchange. Relying on "case law broadly construing section 510(b)," the bankruptcy court determined "that the claim need not flow directly from the securities transaction, but can be viewed as 'arising from' the transaction if the transaction is part of the causal link leading to the injury."[56]

Rombro argued on appeal that "the phrase 'arising from' in section 510(b) is unambiguous and plainly applies only to claims stemming directly from a purchase, sale, or rescission of the debtor's security, none of which occurred here."[57] According to Rombro, "his claim did not arise from damages flowing from the purchase or sale of debtor's stock but from the purchase by the debtor of Rombro's PrimeRx stock, which in any event never occurred."[58] The Trustee **[**24]** argued that "claims 'arising from' the purchase of a security . . . include claims that are predicated on the failure to issue stock, relying on case law broadly interpreting the statute."[59] Although the Second Circuit found section 510(b) to be ambiguous, it nonetheless held that Rombro's claim arose from the purchase or sale of a security of the debtor in large part because once Rombro entered into the stock exchange agreement "he became bound by the choice he made to trade the relative safety of cash compensation for the upside potential of shareholder status — the very choice highlighted by Slain and Kripke."[60]

## V. DISCUSSION

### A. The Bankruptcy Court Did Not Err in Subordinating Claren Road's Claim

Claren Road argues that the Bankruptcy Court erred in finding that section 510(b) **[*445]** was unambiguous when applied to its claim.[61] While Claren Road suggests that on a literal reading section 510(b) does not apply in the absence of an actual purchase or sale, it stresses that the Second Circuit deemed the statute to be ambiguous under a "similar factual scenario in *Med Diversified*."[62] Thus, Claren Road argues that the

[52] Id. at 138.

[53] *Id.* (emphasis added).

[54] *Med Diversified* is the Second Circuit's only published opinion addressing section 510(b).

[55] *See* Med Diversified, 461 F.3d at 253.

[56] Id. at 254 (quotation marks omitted).

[57] Id. at 255.

[58] Id. at 254.

[59] Id. at 255. The Second Circuit thus found that the phrase "'arising from' is ambiguous as applied to the claims in this case" and reviewed the purposes behind the statute to determine if there was a sufficient causal link. While *Med Diversified* is the only published Second Circuit decision interpreting section 510(b), the Second Circuit found section 510(b) to be *unambiguous* when applied to different facts in an unpublished decision. *See* In re MarketXT Holdings Corp., No. 08-5560, 346 Fed. App'x 744, 746 (2d Cir. Sept. 28, 2009) ("The bankruptcy court correctly began with the plain meaning of the statute. Furthermore, we agree with the bankruptcy court that Waltzer's claim, based on a state court judgement for damages **[**25]** in connection with the sale of stock, fell within the plain meaning of the statute.").

[60] Med Diversified, 461 F.3d at 256.

[61] *See* Claren Road Mem. at 8-10.

[62] *Id.* Claren Road points out that the Third (*Telegroup*), Fifth (*Seaquest Diving*), Ninth (*Betacom*), and Tenth (*Geneva Steel*) Circuits, have also found section 510(b) ambiguous

Bankruptcy Court was obligated to consider section 510(b)'s legislative history and purpose to resolve this ambiguity, and, that if it had, it would have recognized that subordination of Claren Road's claim did not advance the statute's purpose.[63]

Claren Road argues that section 510(b) is squarely aimed at investors that attempt to bootstrap their way to parity with unsecured creditors by transforming their investment interests into unsecured claims. **[**26]** [64] According to Claren Road, subordination of its claim does not further either the risk-allocation or equity-cushion policy rationales identified in *Med Diversified* as the only two policy rationales justifying subordination.[65] This is because Claren Road did not "assume the risk or return expectations of a Lehman investor, much less an LBI equity holder" insofar as its claim arises from an attempt to dispose of the bonds for "a fixed sum of cash."[66] In addition, Claren Road warns that "[a]llocating the risk associated with a prime-broker's insolvency to the broker's customers will have a negative impact on the prime-brokerage industry," because customers, who cannot easily identify whether a security has been issued by an affiliate of a broker-dealer, will refuse to do business with financially troubled broker-dealers for fear their claims will be subordinated under section 510(b), leading to more broker-dealer failures.[67]

The Bankruptcy Court did not err in holding that Claren Road's claim was subject to subordination under section 510(b). *First*, even if the statute were ambiguous as to whether an "actual" purchase or sale is needed, under *Med Diversified* and other case law HN7[] it is now well-settled that section 510(b) applies in the absence of an actual purchase or sale.[68] Indeed, in *Med Diversified* the Second Circuit was "influenced by what appears to be the uniform determination of courts presented with similar claims" that section 510(b) mandated subordination even in the absence of a purchase or sale.[69] As discussed below, **[*446]** the fact that Rombro bargained to *buy* securities and Claren Road was attempting to *sell* securities does not immunize Claren Road's claim from subordination. In short, HN8[] given "[t]he weight of precedent favoring subordination" even where no purchase or sale has occurred, "and the absence of persuasive precedent upholding the contrary position, the ambiguity *vel non* of the statutory text" is beside the point.[70]

*Second*, applying the statute to Claren Road's claim does not require "arising from" to be read nearly as broadly as permitted under the case law.[71] For

when applied to certain claims.

