Caution
As of: May 27, 2022 5:04 PM Z

# *United States v. Int'l Bhd. of Teamsters*

United States Court of Appeals for the Second Circuit

January 22, 2001, Argued ; April 18, 2001, Decided

Docket Nos. 98-6262, 98-6232, 99-6266

**Reporter**

247 F.3d 370 *; 2001 U.S. App. LEXIS 6776 **; 167 L.R.R.M. 2665; 143 Lab. Cas. (CCH) P10,979; 49 Fed. R. Serv. 3d (Callaghan) 549

UNITED STATES OF AMERICA, Plaintiff-Appellee, CHARLES M. CARBERRY, Appellee, v. INTERNATIONAL BROTHERHOOD OF TEAMSTERS et al., Defendants, RON CAREY & WILLIAM HAMILTON, Appellants

**Prior History:** [**1] Appellants Ron Carey and William Hamilton appeal from a decision of the District Court for the Southern District of New York (David N. Edelstein, J.), upholding and enforcing union disciplinary sanctions imposed on them by the Independent Review Board of the International Brotherhood of Teamsters. Carey also appeals from a subsequent decision from the same district court, which affirmed the decision of the Independent Review Board to deny him post-judgment relief.

**Disposition:** Affirmed.

## Core Terms

campaign, district court, contributions, Election, rebilling, consent decree, fiduciary duty, fair hearing, proceedings, argues, donations, perjury, credibility, ban, questions, capricious, subpoena, asserts, inquire, funds, political contribution, post-judgment, requesting, breached, substantial evidence, subpoena power, recommending, fundraising, permanently, corruption

## Case Summary

### Procedural Posture

The United States District Court for the Southern District of New York upheld union disciplinary sanctions imposed on appellant president and appellant director by defendant union's independent review board (IRB). The district court also affirmed the decision of the IRB to deny appellant president post-judgment relief. Appellants filed appeals from the decisions.

### Overview

In the government's suit against defendant union for racketeering, a consent decree between the government and defendant union established the IRB to oversee the eradication of corruption in defendant union. The IRB imposed disciplinary sanctions against appellant president and appellant director based on a scheme by which union funds were manipulated in order to generate contributions to the union presidential campaign. The district court upheld the sanctions, and the appellate court affirmed. The IRB's decision that appellant president breached his fiduciary duty was neither arbitrary nor capricious, and was supported by substantial evidence; the finding that he specifically approved the contributions at issue was supported by the evidence. The IRB's decision that appellant director knowingly participated in the campaign fundraising scheme was also supported by substantial evidence. Appellants were not denied a "full and fair hearing" before the IRB. In addition, the IRB's decision regarding the choice of sanctions was neither arbitrary nor capricious. The appellate court also affirmed the decision to deny appellant director post-judgment relief.

### Outcome

District court decisions were affirmed. The evidence supported the decisions to impose sanctions against appellants.

## LexisNexis® Headnotes

Labor & Employment Law > ... > Labor Arbitration > Judicial Review > General Overview

*HN1*[ ] **Labor Arbitration, Judicial Review**

65

247 F.3d 370, *370; 2001 U.S. App. LEXIS 6776, **1

The findings of a union independent review board are entitled to "great deference" from a reviewing court.

Labor & Employment Law > ... > Labor Arbitration > Judicial Review > General Overview

### HN2[⬇] Labor Arbitration, Judicial Review

Regarding the standard of review in cases where the appellate court is reviewing a decision of the district court, which in turn reviewed a decision of a union's independent review board (IRB), the appellate court's review, like that of the district court, must be of a narrow scope, because this is an area where the IRB has been given wide discretion.

Administrative Law > Judicial Review > Reviewability > Factual Determinations

Civil Procedure > Appeals > Standards of Review > De Novo Review

Administrative Law > Judicial Review > Administrative Record > General Overview

Administrative Law > Judicial Review > Standards of Review > Arbitrary & Capricious Standard of Review

Administrative Law > Judicial Review > Standards of Review > Substantial Evidence

Labor & Employment Law > ... > Labor Arbitration > Judicial Review > General Overview

### HN3[⬇] Reviewability, Factual Determinations

The Administrative Procedures Act permits the court to set aside the agency action only if it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. _5 U.S.C.S. § 706(2)(A)_. Although narrow, appellate review of an administrative record must nonetheless be careful, thorough and probing. The appellate court reviews a union's independent review board's findings of facts for "substantial evidence" on the whole record. The substantial evidence test is deferential. The possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by

substantial evidence. Substantial evidence is more than a mere scintilla and means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Assuming that the agency's findings of fact are supported by "substantial evidence," inferences based on those findings are discretionary and can only be disturbed if they are "arbitrary and capricious."

Civil Procedure > Appeals > Standards of Review > De Novo Review

Environmental Law > Administrative Proceedings & Litigation > Judicial Review

Governments > Legislation > Statutory Remedies & Rights

Administrative Law > Judicial Review > Standards of Review > General Overview

### HN4[⬇] Standards of Review, De Novo Review

The Administrative Procedures Act requires a reviewing court to hold unlawful and set aside agency action, findings and conclusions found to be: (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; (D) without observance of procedure required by law; (E) unsupported by substantial evidence; or (F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court. _5 U.S.C.S. § 706(2)_.

Labor & Employment Law > ... > Labor Arbitration > Judicial Review > General Overview

### HN5[⬇] Labor Arbitration, Judicial Review

In accordance with the great deference owed to a union's independent review board's (IRB) determinations, law in the Second Circuit establishes that a court will not substitute its assessment of a witness's credibility for that of the IRB.

Civil Procedure > Judgments > Entry of Judgments > Consent Decrees



247 F.3d 370, *370; 2001 U.S. App. LEXIS 6776, **1

Labor & Employment Law > ... > Labor Arbitration > Judicial Review > General Overview

### HN6[↓] Entry of Judgments, Consent Decrees

The consent decree officers closest to an investigation are best equipped to evaluate the demeanor, credibility, and ultimately the culpability of those who appear before them.

Labor & Employment Law > Collective Bargaining & Labor Relations > Labor Arbitration > Discipline, Layoffs & Terminations

Labor & Employment Law > Collective Bargaining & Labor Relations > Right to Organize

Labor & Employment Law > Collective Bargaining & Labor Relations > Unfair Labor Practices > General Overview

### HN7[↓] Labor Arbitration, Discipline, Layoffs & Terminations

The Labor-Management Reporting and Disclosure Act establishes, as a matter of federal law, union members' right to the honest and faithful services of union officials. Union officials occupy positions of trust in relation to such organization and its members as a group and it is the duty of each such person to refrain from dealing with such organizations as an adverse party in any matter connected with his duties and from holding or acquiring any pecuniary or personal interest which conflicts with the interests of such organization, and to account to the organization for any profit received by him in whatever capacity in connection with transactions conducted by him or under his direction on behalf of the organization. *29 U.S.C.S. § 501(a)*.

Civil Procedure > Appeals > Standards of Review > De Novo Review

Labor & Employment Law > ... > Labor Arbitration > Judicial Review > General Overview

### HN8[↓] Standards of Review, De Novo Review

Reviewing courts treat with special deference a union's independent review board's credibility determinations.

Civil Procedure > Appeals > Standards of Review > De Novo Review

### HN9[↓] Standards of Review, De Novo Review

The appellate court reviews the district court's determination on a question de novo where it requires the appellate court to interpret the meaning of a federal statute.

Administrative Law > Agency Adjudication > Prehearing Activity

Labor & Employment Law > Collective Bargaining & Labor Relations > Labor Arbitration > Discipline, Layoffs & Terminations

Labor & Employment Law > Collective Bargaining & Labor Relations > Unfair Labor Practices > General Overview

### HN10[↓] Agency Adjudication, Prehearing Activity

See *29 U.S.C.S. § 411(a)(5)*.

Labor & Employment Law > Collective Bargaining & Labor Relations > Labor Arbitration > Discipline, Layoffs & Terminations

Administrative Law > ... > Formal Adjudicatory Procedure > Hearings > General Overview

Labor & Employment Law > Collective Bargaining & Labor Relations > Unfair Labor Practices > General Overview

Labor & Employment Law > Employee Privacy > Disclosure of Employee Information > Public Employees

### HN11[↓] Labor Arbitration, Discipline, Layoffs & Terminations

The "full and fair hearing" requirement of the Labor-Management Reporting and Disclosure Act incorporates the traditional concepts of due process. Not all of the due process protections available in the federal courts apply to union disciplinary proceedings. While the court applies traditional due process concepts, a union has a significant interest in controlling internal discipline, and so does not require the union's disciplinary proceeding

247 F.3d 370, *370; 2001 U.S. App. LEXIS 6776, **1

to incorporate the same protections found in criminal proceedings. Such proceedings need only adhere to the basic principles of due process.

Administrative Law > Agency Adjudication > Prehearing Activity

Constitutional Law > ... > Fundamental Rights > Criminal Process > Compulsory Process

Labor & Employment Law > Collective Bargaining & Labor Relations > Labor Arbitration > Discipline, Layoffs & Terminations

Labor & Employment Law > Collective Bargaining & Labor Relations > Unfair Labor Practices > General Overview

*HN12*[⬇] **Agency Adjudication, Prehearing Activity**

The right to subpoena witness is not a requirement of a "full and fair" hearing under § 101(a)(5)(C) of the Labor-Management Reporting and Disclosure Act (LMRDA). *29 U.S.C.S. § 411(a)(5)(C)*. Most union members lack subpoena power in disciplinary hearings and therefore such power cannot be required by the "full and fair hearing" requirement of LMRDA.

Labor & Employment Law > Collective Bargaining & Labor Relations > Labor Arbitration > Discipline, Layoffs & Terminations

Labor & Employment Law > Collective Bargaining & Labor Relations > Unfair Labor Practices > General Overview

*HN13*[⬇] **Labor Arbitration, Discipline, Layoffs & Terminations**

A violation of a procedural provision of a union's constitution is actionable only if the violation deprived the party of a full and fair hearing under the Labor-Management Reporting and Disclosure Act (LMRDA). A court considering a claim for relief under the LMRDA because a party alleges that an internal union disciplinary hearing violated the union's constitution must conduct a two-step inquiry: (1) the court must find that the hearing violated the constitution; and (2) it must find that the violation deprived plaintiffs of a fair trial within the meaning of the LMRDA. Even assuming a

union fails to follow its own rule, it does not violate the LMRDA unless the violation of its internal rule also contravenes specific provisions in the LMRDA.

Administrative Law > ... > Formal Adjudicatory Procedure > Hearings > General Overview

Criminal Law & Procedure > ... > Standards of Review > De Novo Review > General Overview

Labor & Employment Law > Collective Bargaining & Labor Relations > Labor Arbitration > Discipline, Layoffs & Terminations

*HN14*[⬇] **Formal Adjudicatory Procedure, Hearings**

A union's independent review board proceedings need not be stayed because of pending criminal proceedings related to the same matter.