[63] *See id.* at 8-9.

[64] *See id.* at 17 ("Section 510(b) is intended to prevent shareholders from obtaining creditor status by asserting tort or contract claims associated with an underlying equity transaction. Section 510(b) thus protects the priority scheme established by the Bankruptcy Code.").

[65] *See id.* at 15.

[66] *Id.* at 15, 16, 18. Claren Road also notes that there are no allegations concerning **[**27]** the equity-cushion rationale.

[67] *Id.* at 19-20.

[68] *See* Med Diversified, 461 F.3d at 258 (citing Betacom, 240 F.3d at 830-31); Enron, 341 B.R. at 150-51, 162-63; PT-1 Commc'ns, 304 B.R. at 609; In re Worldwide Direct, Inc., 268 B.R. 69, 73 (Bankr. D. Del. 2001); In re Einstein/Noah Bagel Corp., 257 B.R. 499, 508 (Bankr. D. Ariz. 2000) (subordinating claim based on failed purchase and stating that "the critical point is that the claim arises because of the inability to sell or the failure to purchase the **[**28]** security itself, not merely because the party asserting the claim may hold an equity security of the Debtor.").

[69] Med Diversified, 461 F.3d at 257 (citing Betacom, 240 F.3d at 830; Telegroup, 281 F.3d at 136). The Second Circuit also noted that it found "a measure of support in the fact that Congress did not elect to address this trend in the courts, leaving section 510(b) unchanged by the recent bankruptcy reform legislation . . . ." Id. at 257 n.1.

[70] Enron, 341 B.R. at 157. *Accord* In re Motor Liquidation Co., No. 11 Civ. 7893, 2012 U.S. Dist. LEXIS 15838, 2012 WL 398640, at *3 (S.D.N.Y. Feb. 7, 2012) ("*Motor Liquidation*") ("Regardless of whether the language of § 510(b) is ambiguous [ ] 'fraudulent retention' claims must be subordinated to the claims of general creditors. Both Spirnak's fraudulent inducement and his fraudulent retention claims therefore fall squarely within the scope of § 510(b) and were properly subordinated by the Bankruptcy Court.").

[71] *Compare* Telegroup, 281 F.3d at 138 (finding the statute ambiguous but subordinating claim based on the failure of seller to register securities) *with* Kit digital, 497 B.R. at 178 (subordinating claim based on failure to deliver additional stock under stock purchase agreement and stating that, "The clause 'arising from the purchase or sale' is not ambiguous at all when it's applied to an alleged breach of the agreement of purchase or sale itself, or to a fraud that induced such an agreement.") **[**30]** *and* Enron, 341 B.R. at 152 (subordinating fraudulent retention claims and noting that,

56

example, unlike Rombro in _Med Diversified_, Claren Road held the LBHI bonds and was attempting to sell them, and the failure of that sale was a direct cause of Claren Road's damages.[72] For another example, even though causal ambiguity weighs less heavily for Claren Road's claim than for claims under a fraudulent retention theory, Claren Road's failed attempt **[**29]** to dispose of the bonds is the functional equivalent of the fraudulent retention claims subordinated in cases like _Geneva Steel_, _Granite Partners_, _Enron_, and _Motor Liquidation_. Indeed, _**HN9**_[] regardless of the type of claim, precedent requires subordination of claims by *security holders* that seek to recover, as Claren Road does, for *the loss in value* of a security issued by the debtor or an affiliate. Neither _section 510(b)_ nor SIPA suggests an exception for transactions involving broker-dealer debtors either purchasing or selling affiliate bonds. SIPA provides that _section 510(b)_ applies in liquidation proceedings;[73] bonds, in keeping with their common meaning, are included in the definition of security;[74] and _section 510(b)_ explicitly references both debtor *and* debtor-affiliate securities.[75]

**[*447]** Finally, the risk-allocation policy rationale supports subordination of Claren Road's claim. As the putative seller of LBHI bonds, there is no doubt that Claren Road was an LBHI bondholder.[76] The elephant in the room is that Claren Road entered into its agreement with LBI on Friday, September 12, 2008, and as is well known, on Monday September 15, 2008, LBHI and certain of its affiliates filed petitions for relief under chapter 11 of the Bankruptcy Code, followed days later by LBI's SIPA proceeding.[77] But Claren Road's motivation for selling the bonds is beside **[**32]** the point — "Just as the opportunity to sell or hold belong exclusively to the investors, the risk of illegal deprivations of that opportunity should too."[78] Whether by holding an interest in the LBHI bonds or by entering into the agreement to have LBI purchase those bonds, Claren Road assumed the risk of exactly what happened here — the loss of its investment.[79] Claren Road argues that the risk-allocation rationale does not apply because LBI agreed to pay a fixed sum of cash for the LBHI bonds, and that "in contrast to *Med Diversified*, where the claimant contracted to acquire *more* stock, Claren Road sought to *dispose* of the LBHI Bonds, thereby terminating its right to share in any appreciation

---

"Whereas the phrase 'arising from' unambiguously describes the claims of defrauded purchasers, the same cannot immediately be said of fraudulent retention claims.").