Constitutional Law > ... > Fundamental Rights > Procedural Due Process > Scope of Protection

Criminal Law & Procedure > ... > Accusatory Instruments > Indictments > General Overview

*HN15*[⬇] **Procedural Due Process, Scope of Protection**

When a party must choose between testifying in a civil case or maintaining his *Fifth Amendment, U.S. Const. amend. V*, silence: The same dilemma is faced by any witness in a civil or criminal trial who is himself under investigation or indictment for other crimes. Such a witness must either invoke his privilege against self-incrimination, or assume the general duty to give what testimony one is capable of giving. Civilized standards of procedure and evidence do not require that a witness under indictment be given the option of nonappearance in any proceedings in related civil or criminal cases until his own trial is concluded.

Labor & Employment Law > ... > Labor Arbitration > Judicial Review > General Overview

*HN16*[⬇] **Labor Arbitration, Judicial Review**

The reviewing court should not overturn the union's

independent review board's choice of sanctions unless it finds the penalty unwarranted in law or without justification in fact.

Civil Procedure > Judgments > Relief From Judgments > Motions for New Trials

Civil Procedure > Judgments > Relief From Judgments > Newly Discovered Evidence

**HN17[⤓] Relief From Judgments, Motions for New Trials**

See *Fed. R. Civ. P. 60(b)*.

Civil Procedure > Appeals > Standards of Review > Abuse of Discretion

Civil Procedure > Judgments > Relief From Judgments > General Overview

Civil Procedure > Judgments > Relief From Judgments > Newly Discovered Evidence

**HN18[⤓] Standards of Review, Abuse of Discretion**

Denials for relief under *Fed. R. Civ. P. 60(b)* are reviewed for an abuse of discretion.

Civil Procedure > Judgments > Relief From Judgments > General Overview

**HN19[⤓] Judgments, Relief From Judgments**

A motion for relief from judgment is generally not favored and is properly granted only upon a showing of exceptional circumstances. The burden of proof is on the party seeking relief from judgment.

Civil Procedure > Judgments > Relief From Judgments > General Overview

**HN20[⤓] Judgments, Relief From Judgments**

If the reasons offered for relief from judgment can be considered in one of the more specific clauses of *Fed. R. Civ. P. 60(b)*, such reasons will not justify relief under *Fed. R. Civ. P. 60(b)(6)*.

Civil Procedure > Judgments > Relief From Judgments > Newly Discovered Evidence

**HN21[⤓] Relief From Judgments, Newly Discovered Evidence**

The party seeking relief from judgment has an onerous standard to meet. District courts in the Second Circuit characterize the test in the following manner: The movant must demonstrate that (1) the newly discovered evidence was of facts that existed at the time of trial or other dispositive proceeding, (2) the movant must have been justifiably ignorant of them despite due diligence, (3) the evidence must be admissible and of such importance that it probably would have changed the outcome, and (4) the evidence must not be merely cumulative or impeaching.

Administrative Law > Judicial Review > Reviewability > Factual Determinations

Criminal Law & Procedure > ... > Standards of Review > De Novo Review > General Overview

Civil Procedure > Judgments > Relief From Judgments > General Overview

Criminal Law & Procedure > ... > Sentencing Guidelines > Departures From Guidelines > Judicial Review

Labor & Employment Law > ... > Labor Arbitration > Judicial Review > General Overview

**HN22[⤓] Reviewability, Factual Determinations**

The reviewing court is required to review the union's independent review board's factual and credibility findings based on a very deferential standard. This is especially true when the reviewing court is reviewing the denial of a motion for post-judgment relief. It is not the province of appellate courts to review decisions of the district court for new trials based on claims of factual errors.

**Counsel:** KAREN B. KONIGSBERG, Assistant U.S. Attorney for the Southern District of New York, New York, NY (Steven M. Haber, Jeffrey S. Oesericher, Assistant U.S. Attorneys, on the brief), for Appellee United States of America, as to appellant Ron Carey.

69

247 F.3d 370, *370; 2001 U.S. App. LEXIS 6776, **1

ANDREW W. SCHILLING, Assistant U.S. Attorney for the Southern District of New York, New York, NY (Steven M. Haber, Assistant U.S. Attorney, on the brief), for Appellee United States of America, as to appellant William H. Hamilton.

BRUCE C. BISHOP, Steptoe & Johnson, Washington D.C. (Reid H. Weingarten, Mark J. Hulkower, on the briefs), for Appellant Ron Carey.

G. ROBERT GAGE, JR., Gage & Pavlis, New York, NY (Christopher P. Conniff, on the brief), for [**2] Appellant William W. Hamilton, Jr.

CHARLES M. CARBERRY, Independent Review Board Chief Investigator, New York, NY (Bonnie L. Hemenway, Celia A. Zahner, on the briefs), for Appellee Charles M. Carberry, as to appellants Ron Carey and William Hamilton.

**Judges:** Before: WALKER, Chief Judge, PARKER & KATZMANN, Circuit Judges.

**Opinion by:** KATZMANN

# Opinion

[*374] KATZMANN, *Circuit Judge*:

Appellants Ronald Carey ("Carey") and William Hamilton ("Hamilton") appeal from a decision of the District Court for the Southern District of New York (David N. Edelstein, *J.*), upholding and enforcing union disciplinary sanctions imposed on them by the Independent Review Board ("IRB") of the International Brotherhood of the Teamsters. *United States v. IBT ("Carey & Hamilton Discipline")* 22 F. Supp. 2d 135 (S.D.N.Y. 1998). Carey also appeals from a subsequent decision of the same district court which affirmed the decision of the IRB to deny him post-judgment relief. *United States v. IBT ("Carey Post-Judgment Motion")*, 1999 U.S. Dist. LEXIS 13236, 1999 WL 673340 (S.D.N.Y. Aug. 27, 1999) We affirm the decisions of the district court in their entirety.

After a short background section, this opinion will [**3] set forth the basic facts and procedural history relevant to all three appeals. [1] We then review and address the

claims made by Carey and Hamilton in support of their appeals. Our decision to affirm the decisions below against Carey and Hamilton is based in large part on the extensive factual and credibility findings made by the IRB and the deferential review that our precedents instruct us to apply to those findings.

[*375] I. BACKGROUND

[**4] In June 1988, the government brought suit against, *inter alia*, the International Brotherhood of Teamsters ("IBT" or "the union") and the IBT's General Executive Board under the civil remedies provision of the Racketeer Influenced and Corrupt Organizations Act ("RICO"). *See* 18 U.S.C. § 1964. The complaint alleged that the IBT was controlled by La Cosa Nostra and sought sweeping reforms of the IBT, including the appointment of trustees to conduct the affairs of the IBT, wide-ranging electoral reforms, and permanent injunctions against the commission of racketeering within the union. *See United States v. IBT ("1991 Election Rules Order")*, 931 F.2d 177, 180 (2d Cir. 1991). The case was resolved through a settlement, embodied in a voluntary consent order entered in March of 1989 ("Consent Decree"). *See id.* The goals of the Consent Decree were, *inter alia*, to rid the IBT of the influence of organized crime and establish a culture of democracy within the union. *See generally id.* The Consent Decree established rules for union elections and standards for imposing disciplinary sanctions on violators. *See id.* The Consent Decree [**5] has been discussed in more detail in previous opinions from this court. *See id.; see also United States v. IBT ("Friedman & Hughes")*, 905 F.2d 610, 613 (2d Cir. 1990).

II. FACTS AND PROCEDURAL HISTORY

In 1992, Carey ran for General President of the IBT and won the first general election in which members voted for IBT International officers. Carey took office in February 1992. From 1995 through July 29, 1997, Hamilton served as Director of the IBT's Government Affairs Department; in February 1995, he became an IBT member. As Director of the Government Affairs Department, Hamilton was responsible for recommending which political contributions the IBT should make in connection with its legislative and

---

[1] Although the IRB and the district court treated the sanctions against Carey and Hamilton as one case, each appealed to this court independently, and their appeals were heard separately on the same day. *See* Case Nos. 98-6262 (Carey),

98-6232 (Hamilton). In addition, Carey filed a separate appeal from the decision to deny him post-judgment relief. *See* No. 99-6266. Mr. Carey's two appeals were heard in tandem. For reasons of judicial economy and because the facts relating to all three appeals are inextricably intertwined, we address all three appeals together in this opinion.

247 F.3d 370, *375; 2001 U.S. App. LEXIS 6776, **5

political goals. In 1996, the IBT again held elections, and Carey sought re-election at the head of a slate of candidates for International officers.

The 1996 union elections were supervised, pursuant to the Consent Decree, by a court-appointed Election Officer, Barbara Zack Quindel ("Quindel"). Following Quindel's announcement of the winning candidates for the 1996 elections, which included Ron Carey as General President, post-election protests were filed. Quindel [**6] conducted an investigation of the post-election protests and uncovered serious violations of the 1996 Election Rules. On August 21, 1997, Quindel issued her decision addressing certain post-election protests and concluded that "the Carey Campaign and each member of the Carey slate further violated Article XII, Section 1(b) of the Rules by receiving the use and benefit of [] prohibited contributions." Quindel determined that these impermissible campaign contributions may have affected the outcome of the races of every member of the Carey slate. Therefore, Quindel refused to certify the results of the 1996 Election and instead ordered a rerun election for all International officer positions except for those won by the opposing slate of candidates and a candidate elected without opposition.

Additional evidence surfaced after Quindel's decision of August 21, 1997. On September 18, 1997, Jere Nash ("Nash"), Carey's campaign manager; Martin Davis ("Davis"); and Michael Ansara ("Ansara"), both campaign staff, pled guilty in the United States District Court for the Southern District of New York to felonies arising out of their conduct on behalf of the Carey campaign. As part of their respective [**7] plea agreements, Nash, Davis, and [*376] Ansara each agreed to cooperate fully with the United States Attorney's Office.

Based on this new information, Quindel reopened her investigation into whether Carey had knowledge of, or involvement in, the illegal acts these three individuals perpetrated. During the course of her inquiry, however, Quindel discovered information that led her to recuse herself from any further investigation. Subsequently, by order dated September 29, 1997, the district court designated former federal district court judge Kenneth Conboy as Election Officer "for the sole purpose of investigating and deciding the issue of disqualification of Ronald Carey from the rerun election."

After an investigation in which he issued a number of subpoenas, on November 17, 1997, Election Officer

Conboy released a 74-page decision finding that Carey engaged in extensive violations of the rules governing the 1996 election. Based on these findings, Election Officer Conboy disqualified Carey from running as a candidate in the rerun election. Carey appealed this ruling to the district court. The district court affirmed the decision of Election Officer Conboy, see *United States v. IBT ("Carey")*, 988 F. Supp. 759 (S.D.N.Y.1997), [**8] which in turn was affirmed by this court. See *United States v. IBT ("Carey Disqualification")*, 156 F.3d 354 (2d Cir. 1998).