[72] *See* Claren Road Reply at 3 (describing the Claren Road claim as a "damage claim arising from the debtor's contractual breach of an agreement to buy securities of the debtor's affiliate"); Claren Road Mem. at 5 (describing the Claren Road claim as "representing the difference between the amount that LBI had agreed to pay for the LBHI Bonds and their market price" on the date LBI was placed into SIPA liquidation).

[73] *See* _15 U.S.C. § 78fff(b)_ ("To the extent consistent with the provisions of this chapter, a liquidation proceeding shall be conducted in accordance with, and as though it were being conducted under chapters 1, 3, and 5 and subchapters I and II of chapter 7 of [the Bankruptcy Code]").

[74] *See* _11 U.S.C. § 101(49)(A)_.

[75] *See id.* _§ 510(b)_ (stating that "a claim arising from rescission of a purchase or sale of a security of the debtor or of an affiliate of the debtor, for damages arising from the purchase or sale of such a security, or for reimbursement or contribution allowed under _section 502_ on account of such a claim, shall **[**31]** be subordinated"). As recognized by the Bankruptcy Court, _**HN10**_[] courts applying _section 510(b)_ where the debtor is a broker-dealer must "differentiat[e] between those claims arising from the purchase or sale of [ ] affiliated securities and those that arise from the purchase or sale of securities issued by unaffiliated third parties." Decision Below, _503 B.R. at 786_. Thus, "[i]f Claren Road had a breach of contract claim against LBI for failing to close a trade relating to securities of an unaffiliated issuer, _510(b)_ would not apply." _Id. at 786 n.12_. Similarly, courts have held that _section 510(b)_ does not apply to mortgage backed securities held in securitization trusts because the trusts are not affiliates of the debtor. *See* _Lehman Bros. Holdings Inc., 513 B.R. 624, 2014 WL 3726123, at *6_; _In re Washington Mutual, 462 B.R. 137, 145-46 (Bankr. D. Del. 2011)_.

[76] *See* _Med Diversified, 461 F.3d at 257_; _Geneva Steel, 260 B.R. at 523_.

[77] "[T]ogether these filings constitute the largest business bankruptcy in history." _Lehman Brothers Special Financing Inc. v. BNY Corporate Trustee Services Limited (In re Lehman Brothers Holdings Inc.), 422 B.R. 407, 420 (Bankr. S.D.N.Y. 2010)_ ("Their various corporate entities comprise an integrated enterprise and, as a general matter, the financial condition of one affiliate affects the others.") (quotation marks omitted).

[78] _Granite Partners, 208 B.R. at 342_.

[79] Under the PBA, LBHI was not only listed as an affiliate but as a contracting party. That LBI's and LBHI's fates were tied together was thus apparent from the face of the PBA alone. I also note that the PBA undercuts Claren Road's policy argument to the extent it concerns the inability of investors to know whether they are purchasing affiliate securities.



in price."[80] However, Claren Road still held the LBHI bonds as of the petition date, and its claim is based in part on the diminished value of those bonds.[81] **[*448]** Furthermore, the distinction drawn by Claren Road between Rombro's attempt to acquire securities in *Med Diversified* and Claren Road's attempt to divest its interest in securities is legally irrelevant.[82] "The fact that the value of the [bonds] declined while [Claren Road] held them . . . should not enable [Claren Road] to eviscerate the absolute **[**33]** priority rule, and shift to creditors the investment risk assumed by the [bond] holders."[83] In short, subordination of Claren Road's claim pursuant to *section 510(b)* is justified because it prevents Claren Road from converting its investment loss into a creditor claim.[84]

**B. The Bankruptcy Court Did Not Err in Subordinating Appellants' Claims to the Claims of General Unsecured Creditors**

**1. Claren Road**

Claren Road argues that the "language directing subordination of the asserted claim to claims or interests 'represented by such security' makes no sense where the applicable security creates no claim on the debtor's estate."[85] According to Claren Road, its claim "and claims 'represented by' LBHI Bonds simply do not exist in the same priority chain."[86] Claren Road thus contends that "[a]s written, *section 510(b)* offers no guidance regarding its application when the debtor and the issuer of the subject security are separate entities" and therefore the phrase "represented by such security" is ambiguous when **[**36]** applied to a claim arising from securities of an affiliate.[87] In support of this point, Claren Road argues that "[f]our separate interpretations of the phrase were put forward in this case alone, including two articulated by the Bankruptcy Court."[88] Claren Road's interpretation was that the language refers to the underlying security and that subordination is proper only when there is a close nexus between the affiliate **[*449]** security and the asserted claim, "such as when the debtor has guaranteed the security in question or entered into an agreement to deliver to a creditor the debtor's subsidiary's securities in full

---

[80] *See* Claren Road Mem. at 16 (emphasis in original).