A. The First IRB Proceeding.

In addition to its provisions pertaining to the conduct of free and fair elections, the Consent Decree between the government and the IBT also established the IRB to oversee the eradication of corruption in the IBT. Detailed rules approved by the district court and this court govern operation of the IRB. See *United States v. IBT ("IRB Rules")*, 803 F. Supp. 761 (S.D.N.Y. 1992) aff'd in part, rev'd in part, 998 F.2d 1101 (2d Cir. 1993). The three-member IRB is vested with broad investigative and disciplinary powers, including the power to investigate allegations of corruption. [2] See *IRB Rules, 803 F. Supp. at 784-85*.

On October 22, 1997, the IRB issued an Investigative Report to the [**9] IBT's General Executive Board ("GEB") recommending that Hamilton be charged with bringing

> reproach upon the IBT by ... embezzling IBT funds by arranging for IBT donations to certain advocacy groups as part of a scheme in which, in return for the IBT's donations, individuals, directly or indirectly, would donate money to benefit the [] Carey [] campaign thereby violating ... the IBT Constitution.

In addition, on November 25, 1997, the IRB issued an Investigative Report recommending that Carey be charged as follows:

> In breach of your fiduciary obligations, you authorized IBT contributions in October, 1996 to Citizen Action, Project Vote and the National Council of Senior Citizens, totaling $ 735,000, knowing the contributions would result in a personal benefit to you in money to pay expenses for your re-election campaign. You failed both to disclose that benefit and to give it to the IBT, as your fiduciary duties required. You also failed to exercise

---

[2] Board members in the instant case were William H. Webster, Grant Crandall, and Frederick B. Lacey.

your fiduciary obligation to inquire into the circumstances surrounding your co-fiduciary's recommendations of those transactions.

[*377] The GEB filed the recommended charges against Hamilton and Carey and returned [**10] the matter to the IRB for a joint hearing.

The charges against Carey and Hamilton were based on a scheme by which IBT funds were manipulated in order to generate contributions to the Carey campaign. Specifically, as the IRB noted, in October 1996 the IBT gave $ 735,000 in political contributions from the IBT treasury to three political advocacy organizations: (1) $ 475,000 to Citizen Action, (2) $ 175,000 to Project Vote, and (3) $ 85,000 to the National Council for Senior Citizens ("NCSC"). These contributions were part of a leveraged scheme whereby individuals would contribute to the Carey campaign in return for IBT contributions to these political organizations. The IRB found that Hamilton, as the Director of the Government Affairs Department, helped Nash and Davis implement the scheme by suggesting to Carey and others which donations should be made, while Carey approved the payments to these groups. As a result of this scheme, these political advocacy organizations generated in the range of $ 200,000 for the Carey campaign. These monies were used to fund a large, last-minute mailing to IBT members designed to turn out the pro-Carey vote in the IBT election. That mailing and the [**11] source of the funds were the basis for the Election Officer Quindel's refusal to certify the results of the 1996 election and her call for a rerun election.

On December 5, 1997, Hamilton's counsel wrote the IRB, requesting an adjournment of the IRB hearing "until the completion of any investigation by the United States Attorney's Office for the Southern District of New York regarding any conduct relating to these proposed charges." The letter did not mention the IBT Constitution. The IRB granted Hamilton a brief stay, and, on December 17, 1997, scheduled a consolidated hearing for Carey and Hamilton on January 20 and 21, 1998. Less than one week before the hearing, Carey applied to the district court for authority to issue subpoenas to several potential witnesses. Hamilton joined Carey's application with regard to one witness. The district court denied the requests for subpoenas.

On January 20-22 and March 11, 1998, the IRB held a consolidated hearing concerning the charges against Hamilton and Carey in Washington, D.C. While Carey testified at the hearing, Hamilton did not. On April 27, 1998, after the IRB hearing was concluded, a grand jury in the Southern District of New York [**12] returned an indictment, charging Hamilton with felonies arising out of his role in the campaign fundraising scheme and its cover-up. [3] That day, Hamilton's counsel sent a letter to the IRB stating that counsel did not consider it advisable for Hamilton to file a post-hearing memorandum, and again requested a stay of the proceedings. The IRB did not grant the stay.

After conducting the four-day hearing which included testimony, more than 100 exhibits, and numerous written submissions, the IRB issued its decision on July 27, 1998. The IRB found that Hamilton had brought reproach upon the IBT and embezzled IBT [**13] funds when he knowingly participated in the illegal fundraising scheme benefitting the Carey Campaign, and that Carey breached his fiduciary duty [*378] and brought reproach upon the IBT by failing to inquire before approving the four large political contributions which resulted in monetary benefit to his campaign. The IRB expressly found that Carey both knew of and approved the contributions at issue. ("We can only conclude that at the times in question Carey knew of the proposed contributions and approved them, and we so find.").

Accordingly, the IRB imposed the following penalties:
Hamilton [and Carey are] permanently barred from membership, permanently barred from holding any office or employment relationship with the IBT or its affiliates or otherwise drawing any salary or compensation from any IBT-affiliated source.

**B. The First District Court Decision.**

On July 27, 1998, pursuant to the procedures outlined in the Consent Decree, the IRB submitted an application to the District Court for the Southern District of New York, requesting that an order be entered affirming the IRB's decision regarding Carey and Hamilton. Both Carey and Hamilton submitted objections [**14] to the application, but the district court granted the application and affirmed the IRB decision. See *Carey & Hamilton Discipline, 22*

---

[3] We note that Hamilton was convicted of these criminal charges relating to the fund-raising scandal. His appeals from that conviction, Case Nos. 00-1228, 00-1318, were heard by a panel of this court on January 3, 2001. By unpublished decision, we rejected his appeals and affirmed the conviction. See *United States v. Hamilton, 2001 U.S. App. LEXIS 810, 2001 WL 50135 (2d Cir. Jan. 22, 2001)* (unpublished decision).

*F. Supp. 2d 135*. The district court rejected Carey's argument that there was insufficient evidence to support the IRB's finding that Carey knew of and approved the $ 735,000 in political contributions which resulted in a windfall to his campaign. *Id. at 139-42*. Similarly, the district court rejected Hamilton's challenge to the sufficiency of the evidence. *Id. at 144*. The court rejected Carey's claim that the denial of subpoena power deprived him of a "full and fair hearing" under the Labor-Management Reporting and Disclosure Act ("LMRDA"), *29 U.S.C. § 411(a)(5)*. *Id. at 142*. Similar to Carey, Hamilton argued that the denial of subpoena power, together with the IRB's refusal to grant his request to stay the IRB proceedings against him pending the outcome of the federal criminal investigation, foreclosed a "full and fair hearing" under the LMRDA. The district court found that Hamilton was not legally entitled to a stay in the proceedings or to the use of subpoena [**15] power. *Id. at 143-44*. The court additionally found that the penalties imposed on Carey and Hamilton, lifetime bans from employment with the IBT and similar bans from associating with members of the IBT, were within the IRB's discretion. *Id. at 144-45*. Carey and Hamilton submitted separate appeals.

## C. The Motions for Post-Judgment Relief.

Subsequent to the filing of those appeals, in April 1999, Nash, Carey's campaign manager and a key witness against Carey and Hamilton at the disciplinary hearing before the IRB, pled guilty to a further count of mail fraud and one count of making false statements in connection with a "rebilling scheme." In this scheme Nash caused the IBT (instead of the Carey Campaign) to pay three invoices totaling $ 21,532.17 of Carey Campaign expenses. In his testimony at his plea hearing, Nash described the rebilling scheme as follows:

> The November Group provided services to both the [IBT] and the Ron Carey Campaign. As the campaign manager for [Carey], I often received invoices from the November Group for services provided to the Carey campaign. Because of the pressing concerns about financing for the Carey [**16] campaign in or about September of 1996, I told an employee of the November Group to rebill to the [IBT] certain November [*379] Group invoices that had been sent to the Carey campaign. As a result of my directions to the November Group employee and later Martin Davis, president of the November Group, arranged for these three Carey campaign invoices, totaling approximately $ 21,532,

to be rebilled to the [IBT].

Testimony of Nash at April 20, 1999 hearing before Hon. Denise L. Cote, S.D.N.Y., in *United States v. Jere Nash*, 51 97 CR. 944, at p. 17.

Nash also admitted at the plea hearing that he had lied to the government about his knowledge of, and participation in, the rebilling scheme. Based on this new information about Nash, on April 6, 1999, Carey moved in the district court for an order directing the IRB to consider Carey's motion for relief from judgment under *Rule 60(b) of the Federal Rules of Civil Procedure* and under the rules of the Consent Decree. The district court issued an order referring Carey's and Hamilton's motions to the IRB noting that "should the IRB, in its sole discretion, be of the opinion that it is desirable that the IRB review these [Rule] [**17] 60(b) motions it is free to do so." *United States v. IBT*, No. 88 Civ. 4486 (S.D.N.Y. May 5, 1999). [4] Because the new evidence concerning Nash's fraud arguably brought into question Nash's credibility, and because the IRB had relied on Nash's testimony in the earlier hearing, the IRB accepted the opportunity to review Hamilton's and Carey's applications for relief from judgment.

After briefing from the parties but without a hearing, the IRB issued a Supplemental Decision on July 19, 1999, denying both motions for post-judgment relief. The IRB determined that Nash did not commit perjury during the IRB hearing, let alone on a material issue that would likely change the outcome of the hearing. The IRB reasoned that, [**18] even absent Nash's testimony, there was ample evidence before the IRB to support its prior decision that Carey breached his fiduciary duties when he failed to inquire into the IBT political contributions that resulted in a benefit to his campaign and that Hamilton embezzled funds from the IBT to benefit Carey's campaign. Thus, the IRB found that Carey and Hamilton did not establish circumstances warranting relief from judgment.

The IRB requested that the district court enter an order affirming the Supplemental Decision. Carey and Hamilton submitted objections and asked the district court to reverse the Supplemental Decision, but the

_____

[4] Apparently Hamilton also filed a motion for relief from judgment based on the new evidence concerning Nash's crimes. The IRB and the district court rejected Hamilton's motion along with Carey's. However, unlike Carey, Hamilton did not appeal from the decision to deny him relief from judgment.

247 F.3d 370, *379; 2001 U.S. App. LEXIS 6776, **18

district court affirmed the decision of the IRB. _Carey Post-Judgment Motion, 1999 U.S. Dist. LEXIS 13236, 1999 WL 673340_. Carey appeals.