[81] These facts distinguish the cases cited by Claren Road. *See* *CIT Grp. Inc. v. Tyco Int'l Ltd. (In re CIT Grp.), 460 B.R. 633, 640 (Bankr. S.D.N.Y. 2011)* ("CIT Group") (claimant sold its shares over seven years before the debtor filed for bankruptcy protection), *aff'd*, *No. 12-1692, 479 Fed. App'x 393 (2d Cir. Sept. 6, 2012)*; *Nisselson v. Softbank AM Corp. (In re Marketxt Holdings Corp.), 361 B.R. 369, 390 (Bankr. S.D.N.Y. 2007)* ("*Marketxt*") ("Softbank may have taken an equity risk when it purchased preferred stock, but by **[**34]** the date of the initial bankruptcy petition it was a creditor, not an equity holder. It is black letter law that claims are analyzed as of the date of the filing of a petition, not as of a hypothetical date in the past."); *Burtch v. Gannon (In re Cybersight LLC), No. 05-112, 2004 U.S. Dist. LEXIS 24426, 2004 WL 2713098, at *4 (D. Del. Nov. 17, 2004)* ("In contrast to the circumstances in *Telegroup*, Mr. Gannon's equity stake in Cybersight extinguished pre-petition and with it Mr. Gannon's ability to participate in any of Cybersight's profits or losses."); *Official Comm. of Unsecured Creditors v. American Capital Fin. Servs., Inc. (In re Mobile Tool Int'l, Inc.), 306 B.R. 778, 782 (Bankr. D. Del. 2004)* ("*Mobile Tool*") (same); *In re Wyeth Co., 134 B.R. 920, 921 (Bankr. W.D. Mo. 1991)* ("*Wyeth*") (same). As explained in *CIT Group*, the "'causal connection' between the purchase or sale of a security" in the cases cited by Claren Road "was too remote to require subordination of a contract claim when the purpose and intent of the statute was considered." *CIT Group, 460 B.R. at 643* (describing *Marketxt*, *Mobile Tool*, and *Wyeth*). *CIT Group* is distinguishable for the further reason that its analysis applies only to equity securities and would arguably exclude any claim based on debt securities.

[82] As noted earlier, Slain and Kripke were "only incidentally concerned with the precise predicate of a disaffected shareholder's efforts to recapture his investment from the corporation." Slain and Kripke, 48 N.Y.U. L. Rev. at 267.

[83] *Geneva Steel, 260 B.R. at 523* (quotation marks and alterations omitted). *Accord* *Jacom, 280 B.R. at 572* (" **[**35]** [I]t is readily apparent that the rationale for *§ 510(b)* is not limited to preventing shareholder claimants from improving their position vis-a-vis general creditors; Congress also made the decision to subordinate based on risk allocation.") (quotation marks omitted).

[84] This is true regardless of whether the record establishes that Claren Road benefitted from appreciation based on its ownership of the LBHI bonds — *section 510(b)* does not contain an exception for either unsuccessful or short-term investors.

[85] Claren Road Reply at 6.

[86] Claren Road Mem. at 10.

[87] *Id.* at 10-11.

[88] *Id.* at 11.

58

satisfaction of a debt . . . ."[89]

The Trustee, in turn, argued that "because the LBHI Bonds have 'no valid interests' against LBI, the Claren Road Claim must be subordinated to zero."[90] At the hearing on the claim objection, the Bankruptcy Court suggested a "virtual security" where one assumes that the security of an affiliate is the security of the debtor. Finally, Claren Road argues that the Bankruptcy Court "rejected all of these approaches" and found that a claim represented by the LBHI bonds includes "all claims with respect to or connected **[**37]** to the subject matter of the LBHI Bonds."[91] Thus, Claren Road argues that the Bankruptcy Court erred by not considering the legislative history and purpose of section 510(b), and that subordination of a claim based on securities issued by an affiliate is proper only when such subordination furthers either the risk-allocation or equity-cushion rationales identified in *Med Diversified*.[92] As discussed earlier, Claren Road argues that neither rationale applies.

However, the statute directs that Claren Road's claim "for damages arising from the purchase or sale of [the LBHI bonds]" be subordinated for purposes of distribution to "all claims or interests that are senior to or equal the claim or interest represented by [the LBHI bonds.]" In other words, ***HN11***[] the statute separately refers to the claim subject to subordination, the underlying debtor or affiliate security, and the claim or interest represented by that security.

But ***HN12***[] nothing in section 510(b) ties subordination to a security within the capital structure of the debtor. Claren Road's argument to the contrary simply assumes that this must be the case because otherwise the claim to **[**38]** be subordinated and the claim represented by the security would not be in the same priority scheme which, Claren Road argues, makes it impossible to define the level of subordination. Claren Road's substantive argument — that the security must exist within the capital structure of the debtor — is not only unsupported by the plain language of the statute, but contradicted by the statute's inclusion of affiliate securities.