## III. STANDARD OF REVIEW

This court has consistently stated that _HN1_[↑] the findings of the IRB are entitled to "great deference" from a reviewing court. _Carey Disqualification, 156 F.3d at 364_ (quoting _United States v. IBT ("DiGirlamo"), 19 F.3d 816, 820 (2d Cir.)_, cert. denied, 513 U.S. 873 (1994)) (internal quotation marks omitted); _United States v. IBT ("Parise"), 970 F.2d 1132, 1137 (2d Cir. 1992)_ [**19] (IRB decision upheld if it is "within the realm of reason"). The Consent Decree itself specifies "an extremely deferential standard of review" by the district court—namely, that of the Administrative Procedures Act ("APA")—of decisions of the Consent Decree officials, and such **[*380]** standard has been affirmed by this circuit. See _DiGirolamo, 19 F.3d at 819-20_; _United States v. IBT ("Cimino"), 964 F.2d 1308, 1311 (2d Cir. 1992)_. [5] _HN2_[↑] A recent case established our standard of review in cases where this court is reviewing a decision of the district court, which in turn reviewed a decision of the IRB. See _United States v. IBT ("Giacumbo"), 170 F.3d 136, 143 (2d Cir. 1999)_. We stated:

> Our review, like that of the district court, must be of a narrow scope, because this is an area where the IRB has been given wide discretion. [citation omitted] _HN3_[↑] The APA permits us to set aside the agency action only if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in

accordance with law.' § _5 U.S.C. 706(2)(A)_. Although narrow, appellate review of an administrative record must nonetheless be careful, thorough **[**20]** and probing." _Ward v. Brown, 22 F.3d 516, 521 (2d Cir. 1994)_.

We review the IRB's findings of facts for "substantial evidence" on the whole record. See _DiGirlamo, 19 F.3d at 820_; _Cimino, 964 F.2d at 1311_. The substantial evidence test is deferential. "The possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." _Illinois Cent. R.R. v. Norfolk & W. Ry., 385 U.S. 57, 69, 17 L. Ed. 2d 162, 87 S. Ct. 255(1966)_ [further citation omitted]. Substantial evidence "is more than a mere scintilla [and] means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." _Chrysler Corp. v. U.S. Envtl. Protection Agency, 203 U.S. App. D.C. 283, 631 F.2d 865, 890 (D.C. Cir.1980)_ (internal quotation and citation omitted); [further citation omitted]. Assuming that the agency's findings of fact are supported by "substantial evidence," inferences based on those findings are discretionary and can only be disturbed if they are "arbitrary and capricious."

**[**21]** _Giacumbo, 170 F.3d at 143_.

_HN5_[↑] In accordance with the great deference owed to the IRB's determinations, law in this circuit establishes that a court "will not substitute its assessment of a witness's credibility for that of the IRB." _United States v. IBT ("Simpson"), 931 F. Supp. 1074, 1096 (S.D.N.Y.1996)_, **[**22]** aff'd, _120 F.3d 341 (2d Cir.1997)_. We have stated that _HN6_[↑] the Consent Decree officers closest to an investigation are "best equipped to evaluate the demeanor, credibility, and ultimately the culpability of those who appear before them." _Carey Disqualification, 156 F.3d at 365_ (internal quotation and citation omitted); see also _Cimino, 964 F.2d at 1313_ (refusing to reweigh evidence or question credibility finding of consent decree officers).

**[*381]** IV. DISCUSSION

### A. Carey's and Hamilton's Appeals from the District Court's First Decision.

---

[5] _HN4_[↑] The Administrative Procedures Act requires a reviewing court to hold unlawful and set aside agency action, findings and conclusions found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B) contrary to constitutional right, power, privilege, or immunity;

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(D) without observance of procedure required by law;

(E) unsupported by substantial evidence …; or

(F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

* * *

_5 U.S.C. § 706(2)_.

**1. Was the IRB's decision, that Carey breached his fiduciary duty, arbitrary or capricious or unsupported by substantial evidence?**

Carey, as the General President of the IBT, and Hamilton, as the Director of the Government Affairs Department, had fiduciary obligations to IBT members in handling the union's money. *See Morrissey v. Curran, 650 F.2d 1267, 1274-75 (2d Cir. 1981); United States v. Boffa, 688 F.2d 919, 930-31 (3d Cir. 1982)* ("We believe that HN7[ ] the LMRDA established, as a matter of federal law, union members' right to the honest and faithful services [**23] of union officials."), *cert denied, 465 U.S. 1066, 79 L. Ed. 2d 741, 104 S. Ct. 1415 (1984).* Union officials "occupy positions of trust in relation to such organization and its members as a group" and "it is [] the duty of each such person … to refrain from dealing with such organizations as an adverse party … in any matter connected with his duties and from holding or acquiring any pecuniary or personal interest which conflicts with the interests of such organization, and to account to the organization for any profit received by him in whatever capacity in connection with transactions conducted by him or under his direction on behalf of the organization." *29 U.S.C. § 501(a).*

Although the majority of the IRB did not find that Carey actually knew of the illegal contribution scheme, the IRB held that the information before Carey did "impose on [him] a fiduciary duty to inquire further about any relation or tie between [his] own campaign fundraising and the IBT's payment to an advocacy group like Citizen Action."[6]

[**24] Carey's arguments to this court are similar to those addressed in the district court's thorough and well-reasoned opinion. *See Carey & Hamilton Discipline, 22 F. Supp. 2d at 139-45.* Carey contends that the IRB's finding that he specifically approved the contributions at issue was unsupported by the evidence.[7] Such an error is crucial, Carey urges, because if he did not approve

the political contributions involved in the illegal fundraising scheme, then he had no duty to inquire into those contributions and the IRB's decision would be without a basis in the law. Specifically, Carey asserts that the only evidence that he gave such approval, given that the IRB declined to rely on an affidavit provided by Monie Simpkins ("Simpkins"), Carey's personal secretary, was the unreliable and false testimony of Jere Nash. Nash testified before the IRB that, after learning from Hamilton that Carey initially rejected the proposed contribution to Citizen Action, Nash had a telephone conversation with Carey. In that conversation Nash allegedly told Carey that the contribution to Citizen Action "will help Martin Davis in the fund-raising that he is doing for our campaign." According [**25] to Nash's testimony, Carey replied, "well, hell, no one ever told me about it." Nash further testified "I said, 'Does that mean that this is okay?' [*382] And he said, 'Yes, that is fine.'" Following his conversation with Carey, Nash testified he spoke with Simpkins and advised her that the IBT would be making contributions to certain political organizations and, in return, the Carey campaign would be receiving contributions from certain individuals. Nash asked her to call him if either she or Carey had any questions about the IBT's contributions.

Carey devotes a substantial portion of his brief challenging the IRB's conclusion that Nash informed Carey about the contribution to Citizen [**26] Action. Carey points to Nash's phone records and the IBT's phone records in an attempt to establish that the telephone call Nash described could not have taken place. The IRB rejected these arguments. Carey further argues against crediting Nash's testimony because Nash testified that the conversation with Carey concerning the Citizen Action contribution occurred on October 16 or 17, 1996. Carey asserts that this date is impossible because Hamilton's memo to Carey requesting approval of the Citizen Action donation was dated October 21. However, we note that Citizen Action's letter to Hamilton requesting funds is dated October 14, and Carey could have been aware of the request before Hamilton's memo arrived. The district court spent several pages of its opinion to consider and reject Carey's argument that there was insufficient evidence that Carey approved the political contributions. The district court impressively marshaled the evidence; we agree with its discussion and adopt the following portions of that opinion.

> Contrary to Carey's suggestion …, Nash testified that when he called Simpkins and asked her to find Carey for him, he did not know whether "she got

---

[6] Honorable Frederick B. Lacey of the IRB, in his concurring opinion, stated that "unlike my colleagues, … I find that Carey did know that the contributions were to result in a benefit to his campaign fundraising."

[7] Trying to reconcile testimony suggesting he did indeed know of such contributions, Carey's brief states that he "knew generally of the contributions" but "had no reason to inquire into their purpose, because he believed them to be proper pursuant to the Union's … budgeted plan for political action in the 1996 national elections."

247 F.3d 370, *382; 2001 U.S. App. LEXIS 6776, **26

[Carey] on [**27] the phone that minute or whether [Carey] called back." Carey's arguments regarding Nash's phone records, even if correct, hardly establish that a call did not take place as Nash described in his testimony. Nash testified that he was unsure whether Simpkins was able to connect him to Carey immediately or whether Carey returned Nash's phone call.

****

Furthermore, there are numerous other statements and testimony that establish that Carey approved the contributions. For example, Hamilton stated in a March 1997 interview with an IBT attorney that he discussed the Citizen Action contribution with Carey. Hamilton also stated in an interview with the Election Officer in April 1997 that Carey complained to him in November 1996, shortly after the contributions at issue were made, about the use of funds from the General Treasury.

****

Moreover, the testimony of Gregory Mullenholtz ("Mullenholtz"), who was responsible for processing the paperwork for contributions from the IBT's political action committee, establishes that Hamilton told Mullenholtz, at the time the paperwork for the Project Vote and the NCSC contributions were being processed, that Hamilton "had gone to Mr. Carey [**28] directly and had gotten [Carey's] approval" for the two contributions. Additionally, Kathleen Marrone, who worked for Carey's Executive Assistant Aaron Belk and who formally initialed the approval of the General President's office on many of the contributions at issue, testified that Simpkins told her that Carey had signed off on the Citizen Action contribution.

More importantly, the presence of the initials "RC/ms" on three of the contribution requests (and "ms" on the [*383] fourth) provides additional support for the IRB's conclusion that Carey approved the contributions. Carey himself testified that if Simpkins marked his initials on the approval forms for the contributions at issue, then she must have spoken to him about them, even if he did not recall the conversations. Carey also stated at the IRB hearing that her notation (the initials) was what Simpkins would place on a contribution request after she discussed it with him and he approved the request.

Finally, the IRB specifically found incredulous Carey's claimed lack of memory regarding whether he had approved the contributions as well as his later denial that he had been presented with or had approved the requests. [**29] Carey claimed not to have any recollection of any of the following, all of which occurred within one month: (1) a $ 500,000 loan to Democrat Republican Independent Voter Education ("DRIVE") (the IBT's Political Action Committee); (2) a $ 475,000 Citizen Action donation; (3) a $ 175,000 in Project Vote donations; (4) a $ 85,000 NCSC donation; (5) a $ 150,000 contribution to the AFL-CIO; and (6) a $ 73,000 payment authorized for an outside telephone service to make election - related calls. Documents introduced in evidence at the IRB hearing indicated that in four weeks Carey approved all these expenditures totaling $ 1,458,000 in financial transactions relating to the federal elections.

*Carey & Hamilton Discipline, 22 F. Supp. 2d at 140-41* (footnotes and trial transcript citations omitted).