This is not to say that Claren Road's assumption about the priority scheme is implausible. As one court notes, ***HN13***[] "[i]t is true that generally shareholders of a subsidiary have no claim against the parent and thus are not part of any priority scheme of claims against the parent."[93] However, section 510(b) unambiguously states that rescission, arising-from, and contribution claims involving securities of an affiliate of the debtor are subject to subordination. Thus, any ambiguity in the statute lies not in *whether* claims based on **[*450]** securities of an affiliate are to be subordinated but *how* that subordination is to occur. For this reason, Claren Road's assumption about the priority structure is untenable as it would automatically exclude claims arising from the purchase or sale of securities **[**39]** of an affiliate in derogation of the plain language of the statute.

At the same time, Claren Road's procedural argument — that it is impossible to define the relevant priorities — is easily overcome. Under section 510(b), Claren Road's claim is a claim based on LBI's breach, the securities involved in that claim are the LBHI bonds, and because the LBHI bonds are unsecured debt instruments, the most natural way to read section 510(b) is that the claim "represented by" such unsecured debt instruments is an unsecured claim. Accordingly, Claren Road's claim is properly **[**40]** subordinated to claims of unsecured creditors.[94] This focus on the type of claim the security

---

[89] *Id.*

[90] *Id.* (quotation marks omitted).

[91] *Id.* at 12 (quotation marks omitted).

[92] *See* Claren Road Reply at 7 n.5.

[93] VF Brands, 275 B.R. at 727 (subordinating claims based on affiliate securities). In *VF Brands*, ***HN14***[] the court rejected the argument that because "there is no general principle which states that claims of general unsecured creditors of a parent are senior to the claims of shareholders of its subsidiary[,]" section 510(b) does not require subordination of claims based on affiliate securities to claims held by the debtor's creditors. *Id.* Similar to the Bankruptcy Court here, the court in *VF Brands* looked to the type of claim asserted by the claimant and determined that because the claim was an unsecured claim, section 510(b) required that it be subordinated to the claims of general unsecured creditors. *See id.*

[94] Thus, while I reach the same result as the Bankruptcy Court, I do so not by looking at the type of claim asserted, but rather by looking at the type of claim represented by the security. *See* Decision Below, 503 B.R. at 784; VF Brands, 275 B.R. at 726-27. ***HN15***[] Regardless of the approach, I agree with the Bankruptcy Court and other courts that arising-from claims in the affiliate context must at the very least be subordinated to general unsecured claims to effectuate the purpose of the statute. *See* Del Biaggio, 2013 U.S. Dist. LEXIS 163953, 2013 WL 6073357, at *7; VF Brands, 275 B.R.

represents, rather than where the security falls in the capital structure of the debtor, promotes the purpose of section 510(b), which is to ensure that creditors receive their distribution ahead of investors. By contrast, Claren Road places greater importance on the structure of the priority scheme than the requirement of subordinating certain types of claims for the benefit of creditors.

In addition, HN16[] it is not reasonable to read section 510(b) as applying only when there is a close nexus between the affiliate security and the asserted claim. Section 510(b) states that a claim "*arising from* the purchase or sale of" a security of a debtor *or an affiliate* of the debtor "*shall be subordinated* to all claims **[**41]** or interests that are senior to or equal the claim or interest represented by such security . . . ." The statute's application to securities of an affiliate is therefore unambiguous. Furthermore, the phrase "arising from" — which implies a causal connection — modifies the types of claims that are subject to mandatory subordination, not how those claims are to be subordinated. Neither the phrase "represented by" nor its placement in section 510(b) implies a causal connection requiring a close nexus between the security and the asserted claim.[95] Finally, for the reasons discussed above, subordination of Claren Road's claim fits within the purpose of section 510(b). After all, had Claren Road not entered into the transaction with LBI involving LBHI bonds, it would not have a claim against LBI relating to the diminished value of the LBHI bonds at all (although it would still have a claim against LBHI). Section 510(b) prevents Claren Road from collecting *pari passu* with LBI's general unsecured creditors by virtue of its failed attempt to sell the LBHI bonds.

**2. The Co-Underwriters [**42]**

The co-underwriters concede that their claims are for contribution within the meaning of the first portion of section 510(b). They argue that claims "represented by" LBHI securities must mean claims that are based on *ownership* of **[*451]** LBHI securities. They then argue that because LBHI securities "do not represent a claim that can be made in the LBI case" there are no claims in LBI's case to which their claims can be subordinated.[96] Alternatively, the co-underwriters argue that subordination of their claims does not serve the purposes behind section 510(b).[97]

As explained by the Bankruptcy Court, the co-underwriters' "strained argument . . . assumes that the claims must be based on securities within the capital structure of an enterprise that includes a debtor and its affiliated securities."[98] However, as discussed in connection with the Claren Road claim, that assumption is not supported by the statutory text. HN17[] A straightforward and practical application of section 510(b) recognizes that unsecured, non-equity securities represent unsecured claims, meaning that claims involving such securities must be subordinated to general unsecured claims, and when the relevant security is common stock the underlying **[**43]** claim is subordinated to the level of common stock.[99]

As one court notes, when a "provision such as section 510(b) [ ] plainly incorporates a broad standard," textual analysis "has a tendency to miss the forest for the trees."[100] The co-underwriters' arguments seize on the opportunity to parse section 510(b) in the relatively untested context of the treatment of claims based on securities issued by an affiliate of the debtor in a SIPA liquidation. What is lost in this effort is that there is no question that their claims would be subordinated to the claims of general unsecured creditors if they were based on LBI securities in the SIPA proceeding or LBHI securities in LBHI's bankruptcy case. In either scenario,

---

at 726-27; Lernout & Hauspie Speech Prods., 264 B.R. at 343-44.