In his brief to this court, Carey argues that the IRB erred in finding that he had a duty to inquire because that duty would arise only from Nash's supposed comment that the Citizen Action contribution would be good for Carey's fundraising, and such comment was never made. However, as detailed above by the district court, the IRB had a number of reasons aside from Nash's [**30] testimony for believing that Carey approved the political contributions without inquiring into their propriety. Moreover, Carey's arguments that the IRB was wrong in crediting Nash's testimony and finding Carey's denials and claims of failed memory incredible are very difficult to sustain given that *HN8[↑]* reviewing courts treat with special deference the IRB's credibility determinations. See *Carey Disqualification, 156 F.3d at 365*; *Cimino, 964 F.2d at 1313*.

Furthermore, although our decision does not rest on such a holding, we note that even if we found that the IRB's conclusion that Carey approved the political contributions at issue is unsupported by substantial evidence, the IRB justified its decision on alternative grounds. Specifically, the IRB held that the unusually large size of these contributions, [8] together with Carey's knowledge that he was in a very difficult race for union

---

[8] While Carey argues that the unusual size of the contributions was not striking because the IBT made a conscious decision to be more involved in political races in 1996, the government's brief ably points the unusual coincidence that the only very large contributions that were made by the IBT were those that benefitted Carey's campaign.

247 F.3d 370, *383; 2001 U.S. App. LEXIS 6776, **30

president, the precarious state of his campaign funds and need for substantial expenditures, meant that Carey had a fiduciary duty to inquire into these contributions. Other circumstances surrounding the contributions, including Carey's failure to receive and review information [**31] his staff provided before making a decision, his failure to return phone calls from his ranking assistant, and his lax procedure for approving such large contributions over the telephone, also suggest [*384] that Carey neglected a fiduciary duty of inquiry.

Accordingly, we hold that the IRB's decision that Carey breached his fiduciary duty was neither arbitrary nor capricious, and was supported by substantial evidence.

## 2. Was the IRB's decision, that Hamilton knowingly participated in the campaign fundraising scheme, supported by substantial evidence?

Hamilton's challenge to the sufficiency of the evidence is evaluated under the same standard previously outlined with regard [**32] to Carey's challenge. As the district court stated:

> The IRB found that "Hamilton knowingly participated in the scheme in which IBT donations were made with the understanding that, in return, donations would be made to benefit the Carey campaign." Specifically, the IRB found that Hamilton spoke with Nash about the scheme, Hamilton agreed to seek approval for the contributions and Hamilton recommended contributions to the groups identified by Davis. Furthermore, the IRB concluded that Hamilton "knowingly used his union position to cause union donations to be made in return for contributions to the Carey campaign." The IRB determined that Hamilton embezzled IBT funds and possessed the "fraudulent intent" to do so. The record amply supports the IRB's determination.

> For example, Nash testified that he discussed the scheme with Hamilton, that he explained to Hamilton that it would raise money for the Carey campaign, and that Hamilton agreed to participate in the scheme. Nash further testified that he specifically discussed with Hamilton the contributions to Citizen Action, to Project Vote and to the NCSC. In addition, the record includes memoranda that Hamilton drafted requesting [**33] that the IBT make each of the contributions Nash and Davis called for. Moreover, Hamilton did not

offer an explanation as to how these contributions could have been made without his recommendation. This evidence provides more than ample support for the IRB's findings that Hamilton was a knowing participant in the scheme and that he embezzled IBT funds.

*Carey & Hamilton Discipline, 22 F. Supp. 2d at 144* (trial transcript citations omitted).

This Court agrees with the conclusion of the district court, which is even more convincing when considered in light of additional IRB findings not mentioned in the district court's decision. In particular, the IRB determined that Hamilton's failure to discuss the contributions with his assistant, Bob Nicklas, suggested that Hamilton knew the contributions were illicit and wanted to restrict the flow of information about them. With regard to written evidence, Hamilton's memorandum to Carey in support of a donation to the NCSC stated a different amount and purpose for the donation when compared with the NCSC's request for the donation. This inconsistency, the IRB concluded, suggests that Hamilton knew about the donation from [**34] a source other than the NCSC; that source was most likely Nash. Similarly, while Hamilton told the Election Officer's representatives that a Teamster local had requested the first Project Vote contribution, the IRB found that the local had no written record of such a request. This fact supports a conclusion that Hamilton deliberately misled the Election Officer as to the purpose of the contribution.

As the district court held, the evidence was more than sufficient to sustain the IRB charges against Hamilton.

[*385] 3. Was Carey or Hamilton denied a "full and fair hearing" before the IRB because they were denied the use of subpoenas to compel testimony and documentary evidence, or was Hamilton denied such because the IRB refused his requests to stay his disciplinary hearing pending the resolution of a criminal investigation against him?

Carey and Hamilton argue that the district court's refusal to give them access to its subpoena power deprived them of a full and fair hearing before the IRB, to which they were entitled under section 101(a)(5) of the LMRDA, codified at *29 U.S.C. § 411(a)(5)*. [9] Hamilton

---

[9] The relevant part of the statute states:

*HN10*[⬆] No member of any labor organization may be fined, suspended, expelled, or otherwise disciplined

247 F.3d 370, *385; 2001 U.S. App. LEXIS 6776, **34

adds a claim that his rights under the LMRDA and IBT Constitution [**35] were violated by the IRB's refusal to stay his disciplinary case until the resolution of the criminal investigation against him. The district court twice rejected Carey's and Hamilton's arguments that they must be granted the power to subpoena in order to receive a full and fair hearing under LMRDA. See _United States v. IBT, 992 F. Supp. 598, 599-600 (S.D.N.Y. 1998)_; _Carey & Hamilton Discipline, 22 F. Supp. 2d at 142._ HN9[↑] We review the district court's determination on this question de novo because it requires us to interpret the meaning of a federal statute. See _Dunlop-McCullen v. Local 1-S, AFL-CIO-CLC, 149 F.3d 85, 88 (2d Cir. 1998)_ (district court application of LMRDA reviewed de novo).

[**36] _HN11_[↑]

The "full and fair hearing" requirement of the LMRDA incorporates the "traditional concepts of due process." See _Kuebler v. Cleveland Lithographers & Photoengravers Union Local 24-P, 473 F.2d 359, 363-64 (6th Cir. 1973)._ Not all of the due process protections available in the federal courts apply to union disciplinary proceedings. See _Wellman v. International Union of Operating Eng'rs, 812 F.2d 1204, 1205 (9th Cir. 1987)_ ("While we apply traditional due process concepts, we recognize that a union has a significant interest in controlling internal discipline, and so do not require the union's disciplinary proceeding to incorporate the same protections found in criminal proceedings."). Such proceedings need only adhere to the "basic principles of due process." See _Mayle v. Laborer's Int'l Union of N. Am. Local 1015, 866 F.2d 144, 146 (6th Cir. 1988)_; cf. _Wildberger v. American Fed'n of Gov't Employees AFL-CIO, 318 U.S. App. D.C. 194, 86 F.3d 1188, 1193 (D.C. Cir. 1996)_ (the LMRDA protects only against a "breach of fundamental fairness").

Neither the IBT Constitution nor the Consent Decree grants IBT members compulsory [**37] process rights in disciplinary proceedings. Furthermore, this court has stated that _HN12_[↑] the right to subpoena witness is not "a requirement of a 'full and fair' hearing under _section 411(a)(5)(C)._" _United States v. IBT_, No. 91-630,

Order at 3 (2d Cir. Mar. 27, 1992) (unpublished) (noting that most union members lack subpoena power in disciplinary hearings and therefore such power cannot be required by the "full and fair hearing" requirement of LMRDA.). [10] Other courts have likewise [*386] rejected claims of compulsory process in union disciplinary proceedings. See, e.g., _Frye v. United Steelworkers of Am., 767 F.2d 1216, 1224 (7th Cir. 1985)_ (rejecting appeal of union member based on procedural irregularities at disciplinary hearing, stating that "section 101(a)(5)(C) [of LMRDA] does not require that union disciplinary hearings incorporate the specific protections associated with judicial proceedings), superceded by statute on other grounds as stated in _Meyer v. Rigdon, 36 F.3d 1375, 1380 (7th Cir. 1994)._

[**38] Carey and Hamilton recognize that the law does not provide a right to subpoena witnesses in all LMRDA hearings, but assert that in this case such a right was required. They note that they have been under investigation by the joint forces of the U.S. Attorney's Office for the Southern District, two Court-appointed Elections Officers, and the IRB Chief's Investigator. Carey and Hamilton argue that these investigative powers shared information and together possessed such awesome resources that it was necessary for the district court to issue subpoenas on their behalf in order to ensure that they receive a fair hearing.

Carey contends that, had he been given subpoena power, he likely could have demonstrated more of Nash's trickery and motives to lie. Specifically, Carey asserts that he could have shown that Nash "was looting the Carey Campaign … of hundreds of thousands of dollars." Such evidence would have further disproved Nash's contention that he informed Carey that the contribution to Citizen Action would benefit Carey because, Carey argues, Nash would likely not have alerted Carey to the transaction in which Nash was stealing from his campaign. Carey also surmises that had he [**39] been able to compel the testimony of Simpkins, it would have gone a long way towards exonerating him. According to Hamilton, if he had subpoena power and access to November Group documents, as well as the opportunity to confront Martin

---

except for nonpayment of dues by such organization or by any officer thereof unless such member has been (A) served with written specific charges; (B) given a reasonable time to prepare his defense; (C) afforded a full and fair hearing.

_29 U.S.C. § 411(a)(5)_

[10] The district court's previous opinion denying Carey subpoena power also noted that Carey's argument is "contrary to the well-established notion that reliable hearsay is admissible in a disciplinary hearing under the Consent Decree, and may alone provide the basis for disciplinary action." _992 F. Supp. at 600 n.3_ (citing _DiGirlamo, 19 F.3d at 823-24_).

247 F.3d 370, *386; 2001 U.S. App. LEXIS 6776, **39

Davis, he could have proven that he was not a party to the scheme, which he claims was developed to benefit Davis and Nash.

While we do not reach the issue of whether a union member subject to a disciplinary proceeding would ever be entitled to subpoena power in order to guarantee his or her statutory right under the LMRDA to a "full and fair hearing," we find in any event that this was not such a case. Although Carey was not permitted to subpoena witnesses, he testified in his own defense and presented other evidence and witnesses to rebut the charges against him. He cross-examined witnesses at the IRB hearing, (including Jere Nash, who was forced to come by subpoena from the U.S. Attorney's Office, issued at Carey's request.) Carey was able to challenge the statements of Nash and Simpkins by introducing arguably inconsistent statements of those declarants themselves and by introducing other physical evidence, such as phone records. Indeed, Carey's [**40] defense was so effective that he convinced the IRB not to rely on the harmful Simpkins affidavit. Despite vigorous attempts to discredit Nash, Carey was unable to persuade the IRB to disregard his testimony. But that does not mean that under the law we are bound to follow that he was deprived of a full and fair hearing.