[95] *See* ANZ Mem. at 10 (citing to dictionaries defining "represent" to mean "to correspond in kind" and "to correspond in essence: Constitute") (citations omitted).

[96] Decision Below, 503 B.R. at 786-87.

[97] *See* ANZ Mem. at 20-24; UBSFS Mem. at 11-14.

[98] Decision Below, 503 B.R. at 787.

[99] As discussed above in footnote 94, I reach the same result as the Bankruptcy Court but based on the type of security and not the type of claim. However, it is not entirely clear what types of securities were involved in the numerous transactions underwritten by ANZ. Accordingly, to the extent that unsecured creditors will be paid in full, leaving a distribution to subordinate claimants, the Bankruptcy Court is directed to determine the appropriate level of subordination of ANZ's claims.

[100] Enron, 341 B.R. at 159 ("Distinctions between possible and actual word choices, or analysis of the textual construction and word placement, are of minimal independent value, particularly where alternative analyses at the same level of specificity produce contrary conclusions.").

the precise meaning of **[**44]** "represented by" would not be relevant to the issue of subordination.[101] Because ***HN18***[] claims for contribution arising from transactions based on securities of an affiliate of the debtor are plainly subject to subordination under *section 510(b)*, it would be anomalous to restrict *section 510(b)*'s application to the rare contexts suggested by the co-underwriters.[102] For example, the Bankruptcy Code does not expressly provide for substantive consolidation, making it unlikely that Congress would have relied on that **[*452]** mechanism to provide meaning to the "affiliate" language in *section 510(b)*.[103]

The co-underwriters argue that the risk-allocation rationale does not apply when the securities have been issued by an affiliate of the debtor.[104] But ***HN19***[] by including securities of affiliates in *section 510(b)*, Congress has already made the judgment that claims for contribution based on such securities must be subordinated. This is because "underwriters are in a better position to allocate risks associated with the issuance of securities and [ ] it is inconsistent with **[**46]** the policies articulated in the legislative history of *section 510(b)* to force unsecured creditors to subsidize the underwriters' litigation costs."[105]

## VI. CONCLUSION

In sum, ***HN20***[] *section 510(b)* mandates the subordination of arising-from and contribution claims, provided such claims are based on securities of a debtor or an affiliate of the debtor. The level of subordination can be determined by reference to the type of claim or interest represented by such security — *e.g.*, secured, unsecured, common stock, or equity. In cases involving affiliate securities, the type of security dictates the level of subordination whether or not that security represents an actual claim in the debtor's case. For the foregoing reasons, the two Orders entered by the Bankruptcy Court are AFFIRMED. The Clerk of the Court is directed to close **[**47]** these appeals.

SO ORDERED:

/s/ Shira A. Scheindlin

Shira A. Scheindlin

U.S.D.J.

Dated: New York, New York

September 5, 2014

End of Document

---

[101] ANZ states that "neither courts nor commentators have indicated that 'the claim or interest represented by such security' was anything other than a claim based on ownership of the security." ANZ Mem. at 12. However, those courts and commentators were not considering the affiliate issues raised here.

[102] *See* UBSFS Mem. at 9 (arguing that its position does not mean that a claim based on a security issued by the **[**45]** debtor's affiliate would never be subordinated because "there are at least two such situations: 'when the debtor has guaranteed payment or the estates are consolidated'") (quoting Decision Below, *503 B.R. at 787*); ANZ Mem. at 3 (advancing the same argument).

[103] *See In re Augie/Restivo Baking Co., Ltd., 860 F.2d 515, 518 (2d Cir. 1988)* ("Substantive consolidation has no express statutory basis but is a product of judicial gloss."). In chapter 11, a plan must provide adequate means for implementation, such as merger or consolidation with other entities. See *11 U.S.C. § 1123(a)(5)(C)*. Courts have interpreted this provision as permitting substantive consolidation under a plan of reorganization. Substantive consolidation in the SIPA context is rare and works to bring individuals or entities *into the SIPA liquidation*, not into a case under the Bankruptcy Code. *See, e.g., In re New Times Sec. Servs., Inc., 371 F.3d 68, 73 (2d Cir. 2004)*.

[104] *See* ANZ Mem. at 21-24; UBSFS Mem. at 11-12.

[105] *Jacom, 280 B.R. at 572*. This statement is no less true when securities are issued by an affiliate or when the securities do not represent a claim that can be made in the debtor's case — these facts do not change the status of either the underwriters or the creditors or their respective claims. The Court has considered the other arguments raised by the co-underwriters and rejects them.