At the hearing Hamilton did not testify in his own defense, but instead relied on cross-examination, particularly of Jere Nash. It was Nash's testimony which was most harmful to Hamilton, and his counsel was unable to persuade the IRB to disregard it. Although Davis did not testify, [*387] Hamilton's counsel had the opportunity to oppose the evidence based on Davis's plea allocution in Davis's criminal case, and Hamilton does not argue that he was prevented from rebutting Davis's statement. As with Carey, we cannot conclude that the lack of subpoena power deprived Hamilton of a full and fair hearing.

Hamilton also argues that he did not receive a full and fair hearing before the IRB because he was twice denied a stay of the IRB proceedings. According to Hamilton, two reasons justified a stay. First, the IBT Constitution provides that "no member or officer shall be required [**41] to stand trial on charges involving the same set of facts as to which he is facing criminal or civil trial until his final court appeal had been concluded." Constitution and By-laws of the IBT, art. XIX, § 7(a). Second, Hamilton claims that he could not offer a full defense without compromising his *Fifth Amendment* right against self-incrimination because he was being investigated and was indicted by the United

States Attorney. We address these arguments seriatim.

HN13[↑] A violation of a procedural provision of a union's constitution is actionable only if the violation deprived the party of a full and fair hearing under the LMRDA. *See Yager v. Carey, 333 U.S. App. D.C. 48, 159 F.3d 638 (D.C. Cir. 1998), aff'g 910 F. Supp. 704, 713 (D.D.C. 1995)* ("A court considering a claim for relief under the LMRDA because a party alleges that an internal union disciplinary hearing violated the union's constitution must conduct a two-step inquiry: (1) the court must find that the hearing violated the constitution; and (2) it must find that the violation deprived plaintiffs of a fair trial within the meaning of the LMRDA."); *Wellman, 812 F.2d at 1206* ("Even [**42] assuming a union fails to follow its own rule, it does not violate the LMRDA unless the violation of its internal rule also contravenes specific provisions in the LMRDA."). Hamilton's claim that the denial of his first request for a stay violated the IBT Constitution is meritless because at the time of his request he was not facing any trial. Furthermore, even if the denial was a violation of the IBT's Constitution, Hamilton cannot show that it deprived him of a fair hearing, as he was able to mount a vigorous defense against his accusers. His able counsel strenuously cross-examined witnesses, particularly Nash, and highlighted weaknesses in witnesses' testimony. Furthermore, in finding against Hamilton, the IRB did not rely on any adverse inference drawn from his failure to testify.

With regard to Hamilton's second request for a stay, which was made more than a month after the close of the hearings, on the day of his post-trial brief was due, the denial only deprived Hamilton of an alleged right to submit a post-trial brief. At the opening of the hearing, his counsel presented the IRB panel with those arguments that he presumably would have raised in his post-trial brief; thus, the [**43] panel was well aware of Hamilton's position and the post-trial brief likely would have been cumulative. As noted above, union proceedings need only adhere to the "basic principles of due process." *See Mayle, 866 F.2d at 146.* In light of this standard, because Hamilton had an opportunity to present his arguments to the IRB at the hearing, we cannot find his inability to submit a post-trial brief constituted a denial of his right to a full and fair hearing.

With respect to Hamilton's argument that the denial of his request for a stay was a violation of his *Fifth Amendment* rights, the district court stated:

This Court has previously ruled that *HN14*[↑] IRB

247 F.3d 370, *387; 2001 U.S. App. LEXIS 6776, **43

proceedings need not be stayed because of pending criminal proceedings **[*388]** related to the same matter. *See United States v. IBT ("Hickey"), 945 F. Supp. 96, 99 (S.D.N.Y.1996)* ("Because the *Fifth Amendment* is unavailable to a union member called to sworn examination before an internal disciplinary body, this Court finds that it does not support Hickey's request to stay the IRB examination . . . ."). Given that one of the principal goals of the Consent Decree is to rid the union of corruption, there were **[**44]** compelling reasons in this case not to allow the pendency of related criminal proceedings to delay IRB disciplinary proceedings. Thus, because the IRB's determination not to stay the proceedings against Hamilton was correct, it did not render the IRB's Decision arbitrary and capricious.

*Carey & Hamilton Discipline, 22 F. Supp. 2d at 143.* [11]

This ruling is consistent with our caselaw. This court has noted that *HN15*[⊞] when a party must choose between testifying in a civil case or maintaining his *Fifth Amendment* silence:

> The same dilemma is faced by any witness in a civil or criminal trial who is himself under investigation or indictment for other crimes. Such a witness must either invoke his privilege against self-incrimination, or assume the general duty to give what testimony one is capable **[**45]** of giving.
> ****
> We cannot agree that civilized standards of procedure and evidence require that a witness under indictment be given the option of nonappearance in any proceedings in related civil or criminal cases until his own trial is concluded.

*United States v. Simon, 373 F.2d 649, 653 (2d Cir. 1967)* (internal quotation marks and citation omitted), vacated as moot, 389 U.S. 425 (1967);*see United States v. Kordel, 397 U.S. 1, 11, 25 L. Ed. 2d 1, 90 S. Ct. 763 (1970)* ("It would stultify enforcement of federal law to require a governmental agency . . . invariably to choose either to forgo recommendation of a criminal prosecution once it seeks civil relief, or to defer civil proceedings pending the ultimate outcome of a criminal trial."); *Nosik v. Singe, 40 F.3d 592, 596 (2d Cir. 1994)*

(denying motion for injunction to enjoin state proceedings on ground that testimony at hearings might compromise petitioner's *Fifth Amendment* right against self-incrimination); *see also Kashi v. Gratsos, 790 F.2d 1050, 1057 (2d Cir. 1986)* (defendant's due process rights were not violated when court refused **[**46]** to stay civil securities trial until after criminal statute of limitations had expired although United States Attorney had decided not to prosecute). Accordingly, Hamilton did not have a due process right to have the IRB's proceedings delayed because of the criminal investigation and his subsequent indictment.

Moreover, in this case, the need for the union to proceed with the hearing was particularly urgent because the union was faced with the need to purge itself of corruption at its highest levels. *See United States v. IBT ("Yellow Freight"), 948 F.2d 98, 103 (2d Cir. 1991)*, vacated as moot, 506 U.S. 802 (1992). Requiring the union to delay either its hearing awaiting Hamilton's testimony, or its decision awaiting Hamilton's post-trial brief until criminal proceedings were concluded, could have unduly hampered the union, especially one that had **[*389]** been found to be riddled with corruption for years. In response to this point, Hamilton argues that because he had resigned from the union by the time of the hearing, the union faced no threat from him. However, his resignation did not give the union the same relief it achieved by the IRB's decision and **[**47]** its confirmation by the district court: an enforceable associational and employment ban.

In sum, because due process did not require a stay, and because granting a stay would have posed a threat to the union, this court cannot find that Hamilton was denied a full and fair hearing before the IBT.

**4. Was the IRB arbitrary or capricious in either A) imposing a lifetime ban on Carey and Hamilton from membership or employment with the IBT or B) imposing a lifetime ban on Carey and Hamilton from associating with members of the IBT?**

We have held "that *HN16*[⊞] the reviewing court should not overturn the [IRB]'s choice of sanctions unless it finds the penalty unwarranted in law or without justification in fact." *Simpson, 120 F.3d at 348* (internal quotation marks and citation omitted) (alteration in original); *see also United States. v. IBT ("Wilson"), 978 F.2d 68, 73 (2d Cir. 1992)* ("A court may only consider whether the administrator made an allowable judgment in his or her choice of the remedy") (internal quotation

---

[11] The district court did not address Hamilton's argument that the denial of his requests for a stay violated the IBT Constitution because such argument is raised for the first time on appeal.

marks and alterations omitted).

### a. The Lifetime Employment Ban.

The IRB imposed the following penalty on Carey and Hamilton, in which [**48] each was

> permanently barred from membership, permanently barred from holding any office or employment relationship with the IBT or its affiliates or otherwise drawing any salary or compensation from any IBT-affiliated source.

Carey argues that the IRB acted arbitrarily and capriciously by imposing a "grossly disproportionate" sanction, and Hamilton claims to join in those arguments. "Permanent suspension," Carey asserts, "has, almost invariably, been reserved for involvement with organized crime … ." Carey argues that permanent suspension "has never, to [his] knowledge, been imposed for negligence, i.e., breaching a fiduciary duty by failing to inquire." However, as demonstrated by some of the cases cited by Carey himself, courts have imposed lifetime suspensions on IBT members for breaching their fiduciary duty by failing to investigate into other members' possible involvement with organized crime. See Carey brief at 45-46 n.13 (citing, inter alia, United States v. IBT ("Application LXXIII of the IA") 803 F. Supp. 740 (S.D.N.Y. 1992)).

Contrary to Carey's assertion that the IRB found that his only wrongdoing was "nonfeasance in failing [**49] to follow up on a cryptic comment," the IRB determined that Carey committed "serious breaches of trust" that "require severe sanctions." The IRB stated that "by his entire course of conduct, [Carey] abdicated his fiduciary responsibilities." Moreover, the IRB justified the penalty imposed on Carey by finding that "as the top elected official of the IBT, Carey was especially obligated to follow the[] rules, particularly as to financial transactions of the size involved here and in light of his constitutional obligation to review expenditures." Caselaw in this circuit supports the IRB's holding that because of Carey's position as the highest union official his misconduct was more serious. See Simpson, 120 F.3d at 349 ("It was well within the IRB's discretion to conclude that, precisely because Simpson was a trusted, high-level official in the IBT, his conduct … was more culpable.").

[*390] With regard to Hamilton, the IRB stated that "Hamilton, as the top administrative official responsible for political contributions, must be held especially accountable." According to the IRB, "Hamilton, in concert with his co-schemers, knowingly used his union position to cause union [**50] donations to be made in return for contributions to the Carey Campaign, a non-union reason, thereby bringing reproach upon the IBT." Such an abuse of trust by a powerful administrative official undermines the faith of the public and the IBT members in the ability of the union to conduct its day-to-day affairs in a trustworthy and honest way. Actions which cause such harm are deserving of serious rebuke, both to censure officers such as Hamilton, and to warn other members that such abuse will not be tolerated.