 Positive
As of: May 27, 2022 4:39 PM Z

# Coe v. RJM, LLC

United States Court of Appeals for the Second Circuit

April 20, 2010, Decided

09-4127-bk

**Reporter**
372 Fed. Appx. 188 *; 2010 U.S. App. LEXIS 8123 **

Michelle Y. Coe, Appellant, v. RJM, LLC, as Plan Administrator for Refco, Inc., Appellee.

**Notice:** PLEASE REFER TO *FEDERAL RULES OF APPELLATE PROCEDURE RULE 32.1* GOVERNING THE CITATION TO UNPUBLISHED OPINIONS.

**Subsequent History:** Related proceeding at *Seip v. Rogers Raw Materials Fund, LP., 408 Ill. App. 3d 434, 948 N.E.2d 628, 2011 Ill. App. LEXIS 194, 350 Ill. Dec. 348 (Ill. App. Ct. 1st Dist., 2011)*
***Motion*** denied by *In re REFCO Inc., 2011 U.S. Dist. LEXIS 89123 (S.D.N.Y., Aug. 2, 2011)*

**Prior History:** **[**1]** Appeal from a judgment of the United States District Court for the Southern District of New York. (Sullivan, J.).

*In re Refco Inc., 2009 U.S. Dist. LEXIS 66274 (S.D.N.Y., July 29, 2009)*

## Core Terms

***bankruptcy*** court, district court, orders, ***reconsideration motion***, lift, automatic stay, court review, expunging, court's decision, ***reconsideration***, allegations, disallow, omnibus, reasons, mail

## Case Summary

**Procedural Posture**
Appellant appealed from the judgment of the United States District Court for the Southern District of New York, which dismissed her appeal from a ***bankruptcy*** court order denying her ***motion for reconsideration*** of the ***bankruptcy*** court's orders denying her ***motion*** to lift an automatic stay and expunging her claims against appellee debtor.

62

**Overview**

*Fed. R. **Bankr.** P. 9024* provided that ***reconsideration motions*** in the ***bankruptcy*** court were governed by *Fed. R. Civ. P. 60*. The ***bankruptcy*** court did not abuse its discretion in determining that appellant failed to satisfy *Fed. R. Civ. P. 60(b)*. As the ***bankruptcy*** court properly determined, appellant made only unsubstantiated allegations that she did not receive debtor's objections to her claims. Even if appellant had alleged to the ***bankruptcy*** court that on March 6, 2007, she moved from one address in Miami to another but subsequently was unable to receive forwarded mail at her new address because the owner of the property rejected her mail and directed that it be returned, and as a result she never received debtor's omnibus ***motion*** to disallow certain claims, her allegations were unsupported by any affidavits or other evidence. Appellant therefore failed to meet her burden under *Fed. R. Civ. P. 60(b)*.

**Outcome**
The judgment of the district court was affirmed.

## LexisNexis® Headnotes

***Bankruptcy*** Law > Procedural Matters > Judicial Review > ***Bankruptcy*** Appeals Procedures

*HN1*[] **Judicial Review, Bankruptcy Appeals Procedures**

*Fed. R. **Bankr.** P. 8002* was amended to provide that a ***motion for reconsideration*** filed pursuant to *Fed. R. **Bankr.** P. 9024* within 14 days after the entry of judgment, rather than 10 days, tolls the time to appeal.

**Bankruptcy** Law > ... > Judicial Review > Standards of Review > De Novo Standard of Review

HN2[] **Standards of Review, De Novo Standard of Review**

An appellate court's review of the orders of the district courts in their capacity as appellate courts in **bankruptcy** cases is plenary. Fed. R. Civ. P. 52(a).

**Bankruptcy** Law > Procedural Matters > General Overview

Civil Procedure > ... > Relief From Judgments > Excusable Mistakes & Neglect > General Overview

HN3[] **Bankruptcy Law, Procedural Matters**

Fed. R. **Bankr.** P. 9024 provides that **reconsideration motions** in the **bankruptcy** court are governed by Fed. R. Civ. P. 60. Fed. R. **Bankr.** P. 9024.

Civil Procedure > ... > Relief From Judgments > Excusable Mistakes & Neglect > General Overview

HN4[] **Relief From Judgments, Excusable Mistakes & Neglect**

See Fed. R. Civ. P. 60(b).

Civil Procedure > Appeals > Standards of Review > Abuse of Discretion

HN5[] **Standards of Review, Abuse of Discretion**

A district court would necessarily abuse its discretion if it based its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence.

**Counsel:** FOR APPELLANT: Michelle Coe, Pro se, Indianapolis, Indiana.

FOR APPELLEE: Steven Wilamowsky, Rheba Rutkowski, Stephanie W. Mai; Bingham McCutchen LLP; New York, New York.