At bottom, Hamilton's embezzlement and Carey's breach of his fiduciary duties resulted in the misuse of $ 735,000 of union funds. As a result of their approval of the contributions to the political advocacy organizations, the 1996 IBT election had to be overturned and the union membership was denied its right to a fair and democratic election. We therefore hold that IRB's decision regarding the choice of sanctions is neither arbitrary nor capricious. [12]

### [**51] b. The Lifetime Associational Ban.

Carey further contends that the associational ban in Paragraph E(10) of the Consent Decree should not be applied to him. Paragraph E(10) of the Consent Decree enjoins IBT officers, representatives, members and employees from "knowingly associating with … any person otherwise enjoined from participating in union affairs … ." Carey argues that "the rationale for the associational ban is to protect and insulate IBT officers and members from contact with persons involved in ongoing organized criminal enterprises." Therefore, he asserts, "an associational ban would serve no legitimate purpose and is not necessary to insulate IBT members from exposure to a person found guilty of ongoing corruption or criminal enterprise." [13]

---

[12] The district court agreed with the penalty imposed, stating: "There has been no case since the implementation of the Consent Decree in which the wrongdoing resulted in as much harm to the IBT and its members and so directly undermined a central provision of the Consent Decree—an honest and fair general election—as was done here." Carey & Hamilton Discipline, 22 F. Supp. 2d at 143.

[13] The district court rejected this argument, stating:

> Contrary to Carey's claim, the associational ban also serves to protect IBT officers and members from people of dubious character. The true test of one's character is what one does when one believes nobody is watching.

[**52] Alternatively, Carey argues that the associational ban applied to him should only prevent professional or business contacts with IBT membership and should not bar him from purely social meetings with the friends he has made over a 40-year career with the Teamsters.

Carey has sympathetic arguments that the penalty imposed on him is harsh given his many years of service to the union; nonetheless, the penalty has a basis in the IBT rules and the Consent Decree. The IRB reasonably determined that Carey is to be permanently barred from the IBT [*391] and therefore he clearly falls within the scope of Paragraph E(10) of the Consent Decree.

Hamilton has adopted Carey's arguments by reference, but has failed to develop them in a fact-specific way. The court will simply note that with respect to the associational ban, Hamilton has had a significantly shorter career with the IBT than Carey, and therefore his argument is less compelling.

Based on the facts, we cannot find the associational bans to be arbitrary or capricious.

**B. Carey's Appeal From the Decision to Deny Him Post-Judgment Relief.**

As detailed above, after being informed about Nash's guilty pleas admitting his involvement [**53] in the rebilling scheme and lying to the government about that activity, Carey sought post-judgment relief. Carey cites *Rule 60(b) of the Federal Rules of Civil Procedure* as the grounds under which the IRB or district court should have granted him post-judgment relief. *Rule 60(b)* provides in relevant part:

> HN17[⬆] on motion and upon such terms as are just, the court may relieve a party … from a final judgment, order or proceeding for the following reasons: … (2) newly discovered evidence which by due diligence could not have been discovered in

time to move for a new trial under Rule 59(b); … (6) any other reason justifying relief from the operation of the judgment.

*Fed. R. Civ. Pro. 60(b).*

Carey's grounds for relief pressed on appeal allege newly discovered evidence under *Rule 60(b)(2)* and *Rule 60(b)(6)*'s catch-all provision. [14] Additionally, Carey argues that the IRB's determination, that even absent Nash's testimony there was ample evidence that Carey violated the IBT Constitution and his fiduciary duties, was arbitrary and capricious.

[**54] Because the IRB used *Rule 60(b)* as a point of reference in deciding on the motion for post-judgment relief, the district court also examined *Rule 60(b)* "to assist with its analysis of the IRB's decision under the arbitrary and capricious standard." [15] *Carey Post-Judgment Motion, 1999 U.S. Dist. LEXIS 13236, 1999 WL 673340, at *3.* HN18[⬆] Denials for relief under *Rule 60(b)* are reviewed for an abuse of discretion. *See Devlin v. Transportation Comm. Int'l Union, 175 F.3d 121, 132 (2d Cir. 1999).* HN19[⬆] A motion for relief from judgment is generally not favored and is properly granted only upon a showing of exceptional circumstances. *See Paddington Partners v. Bouchard, 34 F.3d 1132, 1142 (2d Cir. 1994); Nemaizer v. Baker, 793 F.2d 58, 61 (2d Cir. 1986).* The burden of proof is on the party seeking relief from judgment, in this case Carey. *See Paddington, 34 F.3d at 1142.*

[**55] We note at the outset that Carey's claim for relief under *Rule 60(b)(6)* is unavailing. Controlling cases have held that HN20[⬆] if the reasons offered for relief from judgment can be considered in one of the more [*392] specific clauses of *Rule 60(b)*, such reasons will not justify relief under *Rule 60(b)(6).* *See Liljeberg v. Health Servs. Acquisition Corp., 486 U.S. 847, 863, 100 L. Ed. 2d 855, 108 S. Ct. 2194 (1988); Nemaizer, 793 F.2d at 63.* Because Carey's claim regarding Nash's

---

Both Carey and Hamilton, through their conduct during the 1996 IBT election have exhibited shoddy characteristics to this Court. Paragraph E(10) provides no exceptions based on the stated reasons for the permanent bar, and this Court finds no basis to grant Carey or Hamilton exceptional treatment.

*Carey & Hamilton Discipline, 22 F. Supp. 2d at 145* (footnote omitted).

---

[14] Although Carey argued for relief under *Rule 60(b)(3)* (alleged fraud by an adverse party) before the IRB and the district court, he does not renew such argument before this court.

[15] As the district court and the IRB noted, the Federal Rules of Civil Procedure do not apply to proceedings before the IRB. *Carey Post-Judgment Motion, 1999 U.S. Dist. LEXIS 13236, 1999 WL 673340, at *3.* However, the IRB used the standards articulated in *Rule 60(b)* to assist with its analysis of Carey's application. The district court followed that lead. *Id.*

alleged perjury is properly considered under *Rule 60(b)(2)* as newly discovered evidence, Carey's claim under 60(b)(6) was correctly rejected. *See Madonna v. United States, 878 F.2d 62, 64 (2d Cir. 1989)* (action under *Rule 60(b)(2)* is properly based on new evidence of fraud or mistake discovered after trial).

## 1. Nash's Alleged Perjury as Newly Discovered Evidence Under *Rule 60(b)(2)*.

HN21[↑] The party seeking relief from judgment has an onerous standard to meet. District courts in this circuit have characterized the test in the following manner:

> The movant must demonstrate that (1) the newly discovered evidence was of facts that existed at the time of trial [**56] or other dispositive proceeding, (2) the movant must have been justifiably ignorant of them despite due diligence, (3) the evidence must be admissible and of such importance that it probably would have changed the outcome, and (4) the evidence must not be merely cumulative or impeaching.

*United States v. IBT, 179 F.R.D. 444, 447 (S.D.N.Y. 1998)* (alteration in original) (quoting *Frankel v. ICD Holdings S.A., 939 F. Supp. 1124, 1127 (S.D.N.Y. 1996)).*

Carey's objection to the IRB's Supplemental Decision is basically that the new evidence demonstrates that Nash committed perjury before the IRB and therefore that the IRB's prior decision, which heavily relied on Nash's testimony, must be reversed. Carey points to three transcript excerpts from Nash's testimony before the IRB that he alleges prove that Nash committed perjury during the IRB hearing, and one other place where he asserts that Nash violated his oath to tell the whole truth. After addressing the claimed instances of Nash's perjury, we will review Carey's arguments that evidence of the alleged perjury was "of such importance that it probably would have changed the outcome." *IBT, 179 F.R.D. at 447* [**57] (citation omitted).

The first instance in which Carey alleges that Nash perjured himself during the IRB hearing was when Nash denied that he hid details from Carey because he did not want the IBT General President to know about them. During the IRB hearing Nash was asked the following questions and provided the following responses:

> Q: Is it fair to say that during the course of this campaign there were a great number of details that you attended to that you did not share with Mr.

Carey?
A: Yes, sir.
Q: And some of them you didn't share because they were in your area of responsibility rather than his?
A: Yes, sir.
Q: And some of them you didn't share because they might have concerned matters that Mr. Carey wasn't interested in?
A: Same thing.
Q: And is it fair to say that there were some details you didn't share with Mr. Carey because you didn't want him to know about them?
A: I can't think of a one.

Carey asserts that because Nash did not discuss the rebilling scheme in response to the last question, Nash committed perjury before the IRB. Carey argues that, although Nash's answer is framed as an absence of recollection, the chronology [**58] reveals [*393] that the rebilling scheme was fresh in his mind and thus his claims of no memory are outright perjury. Specifically, Carey notes that Nash had been confronted by the government with questions abut the false invoices within a week before of his testimony before the IRB.

While the timing suggests that Nash should have remembered the rebilling scheme, it is very difficult to conclude this testimony was perjurious, as such a finding hinges on establishing definitively Nash's motives for keeping the rebilling scheme from Carey. As the district court pointed out, Nash might have not shared the rebilling scheme with Carey for reasons other than a desire to keep it from him. *Carey Post-Judgment Motion, 1999 U.S. Dist. LEXIS 13236, 1999 WL 673340, at *5.* Under the IBT's fund approval process, there was no requirement for Nash to contact Carey regarding the payment of the three relatively minor invoices because expenditures of that size did not need Carey's approval. *Id.*

The second instance in which Carey alleges that Nash perjured himself during the IRB hearing was during the following colloquy:

> Q: What else was there, that you are aware of, that reflected benefit to Davis out of [**59] these transactions that we have been inquiring into?
> A: All that I am aware of I have learned since Martin Davis's arrest and that is what I was referring to, because of the illegal conduct he did, he made money through those -- through that illegal conduct, none of which I knew and would not have approved of.

Carey argues that this answer was perjurious because Nash knew that Davis was involved in the rebilling scheme with Nash himself. The IRB concluded that Carey's argument "assumes erroneously that the question asked referred to the rebilling scheme." The IRB explained that it believed that the question "concerning the benefit to Davis 'out of these transactions' obviously referred to the four advocacy group contributions by the IBT and not any transaction the Carey Campaign may have directly engaged in." [16] Carey responds by arguing that the question was not limited, that it was a broad based question. Even more importantly, Carey argues, Nash's answer was extremely broad in asserting that he would not have approved of any illegal conduct by Martin Davis.

[**60] While the rebilling scheme assisted the Carey campaign by having the IBT pay expenses the campaign itself should have paid, it is not obvious how Davis benefitted -- and the relevant question asked for instances in which Davis benefitted. Carey's brief argues that Davis, as an owner of the November Group, benefitted by having the November Group's bills paid promptly by the IBT because the Carey campaign might not have been able to pay those bills.

The third instance where Carey alleges that Nash perjured himself during the IRB hearing concerned Nash's prior truthfulness with the government. During the IRB hearing Nash was asked the following questions, to which he provided the following responses:

Q: Now, when did you first meet with the government at all in connection with this case?
A: In connection with this particular hearing or in connection with my meeting with the government?