**Judges:** PRESENT: BARRINGTON D. PARKER, DEBRA ANN LIVINGSTON, GERARD E. LYNCH, Circuit Judges.

# Opinion

**[*188]** ***SUMMARY ORDER***

**UPON DUE CONSIDERATION IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the judgment of the district court be **AFFIRMED.**

Appellant Michelle Coe, *pro se,* appeals from the judgment of the district court dismissing her appeal from a **bankruptcy** court order denying her **motion for reconsideration**. In **bankruptcy** court, Appellant sought **reconsideration** of an order denying her **motion** to lift an automatic stay and of two separate orders expunging **[*189]** her claims (Claim 10835 and Claim 12512) **against Appellee Refco, Inc.** She then sought **reconsideration** of the order denying her **motion to reconsider** the **motion** to lift the automatic stay. The **bankruptcy** court denied the **motions** on the grounds that (1) the **motion** to lift the stay was moot, and (2) Appellant did not meet her burden of proving that the expungement orders should be reconsidered **[**2]** on the basis of her alleged non-receipt of Appellee's omnibus objections to her claims.

As an initial matter, we note that the district court's review was limited to the orders entered by the **bankruptcy** court on July 31, 2007, and August 10, 2007, because Appellant's request for a decision on her **motion** to lift the automatic stay, construed by the **bankruptcy** court as a **motion for reconsideration** of the orders disallowing her claims, did not toll the time to appeal from those orders because it was not filed within ten days of the order expunging Claim 12512 entered by the **bankruptcy** court in April 2007. *See* Fed. R. **Bankr.** P. 8002. * We assume the parties' familiarity with the facts and procedural history.

Upon review of the record and case law, the district court correctly found that the **bankruptcy** court did not

* HN1[] Rule 8002 was amended effective December 1, 2009, to provide that a **motion for reconsideration** filed pursuant to **Bankruptcy** Rule 9024 within 14 days after the entry of judgment, rather than 10 days, tolls the time to appeal. The earlier time limit applies in this case because the relevant proceedings in the **bankruptcy** court took place in 2007.

63

abuse its discretion in denying Appellant's **[**3]** ***motions for reconsideration***. *HN2*[] This Court's review of the orders of the district courts in their capacity as appellate courts in ***bankruptcy*** cases is plenary. *In re First Cent. Fin. Corp., 377 F.3d 209, 212 (2d Cir. 2004)*; *see also* *Fed. R. Civ. P. 52(a)*; *In re Ionosphere Clubs, Inc., 922 F.2d 984, 988 (2d Cir. 1990)* (noting that, in reviewing an appeal from the ***bankruptcy*** court to the district court, this Court conducts the same review over the district court's decision as that court exercised over the ***bankruptcy*** court's decision).

*HN3*[] *Bankruptcy Rule 9024* provides that ***reconsideration motions*** in the ***bankruptcy*** court are governed by *Rule 60 of the Federal Rules of Civil Procedure*. *Fed. R.* ***Bankr.*** *P. 9024*. *Rule 60* provided:

> *HN4*[] On ***motion*** and upon such terms as are just, the court may relieve a party or a party's legal representative from a final judgment, order, or proceeding for the following reasons: (1) mistake, inadvertence, surprise, or excusable neglect; (2) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b); (3) fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct **[**4]** of an adverse party; (4) the judgment is void; (5) the judgment has been satisfied, released, or discharged, or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment should have prospective application; or (6) any other reason justifying relief from the operation of the judgment. The ***motion*** shall be made within a reasonable time, and for reasons (1), (2), and (3) not more than one year after the judgment, order, or proceeding was entered or taken.

*Fed. R. Civ. P. 60(b)*. Because Appellant's appeal to the district court concerned the ***bankruptcy*** court's orders denying her ***motions for reconsideration***, this Court reviews each of those decisions for abuse of discretion. *See* *Transaero, Inc. v. La Fuerza Aerea Boliviana, 162 F.3d 724, 729 (2d Cir. 1998)*; *Devlin v. Transp.* ***[*190]*** *Commc'ns Int'l Union, 175 F.3d 121, 131-32 (2d Cir. 1999)*. ***HN5***[] "A district court would necessarily abuse its discretion if it based its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence." *Transaero, 162 F.3d at 729* (internal quotation marks omitted).

In this case, the ***bankruptcy*** court did not abuse its discretion in **[**5]** determining that Appellant failed to satisfy *Rule 60(b)*. As the ***bankruptcy*** court properly determined, Appellant made only unsubstantiated allegations that she did not receive Appellee's objections to her claims. Even if Appellant had alleged to the ***bankruptcy*** court, as she does to this Court, that on March 6, 2007, she moved from one address in Miami to another but subsequently was unable to receive forwarded mail at her new address because the owner of the property rejected her mail and directed that it be returned, and as a result she never received Appellee's omnibus ***motion*** to disallow certain claims, including Claim 12512, her allegations are unsupported by any affidavits or other evidence. Appellant therefore failed to meet her burden under *Rule 60(b)*.

We have considered all of Appellant's remaining arguments and find them to be without merit. For the reasons stated above, the judgment of the district court is AFFIRMED.

---

End of Document