[*394]
Q: Since you began cooperating.
A: End of May, early June.
Q: Did you meet with the government before your plea or after your plea?
A: Before my plea.
Q: How long before your plea?
A: I think the plea was in September.

Q: Were you debriefed—was there a [**61] lengthy discussion in which they asked you questions and

you gave them answers?
A: Several.
Q: Did you answer their questions truthfully? A: Yes, sir.

Carey contends that because Nash admitted to making false statements to the government about the rebilling scheme after his September 1997 guilty plea, he committed perjury when he testified that he truthfully answered the government's questions prior to his September 1997 guilty plea. Furthermore, according to Carey, Nash's admission that he concealed and falsely denied his role in the rebilling scheme to the government demonstrated that he lied when he testified that when he agreed to come in June 1997 and began to cooperate, "I told [the government] everything I knew."

The IRB rejected this argument, finding that "Nash's testimony ... that he answered questions asked of him by the government before his September 1997 guilty plea [record cite and footnote omitted] could not be perjury when it is considered that at that time the government had not asked him any questions which would implicate the three invoices involved in the rebilling scheme." This finding by the IRB is supported by the fact that the criminal information [**62] to which Nash plead guilty alleges that Nash was first asked (and first lied) about the billing scheme in March of 1998.

Carey responds by arguing that the IRB and district court decisions rely almost completely on the testimony of Nash himself, a witness twice convicted of lying to the government about the circumstances of this very case. Carey asserts that Nash would do or say anything to keep the government's case against Carey from unraveling, because Nash needs help from the government in the form of an application for a downward departure in sentencing. We agree with Carey that there are serious questions about Nash's credibility in this case, but reiterate that _HN22[↑]_ this court is required to review the IRB's factual and credibility findings based on a very deferential standard. See _Cimino, 964 F.2d at 1313._ This is especially true given that we are reviewing the denial of a motion for post-judgment relief. See _United States v. Johnson, 327 U.S. 106, 111-12, 90 L. Ed. 562, 66 S. Ct. 464 (1946)_ (it is not the province of appellate courts to review decisions of the district court for new trials based on claims of factual errors); _United States v. Polisi, 416 U.S. 573, 576 (2d Cir. 1969)_ [**63] (same).

In his final claim regarding Nash's untruthful testimony,

---

[16] The district court likewise found "that neither the question nor the answer had anything to do with the rebilling scheme, and therefore, was not perjurious." _Carey Post-Judgment Motion, 1999 U.S. Dist. LEXIS 13236, 1999 WL 673340, at *6._

Carey asserts that "Nash repeatedly vouched for his own truthfulness when he was questioned about his motivation to inculpate Mr. Carey to obtain a downward departure motion." While conceding that Nash's insistence that he was at the IRB hearing to tell the truth did not contain a "specific statement" that is "in so many words a demonstrable lie," Carey still argues that this Court should treat Nash's vouching as another lie. [17] Overall, the IRB concluded that "the [*395] answers of Nash to the questions in the record before [the IRB] concerning contributions to the advocacy groups in October and early November 1996 cannot, as a matter of fact, be understood to include the three campaign invoices probably paid in September of 1996." Thus, the IRB determined that none of the portions of Nash's testimony on which Carey relies "has been shown to be perjury." The district court agreed with the IRB's assessment. *Carey Post-Judgment Motion, 1999 U.S. Dist. LEXIS 13236, 1999 WL 673340, at *7.*

[**64] Whatever can be said for the view that Nash's testimony to the IRB constituted perjury, in a difficult case such as this one, we are reluctant to disturb the factual and credibility findings of the IRB. Even assuming *arguendo* that we were to find that Nash's statements constituted perjury, the result in the case would be the same because Carey cannot establish that any of the perjurious statements are sufficiently material to the IRB's underlying decision.

The IRB itself determined that, even if they constituted perjury, Nash's statements were "not material to the issues before [the IRB]." The IRB noted that "had the testimony about the rebilling scheme [and Nash's role] been offered, it would only have been considered as impeaching Nash's credibility." The IRB found that the evidence of the rebilling scheme was not of "'such importance' to the issue of the involvement of Carey … in the contributions to the advocacy groups that it would

---

[17] The district court stated that:

A review of the portion of the transcript that Carey and Hamilton cite in support of this claim, however, reveals that Nash was questioned regarding his understanding of the requirements of his plea agreement. [trial transcript omitted]. Nash testified about his obligations under the plea agreement, including his responsibility to tell the truth. Nash did not "vouch for his own truthfulness." Thus, this Court finds Carey's and Hamilton's argument to be without merit.

*Carey Post-Judgment Motion, 1999 U.S. Dist. LEXIS 13236, 1999 WL 673340, at *7.*

---

have altered our conclusions regarding Carey's breach of fiduciary duty."

Carey urges that the IRB erred in finding that the allegations regarding Nash's testimony were "merely cumulative or impeaching" and did not warrant relief. Carey [**65] recognizes that, ordinarily, newly discovered evidence that merely goes to impeachment of a witness is not grounds for a new trial. However, Carey argues that in this situation, where the testimony of Nash was crucial to the outcome of Carey's hearing and the IRB's decision to credit Nash's testimony is called into question by this newly discovered evidence, the IRB must consider the effect of the new evidence on Nash's credibility, even if cumulative.

In support of this argument, Carey cites criminal cases where courts have granted post-conviction relief based on information that key witnesses against the defendants had perjured themselves. In *United States v. Wallach*, the government acknowledged that one of its key witnesses committed perjury during the criminal trial. *935 F.2d 445, 455 (2d Cir. 1991).* This court reversed the convictions and remanded for a new trial, finding that "as a matter of law that had the jury been aware of [the] perjury it probably would have acquitted the defendants." *Id. at 458-59.* In another criminal case cited by Carey, *Alvarez v. United States*, the district court ordered a new trial finding that, in light [**66] of substantial new evidence which cast doubt on the veracity of a key witness, "a jury would probably acquit the defendant of the crimes for which he was convicted." *808 F. Supp. 1066, 1096 (S.D.N.Y. 1992).* Carey also relies on the Seventh Circuit's decision in *United States v. Taglia, 922 F.2d 413 (7th Cir.), cert. denied, 500 U.S. 927 (1991).* In that case the Court explained [*396] that "if the government's case rested entirely on the uncorroborated testimony of a single witness who was discovered after trial to be utterly unworthy of being believed … the district judge would have the power to grant a new trial in order to prevent an innocent person from being convicted." *Id. at 415.* Carey likens his appeal to these criminal cases. He argues that the IRB erred in not granting relief based on the new impeachment evidence because Nash's testimony provided "the only supposed information which would have given Carey a reason to suspect impropriety within his campaign" and because the evidence "utterly destroys" Nash's credibility.

However, Carey's argument overlooks one key fact about the present case. Unlike the criminal cases [**67] he cites in which the court had to vacate the convictions

and remand for new trials in order to allow the trier of fact to consider the new evidence regarding the diminished credibility of the witness, here the trier of fact (the IRB) reconsidered the matter with full knowledge of Nash's new convictions for fraud and for lying to the government. After deliberation of the case in light of the new evidence regarding Nash's credibility, the IRB specifically affirmed its earlier decision. Thus, assuming without deciding [18] that the standard announced by the Seventh Circuit in *Taglia* applies to motions for post-judgment relief in civil cases, the outcome would be the same because IRB held that there was sufficient evidence apart from Nash's testimony to support its finding that Carey breached his fiduciary duty.

[**68] Carey's brief repeatedly asserts that Nash's testimony provides the only evidence against him. This argument, also made in his other appeal, ignores the extensive record and the findings of the IRB. Nash's testimony hardly provides the only evidence against

_____

[18] The question is the precise standard of proof required for Carey to succeed in his motion for post-judgment relief. While the IRB cited the standard adopted by district courts in dealing with *Rule 60(b)* motions based on alleged perjury, see *United States v. IBT, 179 F.R.D. 444, 447 (S.D.N.Y. 1998)*, both Carey and the district court note the criminal caselaw in which a convicted defendant later appeals on the grounds that perjured testimony was offered against him or her. In such criminal cases we have held that "where the newly discovered evidence is the existence of allegedly perjured testimony, the defendant must first demonstrate that perjury was in fact committed." *United States v. Torres, 128 F.3d 38, 49 (2d Cir. 1997)*, cert. denied, **523 U.S. 1065 (1998)**. Where perjury is established, the court must then consider the materiality of the perjury and its likely affect on the verdict had the evidence been made known to the trier of fact. See *United States v. White, 972 F.2d 16, 20 (2d Cir.)*, cert. denied, **506 U.S. 1026, 121 L. Ed. 2d 593, 113 S. Ct. 669 (1992)**. The level of materiality required by the movant depends on whether the prosecution knew or should have known of the perjury. See *Torres, 128 F.3d at 49*; *White, 972 F.2d at 21*. It is not entirely clear whether the standards set forth in the criminal cases are as exacting on the movant as that adopted by district courts in civil cases discussed *infra*.

We decline to address the precise standard required of Carey's *Rule 60(b)* motion, because, under either of the possible standards, Nash's alleged perjury is insufficiently material to require reversing the decision of the district court. See *White, 972 F.2d at 22* (declining to decide the level of materiality required for evidence of perjury to require a reversal of a conviction, because under either standard the decision would be the same).

Carey. Indeed, the IRB specifically held that the evidence before it, even excluding Nash's testimony, was sufficient to conclude that Carey breached his fiduciary duty and should be expelled from the union. The IRB stated:

> The disclosure of Nash's perjury as to the September 1996 rebilling scheme would not have altered our Decision. [*397] Nash's testimony concerning his telephone call, apparently on October 17, 1996, with Carey provided only one of several bases for our conclusion that Carey's fiduciary duties required him, under the circumstances, to inquire further concerning the relationship between the contributions to the advocacy groups and his own campaign fundraising. *The other bases for reaching that conclusion are themselves sufficient to support our findings.*

(emphasis added).

We have already detailed the other evidence supporting the IRB's determination that Carey breached his fiduciary duty. Carey's [**69] arguments contesting these findings have likewise already been addressed; they do not differ substantially in this appeal as opposed to the prior one.

Applying a deferential standard of review as we are required to do, we have considered Carey's and Hamilton's remaining arguments and have found them to be without merit. [19]

## V. CONCLUSION

We recognize the irony, indeed the poignancy, of this case in which a union leader, long pledged to internal reform, should be held accountable for corrupt practices. But the law requires no less. Union democracy, after all, is premised on fair elections. To that end, union officials, such as Carey and Hamilton, have a duty to ensure the integrity of that process and to fulfill their obligations to union members by adhering to the highest standards of governance. [**70]

_____

**End of Document**

_____

[19] Because we do not find that the case should be remanded to the IRB for further proceedings, we do not reach the merits of Carey's contention that on remand the case must be assigned to a different panel of the IRB.